UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEFENDERS OF WILDLIFE              )
1130 Seventeenth St., N.W.         )
Washington, D.C.  20036,           )
                                   )
THE HUMANE SOCIETY OF THE          )
UNITED STATES                      )
2100 L Street, N.W.                )
Washington, D.C. 20037,            )
                                   )    No.  05-2191 (PLF)
THE OCEAN CONSERVANCY              )
2029 K Street, N.W.                )
Washington, D.C. 20006,            )
                                   )
REGINA ASMUTIS-SILVIA,             )
3 Jacqueline Lane                  )
Plymouth, MA 02360,                )
                                   )
                Plaintiffs,        )
        v.                         )
                                   )
CARLOS GUTIERREZ, Secretary,       )
Department of Commerce             )
14th Street and                    )
Constitution Ave., N.W.            )
Washington, D.C. 20230,            )
                                   )
WILLIAM T. HOGARTH,                )
Assistant Administrator            )
for Fisheries                      )
National Marines Fisheries Service )
1335 East-West Highway             )
Silver Spring, MD 20910,           )
                                   )
MICHAEL CHERTOFF, Secretary        )
U.S. Department of                 )
Homeland Security                  )
Washington, D.C. 20528, and        )
                                   )
ADMIRAL THOMAS H. COLLINS,         )
Commandant                         )
United States Coast Guard          )
2100 Second Street, S.W.           )
Washington, D.C. 20593,            )
                                   )
                Defendants.        )

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.    This suit challenges the failure of two federal agencies to protect the critically imperiled North Atlantic right whale from collisions with marine vessels.  The remaining North Atlantic right whale population contains less than 300 individuals, and ship strikes are one of the two largest threats facing the species.  Of nine right whales deaths in the past two years, at least four resulted from ship strikes, and an additional whale found dead earlier this week also appears to have been a victim of such a collision.

2.    Neither the Department of Commerce's National Oceanic and Atmospheric Administration ("NOAA Fisheries"), nor the Department of Homeland Security's U.S. Coast Guard ("Coast Guard"), are taking the steps within their authority that are urgently required to ameliorate this problem by rerouting vessels out of right whale habitat or reducing the speed of vessels in these areas.

3.    In June 2004, NOAA Fisheries announced that it would adopt regulations to address these ship strikes.  More than a year later, however, after failing to take any meaningful steps toward promulgating such rules, the agency denied plaintiffs' Rulemaking Petition for emergency regulations setting reduced speeds for, or rerouting, marine vessels in right whale habitat.  In light of the agencies' recognition of the urgent need for these regulations, and its continuing failure to act, NOAA Fisheries' denial of the Rulemaking Petition is "arbitrary, capricious, an abuse of

2

discretion, or otherwise not in accordance with law," in violation of the Administrative Procedure Act ("APA").  5 U.S.C. § 706.

4.    The U.S. Coast Guard, which has primary responsibility for regulating commercial shipping in right whale habitat, has a statutory obligation under the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a)(2), to insure that commercial shipping does not jeopardize the continued existence of the North Atlantic right whale. By refusing to even consult with NOAA Fisheries regarding these impacts, the Coast Guard is violating the ESA, and is also acting in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the APA. 5 U.S.C. § 706.

5.    Finally, the ESA also requires that both of these agencies utilize their authorities to protect and conserve the North Atlantic right whale. 16 U.S.C. § 1536(a)(1).  By denying plaintiffs' Rulemaking Petition, and otherwise failing to take the steps necessary to protect and conserve the right whale, NOAA Fisheries and the Coast Guard are violating the ESA, and are acting in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the APA.  5 U.S.C. § 706.

## JURISDICTION

6.    This Court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(g) and 28 U.S.C. § 1331.

## PARTIES

### A.    Plaintiffs

7.    Plaintiff Defenders of Wildlife ("Defenders") is a national nonprofit organization with more than 500,000 members and supporters across the nation.  Defenders is dedicated to the protection and restoration of all native wild animals and plants in their natural communities.  Defenders is involved in numerous projects to further the protection of the North Atlantic right whale.

8.    Defenders brings this action on behalf of its members, some of whom who enjoy observing, photographing and appreciating North Atlantic right whales in the wild, and studying the species in its natural habitat.  The interests of Defenders' members in observing, studying and otherwise enjoying the North Atlantic right whale and its habitat are harmed by NOAA Fisheries and the Coast Guard's violations of the ESA and the APA, because, by failing to adopt necessary safeguards to protect right whales from ship strikes, and by instead taking actions that increase the likelihood of these collisions, the federal defendants are contributing to the depletion and eventual extinction of the species.

