UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

—————————————————————

| | ) | |
|---|---|---|
| Defenders of Wildlife, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No.  05-2191 (PLF) |
| | ) | |
| v. | ) | |
| | ) | |
| Carlos Gutierrez, et al., | ) | |
| | ) | |
| Defendants. | ) | |

—————————————————————

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiffs hereby move for

summary judgment.  For the reasons fully set forth in the accompanying memorandum, there are

no genuine issues of material fact in dispute, and plaintiffs are entitled to judgment as a matter of

law.  In support of this motion, plaintiffs hereby submit the accompanying Memorandum of Law,

a Proposed Order, a Statement of Materials Facts as to Which There is no Genuine Issue, and

Plaintiffs' Exhibits 1-33.

Respectfully submitted,

—————— /s/ ——————

Of Counsel:

Michael P. Senatore (D.C. Bar No. 453116)
Andrew Hawley (Cal. Bar No. 229274)
Defenders of Wildlife
1130 Seventeenth Street, N.W.
Washington, D.C.  20036

Howard M. Crystal
(D.C. Bar No. 446189)
Eric R. Glitzenstein
(D.C. Bar. No. 358287)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C.  20009
(202) 588-5206

June 2, 2006

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| Defenders of Wildlife, <u>et al.</u>,    ) | |
|                                   ) | |
|     Plaintiffs,              ) | No.  05-2191 (PLF) |
|                                   ) | |
|     v.                        ) | |
|                                   ) | |
| Carlos Gutierrez, <u>et al.</u>,     ) | |
|                                   ) | |
|     Defendants.         ) | |
| _____ ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

Howard M. Crystal  (D.C. Bar No. 446189)
Eric R. Glitzenstein (D.C. Bar. No. 358287)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C.  20009
(202) 588-5206

Of Counsel:

Michael P. Senatore (D.C. Bar No. 453116)
Andrew Hawley (Cal. Bar No. 229274)
Defenders of Wildlife
1130 Seventeenth Street, N.W.
Washington, D.C.  20036

June 2, 2006                          Attorneys for Plaintiffs

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

GLOSSARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.      STATUTORY FRAMEWORK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.      The Marine Mammal Protection Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B.      The Endangered Species Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        C.      The Ports and Waterways Safety Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.     RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        A.      The Critically Imperiled North Atlantic Right Whale . . . . . . . . . . . . . . . . . . . . 9

        B.      The Gravest Threat Presently Facing The Species: Ship Strikes . . . . . . . . . . . . . 13

        C.      The Coast Guard's Regulation of Shipping in Right Whale Habitat . . . . . . . . . . 15

        D.      NMFS's Unfulfilled Promise To Take Action To
                Protect Right Whales From Ship Strikes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        E.      Plaintiffs' Petition For Emergency Regulations . . . . . . . . . . . . . . . . . . . . . . . . 19

        F.      NMFS's Denial of The Rulemaking Petition And The Present Lawsuit . . . . . . . 20

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

I.      THE DENIAL OF PLAINTIFFS' PETITION FOR EMERGENCY
        REGULATIONS WAS ARBITRARY AND CAPRICIOUS. . . . . . . . . . . . . . . . . . . . . 24

II.     BY FAILING TO CONSULT WITH NMFS CONCERNING THE IMPACTS
        OF SHIPPING ON RIGHT WHALES, THE COAST GUARD IS VIOLATING
        SECTION 7(A)(2) OF THE ESA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

III.    BY FAILING TO USE THEIR AUTHORITIES AND PROGRAMS TO
        PROTECT AND RECOVER THE NORTH ATLANTIC RIGHT WHALE,
        NMFS AND THE COAST GUARD ARE BOTH VIOLATING
        SECTION 7(A)(1) OF THE ESA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

IV.     APPROPRIATE RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

        A.    NMFS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

        B.    Coast Guard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                        **PAGE**

*American Horse Protection Association v. Lyng,
  812 F.2d 1 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,
  515 U.S. 687 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

In re Bluewater Network,
  234 F.3d 1305 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

*Citizens to Preserve Overton Park v. Volpe,
  401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

City of Las Vegas v. Lujan,
  891 F.2d 927 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

Common Cause v. FEC,
  692 F. Supp. 1391 (D.D.C. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24, 32

Defenders of Wildlife v. Administrator, Environmental Protection Agency,
  882 F.2d 1294 (8th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

Defenders of Wildlife v. Andrus,
  428 F. Supp. 167 (D.D.C. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

Defenders of Wildlife v. Babbitt,
  130 F. Supp. 2d 121 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

Defenders of Wildlife v. Babbitt,
  958 F. Supp. 670 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

Defenders of Wildlife v. EPA,
  420 F.3d 946 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

Ethyl Corp. v. EPA,
  541 F.2d 1 (D.C. Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Authorities upon which plaintiffs
 chiefly rely are marked with an asterisk          iii

Florida Key Deer v. Stickney,
    864 F. Supp. 1222 (S.D. Fla. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 38

Forest Guardians v. U.S. Forest Service,
    370 F. Supp. 2d 978 (D. Ariz. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Fox Television Stations, Inc. v. F.C.C.,
    280 F.3d 1027 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Fund For Animals v. Babbitt,
    903 F. Supp. 96 (D.D.C. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Geller v. Federal Communications Commission,
    610 F.2d 973 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service,
    378 F.3d 1059 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Hammon v. Norton,
    370 F. Supp. 2d 226 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Japan Whaling Association v. American Cetacean Society,
    478 U.S. 221 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Jifry v. Federal Aviation Administration,
    370 F.3d 1174 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Loggerhead Turtle v. Council of Volusia Cty., Fla.,
    148 F.3d 1231 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 40

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.
    463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

National Wildlife Federation v. Brownlee,
    402 F. Supp. 2d 1 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Authorities upon which plaintiffs
  chiefly rely are marked with an asterisk     iv

National Wildlife Federation v. FEMA,
    345 F. Supp. 2d 1151 (W.D. Wash. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

Natural Resources Defense Council v. Daley,
    209 F.3d 747 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

Natural Resources Defense Council v. Houston,
    146 F.3d 1118 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

PPL Wallingford Energy LLC v. FERC,
    419 F.3d 1194 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

Pacific Rivers Council v. Brown,
    No. 02-243-BR, 2002 WL. 32356431 (D. Or. Dec. 23, 2002)  . . . . . . . . . . . . . . . . . .  39

Pacific River Council v. Thomas,
    30 F.3d 1050 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

Palila v. Hawaii Department of Land & Natural Resources,
    639 F.2d 495 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

Pyramid Lake Paiute Tribe of Indians v. U.S. Department of Navy,
    898 F.2d 1410 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26, 43

SEC v. Chenery Corp.,
    332 U.S. 194 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

Sierra Club v. Flowers,
    423 F. Supp. 2d 1273 (S.D. Fla. 2006)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

Sierra Club v. Glickman,
    156 F.3d 606 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

Sierra Club v. Yeutter,
    926 F.2d 429 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

Strahan v. Coxe,
    127 F.3d 155 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

*Authorities upon which plaintiffs
 chiefly rely are marked with an asterisk     v

*<u>Strahan v. Linnon,</u>
    967 F. Supp. 581 (D. Mass. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*<u>TVA v. Hill,</u>
    437 U.S. 153 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5, 30

<u>Thomas v. Peterson,</u>
    753 F.2d 754 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

<u>Turtle Island Restoration Network v. NMFS,</u>
    340 F.3d 969 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

<u>United States v. Monsanto,</u>
    491 U.S. 600 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

<u>United States v. Town of Plymouth, Mass.,</u>
    6 F. Supp. 2d 81 (D. Mass. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

*<u>Washington Toxics Coalition v. EPA,</u>
    413 F.3d 1024 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 40, 45

<u>Waterwatch of Oregon v. U.S. Army Corps of Engineers,</u>
    No. 99-861-BR, 2000 WL 1100059 (D. Or. June 7, 2000) . . . . . . . . . . . . . . . . . . . . .  42

## FEDERAL STATUTES

5 U.S.C. § 553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 44

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 23, 43

16 U.S.C. § 1361 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

16 U.S.C. § 1372(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

16 U.S.C. § 1382(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 42

16 U.S.C. § 1386 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Authorities upon which plaintiffs
 chiefly rely are marked with an asterisk          vi

16 U.S.C. § 1401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

16 U.S.C. § 1402(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

16 U.S.C. § 1531(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

16 U.S.C. § 1532(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

16 U.S.C. § 1533(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

16 U.S.C. § 1536(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

16 U.S.C. § 1536(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

16 U.S.C. § 1536(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

33 U.S.C. § 1221 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

33 U.S.C. § 1223(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

33 U.S.C. § 1223(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

33 U.S.C. § 1224(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

42 U.S.C. § 4321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

**FEDERAL REGULATIONS**

33 C.F.R. § 167.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

33 C.F.R. § 167.15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

33 C.F.R. Part 167, Subpart B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

50 C.F.R. § 17.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

50 C.F.R. § 222.102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 37

50 C.F.R. § 226.203 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

50 C.F.R. § 402.01(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

50 C.F.R. § 402.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 33, 38, 45

## GLOSSARY

| | |
|---|---|
| ANPR | Advance Notice of Proposed Rulemaking |
| APA | Administrative Procedure Act |
| AR | Administrative Record Document |
| BA | Biological Assessment |
| Bi-Op | Biological Opinion |
| BN | Administrative Record Document Bates Number |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| MMC | Marine Mammal Commission |
| MMPA | Marine Mammal Protection Act |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service (also called "NOAA Fisheries") |
| PARS | Port Access Route Study |
| PBR | Potential Biological Removal Level |
| PWSA | Ports and Waterways Safety Act |
| TSS | Coast Guard Traffic Separation Scheme |

**INTRODUCTION**

This case concerns the failure of two federal agencies, the National Marine Fisheries Service ("NMFS") and the United States Coast Guard ("Coast Guard"), to take the steps that are immediately necessary to protect one of the most imperiled large whale species in the world today – the North Atlantic right whale – from the deadly threat posed by collisions with marine vessels traveling at unsafe speeds.  See Plaintiffs' Exhibits ("Pl. Ex.") 1 and 2 (photographs). Although, within the past two and one-half years alone, at least nine North Atlantic right whales – *out of a total remaining population of less than 300 individuals* – have died, including 6 reproductively mature females, three of whom were pregnant, and although there is no dispute that reducing ship speeds and implementing other measures to avoid ship strikes is critical to stemming this ongoing slaughter, *neither NMFS nor the Coast Guard has put these measures into immediate effect*.

To the contrary, although NMFS has recognized the need for these measures for more than five years, and issued an Advance Notice of Proposed Rulemaking for a ship strike reduction strategy ("Strategy") *two years ago*, it has made no further regulatory progress.   See Advance Notice of Proposed Rulemaking For Right Whale Ship Strike Reduction ("ANPR") (69 Fed. Reg. 30,857 (2004)) (NMFS AR 20, at BN 468) (Pl. Ex. 3).  Instead, the agency withdrew a draft Environmental Assessment and decided to prepare a full blown Environmental Impact Statement ("EIS") on the Strategy, and has not even yet issued a *Draft* EIS for public comment.[1]

---

[1]     Defendants have produced two separate bates numbered Administrative Records ("AR") – one for NMFS, which is divided into documents, and to which plaintiffs will refer by document number and bates number (i.d., NMFS AR _, at BN _), and one for the Coast Guard, which

In light of the sheer length of time it will take to complete an EIS as well as a complete rulemaking process (asssuming that it is ever brought to completion), plaintiffs submitted a Rulemaking Petition to NMFS seeking *emergency* regulations imposing vessel speed restrictions in right whale high use areas.  <u>See</u> May 19, 2005 Petition for Initiation of Emergency Rulemaking To Prevent Extinction of the North Atlantic Right Whale ("Emergency Rulemaking Petition") (NMFS AR 12) (Pl. Ex. 4).  However, rather than even seeking public comment on the Petition, NMFS summarily denied it, on the grounds that emergency measures would "curtail full public notice, comment and environmental analysis, duplicate agency resources for a more comprehensive strategy, as well as risk delaying implementation of the draft Strategy."  <u>See</u> Petition to Initiate Emergency Rulemaking To Prevent The Extinction Of the North Atlantic Right Whale: Final Determination ("Petition Denial") (70 Fed. Reg. 56,884 (2005)) (NMFS AR 1) (Pl. Ex. 5).

As explained further below, this rationale makes no sense logically or legally, since emergency regulations could be accomplished *with* public notice and comment (and in any event the regulated industry has had ample opportunity to comment on these measures), and since the entire purpose of emergency regulations would be to protect right whales until NMFS's "more comprehensive strategy" can finally be put into action.  Accordingly, NMFS's response flies in the face of the agency's statutory mandate *to protect the right whale from extinction*, <u>see</u> 16 U.S.C.1 §§ 1382(a), 1536(a)(1), and is therefore arbitrary and capricious in violation of the

---

plaintiffs will refer to by bates number ("CG AR _").  Plaintiffs are including the most pertinent of these AR materials as exhibits here.  In addition, plaintiffs are relying on a number of pertinent scientific studies, Federal Register documents, and several other documents that defendants omitted from the AR.  Concurrently with this brief plaintiffs are filing a motion to supplement the record to ask that the Court consider these materials here as well.

Administrative Procedure Act, 5 U.S.C. § 706.  See American Horse Prot. Assn v. Lyng, 812

F.2d 1 (D.C. Cir. 1987).

As for the Coast Guard, that agency's "Traffic Separation Schemes" ("TSSs") congregate

vessel traffic in important right whale feeding, breeding, calving and migration areas, *including*

*designated right whale critical habitat*.  Because these TSSs are adversely affecting right whales

– indeed, they are seriously exacerbating the ship strike crisis, see, e.g. "Large Whale Ship

Strikes Relative To Vessel Speed" (NOAA Fisheries White Paper) at 7 (Pl. Ex. 6) ("One of the

greatest factors contributing to ship/whale collisions may be the overlap of right whale

distribution and vessel traffic densities") – the Coast Guard *must* consult with NMFS under

Section 7(a)(2) of the Endangered Species Act ("ESA"), and obtain NMFS's Biological Opinion

as to whether the Coast Guard is jeopardizing the continued existence of the right whale or

adversely modifying right whale critical habitat.  16 U.S.C. § 1536(a)(2).  Accordingly, since the

Coast Guard Administrative Record reflects that the agency has *never* undertaken Section 7

consultation to evaluate the impacts of even a single TSS on right whales, let alone the

cumulative effects of the entire East Coast traffic routing system, the agency is in flat violation of

the ESA.  See, e.g., Washington Toxics Coalition v. EPA, 413 F.3d 1024 (9th Cir. 2005)

(holding that the Environmental Protection Agency must engage in Section 7 consultation over

its registration of pesticides in light of its "ongoing discretion" concerning the pesticide

registration process).

