Plaintiffs' Exhibit 12
Defenders of Wildlife v. Gutierrez
No. 05-2191 (PLF) (D.D.C.)

6. Update on the Windsurfer's exemption from PFD's.
7. Status report on Preemption of State Boating Laws.
8. Update on proposed Visual Distress Signal regulations.
9. Office of Boating Safety report.
10. Members' Items.
11. Chairman's Session.

Attendance is open to the interested public. With the approval of the Chairman, members of the public may present oral statements at the meeting. Persons wishing to present oral statements should so notify the Executive Director no later than the day before the meeting. Any member of the public may present a written statement to the Council at any time. Additional information may be obtained from Commander Neal Mahan, Executive Director, National Boating Safety Advisory Council, U.S. Coast Guard (G-BA), Washington, D.C. 20590, or by calling 202-426-1080.

Issued in Washington, D.C. on April 10, 1979.

B. E. Thompson,
*Rear Admiral, U.S. Coast Guard, Chief, Office of Boating Safety.*

[CGD-79-056]
[Doc. 79-11757 Filed 4-13-79; 8:45 am]
BILLING CODE 6910-14-M

## Coast Guard

### Port Access Routes; Study Dates and Contact Points

The Coast Guard is undertaking a study of the potential vessel traffic density and the need for safe access routes for vessels operating in the approaches to U.S. ports and in the traditional routes between ports in the continental United States including Alaska. The results of this study could cause restrictions on the manner in which specific areas leased after the date of this Notice may be explored and developed for natural resources. Any action taken as a result of the study would be consistent with sub-section 4(c)(1) and 4(c)(2) of the Ports and Waterways Safety Act (PWSA), (P.L. 95-474, 92 Stat. 1473).

This study is being conducted under the standards contained in sub-section 4(c)(3)(A) of the PWSA. As a result of this study it is anticipated that suitable ships' routing measures, such as shipping safety fairways and/or traffic separation schemes, may be proposed in future Federal Register. Implementing regulations of any routing measures will be in accordance with the PWSA and the Administrative Procedures Act. In accordance with the PWSA, the Coast Guard will consult with the Secretaries of State, Interior, Commerce, and the Army, and the Governors of the affected States, concerning this matter.

Since the entire coast of the United States is being studied, Coast Guard district staff officers will be responsible for executing this study in various study areas. Based on present needs and anticipated use conflicts in various study areas, and the resources available to conduct the study, the study will be completed in the various areas at different times. it is realized that in many locations traditional traffic routes cross from one study area to another or extend into waters under the jurisdiction of another country. The work of the study and any plan for development of routing measures will be coordinated between adjacent study areas and will consider traffic patterns and other factors in adjacent waters that are under the jurisdiction of another country, where appropriate. The following list divides the coast of the United States into defined areas, provides areas of interest, and provides the "CONTACT" officer who is responsible for the study in each area.

**Study Areas and Contacts**

Area 1: Northeast coast of Maine. From the coast seaward to the 1800 meter curve or to the limit of Canadian jurisdiction, from the Canadian/United States border to a line bearing 120° T from Great Duck Island Light (44°08.5' N, 68°14.8' W).

Dates: Complete data collection by June 1, 1980. Publish study results—February 1, 1981 (estimated).

Area 2: Includes Searsport, Bucksport, and Portland, Maine, and Portsmouth, New Hampshire. From the coast seaward to the 1800 meter curve or to the limit of Canadian jurisdiction, from a line bearing 120° T from Great Duck Island Light (44°08.5' N, 68°14.8' W) to a line bearing 110° T as it passes through Isle of Shoals Light (42°58.0' N, 70°37.4' W).

Dates: Complete data collection by June 1, 1980. Publish study results—February 1, 1981 (estimated).

Area 3: Includes Boston, Massachusetts. From the coast seaward to the 1800 meter curve or to the limit of Canadian jurisdiction, from a line bearing 110° T as it passes through Isle of Shoals Light (42°58.0' N, 70°37.4' W) to a line bearing 180° T from Chatham Light (41°40.3' N, 69°57.0' W).

Dates: Complete data collection by December 1, 1979. Publish study results—July 1, 1980 (estimated).

Area 4: Includes Fall River and New Bedford, Massachusetts, and Providence, Rhode Island. Enclosed by the coast and a line bearing 180° T from Chatham Light (41°40.3' N, 69°57.0' W) to 40°40.0' N latitude; thence a line bearing 270° T to 71°51.5' W longitude; thence a line bearing 000° T to Watch Hill Light (41°18.2' N, 70°51.5' W).

