Plaintiffs' Exhibit 13
Defenders of Wildlife v. Gutierrez
No. 05-2191 (PLF) (D.D.C.)

## Documentation of Models Used in Analysis of High-Level Waste Disposal

**AGENCY:** Nuclear Regulatory Commission (NRC).

**ACTION:** Notice of draft technical position.

**SUMMARY:** The High-Level Waste Licensing Management Branch, Division of Waste Management, has published NUREG-0856, "Draft Technical Position on Documentation of Models." This report presents guidelines for the preparation of documentation on computer programs used in support of a license application for high-level waste disposal.

Comments on the draft technical position are encouraged. Such comments will be considered in the preparation of the final technical position.

**DATE:** Comments are due May 1, 1982.

**ADDRESSES:** Copies of NUREG-0856 are available from the National Technical Information Service, Springfield, VA 22161. Written comments should be sent to Michael J. Bell, Chief, High-Level Waste Licensing Management Branch, Division of Waste Management, Nuclear Regulatory Commission, Washington, D.C. 20555.

**FOR INFORMATION CONTACT:**
Stewart A. Silling, High-Level Waste Licensing Management Branch, Division of Waste Management, Nuclear Regulatory Commission, Washington, D.C. 20555, telephone (301) 427-4173.

Dated at Silver Spring, Maryland, this 28th day of December, 1981.

Malcolm R. Knapp,
*High-Level Waste Licensing Management Branch, Division of Waste Management.*

[FR Doc. 82-406 Filed 1-6-82; 8:45 am]
**BILLING CODE 7590-01-M**

## SECURITIES AND EXCHANGE COMMISSION

[Release No. 18380; (SR-Amex-81-22)]

### The American Stock Exchange, Inc.; Order Granting Accelerated Approval of Proposed Rule Change

December 31, 1981.

The American Stock Exchange, Inc. ("Amex"), 86 Trinity Place, New York, N.Y. 10006, submitted on November 30, 1981, copies of a proposed rule change pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 (the "Act") and Rule 19b-4 thereunder, to amend Sections 151, 152 and 334 of the Amex Company Guide to revise the exchange's listing fee schedules, and to change from July to January the month in which annual fees are due and payable.

Notice of the proposed rule change together with the terms of substance of the proposed rule change was given by publication of a Commission Release (Securities Exchange Act Release No. 34-18309, December 4, 1981) and by publication in the Federal Register (46 FR 60702, December 11, 1981). No comments were received with respect to the proposed rule change.

The Commission finds that the proposed rule change is consistent with the requirements of the Act and the rules and regulations thereunder applicable to national securities exchanges, and, in particular, the requirements of Section 6, and the rules and regulations thereunder.

The Commission finds good cause for approving the proposed rule change prior to the thirtieth day after the date of publication of the notice of filing thereof, in that the proposed change in the annual billing date from July to January of each year is intended to place the billing year on a calendar year basis to facilitate financial planning. Accelerated treatment is necessary in order to enable the exchange to begin the proposed calendar year billings on January 1, 1982.

It is therefore ordered, pursuant to Section 19(b)(2) of the Act, that the above-mentioned proposed rule change be, and hereby is, approved.

For the Commission, by the Division of Market Regulation pursuant to delegated authority.

Shirley F. Hollis,
*Assistant Secretary.*

[FR Doc. 82-337 Filed 1-6-82; 8:45 am]
**BILLING CODE 8010-01-M**

## DEPARTMENT OF TRANSPORTATION

### Coast Guard

[CGD 81-106]

### Port Access Route Study Results

**AGENCY:** Coast Guard, DOT.

**ACTION:** Notice of study results.

**SUMMARY:** The purpose of this notice is to publish the results of the Port Access Route study announced on April 16, 1979, in the Federal Register (44 FR 22543) and modified on January 31, 1980 (45 FR 7026). Only the results for study areas 1 to 4 are published in this notice. Generally, these areas include the coast of Maine, New Hampshire, Massachusetts and Rhode Island. No new routing measures are proposed for study areas 1 to 4. However, two minor modifications are recommended for the existing traffic separation scheme in the approaches to Narragansett Bay, RI, and Buzzards Bay, MA. Also, it is recommended that a precautionary area be designated in the area located between the existing Nantucket to Ambrose and Boston Harbor traffic separation schemes.

### Background

The Ports and Waterways Safety Act (PWSA) (Pub. L. 95-474; 92 Stat. 1473, 33 U.S.C. 1223) mandated that the Coast Guard "undertake a study of the potential traffic density and the need for safe access routes." The Federal Register for April 16, 1979 (44 FR 22543), announced the scope of the study and included a description of each area to be studied. Coast Guard district staff officers were assigned responsibility for executing the study; and it has been conducted under the standards contained in sections 4 and 5 of the PWSA. As a result of the study, appropriate ships' routing measures, such as safety fairways and traffic separation schemes, may be proposed. Where the study indicates that no new routing measures are to be designated in an area, notice of such a conclusion is to be published in the Federal Register. However, areas for which results are published may be studied again in the future as changes in conditions warrant re-evaluation.

