Plaintiffs' Exhibit 20
Defenders of Wildlife v. Gutierrez
No. 05-2191 (PLF) (D.D.C.)

# DEFENDERS OF WILDLIFE • THE HUMANE SOCIETY OF THE UNITED STATES • THE OCEAN CONSERVANCY • WHALE AND DOLPHIN CONSERVATION SOCIETY

November 3, 2005

**Via First Class Mail/Return Receipt Requested**

Michael Chertoff, Secretary
U.S. Department of Homeland Security
Washington, D.C. 20528

Admiral Thomas H. Collins, Commandant
United States Coast Guard
2100 Second Street, SW
Washington, DC 20593

Carlos Gutierrez, Secretary
U.S. Department of Commerce
Office of the Secretary
United States Department of Commerce
14th and Constitution Avenue, N.W.
Washington, D.C. 20230

William T. Hogarth, Ph.D., Assistant Administrator for Fisheries
National Marine Fisheries Service
1315 East-West Highway, Room 14564
Silver Spring, MD 20910

RE: NOTICE OF VIOLATIONS OF THE ENDANGERED SPECIES ACT REGARDING THE ENDANGERED NORTH ATLANTIC RIGHT WHALE

Defenders of Wildlife, The Humane Society of the United States, The Ocean Conservancy, and Whale and Dolphin Conservation Society request that immediate action be taken to remedy the United States Coast Guard's ongoing violations of the Endangered Species Act ("ESA" or "Act"), 16 U.S.C. § 1531 et seq., and the Administrative Procedure Act, 5 U.S.C. § 706, with respect to the critically endangered North Atlantic right whale. The Coast Guard has wholly failed to meet its obligations to protect and conserve this species by not fulfilling its mandatory duties pursuant to Section 7 of the Act. See 16 U.S.C. § 1536(a). Specifically, the Coast Guard is in violation of Section 7(a)(2) of the ESA, id. § 1536(a)(2), by failing to consult with the National Marine Fisheries Service ("NOAA Fisheries") to insure that its designation and ongoing implementation of vessel routing measures pursuant to the Ports and Waterways Safety Act ("PWSA"), 33 U.S.C. § 1221 et seq., are not likely to

jeopardize the continued existence of the right whale or result in the destruction or adverse modification of its critical habitat. 16 U.S.C. § 1536(a)(2). Moreover, the Coast Guard's actions regulating vessel traffic in areas frequently used by right whales for feeding, breeding, migration, and other essential life functions is resulting in unlawful take of right whales, in violation of Section 9 of the Act. Id. § 1538. Finally, the Coast Guard is in violation of Section 7(a)(1) of the ESA as it has failed to implement measures to provide for the conservation of the right whale. Id. § 1536(a)(1).

## BACKGROUND

The North Atlantic right whale is in imminent danger of extinction. Listed as endangered under the ESA since 1973, see 35 Fed. Reg. 8495 (June 2, 1970); codified at 50 C.F.R. §17.11, the only remaining viable population of the species, found off the east coast of the United States and Canada, presently contains fewer than 300 individuals. See 70 Fed. Reg. 36121 (June 22, 2005). Decimated by commercial whaling, the North Atlantic right whale population was reportedly reduced to fewer than a hundred individuals by the early twentieth century. Since that time, despite continuous domestic and international legal protection, the species has not recovered and again is in decline.

NOAA Fisheries has stated, "[t]here is reason for serious concern about the future of North Atlantic right whales." NOAA Fisheries, Recovery Plan for the North Atlantic Right Whale (*Eubalaena glacialis*) Revision, p. IA-1 (2005) ("Recovery Plan"). Specifically, the Service has concluded that the "loss of even a single individual may contribute to the extinction of the species" and "if current trends continue, the population could go extinct in less than 200 years." 69 Fed. Reg. 30857, 30858 (June 1, 2004) (Advance Notice of Proposed Rulemaking for Right Whale Ship Strike Reduction) ("ANPR"); see also Recovery Plan, p. IF. The right whale's imperiled status is due largely to the ongoing pressure placed on the population from anthropogenic factors, such as entanglement in fishing gear, habitat degradation, and, most notably, injuries and mortalities due to ship strikes. Human activities cause at least fifty percent of all right whale mortalities, with incidents of ship strikes alone accounting for over thirty-seven percent of all known right whale deaths since 1986. Kraus, S. D. et al. North Atlantic Right Whales in Crisis. Science, Vol. 309, Issue 5734, 561-562, July 22, 2005 ("Right Whales in Crisis") (Attachment A) ("Of the 48 dead right whales reported since 1986, at least 18 were killed by vessel collisions, and six were killed by entanglements in fishing gear.").[1] NOAA Fisheries has stated that ship strikes and entanglements in fishing gear are "the principal factor[s] believed to be retarding growth and recovery of the population." NOAA Fisheries, Draft 2005 Stock Assessment, December 2004 (Attachment C).

