UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEFENDERS OF WILDLIFE *et al.*,        )
                                        )    Case No. 1:05CV02191
                    Plaintiffs,         )
                                        )
        v.                              )
                                        )
CARLOS GUTIERREZ *et al.*,              )
                                        )
                    Defendants.         )
_____ )

## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants hereby cross-move for summary judgment in their favor. For the reasons set forth in the accompanying memorandum, there are no genuine issues of material fact in dispute and Defendants are entitled to judgment as a matter of law. In support of this motion, Defendants hereby submit the accompanying Memorandum of Law, Proposed Order, Statement of Material Facts as to Which There is No Genuine Dispute, and Response to Plaintiffs' Statement of Material Facts as to Which There is No Genuine Dispute.

Respectfully submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division
JEAN E. WILLIAMS, Chief

     /s/ *Bridget Kennedy McNeil*
BRIDGET KENNEDY McNEIL, Trial Attorney
Wildlife and Marine Resources Section
Ben Franklin Station, P.O. Box 7369
Washington, D.C. 20044-7369
Tel: (202) 305-0388/ Fax: (202)305-0275
bridget.mcneil@usdoj.gov

Dated: July 14, 2006                    Attorneys for Federal Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DEFENDERS OF WILDLIFE *et al.*, | ) | |
| | ) | Case No. 1:05CV02191 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CARLOS GUTIERREZ *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**COMBINED MEMORANDUM IN SUPPORT OF DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A. Endangered Species Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        1. ESA Section 7(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        2. ESA Section 7(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        3. ESA Section 11(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B. Marine Mammal Protection Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C. Ports and Waterways Safety Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    D. The Process of Establishing TSSs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A. The North Atlantic right whale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    B. Ongoing Federal Efforts to Protect the Right Whale . . . . . . . . . . . . . . . . . . . . . . . . . 13

        1. The Advance Notice of Proposed Rulemaking . . . . . . . . . . . . . . . . . . . . . . . . 14

        2. The Coast Guard's Right Whale PARS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    C. Plaintiffs' Petition to NMFS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    D. NMFS' Proposed Regulation on Speed Restrictions . . . . . . . . . . . . . . . . . . . . . . . . . 19

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    A. Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    B. The Proper Standard of Review for Plaintiffs' Claims . . . . . . . . . . . . . . . . . . . . . . . . 21

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    A. Plaintiffs' Claims Against NMFS Must Fail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        1. NMFS' Denial of the Petition was Reasonable . . . . . . . . . . . . . . . . . . . . . . . . 22

        2. Prudential Mootness Counsels in Favor of Dismissal of Plaintiffs' Petition
           Denial Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        3. Plaintiffs' ESA Section 7(a)(1) Claim Against NMFS Must Fail. . . . . . . . . . . . . .26

B.  The Claims Against the Coast Guard Must Be Dismissed on Jurisdictional Grounds . . . . 28

1. Plaintiffs Fail to Sufficiently Demonstrate Standing To Bring a Section 7 Claim Against the Coast Guard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

2. Plaintiffs' Claim Is a Nonjusticiable Political Question and Impermissibly Requests this Court to Intervene in the President's Foreign Affairs Powers . . . . . . . . . . . . . .31

3. The Statute of Limitations and the Doctrine of Ripeness Bound This Court's Judicial Review of Coast Guard Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

C.  The Coast Guard is Not Required to Consult on Its Role in the IMO's Establishment of TSSs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

D.  The Coast Guard is In Compliance with ESA Section 7(a)(1) . . . . . . . . . . . . . . . . . . . . 41

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44

## TABLE OF AUTHORITIES

FEDERAL CASES

Abbott Labs v. Gardner, 387 U.S. 136 (1967 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

A.L. Mechling Barge Lines, Inc. v. United States, 368 U.S. 324 (1961) . . . . . . . . . . . . . . . . . 24

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

Ashley Creek Phosphate Co.v. Norton, 420 F.3d 934 (9th Cir. 2005) . . . . . . . . . . . . . . . . . 30, 40

Baker v. Carr, 369 U.S. 186 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

Bldg and Constr. Dept. v. Rockwell Int'l Corp., 7 F.3d 1487 (10th Cir. 1993) . . . . . . . . . . . . 25

Bowman Transp. v. Arkansas-Best Freight Sys., 419 U.S. 281 (1974) . . . . . . . . . . . . . . . . . . 21

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Chamber of Commerce v. U.S. Dep't of Energy, 627 F.2d 289 (D.C. Cir. 1980) . . . . . . . . . . 25

Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 111 (1948) . . . . . . . . . . 34

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . . . . 21

Cleary, Gottlieb, Steen & Hamilton v. Dep't of Health & Human Servs., 844 F.Supp. 770
(D.D.C. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Cmty. for Creative Non-Violence v. Pierce, 814 F.2d 663 (D.C. Cir. 1987) . . . . . . . . . . . . . . 31

Coal. for Sustainable Res. v. U.S. Forest Serv., 48 F. Supp. 2d 1303 (D. Wyo. 1999). . . . . 26-28

Ctr. for Marine Conservation v. Brown, 917 F. Supp. 1128 (S.D. Tex. 1996) . . . . . . . . . . . . . 27

Dalton v. Specter, 511 U.S. 462 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Defenders of Wildlife v. Administrator, EPA, 688 F. Supp. 1334 (D. Minn. 1988) . . . . . . . . . 27

Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121 (D.C. Cir. 2001) . . . . . . . . . . . . . . . 26, 44

Department of Transportation v. Public Citizen, 541 U.S. 752 (2004) . . . . . . . . . . . . . . . . . . . 40

Florida Audubon Soc'y v. Bensten, 94 F.3d 658 (D.C. Cir. 1996) (en banc) . . . . . . . . . . . . 29, 30

Fox Television Stations v. F.C.C., 280 F.3d 1027 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . 25

Franklin v. Massachusetts, 505 U.S. 788 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 39

Friends of Endangered Species v. Jantzen, 760 F.2d 976 (9th Cir. 1985) . . . . . . . . . . . . . . . . . 22

Haig v. Agee, 453 U.S. 280 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Hawksbill Sea Turtle v. FEMA, 11 F. Supp. 2d 529 (D.V.I. 1998) . . . . . . . . . . . . . . . . . . . . . 26

Hwang Geum Joo v. Japan, 413 F.3d 45 (D.C.Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

In Re: Barr Laboratories, 930 F.2d 72 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221 (1986) . . . . . . . . . . . . . . . . . . . . . 32

Jensen v. NOAA, 512 F.2d 1189 (9th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

Lodi Truck Serv., Inc. v. United States, 706 F.2d 898 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . 21

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 31

Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Marbled Murrelet v. Babbitt, 83 F.3d 1068 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Marsh v. Oregon Natural Res. Council, 490 U.S. 360 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Motions Sys. Corp. v. Bush, 437 F.3d 1356 (Fed.Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Nat'l Wildlife Fed'n v. Norton, 332 F.Supp.2d 170 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . 28

Oetjen v. Cent. Leather Co., 246 U.S. 297 (1918) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Public Citizen v. United States Trade Representative, 5 F.3d 549 (D.C. Cir. 1993) . . . . . . . . 38

Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy, 898 F.2d 1410 (9th Cir. 1990).....26, 41,42, 44

Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208 (1974) . . . . . . . . . . . . . . . . . 32

Schneider v. Kissinger, 412 F.3d 190 (D.C.Cir.2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

Sierra Club v. Glickman, 156 F.3d 606 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Simon v. E. Kentucky Welfare Rights Org., 426 U.S. 26 (1976) . . . . . . . . . . . . . . . . . . . . . . . . 31

Steel Co. v. Citizens for a Better Env't, 118 S. Ct. 1003 (1998) . . . . . . . . . . . . . . . . . . . . . . . . 29

Strahan v. Linnon 967 F.Supp. 581 (D.Mass. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 27, 39, 41

Strahan v. Linnon (Table), 1998 WL 1085817 (1st Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 39

United States v. Curtiss-Wright Export Corp., 299 U.S. 304 (1936) . . . . . . . . . . . . . . . . . . . . . 33

United States v. Locke, 529 U.S. 89 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States v. W.T. Grant Co., 345 U.S. 629 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## FEDERAL STATUTES

16 U.S.C. § 1361(1)-(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

16 U.S.C. § 1361(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

16 U.S.C. § 1362(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

16 U.S.C. § 1362(13) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

16 U.S.C. § 1362(8)-(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

16 U.S.C. § 1371(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

16 U.S.C. § 1373 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

16 U.S.C. § 1382(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

16 U.S.C. § 1536(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

16 U.S.C. § 1536(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 36, 37

16 U.S.C. § 1540(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

16 U.S.C. § 1540(g)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

22 U.S.C. § 2656 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

22 U.S.C. § 2651 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

28 U.S.C. § 2401(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

33 U.S.C. § 1221(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

33 U.S.C. § 1223(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

33 U.S.C. § 1223(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 10, 11

33 U.S.C. § 1223(c)(5)(C) . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

33 U.S.C. § 1230(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

33 U.S.C. §§ 1221-1232 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

5 U.S.C. App. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Coast Guard and Maritime Transportation Act of 2004, Pub. L. 108-293, 118 Stat. 1028 . . . . . 16

Port and Tanker Safety Act of 1978, Pub. L. No. 95-474, 92 Stat. 1471 (1978) . . . . . . . . . . . . . 7

## FEDERAL REGULATIONS

40 C.F.R. § 1508. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

50 C.F.R. § 402.0 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

33 C.F.R. Part 167 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

33 C.F.R. § 167.5(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

50 C.F.R. § 216.15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

50 C.F.R. § 216.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

50 C.F.R. § 226.203 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-15

50 C.F.R. § 402.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 39, 40

50 C.F.R. § 402.13(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

50 C.F.R. § 402.14(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

50 C.F.R. § 402.14(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

50 C.F.R. § 402.14(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

50 C.F.R. § 402.14(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

50 C.F.R. § 402.14(*l*)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

50 C.F.R. § 402.16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## OTHER AUTHORITIES

Convention on the Intergovernmental Maritime Consultative Organization, March 6, 1948, Art. 5, 9 U.S.T. 621 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Federal Rule of Civil Procedure 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

IMO Guidance on Preparation of Proposals on Ships Routeing Systems . . . . . . . . . . . . . . . . . 9

IMO Ships' Routeing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 11, 12, 17

International Convention for the Safety of Life at Sea, 32 U.S.T. 47, T.I. A. S. No. 9700 (Nov. 1. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

U.S. Coast Guard Marine Safety Manual, Vol. XI, Chap 1, § (E)(2) . . . . . . . . . . . . . . . . . . . . . . . 8

## TABLE OF ACRONYMS

ANPR = Advance Notice of Proposed Rulemaking - NMFS' Federal Register publication of its
       draft strategy to reduce right whale ship strikes

APA = Administrative Procedure Act

BA = biological assessment - an ESA Section 7 document prepared by the action agency
     evaluating the effects of its proposed action on endangered species

BiOp = biological opinion - an ESA Section 7 document prepared by the consulting agency
       assessing the likelihood of whether a  federal agency action will jeopardize an
       endangered species

DEIS = draft environmental impact statement - undertaken pursuant to the requirements of the
       National Environmental Policy Act

DMA = dynamic management area - one of the proposed regulatory measures to avoid ship
      strikes

ESA = Endangered Species Act

IMO = International Maritime Organization - a specialized agency of the United Nations which
      regulates international shipping

MSC = IMO Maritime Safety Committee, parent body to the Sub-committee on Safety of
      Navigation

