UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEFENDERS OF WILDLIFE *et al.*, ) | |
| ) | Case No. 1:05CV02191 |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| CARLOS GUTIERREZ *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINE DISPUTE**

Pursuant to LCvR 7(h), Federal Defendants hereby submit the following statement of material facts as to which there is no genuine dispute:

1.   Due to its coastal nature, slow swimming speed, and high oil yield, the Northern Atlantic right whale ("right whale") was a primary target of the early whale fisheries from 1100 to the early 1900s.  CG AR 43.  Commercial harvest over the centuries resulted in the decimation of the population to possibly less than 50 animals by the turn of the century.  Id. at 44.

2.   From this low number, the North Atlantic right whale has slowly increased in number and is now thought to number approximately 300 individuals, but is still considered to be one of the most critically endangered large whales in the world.  NMFS AR 20 BN 503.  Recovery of this population is slow, in part, because of the reproductive process: females do not give birth until an average of 7.5 years and the gestation process takes 12 months.  CG AR 47-48. Additionally, females only give birth approximately every 4 or more years.  Id. at 48.

3.   Right whales are migratory animals and seasonal movements are observed between the spring and summer feeding grounds off the coast of Massachusetts and the winter calving

1

grounds off the coasts of Georgia and Florida. CG AR 45. In 1994, NMFS designated critical habitat for the right whale in the Great South Channel, Cape Cod Bay, and in the coastal waters off Georgia and Florida. See 50 C.F.R. § 226.203. Right whale critical habitat and distribution tend to coincide with several major shipping corridors on the eastern U.S. and southeastern Canadian coasts. NMFS AR 20 BN 503. Accordingly, mortality due to entanglements in fishing gear and collisions with ships are the two most significant human-caused threats to right whales of the modern era. Id.

4.     In 1991, NMFS issued a recovery plan for the right whale, which was revised in 1999, 2004 and 2005. 70 Fed. Reg. 32,293 (June 2, 2005).

5.     In 1995, the Coast Guard was already engaged in cooperative efforts to implement conservation measures for endangered whales and sea turtles. CG AR 10, 156-159, 202-250. Additional conservation measures were implemented after receipt of the NMFS 1995 biological opinion ("BiOp"), and subsequent BiOps that resulted from reinitiated consultation on the Coast Guard's Atlantic coast operations. Id. at 316-22, 393-97.

6.     NMFS and the Coast Guard operate a Sighting Advisory System/Early Warning System, which provides aircraft support for the location of transiting right whales, which helps prevent ship strikes and contributes to data collection efforts. NMFS AR 20 BN 503; CG AR 865. To this end, the Coast Guard contributed $222,000 to this program in 2005. Id.

7.     In 1997, NMFS issued a regulation prohibiting all approaches within 500 yards of any right whale, whether by vessel, aircraft or other means, in order to limit disturbance of the whales, which is enforced by the Coast Guard. 62 Fed.Reg. 6,729, 6,736. (Feb. 13, 1997).

8.     In 2000, the Coast Guard promulgated its strategic plan to help recover and

maintain healthy populations of marine protected species, OCEAN STEWARD. CG AR 425-435. While Ocean Steward is broader than only the right whale, many of its objectives are directly related to right whales, such as participating in federal recovery teams and task forces, advising the Atlantic Large Whale Take Reduction Team, funding aerial surveys, operation of the Mandatory Ship Reporting System, and increasing public education. CG AR 865.

9. The Coast Guard issues periodic notices to mariners regarding ship strikes, and issues messages on their NAVTEX system with the location of right whales. CG AR 51, 419-20. The Coast Guard provides vessel and aircraft support to facilitate right whale research and population monitoring, as well as assistance in right whale disentanglements and strandings. Id. at 10, 284-85, 458.

10. The Coast Guard worked with the Department of State to propose that the U.S. Government seek IMO adoption of two mandatory ship reporting systems, jointly run by NMFS and the Coast Guard, which are designed to reduce the likelihood of collisions between right whales and ships: a year-round northeastern reporting system located mainly off the coast of Massachusetts in the right whale's main feeding grounds; and a November 15 through April 16 southeastern reporting system located off the coasts of Florida and Georgia, encompassing the only known calving grounds for the right whale. CG AR 436-447. The IMO adopted the mandatory ship reporting systems in 1998, and the United States took action to implement the systems after this date, resulting in the final rule on November 20, 2001. Id. at 436-447. The reporting system requires vessels of 300 tons or greater to provide a real-time report of its course and planned route, speed, date and time of entry into the reporting area, destination and expected time of arrival. CG AR 446. In return, the vessel receives an advisory, developed in conjunction

with NMFS, on protection of whales and current sighting information and instructions on how to avoid collisions.  CG AR 437.