9.    Plaintiff The Humane Society of the United States ("HSUS") is a national animal protection organization with more than nine

million members and constituents. The HSUS is dedicated to protecting wild and domestic animals by actively opposing those projects, plans, and events which result in the cruel or inhumane treatment of animals. The HSUS is involved in numerous projects to further the protection of the North Atlantic right whale.

10.  The HSUS brings this action on behalf of its members, some of whom who enjoy observing, photographing and appreciating North Atlantic right whales in the wild, and studying the species in its natural habitat.  The interests of HSUS's members in observing, studying and otherwise enjoying the North Atlantic right whale and its habitat are harmed by NOAA Fisheries and the Coast Guard's violations of the ESA and the APA, because, by failing to adopt necessary safeguards to protect right whales from ship strikes, and by instead taking actions that increase the likelihood of these collisions, the federal defendants are contributing to the depletion and eventual extinction of the species.

11.  Plaintiff The Ocean Conservancy is a non-profit science-based environmental advocacy organization with over 150,000 members.  The Ocean Conservancy is dedicated to protecting marine wildlife species, including right whales and their habitats, and to conserving coastal and ocean resources.  To further its goals, The Ocean Conservancy conducts policy-oriented research, promotes public awareness, education, and citizen involvement in the conservation of marine wildlife and their habitats, and supports

5

domestic and international programs for the protection of these resources. The Ocean Conservancy is involved in numerous projects to further protection of the North Atlantic right whale.

12. The Ocean Conservancy brings this suit on behalf of its members, some of whom enjoy observing, photographing and appreciating North Atlantic right whales in the wild, and studying the species in its natural habitat. The interests of The Ocean Conservancy's members in studying and otherwise enjoying the North Atlantic right whale and its habitat are harmed by NOAA Fisheries and the Coast Guard's violations of the ESA and the APA, because, by failing to adopt necessary safeguards to protect right whales from ship strikes, and by instead taking actions that increase the likelihood of these collisions, the federal defendants are contributing to the depletion and eventual extinction of the species.

13. Plaintiff Regina Asmutis-Silvia, a resident of Plymouth, Massachusetts, has a Masters of Science in Biology, and has been involved in whale research, education and conservation for more than fifteen years. She is a member of the Atlantic Large Whale Take Reduction Team and the Stellwagen Bank National Marine Sanctuary Advisory Council. Mrs. Asmutis-Silvia enjoys observing, photographing and appreciating North Atlantic right whales in the wild, and studying the species in its natural habitat. Her interests in studying and otherwise enjoying the North Atlantic right whale and its habitat are harmed by NOAA Fisheries and the Coast Guard's

violations of the ESA and the APA, because, by failing to adopt necessary safeguards to protect right whales from ship strikes, and by instead taking actions that increase the likelihood of these collisions, the federal defendants are contributing to the depletion and eventual extinction of the species.

**B.    Defendants**

14.    Defendant Carlos Gutierrez is the Secretary of Commerce, and has ultimate responsibility for the programs of NOAA Fisheries.

15.    Defendant William T. Hogarth is the Assistant Administrator for Fisheries at NOAA Fisheries, the agency within the Department of Commerce which has been delegated the responsibility for implementing the MMPA and the ESA's provisions for species such as the North Atlantic right whale.

16.    Defendant Michael Chertoff is the Secretary of the Department of Homeland Security, and has ultimate responsibility for the programs of the U.S. Coast Guard.

17.    Defendant Admiral Thomas H. Collins is the Commandant of the U.S. Coast Guard, which regulates commercial shipping pursuant to the Ports and Waterways Safety Act, 33 U.S.C. § 1221, et seq.

## STATUTORY FRAMEWORK AND FACTS GIVING RISE TO PLAINTIFFS' CAUSES OF ACTION

**A.    Statutory and Regulatory Framework**

**1.    The Endangered Species Act**

18.  Reflecting an "explicit congressional decision to afford first priority to the declared national policy of saving endangered species," the ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tennessee Valley Authority v. Hill, 437 U.S. 153, 180, 185 (1978). Recognizing that certain species of plants and animals "have been so depleted in numbers that they are in danger of or threatened with extinction," 16 U.S.C. § 1531(a)(2), Congress enacted the statute to provide both "a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] a program for the conservation of such endangered species and threatened species . . . ." Id. § 1531(b).  The principal duties the Act imposes upon the Secretary of Commerce for marine species such as the North Atlantic right whale have been delegated to NOAA Fisheries.  50 C.F.R. § 222.101(a).

19.  Under the ESA, a species is listed as "endangered" where it is "in danger of extinction throughout all or a significant portion of its range ...."  16 U.S.C. § 1532(6).  The right whale has been listed as an endangered species since the ESA was originally enacted in 1973.