In light of these legal violations, plaintiffs principally seek an Order (a) remanding

NMFS's denial of the Rulemaking Petition back to that agency for a new decision on an

expedited schedule, in order to insure adequate protection during the next right whale migration

season, and (b) setting a schedule for the Coast Guard to obtain a Biological Opinion from

NMFS, in order to insure that the agency's routing measures for marine vessels do not continue

to threaten the survival and recovery of right whales, and adversely modify right whale critical

habitat.

## BACKGROUND

## I.   STATUTORY FRAMEWORK

### A.   The Marine Mammal Protection Act

Recognizing that "certain species and population stocks of marine mammals are, or may

be, in danger of extinction or depletion as a result of man's activities," Congress passed the

Marine Mammal Protection Act ("MMPA") in 1972 to insure that they are "protected and

encouraged to develop to the greatest extent feasible . . . to maintain the health and stability of

the marine ecosystem."  16 U.S.C. § 1361.  The principal responsibilities that the Act imposes on

the Secretary of Commerce are carried out by NMFS.

The MMPA provides several protections for marine mammals, including the North

Atlantic right whale.  Most importantly, the statute prohibits the unauthorized "take" of all

marine mammals, 16 U.S.C. § 1372(a), which is defined to include "harass, hunt, capture, or kill,

or attempt to harass, hunt, capture, or kill, any marine mammal."  Id. § 1362(13).  Under the

MMPA, NMFS may only authorize the "incidental take" of marine mammals from activities

such as shipping by regulation, when it finds that the taking will have a negligible impact on the

species.  Id. § 1371(a)(5).  There is no such regulation for North Atlantic right whale.

The MMPA requires that NMFS periodically report to Congress on the status of species

protected under the Act.  16 U.S.C. § 1386.  These "Stock Assessments" must set forth the

"potential biological removal level" ("PBR") for the species, which is defined as "the *maximum number of individuals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population*," id. § 1362(20) (emphasis added) – a term, in turn, defined as "the number of animals which will result in the maximum productivity of the population or the species, keeping in mind the carrying capacity of the habitat and the health of the ecosystem of which they form a constituent part." Id. § 1362(9). The PBR for the North Atlantic right whale is zero. See 2003 Stock Assessment at 8 (NMFS AR 21, at BN 477).

Finally, in order to further protect marine mammals such as right whales, the MMPA also requires that NMFS, "in consultation with any other Federal agency to the extent that such agency may be affected, *shall prescribe such regulations as are necessary and appropriate* to carry out the purposes of this title." 16 U.S.C. § 1382(a) (emphasis added).

### B.    The Endangered Species Act

The Endangered Species Act is the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Babbitt v. Sweet Home Chapter of Communities for a Great Oregon ("Sweet Home"), 515 U.S. 687, 698 (1995) (other citations omitted). In the words of the Supreme Court, finding "the value of endangered species [to be] 'incalculable,'" TVA v. Hill, 437 U.S. 153, 187 (1978) (emphasis added), Congress' "plain intent" in passing the statute "was to halt and reverse the trend toward extinction, *whatever the cost*." Sweet Home, 515 U.S. at 699, quoting TVA, 437 U.S. at 180 (emphasis added).

To accomplish this purpose, the ESA provides specific protections to species that NMFS – which administers the ESA for marine species, 50 C.F.R. § 402.01(b) – lists as "endangered"

5

or "threatened."  A species is deemed "endangered" if it "is in danger of extinction throughout all or a significant portion of its range . . . ."  16 U.S.C. § 1532(6).

The ESA prohibits the "take" of any endangered species, id. § 1538(a)(1) – a term that, as in the MMPA, is broadly defined to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or [ ] attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  NMFS defines "harm," in turn, to include "an act which actually kills or injures fish or wildlife . . . includ[ing] significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering."  50 C.F.R. § 222.102.  For species, such as the right whale, that were designated as endangered under prior legislation even before the ESA was enacted, the statute also authorizes, but does not require, NMFS to designate "critical habitat" for the species, which is "the specific area . . .  on which are found those physical or biological features I essential to the conservation of the species and (II) which may require special management considerations or protection . . . ."  16 U.S.C. § 1532(5).

The ESA's most far-reaching obligations are imposed upon federal agencies.  Thus, the ESA requires that whenever a federal agency permits or undertakes activities that "may affect" a listed species, the agency, referred to as the "action agency," must, "in consultation with" NMFS, "insure" that those activities are "not likely to jeopardize the continued existence of" the species or "result in the destruction or adverse modification of" critical habitat.  Id. § 1536(a)(2).

To meet this obligation, the action agency generally prepares a Biological Assessment ("BA") or otherwise evaluates the impact of these activities on the species, id. § 1536(c); 50 C.F.R. § 402.14, and NMFS, after reviewing "the best scientific and commercial data available,"

including any information provided in the BA, issues a Biological Opinion ("Bi-Op") detailing

"how the agency action affects the species," and, in particular, whether the action is "likely to

jeopardize the continued existence of" the species or result in the adverse modification of critical

habitat.  16 U.S.C. § 1536(a)(2) and (b)(3)(A); see also 50 C.F.R. §§ 402.14(g), (h).  This process

is known as "formal consultation."  Id. § 402.14.[2]

      If, in its Bi-Op, NMFS concludes that the activities under review are likely to jeopardize

the species or adversely modify critical habitat, it must suggest "reasonable and prudent"

alternatives that would avoid this result.  16 U.S.C. § 1536(b)(3).  Although for many species the

Service's Bi-Op may also authorize the anticipated "incidental take" of the species associated

with the activity, Section 7 prohibits NMFS from permitting *any* such "take" for a marine

mammal such as the right whale, where there are no regulations under the MMPA permitting

such a taking.  Id. § 1536(b)(4).

      Finally, consistent with the overall conservation goals of the Act, NMFS is also required

to "review other programs" it administers and "utilize such programs in furtherance of" the

ESA's purposes, while all *other* federal agencies are required to "carry[ ]out programs for the

conservation of endangered species . . . ."  Id. § 1536(a)(1).  In addition, NMFS is required to

"develop and implement  . . . 'recovery plans' . . . for the conservation and survival of

endangered species. . . ."  16 U.S.C. § 1533(f).

---

   [2]   Formal consultation is required whenever activities "may affect" a species, unless the
agency concludes that the activities are "not likely to adversely affect" the species, and NMFS
concurs in writing with that conclusion.  Id. § 402.14(b)

C.     **The Ports and Waterways Safety Act**

Finding that "increased vessel traffic in the Nation's ports and waterways creates substantial hazard to life, property and the marine environment," Congress passed the Ports and Waterways Safety Act ("PWSA") to, *inter alia*, protect the "marine environment."  33 U.S.C. § 1221.  To achieve this objective, the PWSA directs the Coast Guard to regulate marine vessels in several ways.

For travel in and out of ports, the Act provides that the Coast Guard "shall designate necessary fairways and traffic separation schemes ('TSS') for vessels operating in the territorial sea of the United States," "[i]n order to provide safe access routes for the movement of vessel traffic . . . ."  Id. § 1223(c).  TSSs are a "routing measure which is aimed at the separation of opposing streams of traffic by appropriate means and by the establishment of traffic lanes."  33 C.F.R. § 167.5(b).  The Coast Guard may make the use of a TSS or other measure mandatory, 33 U.S.C. § 1223(c)(5)(B), but has not generally done so in light of the high compliance rate with TSSs.  See, e.g., ANPR at 30,860; "Chesapeake Bay Entrance Sealanes–Report of the Survey" (June 1970) (Pl. Ex. 7).[3]

Before designating TSSs, the Coast Guard is required to prepare a Port Access Route Study ("PARS") to consider the "potential traffic density and the need for safe access routes . . .."  33 U.S.C. § 1223(c)(3)(A).  In undertaking a PARS, the Coast Guard also "shall," "in

---

[3]     In addition to setting traffic lanes, TSS may also include one or more "area[s] to be avoided" -- i.e., "area[s] within defined limits in which either navigation is particularly hazardous or it is exceptionally important to avoid casualties and which should be avoided by all ships or certain classes of ships."  33 C.F.R. § 167.5(a).  They may also include "precautionary area(s)," which are "routing measure(s) comprising an area within defined limits where ships must navigate with particular caution . . . ."  Id. § 167.5(e).

8

consultation with" other agencies, including "the Secretary of Commerce," take into account "all

other uses of the area under consideration."  Id. § 1233(c)(3)(B).

     In addition, in specific areas "determine[d] to be hazardous," the Coast Guard may

"control vessel traffic" by, *inter alia*, "establishing vehicle traffic routing schemes;" "establishing

vessel size, speed, draft limitations and vessel operating conditions"; or "restricting operation[s],

in any hazardous area . . . ."  Id. § 1223(a)(4).  The agency also may establish and maintain

"vessel traffic services" ("VTS") "for controlling or supervising vessel traffic or for protecting

navigation and the marine environment."  Id. § 1223(a)(1).

     In establishing each of these regulatory schemes, the PWSA requires that the Coast Guard

"take into account all relevant factors concerning navigation and vessel safety [and] protection of

the marine environment," including, *inter alia*, "any other potential or actual conflicting activity"

and "environmental factors."  Id. § 1224(a).  Finally, after TSSs or other measures have been

established, the PWSA authorizes the Coast Guard to "adjust the location or limits of designated

fairways or traffic separation schemes, in order to accommodate the needs of other uses which

cannot be reasonably accommodated otherwise."  33 U.S.C. § 1223(c)(5)(C); 33 C.F.R. § 167.15.

## II.    RELEVANT FACTS

### A.    The Critically Imperiled North Atlantic Right Whale

     As NMFS has explained, the North Atlantic right whale (*Eubalaena glacialis*) is one of

*"the most endangered* of the large whale species" in the world.  Designated Critical Habitat;

Northern Right Whale (59 Fed. Reg. 28,793 (1994))(emphasis added) (Pl. Ex. 8); see also

Recovery Plan for the North Atlantic Right Whale ("Recovery Plan") (NMFS Aug. 2004) at IA-1

(Pl. Ex. 9)(excerpts).  Prized for their oils and baleen, the right whales' ironic name derives from

their slow speed and occupation of surface waters, for whalers considered them the "right" whale to hunt.  Commercial whaling severely depleted the species, which has not recovered.  ANPR at 30,858 (NMFS AR 20)(Pl. Ex. 3).

Although the species has been designated as "endangered" for over thirty-five years – listed first under the Endangered Species Conservation Act in June 1970, see 35 Fed. Reg. 8495 (June 2, 1970), and subsequently under the ESA, see 50 C.F.R. § 17.11 –  listing has not been sufficient to protect the species.  The eastern North Atlantic population is nearly extinct, and the western North Atlantic population – that lives off the East Coast of the United States and Canada – is presently estimated at less than 300 remaining individuals, and declining.  ANPR at 30,858 (NMFS AR 20, at 468); see also Notice of Intent to Prepare EIS (NMFS AR 9)("The abundance of North Atlantic right whales is believed to be fewer than 300 individuals despite protection for half a century."); 2003 Stock Assessment (NMFS AR 21 at 7-8) (noting that the species' PBR is zero).

Female right whales do not reach reproductive maturity until they are nine to ten years old, and even then only give birth to one calf every two to seven years.  See Recovery Plan at IIE-1 (Pl. Ex. 9).  Accordingly, in light of the incredibly low numbers of whales remaining, the survival of each female, and especially each female of reproductive age, is absolutely critical to the species' survival.  See ANPR at 30,858 (Pl. Ex. 3) (NMFS's explanation that models indicate "preventing the mortality of *one adult female a year* alters the projected [extinction] outcome for the species")(emphasis added); Coast Guard Biological Assessment on Coast Guard Operations ("CG BA") at 3-7 (CG AR 48) ("even a few incidental deaths may greatly affect the rate of increase in a drastically reduced population with such a long reproductive cycle").

10

Right whales are slow moving, and "spend a large amount of time at or near the surface resting, feeding, nursing and socializing."  Nichols and Powell, "Analysis of Risk to North Atlantic Right Whales from Shipping Traffic in Cape Cod Bay" ("Cape Cod Bay Report") (Feb. 2005) at 1 (CG AR 684).  Although adult right whales can be as large as fifty-five feet and can weigh more than seventy tons, "[m]ariners may have difficulty spotting right whales due to their dark coloration and their low profile when feeding at or beneath the surface, resting or nursing." Id.  These factors make right whales particularly susceptible to ship strikes.  See also Pl. Ex. 2 (photographs of right whales struck by ships).

Indeed, in the past few years, at least eight right whales are known, or are suspected to have died from ship strikes alone, in addition to the other threats the species still faces, such as entanglements with fishing gear.  Moreover, of the nine known right whales deaths since January 2004, *six involved females of reproductive age, three of whom were pregnant* when they were killed.  See, e.g., NMFS AR 6 (NMFS Memorandum explaining that "six right whales three of them pregnant females have been struck and killed by ships in the past year alone").  The loss of this many reproductive females in such a short period is unprecedented in the last quarter century, and is particularly devastating in light of the critical need for the birth and survival of additional right whales to offset the ongoing killing of the species.  See  Scott D. Kraus et al., *North Atlantic Right Whales in Crisis*, SCIENCE, July 22, 2005 (Vol. 309) ("Right Whales in Crisis") (Pl. Ex. 10).

Overall, leading right whale experts estimate that the average number of right whales dying each year, including those whose bodies are never located, *could be in excess of 14 animals*.  Id.  This four percent annual population loss – which includes females of reproductive

11

age – has led to a marked decrease in the reproductive capacity of the population. Id. As long as the species is unable to reproduce fast enough to offset annual losses, the decline in the population will continue. Indeed, NMFS has explained that, while the actual extinction of the species may not occur for some time in light of the species' long lifespan, *"biological extinction could easily occur within the next couple of generations*." Draft Environmental Assessment to Implement the Operations Measures of the North Atlantic Right Whale Ship Strike Reduction Strategy" (NMFS AR 8) at 3-1 (emphasis added); see also Michael J. Moore et al., *Morphometry, gross morphology and available histopathology in North Atlantic right whale (*Eubalaena glacialis*) mortalities (1970-2002)*, 6 J. Cetacean Res. Manage. 1 (2005) (Pl. Ex. 11).