Dates: Complete data collection by June 1, 1980. Publish study results—February 1, 1981 (estimated).

Contact: For Areas 1 through 4: LCDR F. P. Hopkins, c/o Commander (m), First Coast Guard District, 150 Causeway Street, Boston, MA 02114, (617) 223-6915.

Area 5: Includes New York, NY, excludes Long Island Sound. Enclosed by the coast and a line bearing 180° T from Montauk Point Light (41°04.3' N, 71°51.4' W) to 40°40.0' N latitude; thence a line bearing 090° T to 69°57.0' W longitude; thence a line bearing 180° T to the 1800 meter curve; thence southwesterly along the 1800 meter curve to 38°45.0' N latitude, 72°44.0' W longitude; thence a line bearing 295° T to Atlantic City Light (39°21.9' N, 74°24.6' W).

Dates: Complete data collection by July 1, 1979. Publish study results—October 1, 1979 (estimated).

Area 5a: Includes Long Island Sound. All of Long Island Sound and that portion of Block Island Sound lying west of a line from Watch Hill Light (41°18.2' N, 70°51.5' W) to Montauk Point Light (41°04.3' N, 71°51.4' W).

Dates: Complete data collection by June 1, 1980. Publish study results—December 1, 1980 (estimated).

Area 6: Includes Delaware Bay. From the coast seaward to the 1800 meter curve, from a line bearing 115° T from Atlantic City Light (39°21.9' N, 74°24.6' W) to a line bearing 122° T from Fenwick Island Light (38°27.1' N, 75°03.3' W).

Dates: Complete data collection by July 1, 1979. Publish study results—October 1, 1979 (estimated).

Contact: For Areas 5 through 6: LT W. J. Chubb, c/o Commander (mps), Third Coast Guard District, Governors Island, NY 10004, (212) 668-7179.

Area 7: Delmarva Peninsula. From the coast seaward to the 1800 meter curve, from a line bearing 122° T from Fenwick Island Light (38°27.1' N, 75°03.3' W) to a line bearing 060° T from Cape Charles Light (37°07.4' N, 75°54.4' W).

Dates: Complete data collection by June 1, 1981. Publish study results—December 1, 1981 (estimated).

Area 8: Includes the entrance to the Chesapeake Bay. From the coast seaward to the 1800 meter curve, from a line bearing 060° T from Cape Charles Light (37°07.4' N, 75°54.4' W) to 36°33.0' N latitude.

Dates: Complete data collection by June 1, 1980. Publish study results—December 1, 1980 (estimated).

Area 9: North Carolina Outer Banks. From the coast seaward to the 1800 meter curve, from 36°33.0' N latitude to a line bearing 163° T from Cape Lookout Light (34°37.3' N, 76°31.5' W).

Dates: Complete data collection by June 1, 1981. Publish study results—December 1, 1981 (estimated).

Area 10: Includes Morehead City, North Carolina. Enclosed by the coast and a line bearing 163° T from Cape Lookout Light (34°37.3' N, 76°31.5' W) to the 1800 meter curve; thence south-southwest along the 1800 meter curve to 32°41.0' N latitude, 76°20.0' W longitude; thence a line bearing 302° T to

33°09.0' N latitude, 77°14.0' W longitude; thence a line bearing 012° T to the coast.

Dates: Complete data collection by June 1, 1980. Publish study results—December 1, 1980 (estimated).

Area 11: Onslow Bay. Enclosed by the coast and a line bearing 192° T from 34°41.0' N latitude, 76°50.0' W longitude and a line bearing 137° T from Oak Island Light (33°53.6' N, 78°02.1' W).

Dates: Complete data collection by June 1, 1981. Publish study results—December 1, 1981 (estimated).

Area 12: Includes Wilmington, North Carolina. Enclosed by the coast and a line bearing 137° T from Oak Island Light (33°53.6' N, 78°02.1' W) to 33°08.0' N latitude, 77°11.6' W longitude; thence a line bearing 122° T to 32°50.0' N latitude, 76°37.0' W longitude; thence a line bearing 270° T to 78° W longitude; thence a line bearing 336° T to the coast at the North Carolina/South Carolina border.

Dates: Complete data collection by June 1, 1980. Publish study results—December 1, 1980 (estimated).

Contact: For Areas 7 through 12: LT D. G. Bratton, c/o Commander (mps), Fifth Coast Guard District, 431 Crawford Street, Portsmouth, VA 23705, (804) 398-9398.