Results for areas 5, 5a and 6 (New York and Delaware approaches and Long Island Sound) were published in 46 FR 49035; for areas 13 to 20 (coast of South Carolina, Georgia and Florida) in 46 FR 48376; for area 21 (Gulf of Mexico) in 46 FR 49989; for areas 26 to 29 (coast of Oregon and Washington) in 46 FR 59686; and for areas 30 to 32 (Alaska) in 46 FR 61049. Results for the remaining study areas (7 to 12 along the Mid-Atlantic coast and 22 to 25 along California) will be published in a future Federal Register.

The First Coast Guard District performed the study for areas 1 to 4. Geographically, these areas are described as follows:

AREA 1: Northeast coast of Maine.
  From the coast seaward to the 1800 meter curve or to the limit of Canadian jurisdiction, from the Canadian/United States border to a line bearing 120° T from Great Duck Island Light (44°08.5′ N, 68°14.8′ W).
AREA 2: Includes Searsport, Bucksport, and Portland, Maine, and Portsmouth, New Hampshire.
  From the coast seaward to the 1800 meter curve or to the limit of Canadian jurisdiction, from a line bearing 120° T from Great Duck Island Light (44°08.5′ N, 68°14.8′ W) to a line bearing 110° T as it

passes through Isle of Shoals Light (42°58.0′ N, 70°37.4′ W).

AREA 3: Includes Boston, Massachusetts.
From the coast seaward to the 1800 meter curve or to the limit of Canadian jurisdiction, from a line bearing 110° T as it passes through Isle of Shoals Light (42°58.0′ N, 70°37.4′ W) to a line bearing 180° T from Chatham Light (41°40.3′ N, 69°57.0′ W).

AREA 4: Includes Fall River and New Bedford, Massachusetts, and Providence, Rhode Island.
Enclosed by the coast and a line bearing 180° T from Chatham Light (41°40.3′ N, 69°57.0′ W) to 40°40.0′ N latitude; thence a line bearing 270° T to 71°51.5′ W longitude; thence a line bearing 000° T to Watch Hill Light (41°18.2′ N, 71°51.5′ W).

### Findings and Conclusions

An offshore traffic separation scheme (TSS) is an internationally recognized routing measure which is intended to separate opposing streams of vessel traffic by the establishment of traffic lanes. It can be compared to a highway for vessels. Although use of a TSS is often voluntary, once a vessel is within the scheme the operator is governed by Rule 10 of the International Regulations for Preventing Collisions at Sea (72 COLREGS) and is obligated to obey the directional designations. A TSS receives international recognition when it is adopted by the Inter-Governmental Maritime Organization (IMCO).

Currently, off the coast of New England, four IMCO-adopted TSS's are established for traffic management: (a) "In the Approaches to Portland, Maine;" (b) "In the Approaches to Boston, Massachusetts;" (c) "In the Approaches to Narragansett Bay, Rhode Island, and Buzzards Bay, Massachusetts;" and (d) the "Eastern Approach" to New York off Nantucket (Nantucket to Ambrose Sea Lanes). Also adopted by IMCO in this vicinity is an "Area to be Avoided" which warns the mariner that the Nantucket Shoal area is hazardous. These routing measures were evaluated during the Port Access Route study to determine their continued contribution to navigation safety.

The study of Areas 1–4 was primarily focused upon three factors: the volume of traffic following certain traditional routes, fishing vessels in established fishing grounds, and potential placement of mobile and fixed structures or platforms during oil exploration and production in or near these routes and fishing grounds. After extensive data gathering and consultations with navigation and shipping interests, oil companies, fishing industries and federal, state and local agencies the Coast Guard determined the following:

a. *Portland:* The existing traffic separation scheme "In the Approaches to Portland, Maine," is adequate for the traditional trade routes and amount of traffic to and from the port of Portland.

b. *Boston and Nantucket:* The existing traffic separation scheme "In the Approach to Boston, Massachusetts," is adequate for the traditional trade routes and amount of traffic to and from the Port of Boston.

There is no present conflict between access to the Port of Boston and oil exploration activities. These activities are only known to the extent of estimates based on geophysical information and on preliminary test drilling in a portion of study Area 3. Future developments may occur which could cause the proliferation of mobile and/or fixed structures and platforms. If such were the case, it may become necessary to designate additional access systems in Area 3 at a future date.