The North Atlantic right whale population inhabits the waters off the east coast of the United States and Canada. Portions of the population are found year round in the Gulf of Maine, in feeding grounds off the coast of New England in the spring and summer, and are

---

[1] See also Knowlton A.R. and S.D. Kraus. 2001 Kraus. Mortality and serious injury of northern right whales (Eubalaena glacialis) in the western North Atlantic Ocean. Jour. Cetacean Res. Manag. (Special Issue) 2:193-208 (Attachment B) (noting that ship strikes caused 47.4 percent of reported right whale deaths between 1990 and 1999.).

known to occur seasonally in the waters of the southeastern United States in the winter. Recovery Plan, at IC-ID. Areas in both the northeast and southeast are designated critical habitat. 50 C.F.R. § 226.203. Within the species' range, the limited sighting effort has generally found right whales in the coastal or shelf waters within thirty nautical miles of shore. Knowlton, A.R. et al. Right Whale Sightings and Survey Effort in the Mid Atlantic Region: Migratory Corridor, Time Frame, and Proximity to Port Entrances, p. 9, July 2002 (Attachment D). As a result, right whales spend considerable amounts of time in waters regularly traversed by thousands of ships making hundreds of thousands of port calls annually. See Army Corps of Engineers, Waterborne Commerce of the United States, Calendar Year 2003, Part 1– Waterways And Harbors Atlantic Coast. Thus, while several factors, including the species' feeding, resting and socializing behaviors, appear to make right whales particularly vulnerable to ship strikes, the high density of shipping traffic in areas frequently used by right whales significantly increases the threat to the species. See NOAA Fisheries, Biological Opinion on American Lobster Fishery, p. 96 (2001).

This threat has been brought into sharp focus by recent events. Between January 2004 and July 2005, there were eight recorded right whale deaths; four were conclusively linked to human causes, three by ship strikes and one by entanglement, a ship strike was suspected in a fifth, and another may have resulted from injuries sustained in a pervious ship strike incident. See Summary of Recent Reported Right Whale Mortalities (Attachment E). Specifically, six of these whales were reproductively-mature females – three of which were carrying fetuses at the time of death. Reproductive females represent the key to the recovery of the species, and to lose not one, but six – which represents more than five percent of the total female breeding population – in an eighteen-month period is virtually catastrophic for the species. Furthermore, these mortalities represent only those animals whose bodies were found, and should be considered a minimum estimate of actual deaths. See Stock Assessment ("some injury or mortality due to ship strikes almost certainly passes undetected, particularly in offshore waters.").

These recent events have taken an extraordinary toll on a population that is so fragile that NOAA Fisheries has previously stated that, given the species' "low population size and their poor reproductive rate, the loss of even one northern right whale . . . may reduce appreciably the likelihood of both survival and recovery of this species . . .." Biological Opinion on American Lobster Fishery, p. 100. Therefore, it has become indisputable that unless drastic action is taken incidents of ships strikes will drive the species to extinction.

I.     **The Coast Guard Has the Authority to Regulate Vessel Traffic within Right Whale Habitat**

Under the PWSA, the Coast Guard has the authority to regulate shipping traffic. See 33 U.S.C. § 1221(a) (The Coast Guard may establish regulations for "navigation or vessel safety" or for the "protection of the marine environment."). The PWSA provides several regulatory mechanisms through which the Coast Guard may regulate all vessels bound for, or departing from, a port or place subject to the jurisdiction of the United States.

First, the Coast Guard is authorized to establish "vessel traffic services" ("VTS") to manage ship traffic in or near ports and areas with the heaviest vessel traffic. Id. § 1223(a)(1). Specifically, the PWSA authorizes the development and operation of VTSs "in any port or place under the jurisdiction of the United States, in the navigable waters of the United States, or in any area covered by an international agreement . . . ."[2] Id. A VTS may control vessel traffic "for the protection of navigation or the marine environment," through the use of "reporting and operating requirements, surveillance and communications systems, routing systems and fairways" and in certain instances require the use of specified navigation and communication equipment. Id. § 1223(a)(1), (3). The PWSA states that the Coast Guard "shall require appropriate vessels which operate in an area of a vessel traffic service to utilize or comply with that service." Id. § 1223(a)(2); 33 C.F.R. § 161.12(a) ("Subject to the exigencies of safe navigation, a VTS User shall comply with all measures established or directions issued by a VTS.").