MMPA = Marine Mammal Protection Act

NAV = IMO Sub-committee on Safety of Navigation

NEPA = National Environmental Policy Act

NMFS = National Marine Fisheries Service, a NOAA agency within the Department of
       Commerce

NOAA = National Oceanic and Atmospheric Administration, within the Department of
       Commerce

PARS = Port Access Route Study - a PWSA study of potential traffic density and the need for
       safe access routes in a particular port

PWSA = Ports and Waterways Safety Act

SHC = Shipping Coordinating Committee

SOLAS = International Convention for the Safety of Life at Sea

TSS = traffic separation scheme - one of several possible vessel routing measures

## INTRODUCTION

Plaintiffs present the issue of ship strike mortality of the North Atlantic right whale ("right whale") as a sudden crisis that has increased in the past few years, requiring immediate action from the Coast Guard and the National Marine Fisheries Service ("NMFS") in order for the species to recover.  While both agencies acknowledge that ship strikes are a serious factor affecting the recovery of right whales, a meaningful discussion of measures to protect right whales requires a complete and accurate assessment of the facts.  Right whale populations were all but decimated by hundreds of years of commercial whaling.  Despite the lengthy amount of time projected for recovery of this species, the population of right whales has nonetheless increased from fewer than 100, by some estimates, in the early 1900s, to approximately 300 today. However, these population numbers are far below the established recovery goal.  In consideration of the right whale's status, the NMFS and the Coast Guard are actively working to aid the right whale's recovery.  Each agency has engaged in numerous individual activities to benefit the whale and have worked together for over ten years to implement many of the goals in the recovery plan.  Recognizing that human activities are one of the major factors affecting recovery, NMFS prepared a comprehensive strategy to reduce ship strikes in 2004.  Many of the proposed measures in this strategy are novel and unprecedented, such as imposing offshore speed restrictions on both United States and foreign flag vessels engaged in interstate and foreign commerce.

In May 2005, Plaintiffs requested NMFS to implement the controversial speed restrictions on an emergency, interim basis.  NMFS denied the petition on the basis that there was no new information presenting an emergency and its determination that agency resources would best be spent on implementation of permanent measures outlined in the draft strategy. Plaintiffs now challenge the reasonableness of NMFS' denial of their petition for emergency

1

rulemaking.  With respect to the rulemaking process, NMFS has recently published a proposed rule for notice and comment, scheduled three public hearings, and prepared a draft Environmental Impact Statement and economic analysis on the proposed rule.  The rulemaking is clearly proceeding apace and the Court should not intervene in the administrative process.

Plaintiffs also allege that the Coast Guard is required to engage in the Endangered Species Act ("ESA") Section 7 consultation process regarding the role it plays in the development of United States proposals to the International Maritime Organization ("IMO") - a specialized agency of the United Nations - to establish or adjust traffic separation schemes ("TSSs") in waters off of the Atlantic Coast.  With respect to the Coast Guard, Plaintiffs completely mischaracterize the international process required to establish a TSS and the Coast Guard's role in that process.  As explained below, Plaintiffs' claims against the Coast Guard are rife with legal infirmities, rendering them nonjusticiable and unsupported by law, as the Coast Guard takes no action which triggers the requirements of ESA Section 7.

By presenting the situation as a sudden crisis which warrants emergency measures, Plaintiffs ignore the history and nature of the far-ranging federal efforts to recover right whales, the status of the proposed rulemaking, the international nature of the TSS process, and the ongoing domestic and international efforts on new and changed routing measures.  Plaintiffs ask the Court to take the remarkable step of overriding ongoing executive branch action, order NMFS to engage in emergency rulemaking that is duplicative of the proposed rule, and order the Coast Guard to engage in an unwarranted consultation on long-established traffic separation schemes created by the IMO.  This Court should grant summary judgment in favor of the federal Defendants, and dismiss Plaintiffs' Amended Complaint with prejudice.

## STATUTORY AND REGULATORY BACKGROUND

**A.    Endangered Species Act**

1.    ESA Section 7(a)(1)

Section 7(a)(1) of the ESA states that:

> [t]he Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this chapter.  All other Federal agencies shall, in consultation with and with the assistance of [FWS or NMFS], utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species[.]

16 U.S.C. § 1536(a)(1).  The conservation requirement under 7(a)(1) is often, but not always, met in tandem and coordination with a federal agency's formal consultation obligations under 7(a)(2) to ensure that its actions are not likely to jeopardize the continued existence of listed species.

Pursuant to 50 C.F.R. § 402.14(j), when issuing biological opinions under Section 7(a)(2), NMFS may provide a "statement concerning discretionary conservation recommendations" which "are advisory and are not intended to carry any binding legal force." The Services[1] have clarified that the term "conservation recommendations" was introduced into the regulations to explain the consulting agency's "role in helping [action] agencies meet their section 7(a)(1) responsibilities." See 51 Fed. Reg. 19,926, 19,931 (June 3, 1986).  Thus, conservation measures are "voluntary measures that the Federal [action] agency has the discretion to undertake to avoid or reduce adverse effects of a proposed action that otherwise complies with the provisions of section 7(a)(2)." Id.; id. at 19,934 ("the Act does not mandate particular actions be taken by Federal agencies to implement 7(a)(1)").

---

[1] The regulations for ESA Section 7 were jointly prepared by NMFS and the United States Fish and Wildlife Service, who jointly administer the ESA.  Because NMFS has jurisdiction over the species at issue, for the purposes of this brief,  "the Service" or the "Secretary" refers only to NMFS.

3

2.    ESA Section 7(a)(2)

Section 7 of the ESA requires each federal agency ("action agency"), in consultation with

NMFS, to "insure that any action authorized, funded, or carried out by such agency is not likely

to jeopardize the continued existence of any endangered species or threatened species or result in

the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2).

There are two types of consultation, described at length in the Section 7 regulations: formal and

informal.  Informal consultation is "an optional process that includes all discussions,

correspondence, etc., between the Service and the Federal agency or the designated non-Federal

representative prior to formal consultation, if required."  50 C.F.R. § 402.02.  The optional

process of informal consultation allows the Service to assist the action agency in determining

whether formal consultation is required under Section 7.  Id.; see also § 402.13.  If an action

agency determines, with written concurrence of NMFS, that the action "is not likely to adversely

affect listed species or critical habitat, the consultation process is terminated, and no further

action is necessary."  50 C.F.R. § 402.13(a); see also §402.14(b)(1) (action agency need not

initiate formal consultation if it determines, after informal consultation, with written concurrence

of wildlife agency, that proposed action is not likely to adversely affect listed species or critical

habitat).

Formal consultation is required for agency actions that "may affect" listed species or

critical habitat.  50 C.F.R. § 402.14(a).  Formal consultation typically concludes with the

issuance of a biological opinion ("BiOp") by NMFS.  Id. § 402.14(*l*)(1).  The BiOp assesses the

likelihood of jeopardy to the species.  See id. § 402.14(g) (discussing NMFS' responsibilities

during formal consultation).  The BiOp must include an evaluation of the current status of the

species and the effects of the action and cumulative effects on the species.  50 C.F.R. §

402.14(g)(2), (3).  The term "effects of the action" is defined to mean "the direct and indirect

4

effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline." Id. § 402.02.

After issuance of a BiOp, reinitiation of formal consultation is required where discretionary Federal involvement or control has been retained or is authorized by law, and one or more of the following factors exists: (1) the amount or extent of taking specified in an ITS is exceeded; (2) new information reveals effects not previously considered; (3) the agency action is modified in a manner that causes an effect not previously considered; or (4) a new species is listed or critical habitat designated that may be affected by the action. 50 C.F.R. § 402.16.

      3.    ESA Section 11(g)

The ESA citizen-suit provision provides, in relevant part, that any person may commence a civil suit "to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)(A). The statute goes on to provide that "[t]he district courts shall have jurisdiction ... to enforce any such provision or regulation, or to order the Secretary to perform such act or duty, as the case may be." 16 U.S.C. § 1540(g)(1). Prior to bringing such an action, the prospective plaintiff is required to provide written notice of the violation to the Secretary, and to the alleged violator of any such provision or regulation. Id. § 1540(g)(2)(A).

**B.    Marine Mammal Protection Act**

The MMPA was enacted in 1972 in part to prevent the extinction or depletion of marine mammal stocks as a result of human activities. 16 U.S.C. § 1361(1),(2). Recognizing that "there is inadequate knowledge of the ecology and population dynamics of such marine mammals..." 16 U.S.C. § 1361(3), Congress found that marine mammals "should be protected and encouraged to

develop to the greatest extent feasible commensurate with sound policies of resource management." 16 U.S.C. § 1361(6).  In furtherance of its purposes, the MMPA establishes a general "moratorium," which prohibits the taking or importation of marine mammals or marine mammal products.  16 U.S.C. § 1371(a); see also id. § 1362(8) (defining "moratorium"); id. § 1371(a)(1) - (a)(6) (describing exceptions); id. § 1373 (authorizing regulations on take and importation).  The Act defines "take" to mean "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal."  16 U.S.C. § 1362(13); 50 C.F.R. § 216.3.

Congress established "the goal to obtain an optimum sustainable population ["OSP"] keeping in mind the carrying capacity of the habitat."  16 U.S.C. § 1361(6).  Under the MMPA, a species or population stock of marine mammals is "depleted" if the Secretary or a state to which authority for the conservation and management of the species is transferred determines that the stock is below its OSP, or if the stock is listed as endangered or threatened under the ESA.  16 U.S.C. § 1362(1); see also 50 C.F.R. § 216.15 (listing depleted species).  The OSP for a population or stock of marine mammals is "the number of animals which will result in the maximum productivity of the population or the species, keeping in mind the carrying capacity of the habitat and the health of the ecosystem of which they form a constituent element."  16 U.S.C. § 1362(9); see also 50 CFR § 216.3.  Finally, the MMPA also provides the Secretary with authority, in consultation with other federal agencies, to prescribe such regulations as are necessary and appropriate to carry out the purposes of the Act.  16 U.S.C. § 1382(a).

## C.    Ports and Waterways Safety Act

The regulation of navigation in the United States dates to adoption of the Constitution, and Congress has enacted a series of statutes over the past two centuries reflecting concern with the safety of a growing maritime transport industry.  See generally, United States v. Locke, 529 U.S. 89, 99 (2000).  In response to a 1967 spill of 120,000 tons of oil off the coast of England,

Congress enacted the Ports and Waterways Safety Act of 1972 ("PWSA") to "reduce the possibility of vessel or cargo loss, or damage to life, property, or the marine environment."  33 U.S.C. § 1221(c)(1).  The PWSA, as amended by the Port and Tanker Safety Act of 1978, Pub. L. No. 95-474, 92 Stat. 1471 (1978), governs navigation and waterways management, such as vessels traffic services, ship routing, and tug escort requirements, 33 U.S.C. §§ 1221-1232.  The PWSA specifically authorizes the Coast Guard to "provide safe access routes for the movement of vessel traffic proceeding to or from ports or places subject to the jurisdiction of the United States" through designation of "necessary fairways and traffic separation schemes for vessels operating in the territorial sea of the United States and in high seas approaches, outside the territorial sea, to such ports or places."  33 U.S.C. § 1223(c)(1).  The PWSA specifies that any such designation "shall recognize . . . the paramount right of navigation over all other uses."[7]  Id.  The PWSA also authorizes adjustment of the location or limits of a fairway or TSS

> to accommodate the needs of other uses which cannot reasonably be accommodated otherwise: *Provided*, That such an adjustment will not, in the judgment of the Secretary, unacceptably adversely affect the purpose for which the existing designation was made and the need for which continues...

Id. § 1223(c)(5)(C) (emphasis in original).