11.     In 2003, the Coast Guard required each District to establish a Protected Living Marine Resources Programs identifying the effects of Coast Guard cutter boat and aircraft operations on the unique environment and population of protected species in each District.  CG AR 448-463.  This initiative imposes numerous requirements on Coast Guard ships and aircrafts to minimize their risk of collision or disturbance of protected species, including: minimum approach distances and altitudes when operating in the vicinity of protected species; training of shipboard lookouts in marine mammal identification; marking of critical habitats on operational charts; minimizing transits through right whale critical habitat and known concentration areas; and operating at safe speeds whenever right whales are known to be in the vicinity.  Id.; CG AR 866.

12.     NMFS formulated a draft strategy to further reduce ship strikes to the extent practicable while minimizing the adverse impact on ship operations, published in the Federal Register as an Advance Notice of Public Rulemaking("ANPR").  69 Fed. Reg. 30,857 (June 1, 2004).  The draft Strategy outlined by NMFS consists of five elements: (1) establishment of new operational measures for the shipping industry, including consideration of routing and speed restrictions, applicable to vessels 65 feet or greater; (2) negotiation of a right whale conservation agreement with Canada; (3) development and implementation of education and outreach programs; (4) review of the need for ESA Section 7 consultation with all Federal agencies who operate or authorize the use of vessels in waters inhabited by right whales, or whose actions directly or indirectly affect vessel traffic; and (5) continuation of ongoing research, conservation, and education/outreach activities.  Id.

13.     The strategy allows for regional implementation, and accommodates differences in oceanography, commercial ship traffic patterns, navigational concerns, and right whale use. Id. For the southeastern Atlantic coast, the range of possible measures, applicable December 1 through March 31, include designated routes to reduce the risk of collisions and seasonal speed restrictions in the range of 10-14 knots. Id. at BN 504.  For the mid-Atlantic coast, the possible measures include speed restrictions of 10-14 knots within 20-30 miles from designated ports, applicable on rolling dates designed around right whale presence in each area. Id.  For the northeastern Atlantic coast, the possible measures include: 1) in Cape Cod Bay, applicable January 1 to April 30, routing measures to reduce the risk of collisions, speed restrictions, and additional notices to mariners; 2) off Race Point, applicable April 1 through May 15, speed restrictions; 3) in the Great South Channel, applicable April 1 through July 31, proposal to the IMO of an Area to Be Avoided, applicable to vessels 300 gross tons and above, and speed restrictions applicable to all vessels greater than 65 feet; and 4) in the Gulf of Maine, applicable year-round, dynamic area management consisting of possible speed restrictions or routes to avoid whale strikes. Id. at BN 504-506.

14.     NMFS received a great number of public comments on the draft strategy, and had to extend the comment period twice. NMFS AR 19 BN 265-501; NMFS AR 18; NMFS AR 17. In July and August 2004, NMFS held five public meetings along the East Coast to present the draft strategy and seek input on the development and implementation of the proposed new operational measures. NMFS AR 17 BN 261. In September and October, 2004, NMFS held nine additional stakeholder meetings along the East Coast with port and shipping industry representatives, in order to explain the overall draft strategy, as well as to focus on specific areas adjacent to each

port. NMFS AR 14. In September and November 2004, NMFS convened two additional focus group meetings, which were attended by a range of federal, state, and non-governmental entities, including representatives from Defenders of Wildlife and the Ocean Conservancy. NMFS AR 15, 16.

15.     The Coast Guard and Maritime Transportation Act of 2004 requires the Coast Guard to cooperate with NOAA in analyzing potential vessel routing measures for reducing vessel strikes of right whales, as outlined in the ANPR, and to report back to Congress by January 2006. Pub. L. 108-293, 118 Stat. 1028, § 626 (Aug. 9, 2004). On February 18, 2005, the Coast Guard issued a notice of the upcoming PARS which would focus on potential and existing vessel routing measures off of Cape Cod and the Georgia and Florida coasts. 70 Fed. Reg. 8,312. The Coast Guard noted that it would consider previous studies, analyses of vessel traffic density, and agency and stakeholder experience in, and public comments on, vessel traffic management, navigation, ship handling, and weather. Id. at 8,314. The notice defined the possible recommendations that could result from the PARS, id., and requested public comment on several questions, as well as the entire planned PARS. Id. Both the Ocean Conservancy and Defenders of Wildlife submitted comments in April 2005. CG AR 720-21, 761-65.

16.     On May 24, 2006, the Coast Guard issued a notice of the completed PARS and the recommendations, requesting additional public comment. 71 Fed. Reg. 29,876. In its analysis, the Coast Guard considered ship transit data, scientific information provided by NOAA on right whale locations and migratory patterns, as well as vessel traffic information recorded from the Mandatory Ship Reporting System. Id. at 29,878. In contrast to a routine PARS, the Coast Guard did not consider economic impacts, as NMFS is analyzing economic impacts as part of

the overall ship strike strategy. Id.