20.   Once listed, a species is entitled to a number of protections.  Of critical importance here are the requirements of Section 7 of the Act.  Id. § 1536.  Section 7(a)(2) requires all Federal agencies, in consultation with NOAA Fisheries, to "insure that any action[s] authorized, funded, or carried out" by such agencies are "not likely to jeopardize the continued existence of any endangered species [or] result in the destruction or adverse modification" of such species' designated critical habitat.  Id. § 1536(a)(2).  To start this process, the agency - called the "action agency" - must provide NOAA Fisheries with "the best scientific and commercial data available . . . for an adequate review of the effects" the agency's action, or the action it is approving, may have on listed species.  50 C.F.R. § 402.14(d).

21.   Once NOAA Fisheries has reviewed this and other information, that agency provides the action agency with a Biological Opinion ("BO") that details "how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3).  If the BO concludes that the action is likely to jeopardize the continued existence of the species, or result in the destruction or adverse modification of the species' critical habitat, NOAA Fisheries must suggest "reasonable and prudent alternatives which" if implemented, would prevent such a violation. Id.; 50 C.F.R. § 402.14(h)(3).

22.   In addition, the BO must include a statement detailing the amount and impact of any "take" of the listed species anticipated

from the proposed action; the "reasonable and prudent measures" the agency must undertake to minimize the impact of such take; in the case of marine mammals, such as the right whale, measures necessary to comply with the Marine Mammal Protection Act's restrictions on take; and the "terms and conditions" the agency must comply with to implement those measures. 16 U.S.C. § 1536(b)(4)(C); 50 C.F.R. § 402.14(i). Regardless of the outcome of the consultation process, it remains each agency's continuing obligation to "determine whether and in what manner to proceed with the action in light of its section 7 obligations . . . ." 50 C.F.R. § 402.15(a).

23. Section 7(a)(1) of the Act requires NOAA Fisheries to review the programs it administers and utilize them in furtherance of the purposes of the ESA. 16 U.S.C. § 1536(a)(1). This subsection also requires that the U.S. Coast Guard and all other federal agencies "utilize their authorities" to "carry[ ] out programs for the conservation of endangered species." Id.

24. Section 9 of the Act also broadly prohibits the "take" of any endangered species. Id. § 1538(a). Pursuant to this provision, it is illegal for anyone to "take" any individual member of such a species anywhere within the United States or the territorial sea of the United States, or upon the high seas, without a permit. Id. § 1538(a)(1); 50 C.F.R. §§ 17.21. The term "take" includes to "harass, harm, pursue . . . wound, kill [or] to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

25.  The Act authorizes enforcement for violations of these prohibitions, including authorizing NOAA Fisheries and the U.S. Coast Guard to promulgate particular regulations to protect against the take of listed species.  Id. § 1540(f).  The statute also requires that NOAA Fisheries take affirmative steps to protect and recover listed species, including that the agency formally designate and protect "critical habitat" for listed species, id. § 1533(a)(3), and "develop and implement plans . . . for the conservation and survival of listed species."  Id. § 1533(f)(1).

### 2.  __The Marine Mammal Protection Act__

26.  Recognizing that "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities," Congress passed the MMPA in 1972 to insure that they are "protected and encouraged to develop to the greatest extent feasible . . . to maintain the health and stability of the marine ecosystem."  16 U.S.C. § 1361.  The principal responsibilities that the Act imposes on the Secretary of Commerce are carried out by NOAA Fisheries.

27.  The MMPA provides several protections for marine mammals. The statute prohibits the unauthorized "take" of all marine mammals, including the North Atlantic right whale.  Id. § 1372(a).  To "take" under the MMPA includes to "harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill, any marine mammal." Id. § 1362(13).

28.   In addition, in order to protect marine mammals from take, the MMPA requires that NOAA Fisheries, "in consultation with any other Federal agency to the extent that such agency may be affected, shall prescribe such regulations are necessary and appropriate to carry out the purposes of this subchapter." Id. § 1382(a).  The statute further provides that all other agencies, including the U.S. Coast Guard, are "directed to cooperate with [NOAA Fisheries] in such manner as may be mutually agreeable, in carrying out the purposes of this subchapter." Id. § 1382(b).

### 3.   **The Ports and Waterways Safety Act**

29.   Finding that "navigation and vessel safety and protection of the marine environment are matters of major national importance," and that "increased vessel traffic in the Nation's ports and waterways create substantial hazards to life, property and the marine environment," Congress passed the Ports and Waterways Safety Act ("PWSA") to, *inter alia*, protect the "marine environment." 33 U.S.C. § 1221.  The PWSA authorizes the Coast Guard to regulate marine vessels in several ways.