North Atlantic right whales are most often found in coastal or shelf waters. From late Winter to early Fall the majority of right whales are located in feeding and nursery grounds off the coast of New England, including Cape Cod Bay, the Great South Channel east of Cape Cod, and George's Bank further east, which is considered "among the most productive continental-shelf ecosystems in the world." CG BA (CG AR 26). Later in the Fall, and then again in the Spring, right whales migrate down, and then up the coast, and a segment of the population moves to calving grounds off the coast of Georgia and Florida. 2003 Stock Assessment 6 (NMFS AR 21, at 6). As the Coast Guard has recognized, Cape Cod Bay, the Great South Channel, and the coasts of Georgia and Northern Florida are "extremely important habitat for cetaceans." CG BA at 43.

Indeed, in light of the critical importance of these habitat areas to the species, in 1994 NMFS identified three areas with "feeding sites, breeding grounds, and calving areas" that "are considered *essential to the northern right whale*," and designated "critical habitat" in those areas:

1) the Great South Channel east of Cape Cod; 2) Cape Code and Massachusetts Bays; and 3)

coastal Florida and Georgia.  59 Fed. Reg. 28,793, 28,803 (Jun. 3, 1994) (Pl. Ex. 8) (emphasis

added); codified at 50 C.F.R. § 226.203.  In designating these areas, NMFS explained that "*any*

Federal action that may affect these areas or features *is subject to the consultation requirements*

*of section 7 of the Endangered Species Act.*"  Id. at 28,973 (emphasis added).

### B.    The Gravest Threat Presently Facing The Species: Ship Strikes

As the Coast Guard has acknowledged, "[r]ight whale habitat use coincides with coastal

areas intensively used by humans for fishing, shipping, and recreation."  CG BA at 3-1 (CG AR

42); id. at 3-8 to 3-9 (CG AR 49-50) ("many of the high-use areas for right whales include major

shipping lanes or high-traffic areas along the east coast, mak[ing right whales] susceptible to

interactions with ships").  As a result, as NMFS has explained, "[c]ollisions with ships account

for more confirmed right whale mortalities *than any other human-related activity.*"  ANPR at

30,858 (AR 468)(Pl. Ex. 3) (emphasis added).  Indeed, these ship strikes "are responsible for

over 50% of known human-related right whale mortalities and are believed to be *one of the*

*principal causes for the lack of recovery in this population.*"  Id. (emphasis added); see also

Nichols and Powell, "Analysis of Risk to North Atlantic Right Whales from Shipping Traffic in

Cape Cod Bay" ("Cape Cod Bay Report")(Feb. 2005) at 1 (CG AR 684) ("The leading known

cause of right whale mortality is collision with ships"); Pl. Ex. 2 (right whale injured from a ship

strike); see also Defendants' Answer ("Answer") (Feb. 16, 2006), ¶ 45 (admitting that "collisions

with commercial ships is one of the factors contributing to the recent decline of the North

Atlantic right whale"); Recovery Plan at IG-1 ("The greatest known current cause of right whale

mortality in the western North Atlantic is collision with ships").

The risks posed by shipping vessels are significantly elevated because "[r]ight whales are located in, or adjacent to, several major shipping corridors . . . ." Cape Cod Bay Report at 1; Answer, ¶ 64 (admitting that Coast Guard TSS that "are located in areas where right whales occur"). Thus, for example, the Boston TSS travels directly through right whale critical habitat, including the Great South Channel. ANPR at 30,860 (NMFS AR 20, at BN470) (Pl. Ex. 3) (explaining that right whales are "found in large aggregations during spring and early summer" as they move from Cape Cod Bay east toward the Great South Channel, and that *the Boston shipping lanes concentrate ship traffic through this region*")(emphasis added); see also CG AR 334 ("shipping traffic in Massachusetts Bay is estimated at 1200 ship crossings per year, averaging three per day"). Numerous other shipping lanes also travel through other known right whale habitat use areas, such as the Gulf of Maine, and right whale migration corridors up and down the East Coast. See, e.g., Coast Guard BA at 3-1 (CG AR 42) ("The western margin of the Gulf of Maine is the most intensely used cetacean habitat on the northwest U.S. continental shelf"); ANPR at 30,859 (In the mid-Atlantic, "[s]hip traffic entering ports in this area, or transiting through it, continually crosses the whales' north-south migratory corridor"). accord Answer, ¶ 45 (admitting that "right whales occupy waters traversed by thousands of ships").

Defendants have developed several *voluntary* measures in recent years intended to reduce the risks of ship strikes. These measures involve notifying vessels concerning the presence of right whales, and then assuming the vessels will take appropriate steps to avoid a ship strike. See Mandatory Ship Reporting System for Northern Right Whales ("Mandatory Ship Reporting") (available at http://www.nmfs.noaa.gov/pr/shipstrike/msr)(last visited June 1, 2006). However, as NMFS has explained, *"[d]espite these efforts, right whales continue to be killed as a result of*

14

*collisions with vessels.*" ANPR at 30,858 (NMFS AR 20, at 468) (emphasis added); see also Right Whales in Crisis at 561 ("without requiring changes in the operation of ships within right whale habitats and migratory corridors, [other efforts have] not led to a reduction in ship strike mortalities. [ ] Eight dead right whales in the past 16 months provide clear evidence that management efforts have been woefully inadequate, and much stronger measures are needed to reverse the right whale's decline").

### C.    The Coast Guard's Regulation of Shipping in Right Whale Habitat

In 1978, Congress directed the Coast Guard to undertake PARS and evaluate the need for TSS and other vessel routing measures.  PWSA, Pub. Law 95-474.  In response to that directive, the Coast Guard undertook a process to consider "the need for safe access routes for vessels operating in the approaches to U.S. ports and in the traditional routes between ports" in the coastal United States.  44 Fed. Reg. 22,543 (1979) (Pl. Ex. 12).

Over the following years, the Coast Guard established TSSs and other measures in numerous port areas that include right whale habitat on the eastern seaboard.  See, e.g., 47 Fed. Reg. 879, 880 (1982)(Pl. Ex. 13) (four TSS off New England – "(a) 'In the Approaches to Portland Maine;' (b) 'In the Approaches to Boston, Massachusetts;' (c) ' In the Approaches to Narragansett Bay, Rhode Island, and Buzzards Bay, Massachusetts;' and (d) the 'Eastern Approach' to New York off Nantucket"); see also Off New York TSS (33 C.F.R. §§ 167.150 to 167.155); Off Chesapeake Bay (id. §§ 167.200 to 167.203); Off Delaware Bay TSS (id. §§ 161.170 to 161.174) (2000); CG AR 2559 (announcing new TSS for Cape Fear River, North Carolina).  As provided by the PWSA, 33 U.S.C. § 1223(c)(5)(C), some of these TSSs have been

reevaluated and altered over time.  See, e.g., CG AR 1892 (2004 changes to Chesapeake TSS);

CG AR 1120 (new PARS for Casco Bay); CG AR 1218 (new PARS for Buzzards Bay).[4]

Although NMFS has explicitly recognized "the need for ESA section 7 consultations with

all Federal agencies who operate or authorize the use of vessels in waters inhabited by right

whales, or whose actions directly or indirectly affect vessel traffic," ANPR at 30,858 (NMFS AR

468), in establishing these TSSs –  including those in the last several years – the Coast Guard has

not engaged  in Section 7 consultation with NMFS concerning whether any of these TSSs, or all

of them taken together, are likely to jeopardize the continued existence of the right whale or

adversely modify the species' critical habitat.  Moreover, although, as explained below, in

response to an explicit Congressional directive, the Coast Guard has finally undertaken a PARS

that takes right whale impacts into consideration, the Coast Guard has not engaged in Section 7

consultation with regard to any TSS changes associated with this PARS.  See CG AR 946 and

992 (Coast Guard and NMFS correspondence confirming lack of consultation on current

PARS).[5]

---

[4]    For reasons that are not explained in the Coast Guard AR, some of these TSSs have been
promulgated as regulations in the Code of Federal Regulations, while others have not.  It does
appear that at least some TSSs are established through the approval of the International Maritime
Organization, see, e.g., CG AR 1084 – a United Nations agency that addresses maritime safety
and other matters through international agreements and other protective measures.  See generally,
Introduction to IMO (http://www.imo.org/home.asp) (last visited June 1, 2006).

[5]    As explained further below, as a result of prior litigation, Strahan v. Linnon, 967 F. Supp.
581 (D. Mass. 1997), affd 187 F.3d 623 (1st Cir. 1988), the Coast Guard has undertaken
consultation regarding the impacts of its own vessels on right whales.  See infra at 33-34.

**D.    NMFS's Unfulfilled Promise To Take Action To
        Protect Right Whales From Ship Strikes**

As noted, defendants have developed several voluntary programs intended to reduce the
risks of ship strikes, primarily by notifying mariners of the presence of right whales, and relying
on the mariners to use that information to avoid a ship strike.  However, recognizing that "this
complex problem requires additional, more pro-active measures to reduce or eliminate the threat
of ship strikes to right whales," *more than five years ago* NMFS commissioned a Report from the
Northeast and Southeast Right Whale Recovery Implementation Teams to recommend additional
measures.  ANPR at 30858; Bruce A. Russell, White paper: Recommended Measures To Reduce
Ship Strikes of North Atlantic Right Whales. Aug. 2001 ("Ship Strike Report") (Aug. 2001) (Pl.
Ex. 14).  Among other measures, that Report, issued in August 2001, recommended that NMFS
set speed limits of 10 knots in certain areas,  id. at 5; designate Cape Cod Bay, part of the Great
South Channel, and other areas as "Areas To Be Avoided" at certain times of year, id. at 9-10;
and take other steps.

In response to this Report, NMFS developed a "Strategy to Reduce Ship Strikes of Right
Whales."  ANPR at 30,858.  In addition to continued outreach and education efforts, and other
voluntary measures, two of the specific elements of the Strategy provided for: (a) "[t]he
establishment of new operational measures for the shipping industry, including consideration of
routing and speed restrictions" and (b) "ESA section 7 consultations with all Federal agencies
who operate *or authorize the use of vessels* in waters inhabited by right whales, or whose actions
directly or indirectly affect vessel traffic."  ANPR at 30,858 (emphasis added).

17

To further the first objective, in June 2004 – already almost three years *after* recognizing the need for these measures in the August 2001 Report – NMFS issued its Advance Notice of Proposed Rulemaking outlining regulatory measures to protect right whales. NMFS AR 20 (Pl. Ex. 3). The principal measure proposed was *seasonal speed restrictions for vessels in important right whale habitat*. Id.[6]

During the remainder of 2004, NMFS received comments from plaintiffs and others supporting these proposed regulatory measures. See, e.g., NMFS AR 19, at BN 234 (Cetacean Society Int'l); BN 312 (Intl Fund for Animal Welfare); BN 357 (Natural Resources Defense Council); BN 374 (The Whale Center of New England). These included comments from the Marine Mammal Commission ("MMC"), a federal agency whose Presidentially appointed members are charged by Congress to, *inter alia*, recommend to NMFS those "measures as it deems necessary or desirable to further the policies of" the MMPA. 16 U.S.C. §§ 1401, 1402(a)(7). The MMC wholly endorsed the use of speed restrictions to protect right whales, explaining that "restrictions on ship speeds offer an *essential element* of the Service's" ship strike strategy. NMFS AR 19, at BN 484, 487 (Pl. Ex. 15) (emphasis added).

In their comments on the ANPR, plaintiffs emphasized that it is critical that NMFS *put these measures in place promptly*. Id. at BN 255 (Defenders of Wildlife); BN 270 (The Ocean Conservancy); BN 293 (Regina Asmutis-Silvia); 349 (The Humane Society of the United States).

---

[6]  The ANPR provided for speed restrictions in the Southeast from December 1 to March 31st; the Mid-Atlantic in the Spring, and again in the Fall; and in the Northeast from January through July. Id. at 30,858-30,860.

NMFS also held industry stakeholder meetings to consider additional views.  <u>See</u> NFMS AR 14

(Report on Nine Industry Stakeholder Meetings).[7]

> **E.**     <u>**Plaintiffs' Petition For Emergency Regulations**</u>

Despite NMFS's recognition that the regulatory measures outlined in the ANPR are

critical to the protection of right whales, it took no further regulatory action for the remainder of

2005.  Recognizing the need for immediate protections, on January 24, 2005, the MMC wrote

NMFS explaining that, in light of the six right whale deaths in the preceding 11 months, the

MMC "strongly believes that [NMFS] needs to implement *emergency rules at once* to reduce the

number of right whale deaths."  Jan. 24, 2005 Letter from the MMC (Pl. Ex. 16)(emphasis

added).  Thus, the MMC recommended that NMFS adopt "emergency rules" providing speed

restrictions during right whale high use periods.  <u>Id.</u>

NMFS did not accede to this request.  Instead, NMFS decided that it would prepare a full

blown Environmental Impact Statement ("EIS") pursuant to the National Environmental Policy

Act ("NEPA"), 42 U.S.C. § 4321, <u>et seq</u>, before proceeding further.  <u>See</u> NFS AR 7, at 29 (Pl.

Ex. 17).

Gravely concerned about the inevitable delays that would accompany the regular

rulemaking process, in May 2005 plaintiffs and others submitted a formal Rulemaking Petition to

NMFS seeking the imposition of *emergency regulations* to immediately protect right whales by

---

[7]     In the meantime, Congress passed legislation requiring the Coast Guard to cooperate with NMFS in "analyzing potential vessel routing measures for reducing vessel strikes of North Atlantic Right Whales."  Coast Guard and Maritime Transp. Act of 2004, Pub. Law 108-293, § 626.  In response to this directive, in February 2005 the Coast Guard initiated its first PARS that actually takes impacts on right whales into account.  70 Fed. Reg. 8,312 (2005) (CG AR 674).

imposing seasonal speed restrictions.  May 19, 2005 Petition for Initiation of Emergency

Rulemaking To Prevent Extinction of the North Atlantic Right Whale ("Emergency Rulemaking

Petition") (NMFS AR 12).  Largely mirroring the ANPR, and the MMC's request, the Petitioners

sought maximum speed limits of 12 knots for vessels while they are within 25 nautical miles of

port entrances during seasonal right whale high use periods, "until such time as permanent

measures can be enacted."  Id. at 3-4.  As in the ANPR, these specific proposed time periods

varied by region, but ranged from November 1 to July 31st.  Id. at 4.  The Petitioners sought a

similar seasonal speed restriction on travel through right whale critical habitat and in the Boston

TSS, as well as a system to impose speed restrictions in additional areas or during additional time

periods based on unexpected aggregations of whales.  Id.  Other scientists also advocated for

these emergency measures.  See Right Whales in Crisis (Pl. Ex. 10).