Area 13: Includes Cape Romain Area. Enclosed by the coast and a line bearing 156° T from the coast at 78°32.0' W longitude to 32°50.0' N latitude 78° W longitude, thence a line bearing 270° T to the coast.

Dates: Complete data collection by June 1, 1981. Publish study results—December 1, 1981 (estimated).

Area 14: Includes Charleston, South Carolina, and Savannah, Georgia. From the coast seaward to the 1800 meter curve, from 32°50.0' N latitude to 31°30.0' N latitude.

Dates: Complete data collection by August 1, 1980. Publish study results—March 1, 1981 (estimated).

Area 15: Includes Brunswick, Georgia, and Jacksonville, Florida. From the coast seaward to the 1800 meter curve, from 31°30.0' N latitude to 30° N latitude.

Dates: Complete data collection by August 1, 1979. Publish study results—February 1, 1980 (estimated).

Area 16: Includes Cape Canaveral Area. From the coast seaward to the 1800 meter curve or the limit of Bahamian jurisdiction, from 30° N latitude to 27° N latitude.

Dates: Complete data collection by June 1, 1981. Publish study results—December 1, 1981 (estimated).

Area 17: Includes Port Everglades and Miami, Florida. From the coast seaward to the limit of Bahamian jurisdiction, from 27° N latitude to 25°20.0' N latitude.

Dates: Complete data collection by August 1, 1980. Publish study results—March 1, 1981 (estimated).

Area 18: Includes the Florida Keys and southwest Florida coast. From the coast to the 1800 meter curve or the limit of the Bahamian jurisdiction or the limit of Cuban jurisdiction, from 25°20.0' N latitude on the eastern side of Florida, around the Florida Keys, to 27° N latitude on the western side of Florida.

Dates: Complete data collected by June 1, 1981. Publish study results—December 1, 1981 (estimated).

Area 19: Includes the entrance to Tampa Bay. From the coast to a line bearing 019° T passing through the point 27° N latitude, 85° W longitude, from 27° N latitude to 28° N latitude.

Dates: Complete data collection by August 1, 1980. Publish study results—March 1, 1981 (estimated).

Area 20: Includes the Cedar Keys Area. Enclosed by the coast and a line bearing 199° T from the coast at 83°50.0' W longitude to 28° N latitude; thence a line bearing 090° T to the coast.

Dates: Complete data collection by June 1, 1981. Publish study results—December 1, 1981 (estimated).

Contact: For Areas 13 through 20 until May 15, 1979: LCDR M. G. Cavett, c/o Commander (mps), Seventh Coast Guard District, 51 S.W. 1st Avenue, Miami, FL 33130, (305) 350-5651.

After May 15, 1979: LCDR R. M. Acker, c/o Commander (dpl), Seventh Coast Guard District, 51 S.W. 1st Avenue, Miami, FL 33130, (305) 350-5502.

Area 21: Includes entire Gulf of Mexico coast from St. Marks, Florida to the west. From the coast seaward to the 1800 meter curve of the limit of Mexican jurisdiction, from a line bearing 199° T from the intersection of the Florida coast at 83°50.0' W longitude to the Mexican/United States border.

Dates: Complete data collection by June 1, 1980. Publish study results—February 1, 1981 (estimated).

Contact: For Area 21: LCDR G. J. E. Thornton, c/o Commander (mps), Eighth Coast Guard District, Hale Boggs Federal Building, 500 Camp Street, New Orleans, LA 70130, (504) 589-6901.

Area 22: Southern California. Enclosed by the coast and the line of Mexican jurisdiction from the Mexican/United States border to 32° N latitude, 118°08.0' W longitude; thence a line bearing 270° T to 122° W longitude; thence on a line bearing 000° T to 35° N latitude; thence a line bearing 090° T to the coast.

Dates: Complete data collection by January 1, 1980. Publish study results—July 1, 1980 (estimated).

Contact: For Area 22: LT R. A. Wendt, c/o Commander (dj), Eleventh Coast Guard District, 400 Oceangate, Suite 912, Long Beach, CA 90822, (213) 590-2301.

Area 23: Includes Morro Bay and Monterey Bay. Enclosed by the coast and a line bearing 270° T from the coast at 35° N latitude to 122° W longitude; thence a line bearing 338° T to 37° N latitude, 123° W longitude; thence a line bearing 090° T to the coast.

Dates: Complete data collection by June 1, 1980. Publish study results—January 1, 1981 (estimated).