Fisheries were fully considered in the study of Area 3. Since no additional access systems are proposed, no potential conflicting activity in proximity of known fishing grounds has been created.

As a result of the findings of the study of Area 3, the Coast Guard has determined that a "precautionary area" located between the Nantucket to Ambrose traffic lanes and the Boston Harbor traffic lanes is needed to facilitate safe navigation where these two Traffic Separation Schemes meet. This is in addition to the "Area to be Avoided" mentioned above. This measure will more readily identify to mariners that extreme care should be exercised when navigating in the area. Accordingly, the Coast Guard will propose to IMCO that such a precautionary area be adopted for the following reasons:

(1) Information on vessel traffic density in this area indicates that approximately 26 vessels per day transit this area (including fishing vessels). This high density of vessel traffic intersecting at the entrances of two existing traffic separation schemes presents a potential for collision therefore warranting the establishment of the proposed precautionary area.

(2) The nature of vessel traffic transiting the area is p;rimarily vessels (tankers, freighters, container vessels) entering or exiting the two TSS's operating between Boston and New York. Vessels arriving from foreign ports enroute to Boston or New York also enter the appropriate TSS in this area. Fishing vessels are known to fish in this area.

(3) A greater degree of safety can be achieved with the establishment of a precautionary area. The visible display of a precautionary area or appropriate charts re-emphasizes the need for greater care in navigation and alertne in watchkeeping.

(4) This precautionary area would n alter existing patterns of traffic flow i the area. Fishing would continue unrestricted. It will, however, emphas the need for care in navigation where these two routing schemes converge.

(5) This precautionary area will provide an added measure of protectic for the personnel abroad the Nantucke Light Vessel which is involved in numerous close passage situations eac year.

The description of the proposed precautionary area to be designated in the area between the existing Nantuck to Ambrose and Boston traffic separation schemes, is as follows:

An area bounded to the east by a circle o radius 15.5 miles, centered upon geographic position 40°35.0′ N, 69°00.0′ W, intersected b the traffic separation schemes "In the Approaches to Boston, Massachusetts" and the "Eastern Approach" off Nantucket at th following points:

| Latitude | Longitude |
|---|---|
| (1) 40°50.3′ N | 68°56.6′ W |
| (2) 40°23.7′ N | 69°13.8′ W |

and bounded to the west by a line drawn between these two traffic separation schem from 40°48.0′ N, 69°03.0′ W, to 40°36.8′ N, 69°14.0′ W.

c. *Narragansett Bay and Buzzards Bay:* (1) The Port Access Route study identified a need to make a minor modification to the existing traffic separation scheme "In the Approaches to Narragansett Bay, Rhode Island, and Buzzards Bay, Massachusetts." Pilots and Masters interviewed during the study expressed the general opinion tha TSS's are desirable in that they promot safety by making known the normal shipping route for large vessels. Foreign ships entering port can more readily determine the proper and safe course to make their initial landfall. Ships' masters are now accustomed to utilizin; the TSS "In the Approaches to Narragansett Bay, Rhode Island and Buzzards Bay, Massachusetts." This wa given due consideration before recommending a modification.

When contacted during the study, pilots universally expressed dissatisfaction over the northeast end o the Buzzards Bay traffic lanes. Immediately after Buoy #1 (LLNR 626) outbound traffic must make a sharp turr to starboard to enter the outbound lane. A potentially dangerous crossing situation could arise with an outbound vessel cutting off an inbound vessel while the outbound vessel maneuvers tc enter the outbound traffic lane.

It is recommended that the Buzzards Bay approach be shortened by 4 miles to enable outbound traffic to enter the outbound traffic lane without making the sharp turn now necessary. The proposed change is as follows:

*Buzzards Bay Approach*

(a) A separation zone, one mile wide, is centered upon the following geographical positions:

| Latitude | Longitude |
|---|---|
| (1) 41°10.15′ N | 71°19.15′ W |
| (2) 41°21.8′ N | 71°07.1′ W |

(b) A traffic lane, one mile wide, is established on each side of the separation zone. The main traffic directions are: 038°–218°.

(2) Currently, a restricted area is established in the Narragansett Bay approach. This restricted area is controlled by the Naval Underwater System Center (NUSC). It is used by the Navy as a torpedo testing range two or three times per year. The existing restricted area does not encompass the whole are in which the operation takes place. The Center has requested that the restricted area be enlarged to include the entire separation zone. The proposed change is as follows:

*Restricted Area*

Note.—"A restricted area, two miles wide, extending from the southern limit of the Narragansett Bay approach traffic separation zone to latitude 41°24.7′ N has been established.