Second, the PWSA authorizes the Coast Guard to establish operational regulations to protect navigation and the marine environment "in areas subject to the jurisdiction of the United States which [are] determine[d] to be hazardous, or under conditions of reduced visibility, adverse weather, vessel congestion, or other hazardous circumstances." Id. § 1223(a)(4). In such areas, the Coast Guard may establish regulations establishing "times of entry, movement, or departure; [] vessel traffic routing schemes; [] vessel size, speed, draft limitations and vessel operating conditions; and restricting operation, in any hazardous area or under hazardous conditions, to vessels which have particular operating characteristics or capabilities which he considers necessary for safe operation under the circumstances." Id. § 1223(a)(4)(A)-(D). Before adopting such measures, the Coast Guard is required to "take into account all relevant factors concerning navigation and vessel safety and protection of the marine environment," including environmental factors, the scope and degree of the hazard involved, vessel traffic characteristics, and "any other potential or actual conflicting activity." Id. § 1224(a).

Finally, the Coast Guard must designate "necessary . . . traffic separation schemes [("TSS")] for vessels operating in the territorial sea of the United States and in the high seas approaches, outside of the territorial sea, to such ports or places" "to provide safe access routes for the movement of vessel traffic proceeding to or from ports or places subject to the jurisdiction of the United States." Id. § 1223(c). A TSS is a "designated routing measure which is aimed at the separation of opposing streams of traffic by appropriate means and by the establishment of traffic lanes." 33 C.F.R. § 167.5(b). When establishing a TSS, the Coast Guard is required to conduct a Port Access Route Study ("PARS"), during which the agency must consult with various government agencies and departments, and "representatives of the maritime community, ports and harbor authorities or associations, environmental groups, and other parties who may be affected by the proposed actions." 33 U.S.C. §§ 1223(c)(3)(B); 1224(b); see also id. § 1231(b). Through this process, the Coast Guard must consider

---

[2] The term "navigable waters of the United States" is defined to include "all waters of the territorial sea of the United States" which extends out to 12 nautical miles from shore. Id. § 1222(5); see Presidential Proclamation 5982 of Dec. 27, 1988, 54 Fed. Reg. 777 (1988). However, it may be permissible to designate VTSs outside of the territorial sea, as the international agreements provision of the PWSA, 33 U.S.C. §1230, authorizes the Coast Guard to enter into agreements with neighboring nations to establish VTSs "in areas and under circumstances of mutual concern." Id. § 1230(b)(1).

"navigation and vessel safety and protection of the marine environment," while reconciling, "to the extent practicable . . . the need for safe access routes with the needs of all other reasonable uses of the area." Id. §§ 1223(c)(3); 1224(a). When determining whether to designate TSSs the Coast Guard is required to consider environmental factors, the scope and degree of the hazard involved, vessel traffic characteristics, and "any other potential or actual conflicting activity." Id. § 1224(a). Designated shipping routes apply to all United States and foreign-flagged vessels destined for or departing from a port or place subject to the jurisdiction of the United States. See id. § 1223(d).

## II.     The Coast Guard Regularly Uses its Authority to Review, Amend and Establish Routing Measures in Right Whale Habitat

The Coast Guard has used its authority to establish and adjust routing measures, on numerous occasions, in several locations within right whale habitat. Pursuant to the requirements of the PWSA, the Coast Guard conducted PARS for many major United States ports soon after the passage of the Act. See 46 Fed. Reg. 48376 (Oct. 1, 1981) (Notice of PARS results for South Carolina, Georgia and Florida); 46 Fed. Reg. 49035 (Oct. 5, 1981) (Notice of PARS results for New York, Delaware Bay and Long Island Sound); 47 Fed. Reg. 879 (Jan. 7, 1982) (Notice of PARS results for Maine, New Hampshire, Massachusetts and Rhode Island); 47 Fed. Reg. 31766 (July 22, 1982) (Notice of PARS results for Maryland, Virginia and North Carolina). Currently, there are seven established TSS in right whale habitat, including: In the Approaches to Chesapeake Bay, 33 C.F.R. § 167.200 – 202; Off Delaware Bay, Id. § 167.170-174; Off New York, Id. § 167.150 - 155; In the Approaches to Narragansett Bay, Rhode Island and Buzzards Bay, Massachusetts; In the Approach to Boston, Massachusetts; and In the Approaches to Portland, Maine.