The Coast Guard has long interpreted the PWSA to authorize establishment of port access routes to

> prevent damage to, or the destruction or loss of, any vessel, bridge, or other structure on or in the navigable waters of the United States, or any land structure or shore area immediately adjacent to those waters; and to protect the navigable waters and the resources therein from environmental harm resulting from damage to the vessel or shore structures.

---

[7] Within six months of enactment, and before establishing any fairway or TSS, the PWSA required the Coast Guard to conduct a study (commonly known as a port access route study or "PARS") of "potential traffic density and the need for safe access routes in [the] area," and provides authority to conduct other PARS, as needed.  Id. § 1223(c)(3)(A).

See U.S. Coast Guard Marine Safety Manual, Vol. XI, Chap 1 § (E)(2) (page 15)

(http://www.uscg.mil/hq/g-m/nmc/pubs/msm/v6/c1.pdf (last visited July 14, 2006)).  The Coast

Guard does not interpret the PWSA to provide general or unlimited authority to regulate vessel

operations to protect against all forms of potential environmental harm, such as impacts from

collisions with protected species or air emissions.  This view of the extent of PWSA authority to

establish routing measures, such as TSSs, is consistent with the plain language of the PWSA,

which focuses on establishment of "safe access routes."  33 U.S.C. § 1223(c)(1).  This

interpretation is also in accord with the recognized purpose of routing measures, set forth by the

IMO - the only international body for developing guidelines, criteria, and regulations on an

international level for ships' routing systems:

> The purpose of ships' routeing is to improve the safety of navigation in
> converging areas where the density of traffic is great or where freedom of
> movement of shipping is inhibited by restricted sea room, the existence of
> obstructions to navigation, limited depths or unfavourable meteorological
> conditions.  Ships' routeing may also be used for the purpose of preventing or
> reducing risk of pollution or other damage to the marine environment caused by
> ships colliding or grounding or anchoring in or near environmentally sensitive
> areas.

IMO's Ships' Routeing, § 1.1, attached to the Declaration of Bridget Kennedy McNeil as Exhibit

A.  Finally, the Coast Guard's interpretation is supported by the 1998 amendments to the PWSA,

wherein Congress specifically authorized implementation of two mandatory ship reporting

systems developed specifically for protection of the right whale, reflecting that such authority to

regulate solely for the benefit of a specific marine species did not exist prior to the amendment.

See 33 U.S.C. § 1230(d).

**D.      The Process of Establishing TSSs**

Traffic separation schemes and other routing systems have been established in most of

the major shipping areas of the world.  TSSs are routing measures that separate opposing streams

8

of traffic by establishment of traffic lanes, 33 C.F.R. § 167.5(b), and are established to provide order to the existing patterns of traffic flow[3]. See IMO Guidance on Preparation of Proposals on Ships Routeing Systems at 2 ("Routes should follow as closely as possible existing patterns of traffic flow"), available at http://www.imo.org/includes/blastData.asp/doc_id=2735/1060.pdf (last visited July 14, 2006). In order to conform to the requirements of the PWSA, and gain the international shipping community's recognition and adoption of ships' routing measures, the United States government, not the Coast Guard, submits proposed routing measures to the IMO for consideration. The actual establishment of these routing measures is an action taken by the IMO. This process comports with well-established international law, in particular the International Convention for the Safety of Life at Sea ("SOLAS"), which recognizes the IMO as the competent international body for establishment of routing measures. SOLAS Ch. V, Reg. 10.2 *adopted on* Nov. 1, 1974, 32 U.S.T. 47, T.I.A.S. No. 9700. Under SOLAS, IMO seeks to standardize within the international shipping community, the design, development, charted presentation, and use of adopted routing measures. IMO standards prescribed that proposals for routing measures be submitted to IMO, whether within or beyond a nation's territorial sea. Ships Routeing, §§ 3.11, 3.14.

With respect to United States participation at IMO, the State Department executes its foreign affairs authority through the Shipping Coordinating Committee ("SHC"), an advisory committee chartered under the authority of the Federal Advisory Committee Act, 5 U.S.C. App.

---

[3] Contrary to Plaintiffs' allegations that TSSs concentrate vessels in right whale habitat, TSSs serve to separate into traffic lanes opposing streams of traffic already present in the approaches to particular ports. Plaintiffs seem to equate the terms "shipping corridor" or "shipping lane" (which is a generic maritime term meaning the customary courses ships take into and out of port; they can and often do pre-exist established routing measures, such as IMO-approved TSSs) with an established TSS, which is incorrect. Shipping lanes can and often do pre-exist established routing measures such as TSSs.

2.  The SHC's purpose is to advise the Secretary of State[4] on matters related to international shipping and help develop United States government positions on such activities before international bodies, such as the IMO and the United Nations.  See http://fido.gov/facadatabase/docs_charters/159_charter_(2002-12-11-16-03-40).doc (last visited July 14, 2006).  The SHC, initially established in 1958, is chartered by the Secretary of State for two-year terms under the authority of 22 U.S.C. § 2656.  Id.  With respect to IMO matters, the SHC ascertains the views of interested government departments and agencies and members of the public and makes recommendations to the Secretary of State, who provides guidance to the United States representatives at meetings of IMO.  Id.  The charter specifies the SHC's members, meeting dates, and agendas, and generally sets forth how the Committee functions in order to advise the Secretary.  Id.

Prior to the formulation of a United States government routing measure proposal,  the primary role played by the Coast Guard is conducting a PARS, which forms the basis for the recommended routing measure.  The PARS studies the traffic density in the area and the potential need for a TSS or other routing measure.  During the PARS, the Coast Guard confers with other federal agencies and considers all other uses of the area under consideration, including economic, environmental, and recreational uses.[5]  The Coast Guard must only

---

[4] The Department of State is the Department of the Executive Branch that carries out the President's foreign affairs powers.  22 U.S.C. §§ 2651, 2656.

[5] 33 U.S.C. § 1223(c)(3)(B) provides:

Prior to making a designation pursuant to paragraph (1) hereof, and in accordance with the requirements of section 5, the Secretary shall--(B) in consultation with the Secretary of State, the Secretary of the Interior, the Secretary of Commerce, the Secretary of the Army, and the Governors of affected States, as their responsibilities may require, take into account all other uses of the area under consideration (including, as appropriate, the exploration for, or exploitation of, oil, gas, or other mineral resources, the construction or operation of deepwater ports or other structures on or above the seabed or subsoil of the

10

reconcile the need for safe access routes with the needs of all other reasonable uses of the area involved to the extent practicable.  Id. § 1223(c)(3)(c).  Prior to completing a PARS, the Coast Guard solicits comment from federal agencies, interested stake holders in the shipping, commercial fishing, and recreational boating communities, and environmental organizations. Once a PARS is completed, the Executive Branch conducts a review of any recommendations received during the PARS public notice and comment period, through development and interagency clearance of a U.S. proposal for establishing or amending the measure.  As a Contracting Government to the IMO Convention, only the United States government is competent to submit such proposals; individual federal agencies may not[9].

Once a government submits a routing measure proposal, the IMO Sub-committee on Safety of Navigation ("NAV") reviews it for technical compliance with applicable requirements of the IMO's Ship's Routeing Guide, including the requirement that the extent of a traffic separation scheme should be limited to what is essential in the interests of safe navigation.  Ships Routeing § 6.9.  If the proposal is approved, a recommendation is made to the Subcommittee's parent body, IMO's Maritime Safety Committee ("MSC"), which will review and potentially approve it for adoption by IMO.  Even after adoption, IMO routeing measures are generally voluntary and discretionary, as are all the challenged TSSs here,  unless they are expressly made mandatory, where essential in the interest of safety of navigation and protection of the marine

---

submerged lands or the Outer Continental Shelf of the United States, the establishment or operation of marine or estuarine sanctuaries, and activities involving recreational or commercial fishing).

[9] See Convention on the Intergovernmental Maritime Consultative Organization, March 6, 1948, Art. 5, 9 U.S.T. 621; T.I.A.S. 4044, 289 U.N.T.S. 48 (amendment adopted by the Organization November 14, 1975, effective May 22, 1982. (34 U.S.T.  497; T.I.A.S. 10374)); http://www.state.gov/documents/organization/65523.pdf (listing United States as a party to Convention on the Intergovernmental Maritime Consultative Organization).

environment.  Ships Routeing, §§ 8.1, 6.17.  Thus, a vessel owner or master is free to choose whether to use an established TSS.

When a routing measure is submitted by the U.S. government to IMO for consideration, IMO may adopt, reject, or amend it.  If the proposal is adopted, IMO will issue a Circular describing the TSS or other routing measure, and announcing the implementation date.  National hydrographic offices, charting agencies, and companies will then update their charts to reflect any changes.[7]  Vessel use of TSSs follows IMO adoption and charting.  The Coast Guard generally codifies established TSS in 33 C.F.R. Part 167, primarily to inform the public of the TSS.  This normally occurs several years or later following IMO adoption, and has not occurred at all for a number of TSSs.

## FACTUAL BACKGROUND

**A.     The North Atlantic right whale**

Due to its coastal nature, slow swimming speed, and high oil yield, the northern right whale was a primary target of the early whale fisheries from 1100 to the early 1900s.  CG AR 43.  Commercial harvest over the centuries resulted in the decimation of the population to possibly less than 50 animals by the turn of the century.  Id. at 44.  From this low number, the North Atlantic right whale has slowly increased in number and is now thought to number approximately 300 individuals, but is still considered to be one of the most critically endangered large whales in the world.  NMFS AR 20 BN 503.  Recovery of this population is slow, in part, because of the reproductive process.  Females do not give birth until an average of 7.5 years and the gestation process takes 12 months.  CG AR 47-48.  Additionally, females give birth only approximately every 4 or more years.  Id. at 48.

---

[7] In the United States, NOAA's National Ocean Service updates vessel navigational charts with IMO-approved vessel routing measures.

Right whales are migratory animals and seasonal movements are observed between the spring and summer feeding grounds off the coast of Massachusetts and the winter calving grounds off the coasts of Georgia and Florida. CG AR 45. In 1994, NMFS designated critical habitat for the right whale in the Great South Channel, Cape Cod Bay, and in the coastal waters off Georgia and Florida. See 50 C.F.R. § 226.203. Right whale critical habitat and distribution tend to coincide with several major shipping corridors on the eastern U.S. and southeastern Canadian coasts. NMFS AR 20 BN 503. Accordingly, mortality due to entanglements in fishing gear and collisions with ships are the two most significant human-caused threats to right whales of the modern era. Id.

**B.    Ongoing Federal Efforts to Protect the Right Whale**

In 1991, NMFS issued a recovery plan for the right whale, which was revised in 1999, 2004, and 2005. 70 Fed. Reg. 32,293 (June 2, 2005). Two interagency teams, consisting of federal and state agencies as well as local port authorities in the northeast and the southeast are tasked with implementing the recovery plan in each region, which has resulted in the implementation of many of the recovery plan objectives. In recent years, NMFS has coordinated with numerous federal agencies, including the Coast Guard, to implement major actions identified in the recovery plan. CG AR 51. In addition to further research, the efforts focused on reduction of human-related mortalities. Id. NMFS and the Coast Guard operate a sighting advisory/early warning system, which includes aerial surveys, in order to notify mariners of recent right whale sighting locations. Id.; NMFS AR 20 BN 503. The Coast Guard issues periodic notices to mariners regarding ship strikes, and issues messages on their NAVTEX system with the location of right whales. CG AR 51, 419-20. The Coast Guard provides vessel and aircraft support to facilitate right whale research and population monitoring, as well as assistance in right whale disentanglements and strandings. Id. at 10, 284-85, 458. In 1997,

NMFS issued a regulation prohibiting all approaches within 500 yards of any right whale, whether by vessel, aircraft, or other means, in order to limit disturbance of the whales, which is enforced by the Coast Guard. 62 Fed.Reg. 6,729, 6,736. (Feb. 13, 1997). Furthermore, the agencies jointly operate two mandatory ship reporting systems which provide real-time information to mariners entering and transiting right whale critical habitat. NMFS AR 20 BN 503.