17.     The recommendations resulting from the PARS include six categories of action:

    1) Establish precautionary areas at the entrance to the ports of Jacksonville and Fernandina Beach, Florida, and Brunswick, Georgia;

    2) Establish six, two-way routes for these same ports;

    3) Establish precautionary areas at the entrance to Cape Cod Canal and in the vicinity of New Inlet, Massachusetts;

    4) Establish three, two-way routes in Cape Cod Bay to the ports of Boston and Provincetown, Massachusetts, and the entrance to Cape Cod Canal;

    5) Establish a two-way recommended track from Cape Cod Canal entrance to Provincetown, Massachusetts; and

    6) Realign and modify the location and size of the western portion of the TSS "In the Approach to Boston, Massachusetts."

71 Fed.Reg. at 29,878.

18.     The Coast Guard briefly summarized the next steps in implementing the recommendations and indicated that any adjustment to the TSS must be made by the IMO. Id. Accordingly, on March 24, 2006, the United States submitted a proposal to make the adjustment, for consideration of the next meeting of the Sub-Committee on Safety of Navigation. CG AR 1084.

19.     On May 19, 2005, Plaintiffs filed an APA petition for rulemaking requesting NMFS to promulgate emergency rulemaking within 60 days to slow and/or re-route vessels within right whale habitat to protect the species until permanent measures are enacted. NMFS AR 12. The petition requested that the emergency regulations require all ships within 25 miles of all major East Coast port entrances to travel at speeds of 12 knots or less, during expected right whale high use periods. Id. at BN 175-76. The petition requested that the emergency measures be in place

between November 1 through April 30 for all ports from Florida to Rhode Island, from January 1 through May 31 in the area of Cape Cod Bay, and January 1 through July 31 in the area of the Great South Channel. Id. at 176. The petition also requested that all vessels transiting right whale critical habitat during seasonal high use times be restricted to 12 knots or less, or avoid the area altogether. Id. Finally, the petition requested that NMFS institute a dynamic management area to protect whales outside of the times and areas described above, which requires the re-routing of vessels and/or speed restrictions of 12 knots or slower when aggregations of whales are found. Id.

20. NMFS considered several responses to the petition, NMFS AR 11, 10, 4, and issued a letter in response to the petition on September 14, 2005. NMFS AR 3. In denying the petition, NMFS stated:

> As noted above, we are in the process of developing and analyzing a broad ship strike reduction strategy that includes routing changes and ship speed restrictions along the eastern seaboard. Promulgating a separate 12-knot speed limit, at this time, would duplicate agency efforts and reduce agency resources for a more comprehensive strategy, as well as risk delaying implementation of the draft Strategy. Your petition does not present any new information about right whales that warrants promulgating a rule on an emergency basis rather than completing the ongoing rulemaking. Instead of imposing measures in piecemeal fashion, NMFS continues to believe that putting a comprehensive strategy in place is the best course of action. Therefore, we will publish a denial of the petitioned request to issue emergency regulation in the *Federal Register*. We will continue, however, to proceed as quickly as possible with analysis and rulemaking to implement the comprehensive ship strike strategy.

Id.

21. On June 26, 2006, NMFS published a proposed rule to implement speed restrictions to reduce the threat of ship strikes to the right whale. 71 Fed. Reg. 36,299. The rule proposes a speed restriction of 10 knots or less during certain times in each of three major regions along the

U.S. east coast (Northeast, Mid-Atlantic, and Southeast), although NMFS is also accepting comment on speed restrictions of 12 knots or 14 knots. Id. at 36,305. Speed restrictions would apply to non-federal vessels that are 65 feet in length or greater. Id. In the southeast coast off of Georgia and Florida, the speed restrictions will be in effect from November 15 to April 15 of each year. Id. In the mid-Atlantic region, NMFS proposes to restrict vessel speed from November 1 through April 30 within 30 nautical miles around 8 ports or bays, ranging northward from Savannah, Georgia to New York. Id. In the Northeast region, NMFS proposes to restrict vessel speed throughout all of Cape Cod Bay from January 1 to May 15, from March 1 to April 30 in a 50 square mile area off of Race Point, and from April 1 to July 31 in the Great South Channel. Id. at 36,306. The rule also proposes a speed restriction to protect whales that appear outside of the protected areas or during times and places when these seasonal measures are not in effect, through dynamic management areas ("DMA"). Id. at 36,306. Designation of a DMA would be triggered by a concentration of three or more right whales, or one or more non-migrating whales within a TSS, a designated shipping lane, or within a mid-Atlantic port entrance zone. Id. A DMA would remain in effect for 15 days and automatically expire if not modified. Id.