30.   First, the Coast Guard is authorized to operate and maintain "vessel traffic services" ("VTS"), which consist of "measures for controlling or supervising vessel traffic or for protecting navigation of the marine environment." Id. § 1223(a)(1).  These measures "may include, but need not be limited to . . . routing systems and fairways," id., and, once established, a VTS "may issue directions

12

to control the movement of vessels in order to minimize the risk

of collision between vessels, or damage to property or the

environment."  33 C.F.R. § 161.1(b).

31.  Second, the Coast Guard is authorized to "control vessel

traffic in areas" which the agency "determines to be hazardous" by

"specifying times of entry, movement, or departure"; "establishing

vehicle traffic routing schemes;" "establishing vessel size, speed,

draft limitations and vessel operating conditions"; or "restricting

operations, in any hazardous area . . . ."  33 U.S.C. § 1223(a)(4).

32.  Third, the Act provides that the Coast Guard "shall

designate necessary fairways and traffic separation schemes ("TSS")

for vessels operating in the territorial sea of the United States,"

"[i]n order to provide safe access routes for the movement of vessel

traffic . . . ."  Id. § 1223(c).  TSSs are a "routing measure which

is aimed at the separation of opposing streams of traffic by

appropriate means and by the establishment of traffic lanes."  33

C.F.R. § 167.5(b).

33.  As one component of setting TSS, the Coast Guard may

designate an "area to be avoided," which is an "area within defined

limits in which either navigation is particularly hazardous or it

is exceptionally important to avoid casualties and which should be

avoided by all ships or certain classes of ships."  33 C.F.R. §

167.5(a).  It may also designate a "precautionary area," which is

13

a "routing measure comprising an area within defined limits where ships must navigate with particular caution . . . ." Id. § 167.5(e).

34.  Before designating TSS, the Coast Guard is required to prepare a Port Access Route Study ("PARS") to consider the "potential traffic density and the need for safe access routes . . . ." 33 U.S.C. § 1223(c)(3)(A).  In undertaking the PARS, the Coast Guard also "shall," "in consultation with" other agencies including "the Secretary of Commerce," take into account "all other uses of the area under consideration."  Id. § 1233(c)(3)(B).

35.  In establishing each of these regulatory schemes, the PWSA requires that the Coast Guard "take into account all relevant factors concerning navigation and vessel safety and protection of the marine environment," including, *inter alia*, "any other potential or actual conflicting activity" and "environmental factors."  Id. § 1224(a).

36.  After TSS or other measures have been established, the PWSA authorizes the Coast Guard to "adjust the location or limits of designated fairways or traffic separation schemes, in order to accommodate other users which cannot be reasonably accommodated otherwise."  Id. § 1223(c)(5)(C).  The statute also directs that the Coast Guard "shall issue, and may from time to time amend or repeal, regulations necessary to implement this chapter."  Id. § 1231(b).

14

B.    __Relevant Facts__

    1.    __The North Atlantic Right Whale__

    37.   The North Atlantic right whale (*Eubalaena glacialis*) is one of the rarest of the large whales worldwide.  Once prized for its baleen and oils, the right whale received its ironic name because early whalers found these slow moving leviathans the "right" whale to hunt.  Over a thousand years of commercial whaling nearly drove the species to extinction by the early twentieth century.

    38.   Adult right whales typically measure between forty-five and fifty-five feet, and can weigh over seventy tons.  Right whales, which are generally black, are known for their stocky body, lack of a dorsal fin, large head, and broad, deeply notched tail with a smooth trailing edge.  The right whale primarily feeds on zooplanktons, often by skimming along the surface of water with its mouth open, filtering prey through its baleen.

    39.   The North Atlantic right whale was comprised of two separate populations.  The western population, which inhabits the waters off the East coast of the United States and Canada, today contains approximately three hundred individuals.  The eastern population, which was once found from the coast of northern Europe to the northwest coast of Africa, is already nearly, if not completely, extinct.

    40.   North Atlantic right whales are most often found in coastal or shelf waters, although movements over much deeper waters

have been documented.  In the western North Atlantic, the majority of right whales are found in higher latitude feeding and nursery grounds largely in New England waters, including the Great South Channel to the east of Cape Cod, Massachusetts Bay and Cape Cod Bay, and north to the Bay of Fundy and Scotian Shelf where they may be found from late winter through fall.  It is unknown where much of the population spends the winter, although a portion moves to calving grounds off the coast of Georgia and Florida.  Individuals have also been documented transiting between the Gulf of Maine and the southeastern U.S. during the winter months.

41.  The right whale has been protected as an "endangered" species for over thirty-five years - listed as "endangered" first under the Endangered Species Conservation Act in June 1970, see 35 Fed. Reg. 8495 (Jun. 2, 1970), and subsequently under the ESA. See 50 C.F.R. § 17.11.  The right whale is also designated as "depleted" under the MMPA.