> ### F.    NMFS's Denial of The Rulemaking Petition And The Present Lawsuit

Recognizing that the "recommendations of the emergency rulemaking are part of the

shipstrike strategy, almost word for word," NMFS considered several responses to the Petition,

including requesting public comment on it, and issuing proposed emergency regulations – either

of which would have provided the very "public notice [and] comment" that the agency

incongruously claimed later would be "curtailed" unless the Petition were denied, 70 Fed. Reg. at

56,884 (NMFS AR 1) (Pl. Ex. 5).  See NMFS AR 11 (Pl. Ex. 18).  Rather than take either of

these steps, however, less than a month after receiving the Petition, NMFS tentatively decided to

*deny* it.  NMFS AR 10.  Although several weeks later NMFS published a Notice of Intent to

finally *begin* the EIS that the agency intended to complete before putting any kind of regulations

in place, none of the alternatives in the EIS at all addressed the *timetable* on which regulations

20

would be implemented.  70 Fed. Reg. 36,121 (June 22, 2005)  (NMFS AR 9).  Moreover, as early

as July 2005, NMFS already recognized that, even on an expedited schedule, the EIS would not

be completed *for at least another year*.  NMFS AR 7 (EIS Timetable).

In September 2005, NMFS wrote to plaintiffs explaining that the agency intended to deny

the Rulemaking Petition.  NMFS AR 3 (Pl. Ex. 19).  The *only* rationale provided for this decision

was that the emergency regulations plaintiffs had requested "would duplicate agency efforts and

reduce agency resources for a more comprehensive strategy, as well as risk delaying

implementation of the draft Strategy."  Id. at BN 7.  In other words, NMFS refused to put

emergency regulations in place because it might delay the permanent regulations NMFS is

continuing to develop.  However, NMFS entirely failed to explain why the benefits of immediate

regulations would not far outweigh any delay those regulations might engender in the

development of final regulations, since the emergency regulations would protect right whales

until such time as the permanent regulations could be completed, even on a more delayed

schedule.  Instead, the agency outlined the steps it is presently taking for right whales – the very

kind of steps it had previously explained had proven inadequate – and promised that it would

"proceed as quickly as possible" to promulgate the final regulations, explaining that the agency

anticipated a Draft EIS and a proposed regulation "by the end of the year or early in 2006."  Id. at

BN 6-7.

On September 29, 2005, NMFS published a Federal Register notice formally denying the

Rulemaking Petition, and reiterating the rationale provided in the earlier letter.  Petition Denial

(NMFS AR 1) (Pl. Ex. 5).  Thus, NMFS denied the Petition on the ground that, "[p]romulgating

a separate 12-knot speed limit, at this time, would curtail full public notice, comment and

environmental analysis, duplicate agency resources for a more comprehensive strategy, as well as risk delaying implementation of the draft Strategy." Id.  However, although the right whale high use periods during which speed restrictions are most essential (starting in November) were fast approaching, NMFS not only failed to commit to the development of regulations before that time period, it failed to commit to *any timetable at all* for the completion of this process.

In light of NMFS's inexplicable refusal to consider emergency measures, and the agencies' ongoing failure to make progress, plaintiffs filed this suit against NMFS in November 2005, challenging the agency's denial of the Rulemaking Petition as arbitrary and capricious under the APA.  See Complaint (Nov. 9, 2005).  In January 2006, after providing the Coast Guard with the requisite 60-days notice, plaintiffs filed an Amended Complaint adding a claim against that agency for its violations of ESA, including the agency's complete failure to engage in formal consultation under Section 7(a)(2) concerning the impacts of shipping on right whales. See Amended Complaint (Jan. 12, 2006); see also plaintiffs' 60-day notice letter (Pl. Ex. 20).

In the first five months of this year, three additional right whales have died.  One of the additional deaths was from a ship strike, and a second may have been as well.  A fourth whale was struck by a ship and survived.  See Declaration of Regina Asmutis, ¶ 4 (Pl. Ex. 21).  In the meantime, NMFS has still neither issued its Draft EIS, nor proposed regulations to address this ongoing crisis.

## **ARGUMENT**

In considering plaintiffs' claims here, the Court must engage in a "thorough, probing, in-depth review," Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415 (1971), to determine whether NMFS's denial of the Rulemaking Petition, or the Coast Guard's failure to

enter into formal consultation under the ESA, is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). While this standard is a deferential one, the Court must not "rubber-stamp the agency decision as correct," Ethyl Corp. v. EPA, 541 F.2d 1, 34 (D.C. Cir. 1976), for "[t]o play that role would be 'tantamount to abdicating the judiciary's responsibility under the [APA].'" Natural Res. Def. Council v. Daley, 209 F.3d 747, 755 (D.C. Cir. 2000)(other citations omitted). To the contrary, as the Supreme Court has explained, the Court must be satisfied that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29, 43 (1983)(other citations omitted); see also PPL Wallingford Energy LLC v. FERC, 419 F.3d 1194, 1198 (D.C. Cir. 2005); Defenders of Wildlife v. Babbitt, 958 F. Supp. 670, 679 (D.D.C. 1997) ("[T]he presumption of agency expertise may be rebutted if its decisions, even though based on scientific expertise, are not reasoned"). Applying that standard here, it is evident that NMFS's denial of the Rulemaking Petition cannot withstand scrutiny, and that the Coast Guard has no legal basis for refusing to engage in formal consultation concerning the impacts of vessel traffic on right whales. Moreover, the failure to take these concrete steps also violates defendants' affirmative obligations under ESA Section 7(a)(1) to protect and conserve the species. 16 U.S.C. § 1536(a)(1).[8]

---

[8]    Plaintiffs, who have members who regularly look for, observe, study, and appreciate North Atlantic right whales in their natural habitat, and whose ability to engage in these activities is concretely compromised by the risk of whales dying or being injured as a result of ship strikes, plainly have standing here, see Declarations of Regina Asmutis, Sharon Young, Linda Bermer and John Phillips (Pl. Exs. 21-24). See, e.g., Japan Whaling Assn v. Am. Cetacean Soc., 478 U.S. 221, 230, n.4 (1986) (finding that plaintiffs who engaged in "whale watching and studying" had standing to challenge activity that killed whales); Lujan v. Defenders of Wildlife, 504 U.S.

I.      **THE DENIAL OF PLAINTIFFS' PETITION FOR EMERGENCY
        REGULATIONS WAS ARBITRARY AND CAPRICIOUS.**

As noted, after working with the agency and giving it the benefit of the doubt for almost *four years* after Ship Strike Report had identified specific, mandatory measures to protect right whales from ship strikes, and for almost a *full year* after NMFS had issued its ANPR identifying specific measures, in May 2005 plaintiffs submitted a Rulemaking Petition seeking *emergency* regulations to provide right whales with some immediate protection, by establishing speed restrictions during the time periods that right whales are most likely to encounter marine vessels. NMFS AR 12.  Rather than issuing proposed emergency regulations, or even seeking public comment on the merits of Petition, NMFS cursorily rejected the Petition on the grounds that "[p]romulgating a separate 12-knot speed limit, at this time, would curtail full public notice, comment and environmental analysis, duplicate agency resources for a more comprehensive strategy, as well as risk delaying implementation of the draft Strategy."  Petition Denial at 56,884 (NMFS AR 1).

This rationale cannot withstand scrutiny.  As the D.C. Circuit has explained, the denial of a Rulemaking Petition can only be upheld if the Court finds that the agency "presented a *reasonable explanation* of [its] failure to grant the rulemaking petition."  American Horse Protection Assn. v. Lyng, 812 F.2d 1, 7 (D.C. Cir. 1987) (emphasis added).  To judge the adequacy of NMFS's explanation here, the Court must "take a close look at the agency's action, as well as the agency's articulated rationale,"  Common Cause v. FEC, 692 F. Supp. 1391, 1393 (D.D.C. 1987), to determine whether the denial of the Petition can be reconciled with the

_____

555, 565-66 (1992) (plaintiff who "use[s] the area affected" may "claim[ ] injury from environmental damage . . . ").

agency's statutory mandates.  Lyng, 812 F.2d at 5 (explaining that denials of petitions are properly overturned where "the agency has been blind to the source of its delegated power")(other citations omitted).  Here, in light of the clear need for *immediate* regulations to protect right whales from ship strikes, and NMFS's statutory mandate to protect right whales from extinction, NMFS has failed to articulate a "reasonable explanation" for its summary rejection of plaintiffs' Petition.  Lyng, 812 F.2d at 7; Cf. Fox Television Stations, Inc. v. F.C.C., 280 F.3d 1027, 1042 (D.C. Cir. 2002)(rejecting an agency's failure to act where a "wait-and-see approach cannot be squared with its statutory mandate . . ..")

Turning first to NMFS's statutory obligations, both the MMPA and the ESA *require* that NMFS take the steps necessary to protect the North Atlantic right whale from extinction.  The MMPA prohibits the intentional "take" of  marine mammals such as right whales, 16 U.S.C. § 1372(a), and prohibits any "incidental take" of the species unless the agency can find that such a take will have a negligible impact, id. § 1371(a)(5) – a finding that NMFS certainly has not, and could not, make for right whales.  Of critical relevance here, the statute then requires that, to insure that these objectives are met, NMFS "*shall* prescribe such regulations as are necessary and appropriate to carry out the purposes of this subchapter."  Id. § 1382(a) (emphasis added).  Accordingly, since the term "shall" "is an imperative denoting a definite obligation," Fund For Animals v. Babbitt, 903 F. Supp. 96, 111 (D.D.C. 1995), NMFS is statutorily required to take all the steps necessary to protect the right whale – including putting speed restrictions in place in a timely manner.  See United States v. Monsanto, 491 U.S. 600, 607 (1989) (where statute used the terms "shall order" forfeiture under certain circumstances, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory").

25

Further reinforcing this affirmative mandate, Section 7(a)(1) of the ESA requires that, to fulfill its obligations under the *ESA*, NMFS "*shall* review other programs administered by" the agency – e.g., the MMPA – and utilize such programs in furtherance of the purposes" of the ESA. 16 U.S.C. § 1536(a)(1). Those purposes, in turn, include not only protecting right whales from "take," but also *recovering the species to the point where ESA protection is no longer necessary*. 16 U.S.C. § 1531(b) (explaining that the ESA's purposes include "a program for the conservation" of listed species); id. § 1532(3) (defining "conservation" to include "the use of *all* methods and procedures which are necessary to bring [a listed species] to the point at which the measures provided [by the ESA] are no longer necessary"). Indeed, as noted, the Supreme Court has emphasized that the "plain intent" of Congress in passing the ESA was precisely to "halt and reverse the trend toward extinction, *whatever the cost*." Sweet Home, 515 U.S. at 699, quoting TVA, 437 U.S. at 180 (emphasis added). Accordingly, both the MMPA and the ESA affirmatively require that NMFS take whatever steps are necessary both to protect the species from extinction, and to insure the species' ultimate recovery. See, e.g. Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service, 378 F.3d 1059, 1070 (9th Cir. 2004) (explaining conservation goals of the ESA); see also Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy, 898 F.2d 1410, 1417-18 (9th Cir. 1990) (Section 7(a)(1) requires that agencies "act affirmatively" to protect listed species); Defenders of Wildlife v. Andrus, 428 F. Supp. 167, 170 (D.D.C. 1977) (finding that agencies administering the ESA "must use all methods necessary to" "bring these species back from the brink so that they may be removed from the" list of protected species).

26

On this Record, there can be no room for doubt that immediately protecting right whales from the ongoing threat of ship strikes is critical to fulfilling these mandates. Indeed, in rejecting the Rulemaking Petition, NMFS did not even remotely suggest that the seasonal speed restrictions plaintiffs were advocating were not *necessary* to protect right whales. To the contrary, NMFS acknowledged the need for precisely these kinds of measures, explaining that it is working on "proposed routing changes and ship speed restrictions along the eastern seaboard." 70 Fed. Reg. at 56885 (NMFS AR 1, at BN 4)(Pl. Ex. 5).

This is not surprising, for the Administrative Record amply demonstrates the necessity, and utility, of precisely these measures, which are designed to slow vessel traffic in critically important right whale habitat during those times of year that right whales are most often found in these areas. Given that NMFS has recognized time and again that ships strikes pose an enormous threat to the species, and are "one of the principal causes for the lack of recovery in this population," there is simply no dispute here that measures to reduce ship strikes are critically necessary. ANPR at 30,858.

It is also evident that restricting vessel speed in right whale high use areas would be an effective means to reduce the risks associated with ship strikes. As the MMC explained in commenting on the ANPR, "[t]he best available information . . . indicate[s] that collisions causing lethal or serious injuries to whales are absent or very rare when vessels travel at less than 10 knots, infrequent at speeds between 10 and 13 knots, and most common at speeds of 14 knots or higher." NMFS AR 19 (Pl .Ex. 15), at BN 487; see also id. at BN 486 (showing dramatic increase in whale injuries and mortality from ship strikes at speeds greater than 12 knots). Thus, as the MMC also explained, "restrictions on ship speeds offer an essential element of the

27

Service's proposed strategy . . . ."  NMFS AR 19, at BN 487 (Pl. Ex. 15); see also Pl. Ex. 16

(MMC letter urging that NMFS enact emergency regulations).[9]

Moreover, with so many right whales continuing to die from ship strikes, the urgency of

the situation has only grown since the Ship Strike Report was issued in 2001, and the ANPR was

issued in 2004.  See, e.,g., NMFS AR 6 (discussing recent right whale deaths from ship strikes).

Indeed, while whales continue to die from ship strikes, NMFS has frankly acknowledged that, in

light of the species' drastically reduced numbers, the death of a *single whale* – particularly an

adult female – *may determine whether the species goes extinct*.  ANPR at 30,858; see also, e.g.,

CG AR 312 (1996 NMFS Bi-Op explaining that "[b]ecause so few individuals are left in the

population, *any impact to this species is considered extremely critical*").