Area 24: Includes San Francisco Bay. Enclosed by the coast and a line bearing 270° T from the coast at 37° N latitude to 123° W longitude; thence a line bearing 321.5° T to 38° N latitude, 124° W longitude; thence a line bearing 090° T to the coast.

Dates: Complete data collection by June 1, 1980. Publish study results—January 1, 1981 (estimated).

Area 25: Northern California including Humboldt Bay. Enclosed by the coast and a line bearing 270° T from the coast at 38° N latitude to 124° W longitude; thence a line bearing 339° T to 40° N latitude, 125° W longitude; thence a line bearing 000° T to 42° N latitude; thence a line bearing 060° T to the coast at the California/Oregon border.

Dates: Complete data collection by June 1, 1980. Publish study results—January 1, 1981 (estimated).

Contact: For Areas 23 through 25: CDR R. G. Hall, c/o Commander (mps), Twelfth Coast Guard District, 630 Sansome Street, San Francisco, CA 94126, (415) 556-1380.

Area 26: Oregon Coast. Enclosed by the coast and a line bearing 270° T from the coast at 42° N latitude to a point 125°10.0' W longitude; thence a line bearing 357° T to 45°35.0' N latitude, 125°25.0' W longitude; thence a line bearing 090° T to the coast.

Dates: Complete data collection by December 1, 1979. Publish study results—June 1, 1980 (estimated).

Area 27: Includes Columbia River Entrance. Enclosed by the coast and a line bearing 270° T from the coast at 45°35.0' N latitude to 125°25.0' W longitude; thence a line bearing 349° T to 46°45.0' N latitude, 125°45.0' W longitude; thence a line bearing 090° T to the coast.

Dates: Complete data collection by December 1, 1979. Publish study results—June 1, 1980 (estimated).

Area 28: Washington Coast. Enclosed by the coast and a line bearing 270° T from the coast at 46°45.0' N latitude to 125°45.0' W longitude; thence a line bearing 344° T to 47°45.0' N latitude, 126°10.0' W longitude; thence a line bearing 090° T to the coast.

Dates: Complete data collection by December 1, 1979. Publish study results—June 1, 1980 (estimated).

Area 29: Includes the entrance to the Strait of Juan de Fuca. From the coast, including the entrance to the Strait of Juan de Fuca, seaward to the 1800 meter curve, from 47°45.0' N latitude to the limit of Canadian jurisdiction.

Dates: Complete data collection by December 1, 1979. Publish study results—June 1, 1980 (estimated).

Contact: For Areas 26 through 29: LCDR D. W. Powell, c/o Commander (dpl), Thirteenth Coast Guard District, 915 Second Avenue, Seattle, WA 98174, (206) 442-7523.

Area 30: Includes Prince William Sound. From the coast to 59° N latitude, from 142° W longitude to 148° W longitude.

Dates: Complete data collection by July 1, 1979. Publish study results—January 1, 1980 (estimated).

Area 31: Includes Cook Inlet and the Shelikof Strait. From the coast on the northwest to 56° N latitude on the south and to 150° W longitude on the east.

Dates: Complete data collection by J 1979. Publish study results—January 1, 1 (estimated).

Area 32: Alaska. From the coast seaward to the 1800 meter curve or the limit of

Socialist Republics jurisdiction, from the Canadian/United States border to the Bering Straits, excluding any area to the west of 170° W longitude, excluding the regions lying within areas 30 and 31 above.

Dates: Complete data collection by July 1, 1979. Publish study results—January 1, 1980 (estimated).

Contact: For Areas 30 through 32: LT D. P. Montoro, c/o Commander (mvs), Seventeenth Coast Guard District, P.O. Box 3-5000, Juneau, AK 99802, (907) 586-7195.

It should be noted that the area to be studied as published on January 29, 1979 (44 FR 5739), and amplified on February 8, 1979 (44 FR 8052), has been divided. That area was described as extending from the coast of the United States to the 1800 meter curve (approximately 1000 fathoms) or the limit of the Canadian jurisdiction on the Outer Continental Shelf, from 35° N. Latitude to 43° N. Latitude. That area is now included in study areas numbered 3 to 9 listed above. This action was taken in order that the study of that area might be more effectively conducted. Copies of comments received in response to those notices will be forwarded to the officers now responsible for the smaller areas for proper consideration.

The Coast Guard is interested in receiving additional views from interested parties who have information that might pertain to the safe routing of ships as affected by other reasonable uses of the area. Written comments should include the docket number (CGD 79-047), the name and address of the person submitting the comments, and reason for the comment. The comments should also identify the specific study area or areas to which it applies.