"The restricted area will only be closed to vessel traffic by the Naval Underwater System Center during periods of daylight and optimum weather conditions for torpedo range usage. The closing of the restricted area will be indicated by the activation of a white strobe light mounted on Brenton Reef Light and controlled by a naval vessel supporting the torpedo range activities. There would be no vessel restrictions expected during inclement weather or when the torpedo range is not in use."

Implementation

In order to implement the above proposals, including the change to the TSS lane, the change to the separation zone restriction, and the new precautionary area, it will be necessary to apply to the Inter-Governmental Maritime Consultative Organization (IMCO) for adoption and international recognition of the changes. It is expected that applications for these changes will be submitted early in 1982. Adoption by the Maritime Safety Committee of IMCO may take nine months. No amendment to a routing system can become effective earlier than four months after IMCO adoption.

FOR FURTHER INFORMATION CONTACT:
Mr. Christopher Young, Office of Marine Environment and Systems (G–WWM–2), Room 1608, U.S. Coast Guard Headquarters, 2100 Second Street, S.W., Washington, D.C. 20593 (202) 426–4958 between 7:30 a.m. and 4:30 p.m. Monday through Thursday, except holidays.

Dated: December 28, 1981.

R. A. Bauman,
*Rear Admiral, U.S. Coast Guard, Chief, Office of Navigation.*

[FR Doc. 82-183 Filed 1-6-82; 8:45 am]
BILLING CODE 4910-14-M

[CGD 81-105]

Qualification Of Schlumberger Technology Corporation As A Citizen Of The United States

Notice is given that pursuant to 45 CFR 67.23–7, issued under the provisions of section 27A of the Merchant Marine Act, 1920, as added by the Act of September 2, 1958 (46 U.S.C. 883–1), Schlumberger Technology Corporation of 100 Macco Boulevard, Sugar Land, Texas 77478, incorporated under the laws of the State of Texas, did on December 3, 1981, file with the Commandant, United States Coast Guard, in duplicate, an oath for qualification as a citizen of the United States following the forms of oath prescribed in Form CG–1260.

The oath shows that:

(a) A majority of the officers and directors of the corporations are citizens of the United States;

(b) Not less than 90 percent of the employees of the corporation are residents of the United States;

(c) The corporation is engaged primarily in a manufacturing or mineral industry in the United States or in a Territory, District, or possession thereof;

(d) The aggregate book value of the vessels owned by the corporation does not exceed 10 percent of the aggregate book value of the assets of the corporation; and

(e) The corporation purchases or produces in the United States its Territories or possessions not less than 75 percent of the raw materials used or sold in its operations.

The Commandant, United States Coast Guard, having found this oath to be in compliance with the law and regulations, on December 16, 1981, issued to Schlumberger Technology Corporation, a certificate of compliance as provided for in 46 CFR 67.23–7. This certificate and any authorization granted thereunder will expire three years from December 16, 1981, unless there first occurs a change in the corporate status requiring a report under 46 CFR 67.23–7.

Dated: December 28, 1981.

L. N. Hein,
*Captain, U.S. Coast Guard, Acting Chief, Office of Merchant Marine Safety.*

[FR Doc. 82-184 Filed 1-6-82; 8:45 am]
BILLING CODE 4910-14-M

Federal Aviation Administration

Airport Traffic Control Tower at Augusta, Ga.; Reduction Of Hours

Notice is hereby given that on or about January 10, 1982, the Augusta, Georgia Airport Traffic Control Tower will be permanently closed each day from 11 p.m. to 7 a.m. local time. This information will be reflected in forthcoming issues of the Airman's Information Manual.

Issued in East Point, Georgia, on December 24, 1981.

Jonathan Howe,
*Director, Southern Region.*

[FR Doc. 82-103 Filed 1-6-82; 8:45 am]
BILLING CODE 4910-13-M

Traffic Alert and Collision Avoidance System (TCAS) Conference

The Department of Transportation hereby announces a Traffic Alert and Collision Avoidance System (TCAS) Conference. This 2-day conference will commence at 10:30 a.m. on January 11, 1982, in the Third Floor Auditorium of FOB 10A, 800 Independence Avenue SW., Washington, D.C.

The purpose of this conference is to present recent technical results from the Federal Aviation Administration development program and to discuss these results and program plans with conference attendees. This information exchange is intended to support current activities to develop Minimum Operational Performance Standards for TCAS and aid the aviation community in the preparation of comments on the Draft National Aviation Standard for TCAS to be published in the Federal Register in January.

TCAS is intended to satisfy the operational need for an airborne separation assurance service and to ensure compatibility with all elements of the National Airspace System. Its operation does not depend upon the existence of any of these other elements except Air Traffic Control Radar Beacon System (ATCRBS) transponders with altitude encoders or Mode S transponders with altitude encoders in other aircraft.

Although the meeting is open to the public (space permitting) there will be a registration fee of $5.00 to cover