Over time, the Coast Guard has reviewed and modified several of these routing measures within right whale habitat. For example, the Coast Guard reviewed and amended the routing measures for the approaches to the Delaware Bay. 65 Fed. Reg. 12944 (Mar. 10, 2000); see 33 C.F.R §§167.170-174. More recently, the Coast Guard determined that the vessel routing measures in the approaches to the Chesapeake Bay required updating. See 69 Fed. Reg. 3869 (Jan. 27, 2004). Similarly, to accommodate an anticipated increase in vessel traffic, the Coast Guard recommended alterations to the approaches to Cape Fear River and Beaufort Inlet, N.C. 69 Fed. Reg. 18476 (Apr. 4, 2004). The Coast Guard has also begun the process of reviewing the need to amend or modify other routing measures. For example, in 2003, the Coast Guard undertook a PARS to assess the need for modifications to the measures established for the approaches to Narragansett Bay, Rhode Island and Buzzards Bay, Massachusetts. See 68 Fed. Reg. 74199 (Dec. 23, 2003). The Coast Guard has also begun a PARS on the routes into Portland, Maine, in response to a dredging project that will allow more, larger vessels to enter the port. 70 Fed. Reg. 7067 (Feb. 10, 2005).

## III.    Right Whales Often Use, and are Killed in, the Areas Where the Coast Guard has Established Routing Measures

There is substantial evidence that right whales regularly use the waters in and near designated shipping lanes. NOAA fisheries and other groups regularly survey migration

corridors and several areas of aggregation, and as a result of these efforts, NOAA Fisheries has regularly documented the presence of right whales in and near established shipping lanes. See North Atlantic Right Whale Sighting Survey and Sighting Advisory System 2004 Results Summary (Attachment F). Indeed, at one point early this year nearly one-third of the known right whale population was observed in or near the Boston TSS. See Sighting Notice for May 14, 2005 (Attachment G).

Moreover, evidence suggests that historically ship strike incidents have routinely occurred in, and in close proximity to, designated shipping lanes. The sheer number of right whales that have been found near shipping lanes leads to the conclusion that there is a "link between shipstruck animals and proximity to shipping lanes." Knowlton, 2002 at 25. In fact, twelve of the thirty-nine known right whale deaths documented between 1970-1999 occurred, on average, within twelve miles of a designated shipping lane. See Knowlton, A.R. and S.D. Kraus, 2001, Table 1. Of the remaining twenty-seven right whale fatalities, the cause of death was unknown for eleven individuals; three of these whales were found within nine miles of a shipping lane, and another four were found between nine and twenty-six miles from a shipping lane, leading one study to suggest that "some proportion of these unknown cause mortalities could be attributed to ship strikes." Id. at 189.

Furthermore, of the recent right whale deaths, several have occurred in close proximity to established shipping lanes. For example, on November 17, 2004, the Navy reported striking a whale while exiting the Chesapeake Bay. Subsequently, on November 24, 2004, the carcass of a pregnant, adult female right whale was found off the coast of North Carolina, a necropsy revealed she died of injuries from a ship strike and reports and descriptions indicate a high probability that this is the same animal reported by the Navy. In addition, two right whale carcasses where found sixty-five and one hundred miles southeast of Nantucket, Massachusetts respectively. Although neither of the whales were retrieved, and thus the cause of death could not be determined, the whales where found very close to both the Boston TSS and the shipping lanes into New York.

## DISCUSSION

I. **THE COAST GUARD IS IN VIOLATION OF SECTION 7(a)(2) OF THE ENDANGERED SPECIES ACT FOR FAILING TO CONSULT ON ACTIONS THAT ARE AFFECTING THE RIGHT WHALE, AND FAILING TO INSURE THAT ITS ACTIONS ARE NOT JEOPARDIZING THE SPECIES' CONTINUED EXISTENCE OR ADVERSELY MODIFYING CRITICAL HABITAT.**

The ESA mandates that all federal agencies "shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). This provision mandates that endangered and threatened species are "afforded the highest of priorities" when actions are taken that may affect such species, T.V.A. v. Hill, 437 U.S. 153, 174 (1978), and thus "imposes a rigorous affirmative duty on federal agencies to insure that their actions" do not jeopardize the

continued existence of the species or adversely modify or destroy the habitat upon which the species depends. See Greenpeace v. NMFS, 106 F. Supp. 2d 1066, 1075 (W.D. Wash. 2000) (internal quotations omitted).

Section 7(a)(2) requires the Coast Guard to "consult" with the appropriate wildlife agency – here, NOAA Fisheries – on actions that could impact listed species. See Thomas v. Peterson, 753 F. 2d 754, 763 (9th Cir. 1985) ("without substantial compliance with those procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result."). This obligation can be satisfied either through "formal" consultation, during which NOAA Fisheries issues a Biological Opinion addressing the potential effects of the action on listed species, offers reasonable and prudent alternatives to the action that will avoid jeopardizing the species, and where appropriate, issues an incidental take statement specifying measures to mitigate the impacts of the authorized take, 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14, or through "informal" consultation in the limited circumstance where the action agency determines, and NOAA Fisheries concurs in writing, that the action may affect but "is not likely to adversely affect" a listed species. 50 C.F.R. § 402.13.