      1.     The Advance Notice of Proposed Rulemaking

Despite these continuing actions, right whale recovery efforts continued to be adversely affected by ship collisions. With assistance from interagency partners, including the Coast Guard, NMFS formulated a draft strategy to further reduce ship strikes to the extent practicable while minimizing the adverse impact on ship operations, detailed in the Advance Notice of Public Rulemaking ("ANPR"). 69 Fed. Reg. 30,857 (June 1, 2004). The draft Strategy outlined by NMFS consists of five elements: (1) establishment of new operational measures for the shipping industry, including consideration of routing and speed restrictions, applicable to vessels 65 feet or greater; (2) negotiation of a right whale conservation agreement with Canada; (3) development and implementation of education and outreach programs; (4) review of the need for ESA Section 7 consultation with all Federal agencies who operate or authorize the use of vessels in waters inhabited by right whales, or whose actions directly or indirectly affect vessel traffic; and (5) continuation of ongoing research, conservation, and education/outreach activities. Id.

The strategy contemplated regional implementation, and allowed for differences in oceanography, commercial ship traffic patterns, navigational concerns, and right whale use. Id. For the southeastern Atlantic coast, the range of possible measures discussed in the ANPR, applicable December 1 through March 31, included designated routes to reduce the risk of collisions and seasonal speed restrictions in the range of 10-14 knots. Id. at BN 504. For the

14

mid-Atlantic coast, the possible measures discussed included speed restrictions of 10-14 knots

within 20-30 miles from designated ports, applicable on rolling dates designed around right

whale presence in each area.  Id.  For the northeastern Atlantic coast, the possible measures

discussed included: 1) in Cape Cod Bay, applicable January 1 to April 30, routing measures to

reduce the risk of collisions, speed restrictions, and additional notices to mariners; 2) off Race

Point, applicable April 1 through May 15, speed restrictions; 3) in the Great South Channel,

applicable April 1 through July 31, proposal to the IMO of an Area to Be Avoided, applicable to

vessels 300 gross tons and above, and speed restrictions applicable to all vessels greater than 65

feet; and 4) in the Gulf of Maine, applicable year-round, dynamic area management consisting of

possible speed restrictions or routes to avoid whale strikes.  Id. at BN 504-506.

NMFS requested public comment on the draft strategy, which it received in droves, and

had to extend the comment period twice.  See e.g. NMFS AR 19 BN 265-501; NMFS AR 18;

NMFS AR 17.  In July and August 2004, NMFS held five public meetings along the East Coast

to present the draft strategy and seek input on the development and implementation of the

proposed new operational measures.  See NMFS AR 17 BN 261.  In September and October

2004, NMFS held nine additional stakeholder meetings along the East Coast with port and

shipping industry representatives, in order to explain the overall draft strategy, as well as to

focus on specific areas adjacent to each port.  NMFS AR 14.  In September and November 2004,

NMFS convened two additional focus group meetings, which were attended by a range of

federal, state, and non-governmental entities, including representatives from Defenders of

Wildlife and the Ocean Conservancy.  NMFS AR 15, 16.

2.    The Coast Guard's Right Whale PARS

The Coast Guard and Maritime Transportation Act of 2004 requires the Coast Guard to

cooperate with NOAA in analyzing potential vessel routing measures for reducing vessel strikes

15

of right whales, as outlined in the ANPR, and to report back to Congress by January 2006.  Pub. L. 108-293, 118 Stat. 1028, § 626 (Aug. 9, 2004).  The Coast Guard utilized its PARS process to accomplish the Congressional directive, as demonstrated by Volume II of the Coast Guard's administrative record.  On February 18, 2005, the Coast Guard issued a notice of the upcoming PARS which would focus on potential and existing vessel routing measures off of Cape Cod and the Georgia and Florida coasts.  70 Fed. Reg. 8,312.  The Coast Guard noted that it would consider previous studies, analyses of vessel traffic density, and agency and stakeholder experience in, and public comments on, vessel traffic management, navigation, ship handling, and weather.  Id. at 8,314.  The notice defined the possible recommendations that could result from the PARS, id.,  and requested public comment on several questions, as well as the entire planned PARS.  Id.  Both the Ocean Conservancy and Defenders of Wildlife submitted comments in April 2005.  CG AR 720-21, 761-65.

On May 24, 2006, the Coast Guard issued a notice of the completed PARS and the recommendations, requesting additional public comment.  71 Fed. Reg. 29,876.  In its analysis, the Coast Guard considered ship transit data, scientific information provided by NOAA on right whale locations and migratory patterns, as well as vessel traffic information recorded from the Mandatory Ship Reporting System.  Id. at 29,878.  In contrast to a routine PARS, the Coast Guard did not consider economic impacts, as NMFS is analyzing economic impacts as part of the overall ship strike strategy.  Id.  Finally, the Coast Guard considered public comment it received in response to the notice of the PARS, as well as the comments NMFS received in response to the ANPR.  Id.  The recommendations in the PARS include six categories of action:

> 1) Establish precautionary areas at the entrance to the ports of Jacksonville and Fernandina Beach, Florida, and Brunswick, Georgia;

2) Establish six, two-way routes for these same ports[8];

3) Establish precautionary areas at the entrance to Cape Cod Canal and in the vicinity of New Inlet, Massachusetts;

4) Establish three, two-way routes in Cape Cod Bay to the ports of Boston and Provincetown, Massachusetts, and the entrance to Cape Cod Canal;

5) Establish a two-way recommended track from the Cape Cod Canal entrance to Provincetown, Massachusetts; and

6) Realign and modify the location and size of the western portion of the TSS "in the Approach to Boston, Massachusetts."

Id. The Coast Guard briefly summarized the next steps in implementing the recommendations. Any adjustment to the Boston TSS must be made by the IMO. Id. Accordingly, on March 24, 2006, the United States submitted a proposal to the IMO to make the adjustment, for consideration at the next meeting of the Sub-Committee on Safety of Navigation[9]. CG AR 1084.

## C.    Plaintiffs' Petition to NMFS

On May 19, 2005, Plaintiffs filed an APA petition for rulemaking requesting NMFS to promulgate emergency rulemaking within 60 days to slow and/or re-route vessels within right whale habitat to protect the species until permanent measures are enacted. NMFS AR 12. The petition requested that the emergency regulations require all ships within 25 miles of all major East Coast port entrances to travel at speeds of 12 knots or less, during expected right whale high

---

[8] Contrary to Plaintiffs' representation that the PARS resulted in a recommendation to propose a new TSS in the southeast, Pls' Mot. at 35, the recommendation is only to establish precautionary areas and two-way routes, which are less stringently defined routing measures than a TSS.

[9] This session will occur July 17-21, 2006, at the IMO headquarters in London, England. *See* http://www.imo.org/Newsroom/mainframe.asp?topic_id=112; http://www.imo.org/includes/blastDataOnly.asp/data_id%3D14138/1.pdf. If the Sub-Committee favorably recommends the proposal to the Maritime Safety Committee, it will be reviewed and a determination will be made by December 2006. *See* http://www.imo.org/home.asp; http://www.imo.org/includes/blastDataOnly.asp/data_id%3D14807/2721.pdf. If adopted, the IMO adoption of the amendment to the Boston TSS would become effective six months later, in May 2007. Ships Routeing, § 3.8

use periods.  Id. at BN 175-76.  The petition requested that the emergency measures be in place

from November 1 through April 30 for all ports from Florida to Rhode Island, from January 1

through May 31 in the area of Cape Cod Bay, and January 1 through July 31 in the area of the

Great South Channel.  Id. at 176.  The petition also requested that all vessels transiting right

whale critical habitat during seasonal high use times be restricted to 12 knots or less, or avoid the

area altogether.  Id.  Finally, the petition requested that NMFS institute a dynamic management

area to protect whales outside of the times and areas described above, which requires the re-

routing of vessels and/or speed restrictions of 12 knots or slower when aggregations of whales

are found.  Id.

NMFS considered several responses to the petition, NMFS AR 11, 10, 4, and issued a

letter in response to the petition on September 14, 2005.  NMFS AR 3.  NMFS reaffirmed that

reducing right whale mortality is one of their highest priorities.  Id. at BN 8.  NMFS discussed its

multi-year draft Ship Strike Reduction Strategy, and the ANPR, which included the protective

measures requested by Plaintiffs, as well as the public meetings held on this issue.  Id.  NMFS

stated that it was currently analyzing various measures and alternatives, while also preparing a

draft EIS, and hoped to issue a proposed rule by early 2006.  Id.  NMFS indicated that it was also

working with other federal agencies to reduce ship strikes, noting that most agencies are working

to the best of their ability, within their authorities, to reduce ship strikes by operation of federal

vessels, and also informed the Plaintiffs of the Coast Guard right whale PARS to assess possible

routing changes.  Id. at BN 8-9.  NMFS discussed the additional efforts it was implementing:

NOAA advisories to ships to slow to 12 knots or less when transiting areas occupied by right

whales; revising the U.S. Coast Pilots to include the same information; and initiation of a

program to provide speed advisories on real-time electronic navigational charts.  Id.  NMFS also

identified their increased efforts to educate mariners on how to avoid ship strikes, including

collaboration with the cruise industry to develop training modules for captains and crew, which

include speed advisories.  Id.  In denying the petition, NMFS stated:

> As noted above, we are in the process of developing and analyzing a broad ship
> strike reduction strategy that includes routing changes and ship speed restrictions
> along the eastern seaboard.  Promulgating a separate 12-knot speed limit, at this
> time, would duplicate agency efforts and reduce agency resources for a more
> comprehensive strategy, as well as risk delaying implementation of the draft
> Strategy.  Your petition does not present any new information about right whales
> that warrants promulgating a rule on an emergency basis rather than completing
> the ongoing rulemaking.  Instead of imposing measures in piecemeal fashion,
> NMFS continues to believe that putting a comprehensive strategy in place is the
> best course of action.  Therefore, we will publish a denial of the petitioned request
> to issue emergency regulation in the *Federal Register*.  We will continue,
> however, to proceed as quickly as possible with analysis and rulemaking to
> implement the comprehensive ship strike strategy.

Id.

## D.    **NMFS' Proposed Regulation on Speed Restrictions**

On June 26, 2006, NMFS published a proposed rule to implement speed restrictions to

reduce the threat of ship strikes to the right whale.  71 Fed. Reg. 36,299.  The rule proposes a

speed restriction of 10 knots or less during certain times in each of three major regions along the

U.S. east coast (Northeast, Mid-Atlantic, and Southeast), although NMFS is also accepting

comment on speed restrictions of 12 knots or 14 knots.  Id. at 36,305.  Speed restrictions would

apply to non-federal vessels that are 65 feet in length or greater.  Id.  These proposed measures

are adapted to right whale seasonal occurrence in each area, as well as commercial ship traffic

patterns and navigational concerns.  Id.  In the southeast coast off of Georgia and Florida, the

speed restrictions will be in effect from November 15 to April 15 of each year.  Id.  In the mid-

Atlantic region, NMFS proposes to restrict vessel speed from November 1 through April 30

within 30 nautical miles around 8 ports or bays, ranging northward from Savannah, Georgia, to

New York.  Id.  In the Northeast region, NMFS proposes to restrict vessel speed throughout all

of Cape Cod Bay from January 1 to May 15, from March 1 to April 30 in a 50-square-mile area

off of Race Point, and from April 1 to July 31 in the Great South Channel.  Id. at 36,306.  The

rule also proposes a speed restriction to protect whales that appear outside of the protected areas

or during times and places when these seasonal measures are not in effect, through dynamic

management areas ("DMA").  Id. at 36,306.  Designation of a DMA would be triggered by a

concentration of three or more right whales, or one or more non-migrating whales within a TSS,

a designated shipping lane, or within a mid-Atlantic port entrance zone.  Id.  A DMA would

remain in effect for 15 days and automatically expire if not modified.  Id.