22.     NMFS is accepting written comments on the proposed regulation for 60 days, until August 25, 2006. Id. at 36,299. Concurrently, NMFS will be holding at least three public hearings on the proposed rulemaking: an August 8, 2006 hearing in Jacksonville, Florida; an August 10, 2006 hearing in Baltimore, Maryland; and an August 14, 2006 hearing in Boston, Massachusetts. See http://www.nmfs.noaa.gov/pr/shipstrike/. Additionally, since the filing of Plaintiffs' brief, NMFS has completed the Draft Environmental Impact Statement ("DEIS"),

9

analyzing the six alternatives considered for this rulemaking, at three levels of speed restrictions, and the economic analysis for the selected alternative presented in the proposed rulemaking. See 71 Fed.Reg. 38,640 (July 7, 2006). Both of these documents are available in full on the agency's website, and NMFS is accepting public comment through September 5, 2006..

http://www.nmfs.noaa.gov/pr/shipstrike/.

23.     TSSs are routing measures that separate opposing streams of traffic by establishment of traffic lanes and are established to provide order to the existing patterns of traffic flow. See IMO Guidance on Preparation of Proposals on Ships Routeing Systems at 2 ("Routes should follow as closely as possible existing patterns of traffic flow"), available at http://www.imo.org/includes/blastData.asp/doc_id=2735/1060.pdf. In order to conform to the requirements of the PWSA, and gain the international shipping community's recognition and adoption of ships' routing measures, the United States government submits proposed routing measures to the IMO for consideration. The actual establishment of these routing measures is an action taken by the IMO. See CG AR 1084-1093, 2124-2127, 2128-2133, 2518-24, 2138-2139, 2140-2159, 2530-37, 2538-56.

24.     This process comports with well-established international law, in particular the International Convention for the Safety of Life at Sea ("SOLAS"), which recognizes the IMO as the competent international body for establishment of routing measures. SOLAS Ch. V, Reg. 10.2 *adopted on* Nov. 1, 1974, 32 U.S.T. 47, T.I.A.S. No. 9700. Under SOLAS, IMO seeks to standardize within the international shipping community, the design, development, charted presentation and use of adopted routing measures. Proposals for routing measures are to be submitted to IMO, whether within or beyond a nation's territorial sea. Ships Routeing, §§ 3.11,

3.14.

25.     With respect to United States participation at IMO, the State Department executes its foreign affairs authority through the Shipping Coordinating Committee ("SHC"), an advisory committee chartered under the authority of the Federal Advisory Committee Act, 5 U.S.C. App. 2.  The SCC's purpose is to advise the Secretary of State on matters related to international shipping and help develop United States government positions on such activities before international bodies, such as the IMO and the United Nations.  See http://fido.gov/facadatabase/docs_charters/159_charter_(2002-12-11-16-03-40).doc.  The SCC, initially established in 1958, is chartered by the Secretary of State for two-year terms under the authority of 22 U.S.C. §2656.  Id.  With respect to IMO matters, the SCC ascertains the views of interested government departments and agencies and members of the public and makes recommendations to the Secretary of State, who provides guidance to the United States representatives at meetings of IMO.  Id.  The charter specifies the SCC's members, meeting dates and agendas, and generally sets forth how the Committee functions in order to advise the Secretary.  Id.

26.     Once a government submits a routing measure proposal, the IMO Sub-committee on Safety of Navigation ("NAV") reviews it for technical compliance with applicable requirements of the IMO's Ship's Routeing Guide, including the requirement that the extent of a traffic separation scheme should be limited to what is essential in the interests of safe navigation.  Ships Routeing § 6.9.  If the proposal is approved, a recommendation is made to the Subcommittee's parent body, IMO's Maritime Safety Committee ("MSC"), which will review and potentially approve it for adoption by IMO.  Even after adoption, IMO routeing measures are generally

voluntary and discretionary, as are all the challenged TSSs here, unless they are expressly made mandatory, where essential in the interest of safety of navigation and protection of the marine environment. Ships Routeing, §§ 8.1, 6.17.

Respectfully submitted this 14th day of July, 2006.

        SUE ELLEN WOOLDRIDGE
        Assistant Attorney General
        United States Department of Justice
        Environment and Natural Resources Division
        JEAN E. WILLIAMS, Chief

        /s/ *Bridget Kennedy McNeil*
        BRIDGET KENNEDY McNEIL, Trial Attorney
        Wildlife and Marine Resources Section
        Ben Franklin Station, P.O. Box 7369
        Washington, D.C. 20044-7369
        Tel: (202) 305-0388/ Fax: (202)305-0275
        bridget.mcneil@usdoj.gov

        Attorneys for Federal Defendants