42.  In a 2003 Stock Assessment, NOAA Fisheries' estimated that there were fewer than 300 North Atlantic right whales remaining, and concluded that the population is declining.  Recently published estimates by leading right whale experts indicate that the average number of whales dying each year could be in excess of 14 animals, which includes those dead whales that are not found.  This represents an annual four percent population loss.  Because it takes female right whales nine to ten years to reach reproductive maturity, and

they give birth to only one calf approximately every four years, these losses have led to a marked decrease in the reproductive capacity of the population.  As a result, the population is unable to reproduce fast enough to offset annual losses, and this contributes to a decline in the population.

43.  Given these statistics and trends, NOAA Fisheries explained in its recent Right Whale Recovery Plan that "[t]here is reason for serious concern about the future of North Atlantic right whales." As NOAA Fisheries has stated elsewhere, given the species' "low population size and their poor reproductive rate, the loss of even one northern right whale . . . may reduce appreciably the likelihood of both survival and recovery of this species."

44.  NOAA Fisheries has designated "critical habitat" - i.e., habitat that is "essential to the conservation of the species," id. § 1532(5)(A)(i) - for the North Atlantic right whale in three areas: 1) coastal Florida and Georgia (Sebastian Inlet, Florida to the Altamaha River, Georgia); 2) the Great South Channel (east of Cape Cod); and 3) Cape Cod and Massachusetts Bays.  59 Fed. Reg. 28793 (Jun. 3, 1994); codified at 50 C.F.R. § 226.203.

### 2.  The Role Of Ship Strikes In The Right Whale's Decline

45.  A major factor in the recent decline of the North Atlantic right whale is collisions with commercial ships.  Right whales regularly inhabit waters traversed by thousands of ships making hundreds of thousands of port calls in the United States annually.

As NOAA Fisheries explained in its recent Recovery Plan, "[t]he greatest known current cause of right whale mortality in the western North Atlantic is collision with ships." Of all known right whale deaths since 1986, over thirty-five percent have been due to ship strikes.

46.  While several factors - including the species' feeding, resting, and socializing behaviors - appear to make right whales particularly vulnerable to ship strikes, the high density of shipping traffic in right whale habitat significantly increases the threat to the species.

47.  Although ship strikes have been a major issue for many years, the problem appears to have only grown worse recently. Since January 2004, there have been at least nine recorded North Atlantic right whale deaths.  Of these nine, four have been confirmed to have died subsequent to ship strikes, and a fifth dead whale – only a month old – was discovered several days ago with large propeller marks that NOAA Fisheries has acknowledged "strongly suggest[s] the animal died from a vessel collision."  Another whale died by entanglement in commercial fishing gear; three more died from unknown causes; and an additional whale was mortally injured by a vessel off the coast of Georgia in March of 2005. Of the deaths from unknown causes, the bodies of two of the animals were not recovered and ship strikes cannot be ruled out as a cause of death.  At least one other whale was also reportedly injured by ship strikes during this period.

48.  These losses are particularly devastating because at least six of these whales were reproductively-mature females, and three of them were pregnant and carrying near-term female calves at the time of their death.  The loss of this many reproductive females in such a short period of time is unprecedented in the last quarter century.

### 3.  NOAA Fisheries' And The Coast Guard's Failure To Take Action To Address This Crisis

49.  NOAA Fisheries and the Coast Guard both have the authority to address ship strikes by imposing regulatory measures to reroute vessels in right whale habitat or insure that vessels traveling these areas proceed in a slow, safe manner designed to minimize the chances of a collision with a right whale.  Neither agency is properly exercising this authority, and as a result right whales continue to die from these collisions.

### a.  NOAA Fisheries' Failure To Act

50.  In 1999 NOAA Fisheries implemented a reporting mechanism meant to reduce ship strikes.  This "ship strike reduction program" provides information to ships regarding whale sighting locations, and relies on the shippers to voluntarily use that information to avoid striking whales.  The recent spate of ship strikes has occurred despite this reporting program.

51.  Recognizing that "this complex problem requires additional more pro-active measures to reduce or eliminate the threat of ship

19

strikes to right whales," 69 Fed. Reg. 30857, 30858 (June 1, 2004),
in June 2004 - almost a year-and-a-half ago - NOAA Fisheries published
an Advance Notice Of Proposed Rulemaking ("ANPR") for Right Whale
Ship Strike Reduction.

52.   In the ANPR, NOAA Fisheries acknowledged the urgency for
additional regulations, noting that present population models
indicate that the loss of "even a single individual may contribute
to the extinction of the species." To address this admitted crisis,
NOAA Fisheries stated that it intends to adopt regulations to
designate routes, and/or impose speed restrictions, in areas
frequented by right whales in order to reduce ship strikes. Since
the publication of the ANPR, at least five right whales have been
killed and others seriously injured by ship strikes.