Thus, evaluating NMFS's response to the Rulemaking Petition in light of the agency's

statutory mandates, and the critical status of the species, it is evident that NMFS's rationale for

summarily denying the Petition is not reasonable.  First, NMFS claimed that it was appropriate to

deny the Petition because emergency regulations would "curtail full public notice, comment and

environmental analysis . . .." 70 Fed. Reg. 56,884 (2005) (NMFS AR 1)(Pl. Ex. 5).  However,

NMFS could have readily addressed that concern by *seeking expedited public comment on the*

---

[9]    See also David W. Laist et al., *Collisions Between Ships and Whales*, 17 Marine Mammal
Sci. 35 (2001) (Pl. Ex. 25)("Among collisions causing lethal or severe injuries, 89% (25 of 28)
involved vessels moving at 14 kn or faster and the remaining 11% (3 of 28) involved vessels
moving at 10-14 kn; none occurred at speeds below 10 kn"); see also id. at 57 ("collision records
first appear late in the 1800s when the fastest vessels began attaining speeds of 14 kn, and then
increased sharply in the 1950s-1970s when the average speed of most merchant ships began to
exceed about 15 kn").  Indeed, the MMC has suggested that "an effective speed restriction could
offer *even more* protection to whales than rerouting traffic around identified whale aggregations
because ships routed at undiminished speed around whale concentrations could encounter
animals joining or leaving nearby concentrations."  MMC Comments, Enc. at 2 (Pl. Ex. 15)
(NMFS AR 19, at 488) (emphasis added).

*Petition*.  Indeed, contrary to NMFS's rationale here, the agency often publishes an

announcement of Rulemaking Petitions for public comment, see, e.g., 69 Fed. Reg. 32,991

(2004)(Pl. Ex. 26) – including where, as here, the Petition seeks *emergency* rulemaking.  See,

e.g., 69 Fed. Reg. 40,850 (2004) (Pl. Ex. 27) (NMFS request for public comment on a

Rulemaking Petition seeking emergency regulations).

Moreover, the Rulemaking Petition here requested that NMFS "*initiate* an emergency

rulemaking to protect this critically endangered species," Rulemaking Petition at 1 (NMFS AR

12) (emphasis added), and did not, as NMFS's response suggests, insist that the regulations be

issued without any prior public comment or environmental analysis whatsoever.  See also id. at 3

(requesting regulations "within sixty days").  Accordingly, as NMFS itself recognized in

considering the Petition – but inexplicably ignored in denying it – the agency could have either

asked for comment on the Petition, or issued the proposed emergency regulations, either of which

would have addressed this concern.  See NMFS AR 11 (Pl. Ex. 18) (discussing these options).[10]

NMFS's assumption that there is some *requirement* that it provide *extensive* notice and

analysis before taking action here – steps that can only be intended for the regulated industry –

_____

[10]    This concern is also seriously undermined by the fact that NMFS has ample authority
under the APA's "good cause" exception to issue immediate regulations without undertaking
prior notice and comment, where, as here, doing so would be in the public interest.  See 5 U.S.C.
§ 553(b)(3)(B); Jifry v. Federal Aviation Admin., 370 F.3d 1174, 1178 (D.C. Cir. 2004)
(explaining that an agency "need not engage in notice and comment" when to do so would be
"impracticable, unnecessary, or contrary to the public interest").  Indeed, within the last several
weeks NMFS has invoked this *precise* authority to implement temporary regulations to protect
right whales from fish entanglement.  71 Fed. Reg. 28,587, 28,588 (May 17, 2006)(Pl. Ex. 28)
(implementing temporary fishing restrictions, and explaining that "[p]roviding prior notice and
opportunity for comment on this action, pursuant to [NMFS's] regulations, would be
impracticable because it would prevent NMFS from executing its functions to protect and reduce
serious injury and mortality of endangered right whales").

misapprehends "the source of [NMFS] delegated power," i.e., its obligations under the MMPA and the ESA.  Lyng, 812 F.2d at  7.  In Lyng, for example, which concerned a Petition to ban the use of "soring" devices – devices that injure horses' front limbs, causing them to adopt a highly-prized gait – the defendant agency had denied the Petition on the grounds that its authorizing statute required it to balance the horse industry's needs against the statutory command to prohibit unnecessary cruelty.  Id. at 6-7.  Explaining that the statute made it clear that protecting the horses was to be *paramount*, the D.C. Circuit set aside the denial, explaining that the agency had not demonstrated that its "refusal to act was the product of reasoned decisionmaking."  Id.; see also Geller v. Federal Communications Comm'n, 610 F.2d 973, 979 (D.C. Cir. 1979) (denial of rulemaking petition will be set aside if "plainly misguided").

Similarly, here, nothing in either the MMPA or the ESA suggests that the agency is *required* to obtain comments from the shipping industry before imposing *emergency* measures that are necessary to protect right whales.  To the contrary, as noted, Congress's intent was to protect imperiled species, "whatever the cost." Sweet Home, 515 U.S. at 699, quoting TVA, 437 U.S. at 180 (emphasis added); cf. City of Las Vegas v. Lujan, 891 F.2d 927 (D.C. Cir. 1989) (upholding emergency regulations to protect imperiled species).

Moreover, *NMFS already has obtained the shipping industry's views on these regulations.*  More than six months ago, numerous shipping interests submitted detailed comments on NMFS's ANPR, expressing their views on the utility and appropriateness of the very regulations plaintiffs have requested.  See, e.g. NMFS AR 19, at BN 231-233.  In addition, to further consider the industry's views, NMFS held a series of stakeholder meetings.  NMFS AR

14.   Therefore, it is simply not the case that imposing measures at this time would somehow preclude the regulated industry from being heard here.[11]

NMFS's other rationale for rejecting the Petition for emergency regulations – that it would "duplicate agency resources for a more comprehensive strategy, as well as risk delaying implementation of the draft Strategy," 70 Fed. Reg. at 56,884 (NMFS AR 1)(Pl. Ex. 5) – is equally spurious, for it ignores the critical fact that *the emergency regulations would be in place until the comprehensive strategy could be implemented.*   Indeed, NMFS's response entirely ignores the fact that these emergency regulations would be *stopgap measures* that would simply provide some immediate protection for right whales while the regular rulemaking process proceeds.   See Rulemaking Petition at 3 (NMFS AR 12) (requesting emergency regulations "until such time as permanent measures can be enacted").[12]

In this regard, it is also critical to emphasize just how long that regular rulemaking process has taken, and is likely to take before it is completed, if ever.   The ANPR was issued two years ago.  Pl. Ex. 3.  The Notice of Intent to prepare an EIS to accompany these regulations was issued almost a year ago.  NMFS AR 9.  Yet, to date, NMFS has neither issued even a *Draft* EIS for public comment, nor any Proposed Regulations.  Nor has the agency even committed to any date certain by when any of these steps will occur.  See Comments of Atlantic Offshore

---

[11]    Of course, a number of these comments opposed the kind of regulations plaintiffs seek. However, since NMFS did not rely on any of those concerns in denying the Petition, and instead has consistently *supported* these measures, these objections could not justify NMFS's denial of the Petition.  See, e.g., SEC v. Chenery Corp. 332 U.S. 194, 196 (1947) (agency decision must be defended based on the agency's own rationale).

[12]    Thus, for example, if as a result of putting the comprehensive ship strike Strategy into place certain vessels are rerouted out of important right whale habitat altogether, speed restrictions on those areas may not longer be necessary.

Lobstermen's Association (NMFS AR 19, at BN 362) (comments on ANPR, noting that since "the report was published in 2001, *what on earth took so long to get to this point*?")(emphasis added).[13]

Accordingly, even assuming *arguendo* that, as NMFS claims, promulgating emergency speed restrictions would further delay the date by which permanent regulations can be finalized, this would appear to be a small, if any, price to pay *in order to provide some immediate protection to right whales*.  In short, since the regulations sought by plaintiffs' Rulemaking Petition are *necessary* for NMFS to fulfill its statutory obligations under the ESA and the MMPA, and since the agency's rationales for rejecting the Petition fly in the face of those mandates, the Court should set aside and remand NMFS's decision to deny the Petition.  See also Common Cause v. Federal Election Commn, 692 F. Supp. 1391, 1396 (D.D.C. 1987) (remanding for reconsideration of a rulemaking petition, explaining that "where the agency interprets its statute in a way that flatly contradicts Congress's express purpose, the court may – indeed must – intervene and correct the agency").[14]

---

[13]    To the contrary, the agency has a long history of missing its own deadlines in this rulemaking process.  Thus, for example, as recently as last July, NMFS wrote to the Marine Mammal Commission stating that the agency expected "to issue the DEIS [Draft EIS] and proposed rule by the end of the year" -- i.e., December 2005.  Pl. Ex. 29.  Similarly, in the letter responding to the Petition in September 2005, NMFS indicated that it "expect[s] to issue the DEIS and a proposed rule by the end of the year or early in 2006."  NMFS AR 11 (Pl. Ex. 18).  As of today, NMFS has still not issued *either* the Draft EIS *or* the proposed rule, and it has not indicated when it will do so.

[14]    Although plaintiffs are not asking the Court to Order NMFS to issue the emergency regulations at this time, see infra at IV, as noted above, should it so choose NMFS *could* impose immediate regulations without prior notice and comment.  See supra at 29, n. 10.

## II.     BY FAILING TO CONSULT WITH NMFS CONCERNING THE IMPACTS OF SHIPPING ON RIGHT WHALES, THE COAST GUARD IS <u>VIOLATING SECTION 7(A)(2) OF THE ESA.</u>

As noted, Section 7(a)(2) of the ESA and the ESA's implementing regulations require that whenever a federal agency permits or authorizes activities that "may affect" a listed species, the agency must "insure" that those activities are not likely to jeopardize the species' continued existence or result in the adverse modification of critical habitat, 16 U.S.C. § 1536(a)(2). <u>See</u> <u>Hammon v. Norton</u>, 370 F. Supp. 2d 226, 264 (D.D.C. 2005). To fulfill this mandate for marine species such as the right whale, the agency generally prepares a BA, 16 U.S.C. § 1536(c); 50 C.F.R. § 402.14, and enters into "formal consultation" with NMFS, <u>id.</u> § 402.14, after which NMFS issues a Bi-Op that determines whether the activities are "likely to jeopardize the continued existence of" the species or result in the adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2) and (b)(3)(A); <u>see</u> <u>also</u> 50 C.F.R. §§ 402.14(g), (h). If, in its Bi-Op, NMFS concludes that the activities under consideration *are* likely to jeopardize the species or adversely modify critical habitat, NMFS must identify a "reasonable and prudent" alternative that would avoid this result. 16 U.S.C. § 1536(b)(3).

Thus, for example, as a result of prior litigation – <u>Strahan v. Linnon</u>, 967 F. Supp. 581 (D. Mass. 1997), <u>affd</u> 187 F.3d 623 (1st Cir. 1988) – the Coast Guard prepared a BA in 1995 to evaluate the impact of its *own* vessels on protected species, including the right whale. CG AR 1. The Coast Guard then entered into formal consultation with NMFS on these activities, and in September 1995 NMFS issued a Bi-Op. CG AR 251. After detailing various measures the Coast Guard would take to avoid ship strikes, including posting lookouts on all Coast Guard vessels

during specific time periods and other restrictions, id. at 255, NMFS concluded that the Coast

Guard activities at issue would not jeopardize the species.  Id. at 291.[15]

However, while the Coast Guard has consulted with NMFS on the impacts of its *own*

vessels' activities on the right whale, the agency has inexplicably never entered into formal

consultation concerning the impacts of its TSSs, which direct marine vessels in right whale

habitat, on the species.  As noted, the Coast Guard has established TSSs in right whale habitat

near numerous port areas along the East Coast.   In Casco Bay (Portland, Maine) and Buzzards

Bay (Providence, Rhode Island), the Coast Guard has existing TSSs, and is in the process of

revising those TSSs.  CG AR 1120 and 1218; see also 70 Fed. Reg. 38,061 (recent Montauk

Channel and Block Island Sound PARS).  The Coast Guard also has TSSs in New York, the

Chesapeake Bay, and the Delaware Bay, several of which have also undergone recent revisions.

See Off New York TSS (33 C.F.R. §§ 167.150 to 167.155); Off Chesapeake Bay (id. §§ 167.200

to 167.203); Off Delaware Bay TSS (id. §§ 161.170 to 161.174); see also CG AR 2162

(announcing 2005 changes to Chesapeake Bay TSS).  And in Cape Fear (Wilmington, North

Carolina), the Coast Guard also recently established a TSS.  CG AR 2539, 2507.

Finally, in the areas of Cape Cod Bay, Race Point, and the Great South Channel (Boston,

Massachusetts), recognizing the significant adverse impacts that the existing TSS was having on

---

[15]    Less than a year later, after evaluating "new information that may indicate a change in the
current status of the right whale population, and taking into account cumulative effects," NMFS
issued a new Bi-Op to the Coast Guard, concluding that the agency's activities "*are likely to
jeopardize the continued existence of the species*."  CG AR 310 (emphasis added).  Accordingly,
NMFS identified a "Reasonable and Prudent Alternative" that would avoid jeopardy, including
expanded use of trained lookouts on Coast Guard vessels and other measures.  Id. at 337.
Although the RPA also included several measures for the Coast Guard to begin to address the
impacts of *private* vessels on right whales, the Bi-Op itself did not directly address the impacts of
those vessels, because that was not within the scope of the consultation.  See id. at 339-40.

right whales, and in response to a specific Congressional directive, the Coast Guard is *rerouting its TSS specifically to address right whale impacts* (although not moving it entirely out of right whale critical habitat). CG AR 1086-1093. Similarly, in the Southeast United States (Jacksonville, Florida, Fernandina Beach, Florida, and Brunswick, Georgia), where the Coast Guard has not previously established a TSS, the agency intends to put a TSS in place specifically to address right whale impacts. <u>See</u> CG AR 1094. However, in establishing, revising, and continuing to maintain each of these TSSs, the Coast Guard has *never engaged in consultation under Section 7.*[16]

There certainly can be no dispute that the Coast Guard's TSSs are agency actions that can trigger Section 7 obligations. <u>See</u>, <u>e.g.</u>, <u>NRDC v. Houston</u>, 146 F.3d 1118, 1125 (9th Cir. 1998)(explaining that agency action "has been defined broadly"); <u>see also</u> <u>Florida Key Deer v. Stickney</u>, 864 F. Supp. 1222, 1229 (S.D. Fla. 1994) (same). Indeed, the designation of a TSS falls squarely within the definition of an "action" for purposes of Section 7, which includes "all activities or programs of any kind authorized. . . . in whole or in part, by Federal agencies, in the United States or upon the high seas," including "the promulgation of regulations." 50 C.F.R.

---

[16]    As noted, in preparing the PARS for the most recent TSSs, the Coast Guard obtained NMFS's concurrence that formal consultation was not necessary on the PARS itself. CG AR 946 and 992. Nonetheless, in providing this concurrence NMFS emphasized that, while formal consultation was not necessary on the PARS itself "because it is simply a study which will provide recommendations," "*if and when the U.S. Coast Guard or another agency proposed to authorize, fund, or carry out study recommendations, that proposal may constitute an 'action' for the purposes of section 7(a) of the ESA and may require formal or informal consultation with our agency.*" CG AR 992 (emphasis added).