Further information can be obtained from and comments concerning specific areas of the study should be submitted to the individual listed as "CONTACT" for each study area as listed above. Comments addressing the study in general should be sent to:

LCDR John Bannan, c/o Commandant (G-WLE-4/73), U.S. Coast Guard, 400 Seventh Street, S.W., Washington, DC 20590, (202) 426-4958.

Study policies: The action to be taken as a result of the study can not be specified at this time. However, the Coast Guard has certain policies which are provided here to assist those who wish to submit comments to the study and those who are concerned with upcoming OCS Oil and Gas leases. These policies and intentions are based Coast Guard experience in the areas of ships routing, navigation, cargohandling, the effects of weather, and prior analysis of the traffic density in of the PWSA.

The PWSA directs that the Secretary [Coast Guard] provide safe access routes for the movement of vessel traffic proceeding to or from ports * * * and shall designate necessary fairways and traffic separation schemes * * *." The PWSA provides clear guidance as to the manner in which this is to be done. Among the concepts that stand out are: "Such a designation shall recognize, within the designated area, the paramount right of navigation over all other uses." and "to the extent practicable, reconcile the need for safe access routes with the needs of all other reasonable uses of the area involved."

The PWSA also directs consultation with the Secretaries of State, Interior, Commerce, and the Army, and the Governors of the affected States. We are to "at the earliest possible time, consult with and receive and consider the views of representatives of the maritime community, port and harbor authorities or associations, environmental groups, and other parties who may be affected by the proposed action."

In addition, the Act states that the Secretary [Coast Guard] "may, from time to time, as necessary, adjust the location or limits of designated fairways or traffic separation schemes, in order to accommodate the needs of other uses which cannot be reasonably accommodated otherwise: Provided, That such an adjustment will not, in the judgment of the Secretary, unacceptably adversely affect the purpose for which the existing designation was made and the need for which continues." Further details are contained in Sections 4(c) and Section 5 of the PWSA. The Coast Guard anticipates that, in the course of time, population shifts, changes in transportation routes, knowledge of resource locations, technological breakthroughs, etc. will make this present work invalid. At such times as this occurs, the Coast Guard will re-study the affected areas.

The use conflicts which are of current concern in the areas to be studied are related to three factors, that of the volume of opposing traffic flowing along certain traditional routes, that of fishing in certain regions, and that of present or potential placement of oil exploration and production facilities in or near these routes. The factor of opposing traffic has been addressed by the establishment of Traffic Separation Schemes (TSSs) in various harbor approaches. These are subject to modification as a result of the current study and with the adoption of recommended changes by the Inter-Governmental Maritime Consultative exploitation facilities has been addressed by the establishment of shipping safety fairways in certain areas. These also are subject to modification as a result of this study.

Fisheries will be fully considered in the conduct of this study.

At this time the amount and location of petroleum resources in many areas which might be affected by routing measures is known only to the extent of estimates based on geophysical information and on previous drilling which has been done in some areas. Hence, the Coast Guard anticipates establishing, where appropriate and possible, temporary measures to provide safe routing, while allowing full exploration of areas not yet under development. Such measures might be provisional port access routes as proposed in the Federal Register by the U.S. Army Corps of Engineers (COE) on June 30, 1978, (43 FR 28523) or one of the several modifying proposals made by commenters to the COE notices. Another alternative, which generally appears less desirable, would be to establish guidelines for the spacing of exploration equipment along the access routes. Similar guidelines are contained in "Authorization for Exploratory Drilling in the Gulf of Santa Catalina, California," published by the COE in the Federal Register on June 30, 1978, (43 FR 28475). Such regulatory guidelines, if adopted, would probably apply within the defined limits of a provisional port access route.

In certain areas where there is relatively high traffic density and the topography precludes alternate routing, other surface uses may have to be continuously restricted.

Once the location of resources is known, regular routes will be established, as necessary, to provide safe access. Such routes would be located, to the maximum extent practicable, in a manner to allow the placement of production facilities necessary to extract the resources.

As competition for the sea surface increases and conflicts result, all users must share in any inconvenience. The Coast Guard is carefully examining this problem in order to arrive at the most equitable solution, one which seeks to minimize conflicts, but which has safety as the paramount consideration.

F. P. Shubert,
*Captain, U.S. Coast Guard, Acting Chief, Office of Marine Environment and Systems.*

[CGD 79-047]
[FR Doc. 79-11801 Filed 4-13-79; 8:45 am]
BILLING CODE 4910-14-M