Consultation is required whenever an agency action "may affect" a listed species or designated critical habitat. 50 C.F.R. § 402.14; see 51 Fed. Reg. 19,926, 19,949 (June 3, 1986) ("Any possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement . . ..") (emphasis added). "[A]ll activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas" are "actions" subject to consultation, and include, but are not limited to, "actions intended to conserve listed species or their habitat; [] the promulgation of regulations;[] or [] actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02(b). Importantly, agencies must consult on those actions that may affect listed species where the agency retains ongoing discretionary control over the action. Id. § 402.03; Washington Toxics Coalition v. EPA, 413 F.3d 1024, 1032-34 (9th Cir. 2005) (finding agency obligation to consult over effects of ongoing pesticide registration).

As discussed above, the Coast Guard's regulation of shipping traffic, including its designation, review and revision of shipping lanes, is plainly affecting the right whale by concentrating ships within areas used by right whales. This concentration of vessels and whales not only increases the likelihood of death or serious injury caused by fatal whale-ship collisions, but also may result in the harassment of right whales, and adversely affect sensitive habitat areas by increasing the amount of underwater sea noise and pollution and disrupting prey distribution, thereby excluding whales from important, preferred habitat areas.[3]

---

[3] It should be noted that the establishment of vessel routing measures within right whale habitat could be used to provide an effective mechanism for protecting the species from ship strikes. Routing measures, if designed and implemented properly, could reduce the likelihood of whale-vessel interactions by removing ships from the areas most frequented by whales, thereby reducing both the potential for whale-ship interactions and the population's overall exposure to the threats from ships. Moreover, routes may reduce the administrative enforcement burden by limiting the area over which enforcement resources must be deployed by the federal agencies charged with the protection of the species.

Nonetheless, the Coast Guard has failed to consult with NOAA Fisheries on these actions, in patent violation of Section 7 of the ESA.

The Coast Guard's failure to address, through the Section 7 consultation process, the impacts of its regulation of shipping traffic in right whale habitat is particularly troubling given the frequency that right whales must traverse the shipping lanes. Indeed, the Coast Guard has acknowledged that its designation and regulation of shipping lanes may affect right whales, and, in fact, has announced plans to assess whether a limited number of existing routing measures should be altered to better protect right whales by reducing the probability of ship-whale encounters. See 70 Fed. Reg. 8312 (Feb. 18, 2005). The Coast Guard, however, has wholly failed to address, in consultation with NOAA Fisheries, how all existing shipping lanes, found within right whale habitat, are affecting the species.[4]

Moreover, Section 7(a)(2) of the ESA "makes no legal distinction between the trigger for its requirement that agencies consult [] and the trigger for its requirement that agencies shape their actions so as not to jeopardize endangered species." Defenders of Wildlife v. U.S. Environmental Protection Agency, 420 F.3d 946, 961 (9th Cir. 2005) (emphasis original). An agency action is deemed to "jeopardize the continued existence of a species" if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Here, by designating shipping lanes within right whale habitat, and maintaining lanes within designated critical habitat, without simultaneously imposing operational measures designed to protect the right whales, such as, but not limited to, imposing speed restrictions, the Coast Guard has greatly increased the likelihood that the very few remaining Atlantic right whales will be harassed, harmed, and potentially struck and killed by ships. As discussed above, the evidence indicates that Coast Guard designated shipping lanes have already led to the injury and deaths of several right whales. Therefore, in light of the fact that NOAA Fisheries has acknowledged that "the loss of even one northern right whale . . . may reduce appreciably the likelihood of both survival and recovery of this species," NOAA Fisheries, Biological Opinion on American Lobster Fishery at 100 (emphasis added), the Coast Guard's has not "insured" that its actions are not

---

Indeed, the regulatory measures outlined by NOAA Fisheries in the Advance Notice of Proposed Rulemaking for Right Whale Ship Strike Reduction, 69 Fed. Reg. 30857, demonstrate how routing measures could be used as part of an overall strategy to provide meaningful protections for the right whale. However, the routing measures that are currently in existence cannot be viewed in the same light as those measures that may be created pursuant to the ANPR, because the Coast Guard did not consider the potential impacts on the right whale when previously establishing routing measures. The existing measures may be adversely affecting the right whale by concentrating large ships in undesirable locations within right whale habitat, including designated critical habitat.