     NMFS is accepting written comments on the proposed regulation for 60 days, until

August 25, 2006.  Id. at 36,299.  Concurrently, NMFS will be holding at least three public

hearings on the proposed rulemaking: an August 8, 2006 hearing in Jacksonville, Florida; an

August 10, 2006 hearing in Baltimore, Maryland; and an August 14, 2006 hearing in Boston,

Massachusetts.  See  http://www.nmfs.noaa.gov/pr/shipstrike/ (last visited July 14, 2006).

Additionally, since the filing of Plaintiffs' brief, NMFS has completed the draft EIS, analyzing

the six alternatives considered for this rulemaking, at three levels of speed restrictions, and the

economic analysis for the selected alternative presented in the proposed rulemaking.  See 71

Fed.Reg. 38,640 (July 7, 2006).  Both of these documents are available in full on the agency's

website, and NMFS is accepting public comment through September 5, 2006.

http://www.nmfs.noaa.gov/pr/shipstrike/.

## STANDARD OF REVIEW

### A.  Summary Judgment

     Summary judgment may be granted to a moving party when it shows that there are no

material facts in dispute and that the moving party is entitled to judgment as a matter of law.  See

Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Material facts are those

"that might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986).  In deciding whether the summary judgment burden has been

met, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be

drawn in his favor."  Id. at 255; Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990) (all

evidence and the inferences drawn thereon must be viewed in the light most favorable to the

non-moving party.)

**B.      The Proper Standard of Review for Plaintiffs' Claims**

        Plaintiffs correctly assert that this Court reviews both NMFS' denial of the petition and

the Coast Guard's compliance with ESA Section 7 under the "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law" standard of the Administrative Procedure

Act ("APA"), 5 U.S.C. § 706(2)(A).  Accordingly, the court's role is to determine whether "the

decision was based on a consideration of the relevant factors and whether there has been a clear

error of judgment."  Citizens to Pres. Overton Park, Inc.  v. Volpe, 401 U.S. 402, 416 (1971).

"[T]he ultimate standard of review is a narrow one.  The court is not empowered to substitute its

judgment for that of the agency."  Id.  To satisfy the standard, an agency is not required to have

furnished "detailed reasons for its decision" so long as the Court is not required to "speculate" as

to its basis.  Lodi Truck Serv., Inc. v. United States, 706 F.2d 898, 901 (9th Cir. 1983).  This

Court must uphold the agency's decision so long as the agency's path may "reasonably be

discerned."  Bowman Transp. v. Arkansas-Best Freight Sys., 419 U.S. 281, 286 (1974).  Under

the "arbitrary and capricious" standard, the burden of proof is on the challenger of the agency

decision.  Cleary, Gottlieb, Steen & Hamilton v. Dep't of Health & Human Servs., 844 F.Supp.

770, 783 (D.D.C. 1993) (citing Schweiker v. McClure, 456 U.S. 188 (1982)).  Where an

agency's particular technical expertise is involved, the reviewing court should be particularly

zealous in guarding the agency's discretion.  Marsh v. Oregon Natural Res. Council, 490 U.S.

360, 376-77 (1989) (citing Baltimore Gas & Elec. Co. v. Natural Res. Defense Council, Inc., 462

21

U.S. 87, 103 (1983)). The Court is not required to weigh conflicting expert opinions or to consider whether the agency employed the best scientific methods. Friends of Endangered Species v. Jantzen, 760 F.2d 976, 986 (9th Cir. 1985). Rather, the court is required simply to determine whether the agency has made a rational decision, based on the information before the decisionmaker.

## ARGUMENT

### A. Plaintiffs' Claims Against NMFS Must Fail.

#### 1.    NMFS' Denial of Plaintiffs' Petition was Reasonable.

As set forth in the administrative record, NMFS denied Plaintiffs' petition for three major reasons: 1) NMFS had already outlined a comprehensive strategy to reduce ship strikes which includes the requested emergency measures, and was actively working with the public, government agencies, and the regulated industries to implement the strategy; 2) the petition presented no new information warranting emergency rulemaking instead of completion of the ongoing rulemaking; and 3) promulgation of a separate 12-knot speed limit would duplicate agency efforts and reduce agency resources for a more comprehensive strategy, as well as risk delaying implementation of the draft strategy. NMFS AR 3 BN 9. It is clear that NMFS is afforded great discretion in both the development and implementation of recovery plans. See Strahan v. Linnon 967 F.Supp. 581, 597 (D.Mass. 1997). This discretion extends to decisions on how to utilize agency resources in its implementation of recovery efforts. Exercising this discretion, NMFS determined that continued implementation of the ongoing permanent rulemaking was a better use of their limited resources than the emergency rule proposed by Plaintiffs.

Furthermore, despite the presentation of the facts in Plaintiffs' brief, NMFS' determination that there was no new information justifying emergency measures was rational

and supported by the record.  Plaintiffs argue that "in the past two and one-half years alone, at least nine North Atlantic right whales … have died" and that the agencies have failed to take "immediately necessary" steps to stem the "ongoing slaughter" of right whales.  Pls' Mot. at 1. The hyperbolic picture Plaintiffs paint fails to distinguish between right whale mortalities in general and those actually attributed to ship strikes, or to provide context for the statistics.  The fact is that NMFS was aware of the recent deaths of right whales cited by Plaintiffs.  See,e.g., NMFS AR 6 BN 25.  Its determination that the status of the species made it all the more necessary to press forward with permanent regulations is entirely reasonable.

Finally, this is not a situation in which NMFS employees have "just been twiddling their thumbs," In Re: Barr Laboratories, 930 F.2d 72, 74 (D.C. Cir. 1991), at the expense of implementing speed restrictions for the benefit of right whales.  Rather, NMFS was diligently working through the proper procedures in order to implement permanent protections outlined in their overall ship strike reduction strategy, which includes the speed restrictions requested by Plaintiffs.  This work has resulted in a proposed rule for speed restrictions at various locations and times, suited to best protect the right whale, as well as dynamic management areas to protect whales outside of those locations.  71 Fed.Reg. 36,299.  It was certainly within NMFS' discretion to decide to continue work on the proposal for permanent regulations, instead of diverting resources to a short-term, emergency rule, when Plaintiffs had submitted no new information warranting emergency measures instead of completion of the ongoing rulemaking. While Plaintiffs disagree with the agency's ordering of its own resources and activities, they cannot demonstrate that NMFS' response to their petition is arbitrary and capricious, and this Court should uphold the agency's decision, counseled by the D.C. Circuit's conclusion that "respect for the autonomy and comparative institutional advantage of the executive branch has traditionally made courts slow to assume command over an agency's choice of priorities."  Barr

Labs., 930 F.2d at 74.

> **2.    Prudential Mootness Counsels in Favor of Dismissal of Plaintiffs' Petition Denial Claim.**

Plaintiffs disagree with NMFS' determination that the best use of its resources was to continue pursuit of the comprehensive ship strike strategy, instead of duplicating agency efforts in piecemeal regulation.  Likewise, Plaintiffs are not satisfied with the pace of the administrative process, despite the government's responsibility to thoroughly analyze the complexity of the issues and the wide array of public opinion on possible regulatory measures, as evidenced by NMFS' administrative record.  Yet, their argument for their claim of the unreasonableness is that NMFS has yet to propose any regulation and it is allegedly impossible to determine how much longer the administrative process will take.  However, in the period since Plaintiffs' opening brief was filed, NMFS has completed a proposed rule on speed restrictions.  71 Fed.Reg. 36,299. The proposed regulation includes all of the measures requested in Plaintiffs' petition, and the proposed speed restriction of 10 knots is even more restrictive than Plaintiffs' request. Furthermore, NMFS has completed the draft EIS, the economic analysis of the proposed rule, and scheduled at least three public hearings in August 2006. These actions clearly repudiate Plaintiffs' allegations that the regulatory process is stalled.  Because NMFS is clearly progressing as quickly as possible toward a final rule, the Court should decline Plaintiffs' request to interfere with the administrative process, which could only further delay implementation of permanent regulation.

Prudential mootness "address[es] not the power to grant relief but the court's discretion in the exercise of that power."  Id.   The Court has discretion to withhold declaratory or injunctive relief – even where its authority to grant such relief is undisputed.  United States v. W.T. Grant Co., 345 U.S. 629 (1953); A.L. Mechling Barge Lines, Inc. v. United States, 368

U.S. 324, 331 (1961). This discretion, founded in the doctrine of prudential mootness, is based on "considerations of prudence and comity for coordinate branches of government." <u>Chamber of Commerce v. U.S. Dep't of Energy</u>, 627 F.2d 289, 291 (D.C. Cir. 1980); <u>Bldg and Constr. Dept. v. Rockwell Int'l Corp.</u>, 7 F.3d 1487, 1491-92 (10th Cir. 1993) (noting that "considerations of prudence and comity for coordinate branches of government" make the use of the prudential mootness doctrine particularly appropriate where the government is the defendant). As the D.C. Circuit succinctly explained in <u>Chamber of Commerce</u>, "[i]n some circumstances, a controversy, not actually moot, is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant." 627 F.2d at 291.

The situation before the Court presents such a circumstance. Even if this Court found that NMFS' petition denial is arbitrary and capricious, the appropriate remedy is to remand the petition to NMFS for a more adequate analysis and decision. <u>Fox Television Stations v. F.C.C.</u>, 280 F.3d 1027, 1047 (D.C. Cir. 2002). To do so now will simply detract agency resources from moving forward with the rulemaking process on the permanent speed restrictions. The comment period closes August 25, 2006, after which NMFS must analyze and respond to the public comment on this controversial proposal, which is expected to be substantial, as evidenced by the previous public comment received in the draft strategy. NMFS AR 19 BN 265-501. Not only must NMFS address the written comments received through this process, but also the comments raised at the three scheduled public meetings, and the public comments on the draft EIS and the economic analysis, which are due September 5, 2006. To order the agency to duplicate agency effort on interim emergency measures, and slow down the implementation of a final rulemaking on the proposed permanent measures, which still require substantial work, is just such a situation that can be avoided by applying the doctrine of prudential mootness in this case.

**3.    Plaintiffs' ESA Section 7(a)(1) Claim Against NMFS Must Fail.**

Plaintiffs argue that ESA Section 7(a)(1) mandates that NMFS review its implementation of the MMPA, which provides the authority to proscribe regulations to further its conservation goals, which in turn imposes an affirmative obligation to immediately implement the speed restrictions requested. However, ESA Section 7(a)(1) simply does not provide such specific mandates and Plaintiffs' argument does not establish any violation of Section 7(a)(1). Section 7(a)(1) does not provide any mechanism for applying its very broad goals to particular circumstances involving particular species, nor does the section mandate particular agency actions. E.g., Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121, 135 (D.C. Cir. 2001). To hold otherwise would result in a court substituting its judgment for that of the agency in determining how that agency should use its authorities to conserve species under Section 7(a)(1). Nowhere in the statute or in the legislative history is there any indication that Congress intended the courts to determine on their own the optimum mix of agency activities that constitute conservation programs under Section 7(a)(1).