### i.   Plaintiffs' Rulemaking Petition to NOAA Fisheries

53.   Despite NOAA Fisheries' recognition that new regulations
are urgently needed to address ship strikes, almost a year after
the ANPR the agency had not proposed any specific rules for public
comment or taken any further regulatory action. To move this process
forward, in May 2005, plaintiffs and other groups submitted a formal
Rulemaking Petition to NOAA Fisheries seeking emergency regulations
to reduce the risk of ship strikes.

54.   Petitioners requested, pursuant to the APA, 5 U.S.C.
§ 553(e), that the Department of Commerce and NOAA Fisheries act
immediately, under the ESA and the MMPA, to implement emergency

regulations to protect this critically endangered species.  Relying
heavily on measures NOAA Fisheries itself has already recognized
are necessary, petitioners described precisely what these
regulations must include.

55.  Specifically, petitioners requested that emergency
regulations be implemented "to slow and/or re-route vessels within
right whale habitat, as a means of protecting the species until such
time as permanent measures can be enacted."  The Petition requested
that "[s]uch emergency regulations should require all ships entering
and leaving all major East Coast ports to travel at speeds of twelve
knots or less within twenty-five nautical miles of port entrances
during expected right whale high use periods."

56.  In light of the specific time period when right whales
are likely to be found in particular areas, the Petition requested
that these measures should be in place between November 1st and April
30th for all ports from Florida north to Rhode Island; between January
1st and May 31st in the area of Cape Cod Bay; and between January
1st and July 31st in the area of the Great South Channel.  The Petition
also requested that, "given the high seasonal right whale aggregation
in the area, similar speed restrictions should be placed on all ships
traveling in the Boston Traffic Separation Scheme" between January
1st and July 31st, and that "all vessels traveling within right whale
critical habitat during the seasonal high use times should be required
to proceed at 12 knots or slower, or avoid the area altogether."

57.   Finally, the Petition requested that NOAA Fisheries "institute dynamic management areas to protect whales outside of the times and areas described above.[] This dynamic management system should require the re-routing of vessels and/or operation at speeds of 12 knots or slower, when aggregations of whales are found in areas where other protective measures are not in place."

58.   A month after receiving the Rulemaking Petition, in June 2005, NOAA Fisheries published a Notice of Intent to prepare an Environmental Impact Statement ("EIS"), pursuant to the National Environmental Policy Act ("NEPA") 42 U.S.C. § 4321, et seq., concerning the potential ship strike regulations. 70 Fed. Reg. 36,121 (2005).  Although NOAA Fisheries once again recognized that "the loss of even an individual animal has measurable effects that may contribute to the extinction of the species," id., the agency explained that it intends to prepare a full-blown EIS before implementing any mandatory ship strike avoidance requirements - a process that typically takes agencies several years to complete. The NOI contained no timetable for either completion of the EIS, or for implementing regulations.

### ii. NOAA Fisheries' Denial of the Rulemaking Petition

59.   On September 29, 2005, NOAA Fisheries formally denied plaintiffs' Rulemaking Petition.  70 Fed. Reg. 56,884 (2005).  In its denial Notice, NOAA Fisheries neither disagreed that regulations to curtail ship strikes are urgently needed, nor that the specific

regulations requested in the Petition would be both effective and appropriate to address the problem in the short-term.  Instead of addressing the merits of the Petition, NOAA Fisheries claimed that it was denying the Petition because emergency regulations would "duplicate agency efforts" being devoted to permanent regulations to be adopted once the EIS is complete, and because the agency is "enhancing its non-regulatory [i.e., voluntary] measures to reduce ship strikes."

60.  The denial Notice set forth no evidence to suggest that "enhanced" voluntary measures would be any more successful in addressing the ship strike crisis than past measures.  The Notice also failed to explain why emergency regulations could not be put in place far more rapidly than permanent regulations, thus reducing the risks of ship strikes while permanent regulations are being developed.

61.  Although, in a separate letter to plaintiffs responding to the Petition, NOAA Fisheries had stated that the agency expected to issue a Draft EIS, and proposed implementing regulations, by early 2006, the Federal Register Notice formally denying the Petition omitted any reference to this or any other timetable for completing the rulemaking process.  Even the letter to plaintiffs, which was sent on September 14, 2005, gave no indication when regulations would be adopted in final form.

62.  On information and belief, NOAA Fisheries has no firm and expeditious timetable for the adoption of ship strike regulations to protect the critically imperiled North Atlantic right whale from extinction due to collisions with marine vessels.