§ 402.02; see also, e.g., Turtle Island Restoration Network v. NMFS, 340 F.3d 969, 974 (9th Cir.

2003) (finding that NMFS "issuance of fishing permits to boats to allow fishing on the high seas

clearly constitutes 'agency action' sufficient to trigger the protections of the ESA").

It is also evident that the requisite nexus exists between the Coast Guard's designation of

TSSs and the resultant risk of ship strikes on right whales. Indeed, the Coast Guard itself

recognizes this nexus, *as demonstrated by its alteration of the Boston TSS precisely to address*

*this issue*. This is hardly surprising, since there is no dispute that "[r]ight whales are located in,

or adjacent to, several major shipping corridors," Cape Cod Bay Report at 1, and that Coast

Guard measures "concentrate ship traffic" into right whale use areas. ANPR at 30,860; id. at

30,859 (In the mid-Atlantic, "[s]hip traffic entering ports in this area, or transiting through it,

continually crosses the whales' north-south migratory corridor"); see also Misty Niemeyer et al.,

"North Atlantic Right Whale Sighting Survey (NARWSS) and Right Whale Sighting Advisory

System: 2005 Results Summary." Northeast Fisheries Science Center. (Pl. Ex. 30) at 6 (showing

enormous overlap of right whales and shipping lanes).[17]

---

[17]    See also, e.g., Amy R. Knowlton & Scott D. Kraus, Mortality and serious injury of
northern right whales (Eubalaena glacialis) in the western North Atlantic Ocean, 2 J. Cetacean
Res. Manage. 193, 198 (2001) (Pl. Ex. 31) (explaining that "[f]or all 16 carcasses known to have
been struck by ships, the distances to the nearest shipping channel ranged from 0-26 miles with
an average distance of 9.9 miles"); Gregory K. Silber et al., "Ship Traffic Patterns in Right
Whale Critical Habitat: Year One of the Mandatory Ship Reporting System." NOAA Technical
Memorandum (Jan. 2002) (Pl. Ex. 32) at 7 ("The information provided here – especially the
number of ships that traverse right whale aggregation areas – demonstrates why ships present a
significant threat to the species. Although the circumstances that align to cause ship strikes are
not completely understood, the risk of collision is highlighted by the sheer volume of shipping in
areas where right whales occur, coupled with right whale behavioral patterns (the animals spend
much of their time at the surface"); Amy R. Knowlton et al., "Right Whale Sightings and Survey
Effort in the Mid Atlantic Region: Migratory Corridor, Time Frame, and Proximity to Port
Entrances." Report submitted to the NMFS ship strike working group (July 2002) (Pl. Ex. 33) at
25 ("The mortality data do show a link between shipstruck animals and proximity to shipping

While, as noted, vessels have some flexibility whether to travel in the Coast Guard's TSSs, the Record reflects that, as a practical matter, vessels routinely travel within these designated areas, which provide them assurance of safe passage through busy shipping corridors. See, e.g., ANPR at 30,860 ("The Boston shipping lanes concentrate ship traffic through" the Great South Channel); see also Pl. Ex. 7. Consequently, as NMFS has explained, "[o]ne of the *greatest factors* contributing to ship/whale collisions may be the overlap of right whale distribution and vessel traffic densities." "Large Whale Ship Strikes Relative To Vessel Speed" (Pl. Ex. 6), at 7 (emphasis added).

Similarly, it is absolutely clear that ships strikes are having serious adverse impacts on the species. Indeed, as NMFS has also explained, "[s]hip collisions are responsible for more right whale deaths than any other single human impact." Id. at 1; see also id. ("ship strikes are responsible for 10 of 18 right whale deaths attributable to human activity" between 1970 and 1999. "It is important to note, however, that many ship strikes go unreported, and therefore it is highly likely that right whale mortality from ship collisions is far higher than the figure presented here").

Moreover, in addition to the risks posed by *directly hitting* a right whale, "[t]urbulence associated with vessel traffic may also indirectly affect northern right whales by breaking up the dense surface zooplankton patches in certain whale feeding areas." Crit. Hab. Rule at 28,797 (Pl. Ex. 8). Indeed, in light of these and other impacts, NMFS has explained that "frequent travel by commercial vessels in [right whale critical habitat] represents a considerable threat to northern right whales." Id. at 28,803; see also 50 C.F.R. § 222.102 (defining "harm" – which constitutes a

_____

lanes and some correlation between deaths and timeframes of migration").

prohibited "take," 16 U.S.C. § 1532(19) – to include any "act which actually kills or injures fish or wildlife . . . includ[ing] significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering").

Accordingly, there is simply no room for debate that the Coast Guard's TSSs "may affect" right whales and their critical habitat, which is all that is necessary to require that the agency engage in formal consultation and obtain a Bi-Op from NMFS, 50 C.F.R. § 402.14. See, e.g., National Wildlife Fed. v. FEMA, 345 F. Supp. 2d 1151, 1174 (W.D. Wash. 2004) ("threshold for formal consultation must be set sufficiently low to allow Federal agencies to satisfy their duty to 'insure' [against jeopardy] under Section 7(a)(2)"); Florida Key Deer v. Stickney, 864 F. Supp. 1222, 1229 (S.D. Fla. 1994)("the applicable threshold for triggering formal consultation is very low"); Sierra Club v. Flowers, 423 F. Supp. 2d 1273, 1370 (S.D. Fla. 2006)(so long as an activity "'may affect listed species or critical habitat' then the agency must initiate formal consultation'"); see also 51 Fed. Reg. 19,926, 19,949 (1986) ("Any possible effect . . . triggers the formal consultation requirement").  Indeed, there is a long line of cases in which courts have found parties responsible for the "*take*" of ESA protected species, where – as here – the defendant had authorized or facilitated third party activities that were harming the species. See, e.g., Defenders of Wildlife v. Administrator, Environmental Protection Agency, 882 F.2d 1294, 1300-01 (8th Cir. 1989) (EPA's registration of a pesticide violated the ESA where "EPA's decision to register pesticides containing strychnine or to continue these registrations *was critical to the resulting poisonings of endangered species*"); Loggerhead Turtle v. Council of Volusia Cty., Fla., 148 F.3d 1231, 1251 (11th Cir. 1998), cert. denied, 119 S. Ct. 1488 (1999) ("the

regulatory acts of governmental entities can cause takes of protected wildlife" where the "regulatory entity purports to make lawful an activity that allegedly violates the ESA"); Strahan v. Coxe, 127 F.3d 155, 164 (1st Cir. 1997) (state agency violated ESA because it "licensed commercial fishing operations to use gillnets and lobster pots in specifically the manner that is likely to result in violation of [the ESA]").[18]

In Strahan, for example, the First Circuit considered whether the State of Massachusetts was responsible for the take of right whales occurring from commercial fishing. 127 F.3d 164. Defendants argued that the State was not responsible for this take, because it only occurred as a result of the intervening act of a third party – the fishermen. Id. Rejecting this argument, the First Circuit explained that the State *was* responsible for this take, because "it is not possible for a licensed commercial fishing operation to use its gillnets or lobster pots in the manner permitted by the Commonwealth without risk of violating the ESA by exacting a taking." Id.[19]

---

[18]     See also United States v. Town of Plymouth, Mass., 6 F. Supp. 2d 81 (D. Mass. 1998) (town responsible for permitting off-road vehicles on beach, which caused the take of a protected species); Palila v. Hawaii Dept of Land & Natural Resources, 639 F.2d 495, 497-98 (9th Cir. 1991) (state responsible for feral goats and sheeps' destruction of endangered species' habitat); Pacific Rivers Council v. Brown, No. 02-243-BR, 2002 WL 32356431, * 11 (D. Or. Dec. 23, 2002) ("Courts repeatedly have held governmental officers may be liable for violating the take prohibition authorizing activities undertaken by others"); National Wildlife Federation v. Hodel, 23 Env't Cas. (BNA) 1089, 1092-93 (E.D. Cal. 1985) ("FWS's authorization of the use of lead shot ammunition, which resulted in secondary poisoning of bald eagles, constituted a take under the ESA"); cf. Sierra Club v. Yeutter, 926 F.2d 429, 438-39 (5th Cir. 1991) (Forest Service management of timber stands was a taking of listed species).

[19]     The plaintiff had also claimed that the Coast Guard was responsible for private vessels' "taking" right whales by ship strikes, on the theory that the Coast Guard licenses those vessels. Strahan v. Linnon, 967 F. Supp. 581, 621-622 (D. Mass. 1997). The district court rejected this theory on the grounds that vessel licensing is a *non-discretionary* activity. Id. Although, contrary to this conclusion, the Ninth Circuit recently ruled that Section 7 of the ESA *itself* provides agencies with the requisite discretion to consider endangered species impacts, Defenders of Wildlife v. EPA, 420 F.3d 946, 970 (9th Cir. 2005), in this case the Court need not

Similarly, in Loggerhead Turtle, the Eleventh Circuit considered whether a County could be responsible for the take of a listed species as a result of its failure to adequately regulate beachfront lighting that was having significant adverse impacts on sea turtles. 148 F.3d 1231. As in Strahan, the Court explained that the County's failure to restrict this lighting in the manner necessary to protect species can violate the ESA. Id. at 1249-52.

This same reasoning applies here, where it is not possible for vessels to travel in the TSS established by the Coast Guard without similarly risking a ship strike with a right whale. Moreover, while Strahan, Loggerhead Turtle and a host of other cases have found government entities responsible for the "*take*" of a listed species that was not directly caused by the defendant, here, by contrast, plaintiffs simply contend that the Coast Guard's TSSs "may affect" the right whale. Since this is a significantly lower threshold, it is even more evident that the Coast Guard must, at minimum, engage in Section 7 consultation in this case. See, e.g. Thomas v. Peterson, 753 F.2d 754, 765 (9th Cir. 1985)(explaining the lesser burden involved in demonstrating a violation of Section 7(a)(2)'s procedural requirements as distinguished from

---

resolve that issue because here the PWSA provides the Coast Guard with a great deal of discretion in setting TSSs, 33 U.S.C. § 1223(c)(5)(C) – in order to, *inter alia*, "prevent or reduce the risk of pollution, harm to endangered species, or other damage to the marine environment from ship collisions or groundings in coastal areas and critical marine habitats." Coast Guard BA at 4-8 (CG AR 146). Accordingly, Section 7 consultation is plainly required. See, e.g., Washington Toxics Coalition v. EPA, 413 F.3d 1024, 1033 (9th Cir. 2005) (rejecting EPA's argument that it need not consult on the impacts of registered pesticides on listed species; "because EPA retains *ongoing discretion* to register pesticides, alter pesticide registrations, and cancel pesticide registrations . . . it has a continuing obligation to follow the requirements of the ESA")(emphasis added).

demonstrating a "take"); see also National Wildlife Fed. v. Brownlee, 402 F. Supp. 2d 1, (D.D.C.

2005) (finding violation of Section 7(a)(2) for action that may affect species).[20]

<p style="text-align:center">*          *          *</p>

NMFS has repeatedly emphasized the importance of "completing or initiating further

consultations under section 7(a) of the ESA . . . to ensure that routine vessel operations. . . are not

likely to jeopardize the continued existence of right whales or destroy or adversely modify right

whale critical habitat."  Petition Denial at 56,885; 59 Fed. Reg. at 28,973 (Pl. Ex. 8)(NMFS's

explanation, in designating right whale critical habitat, that "any Federal action that may affect

these areas or features *is subject to the consultation requirements of section 7 of the Endangered*

*Species Act*")  (emphasis added).   Indeed, one of the central components of NMFS's Ship Strike

Strategy is to engage in "ESA section 7 consultations *with all Federal agencies who operate or*

*authorize* the use of vessels in waters inhabited by right whales, or whose actions directly or

indirectly affect vessel traffic." ANPR at 30,858 (NMFS AR 20)(Pl. Ex. 3)(emphasis added).

Accordingly, it is evident that, to fulfill its obligation to protect against jeopardizing the

continued existence of the right whale or adversely modifying critical habitat, the Coast Guard

must finally engage in formal Section 7 consultation regarding the impacts of its East Coast TSSs

on right whales.[21]

---

[20]    Thus, plaintiffs are not asking the Court to find the Coast Guard liable for a "take" of
right whales.  Although the Record certainly supports such a conclusion, plaintiffs are principally
concerned with getting the Coast Guard into formal consultation, so that the agencies can
develop the measures necessary to avoid jeopardizing the species or its critical habitat.

[21]    Because, as noted, there can be no dispute that the Coast Guard has the *authority* to
change its TSSs and other routing measures to protect right whales, the agency plainly must
consult on these measures regardless of when they were put into place.  See, e.g., Forest
Guardians v. U.S. Forest Service, 370 F. Supp. 2d 978, 986 (D. Ariz. 2004)(the ESA applies to

<p style="text-align:center">41</p>

III.    **BY FAILING TO USE THEIR AUTHORITIES AND PROGRAMS TO PROTECT AND RECOVER THE NORTH ATLANTIC RIGHT WHALE, NMFS AND THE COAST GUARD ARE BOTH VIOLATING SECTION 7(A)(1) OF THE ESA.**

As the foregoing discussion demonstrates, NMFS and the Coast Guard are allowing – and facilitating – vessel traffic at unsafe speeds in right whale habitat, and in so doing are entirely failing to address the most critical threat facing a species already teetering on the very brink of extinction.   As a result, particularly since these are the only two agencies with the statutory authority to address this critical threat to right whales, in addition to violating the APA (in the case of NMFS) and Section 7(a)(2) of the ESA (in the case of the Coast Guard), the federal defendants are also violating their affirmative obligations under Section 7(a)(1) of the ESA.  16 U.S.C. § 1536(a)(1).

As regards NMFS, as noted above, see supra at 25-26, Section 7(a)(1) requires that the agency "*shall* review other programs [it] administer[s] . . . and utilize such programs in furtherance of the purposes of" the ESA, id. (emphasis added)  – i.e., to "halt and reverse the trend toward extinction, *whatever the cost*." Sweet Home, 515 U.S. at 699, quoting TVA, 437 U.S. at 180 (emphasis added).  Those "other programs," in turn, include the MMPA, which

_____

"prior agreements" so long as "a federal  agency has retained some measure of control over an activity"), citing Klamath Water Users Prot. Assn v. Patterson, 204 F.3d 1206, 1213 (9th Cir. 2000); see also Pacific River Council v. Thomas, 30 F.3d 1050, 1055 (9th Cir. 1999).  Indeed, since these TSSs are having continuing adverse impacts of right whales, and right whale critical habitat, by failing to consult the Coast Guard is violating its statutory obligation to insure that these measures are not *jeopardizing the species or adversely modifying critical habitat*.  16 U.S.C. § 1536(a)(2); see also, e.g., Waterwatch of Oregon v. U.S. Army Corps of Engs., No. 99-861-BR, 2000 WL 1100059 (D. Or. June 7, 2000) (plaintiffs may present a Section 7(a)(2) claim where agency has the authority to modify a prior decision that is having continuing adverse effects on listed species).

mandates that NMFS *"shall* prescribe such regulations as are necessary and appropriate to carry out" that statute's similar conservation goals. 16 U.S.C. § 1382(a)(emphasis added).