[4] The Coast Guard's recent action undertaking a PARS to assess developing routing measures, as part of the overall ship strike reduction strategy outlined by NOAA Fisheries in the ANPR, 70 Fed. Reg. 8312, will do nothing to remedy the violations alleged here. This PARS will "focus on the northern region: first on Cape Cod Bay, and then, if it can be accomplished within the timeframe required by applicable legislation, the area off Race Point at the northern end of Cape Code (Race Point) and the Great South Channel, and the southern region: Along the seacoast in the approaches to the Ports of Jacksonville and Fernandina Beach, Florida, and Brunswick, Georgia." Id. at 8312. Thus, even if the Coast Guard reviews all of the areas it has laid out in the notice, which is not guaranteed, the established routing measures in the water off the mid-Atlantic States and the Gulf of Maine will not be reviewed or consulted upon.

likely to jeopardize this species' continued existence or adversely modify its critical habitat, in violation of Section 7(a)(2).

      Evidence that the Coast Guard's designation and maintenance of shipping lanes within critical habitat and other areas used by right whales is a violation of Section 7 is found in NOAA Fisheries' previous conclusion that, to avoid jeopardizing the continued existence of the species, the Coast Guard must "work in conjunction with other agencies to designate critical habitat and other high-use areas as Particularly Sensitive Areas or other special areas, and . . . establish traffic routes that would avoid these areas." See NOAA Fisheries, Endangered Species Act Section 7 Consultation Biological Opinion, 24, 29 (1996). Despite this, to date, the Coast Guard has failed to reconsider the placement of the Boston TSS that transects both the Great South Channel Critical Habitat Area and the Stellwagen Bank Marine Sanctuary. While, arguably, ships must pass through some portion of these areas, this does not abrogate the Coast Guard's obligation to assess two issues: first, where in these areas shipping traffic should be concentrated to ensure the least impact on the whales; and second, what operational measures must be put in place to protect the species. Moreover, no routing measures designed to protect the right whale have been established in the northeast or mid-Atlantic regions. In the southeast, no routing measures have been established to protect the right whale in and around the major ports within designated critical habitat. The Coast Guard's failure to implement the necessary measures is particularly egregious given that, since completion of the 1996 Biological Opinion, there have been at least nine recorded right whale deaths from ship strikes along the east coast, and three whales reportedly injured by collisions with ships. See Knowlton and Kraus, 2001, Table 3; Right Whale Incident Summary.

      Furthermore, the Coast Guard has failed to ensure that the designation and maintenance of shipping lanes within right whale critical habitat, while failing to impose appropriate operational measures on those ships operating both within the ship lanes and the critical habitat generally, will not adversely modify the right whale's critical habitat by diminishing the value of the habitat for the species' recovery, in violation of Section 7(a)(2). See Gifford Pinchot Task Force v. United States Fish & Wildlife Serv., 378 F.3d 1059, 1069-71 (9th Cir. 2004). Currently, the Boston TSS transects the western portion of the later-designated Great South Channel Critical Habitat. See ANPR, Figure 3. When designating the species' critical habitat, NOAA fisheries noted, "right whales are no longer observed in certain areas where they once were found" and attributed this absence, in part, to "[i]ncreased human activities, habitat degradation, [and] insufficient quantities of prey . . .." 59 Fed. Reg. 28793, 28796 (June 3, 1994). NOAA Fisheries went on to state the activities that may affect the right whale's critical habitat include: mortalities due to ship strikes; habitat degradation as result of pollution, noting that pollution may have "direct toxic effects on the whale" and "may also affect phytoplankton and zooplankton populations in a way that decreases the density and abundance of specific zooplankton patches on which northern right whales feed"; "[t]urbulence associated with vessel traffic" which can "break[] up the dense surface zooplankton patches" in feeding areas; and possible harassment from vessels repeatedly coming too close to whales. Id. at 28796-97. The Coast Guard's continued implementation of the shipping lanes within the Great South Channel has increased the likelihood of all of these events occurring within the whale's primary feeding habitat. Yet, the Coast Guard has failed

to insure, in consultation with NOAA Fisheries, that it is not adversely modifying the species' critical habitat.

In sum, the Coast Guard has wholly failed to meet the mandatory obligations under Section 7(a)(2) of the ESA to consult with NOAA Fisheries, and to insure that its actions will not jeopardize the continued existence of the species or impair its critical habitat. This failure is unacceptable in light of the devastating impact right whale mortalities resulting from ship strikes are having on the population.

## II.  THE COAST GUARD'S ACTIONS ARE CAUSING THE ILLEGAL "TAKE" OF RIGHT WHALES IN VIOLATION OF SECTION 9 OF THE ENDANGERED SPECIES ACT

Under Section 9 of the ESA, it is unlawful for any person to "take" a listed species. 16 U.S.C. § 1538(a)(1)(B). The term take is defined by statute to include engaging, or attempting to engage in conduct that will "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" members of a listed species. Id. § 1532(19). NOAA Fisheries further define the term "harm" as "an act which actually kills or injures fish or wildlife. Such an act may include significant habitat modification or degradation that actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns including breeding, spawning, rearing, migrating, feeding, or sheltering." 50 C.F.R. § 222.102. The term "harass," while not specifically defined by NOAA Fisheries, is defined by the U.S. Fish and Wildlife Service as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." Id. § 17.3. Here, the Coast Guard's designation of shipping lanes is causing the take of right whales.