The law is clear that federal action agencies, like NMFS here, are afforded substantial discretion in determining how best to fulfill their Section 7(a)(1) obligations. Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy, 898 F.2d 1410, 1418 (9th Cir. 1990) (citing Carson-Truckee Water Conservancy Dist. v. Clark, 741 F.2d 257, 262 (9th Cir. 1984)). This discretion is apparent from the face of the statute itself and the ESA's implementing regulations, which are accorded Chevron deference. Pyramid Lake, 898 F.2d at 1418. District courts considering the issue have also agreed that a federal agency enjoys substantial discretion in implementing its ESA Section 7(a)(1) responsibilities. See Coal. for Sustainable Res. v. U.S. Forest Serv., 48 F. Supp. 2d 1303, 1315 (D. Wyo. 1999) (case law on this issue is well settled), aff'd in part, vacated on other grounds, 259 F.3d 1244 (10th Cir. 2001); Hawksbill Sea Turtle v. FEMA, 11 F. Supp. 2d 529,

542-43 (D.V.I. 1998) (recognizing federal agency discretion under ESA 7(a)(1)); <u>Strahan v. Linnon</u>, 967 F. Supp. 581, 596 (D. Mass. 1997), <u>aff'd</u> 187 F.3d 623 (1st Cir. 1998); <u>Ctr. for Marine Conservation v. Brown</u>, 917 F. Supp. 1128, 1150 (S.D. Tex. 1996) ; <u>Defenders of Wildlife v. Administrator, EPA</u>, 688 F. Supp. 1334, 1352 (D. Minn. 1988), <u>aff'd in part and rev'd in part on other grounds</u>, 882 F.2d 1294 (8th Cir. 1989).

In <u>Coalition for Sustainable Resources</u>, the plaintiffs challenged the Forest Service's management decisions concerning the Medicine Bow National Forest under Section 7(a)(1) because they did not maximize water available to listed species or implement certain specific snow and vegetation techniques to increase water flow to the Platte River Basin, as suggested by the plaintiffs.  48 F. Supp. 2d. at 1307.  The federal defendants moved to dismiss these counts for failure to state a claim.

The District of Wyoming granted the motion, finding that:

> The Court has conducted an extensive review of the law in this area, and its research has not revealed one case where a court ordered the federal agency to take specific measures to land, such as ordering that vegetation and snow management programs be implemented.  The absence of such a case makes sense: The courts are not in the best position to order a specific affirmative remedy such as clearing a forest.
>
> Likewise, this Court is not the proper place to adjudge and declare that the defendants have violated the ESA as a matter of law by not implementing the processes listed. The weighty decisions of what an affirmative act will do, in terms of [the Forest Service's] statutory obligations and potential impact on the environment, is better left to the experts in this field.  To order such action without going through the proper procedure of ordering analyses and impact statements is unthinkable and judicially irresponsible.
>
> In sum, the ESA never envisioned such a remedy for violating § 1536(a)(1) and the Court finds as a matter of law that it will not entertain such an action today.  Defendants' motion to dismiss Plaintiff's ESA claims is thus GRANTED.

<u>Id.</u> at 1316.

Despite the well settled caselaw, Plaintiffs cite <u>Sierra Club v. Glickman</u>, 156 F.3d 606, 617-18 (5th Cir. 1998), for the argument that NMFS' failure to take a specific action to protect a

species, emergency speed restrictions, violates ESA Section 7(a)(1).  However, Plaintiffs

incorrectly expand the breadth of this decision.  Glickman did not rule on the merits of whether a

particular program satisfied Section 7(a)(1), but discussed whether such a claim could be brought

pursuant to the ESA citizen-suit provision, or under the APA.  Furthermore, in Glickman, it was

undisputed that the agency had never engaged in any programs to fulfill their Section 7(a)(1)

duty, with respect to the species at issue in the case, or any species.  Finally, at least one District

of Columbia district court has recognized the limited scope of the Glickman decision.  Nat'l

Wildlife Fed'n v. Norton, 332 F.Supp.2d 170, 187 (D.D.C. 2004) (citing Glickman only for the

proposition that the broad discretion allowed agencies in implementing Section 7(a)(1) does not

excuse total inaction).  Glickman is not helpful to Plaintiffs' 7(a)(1) claim against NMFS.

    In conclusion, NMFS is engaged in numerous conservation programs to protect the right

whale and aid its recovery, as discussed above.  Plaintiffs clearly dispute that NMFS is doing

enough, and believe that immediate speed restrictions are necessary for the conservation of the

right whale.  However, this Court lacks authority to declare that NMFS has violated ESA Section

7(a)(1) as a matter of law by not implementing the conservation measures advocated by

Plaintiffs.  Coal. for Sustainable Resources, 48 F. Supp. 2d at 1315-16.

**B.    The Claims Against the Coast Guard Must Be Dismissed on Jurisdictional Grounds.**

    When reviewing Plaintiffs' claims against the Coast Guard, it is important to consider the

actual nature of the Coast Guard's activities in fulfilling its role in development of a TSS, the

focus of Plaintiffs' claim.  A TSS does not concentrate vessel traffic, as Plaintiffs contend, nor is

its establishment by the IMO a federal agency action within the meaning of ESA Section 7(a)(2).

Rather, a TSS improves existing traffic to and from a port by providing safe access routes,

through separation of the traffic into separate inbound and outbound lanes.  A TSS thereby

reduces the risk of vessel collisions and groundings, including the risk of harm to the

environment from a spill caused by a vessel collision or grounding. TSSs are generally voluntary, not mandatory, and typically follow preexisting vessel traffic patterns. Finally, all of the TSSs at issue were established by IMO under international law at the proposal of the United States. Because of these critical aspects of a TSS, Plaintiffs' claims against the Coast Guard are nonjusticiable and fail on their merits.

1.    **Plaintiffs Fail to Sufficiently Demonstrate Standing To Bring a Section 7 Claim Against the Coast Guard**.

To establish standing under Article III of the Constitution, a plaintiff must demonstrate that: (1) he has personally "suffered an 'injury in fact' – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not 'conjectural' or hypothetical'"; (2) the injury complained of is fairly traceable to the challenged action of the defendant; and (3) it is likely that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal citations omitted); Florida Audubon Soc'y v. Bensten, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc). The burden of proof on this issue falls squarely on the plaintiff. Steel Co. v. Citizens for a Better Env't, 118 S. Ct. 1003, 1017 (1998).

Plaintiffs alleging a "procedural injury", as here, must demonstrate a causal connection between the government action that supposedly required the disregarded procedure and reasonably increased risk of injury to its particularized interest. Florida Audubon, 94 F.3d at 664, 667, n. 4, 668-69. Here, this requirement means that Plaintiffs must prove through "specific facts", Fed. R. Civ. P. 56(e), that the claimed injuries to their interest in observing and enjoying right whales are somehow increased by the Coast Guard's alleged failure to engage in ESA Section 7 consultation with respect to its role in the IMO's establishment of TSSs. Furthermore, the outcome of the procedure must be able to affect Plaintiffs' injury; as procedure, for

procedure's sake, misses the point.  Plaintiffs do not have a legally cognizable interest in merely

seeing an agency perform a procedure.  A free floating assertion of a procedural violation is not a

legally cognizable interest; there must be a concrete and particularized injury, i.e, injury-in-fact.

Ashley Creek Phosphate Co.v. Norton, 420 F.3d 934, 937-38 (9th Cir. 2005).  To obtain standing

the injury-in-fact must be redressable.

The causation analysis also "examines whether it is substantially probable that the

challenged acts of the defendant, not of some absent third party, will cause the particularized

injury of the plaintiff."  Florida Audubon, 94 F.3d at 663.  Causation thus focuses on whether the

party sued is the "proper defendant."  Id. at 664.  The presence of third parties in a chain of

causation can prevent the chain from connecting particularized injuries to challenged acts.  Id. at

663.  Here, vessel operators, who retain the discretion to operate their vessels as they see fit

under the circumstances at sea, including the discretion whether to transit within a TSS, stand as

a critical third party between the Coast Guard's advisory role in the IMO's establishment of

TSSs and actual impacts to right whales.  That is, whether a vessel collides with a right whale is

ultimately determined by the operation of the vessel and the presence of a whale, neither of

which is controlled by a voluntary TSS adopted by the IMO, much less the United States or the

Coast Guard.  Furthermore, it is the IMO which decides whether to adopt and implement a TSS,

based on the recommendation of NAV, which is in turn based upon a proposal from the

government of the United States, not the Coast Guard.  Finally, even if consultation were

conducted, IMO would not be bound by the outcome or necessarily even have the authority to

implement any measures unrelated to safety of navigation.  See *supra* (cite discussion of ships'

routeing guide req'mts).

Plaintiffs submit four declarations in support of their standing to bring their claims both

against NMFS and the Coast Guard.  See Exhibits 21 - 24.  However, these declarations utterly

fail to demonstrate that plaintiffs have a concrete and particularized injury specifically <u>caused</u> by a challenged Coast Guard action, as is required.  The Asmutis-Silvia, Young, and Bermer declarations simply make conclusory statements that their interests in observing whales are harmed by the "Coast Guard's failure to provide the appropriate level of protection" for the right whale, Ex. 21 ¶ 5; Ex. 22 ¶ 14; Ex. 23 ¶ 7, and the "Coast Guard's failure to consult with NMFS on the impacts of the commercial shipping it authorizes on right whales," Ex. 21 ¶ 7; Ex. 22 ¶ 14; Ex. 23 ¶ 9.  The Phillips declaration does not even reference a specific action of the Coast Guard, except to generally state that his interest is harmed by "the failure of the federal defendants to protect and recover the species - including their failure to take timely action to slow and reroute vessels to reduce the risk of ship strikes."  Ex. 24 ¶ 5.  These statements fail to demonstrate, through specific facts, a causal link beginning with their claimed injury and passing unbroken to a specific Coast Guard action that is actually subject to the ESA consultation requirements.  Fed. R. Civ. P. 56(e); <u>Lujan</u>, 504 U.S. at 561; <u>Cmty. for Creative Non-Violence v. Pierce</u>, 814 F.2d 663, 668 (D.C. Cir. 1987) ("the links in the chain of causation . . . are far too weak for the chain as a whole to sustain [Plaintiffs'] standing.");  <u>Simon v. E. Kentucky Welfare Rights Org.</u>, 426 U.S. 26, 46 (1976) (standing will be denied where "[s]peculative inferences are necessary to connect their injury to the challenged actions of petitioners.").  Plaintiffs have not demonstrated that any action or inaction by the Coast Guard actually causes their claimed injuries.  Unless and until Plaintiffs can make such a showing with competent evidence, Plaintiffs' motion for summary judgment must be denied.

**2.    Plaintiffs' Claim Is a Nonjusticiable Political Question and Impermissibly Requests this Court to Intervene in the President's Foreign Affairs Powers**

The political question doctrine is one aspect of "the concept of justiciability, which expresses the jurisdictional limitations imposed upon federal courts by the 'case or controversy'

requirement" of Article III of the Constitution.  Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 215 (1974); see also Hwang Geum Joo v. Japan, 413 F.3d 45, 47-48 (D.C.Cir. 2005).  The nonjusticiability of a political question is primarily a function of the separation of powers.  Baker v. Carr, 369 U.S. 186, 210 (1962).  The doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 (1986); Schneider v. Kissinger, 412 F.3d 190, 193 (D.C.Cir.2005), (courts lack jurisdiction over political decisions that are by their nature "committed to the political branches to the exclusion of the judiciary.")