**b.   The Coast Guard's Similar Failure to Act**

63.  The Coast Guard has established numerous TSS in right whale habitat, including (1) In the Approaches to Chesapeake Bay; (2) Off Delaware Bay; (3) Off New York; (4) In the Approaches to Narragansett Bay, R.I. and Buzzards Bay, Mass.; (5) In the Approach to Boston, Mass.; and (6) In the Approaches to Portland, Maine.

64.  The Coast Guard's designation of shipping lanes concentrates vessels in areas used by right whales.  At one point in the Fall of 2005 nearly one-third of the known right whale population was observed near the Boston TSS.  Consequently, ship strikes routinely occur in, or in close proximity to, designated shipping lanes.  The concentration of vessels in shipping lanes also has adverse impacts on right whale habitat by increasing underwater sea noise and pollution, and disrupting prey distribution.

65.  In the past several years, the Coast Guard has undertaken several new PARS, and has modified TSS and other measures for vessel traffic in these areas.  In 2000 the Coast Guard completed a TSS for the Approaches to Delaware Bay, 65 Fed. Reg. 12,944 (2000); in 2003 the agency initiated a PARS for the Approaches to Narragansett Bay and Buzzards Bay, 68 Fed. Reg. 74,199 (2003); in 2003 it completed

a PARS for the Approaches to Chesapeake Bay, 69 Fed. Reg. 3,869 (2004;
and in 2005 the Coast Guard initiated a PARS for the Approaches to
Portland, Maine.  70 Fed. Reg. 7,067 (2005).

66.  In none of these PARS, TSS or other regulatory mechanisms,
has the Coast Guard set vessel routes or operating conditions in
order to protect right whales from ship strikes.  In addition, in
none of these processes did the Coast Guard consult with NOAA
Fisheries under Section 7 of the ESA regarding the impacts of these
measures on North Atlantic right whales.

67.  In May 2005, NOAA Fisheries requested that the Coast Guard
include in its Notice to Mariners an announcement regarding the
presence of right whales along the eastern seaboard, and a reminder
that vessels must travel at slow, safe speeds while in areas used
by right whales - specifically, less than 12 knots.  The Coast Guard
refused to take even this simple step to further protect right whales.

68.  In 2004, Congress directed the Coast Guard to cooperate
with NOAA Fisheries in "analyzing potential vessel routing measures
for reducing vessel strikes of North Atlantic Right Whales."  Coast
Guard and Maritime Transportation Act of 2004, Pub. Law 108-293,
§ 626.  Congress further directed that the Coast Guard provide a
Report to Congress on the results of its analysis by February 2006.

69.  In response to this directive, in February 2005 the Coast
Guard initiated PARSs "to analyze potential vessel routing measures
and consider adjusting existing vessel routing measures in order

to reduce vessel strikes of the highly endangered" right whale. 70 Fed. Reg. 8,312 (2005). The Notice indicated that these PARSs will only address a portion of the areas where ships travel in right whale habitat.

70. According to the Notice, these PARSs were supposed to be completed by September 2005. On information and belief, no PARS has yet been completed. In addition, on information and belief the Coast Guard has not consulted with NOAA Fisheries under Section 7 of the ESA regarding these PARSs.

### 4. Plaintiffs' 60-Day Notice Letter

71. In light of the Coast Guard's failure to consult with NOAA Fisheries regarding its regulation of commercial shipping in right whale habitat, on November 3, 2005, plaintiffs sent the agency a sixty-day notice letter, pursuant to Section 11 of the ESA. 16 U.S.C. § 1540(g).

72. In that letter, plaintiffs explained that the Coast Guard is violating ESA Section 7(a)(2) by failing to consult with NOAA Fisheries regarding the impacts of the commercial shipping it regulates on right whales, and therefore failing to insure that this vessel traffic is not likely to jeopardize the continued existence of the species. Id. § 1536(a)(2). Plaintiffs further explained that, because the Coast Guard regulates shipping in right whale critical habitat, such as the Boston TSS, which transects the Great South Channel critical habitat area, the agency is also violating

26

its Section 7(a)(2) duty to consult with NOAA Fisheries in order to avoid "adverse[ ] modif[ication]" to critical habitat.  Id.

73.    The letter further explained that the Coast Guard is violating its separate obligation under ESA Section 7(a)(1), id. § 1536(a)(1), to carry out programs for the conservation of the right whale.  These would include, *inter alia*, using its authority under the PWSA to (a) "control the movement of vessels in order to minimize the risk of [ ] damage to [ ] the environment," 33 C.F.R. § 161.1(b); (b) "control vessel traffic in areas" the agency "determines to be hazardous," such as imposing speed restrictions, 33 U.S.C. § 1223(a)(4); or (c) designate "areas to be avoided" or "precautionary areas" to protect right whales. 33 C.F.R. § 167.5.