Accordingly, since, as plaintiffs have demonstrated, see supra at 25-28, it is *critical* to the conservation of the species for NMFS to impose immediate speed restrictions in right whale high use areas, NMFS's failure to take this necessary step violates its affirmative obligations under Section 7(a)(1). See, e.g., Pyramid Lake Paiute Tribe of Indians v. U.S. Dept. of Navy, 898 F.2d 1410, 1417-18 (9th Cir. 1990).[22]

As regards the Coast Guard, Section 7(a)(1) requires that that agency "shall, in consultation with" NMFS, "utilize [its] authorities in furtherance of the purposes of this chapter by *carrying out programs for* the conservation of" listed species. 16 U.S.C. § 1536(a)(1) (emphasis added). Certainly, this mandate requires affirmative steps that go further than the obligation in Section 7(a)(2) to avoid jeopardizing the continued existence of the species or modifying the species' critical habitat. Accordingly, since the Coast Guard has not even yet complied with its obligations under Section 7(a)(2), it cannot be deemed in compliance with Section 7(a)(1). Moreover, in light of the overwhelming evidence here that there are specific steps the Coast Guard must take to protect right whales – such as, *inter alia*, moving the Boston

---

[22]    To be sure, courts have emphasized that agencies have discretion in deciding precisely which programs to undertake to conserve species. See, e.g., Defenders of Wildlife v. Babbit, 130 F. Supp. 2d 121, 135 (D.D.C. 2001). However, where there is a *specific* action – here, vessel speed restrictions – necessary to protect the species, NMFS's failure to take that step plainly violates its affirmative obligation under Section 7(a)(1) and the MMPA, and thus the APA, 5 U.S.C. § 706. See Sierra Club v. Glickman, 156 F.3d 606, 617-18 (5th Cir. 1998)(discussing agency's affirmative obligations under Section 7(a)(1), and the reviewability of their compliance with those requirements).

TSS out of right whale critical habitat – the agency is also failing to comply with the conservation mandate of Section 7(a)(1).[23]

## IV.    APPROPRIATE RELIEF

### A.    NMFS

In light of NMFS's failure to provide a "reasonable explanation" for its denial of plaintiffs' Petition for emergency regulations to protect right whales from ship strikes, plaintiffs seek a Declaratory Order that NMFS is violating Section 7(a)(1) of the ESA and the APA, and an Order setting aside the Petition denial and remanding it back to NMFS to make a new decision, consistent with its statutory obligations. See Lyng, 812 F.2d at 7. Given the urgency of the matter – and particularly since, to date, NMFS has still not issued either its Draft EIS, or proposed regulations – plaintiffs respectfully request that the Court order NMFS to make this new determination within thirty days.

In the event that, on remand, NMFS _grants_ the emergency rulemaking petition, plaintiffs further request that the Court order NMFS to expedite the rulemaking process, and to either issue immediate regulations pursuant to the APA's good cause exception, 5 U.S.C. § 553(b)(3)(B), or, at minimum, complete an expedited rulemaking with effective dates _no later November 1, 2006_, which will begin the next season during which these speed restrictions are necessary. See, e.g., In re Bluewater Network, 234 F.3d 1305, 1307 (D.C. Cir. 2000) (requiring agency to "conduct _prompt_ rulemaking" upon remand)(emphasis in original).

---

[23]    Since Section 7(a)(1) requires that the Coast Guard _consult_ with NMFS regarding the measures necessary to conserve the species, at bare minimum the agency must undertake the required consultation, to determine precisely which measures are necessary – a consultation that typically occurs in conjunction with consultation under Section 7(a)(2). See, e.g., CG AR 379 (Section 7(a)(1) consultation in 1998 Bi-Op on Coast Guard operations).

### B.    Coast Guard

Plaintiffs also seek a Declaratory Order that the Coast Guard is violating Sections 7(a)(1)

and 7(a)(2) of ESA, and the APA, and an Order requiring the Coast Guard and NMFS to engage

in formal Section 7 consultation over the impacts of the Coast Guard's TSSs on right whales and

right whale critical habitat.  See, e.g., Washington Toxics Project, 413 F.3d at 1030 ("The district

court ordered EPA to initiate and complete section 7(a)(2) consultation according to a prescribed

schedule"); Stickney, 864 F. Supp. 2d  at 1241-42 (ordering consultation as remedy for violation

of Section 7(a)(2)); Linnon, 967 F. Supp. at 632 (same).  Again, in light of the urgency of the

matter, plaintiffs request that the Court direct the agencies to complete the consultation within

ninety days, and that a Bi-Op be issued within forty-five days thereafter, as provided by NMFS's

consultation regulations.  50 C.F.R. § 402.14(e).

### CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court grant their Motion

for Summary Judgment, and award them the relief described herein.  An appropriate Order

embodying that relief is attached.

Respectfully submitted,

_____/s/_____

Of Counsel:

Michael P. Senatore (D.C. Bar No. 453116)
Andrew Hawley (Cal. Bar No. 229274)
Defenders of Wildlife
1130 Seventeenth Street, N.W.
Washington, D.C.  20036

June 2, 2006

Howard M. Crystal (D.C. Bar No. 446189)
Eric R. Glitzenstein (D.C. Bar No. 358287)
Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C.  20009
(202) 588-5206

Attorneys for Plaintiffs

45

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------------------------------------

Defenders of Wildlife, <u>et al.</u>          )
                                              )          No.  05-2191 (PLF)
        v.                                    )
                                              )
Carlos Gutierrez, et al.                      )

---------------------------------------------------------

## PLAINTIFFS' STATEMENT OF MATERIALS FACTS
## <u>AS TO WHICH THERE IS NO GENUINE ISSUE</u>

Pursuant to Local Rule 7(h), and <u>Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner</u>, 101 F.3d 145 (D.C. Cir. 1996), plaintiffs hereby submit the following statement of material facts as to which there is no genuine issue:

1.      The North Atlantic right whale (*Eubalaena glacialis*) is one of "the most endangered of the large whale species" in the world.  Designated Critical Habitat; Northern Right Whale (59 Fed. Reg. 28,793 (1994)); <u>see also</u> Recovery Plan for the North Atlantic Right Whale ("Recovery Plan") (NMFS Aug. 2004) at IA-1 (Pl. Ex. 9).  Commercial whaling severely depleted the species, which has not recovered.  NMFS AR 20.

2.      Although the species has been designated as endangered for over thirty-five years, listing has not been sufficient to protect the species.  The eastern North Atlantic population is nearly extinct, and the western North Atlantic population – that lives off the East Coast of the United States and Canada – is presently estimated at less than 300 remaining individuals, and declining.  NMFS AR 20, at 468; <u>see also</u> NMFS AR 9.  In light of the species' drastically reduced numbers, the death of a single whale – particularly an adult female – may determine whether the species goes extinct.  ANPR at 30,858; <u>see also, e.g.</u>, CG AR 312.    The potential

biological removal level for the North Atlantic right whale is zero.  See 2003 Stock Assessment at 8 (NMFS AR 21, at 477).

3.     Female right whales do not reach reproductive maturity until they are nine to ten years old, and even then only give birth to one calf every two to seven years.  See Recovery Plan at IIE-1 (Pl. Ex. 9).  Accordingly, in light of the incredibly low numbers of whales remaining, the survival of each female, and especially each female of reproductive age, is absolutely critical to the species' survival.  See NMFS AR 20 at 30,858; Coast Guard Biological Assessment ("CG BA") at 3-7 (CG AR 48).

4.     Right whales are slow moving, and spend a large amount of time at or near the surface resting, feeding, nursing and socializing.  Nichols and Powell, "Analysis of Risk to North Atlantic Right Whales from Shipping Traffic in Cape Cod Bay" ("Cape Cod Bay Report") (Feb. 2005) at 1 (CG AR 684).  Although adult right whales can be as large as fifty-five feet and can weigh more than seventy tons, mariners may have difficulty spotting right whales due to their dark coloration and their low profile when feeding at or beneath the surface, resting or nursing. Id.  These factors make right whales particularly susceptible to ship strikes.

5.     In the past few years, at least eight right whales are known, or are suspected to have died from ship strikes.  Of the nine known right whales deaths since January 2004, six involved females of reproductive age, three of whom were pregnant when they were killed. NMFS AR 6.  The loss of this many reproductive females in such a short period is unprecedented in the last quarter century, and is particularly devastating in light of the critical need for the birth and survival of additional right whales to offset the ongoing killing of the species.  Scott D.

Kraus et al., *North Atlantic Right Whales in Crisis*, SCIENCE, July 22, 2005 (Vol. 309) ("Right Whales in Crisis") (Pl. Ex. 10).

6.      Overall, leading right whale experts estimate that the average number of right whales dying each year, including those whose bodies are never located, could be in excess of 14 animals.  Id.  This four percent annual population loss – which includes females of reproductive age – has led to a marked decrease in the reproductive capacity of the population.  Id.  As long as the species is unable to reproduce fast enough to offset annual losses, the decline in the population will continue.  While the actual extinction of the species may not occur for some time in light of the species' long life span, biological extinction could easily occur within the next couple of generations.  Draft Environmental Assessment to Implement the Operations Measures of the North Atlantic Right Whale Ship Strike Reduction Strategy" (NMFS AR 8) at 3-1; Michael J. Moore et al., *Morphometry, gross morphology and available histopathology in North Atlantic right whale (*Eubalaena glacialis*) mortalities (1970-2002)*, 6 J. Cetacean Res. Manage. 1 (2005) (Pl. Ex. 11).

7.      North Atlantic right whales are most often found in coastal or shelf waters.  From late winter to early fall the majority of right whales are located in feeding and nursery grounds off the coast of New England, including Cape Cod Bay, the Great South Channel east of Cape Cod, and George's Bank further east, which is considered among the most productive continental-shelf ecosystems in the world.  CG BA (CG AR 26).  Later in the Fall, and then again in the Spring, right whales migrate down, and then up the coast, and a segment of the population moves to calving grounds off the coast of Georgia and Florida.  2003 Stock Assessment 6 (NMFS AR 21,

at 6).  Cape Cod Bay, the Great South Channel, and the coasts of Georgia and Northern Florida are extremely important habitat for cetaceans.  CG BA at 43.

8.      In light of the critical importance of these habitat areas to the species, in 1994 NMFS has identified three areas with feeding sites, breeding grounds, and calving areas considered essential to the northern right whale and designated critical habitat in those areas: 1) the Great South Channel east of Cape Cod; 2) Cape Code and Massachusetts Bays; and 3) coastal Florida and Georgia.  59 Fed. Reg. 28,793, 28,803 (Jun. 3, 1994) (Pl. Ex. 8).  In designating these areas, NMFS explained that any Federal action that may affect these areas or features is subject to the consultation requirements of section 7 of the Endangered Species Act.  Id. at 28,973.

9.      Right whale habitat use coincides with coastal areas intensively used by humans for fishing, shipping, and recreation.  CG BA at 3-1, 3-8, 3-9 (CG AR 42, 49-50).  Collisions with ships account for more confirmed right whale mortalities than any other human-related activity.  ANPR at 30,858 (AR 468)(Pl. Ex. 3).  Ship strikes are responsible for over 50% of known human-related right whale mortalities and are believed to be one of the principal causes for the lack of recovery in this population.  Id.; Nichols and Powell, "Analysis of Risk to North Atlantic Right Whales from Shipping Traffic in Cape Cod Bay" ("Cape Cod Bay Report")(Feb. 2005) at 1 (CG AR 684); Defendants' Answer ("Answer") (Feb. 16, 2006), ¶ 45; Recovery Plan at IG-1.

10.     The risks posed by shipping vessels are significantly elevated because right whales are located in, or adjacent to, several major shipping corridors.  Cape Cod Bay Report at 1; Answer, ¶ 64.  The Boston TSS travels directly through right whale critical habitat, including the Great South Channel.  ANPR at 30,860 (NMFS AR 20, at 470) (Pl. Ex. 3); see also CG AR

4

334.  Numerous other shipping lanes also travel through other known right whale habitat use areas, such as the Gulf of Maine, and right whale migration corridors up and down the East Coast.  Coast Guard BA at 3-1 (CG AR 42); NMFS AR 20 at 30,859; Answer, ¶ 45.

11.    Although defendants have developed several voluntary measures in recent years intended to reduce the risks of ship strikes, right whales continue to be killed as a result of collisions with vessels. NMFS AR 20, at 468 (emphasis added); Right Whales in Crisis at 561. NMFS has concluded that additional, more pro-active measures are necessary to reduce or eliminate the threat of ship strikes to right whales," ANPR at 30,858.

12.    The best available information indicates that collisions causing lethal or serious injuries to whales are absent or very rare when vessels travel at less than 10 knots, infrequent at speeds between 10 and 13 knots, and most common at speeds of 14 knots or higher.  NMFS AR 19 (Pl .Ex. 14), at 486-87; David W. Laist et al., *Collisions Between Ships and Whales*, 17 Marine Mammal Sci. 35 (2001) (Pl. Ex. 25).  An effective speed restriction could offer even more protection to whales than rerouting traffic around identified whale aggregations because ships routed at undiminished speed around whale concentrations could encounter animals joining or leaving nearby concentrations.   MMC Comments, Enc. at 2 (Pl. Ex. 15) (NMFS AR 19, at 488) (emphasis added).

13.    Right whales are located in, or adjacent to, several major shipping corridors, Cape Cod Bay Report at 1, and Coast Guard measures concentrate ship traffic into right whale use areas.  ANPR at 30,860; id. at 30,859; Misty Niemeyer et al., "North Atlantic Right Whale Sighting Survey (NARWSS) and Right Whale Sighting Advisory System: 2005 Results Summary." Northeast Fisheries Science Center. (Pl. Ex. 30) at 6; Amy R. Knowlton & Scott D.