The Coast Guard is liable for the take of right whales that results from ship-whale interactions in Coast Guard designated shipping lanes. See 16 U.S.C. § 1538(g) ("it is unlawful for any person subject to the jurisdiction of the United States to . . . cause to be committed, any offense defined in this section."). The ESA "not only prohibits the acts of those parties that directly exact the taking, but also bans those acts of a third party that bring about the acts exacting a taking." Strahan v. Coxe, 127 F.3d 155, 163 (1st Cir. 1997) (holding that "a governmental third party pursuant to whose authority an actor directly exacts a taking of an endangered species may be deemed to have violated the provisions of the ESA."); see also Defenders of Wildlife v. EPA, 882 F.2d 1294, 1301 (8th Cir. 1989) (holding that by registering certain pesticides which caused the death of endangered species, the Environmental Protection Agency was liable for the take of those species). The Coast Guard's development and maintenance of shipping lanes, which significantly increases the likelihood that right whales will be harassed, harmed and killed as a result of ship-whale interactions, creates "an imminent threat of harm" to right whales. Forest Conservation Council v. Rosboro Lumber Co., 50 F.3d 781, 783-84 (9th Cir. 1995) (stating that it is "clearly conceivable that one can inflict great harm on a protected species by creating an imminent threat of harm to that species [and] [s]uch a threat therefore falls easily within the broad scope of Congress' definition of 'take.'").

The Coast Guard's actions are resulting in the concentration of shipping traffic in areas where right whales congregate. Once designed and implemented, the Coast Guard actively maintains, and facilitates the use of, routing measures, by ensuring their presence on available navigation charts and maintaining a system of aids to navigation. See 33 C.F.R. §62.1(c). These measures apply to all United States and foreign-flagged vessels destined for or departing from a port or place subject to the jurisdiction of the United States, and ships are obligated to, and, in fact do, regularly traverse these areas in compliance with established routing measures. 33 C.F.R. §167.10 ("The operator of a vessel in a TSS shall comply with Rule 10 of the International Regulations for Preventing Collisions at Sea, 1972, as amended."); 33 U.S.C. § 1602; see also Silber, G.K., et al. Ship Traffic Patterns in Right Whale Critical Habitat: One Year of the Mandatory Ship Reporting System (2002) (Documenting the high use of the Boston Traffic Separation Scheme which transects right whale critical habitat) (Attachment H).

As a result, the Coast Guard's continued actions are resulting in the take of right whales, as the implementation of the routing measures creates "a reasonably certain threat of imminent harm" to the species. See Defenders of Wildlife v. Bernal, 204 F.3d 920, 926 (9th Cir. 1999); National Wildlife Fed'n v. Burlington N. R.R., 23 F.3d 1508, 1511 (9th Cir. 1994). As noted above, a significant portion of right whale deaths and injuries from ship strikes occur in, or near, designated shipping lanes. Moreover, the whale's migratory, breeding and feeding patterns may be adversely affected by the presence of large numbers of ships within the whale's preferred habitat. Therefore, the Coast Guard is causing the take of individuals, in direct violation of Section 9 of the ESA.

### III. THE COAST GUARD IS IN VIOLATION OF SECTION 7(a)(1) OF THE ENDANGERED SPECIES ACT BY FAILING TO TAKE ACTION TO CONSERVE THE RIGHT WHALE

Section 7(a)(1) of the ESA imposes a mandatory, affirmative duty on all federal agencies to conserve listed species. 16 U.S.C. § 1536(a)(1) ("The Secretary shall review all other programs administered by him and utilize such programs in furtherance of the purposes of [the ESA]. All other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of endangered species and threatened species."); See Sierra Club v. Glickman, 156 F.3d 606, 617-18 (5th Cir. 1998). The term "conservation" is defined under the ESA as "the use of all methods and procedures which are necessary to bring [listed] species to the point at which the measures provided pursuant to the Act are no longer necessary" – i.e. ensure the recovery of the species. 16 U.S.C. § 1532(3); 50 C.F.R. § 402.02 (defining "recovery" as "the process by which the decline of an endangered species or threatened species is arrested or reversed, and threats to its survival are neutralized, so that its long term survival in nature can be ensured."). Thus, this provision mandates that all Federal agencies "must do far more than merely avoid the elimination of protected species. [All federal agencies] must bring these species back from the brink so that they may be removed from the protected class, and [these agencies] must use all methods necessary to do so." Defenders of Wildlife v. Andrus, 428 F. Supp. 167, 170 (D.D.C. 1977).