The framework laid out by the Supreme Court in Baker has become the authoritative taxonomy of the characteristics of political questions:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Baker, 369 U.S. at 217.  "To find a political question, we need only conclude that one factor is present, not all," Schneider, 412 F.3d at 194, but "[u]nless one of these formulations is inextricable from the case at bar," we may not dismiss the claims as nonjusticiable under the political question doctrine, Baker, 369 U.S. at 217.

The Supreme Court has cautioned that not every matter touching on politics is a political question, and that "it is 'error to suppose that every case or controversy which touches foreign

relations lies beyond judicial cognizance.'" Japan Whaling, 478 at 229-30 (quoting Baker, 369 at 211). Japan Whaling, though presenting a case with "significant political overtones," ultimately presented only a legal question of statutory interpretation as to whether the Secretary of Commerce's duty under domestic law compelled him to certify Japan for harvesting whales in excess of International Whaling Commission limits. Id. In the case at bar, there is no domestic statute for this Court to interpret which constrains or directs how or when the President and his subordinates engage in international negotiations, such as proposals to the IMO to regulate international shipping interests.

Unlike Japan Whaling, this case presents exactly the type of foreign relations issue meeting several of the Baker factors. First, there is no doubt that the Constitution commits negotiations of treaties with foreign nations to the Executive Branch. "Indeed, the Supreme Court has described the President as possessing 'plenary and exclusive power' in the international arena and 'as the sole organ of the federal government in the field of international relations...'" Schneider, 412 F.3d at 195, citing United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 320 (1936). See also Haig v. Agee, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."); Oetjen v. Cent. Leather Co., 246 U.S. 297, 302 (1918)("The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative--'the political'--departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision.")

Furthermore, courts are not equipped to resolve the sensitive diplomatic and policy judgments regarding the conduct of international treaty negotiations, such as the IMO's implementation of SOLAS. When, how, and whether to seek establishment of, or adjustment to, routing measures for vessels calling at U.S. ports, the majority of which are foreign vessels, is

33

best left to the determination of the executive branch.  It is for the expertise of the political

branch, not the courts, to weigh the competing policy and diplomatic values of such proposals.

Finally, the Court should consider the broader implication of Plaintiffs' challenge on the manner

in which the United States interacts in the international arena.  The United States frequently

makes proposals to international bodies, in this context and in many others.  The process is often

complex, dynamic, and short-fused.  A judicial decision that the development of such proposals

must be constrained by engaging in further domestic law procedures such as ESA Section 7

consultation could have sweeping implications for the United States' ability to adequately

manage the process.  As the Supreme Court recognizes, Courts should not intrude into this type

of foreign policy decision:

> [Foreign policy] decisions are wholly confided by our Constitution to the political
> departments of the government, Executive and Legislative. They are delicate,
> complex, and involve large elements of prophecy. They are and should be
> undertaken only by those directly responsible to the people whose welfare they
> advance or imperil. They are decisions of a kind for which the Judiciary has
> neither aptitude, facilities nor responsibility and have long been held to belong in
> the domain of political power not subject to judicial intrusion or inquiry.

Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 111 (1948).

### 3.    The Statute of Limitations and the Doctrine of Ripeness Bound This Court's Judicial Review of Coast Guard Actions.

Assuming that Plaintiffs have standing to bring their procedural claim against the Coast

Guard and this Court's review is not foreclosed by the political question doctrine, to the extent

that Plaintiffs seek to challenge all East Coast TSSs for a lack of ESA consultation, Pls' Mot. at

41, 45, such a challenge is barred by the applicable six-year statute of limitations, 28 U.S.C. §

2401(a).  Therefore, Plaintiffs can challenge Coast Guard actions taken only within six years of

the March 20, 2006 date of service of the amended complaint upon the Secretary of the

Department of Homeland Security.  In an attempt to find an action within the past six years with

which to challenge a failure to consult on the named TSS, Plaintiffs incorrectly state that the Coast Guard is in the process of revising several TSS.

As to Casco Bay, the only activity within the past six years is a 2005 PARS to examine the continued applicability of and need for modifications to current vessel routing measures, which include a TSS that has not been altered for over 24 years.  CG AR 1120-21.  As to the TSS off New York, the last action taken was the 1987 repromulgation of the TSS[10].  CG AR 1284.  In July 2005, the Coast Guard issued a notice that it was conducting a PARS for vessel routing measures in the waters off of Montauk Channel and Block Island, which is an area that does not even have a TSS.  70 Fed.Reg. 38,061 (July 1, 2005).  Finally, a 2003 PARS including Buzzards Bay was conducted to evaluate the continued applicability of and need for modifications to current vessel routing measures in the areas offshore of Connecticut, Rhode Island, and Massachusetts, where the last action was a 1982 adjustment to the existing TSS.  68 Fed. Reg. 74,199, 74,200 (Dec. 23, 2003).  The Coast Guard has not taken any further action with respect to the Casco Bay, Montauk, and Buzzards Bay PARSs.  As a PARS is simply a study resulting in recommendations for future action, see CG AR 992, there is no ripe agency action for the Court to review in connection with each of these three PARS or the TSS off New York.

## C.    The Coast Guard is Not Required to Consult on Its Role in the IMO's Establishment of TSSs.

Even if this Court determines it has jurisdiction to review Plaintiffs' Section 7(a)(2) claim against the Coast Guard, after applying the appropriate statute of limitations and the

---

[10] While there was a 1999 correction to the Code of Federal Regulations, it was only technical and editorial in nature and did not substantively alter or amend the existing TSS.  See 64 Fed.Reg. 34,710 (June 29, 1999).  Even if this editorial adjustment were construed as a new substantive action, it is still outside of the statute of limitations.

doctrine of ripeness, as discussed above, this Court's review is properly limited to three Coast Guard actions: involvement in the United States proposals to amend the Chesapeake Bay TSS (2004), establish the Cape Fear TSS (2004), and amend the Boston TSS (2006), which has yet to even be considered by NAV. As demonstrated below, the Coast Guard activities and involvement in these proposals do not constitute an "action" for the purposes of ESA Section 7 consultation. Therefore, the Coast Guard is not required to engage in ESA Section 7 consultation, and cannot be held liable for a failure to do so.

Plaintiffs summarily state that there can be "no dispute that the Coast Guard's TSSs are agency actions than can trigger Section 7 obligations," and rely on cases that support the general proposition that "action" within the meaning of ESA Section 7 is broad. Pls' Mot. at 35. Plaintiffs are incorrect, both factually and legally. The plain language of ESA Section 7(a)(2) requires each agency to insure that its actions are not likely to jeopardize the continued existence of any endangered species. 16 U.S.C. § 1536(a)(2). Section 7(a)(2) obligations apply only to actions "authorized, funded, or carried out" by that agency. Id. The action that Plaintiffs challenge is the establishment of a TSS, which is an action of the IMO[1/], not the United States or any of its agencies, including the Coast Guard. Any analysis of the merits of Plaintiffs' claim should stop here. Establishment of a TSS is the action of the IMO, a specialized international

---

[1/] The administrative record demonstrates that establishment or adjustment of a TSS is the action of the IMO. See CG AR 1084-1093 (United States' March 2006 proposal to IMO to amend the TSS in the approach to Boston); CG AR 2124-2127 (United States' April 2004 proposal to amend the deep-water route in the southern approach to Chesapeake Bay); CG AR 2128-2133 (United States' April 2004 proposal to amend Traffic Separation Scheme in the approach to Chesapeake Bay); CG AR 2518-24 (United States' April 2004 proposal to establish a Traffic Separation Scheme in the Approaches to the Cape Fear River); CG AR 2138-2139 (IMO adoption of US recommendations to modify the TSS in the approaches to Chesapeake Bay); CG AR 2140-2159 (IMO action adopting US recommendations to modify the TSS in the Approaches to Chesapeake Bay and to establish a TSS in the Approaches to the Cape Fear River); CG AR 2530-37 (Report of 79th Session of IMO Maritime Safety Committee); CG AR 2538-56 (IMO publication of adopted new and amended Existing Traffic Separation Schemes).

body implementing the international treaty regulating commercial shipping and navigation.

There is simply no "agency action" upon which to consult for the purposes of ESA Section 7.

Even if the Court were inclined to look back to the proposal to establish or adjust a TSS, such a proposal is an action of the United States government, not a particular federal agency. *See* *supra* at pp. 8-12; CG AR 1031 ("IMO proposal must clear an interagency process through Dept of State, Dept of Defense, Dept of Homeland Security, USCG, NOAA"); id. ("as part of the document to IMO the US government must submit geographic positions describing the TSS"(emphasis added)).  As demonstrated below, the ESA Section 7 requirement does not apply to a proposal such as this to an international body.

The issue is akin to the line of cases in which courts have found that an agency's final recommendation or report to the President was not a final agency action.  It is well settled that the President is not an 'agency' under the APA, and therefore his actions are not reviewable under same.  Franklin v. Massachusetts, 505 U.S. 788, 801 (1992); Dalton v. Specter, 511 U.S. 462, 469-70(1994).  As discussed above, the power to conduct international relations and negotiations, including representation at the IMO, is committed to the Executive.  The delegation of the power to the State Department, which established the SCC, does not change that analysis. The United States' role in the IMO process is like the situation reviewed by the Ninth Circuit in Jensen v. NOAA, 512 F.2d 1189 (9th Cir. 1975).  Jensen concerned a challenge to a regulation enacted pursuant to a treaty between Canada and the United States to manage the Pacific halibut fishery.  That treaty provided authority to the International Pacific Halibut Commission to enact regulations to preserve the fishery, with approval of the President and the Governor General of Canada.  The President delegated this authority to the Secretary of State, who approved the regulation at issue.  The Ninth Circuit held that the Secretary's approval was an action of the President, and was therefore, unreviewable under the APA because Presidential action in the

field of foreign affairs is committed to Presidential discretion by law.  Id. at 1191.  So it is here.

The United States' involvement and proposals to the IMO are not subject to judicial review, as

they are an exercise of the President's discretionary foreign affairs power.

  Nor is there a separate ground for judicial review based upon a failure to comply with

any independent statutory requirement to prepare the requisite environmental analysis.   In

Public Citizen v. United States Trade Representative, 5 F.3d 549 (D.C. Cir. 1993),

environmental organizations sued the Office of the Trade Representative("OTR") for failure to

comply with the National Environmental Policy Act ("NEPA"), with respect to the North

American Free Trade Agreement.  Applying Franklin, the court found that there was no final

agency action, even though the OTR had completed negotiations on the agreement, because the

agreement would have no effect until the President submitted it to Congress for ratification.  Id.

at 551.  The plaintiffs tried to distinguish Franklin by asserting that NEPA presented an

independent statutory obligation, and the OTR's failure to comply with that statute was a

reviewable agency action, which was rejected by the D.C. Circuit.  Id. at 551-52. Although

NEPA compliance is not at issue in this case, the logic of Public Citizen v. Trade Rep. is equally

applicable here.  The President's exercise of foreign affairs authority to propose an establishment

or adjustment of a TSS is unreviewable, and the consultation requirements of the ESA, or failure

to comply with those requirements, do not provide a separate ground for judicial review.