74.    Finally, plaintiffs notified the Coast Guard that the agency was violating Section 9 of the ESA by authorizing commercial shipping that "takes" right whales.  16 U.S.C. § 1538. In particular, the letter explained that because commercial vessels regulated by the Coast Guard continue to take right whales, by establishing and maintaining these vessels' shipping lanes, and regulating the manner in which these ships operate in these lanes and elsewhere, the agency is responsible for the "take" of these animals under the ESA.

75.    The Coast Guard has not responded to plaintiffs' notice letter.

## PLAINTIFFS' CLAIM FOR RELIEF

### CLAIM ONE

(NOAA Fisheries)

76.  By acknowledging the urgent need for regulations to protect North Atlantic right whales from ship strikes, but failing either to grant plaintiffs' petition for emergency regulations, or to adopt a firm and expeditious timetable for the promulgation of permanent regulations, NOAA Fisheries' denial of plaintiff's Rulemaking Petition is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the APA. 5 U.S.C. § 706(2)(a).

77.  By failing to grant plaintiffs' Rulemaking Petition and thereby using its authorities to protect and recover the North Atlantic right whale, NOAA Fisheries is violating Section 7(a)(1) of the ESA, 16 U.S.C. § 1536(a)(1), and Section 1382(a) of the MMPA, 16 U.S.C. § 1382(a), and is otherwise acting in a manner which is arbitrary and capricious and contrary to law in violation of the APA.  5 U.S.C. § 706.

78.  These legal violations are injuring plaintiffs in the manner described in paragraphs 7-13 above.

### CLAIM TWO

(Coast Guard)

79.  By failing to consult with NOAA Fisheries regarding activities undertaken and authorized by the Coast Guard which may

affect North Atlantic right whales or modify its critical habitat, the Coast Guard is failing to ensure that its actions are not likely to jeopardize the continued existence of the species or result in adverse modification of the species' critical habitat, in violation of Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), and is acting in a manner which is arbitrary and capricious and contrary to law in violation of the APA, 5 U.S.C. § 706.

80.   By failing to use its authorities to protect and recover the North Atlantic right whale, the Coast Guard is violating Section 7(a)(1) of the ESA, 16 U.S.C. § 1536(a)(1), and is acting in a manner which is arbitrary and capricious and contrary to law in violation of the APA, 5 U.S.C. § 706.

81.   By requiring commercial vessels to travel within TSS often inhabited by North Atlantic right whales, which in turn may increase the frequency of ship strikes that harm, harass and kill these animals, the Coast Guard is "taking" the species in violation of Section 9 of the ESA, 16 U.S.C. § 1538, and is acting in a manner which is arbitrary and capricious and contrary to law in violation of the APA, 5 U.S.C. § 706.

82.   These legal violations are injuring plaintiffs in the manner described in paragraphs 7-13 above.

29

Wherefore, plaintiffs respectfully request that this Court:

(1) declare that defendants have violated the ESA and the APA;

(2) set aside and remand NOAA Fisheries' September 29, 2005 denial of plaintiffs' Rulemaking Petition, with directions to make a new decision on the Rulemaking Petition in accordance with the Court's ruling within thirty (30) days;

(3) direct that, should NOAA Fisheries grant the Petition, the agency shall issue emergency regulations to protect North Atlantic right whales from ship strikes within sixty (60) days;

(4) order the Coast Guard and NOAA Fisheries to enter into consultation under Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), regarding the impacts of commercial shipping on North Atlantic right whales;

(5) direct that this consultation be completed within ninety (90) days, and that NOAA Fisheries issue a Biological Opinion within forty-five (45) days thereafter;

(6) direct the defendants to comply with Section 7(a)(1) of the ESA, 16 U.S.C. § 1536(a)(1), and with the MMPA, 16 U.S.C. § 1382, by promulgating regulations and otherwise utilizing their authorities to carry out programs for the conservation and recovery of the North Atlantic right whale;

(7) enjoin the Coast Guard from authorizing activities that "take" North Atlantic right whales in violation of the ESA;

(8)  award plaintiffs their costs, attorneys' fees, and other disbursements for this action, including any expert witness fees; and

(9)  grant plaintiffs such other and further relief as this Court may deem just and proper.

                    Respectfully submitted,


                    Howard M. Crystal (D.C. Bar No. 446189)
                    Eric R. Glitzenstein (D.C. Bar No. 358287)

                    Meyer Glitzenstein & Crystal
                    1601 Connecticut Ave., N.W., Suite 700
                    Washington, D.C.  20009
                    (202) 588-5206

                    Of Counsel:

                    Michael P. Senatore (D.C. Bar No. 453116)
                    Andrew Hawley (Cal. Bar No. 229274)
                    Defenders of Wildlife
                    1130 Seventeenth Street, N.W.
                    Washington, D.C.  20036

                    Attorneys for Plaintiffs

January 12, 2006