Kraus, "Mortality and serious injury of northern right whales (*Eubalaena glacialis*) in the western North Atlantic Ocean," 2 J. Cetacean Res. Manage. 193, 198 (2001) (Pl. Ex. 31); Gregory K. Silber et al., "Ship Traffic Patterns in Right Whale Critical Habitat: Year One of the Mandatory Ship Reporting System." NOAA Technical Memorandum (Jan. 2002) (Pl. Ex. 32) at 7; Amy R. Knowlton et al., "Right Whale Sightings and Survey Effort in the Mid Atlantic Region: Migratory Corridor, Time Frame, and Proximity to Port Entrances." Report submitted to the NMFS ship strike working group (July 2002) (Pl. Ex. 33) at 25.

      14.     Marine vessels routinely travel within designated Traffic Separation Schemes ("TSSs"), which provide them assurance of safe passage through busy shipping corridors. <u>See, e.g.</u>, ANPR at 30,860; <u>see also</u> Pl. Ex. 7. One of the greatest factors contributing to ship/whale collisions may be the overlap of right whale distribution and vessel traffic densities. "Large Whale Ship Strikes Relative To Vessel Speed" at 1 (Pl. Ex. 6), at 7 (emphasis added).

      15.     Ship collisions are responsible for more right whale deaths than any other single human impact. <u>Id.</u> at 1. Ship strikes are responsible for 10 of 18 right whale deaths attributable to human activity between 1970 and 1999. <u>Id.</u> Many ship strikes also go unreported, and therefore it is highly likely that right whale mortality from ship collisions is far higher than the reported number. <u>Id.</u>

      16.     In addition to the risks posed by directly hitting a right whale, turbulence associated with vessel traffic may also indirectly affect northern right whales by breaking up the dense surface zooplankton patches in certain whale feeding areas. Crit. Hab. Rule at 28,797 (Pl. Ex. 8). In light of these and other impacts, NMFS has explained that frequent travel by

commercial vessels in right whale critical habitat represents a considerable threat to northern right whales.  Id. at 28,803

17.    NMFS has repeatedly emphasized the importance of  consultations under section 7(a) of the ESA to ensure that routine vessel operations are not likely to jeopardize the continued existence of right whales or destroy or adversely modify right whale critical habitat.  Petition Denial at 56,885; 59 Fed. Reg. at 28,973 (Pl. Ex. 8).  One of the central components of NMFS's Ship Strike Strategy is to engage in ESA section 7 consultations with all Federal agencies who operate or authorize the use of vessels in waters inhabited by right whales, or whose actions directly or indirectly affect vessel traffic. ANPR at 30,858 (AR 468).

18.    The Coast Guard has established TSSs in right whale habitat near numerous port areas along the East Coast.   In Casco Bay (Portland, Maine) and Buzzards Bay (Providence, Rhode Island), the Coast Guard has existing TSSs, and is in the process of revising those TSSs. CG AR 1120 and 1218; see also 70 Fed. Reg. 38,061 (recent Montauk Channel and Block Island Sound PARS).  The Coast Guard also has TSSs in New York, the Chesapeake Bay, and the Delaware Bay, several of which have also undergone recent revisions.  See Off New York TSS (33 C.F.R. §§ 167.150 to 167.155); Off Chesapeake Bay (id. §§ 167.200 to 167.203); Off Delaware Bay TSS (id. §§ 161.170 to 161.174); see also CG AR 2162 (announcing 2005 changes to Chesapeake Bay TSS).  In Cape Fear (Wilmington, North Carolina), the Coast Guard also recently established a TSS.  CG AR 2539, 2507.  Some of these TSSs have been reevaluated and altered over time.  CG AR 1892; CG AR 1120; CG AR 1218.

19.    Some of these TSSs have been promulgated as regulations in the Code of Federal Regulations, while others have not. At least some TSSs are established through the approval of

the International Maritime Organization ("IMO").  CG AR 1084.  The IMO is a United Nations agency that addresses maritime safety and other matters through international agreements and other protective measures.  Introduction to IMO (http://www.imo.org/home.asp).

20.     The Coast Guard has not engaged in Section 7 consultation with NMFS concerning whether any of these TSSs, or all of them taken together, are likely to jeopardize the continued existence of the right whale or adversely modify the species' critical habitat.  Although the Coast Guard has undertaken a PARS that takes right whale impacts into consideration, the Coast Guard has not engaged in Section 7 consultation with regard to any TSS changes associated with this PARS.  See CG AR 946 and 992.

21.     In the area of Cape Cod Bay, Race Point, and the Great South Channel (Boston, Massachusetts), the Coast Guard has an existing TSS, and recognizing the significant adverse impacts that the existing TSS was having on right whales, is rerouting its TSS specifically to address right whale impacts, although not moving it entirely out of right whale critical habitat. CG AR 1086-1093.

22.     In the Southeast United States (Jacksonville, Florida, Fernandina Beach, Florida, and Brunswick, Georgia), where the Coast Guard has not previously established a TSS, the agency intends to put a TSS in place specifically to address right whale impacts.  See CG AR 1094.  In establishing, revising, and continuing to maintain each of these TSSs, the Coast Guard has never engaged in consultation under Section 7.

23.     More than five years ago NMFS commissioned a Report from the Northeast and Southeast Right Whale Recovery Implementation Teams to recommend additional measures to protect right whales.  ANPR at 30858; Bruce A. Russell, White paper: Recommended Measures

To Reduce Ship Strikes of North Atlantic Right Whales. Aug. 2001 ("Ship Strike Report") (Aug. 2001) (Pl. Ex. 14).  Among other measures, that Report, issued in August 2001, recommended that NMFS set speed limits of 10 knots in certain areas,  id. at 5; designate Cape Cod Bay, part of the Great South Channel, and other areas as "Areas To Be Avoided" ("ATBA") at certain times of year, id. at 9-10; and take other steps.

24.    In response to this Report, NMFS developed a "Strategy to Reduce Ship Strikes of Right Whales."  ANPR at 30,858.  In addition to continued outreach and education efforts, and other voluntary measures, two of the specific elements of the Strategy provided fo the establishment of new operational measures for the shipping industry, including consideration of routing and speed restrictions and ESA section 7 consultations with all Federal agencies who operate or authorize the use of vessels in waters inhabited by right whales, or whose actions directly or indirectly affect vessel traffic.  ANPR at 30,858 (emphasis added).

25.    In June 2004 NMFS issued its Advance Notice of Proposed Rulemaking outlining regulatory measures to protect right whales.  NMFS AR 20 (Pl. Ex. 3).  The principal measure proposed was seasonal speed restrictions for vessels in important right whale habitat.  Id.  The ANPR provided for speed restrictions in the Southeast from December 1 to March 31st; the Mid-Atlantic in the Spring, and again in the Fall; and in the Northeast from January through July.  Id. at 30,858-30,860.

26.    During the remainder of 2004, NMFS received comments from plaintiffs and others  supporting these proposed regulatory measures.  See, e.g., AR 19, at BN 234; BN 312; BN 357; BN 374.  These included comments from the Marine Mammal Commission ("MMC"), which wholly endorsed the use of speed restrictions to protect right whales. NMFS AR 19 (Pl.

Ex. 15), 484, 487.  NMFS also held industry stakeholder meetings to consider additional views.
See NFMS AR 14.

27.    On January 24, 2005, the MMC wrote NMFS explaining that, in light of the six
right whale deaths in the preceding 11 months, the MMC strongly believed that NMFS needed to
implement emergency rules at once to reduce the number of right whale deaths.  Jan. 24, 2005
Letter from the MMC (Pl. Ex. 16).  The MMC recommended that NMFS adopt "emergency
rules" providing speed restrictions during right whale high use periods.  Id.

28.    NMFS did not enact these regulations.  Instead, NMFS decided that it would
prepare an Environmental Impact Statement ("EIS") before proceeding further.  See Pl. Ex. 17.

29.    In May 2005 plaintiffs and others submitted a formal Rulemaking Petition to
NMFS seeking the imposition of emergency regulations to immediately protect right whales by
imposing seasonal speed restrictions.  May 19, 2005 Petition for Initiation of Emergency
Rulemaking To Prevent Extinction of the North Atlantic Right Whale ("Emergency Rulemaking
Petition") (NMFS AR 12).  Largely mirroring the ANPR, and the MMC's request, the Petitioners
sought maximum speed limits of 12 knots for vessels while they are within 25 nautical miles of
port entrances during seasonal right whale high use periods, until such time as permanent
measures can be enacted.  Id. at 3-4.  As in the ANPR, these specific proposed time periods
varied by region, but ranged from November 1 to July 31st.  Id. at 4.  The Petitioners sought a
similar seasonal speed restriction on travel through right whale critical habitat and in the Boston
TSS, as well as a system to impose speed restrictions in additional areas or during additional time
periods based on unexpected aggregations of whales.  Id.  Other scientists also advocated for
these emergency measures.  See Right Whales in Crisis (Pl. Ex. 10).

10

30.    Recognizing that the recommendations of the emergency rulemaking are part of the shipstrike strategy, almost word for word, NMFS considered several responses to the Petition, including requesting public comment on it, and issuing proposed emergency regulations.  See NMFS AR 11 (Pl. Ex. 18).  Less than a month after receiving the Petition, NMFS tentatively decided to deny it.  NMFS AR 10.  Although several weeks later NMFS published a Notice of Intent to finally begin the EIS that the agency intended to complete before putting any kind of regulations in place, none of the alternatives in the EIS at all addressed the timetable on which regulations would be implemented.  70 Fed. Reg. 36,121 (June 22, 2005) (NMFS AR 9).  As early as July 2005, NMFS already recognized that, even on an expedited schedule, the EIS would not be completed for at least another year.  NMFS AR 7.

31.    In September 2005, NMFS wrote to plaintiffs explaining that the agency intended to deny the Rulemaking Petition.  NMFS AR 3 (Pl. Ex. 19).  The only rationale provided for this decision was that the emergency regulations plaintiffs had requested "would duplicate agency efforts and reduce agency resources for a more comprehensive strategy, as well as risk delaying implementation of the draft Strategy."  Id. at BN 7.

32.    On September 29, 2005, NMFS published a Federal Register notice formally denying the Rulemaking Petition, on the ground that, "[p]romulgating a separate 12-knot speed limit, at this time, would curtail full public notice, comment and environmental analysis, duplicate agency resources for a more comprehensive strategy, as well as risk delaying implementation of the draft Strategy."  Petition Denial (NMFS AR 1) (Pl. Ex. 5).

33.    In the first five months of this year, three additional right whales have died.  One of the additional deaths was from a ship strike, and a second may have been as well.  A fourth

whale was struck by a ship and survived.  See Declaration of Regina Asmutis, ¶ 4 (Pl. Ex. 21).

In the meantime, NMFS has still neither issued its Draft EIS, nor proposed regulations to address

this ongoing crisis.

34.     NMFS often publishes an announcement of Rulemaking Petitions for public

comment, including where the Petition seeks emergency rulemaking.  See, e.g., 69 Fed. Reg.

32991 (2004)(Pl. Ex. 26); 69 Fed. Reg. 40,850 (2004) (Pl. Ex. 27).  NMFS has also implemented

temporary regulations to protect right whales from fish entanglement without prior notice and

comment.  71 Fed. Reg. 28,587, 28,588 (May 17, 2006)(Pl. Ex. 28).

35.     The ANPR was issued two years ago.  Pl. Ex. 3.  The Notice of Intent to prepare

an EIS to accompany these regulations was issued almost a year ago.  NMFS AR 9.  To date,

NMFS has neither issued even a Draft EIS for public comment, nor any Proposed Regulations.

Nor has the agency even committed to any date certain by when any of these steps will occur.

36.     NMFS has missed its own deadlines in this rulemaking process.  Pl. Ex. 29;

NMFS AR 11 (Pl. Ex. 18).

37.     Plaintiffs have members who regularly look for, observe, study, and appreciate

North Atlantic right whales in their natural habitat, and whose ability to engage in these activities

is concretely compromised by the risk of whales dying or being injured as a result of ship strikes.

Declarations of Regina Asmutis, Sharon Young, Linda Bermer and John Phillips (Pl. Exs. 21-

24).

Respectfully submitted,

_____/s/_____

Of Counsel:

Michael P. Senatore (D.C. Bar No. 453116)
Andrew Hawley (Cal. Bar No. 229274)
Defenders of Wildlife
1130 Seventeenth Street, N.W.
Washington, D.C.  20036

Howard M. Crystal
(D.C. Bar No. 446189)
Eric R. Glitzenstein
(D.C. Bar. No. 358287)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C.  20009
(202) 588-5206

June 2, 2006

Attorneys for Plaintiffs

13

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                         )
Defenders of Wildlife, et al.,           )
                                         )
          Plaintiffs,                    )          No.  05-2191 (PLF)
                                         )
     v.                                  )
                                         )
Carlos Gutierrez, et al.,                )
                                         )
          Defendants.                    )
_____)

### **ORDER**

Upon consideration of plaintiffs' Motion For Summary Judgment, the opposition thereto, and the entire record herein, it is hereby ORDERED that the Motion is GRANTED; and it is further

ORDERED that the Court DECLARES that the National Marine Fisheries Service ("NMFS") and the United States Coast Guard ("Coast Guard") are violating Sections 7(a)(1) and 7(a)(2) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, in connection with (a) NMFS's denial of plaintiffs' Rulemaking Petition seeking marine vessel speed restrictions in North Atlantic right whale ("right whale") high-use areas, and (b) the Coast Guard's failure to engage in ESA Section 7 consultation concerning the impacts of that agency's Traffic Separation Schemes ("TSS") under the Ports and Waterways Safety Act ("PWSA"), 33 U.S.C. § 1223, on right whales; and it is further

ORDERED that NMFS's denial of the Rulemaking Petition is hereby SET ASIDE and REMANDED to NMFS to make a new decision, consistent with this Court's ruling, within thirty (30) days of this Order; and it is further

ORDERED that, in the event NMFS grants the Rulemaking Petition, NMFS shall complete a rulemaking process by no later than later November 1, 2006, and, in the event NMFS denies the Petition, the Court shall retain jurisdiction over any challenge to that decision; and it is further

ORDERED that the Coast Guard shall promptly enter into consultation with NMFS under Section 7(a)(1) and 7(a)(2) of the ESA, 16 U.S.C. § 1536(a), concerning the impacts of the Coast Guard's TSSs on right whales and right whale critical habitat; and it is further

ORDERED that the Coast Guard and NMFS shall complete the consultation, and NMFS shall issue a Biological Opinion concerning Coast Guard marine vessel routing measures on right whales and right whale critical habitat, within 135 days after entering formal consultation; and it is further

ORDERED that this Court shall retain jurisdiction to ensure defendants' compliance with the terms of the Court's Order.

_____
U.S. District Judge

2