An agency is required to comply with the mandates of Section 7(a)(1) if "some action for which it is responsible crosses the low threshold of possible effect" on a species.[5] See Florida Key Deer v. Stickney, 864 F. Supp. 1222, 1229 (S.D. Fla. 1994) (quoting Romero-Barcelo v. Brown, 643 F.2d 835, 857 (1st Cir. 1981)). Once this threshold in met, it is clear that each agency must develop and implement measures that will provide meaningful conservation benefit for the species. See Fla. Key Deer v. Brown, 364 F. Supp. 2d 1345, 1360 (S.D. Fla. 2005) (each agency has the specific, affirmative duty to further of the goals of the ESA by implementing programs "aimed at improving the viability of a species so that it eventually may be de-listed.").

Given the recent spike in ship strike incidents, the Coast Guard has obviously not developed and implemented an effective conservation program. Indeed, NOAA recently conceded that the measures implemented to date have "not effectively reduced the number of vessel collisions with right whales," and thus have not conserved the species. See NOAA Fisheries, Draft Environmental Assessment to Implement the Operational Measures of the North Atlantic Right Whale Ship Strike Reduction Strategy, 1-3 (June 2005).

The Coast Guard clearly has not used its available authorities to ensure the recovery of the right whale. For example, the Coast Guard, pursuant to the PWSA, has the authority to regulate shipping traffic for the "protection of the marine environment."[6] 33 U.S.C. § 1221(a). Specifically, as discussed above, in addition to the ability to establish TSSs which could be used to control ships traversing right whale habitat, the Coast Guard may establish operational regulations "in any . . . place under the jurisdiction of the United States" through a VTS, id. § 1223(a)(1), or in any areas "subject to the jurisdiction of the Untied State which [is] determine[d] to be hazardous." Id. § 1223(a)(4). In such areas, the Coast Guard may establish various regulation measures, most notably, speed restrictions. Id. § 1223(a)(1) (allowing for the implementation of "operational requirements [and] routing systems"); id. § 1223(a)(4)(C) (allowing for the establishment of "vessel size, speed ... and vessel operating conditions"). The authority to implement speed restrictions is of particular importance in this instance because of the significant conservation benefit the right whale population would receive from appropriate speed restrictions within its habitat. However, to date, the Coast Guard has refused to use its authority to implement speed restrictions. See, e.g., Letter, from Admiral Thomas H. Collins Commandant, U.S. Coast Guard to Dr. William T. Hogarth, Assistant Administrator for Fisheries, National Marine Fisheries Service, June 9, 2005. The failure to implement speed restrictions – which many interested parties, including NOAA Fisheries, consider to be a vital component to any regulatory scheme for the protection of the whale, see NOAA Fisheries, White Paper: Large Whale Ship Strikes Relative to Vessel

---

[5] Note, that an agency cannot avoid this mandatory duty simply because the conservation of listed species does not appear to fit within the agency's primary mission. See Pyramid Lake Paiute Tribe of Indians v. United States Dep't of Navy, 898 F.2d 1410, 1417 (9th Cir. 1990) (rejecting the Navy's argument that although "Section 7(a)(1) requires agencies to develop programs that will operate to conserve listed species, the agencies need do so only in a manner consistent with the accomplishment of the agencies' primary goals.").

[6] "Marine environment" is defined as "the navigable waters of the United States and . . .; the waters and fishery resources of any area over which the United States asserts exclusive fishery management authority . . .; and the recreational, economic, and scenic values of such waters and resources. 33 U.S.C. § 1222(1).

Speed, p.16 (Attachment I) – and other routing measures designed specifically to protect the right whale, is a clear violation of Section 7(a)(1).

## CONCLUSION

We urge the Coast Guard to remedy these violations of the ESA, and to take all necessary and legally required steps to ensure the survival and recovery of the right whale. We remain open to meeting with and working with the Coast Guard to resolve these issues, to ensure that the right whale receives the appropriate level of protection, and invite the Coast Guard to contact us so that a mutually agreeable schedule for the implementation of the required actions and measures can be discussed. If, however, these violations are not remedied within a reasonable time, this letter constitutes notice of intent to sue as required by Section 11(g) of the ESA, 16 U.S.C. § 1540(g), should legal action be necessary to remedy these ongoing violations of the ESA.

Sincerely,

Jonathan R. Lovvorn
Vice President, Animal Protection Litigation
The Humane Society of the United States

Mike Senatore
Vice President, Conservation Litigation
Defenders of Wildlife

Sierra Weaver
Staff Attorney
The Ocean Conservancy

Chris Butler-Stroud
Chief Executive
Whale and Dolphin Conservation Society