  Plaintiffs will likely argue that the activities of the Coast Guard constitute an "action"

within ESA Section 7.  However, the only activity of the Coast Guard as an agency leading up to

IMO adoption and implementation of a TSS is the PARS of the applicable port and shipping

traffic.  Yet, plaintiffs do not challenge NMFS' conclusion that a PARS is not an action for the

purposes of Section 7 because it is simply a study which will provide recommendations.  CG AR

992; Pls' Mot. at 35, n. 16.   NMFS's conclusion, as the expert agency, is completely in line with

the implementing regulations of Section 7(a)(2).  The regulations define what is an "action" for the purposes of ESA Section 7, and the examples given include "(a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air."  50 C.F.R. § 402.02. The illustrated examples all have a ring of finality; there is a noticeable lack of anything such as studies, recommendations, or proposals, let alone proposals to another part of the unitary Executive Branch or United States government proposals to an international body.  The Coast Guard's study and recommendations are unreviewable under Franklin, which held that the Secretary of Commerce's report to the President was not a reviewable final agency action, since the final action complained of was that of the President not the agency.  505 U.S. at 797-99.  Like Franklin, a Coast Guard PARS is an unreviewable "tentative recommendation" for further action by the Executive Branch, rather than a "final and binding determination."  Id. at 798 (citing Abbott Labs v. Gardner, 387 U.S. 136, 151 (1967)); see also Motions Sys. Corp. v. Bush, 437 F.3d 1356, 1362 (Fed.Cir. 2006).

Finally, even if establishment of a TSS were construed as a Coast Guard action, Plaintiffs fail to demonstrate or identify any evidence in the administrative records that the action of establishing a TSS "may affect" right whales, thereby triggering a consultation requirement. Indeed, such a conclusion would be inconsistent with the voluntary nature of a TSS.  Whether a vessel uses a TSS is not subject to Coast Guard control. See 50 C.F.R. § 402.03 (Section 7 requirements apply only to actions in which there is discretionary involvement or control). Rather, how a particular vessel operates at a given moment is up to the vessel operator.  See Strahan v. Linnon, 187 F.3d 623 (Table), 1998 WL 1085817 at *4 (1st Cir.1998).  Establishment of a TSS is not the cause of any interaction between ships and right whales.

In Department of Transportation v. Public Citizen, 541 U.S. 752 (2004), the Supreme Court assessed in what circumstances a federal agency can be held to be a legal cause of environmental harm under NEPA. The Supreme Court held "that where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect." 541 U.S. at 770. The Supreme Court's causation analysis under NEPA in Public Citizen applies equally to the ESA. Like the ESA, the NEPA imposes procedural responsibilities on agencies where there are either "direct effects" or "indirect effects" on the environment. 541 U.S. at 763-64. Specifically, NEPA applies where there are "[i]ndirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." Id. at 764 (quoting 40 C.F.R. § 1508.8). The ESA regulations use very similar language. The ESA regulations require consultation if there are "indirect effects," which are defined as "those that are caused by the proposed action and are later in time, but still are reasonably certain to occur." 50 C.F.R. § 402.02. The Ninth Circuit has held that the causation analysis the Supreme Court applied in the NEPA context in Public Citizen applies equally to the ESA. "'[W]here an agency has no *ability to prevent a certain effect due to its limited statutory authority over the relevant actions*, the agency cannot be considered a legally relevant 'cause' of the effect.'" Defenders of Wildlife, 420 F.3d at 963 (quoting Public Citizen, 541 U.S. at 770); see also Marbled Murrelet v. Babbitt, 83 F.3d 1068, 1075 (9th Cir. 1996) (holding that standards for major federal action under NEPA and agency action under ESA are much the same).

So it is here - even if this Court found that establishment of a TSS is a Coast Guard action, there is no way that such an action is the legal cause of ship strikes, there is no evidence that such an action is the cause of ship strikes, because there is no evidence in the record that a TSS makes ship strikes either more or less likely. While TSSs are beneficial for preventing

ship-to-ship interaction, due to the fact that vessel traffic is already high in the area (or else a TSS would not be required), the discretionary nature of the TSS, and the complete control that vessel masters retain over what route they choose to approach the applicable port means that TSS do not cause adverse effects to right whales.  ESA Section 7(a)(2) simply does not apply.

**D.      The Coast Guard is In Compliance with ESA Section 7(a)(1).**

Plaintiffs perfunctorily argue that since the Coast Guard is allegedly in violation of Section 7(a)(2) with respect to the establishment of traffic separation schemes, it is per se in violation of Section 7(a)(1).  This argument fails for three reasons: (1) the Coast Guard is not in violation of Section 7(a)(2), as discussed above; (2) at least one other district court has rejected the argument that Section 7(a)(1) requires the Coast Guard to specifically regulate non-Coast Guard vessels, Strahan, 967 F.Supp. 581; and (3) this administrative record demonstrates that the Coast Guard has several programs in place for the conservation of right whales, as demonstrated below.

In Strahan, the plaintiff claimed a failure to comply with Section 7(a)(1) because the conservation program adopted by the Coast Guard did not establish speed or distance rules for non-Coast Guard vessels in the vicinity of right whales.  Id. at 596.  The court disagreed, finding that the Atlantic Protected Living Marine Resources Initiative directly addressed the issue and recognizing the Coast Guard's support of NMFS' efforts and proposals to address the ship strike issue.  Id.  The court went on to find that since conservation plans are discretionary measures, the argument that this section requires an agency to implement specific measures such as speed restrictions improperly divests the agency of discretion in deciding how to fulfill its Section 7(a)(1) duties.  Id. (citing Pyramid Lake Paiute Tribe v. U. S. Dep't of the Navy, 898 F.2d 1410, 1418 (9th Cir. 1990)).

Furthermore, the administrative record before this Court amply demonstrates the

numerous Coast Guard actions and programs for the benefit of right whales and other listed species. The 1995 biological assessment ("BA") on Coast Guard operations on the Atlantic coast includes a non-exhaustive discussion of the cooperative efforts the Coast Guard was already engaged in, at that time, to implement conservation measures for endangered whales and sea turtles. CG AR 10, 156-159, 202-250. Additional conservation measures were implemented after receipt of NMFS' 1995 biological opinion and subsequent BiOps that resulted from reinitiated consultation on the Coast Guard's Atlantic coast operations. Id. at 316-22, 393-97. Additionally, it is clear from the record that the Coast Guard has not only consulted with NMFS on how it can use its authorities for the benefit of listed species, but also has gone beyond this requirement in its joint efforts with NMFS to help recover the right whale. See supra p. 13-17.

In addition to activities undertaken pursuant to the 7(a)(1) recommendations in prior BiOps, and other actions in concert with NMFS, in the year 2000, the Coast Guard promulgated its own strategic plan to help recover and maintain healthy populations of marine protected species, named OCEAN STEWARD. CG AR 425-435. The plan identifies four strategies that the Coast Guard employs to eliminate environmental damage and natural resource degradation associated with all maritime activities: (1) raising the profile of the Marine Protected Species program to the level of other major Coast Guard programs; (2) utilizing existing resources and authorities, as well as seeking additional resources and authorities to implement the plan; (3) partnering with other agencies involved with protected marine species to strengthen enforcement and management activities; and (4) publicizing the efforts of the Coast Guard in this area. Id. Numerous key objectives are identified to implement each of the four goals. CG AR 430-433. While Ocean Steward is broader than only the right whale, many of its objectives are directly related to right whales, such as participating in federal recovery teams and task forces, advising the Atlantic Large Whale Take Reduction Team, funding aerial surveys, operation of the

42

Mandatory Ship Reporting System, and increasing public education.

Furthermore, the administrative record details the Coast Guard's work, with the Department of State, in the IMO adoption of two mandatory ship reporting systems designed to reduce the likelihood of collisions between right whales and ships: a year-round northeastern reporting system located mainly off the coast of Massachusetts in the right whale's main feeding grounds; and a November 15 through April 16 southeastern reporting system located off the coasts of Florida and Georgia, encompassing the only known calving grounds for the right whale. CG AR 436-447. The IMO adopted the mandatory ship reporting systems in 1998, and the United States took action to implement the systems after this date, resulting in the final rule on November 20, 2001. Id. at 436-447. The reporting system requires vessels of 300 tons or greater to provide a real-time report of its course and planned route, speed, date and time of entry into the reporting area, destination, and expected time of arrival. CG AR 446. In return, the vessel receives an advisory, developed in conjunction with NMFS, on protection of whales and current sighting information and instructions on how to avoid collisions[12]. CG AR 437.

In 2003, the Coast Guard required each District to establish a Protected Living Marine Resources Program identifying the effects of Coast Guard cutter boat and aircraft operations on the unique environment and population of protected species in each District. CG AR 448-463. This initiative imposes numerous requirements on Coast Guard ships and aircrafts to minimize their risk of collision or disturbance of protected species, including: minimum approach distances and altitudes when operating in the vicinity of protected species; training of shipboard lookouts in marine mammal identification; marking of critical habitats on operational charts;

---

[12] The Coast Guard also works with NOAA in support of the Sighting Advisory System/Early Warning System, which provides aircraft support for the location of transiting right whales, which helps prevent ship strikes and contributes to data collection efforts. CG AR 865. To this end, the Coast Guard contributed $222,000 to this program in 2005. Id.

minimizing transits through right whale critical habitat and known concentration areas; and operating at safe speeds whenever right whales are known to be in the vicinity.  Id.; CG AR 866.

The record is clear that the Coast Guard has not only consulted with NMFS on how to utilize their authorities for the conservation of protected species, but works closely with NMFS in numerous efforts directly benefiting the right whale.  Plaintiffs' only other argument for violation of Section 7(a)(1) is the Coast Guard's alleged failure to implement specific measures that they have identified to protect right whales, such as moving the Boston TSS out of right whale critical habitat.  Pls' Mot. at 43-44.  However, to prove a violation of Section 7(a)(1), it is insufficient for Plaintiffs to simply identify one additional measure that is not implemented by the Coast Guard.  See Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121, 135 (D.D.C. 2001) *opinion after remand from district court* 2003 WL 24122459 (absent showing that agencies failed entirely to carry out conservation programs, federal agencies were not violating ESA Section 7(a)(1), even if they were not implementing all measures for conservation of endangered Sonoran pronghorn being suggested by third parties).  In this case, simply because the Coast Guard has not implemented Plaintiffs' preferred measures does not mean there is a violation of Section 7(a)(1).  The Coast Guard is actively engaged in several programs designed to conserve and protect right whales, in full compliance with Section 7(a)(1).

## CONCLUSION

For the foregoing reasons, Federal Defendants respectfully request that this Court deny Plaintiffs' motion for summary judgment and grant Defendants' motion for summary judgment, thereby dismissing with prejudice Plaintiffs' Amended Complaint in its entirety.  An appropriate proposed order setting forth such relief is attached.

Respectfully submitted this 14th day of July, 2006.

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division
JEAN E. WILLIAMS, Chief

____/s/ *Bridget Kennedy McNeil*_____
BRIDGET KENNEDY McNEIL, Trial Attorney
Wildlife and Marine Resources Section
Ben Franklin Station, P.O. Box 7369
Washington, D.C. 20044-7369
Tel: (202) 305-0388/ Fax: (202)305-0275
bridget.mcneil@usdoj.gov

Attorneys for Federal Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of July, 2006, I electronically filed:

1) the Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion

for Summary Judgment;

2) an accompanying Memorandum of Law;

3) a Proposed Order;

4) a Statement of Material Facts as to Which There is No Genuine Dispute;

5) and a response to Plaintiffs' Statement of Material Facts as to Which There is No Genuine

Dispute;

with the Clerk of Court using the ECF/CM system, which will generate an electronic Notice of

Filing on:

**Howard M. Crystal**                    howardcrystal@meyerglitz.com

**Eric Robert Glitzenstein**           eric@meyerglitz.com

Pursuant to the Court's mailing information for this case, listed on the ECF system, no

parties require manual noticing.

_Bridget Kennedy McNeil_____

46