UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

Defenders of Wildlife, <u>et</u> <u>al</u>.    )
                               )
       Plaintiffs,          )
                               )
       v.               ) No.  05-2191 (PLF)
                               )
Carlos Gutierrez, <u>et</u> <u>al</u>.       )
                               )
       Defendants.       )
                               )

---

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Howard M. Crystal (D.C. Bar No. 446189)
Eric R. Glitzenstein (D.C. Bar No. 358287)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C.  20009
(202) 588-5206

Of Counsel

Michael P. Senatore (D.C. Bar No. 453116)
Andrew Hawley (Cal. Bar No. 229274)
Defenders of Wildlife
1130 Seventeenth Street, N.W
Washington, D.C. 20036

August 4, 2006                    Attorneys for Plaintiffs

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.    PLAINTIFFS ARE ENTITLED TO RELIEF ON THEIR CLAIM
      AGAINST NMFS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.    NMFS Has No Reasonable Explanation For Denying The Rulemaking
            Petition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      B.    Unless NMFS Will Complete The Rulemaking By November 2006,
            Plaintiffs' Petition For Emergency Regulations Is Not Moot. . . . . . . . . . . . . . . 12

II.   THE COAST GUARD MUST CONSULT WITH NMFS ON THE IMPACTS
      OF ITS TRAFFIC SEPARATION SCHEMES ON RIGHT WHALES.  . . . . . . . . . . . . 16

      A.    The PWSA Directs And Empowers The *Coast Guard* To Establish,
            And Modify, Traffic Separation Schemes In Order To, *Inter Alia*,
            Protect The Marine Environment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            1.    The PWSA Directs That The Coast Guard Establish
                  Traffic Separation Schemes.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            2.    The PWSA Authorizes The Coast Guard To Establish,
                  And Amend, TSSs In Order To Protect Right Whales. . . . . . . . . . . . . 20

      B.    Each of The Coast Guard's TSSs Is An "Agency Action" That
            "May Affect" Right Whales. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

            1.    Each TSS Is An "Agency Action" Of The Coast Guard
                  For Purposes of Section 7(a)(2).  . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

            2.    The Coast Guard's TSSs "May Affect" Right Whales. . . . . . . . . . . . 28

    C.     The Coast Guard's Jurisdictional Arguments Also Have No Merit. . . . . . . . . . 34

         1.     Plaintiffs Have Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

         2.     The Political Question Doctrine Is Wholly Inapplicable Here. . . . . . . . 38

         3.     Defendants' Statute of Limitations Argument Also Has No Merit. . . . . 41

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                 **PAGE**

ALDF v. Glickman,
    154 F.3d 426 (D.C. Cir. 1998)(*en banc*) ......................................... 36

*American  Historical Association v. Peterson,
    876 F. Supp. 1300 (D.D.C. 1995) ............................................... 14

American Horse Prot. Association v. Lyng,
    812 F.2d 1 (D.C. Cir. 1987) ................................................. *passim*

Amtrak v. Morgan,
    536 U.S. 101 (2002) ....................................................... 43

Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,
    515 U.S. 687, 698 (1995) ................................................... 27

Baker v. Carr,
    369 U.S. 186 (1962) ....................................................... 41

Bancoult v. McNamara,
    445 F.3d 427 (D.C. Cir. 2006) ............................................. 40

In re Barr Laboratories,
    930 F.2d at 75 ......................................................... 7, 10

Bennett v. Spear,
    520 U.S. 154 (1997) ....................................................... 36

Biodiversity Legal Foundation v. Norton,
    285 F. Supp. 2d 1 (D.D.C. 2003) ............................................ 8

In re Bluewater Network,
    234 F.3d 1305 (D.C. Cir. 2000) ............................................ 10

Center for Biological Diversity v. Evans,
    No. 04-4496, 2005 WL. 1514102 (N.D. Cal. June 14, 2005) ........................ 14

Center for Biological Diversity v. Leavitt,
    No. 02-2277030, 2005 WL. 2277030 (N.D. Cal. Sept. 19, 2005) ........... 25, 44

_____

\* Authorities upon which plaintiffs chiefly rely

iii

Chamber of Commerce of the U.S. v. Department of Energy,
    627 F.2d 289 (D.C. Cir. 1980) ......................................................................... 14

Chicago & Southern Air Lines Inc. v. Waterman Steamship Corp.,
    333 U.S. 103 (1948) .................................................................................... 40

Citizens to Preserve Overton Park v. Volpe,
    401 U.S. 402 (1971) .................................................................................... 10

City of Davis v. Coleman,
    521 F.2d 661 (9th Cir. 1975) ......................................................................... 33

City of Las Vegas v. Lujan,
    891 F.2d 927 (D.C. Cir. 1989) ......................................................................... 9

Competitive Enterprise Institute v. NHTSA,
    901 F.2d 107 (D.C. Cir. 1990) ....................................................................... 37

Consumer Electronics Association v. FCC,
    347 F.3d 291 (D.C. Cir. 2003) ....................................................................... 21

Dalton v. Spector,
    511 U.S. 462 (1994) .................................................................................... 23

Department of Transport v. Public Citizen,
    541 U.S. 752 (2004) .................................................................................... 25

*Defenders of Wildlife v. EPA,
    420 F.3d 946 (9th Cir. 2005) ................................................................... *passim*

Department of the Air Force v. Federal Labor Relations Authority,
    104 F.3d 1396 (D.C. Cir. 1997) ..................................................................... 13

Duke Power Co. v. Carolina Env. Study Group,
    438  U.S. 59 (1978) ......................................................................... 32, 36, 37

_____
* Authorities upon which plaintiffs chiefly rely

Florida Audubon Society v. Bentsen,
    94 F.3d 658 (D.C. Cir. 1996) ..................................................... 38

*Florida Key Deer v. Stickney,
    864 F. Supp. 1222 (S.D. Fla. 1994) ................................... 32, 33, 34

Florida Wildlife Federal v. U.S. Army Corps,
    401 F. Supp. 2d 1298 (S.D. Fla. 2005) ........................................ 33

Foretich v. United States,
    351 F.3d 1198 (D.C. Cir. 2003) ............................................... 3, 13

Franklin v. Mass.,
    505 U.S. 788 (1992) ........................................................... 4, 23

Friends of the Earth v. Laidlaw Environmental Services,
    528 U.S. 167 (2000) ............................................................. 35

Friends of the Earth v. U.S. Army Corps of Engineers,
    109 F. Supp. 2d 30 (D.D.C. 2000) ............................................ 33

Gerber v. Norton,
    294 F.3d 173 (D.C. Cir. 2002) ................................................. 34

Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service,
    378 F.3d 1059 (9th Cir. 2004) .............................................. 32, 44

*Japan Whaling Association v. America Cetacean Society,
    478 U.S. 221 (1986) ...................................................... 4, 35, 39

Jensen v. NMFS,
    512 F.2d 1189 (9th Cir. 1975) ................................................. 23

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992) ............................................................. 35

Metcalf v. Daley,
    214 F.3d 1135 (9th Cir. 2000) ................................................. 23

_____

\* Authorities upon which plaintiffs chiefly rely

Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.
    463 U.S. 29 (1983) ......................................................................................... 10

National Parks Conservation Association v. Manson,
    413 F.3d 1 (D.C. Cir. 2005) ........................................................................ 35

National Wildlife Federal v. Brownlee,
    402 F. Supp. 2d 1 (D.D.C. 2005) ................................................................ 26

National Wildlife Federal v. Coleman,
    529 F.2d 359 (5th Cir. 1976) ...................................................................... 33

*National Wildlife Federal v. FEMA,
    345 F. Supp. 2d 1151 (W.D. Wash. 2004) .............................................. 32, 33

NRDC v. Houston,
    146 F.3d 1118 (9th Cir. 1998) ......................................................... 26, 27, 43

Pacific Rivers Council v. Thomas,
    30 F.3d 1050 (9th Cir. 1995) .......................................................... 26, 27, 42

Penthouse Int'l Ltd. v. Meese,
    939 F.2d 1011 (D.C. Cir. 1991) .................................................................. 14

Point Park University v. NLRB,
    No. 05-1060, _ F.3d _, 2006 WL 2128980 (D.C. Cir. Aug. 1, 2006) ............................. 3

Public Citizen v. U.S. Trade Rep.,
    5 F.3d 529 (D.C. Cir. 1993) ....................................................................... 23

Ragan v. Merchants Transfer & Warehouse Co.,
    337 U.S. 530 (1949) .................................................................................. 42

Red Lake Band of Chippewa Indians v. Swimmer,
    740 F. Supp. 9 (D.D.C. 1990) .................................................................... 40

SEC v. Chenery,
    332 U.S. 194 (1947) .................................................................................... 3

_____

* Authorities upon which plaintiffs chiefly rely

Solon v. Gary Committee School Corp.,
    180 F.3d 844 (7th Cir. 1999) ............................................. 41

Southern Offshore Fishing Association v. Daley,
    995 F. Supp. 1411 (M.D. Fla. 1998) ............................................. 40

Spirit of the Sage Council v. Norton,
    294 F. Supp. 2d 67 (D.D.C. 2003), vacated in part on other gds, 411 F.3d
    225 (D.C. Cir. 2005) ............................................. 37

Strahan v. Coxe,
    127 F.3d 155 (1st Cir. 1997) ............................................. 36

TOMAC v. Norton,
    240 F. Supp. 2d 45 (D.D.C. 2004) ............................................. 33

TVA v. Hill,
    437 U.S. 153 ............................................. 28, 40

In re Texaco,
    570 F. Supp. 1272 (E.D. La. 1983) ............................................. 31

The Pennsylvania,
    86 U.S. (19 Wall.) 125 (1873) ............................................. 31

Thomas v. Peterson,
    753 F.2d 754 (9th Cir. 1985) ............................................. 37

Trinidad Corp. v. S.S. Keiyoh Maru,
    845 F.2d 822 (9th Cir. 1988) ............................................. 31

Turtle Island Restoration Network v. NMFS,
    340 F.3d 969 (9th Cir. 2003) ............................................. 42

United States v. Price,
    361 U.S. 304 (1960) ............................................. 21

United States v. Locke,
    529 U.S. 89 (2000) ............................................. 18

_____

\* Authorities upon which plaintiffs chiefly rely

United States Telecom Association v. FCC,
    359 F.3d 554 (D.C. Cir. 2004) ................................................................. 18

Vernal Enterprises, Inc. v. FCC,
    355 F.3d 650 (D.C. Cir. 2004) ................................................................. 10

*Washington Toxics Coalition v. EPA,
    413 F.3d 1024 (9th Cir. 2005) ............................................................ *passim*

Washington v. Sea Coast Towing Inc.,
    No. 03-166Z, 2004 WL 3780362 (W.D. Wash. Apr. 30, 2004) ................................ 30

Western Watersheds Project v. Matejko,
    _ F.3d _, 2006 WL. 2042825 (9th Cir. July 24, 2006) ............................................ 26, 42

**FEDERAL STATUTES**

5 U.S.C. § 704 ................................................................................................. 24

5 U.S.C. § 706 ................................................................................................. 15

16 U.S.C. § 1361 ................................................................................................. 7

16 U.S.C. § 1536(a)(1) ..................................................................................... 15

16 U.S.C. § 1536(a)(2) ................................................................................ *passim*

33 U.S.C. § 1223(c) ..................................................................................... *passim*

33 U.S.C. § 1224 ....................................................................................... 17, 40

33 U.S.C. § 1231 ............................................................................................... 28

**FEDERAL REGULATIONS**

33 C.F.R. § 167.5(b) ........................................................................................ 30

33 C.F.R. §§ 167.172-174 ............................................................................... 41

_____

* Authorities upon which plaintiffs chiefly rely

33 C.F.R. §§ 167.200 - 167.203 ................................................................ 41

36 C.F.R. § 13.65 ................................................................ 11

50 C.F.R. § 17.100 ................................................................ 11

50 C.F.R. § 402.02 ................................................................ 22, 34

50 C.F.R. § 402.16 ................................................................ 27

_____

* Authorities upon which plaintiffs chiefly rely

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
Defenders of Wildlife, <u>et</u> <u>al</u>.            )
                                            )        No.  05-2191 (PLF)
        v.                                  )
                                            )
Carlos Gutierrez, et al.                    )
_____

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

        While the parties disagree on the scope of the National Marine Fisheries Service

("NMFS") and the U.S. Coast Guard's ("Coast Guard") legal obligations, they agree on the

underlying factual predicate for plaintiffs' Claims.  Thus, there is no dispute that North Atlantic

right whales are critically imperiled, with only approximately 300 members of the species

remaining, and the species is in decline.  Plaintiffs' Exhibit ("Pl. Ex.") 3 (NMFS AR 20, at BN

468) ("if current trends continue, the population could go extinct").  There is also no dispute that

collisions with marine vessels are one of the greatest threats the species faces.  Thus, regardless

of whether the most recent spate of right whale ship strikes is, in fact, a "sudden crisis,"

Defendants' Summary Judgment Memorandum ("Def. Br.") at 1, or rather a crisis that has been

brewing for some time, the parties do not dispute that, during a one year period ending in mid-

2005, at least "six right whales three of them pregnant females [were] struck and killed by ships,"

Def. Resp. to Pl. Stmt. of Material Facts ¶ 5, and that, in 2006, as of the date briefing this case

began, an additional three right whales had already died, while a fourth was hit by a vessel and

survived.  <u>Id.</u> ¶ 33; <u>see also</u> Pl. Stmt. of Material Facts, ¶¶ 5, 33.[1]  Nor do the parties dispute that

_____

        [1]    A *fourth* right whale – a juvenile female – was killed by an apparent ship strike in the past
few weeks.  2d Declaration of Regina Asmutis-Silvia Pursuant to Rule 56(f) ("2d Asmutis-Silvia
Decl."), ¶ 3 (Pl. Ex. 34).

the loss of each *female* brings the species even more appreciably toward the brink of extinction. NMFS AR 20, at BN 30,858.

Therefore, since the parties agree on the critical importance of protecting right whales from ship strikes, this case turns on whether the NMFS' denial of plaintiffs' Rulemaking Petition comports with that agency's statutory mandates to *stem* this ongoing slaughter, and whether the Coast Guard is meeting its statutory obligation to insure that its Traffic Separation Schemes ("TSS") in right whale habitat are not likely to either jeopardize the species' continued existence, or adversely modify the species' federally-designated critical habitat. 16 U.S.C. § 1536(a)(2). And, as regards these legal questions, while defendants offer a smorgasbord of reasons they maintain the Court should *refrain from ruling* on the merits of plaintiffs' Claims – including not only baseless standing, mootness, and statute of limitations defenses, but also far-fetched arguments about foreign affairs powers and "overriding ongoing executive branch action" not even remotely implicated here, Def. Br. at 2 – they offer little of substance in defense of plaintiffs' Claims.

With respect to plaintiffs' Claim against NMFS, which concerns the denial of a Petition for speed limits to protect right whales until permanent speed regulations are imposed, defendants simply have not demonstrated that its Petition denial was reasonable. Def. Br. at 22-23. Thus, while defendants' principal argument is that emergency regulations would have somehow delayed the permanent regulations under development, id., according to the AR the agency never even *considered* any of the critical facts relevant to denying the Petition on this basis, such as, *inter alia*, the extent of the delay the agency was concerned about, and the number of right whales likely to die from additional ship strikes before NMFS completes its permanent

regulations process without imposing interim speed limits.  Accordingly, the AR does not reflect any "reasonable explanation" for denying the Petition, American Horse Prot. Ass'n v. Lyng, 812 F.2d 1, 7 (D.C. Cir. 1987).  See, e.g., Point Park Univ. v. NLRB, No. 05-1060, _ F.3d _, 2006 WL 2128980, *6 (D.C. Cir. Aug. 1, 2006)("We cannot sustain [agency] action on some other basis the [agency] did not mention"), citing SEC v. Chenery, 332 U.S. 194, 197-97 (1947).

        NMFS also erroneously seeks to have the court decline to even consider this Claim, on "prudential mootness" grounds, because, just several weeks before defendants' brief was due – and *after* plaintiffs filed their opening brief – NMFS finally published *Proposed* Regulations for the speed limits sought in the Petition.  Def. Br. at 22-24.  However, since the regulations plaintiffs seek are for the November to July time period, see Pl. Ex. 4 (NMFS AR 12), the Proposed Regulations are entirely irrelevant to plaintiffs' Claim, unless NMFS is prepared to *complete* its rulemaking by this upcoming November, now only three months away. Conspicuously, however, NMFS has not even ventured a guess as to when the rulemaking may be completed.

        Thus, while plaintiffs' Claim might be "prudentially" moot if NMFS made a binding commitment to complete *permanent* regulations before the next calving season which begins in November, absent such a commitment the Proposed Regulations do not – and cannot – make plaintiffs' Claim against NMFS moot as a legal or practical matter.  See, e.g., Foretich v. United States, 351 F.3d 1198, 1216 (D.C. Cir. 2003) (discussing prudential mootness standards). Moreover, even if the late appearance of Proposed Regulations should be considered here, it simply indicates that *this litigation* is the primary driver moving the Rulemaking forward, which

3

means that a mootness ruling would remove the impetus for seeing the regulations through to completion.

As for the Coast Guard, the most striking aspect of that agency's herculean efforts to avoid its basic responsibilities under Section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a)(2), is its failure to address its *domestic* statutory scheme under which that agency establishes TSSs. That statute – the Ports and Waterways Safety Act ("PWSA"), 33 U.S.C. § 1221, et seq. – specifically, and unambiguously, directs that "*the Secretary shall designate . . . traffic separation schemes* " and "*shall issue reasonable rules and regulations governing the use of such designated areas.*" Id.§§ 1223(c)(1), 1223(c)(5) (emphasis added).[2]

Accordingly, contrary to defendants' argument, the process for the *international recognition* of the Coast Guard's TSSs is simply irrelevant to whether, in fulfilling its statutory obligations *under the PWSA*, the Coast Guard must comply with ESA Section 7 to insure that it is not likely to jeopardize the continued existence of the North Atlantic right whale or adversely modify right whale critical habitat. See, e.g., Franklin v. Mass., 505 U.S. 788, 801 (1992) (discerning agency's duties through analysis of statutory scheme). The unavoidable reality is that ESA Section 7(a)(2) requires that "*any*" agency action must avoid jeopardizing a species or destroying its critical habitat, 16 U.S.C. § 1536(a)(2)(emphasis added), and hence the Coast Guard cannot avoid this legal obligation in carrying out its duties under the PWSA.[3]

---

[2]    "Secretary" is defined as the "Secretary of the department in which the Coast Guard is operating." Id. § 1222. Plaintiffs have identified Homeland Secretary Michael Chertoff as a defendant, as well as the Commandant of the Coast Guard, and the specific actions at issue here are taken by the Coast Guard. See Amended Complaint.

[3]    As discussed below, see infra at 38-41, the statutory scheme also disposes of the Coast Guard's "political question" argument, Def. Br. at 31-34. See Japan Whaling Ass'n v. Am.

4

Similarly meritless are the Coast Guard's various arguments that (a) it lacks the authority to take right whale impacts into account in setting TSSs; (b) setting TSSs have no impacts on right whales; and (c) in any event, the Coast Guard need not undertake Section 7 consultation for TSSs that were established too long ago, or are being established. Def. Br. at 34-35, 39-40. As for the authority question, defendants' argument is belied by the plain text of the PWSA, which authorizes the Coast Guard to consider the "*protection of the marine environment*" and "*environmental factors*" in establishing TSSs, 33 U.S.C. § 1224(a) (emphasis added), and to modify TSSs "as necessary." Id. § 1223(c)(5)(C).

As for whether TSSs actually affect right whales, the Coast Guard's modification of the TSS in Boston, see 71 Fed. Reg. 29,876 (2006) (Pl. Ex. 35), and the findings on which it is based, fatally undermine the Coast Guard's argument that there is no relationship between its TSSs and right whale ship strikes. CG AR 1086 ("extensive research . . . demonstrates and supports the need for amending the TSS *to help protect the right whale from collisions with ships*")(emphasis added). Indeed, significant research has established the relationship between these routing schemes, which often direct vessels through important right whale use areas (including right whale critical habitat), and ship strikes. See, e.g., Amy R. Knowlton et al., "Right Whale Sightings and Survey Effort in the Mid Atlantic Region: Migratory Corridor, Time Frame, and Proximity to Port Entrances" ("Right Whale Sightings") (July 2002) (Pl. Ex. 33) at 25 ("The mortality data do show a link between shipstruck animals and proximity to shipping lanes and some correlation between deaths and timeframes of migration"); Owen Nichols and

---

Cetacean Soc'y., 478 U.S. 221, 230 (1986).

Hauke L. Kite-Powell, "Analysis of Risk to North Atlantic Right Whales Of Shipping Traffic in

Cape Cod Bay" ("Analysis of Risk") (Feb. 2005) (Pl. Ex. 36).[4]

        Finally, regarding the various TSSs in right whale habitat, it is undisputed that plaintiffs'

challenge to at least *some* of these TSSs fall even within the Coast Guard's improperly

constricted view of the window during which such claims may be presented  – i.e., within 6 years

*after* they are first implemented.  See Def. Br. at 36 (acknowledging that, even if defendants'

statute of limitations arguments prevailed, several TSSs could still be challenged).

Consequently, there is no dispute that the Court must resolve the threshold question of whether

the Coast Guard has any Section 7(a)(2) obligations in connection with the establishment of

TSSs.  As explained further below, if that overarching question is resolved in plaintiffs' favor as

to some TSSs, plaintiffs propose that the parties be directed to meet and confer about precisely

when, and how, the Coast Guard should come into compliance with its Section 7 obligations with

regard to all of the various routing schemes in right whale habitat.

_____

    [4]    This Study is available on NMFS's website, and it – like plaintiffs' other additional
exhibits submitted here – should be considered by the Court for the same reasons discussed in
plaintiffs' pending Motion to Supplement the Administrative Record (June 2, 2006).  See
http://www.nero.noaa.gov/shipstrike/doc/Nichols_CCB%20vessel%20traffic.pdf (last visted
August 4, 2006); see also 2d Asmutis-Silvia Decl., ¶¶ 11-13.

<u>ARGUMENT</u>

I.    **PLAINTIFFS ARE ENTITLED TO RELIEF ON THEIR**
      **CLAIM AGAINST NMFS.**[5]

    A.    **NMFS Has No Reasonable Explanation For Denying**
          **The Rulemaking Petition.**

    Before turning to the merits of NMFS's arguments on the Rulemaking Petition denial, it

is critical to clarify the legal standard applicable here.  According to NMFS, its decision should

be upheld because "this is not a situation in which NMFS employees have 'just been twiddling

their thumbs.'" Def. Br. at 23, <u>quoting</u> <u>In re Barr Laboratories</u>, 930 F.2d 72, 75 (D.C. Cir. 1991).

    However, as plaintiffs explained in their opening brief, regardless of what NMFS

employees have been doing, the Court can only uphold NMFS's denial of plaintiffs' Rulemaking

Petition if it concludes that the agency had a "reasonable explanation" for refusing to provide

right whales some *immediate* on-the-ground protection from ongoing ship strikes.  Pl. Br. at 24-

25, quoting <u>Lyng</u>, 812 F.2d at 7.  Particularly in light of the agency's overarching statutory

mandates, under the ESA and the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1361,

<u>et</u> <u>seq</u>., to take whatever steps are reasonably necessary to facilitate right whales' recovery from

the brink of extinction, NMFS has entirely failed to provide such an adequate explanation here.

<u>Lyng</u>, 812 F.2d at 5 (overturning agency's denial of a rulemaking petition where the decision

---

    [5]    Because defendants do not challenge plaintiffs' evident standing to present their Claim
against NMFS, plaintiffs will not further address standing here.  <u>See</u> Memorandum in Support of
Motion for Summary Judgment (June 2, 2006) ("Pl. Br.") at 23 n.8 (explaining basis for
plaintiffs' standing).

could not be reconciled with "the source of its delegated power"); see Pl. Br. at 25-26 (discussing NMFS's statutory mandates).[6]

NMFS does not even *try* to defend its decision based on the need for "full public notice," which was one of the rationales provided in the Petition denial. See 70 Fed. Reg. at 58,885 (2006) (NMFS AR 1). Presumably, NMFS recognizes that, as plaintiffs have explained, this defense makes no sense, since NMFS was not required to seek comment; could easily have *sought* public comment; and, in any event, has already *obtained* public comment through the comment period on its Advanced Notice of Proposed Rulemaking. Pl. Br. at 28-30.

Thus, the *only* defense that remains is NMFS's argument that granting the Petition would have drained resources from, and "risk delaying," completion of permanent ship speed regulations. Def. Br. at 22. However, this rationale is illogical, and in any event, is not supported by the AR.

As plaintiffs have explained, and, again, defendants have ignored, even assuming *arguendo* that imposing emergency regulations might delay completion of final regulations, that

---

[6]    In re Barr Laboratories, 930 F.2d at 75, on which NMFS relies, did not involve a Rulemaking Petition, but, rather, a mandamus claim to force compliance with a statutory deadline. In that context, the D.C. Circuit ruled that, where, despite its hard work, an agency lacks adequate resources to comply with the deadline, a reviewing Court could withhold relief. Id. at 74-76. Here, by contrast, plaintiffs seek a remand for a reasonable, record-based explanation of NMFS's decision on the Petition.

Despite defendants' contrary suggestion, the fact that the speed restrictions plaintiffs seek are an element of the right whale Recovery Plan also does not alter the applicable standard of review here, which applies to review of any decision on a Rulemaking Petition. Def. Br. at 22. Moreover, if anything, the Recovery Plan only reinforces plaintiffs' Claim, since, in fact, *mandatory* elements of a Recovery Plan, such as this one, see Recovery Plan at IVA-1 (Pl. Ex. 37), are judicially enforceable. See Biodiversity Legal Found. v. Norton, 285 F. Supp. 2d 1 (D.D.C. 2003) (enforcing element of a Recovery Plan).

delay would not harm right whales *because the emergency regulations would protect them in the meantime*.  Indeed, the entire *raison d'etre* of "emergency regulations" is to provide some stopgap protections until more permanent regulations can be imposed.  Consequently, it makes no sense for NMFS to have denied the Petition for interim regulations merely because permanent regulations are purportedly under development.  Cf. City of Las Vegas v. Lujan, 891 F.2d 927 (D.C. Cir. 1989) (upholding emergency regulations to protect imperiled species, explaining that such regulations are designed to protect the species only until permanent regulations can be imposed, "or else no subsequent rulemaking would be required").

Moreover, nothing in the AR substantiates NMFS's "delay" defense.  Indeed, there is not even the most rudimentary accounting of the costs or staffing needs that might be necessary to draft emergency regulations, or how much longer the *permanent* regulations might take had the agency granted the Petition and devoted some  resources to emergency measures.  And, even more importantly, there is no consideration of *when*, in the event the Petition was denied, permanent regulations would be completed; how many right whales would likely die from additional ship strikes in the meantime; and whether the species could sustain these additional losses.[7]

_____

[7]    Given the agency's acknowledgment that *several* right whales are suffering from human impacts each year, see 71 Fed. Reg. at 36,299, 36,300 (2006) (Pl. Ex. 38) (discussing "mortality and serious injury" of an "average of 2.0 per year"), and that, "[b]ecause so few individuals are left in the population, any impact to this species is considered *extremely critical*," CG AR 312 (emphasis added), it would seem unlikely that, had the agency engaged in this necessary inquiry, it could have concluded that the species could withstand the additional ship strikes likely to occur before permanent regulations could be completed.  Indeed, as noted, *four right whales have already died this year alone*.  See supra at 1.

9

Absent this most basic kind of evidence in the AR, there is simply no basis for the Court to conclude that the agency's decision was reasonable. See, e.g., Vernal Enterprises, Inc. v. FCC, 355 F.3d 650, 658 (D.C. Cir. 2004) (an agency's decision must be "supported by substantial evidence"), citing Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415-16 (1971). Indeed, while it is rudimentary administrative law that an agency's decision can only be upheld so long as there is a "rational connection between the facts found and the choice made," Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co. ("State Farm"), 463 U.S. 29, 43 (1983), in this case NMFS did not even *consider* any of the facts that would be critical to making a rational choice to forego emergency regulations. Accordingly, the Rulemaking Petition should be remanded for NMFS to consider, in the first instance, (1) the impacts on right whales of, extent of, and basis for, any delay in issuing permanent regulations that would be caused by issuing emergency regulations, and (2) the impacts on right whales of having *no* speed restrictions in place *at all* until such time as the permanent regulations can be finalized. Cf. In re Bluewater Network, 234 F.3d 1305, 1307 (D.C. Cir. 2000) (granting mandamus request, where agency presented *no evidence* justifying its delay); In re Barr, 930 F.2d at 75 (considering justifications for delay in evaluating agency's ability to comply with statutory mandate).

NMFS's decision also cannot be sustained on the ground that the Petition presented "no new information warranting emergency rulemaking instead of completion of the ongoing rulemaking," Def. Br. at 22, for the question is not whether the information presented to NMFS is *new*, but rather whether the information demonstrates the need for the regulations sought in the Petition. Here, the evidence before the agency plainly demonstrates the need for these regulations in order to prevent the extinction of and recover the species in accordance with

10

NMFS's legal duties under the ESA and MMPA. Thus, as plaintiffs have explained, and NMFS agrees, ship strikes pose an immediate and substantial threat to the critically imperilled right whale, and the speed limits sought in the Petition will significantly ameliorate those risks. See Pl. Br. at 27-28.[8]

Therefore, the basic issue is not *whether* to impose these speed restrictions, but *on what timetable* it is necessary to do so. And, as to that question, neither in its original decision, nor in its brief, does NMFS offer any reasonable explanation as to whether it makes any sense to wait until it can complete its regular rulemaking process before providing these protections. Particularly given that, contrary to NMFS's claim that it is "proceeding apace" with the Rulemaking, Def. Br. at 2, this process has already taken *five years* simply to get to a Proposed Regulation stage, see Pl. Ex. 14 (August 2001 Report commissioned by NMFS that recommended these measures), and that NMFS has failed even to say *when* the process should be completed, plaintiffs submit that NMFS has not provided a reasonable explanation for permitting the regular rulemaking process to drag on without, in the interim, protecting the species from the ship strikes that will continue to occur.

---

[8]    Indeed, in issuing its Proposed Regulations, NMFS explained not only the high number of documented ship strikes, but also that the "actual number of deaths is almost certainly higher than those documented as some deaths go undetected or unreported, and in many cases it is not possible to determine the cause of death from recovered carcasses." 71 Fed. Reg. at 36,300 (Pl. Ex. 38). The agency also explained that "vessel speed is a principal factor" in ship strikes of right whales, and that – contrary to defendants' argument that these regulations would be "novel and unprecedented," Def. Br. at 1 – identical regulations are in fact already used to protect other marine species. Id. at 36,303-04; see also 50 C.F.R. § 17.100 (speed regulations to protect West Indian manatee); 36 C.F.R. § 13.65 (speed restrictions to protect North Pacific humpback whale).

**B.     Unless NMFS Will Complete The Rulemaking By November 2006, Plaintiffs' Petition For Emergency Regulations Is Not Moot.**

NMFS alternatively argues that the Court should decline to rule on plaintiffs' Claim against NMFS on "prudential mootness" grounds, because NMFS – *following* the filing of plaintiffs' opening brief – has now finally issued *Proposed* Regulations.  Def. Br. at 24-25.  The Proposed Regulations certainly further demonstrate the critical need for speed restrictions to protect right whales, since NMFS is moving forward with them – albeit on a glacially slow timetable relative to the urgent need.  However, they cannot in any manner "moot" plaintiffs' Claim, because they do not provide *any* assurance of when, if ever, right whales will obtain the benefit of a final rule to protect them from ship strikes – let alone that they will have this protection by *November*, which is the next date when these regulations will once again become critically necessary to protect the most vulnerable members of the species – i.e., the reproductively active females and their calves – and thus is the date by which plaintiffs' requested interim regulations be put in place.

In particular, with the exception of the New England coast, the critical time period for these restrictions is from approximately *November through April*, which is when a large percentage of pregnant female right whales congregate and give birth off the Southern coast, and then travel northward for the summer months.  See, e.g., "Right Whale Sightings" (Pl. Ex. 33). Then, from approximately the first of the year, and continuing until mid-summer, it becomes essential to protect right whale aggregations in Cape Cod Bay, off Race Point, and in the Great South Channel.  See Comments on NMFS's Advance Notice (NMFR AR 19, at BN 349 (Humane Society), 254 (Defenders of Wildlife), and 378 (Marine Mammal Commission) (all

12

explaining importance of these time periods); <u>see also</u>  2d Declaration of Sharon Young ("2d

Young Decl."), ¶¶ 5-7 (Pl. Ex. 39).  Consequently, plaintiffs' Rulemaking Petition – and the

similar recommendation for "emergency regulations" from the Marine Mammal Commission

("MMC"), Pl. Ex. 16 – seek speed restrictions in the November to July time frame.  NMFS AR

12.

      Accordingly, while plaintiffs would concur that their Claim against NMFS need not be

resolved were NMFS to *complete its Rulemaking by November* 2006, or even enter into a Court-

Ordered Stipulation to do so, under the Record presently before the Court there is no basis for

finding plaintiffs' Claim moot for "prudential," or any other, reasons.  Indeed, the propitious

timing of NMFS's Proposed Regulations, taken together with the fact that NMFS has studiously

avoided saying *anything* about when that proposal may be finalized, speak volumes about how

much longer the process, which, again, has already taken five years, is likely to drag on before it

is concluded, and thus how many more years right whales are likely to remain at risk from ship

strikes in the absence of emergency regulations.  <u>Cf.</u> 70 Fed. Reg. 35,894 (2005) (separate

rulemaking for right whale protection, issued as Proposed Regulations in July 2005, and not yet

finalized); <u>see also</u> Young Decl., ¶¶ 3-4.

      Defendants' "prudential mootness" argument also has no merit as a legal matter, since the

principle applies only where it is "unlikely that" the relief plaintiffs seek will "actually relieve the

injury."  <u>Foretich</u>, 351 F.3d at 1216; <u>Department of the Air Force v. Fed. Labor Relations Auth.</u>,

104 F.3d 1396, 1402 (D.C. Cir. 1997).  Here, plaintiffs' injury certainly may still be relieved,

should NMFS, on remand, impose emergency speed limits beginning this November.  Since the

*Proposed* Regulations do not actually provide *any* of the protection for right whales sought by

the Rulemaking Petition, they have no bearing on the justiciability of plaintiffs' Claim.  See American Historical Ass'n v. Peterson, 876 F. Supp. 1300, 1312 (D.D.C. 1995) (rejecting prudential mootness argument where agency had not withdrawn challenged decision concerning disposition of President's records, even though agency claimed it would not act pursuant to that decision).[9]

Indeed, this precise NMFS argument was recently rejected by another court in a suit concerning the plight of the Pacific right whale.  Center for Biological Diversity v. Evans, No. 04-4496 WHA, 2005 WL 1514102 (N.D. Cal. June 14, 2005).  In that case, which challenged NMFS's failure to designate right whale critical habitat in the Pacific Ocean, NMFS also argued that the Court should decline to resolve the case because the agency had issued a Federal Register Notice indicating that it was moving forward with the process.  Id. at *3, n.2.  Rejecting this argument, the Court explained that, particularly in light of prior delays, the controversy remained, since there was no assurance whether, or when, the agency would *complete* the rulemaking, which – as in this case – is the only step that could resolve plaintiffs' claim.  Id. ("[T]here is no reason to believe that the agency will now follow-through with promulgating the rule without judicial intervention").

---

[9]    The rare cases applying prudential mootness in this Circuit involved facts starkly different from those here.  Def. Br. at 25.  In Chamber of Commerce of the U.S. v. Department of Energy, there was no longer a live controversy because "[t]he precise conduct that prompted [the] suit . . . *ha[d] come to an end*."  627 F.2d 289, 292 (D.C. Cir. 1980) (emphasis added).  Similarly, in Penthouse Int'l Ltd. v. Meese, the court declined to grant declaratory relief where, in light of the relief already obtained, the extent of plaintiffs' ongoing injury was uncertain, and the claim raised serious constitutional questions.  939 F.2d 1011, 1019-20 (D.C. Cir. 1991).  Here, by contrast, the Proposed Regulations do not remotely resolve the controversy, or injury to plaintiffs, because they do not provide any on-the-ground protection for right whales, and none of the other bases for which prudential mootness might be applicable – such as the avoidance of constitutional questions – are implicated.

\*          \*          \*

NMFS has recognized the critical risks to right whales posed by ship strikes, and the efficacy of speed restrictions to ameliorate those risks.  The agency also recognizes that, in light of the species' extremely precarious status, the take of even *one right whale* may *"*alter[ ] the projected [extinction] outcome" for the species. NMFS AR 3, at 468 (69 Fed. Reg. at 30,858) (Pl. Ex. 3).

Yet, although the AR conclusively demonstrates that *multiple right whales are being struck and killed by ships each year*, in denying plaintiffs' Rulemaking Petition NMFS failed to even *try* to explain how continuing to leave right whales unprotected from ship strikes until permanent regulations can be finalized – assuming they ever are – can be reconciled with the agency's statutory obligations, under both the MMPA, and the ESA, 16 U.S.C. § 1536(a)(1), to take whatever steps are reasonably necessary to protect the species from extinction.  Accordingly, unless NMFS is prepared to complete its present Rulemaking by November, on this Record, plaintiffs are plainly entitled to a remand of the Rulemaking Petition, with instructions for NMFS to make a new decision, consistent with its statutory mandates, before November 2006, when these speed limitations are critically necessary.[10]

---

[10]     Far from asking the Court to "take the remarkable step of overriding ongoing executive branch action," Def. Br. at 2, plaintiffs are simply seeking a remand of NMFS's decision for a *reasonable* explanation, which is a garden-variety Administrative Procedure Act ("APA"), 5 U.S.C. § 706, claim.  <u>Lyng</u>, 812 F.2d 1.

15

II.    **THE COAST GUARD MUST CONSULT WITH NMFS ON THE IMPACTS OF ITS TRAFFIC SEPARATION SCHEMES ON RIGHT WHALES.**

    A.    **The PWSA Directs And Empowers The *Coast Guard* To Establish, And Modify, Traffic Separation Schemes In Order To, *Inter Alia*, Protect The Marine Environment.**

The Coast Guard does not dispute that it has *never* consulted with NMFS to insure that its Traffic Separation Schemes ("TSS") are not jeopardizing the continued existence of the right whale or adversely modifying right whale critical habitat, as explicitly required by Section 7(a)(2) of the ESA.  16 U.S.C. § 1536(a)(2).  Instead, the Coast Guard claims that, for various reasons, it has no legal obligation to protect right whales from the significant adverse impacts of these traffic schemes.

The fundamental flaw in all of the Coast Guard's arguments is that they *ignore the statutory scheme under which the Coast Guard is operating here* – i.e., the PWSA, 33 U.S.C. § 1221, et seq.  Therefore, before turning to the Coast Guard's specific arguments, it is critical to review the Coast Guard's mandate, and discretion, under the PWSA to establish, and appropriately modify, TSSs in United States coastal waters that are such important habitat to right whales.

    1.    **The PWSA Directs That The Coast Guard Establish Traffic Separation Schemes.**

According to the Coast Guard, the threshold reason it has no obligation to insure that TSSs do not cause the extinction of the North Atlantic right whale is that *the Coast Guard does not establish Traffic Separation Schemes*.  Instead, according to defendants, "[t]he actual establishment of these routing measures is an action taken by the IMO [International Maritime

16

Organization],"  Def. Br. at 9 – a United Nations agency that addresses *international* cooperation regarding the regulation of the sea.  See Pl. Br. at 16, n.4.

This is simply wrong as a matter of law.  Indeed, what is most telling about the Coast Guard's extended discussion of the various international agreements and bodies that may be involved in the *international recognition* of TSSa,  Def. Br. at 28-41, is the agency's remarkable failure to even acknowledge, let alone address, its own domestic statutory duties under federal law.  Yet, since the Coast Guard's duties do, and must, flow from the plain terms of the PWSA (which, not surprisingly, does not empower any international body to set TSSs in United States coastal waters), rather than some international agreement, it is that statute which governs here.

Thus, in the PWSA, after finding that "navigation and vessel safety [and] protection of the marine environment  . . . are matters of major *national* importance," 33 U.S.C. § 1221(a) (emphasis added), Congress directed that:

> [i]n order to provide safe access routes for the movement of vessel traffic proceeding to or from ports or places subject to the jurisdiction of the Unites States . . . *the Secretary shall designate* necessary fairways and *traffic separation scheme*s *for vessels operating in the territorial sea of the United States and in high sea approaches*, outside the territorial sea, to such ports or places.

Id. § 1223(c)(1) (emphasis added).

To establish a TSS, the Secretary – i.e., the Coast Guard, see supra at 4 n.2 – prepares a Port Access Route Study ("PARS"), which includes consulting with agencies and other interested parties. 33 U.S.C. §§ 1223(c)(3)(B), 1224(b).  Then, once the Coast Guard has decided on a designation, the Act directs that the agency issue appropriate regulations.  Id. § 1223(c)(5)(A) ("the Secretary [ ] shall issue reasonable rules and regulations governing the use of such designated areas").  Thus, none of the statutory steps involved in considering, and deciding on, a

17

TSS involves even consulting with, let alone obtaining approval of, the IMO or any other international body.  See also 33 C.F.R. Part 167 (Coast Guard regulations establishing TSSs).

To be sure, the PWSA does provide that, *after* the Coast Guard makes its decisions concerning TSSs and other routing measures, the agency "shall, through appropriate channels, (i) *notify* cognizant international organizations of any designation, or adjustment thereof, and (ii) take action to seek the cooperation of foreign states" where the agency designates a  TSS as a mandatory route. 33 U.S.C. § 1223(c)(5)(D)(emphasis added); see also  id. § 1223(c)(5)(B) (providing authority to impose mandatory routes).  The statute similarly provides that,"[t]he Secretary shall transmit, via the Secretary of State, to appropriate international bodies or forums, any regulations issued under this chapter, for *consideration as international standards*."  Id. § 1230(a) (emphasis added).  However, these *post*-decisional steps certainly have no bearing on whether the Coast Guard itself designates TSS, as the agency is authorized to do, under the PWSA.  See also United States v. Locke, 529 U.S. 89, 101 (2000) (under the PWSA, "the Coast Guard may enact measures for controlling vessel traffic or for protecting navigation and the marine environment . . ..").[11]

Consequently, defendants' claim that the existing TSSs in right whale habitat were not established by the Coast Guard, and that the new TSSs presently being finalized will never be established by the agency, is impossible to reconcile with the governing Congressionally-

---

[11]    In light of the statutory scheme, even assuming *arguendo* that, as defendants suggest, the Coast Guard's *practice* is to await making a final decision on its TSSs until after it has obtained international recognition, that practice could not remove the legal effect of a TSS as a Coast Guard decision, defendants' argument to the contrary notwithstanding.  Moreover, the agency certainly could not be lawfully delegating its domestic statutory authority to an international body here.  Cf. United States Telecom Ass'n v. FCC, 359 F.3d 554-56 (D.C. Cir. 2004)  (discussing limits of agency delegation of statutory duties).

mandated scheme. Rather, because, *by statute*, the existing – and future – TSSs are actions taken *by the Coast Guard*, they give rise to obligations under Section 7(a)(2) of the ESA, which covers "any action" by a federal agency. See infra at 22-28 (demonstrating that a TSS is "agency action").

Finally, although the Court need look no farther than the PWSA itself to resolve this issue, should the Court nonetheless deem it necessary to consider any of the international laws, regulations and agreements upon which defendants rely here, plaintiffs are plainly entitled to some basic discovery concerning the Coast Guard's development of TSSs, and the international communities' role in that process. See Fed. R. Civ. P. 56(f). This is especially true in light of defendants' many *factual* assertions wholly unsupported by reference to the AR or any other authority. See, e.g., Def. Br. at 9 (claiming, with no citation, that "establishment of these routing measures is an action taken by the IMO"); id. at 10-11 (claiming that the Coast Guard's role is limited to preparing the PARS); id. at 12 (claiming that the Coast Guard's regulations in the Code of Federal Regulations simply "codifies established TSS").[12]

Indeed, defendants' contention that TSSs are purely a creature of international law is *contradicted* by the AR (as well as the PWSA), which reflects that both NMFS and the Coast Guard recognize that routing measures such as TSSs can be designated, in accordance with the PWSA, *without* IMO approval. CG AR 973; CG AR at 894, 896. Accordingly, while plaintiffs believe the Court can, and should, enter summary judgment for plaintiffs based on the plain

---

[12] Defendants are also very careful in their brief, stating, for example, that IMO approval is necessary to "conform to the requirements of the PWSA, *and* gain the international community's recognition and adoption of ships' routing measures. . . ." Def. Br. at 9 (emphasis added). This statement is not inconsistent with the fact that, as a matter of *domestic* law alone, IMO approval is irrelevant to the establishment of a TSS.

19

terms of the PWSA, plaintiffs are submitting a Rule 56(f) declaration explaining the discovery

they are entitled to obtain if the Court were to address the international law issued raised by the

government.  See 2d Asmutis-Silvia Decl., ¶¶ 8-10.[13]

> **2.    The PWSA Authorizes The Coast Guard To Establish,
> And Amend, TSSs In Order To Protect Right Whales.**

Defendants also contend that the Coast Guard has no *authority* to take right whale

impacts into consideration in establishing, or modifying, TSSs.  See, e.g., Def. Br. at 8.  Once

again, the plain language of the PWSA completely belies this argument.

Thus, not only is protection of the "marine environment" one of the express purposes of

the PWSA, 33 U.S.C. § 1221(c)(1), but, in establishing TSSs, the PWSA specifically directs that

the Coast Guard "take into account all relevant factors concerning navigation and vessel safety

[and] *protection of the marine environment*," including, *inter alia*, "any other potential or actual

conflicting activity" and "*environmental factors*."  Id. § 1224(a) (emphasis added).  Accordingly,

there can be no legitimate dispute that the PWSA, as originally enacted, as well as Section

7(a)(2) of the ESA itself, 16 U.S.C. § 1536(a)(2), provides the Coast Guard with ample authority

---

[13]    For the same reasons, the Court need not consider the IMO "Ships' Routing" document
defendants have submitted to the Court – notably without seeking to Supplement the AR, while
opposing plaintiffs' motion to do so.  Nonetheless, that document also further supports the
*correct* interpretation of the Coast Guard's obligations, by explaining that the role of the IMO is
to provide for the adoption of domestically established routing measures "on an international
level," Ship's Routing (Def. Ex. A), § 3.1; that routing measures do not become effective until
"promulgated by the Government that proposed the system," id. § 3.8; and that participating
countries may choose not to submit their routing systems to the IMO.  Id. § 3.15; see also
Convention of the Intergovernmental Maritime Consultative Organization, 9 U.S.T. 621, T.I.A.S.
4004, Art. 2 ("The Functions of the [IMO] shall be consultative and advisory."); International
Convention for the Safety of Life at Sea, 32 U.S.T. 47, T.I.A.S. No. 9700 ("[t]he selection of the
routes and the initiation of action with regard to them, and the delineation of what constitutes
converging areas, *will be primarily the responsibility of the Governments concerned*")(emphasis
added).

to take the protection of right whales into account in designating TSSs.  See Consumer

Electronics Ass'n v. FCC, 347 F.3d 291, 298 (D.C. Cir. 2003) ("statutes written in broad,

sweeping language should be given broad, sweeping application").[14]

Moreover, the agency's ample authority to protect right whales under the PWSA is

especially obvious in light of the legislation Congress enacted in 2004, specifically directing the

Coast Guard to "analyz[e] potential vessel routing measures for reducing vessel strikes of North

Atlantic Right Whales," and specifically referring to NMFS's Advanced Notice of Proposed

Rulemaking, which discussed, inter alia, developing TSSs to protect right whales, NMFS AR 20.

See Coast Guard and Maritime Transp. Act of 2004, Pub. Law 108-293, § 626.  This legislation

further confirms that the Coast Guard plainly has the authority to establish TSSs to reduce the

risk of ship strikes – which the agency itself plainly recognizes, since the AR reflects Coast

Guard efforts to develop routing measures to protect right whales.  CG AR 1094; see also Def.

Br. at 16-17 (discussing these routing changes, including "modify[ing] the location and size of

the western portion of the" Boston TSS).[15]

_____

[14]    In Defenders of Wildlife v. EPA, 420 F.3d 946, 970 (9th Cir. 2005), the 9th Circuit held
that, even where a statute is written in mandatory terms, Section 7(a)(2) itself imposes a distinct
obligation on the agency to avoid jeopardizing listed species.  Here, however, the Court need not
go that far, since the PWSA, like the statute at issue in Washington Toxics Coalition v. EPA, 413
F.3d 1024. 1033 (9th Cir. 2005), clearly vests the agency with ample discretion to take
endangered species impacts into account.

[15]    The 2004 legislation also disposes of the Coast Guard's argument that legislation enacted
in 1998 – addressing a ship reporting system to protect right whales –  somehow demonstrates
that the PWSA does not empower the Coast Guard to take right whale impacts into account in
setting TSSs.  Def. Br. at 8.  Although the 1998 Amendments would not have any bearing on the
Coast Guard's broad authority to protect the marine environment under the PWSA in any event,
see, e.g., U.S. v. Price, 361 U.S. 304, 313 (1960), the 2004 legislation makes that authority
abundantly clear, since Congress specifically directed the Coast Guard to use that existing
authority to protect right whales.

**B.    Each of The Coast Guard's TSSs Is An "Agency Action"
That "May Affect" Right Whales.**

Defendants do not dispute that NMFS's Section 7 implementing regulations require that whenever an "agency action" "may affect" a protected species or its critical habitat – through either direct effects, or indirect effects that "are reasonably certain to occur" as a result of the action, 50 C.F.R. § 402.02 (defining "effects of the action") – the agency *must* consult with NMFS, and obtain NMFSs' Biological Opinion ("Bi-Op"), in order to insure that the action is not likely to jeopardize the continued existence of the species or adversely modify its critical habitat.  See 50 C.F.R. Part 402.  However, the Coast Guard argues that it has no obligation to insure that its TSSs are not likely to jeopardize right whales or adversely modify their federally designated critical habitat (which the Boston TSS transects), because TSSs are not even an "agency action" within the meaning of ESA Section 7(a)(2), 16 U.S.C. § 1536(a)(2), and, in any event, that the evidence before the Court does not support the contention that TSSs, which vessels are not required to use, "may affect" right whales.  However, because both the law and the facts here amply demonstrate that the Coast Guard's TSSs *are* agency actions that may affect right whales, the Coast Guard cannot escape Section 7 consultation based on these arguments.

**1.    Each TSS Is An "Agency Action" Of The Coast Guard
For Purposes of Section 7(a)(2).**

According to defendants, a TSS is not an "agency action" of the Coast Guard because the agency's only role *before* a TSS is established is to make certain recommendations (after which the "United States government" proposes a TSS to the IMO, Def. Br. at 37), and its only role *after* IMO approval – including the promulgation of regulations in the Code of Federal Regulations, see 33 C.F.R. Part 167 ("Offshore Traffic Separation Schemes") – is purely

22

ministerial.  Def. Br. at 36-38.  Thus, defendants argue, this case is analogous to a line of cases

finding that, where an agency is not the actual decision-maker under the pertinent legal scheme,

plaintiffs may not present a claim against the agency.  See, e.g., Franklin v. Mass., 505 U.S. 788,

801 (1992).

The fundamental fallacy of this argument, once again, is that, as plaintiffs have detailed,

the PWSA expressly vests the *Coast Guard* with the responsibility, and authority, to establish,

and modify, TSSs, including in right whale habitat.  See supra at 16-21.  Accordingly, the cases

on which defendants rely strongly support *plaintiffs'* position here.

Indeed, in each of the cases defendants cite, in order to determine whether the agency had

the necessary decision-making authority to trigger an obligation under federal law, the Court

explored the *statutory scheme under which the agency was operating*, rather than engaging in

some kind of free-floating inquiry into how the agency may conduct its business, as the Coast

Guard appears to be inviting the Court to do here.  Thus, for example, in Franklin, the Court

looked to the underlying statutory scheme to conclude that, because, under the statute, the final

decision at issue was that of the President – who had discretion to adopt, or reject, the Secretary

of Commerce's census determination – plaintiffs could not challenge the Secretary's conclusions

under the APA.  505 U.S. at 799.  Similarly, in Jensen v. NMFS, 512 F.2d 1189 (9th Cir. 1975),

the Court interpreted the terms of an international treaty to conclude that the regulations plaintiffs

challenged were "those of the President," rather than an agency.[16]  Cf. Metcalf v. Daley, 214 F.3d

---

[16]    See also Dalton v. Spector, 511 U.S. 462 (1994) (dismissing claim against Secretary of
Defense's base closure decision where statutory scheme made the President the final decision-
maker); Public Citizen v. U.S. Trade Rep., 5 F.3d 549 (D.C. Cir. 1993) (dismissing claim
concerning an agency's completed negotiation of an international treaty, where the treaty would
have no effect until after Presidential action).

1135 (9th Cir. 2000) (sustaining NEPA challenge to a NMFS decision to present a whaling *proposal* to the International Whaling Commission).

Accordingly, because, in this case, the PWSA plainly gives the *Coast Guard* itself the statutory authority to set TSSs, and does not even *mention* the participation of the President or international bodies in that process, once again, the Court need only look to the statute to conclude that TSSs are, by law, an "*agency* action" of the Coast Guard. Indeed, in flat contradiction of the agency's argument to the Court, the AR reflects that Coast Guard *itself* recognizes that *it* establishes TSSs, not the IMO, or any other body. See CG AR 1829 (59 Fed. Reg. at 21935) (The PSWA "authorizes the Secretary of the Department in which the Coast Guard is operating to *establish TSSs and shipping safety fairways*, where necessary, to provide safe access routes for vessels proceeding to or from United States ports")(emphasis added); CG AR 1820 (55 Fed. Reg. 36,666) (same).[17]

Similarly unavailing is defendants' corollary argument that the Coast Guard's TSSs are not "agency action" because the PWSA does not give the Coast Guard the requisite *discretion* to take right whale impacts into account in establishing or modifying TSSs. Def. Br. at 40. As defendants note, the Supreme Court has recently explained, in the context of a claim originating under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq., that an agency is not a "legally relevant 'cause' of the effect" of its actions where, "due to its *limited*

---

[17]     Although the plain terms of the PWSA entirely distinguish this case from those cited by defendants, it also bears noting that defendants' cases all arose under the APA, and thus the plaintiffs had to identify a "final agency action." 5 U.S.C. § 704. Here, by contrast, plaintiffs' Section 7(a)(2) claim against the Coast Guard arises under the ESA's citizen suit provision, and thus there is no final agency action requirement here. See, e.g., Washington Toxics Coalition, 413 F.3d at 1034 (distinguishing between APA and Section 7(a)(2) claims).

*statutory authority* over the relevant actions," the "agency has no ability to prevent [the] effect." Def. Mem. at 40, quoting Department of Transp. v. Public Citizen, 541 U.S. 752, 770 (2004)(emphasis added). However, that principle has no application here because the PWSA, as well as the ESA, plainly vests the Coast Guard with the authority and duty to take impacts on right whales into account in establishing and amending TSSs. See supra at 16-21. Indeed, once again, in direct contravention of its argument here, in its Biological Assessment on its own activities, the Coast Guard explained that, under the PWSA, TSSs may "be used to prevent or reduce the risk of pollution, *harm to endangered species*, or other damage to the marine environment from ship collisions . . . ." CG AR 146 (emphasis added).[18]

For the same reasons, the Coast Guard's actions in establishing and modifying TSSs in right whale habitat are ongoing, making them all "agency action[s]" for purposes of ESA Section 7(a)(2), 16 U.S.C. § 1536(a)(2), regardless of when they were first established. Indeed, in several decisions in recent years, courts have required the U.S. Environmental Protection Agency ("EPA") to undertake Section 7 consultation regarding the impacts of various approved pesticides on listed species, irrespective of when the pesticides were first registered. See, e.g., Center for Biological Diversity v. Leavitt, No. 02-2277030, 2005 WL 2277030 (N.D. Cal. Sept. 19, 2005); Washington Toxics Coalition v. EPA, No. C01-132C (W.D. Wash. July 2, 2002) (Pl. Ex. 40), aff'd 413 F.3d 1024. The courts have repeatedly found that, because EPA retains the *discretionary authority* to alter its pesticide registrations based on impacts on endangered

---

[18]     As noted earlier, the Ninth Circuit has recently held that, in contrast to NEPA – which is a purely procedural statute – ESA Section 7(a)(2), 16 U.S.C. § 1536(a)(2), imposes a *substantive* prohibition on *any* agency action that might jeopardize a species or adversely modify its critical habitat. See Defenders of Wildlife, 420 F.3d 946. Accordingly, this case is distinguishable from Public Citizen on that basis as well.

species, plaintiffs may maintain a Section 7 claim concerning any pesticide that may be affecting

listed species about which plaintiffs have standing to sue.  Id.[19]

Moreover, as plaintiffs have explained, "agency action" in this context "has been defined

broadly," NRDC v. Houston, 146 F.3d 1118, 1125 (9th Cir. 1998), and includes "all activities or

programs of any kind authorized . . . in whole or in part, by Federal agencies, in the United States

or upon the high seas," including "the promulgation of regulations."  Pl. Br. at 35, quoting 50

C.F.R. § 402.02; see also National Wildlife Fed. v. Brownlee, 402 F. Supp. 2d 1, 9-10 (D.D.C.

2005).  Plainly, the Coast Guard's adoption of TSSs pursuant to the PWSA falls squarely within

this definition, regardless of when they were initially adopted.  See, e.g., Pacific Rivers Council

v. Thomas ("PRC"), 30 F.3d 1050 (9th Cir. 1995).

In PRC, for example, plaintiffs challenged the Forest Service's failure to undertake

Section 7 consultation concerning the adverse impacts of several land resource management

plans ("LRMP") on salmon species that were listed under the ESA only *after* the LRMPs had

been finalized.  Id.   Seeking to avoid Section 7, the Forest Service claimed that it had no duty to

consult because the relevant "agency action" had been *completed* once the LRMPs had been

completed, and thus subsequent impacts on species were irrelevant for purposes of the ESA.  Id.

at 1053 ("the Forest Service argues that the LRMPs are not ongoing agency action throughout

their duration, but only when they were adopted in 1990, or if they are revised or amended in the

future").  The court squarely rejected this argument, explaining that "because the LRMPs have an

---

[19]    The Ninth Circuit's recent decision in Western Watersheds Project v. Matejko, _ F.3d _,
2006 WL 2042825 (9th Cir. July 24, 2006), is not to the contrary, for in that case the Court found
that the Bureau of Land Management was engaged in no ongoing agency action and had no
discretion to change its decision to protect species.  Id. at *8.  Here, the setting of a TSS is plainly
ongoing agency action over which the Coast Guard has ample discretion.

*ongoing and long-lasting effect even after adoption*, we hold that the LRMPs represent ongoing

agency action." Id. at 1053; see also Houston, 146 F.3d at 1130 (finding that agency's ongoing,

discretionary decision to provide water was an agency action triggering the duty to reinitiate

consultation).

Applying those principles here, it does not matter *when* the TSSs in right whale habitat

were first established, so long as it is evident that, at present, those TSSs "may affect" right

whales – in which case the Coast Guard must undertake Section 7 consultation in order to insure

that these TSSs are not jeopardizing the continued existence of the right whale or adversely

modifying right whale critical habitat.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.  Indeed, any

other result would simply make no sense, for it would mean that an agency regulation or

approved activity might cause the *extinction* of a species, and yet the agency would have no

obligation to insure against that result where the regulation or activity was put into place some

time ago.  Since this would fly in the face of Congress' intent to "halt and reverse the trend

toward extinction, *whatever the cost*," Babbitt v. Sweet Home Chapter of Communities for a

Great Oregon ("Sweet Home"), 515 U.S. 687, 699 (1995)(other citations omitted), the statute

certainly cannot be applied in such a restrictive manner.

NMFS's regulations governing the "reinitiation" of consultation is also instructive in this

regard.  50 C.F.R. § 402.16.  That regulation requires an agency, after having completed the

section 7 consultation process, to reinitiate the consultation "where discretionary Federal

involvement or control over the action has been retained or is authorized by law," and where

either (a) "new information reveals effects of the action that may affect listed species or critical

habitat in a manner or to an extent not previously considered" or (b) "a new species is listed or critical habitat designated that may be affected by the identified action."  Id.

Each of those triggers is present here.  First, the Coast Guard plainly has discretion to *change* the TSSs, since the PWSA expressly provides that the Coast Guard "may, from time to time, as necessary, *adjust the location* or limits of designated fairways or *traffic separation schemes* . . .."  33 U.S.C. § 1223(c)(5)(C) (emphasis added); see also id. § 1231(a) ("the Secretary shall issue, *and may from time to time amend or repeal,* regulations necessary to implement this chapter").  Second, it is evident that the Coast Guard's TSSs "may affect" right whales, see infra at 31 –  indeed they *are* adversely affecting right whales – and that these impacts have *never* been considered in the consultation process.  Moreover, critical habitat has been designated *since* some of the TSSs were adopted. See Pl. Ex. 8 (Critical Habitat regulation).

Accordingly, since it is evident that, had the Coast Guard complied with its duty to consult when, for example, it *originally adopted* the Boston TSS, it would be required to *reinitiate* consultation in light of subsequent events, the agency must at least have the same duty to consult when it has never done so before.  Again, any other result would plainly be contrary to the overriding purposes of the ESA.  See TVA v. Hill, 437 U.S. at 186 (finding ongoing duty to consult on project approved "well under way when Congress passed the ESA," explaining that "Congress foresaw that § 7 would, on occasion, require agencies to alter ongoing projects to fulfill the goals of the Act").

## 2.    The Coast Guard's TSSs "May Affect" Right Whales.

The Coast Guard also argues that because the TSSs in right whale habitat are voluntary, and thus vessels may choose not to travel in these routing lanes, plaintiffs cannot demonstrate

that the Coast Guard's TSSs "may affect" right whales.  Def. Br. at 39-40.  As a threshold matter, this argument is impossible to reconcile with the Coast Guard activities detailed in the AR, which include the rerouting of the Boston TSS *specifically to reduce the risks of ship strikes.* Certainly the agency's effort to move that TSS demonstrates that it recognizes that TSSs, at the least, "may affect" right whales and their habitat.  See Routeing of Ships, Ship Reporting and Related Matters, Amendment of the Traffic Separation Scheme "In the Approach to Boston, Massachusetts" ("Boston TSS Amendment") (CG AR at 1085).

Moreover, as the Coast Guard itself explained in connection with this TSS, "extensive research on marine mammals has been conducted that *demonstrates and supports the need for amending the TSS to help protect the right whale from collisions with ships.*"  Id. at 1086 (at ¶ 4) (emphasis added).  Surely, if amending TSSs will help protect right whales from ship collisions, then TSSs "may affect" right whales.  See also id. at 1087 (discussing "up to 58%" "reduction in the risk of ships strikes" as a result of the TSS modification); id. at 1091-93 (charts showing right whale distribution in relation to TSS).[20]

If defendants are suggesting that, because TSSs may be voluntary, vessels routinely ignore them, that argument is also flatly contradicted by the AR, and additional evidence demonstrating that, in fact, many vessels *do follow TSSs*.  Thus, for example, the AR reflects

---

[20]    Similarly, in its recently issued Proposed Regulations on speed limits, NMFS also explained that moving the Boston TSS will "yield[ ] an estimated 58-percent reduction in the risk of ship strikes to right whales, while also reducing ship strike risk to other endangered large whale species by an estimated 81%."  71 Fed. Reg. at 36,303 (Pl. Ex. 38).  Other studies have found that changing vessel routes in other areas used by right whales would similarly reduce ship strikes.  See, e.g., "Analysis of Risk" (Pl. Ex. 36) (explaining rerouting of Boston, Gulf of Maine and Provincetown ship traffic that "would reduce the expected ship/whale encounters by about 60% on the Gulf of Maine route and by about 40% on the Provincetown and Boston routes").

that, as a result of inter-agency discussions about whether the new Boston TSS should be mandatory, NMFS and the Coast Guard agreed to make it a voluntary route, but only because they reached an "understanding that recommended measures are easier to implement, may be implemented more quickly, *and that mariners generally accept and follow such measures*." CG AR 907 (emphasis added); see also CG AR 1011, 1046 (same); accord CG AR 906 (explaining that TSSs "provide[ ] a high level of predictability to ship movements and locations"); see, e.g., Leslie Ward-Geiger, et al., *Characterization of Ship Traffic in Right Whale Critical Habitat*, ("Characterization of Shipping Traffic"), 33 Coastal Management 263, 270 (2005) (Pl. Ex. 41) (chart showing high use of Boston TSS), available at www.nmfs.noaa.gov/pr/pdfs/ shipstrike/critical_habitat_traffic.pdf (last visited Aug. 4, 2006).

The fact that many large and fast marine vessels *follow* the Coast Guard's TSSs is not surprising, since the purpose of a TSS is to *protect vessels* in crowded corridors by separating opposing streams of traffic. 33 C.F.R. § 167.5(b). Indeed, Rule 10 of the International Regulations for Preventing Collisions at Sea ("COLREGS"), which applies to all Coast Guard TSSs, 33 C.F.R. § 167.10, provides that vessels must "[n]ormally join or leave a traffic lane at the termination of the lane," and that, if a vessel chooses not to travel in the traffic lane, it "shall avoid it by as wide a margin as in practicable." Convention on the International Regulations for Preventing Collisions at Sea, Oct. 20, 1972, 10(b)(iii) and 10(h) (33 U.S.C. foll. § 1602). Because the failure to follow these requirements exposes a vessel to increased liability risks for marine accidents, vessels have significant incentives to follow the TSSs. See Washington v. Sea Coast Towing Inc., No. 03-166Z, 2004 WL 3780362, *5 (W.D. Wash. Apr. 30, 2004) ("Under the Pennsylvania Rule, when a vessel is in violation of a [routing regulation] at the time of a

30

collision [that] was intended to prevent such an occurrence, a rebuttable presumption arises that the statutory violation caused the accident."), revd on other gds. 148 Fed. Appx. 612 (9th Cir. 2005)(citing The Pennsylvania, 86 U.S. (19 Wall.) 125, 136 (1873)).[21]

There is also ample evidence in the Record demonstrating that the use of these TSSs by marine vessels, in fact, *has adverse effects on right whales and their critical habitat*.  Thus, as plaintiffs have explained, there is a large body of scientific evidence demonstrating that right whales are found in proximity to TSSs, and that TSSs may pose significant risks of ship strikes. See Pl. Br. at 36 and n.17 (quoting studies finding that right whales are found "in, or adjacent to, several major shipping corridors;"  that TSSs "concentrate ship traffic" in right whale use areas; and that mortality data "show a link between shipstruck animals and proximity to shipping lanes"); see also 2d Asmutis-Silvia Decl., ¶¶ 3-7.

Indeed, lest there be any doubt that the Coast Guard TSSs are located in important right whale habitat areas, it bears emphasizing that the Boston TSS *travels directly through designated right whale critical habitat*. NMFS AR 20, at 470) (Pl. Ex. 3); see also Characterization of Ship Traffic at 270 (map showing overlap between critical habitat and shipping lane)(Pl. Ex. 41). NMFS designated this area as critical habitat based on a finding that the area was "essential" for the "rest and refuge, health, continued survival, conservation and recovery" of the species.  59 Fed. Reg. at 28,793 (Pl. Ex. 8).  Certainly, the location of a major TSS in critical habitat "may

---

[21]    See also Trinidad Corp. v. S.S. Keiyoh Maru, 845 F.2d 822, 826 (9th Cir. 1988) ("There is no question that [complying with COLREGS] is now a statutory duty"); In re Texaco, 570 F. Supp. 1284 (E.D. La. 1983) ("Good seamanship, however, requires that ships should, in general comply with the [traffic separation] scheme, so that failure by any ship to comply with it may well amount to negligent navigation on her part").

affect" that critical habitat by impairing its value for species' *recovery*, which itself requires consultation.  50 C.F.R. § 402.14(a).[22]

Thus, because the record reflects that marine vessels generally abide by TSSs, and those vessels, in turn, have adverse impacts on right whales and their critical habitat, TSSs certainly "may affect" right whales, irrespective of whether vessels are *required* to travel in these lanes. See, e.g., Florida Key Deer v. Stickney, 864 F. Supp. 1222 (S.D. Fla. 1994); National Wildlife Fed. v. FEMA ("NWF"), 345 F. Supp. 2d 1151, 1174-1176 (W.D. Wash. 2004).  For example, in Stickney, the court considered whether the Federal Emergency Management Agency ("FEMA") must engage in Section 7 consultation over its flood insurance program.  864 F. Supp. 1222. Although FEMA flood insurance was not *required* for the development threatening the imperiled key deer, and, indeed, developers could obtain *private* flood insurance were FEMA insurance not available, the Court concluded that the flood insurance program "may affect" the key deer because program participants were engaged in habitat destruction that might adversely impact the species.  Id. at 1238 ("The assertion that private insurance companies would likely step in and provide flood insurance for new development is irrelevant to whether FEMA is required to fulfill its responsibilities under the ESA") (citing Duke Power Co. v. Carolina Env. Study Group, Inc.,

---

[22]    Indeed, placing a TSS in right whale critical habitat "adverse[ly] modif[ies]" that habitat, 16 U.S.C. § 1536(a)(2), since it certainly diminishes the value of that essential habitat for the species' recovery.  See Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service, 378 F.3d 1059, 1070-71 (9th Cir. 2004) (finding that Section 7 prohibits critical habitat modification that inhibits recovery, and not just survival, of a species).

438 U.S. 59, 76-79 (1978)); see also Defenders of Wildlife, 420 F.3d at 963 (applying

"proximate cause" principles to evaluate scope of Section 7 duties).[23]

Similarly, in NWF, another district court considered whether a different FEMA flood

insurance program "may affect" protected salmon species. 345 F. Supp. 2d 1151. Although,

again, FEMA claimed that there was no record evidence demonstrating that the program directly

harmed salmon, the court explained that "FEMA takes too narrow an approach," because the

"effects of the action" that must be considered under the Section 7 process, 50 C.F.R.

§ 402.14(c), includes the "indirect effects," which, in turn, include those effects that "are later in

time, but still are *reasonably certain to occur*" as a result of the action, id. § 402.02 (emphasis

added). 345 F. Supp. 2d at 1176. Thus, because the development at issue was reasonably certain

to occur as an indirect effect of the FEMA flood insurance program, the Section 7 consultation

requirement was triggered. Id.[24]

---

[23]    This result is also consistent with a long line of cases under NEPA that have ruled that, in
considering the effects of federal activities on the environment, agencies must analyze effects of
third party activities that are reasonably likely to occur as a result of the federal activity. See,
e.g., Friends of the Earth, Inc. v. U.S. Army Corps of Engineers, 109 F. Supp. 2d 30 (D.D.C.
2000) (growth-inducing effects of casinos); TOMAC v. Norton, 240 F. Supp. 2d 45 (D.D.C.
2004) (same); National Wildlife Fed. v. Coleman, 529 F.2d 359 (5th Cir. 1976) (effects of
private development likely as result of federal highway project); City of Davis v. Coleman, 521
F.2d 661 (9th Cir. 1975) (same); Florida Wildlife Fed. v. U.S. Army Corps, 401 F. Supp. 2d
1298 (S.D. Fla. 2005) (growth-inducing effects of research park).

[24]    Plaintiffs have previously detailed that numerous courts have found agencies responsible
for the "take" of listed species – which requires a significantly *higher* showing than the "may
affect" trigger at issue here – where the agency action *authorized* third party activities that, in
turn, take species. see Pl. Br. at 39-40 and n.18 (discussing cases). Here, as the flood insurance
cases demonstrate, in light of the low threshold for a "may affect" determination, Stickney, 864
F. Supp. at 1229 (explaining that the "applicable threshold for triggering formal consultation [ ]
is very low"), a third party activity that "may affect" species can trigger Section 7 consultation
requirements, irrespective of whether a federal action is a necessary prerequisite to the activity,
so long as the effect on the species is "reasonably certain to occur" a consequence of the agency

Applying these principles here, the Coast Guard's TSSs "may affect" right whales and their critical habitat in light of the evidence that changes in marine vessel traffic are at least "reasonably certain to occur," 50 C.F.R. § 402.02, as a result of establishing, and modifying TSSs, which, in turn, affects right whales. Indeed, far from bearing out defendants' contention that TSSs do not impact right whales, the AR reflects the Coast Guard's conclusion that "extensive research" *supports* TSS changes to reduce the risks of ship strikes. CG AR 1086.[25]

### C.    The Coast Guard's Jurisdictional Arguments Also Have No Merit.

The foregoing discussion also disposes of many of the Coast Guard's jurisdictional arguments, which are largely a repackaging of defendants' arguments on the merits.

### 1.    Plaintiffs Have Standing.

Defendants do not dispute that plaintiffs' members include individuals who regularly enjoy and appreciate viewing North Atlantic right whales in their natural habitat, Pl. Exs. 21-24

---

action. 50 C.F.R. § 402.02; see also 51 Fed. Reg. 19926, 19,949-50 (1986) ("Any possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement").

[25]    At minimum, plaintiffs are *also* entitled to some basic discovery on this issue before the Court could resolve it in defendants' favor. See 2d Asmutis-Silvia Decl., ¶¶ 8-10. For example, in Stickney, the court considered extensive factual evidence to evaluate the effects of the flood insurance program on imperiled species. 864 F. Supp. at 1228. Similarly, here, if the AR is not deemed sufficient, plaintiffs are entitled to collect some basic evidence from defendants concerning vessel use of TSSs before the Court could conclude, relying solely on the agency's post-lawsuit assertions in its brief to this Court (and contrary to the Coast Guard's actions and statements as reflected in the AR), that TSSs have no impact on the risks of right whale ship strikes. Fed. R. Civ. P. 56(f) (where a "party cannot for the reasons stated present by affidavit facts essential to justify the party's opposition, the court may [permit] discovery to be had or may make such other order as is just"); see Gerber v. Norton, 294 F.3d 173, 180 (D.C. Cir. 2002) ("It would be extraordinarily unfair to permit the Service to rely on such a post-complaint factual assertion, and at the same time allow the agency to deny its opponents the ability to test the assertion's veracity through discovery").

(plaintiffs' declarations), and thus who suffer a concrete *injury* cognizable under Article III when marine vessels hit and kill right whales, thereby diminishing both the number of right whales available for them to observe, and further threatening the survival of the species as a whole. See, e.g., Japan Whaling Ass'n, 478 U.S. at 230, n.4 (plaintiffs who engaged in "whale watching and studying" had standing to challenge agreement between the Secretary of Commerce and Japan that resulted in Japanese whale hunting); Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 181 (2000) ("the relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff"). Indeed, just last week *another female dead right whale was discovered* with thirteen propeller wounds, the victim of yet another ship strike. See 2d Asmutis-Silvia Decl. (Pl. Ex. 34), ¶ 2.

Defendants also do not dispute that, in a procedural rights case such as this one, plaintiffs do not have "to prove that if [they] had received the procedure the substantive result would have been altered," and thus that a Section 7 consultation will, in fact, *redress* their injury. National Parks Conservation Ass'n v. Manson, 414 F.3d 1, 5 (D.C. Cir. 2005); see also Lujan v. Defenders of Wildlife 504 U.S. 555, 573, n.7 (1992) ("The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy").

Instead, defendants argue that plaintiffs cannot satisfy the *causation* prong of the Article III standing test, because, defendants claim, (a) TSSs are established by the IMO, not the Coast Guard, and (b) TSSs have no impact on ship strikes. Def. Br. at 29-31. However, since plaintiffs have already demonstrated the fallacy of both of these arguments, see supra at 22-34, plaintiffs plainly have standing here.

Thus, as plaintiffs have previously explained, despite defendants' assertion that "it is the IMO which decides whether to adopt and implement a TSS," Def. Br. at 30, in fact the PWSA specifically directs that *the Coast Guard* must develop and adopt these schemes. See *supra* at 16-20. Thus, regardless of whether the Coast Guard, for whatever reason, chooses to seek the IMO's input before making its final TSS decisions, in light of the statutory scheme, the final decision on setting TSSs, by Congressional mandate, rests with the Coast Guard, and, consequently, the impacts of TSSs on right whale are legally *caused* by the Coast Guard.

Defendants' second causation argument fares no better. Certainly, the fact that the action directly harming right whales is taken by third parties does not undermine plaintiffs' standing, given that, as plaintiffs have demonstrated, there is a sufficient connection between the Coast Guard's TSSs and the marine vessel routes that pose a risk of ship strikes. See, e.g., ALDF v. Glickman, 154 F.3d 426, 441 (D.C. Cir. 1998) (en banc) ("mere indirectness of causation is no barrier to standing [and] we are concerned here not with the length of the chain of causation, but on the plausibility of each of the links that comprise that chain") (other citations omitted); Bennett v. Spear, 520 U.S. 154, 168-69 (1997) (plaintiffs had standing to challenge a Bi-Op, even though the Bi-op would have no effect unless adopted by another agency not before the Court); see also Strahan v. Coxe, 127 F.3d 155, 164 (1st Cir. 1997)(finding state agency responsible for the take of right whales by private fisherman).

Moreover, this outcome does not change by virtue of the fact that some vessels *might* travel in these areas even without TSSs. See, e.g., Duke Power, 438 U.S. at 76-78. In Duke Power, for example, defendants argued that because nuclear power plants *could* be constructed *regardless* of the challenged federal statute, the program did not cause plaintiffs' injuries.

Rejecting this argument, the Court explained that a plaintiff need not "negate the kind of speculative and hypothetical possibilities suggested in order to demonstrate the likely effectiveness of judicial relief." Id. at 78. Rather, it was sufficient that the Statute encouraged, and was designed to encourage, the construction of nuclear power plants.

Similarly, here, plaintiffs need not demonstrate that, if the Coast Guard had never developed TSSs in areas used by right whales, these vessels would not be using these areas. Instead, it is sufficient, for causation purposes, that, as plaintiffs have demonstrated, *and as intended by the Coast Guard*, marine vessels *do* travel in the TSSs the Coast Guard has established, and, as a result, these TSSs "may affect" right whales in a manner that triggers Section 7 duties. See also Competitive Enterprise Institute v. NHTSA, 901 F.2d 107, 114 (D.C. Cir. 1990) (consumer group had standing to challenge fuel economy standards where  record "support[ed] the causal link" between the fuel economy standards and auto manufacturers' production of fewer large cars that plaintiffs sought to purchase); Spirit of the Sage Council v. Norton, 294 F. Supp. 2d 67, 81-83 (D.D.C. 2003), vacated in part on other gds, 411 F.3d 225 (D.C. Cir. 2005) (plaintiffs had standing to challenge agency rule that was encouraging third party behavior in precisely the manner intended by the agency).  Indeed, since the Coast Guard's failure to comply with Section 7 "lessens the likelihood that environmental considerations will be attended to in making" decisions, this failure itself  "threaten[s] [plaintiffs'] concrete interests," which is sufficient for Article III purposes.  Defenders of Wildlife, 420 F.3d at 958; see also Thomas v. Peterson, 753 F.2d 754, 764 (9th  Cir. 1985) (emphasizing the importance of the Section7 *procedure* in protecting a plaintiffs' concrete interests).

In sum, in light of all of the evidence demonstrating that marine vessels do travel in the Coast Guard's TSSs, and that, therefore, moving TSSs out of right whale high use areas will reduce the risks of ship strikes, plaintiffs have plainly met the Article III threshold of demonstrating that their injury – i.e., the ongoing tide of right whale ship strikes  – is, at least  in part, *caused* by the Coast Guard's TSSs.  By the same token, requiring the Coast Guard to consult on the TSSs will certainly redress that injury.[26]

## 2.    The Political Question Doctrine Is Wholly Inapplicable Here.

Defendants' "political question" argument is also easily disposed of by reference to the PWSA.  Def. Br. 31-34.  Thus, while defendants claim that TSSs are purely a product of international law, as we have shown, see supra at 16-20, the PWSA dictates that the *Coast Guard* establishes TSSs.  Compare Def. Br. at 33 (claiming that "there is no domestic statute for this Court to interpret which constrains or directs how or when the President and his subordinates

---

[26]    Defendants' reliance on Florida Audubon Soc'y v. Bentsen, 94 F.3d 658 (D.C. Cir. 1996), is plainly misplaced here.  Def. Br. at 29-30.  In that case, which challenged an IRS tax credit for the use of a particular alternative fuel additive (known as ETBE), plaintiffs argued that the tax credit caused them injury because (1) it might "prompt third-party fuel producers to undertake the acquisition of production facilities for ETBE and begin to produce ETBE in such quantities as to increase the demand for ethanol from which the ETBE is derived"; (2) this increased demand for ethanol might "increase demand for the agricultural products from which ethanol is made"; (3) this demand might "spur new production of these products by farmers"; and (4) this "increased production" might result in new pollution harming plaintiffs.  Id. at 669-70. Finding that  "[s]uch a protracted chain of causation fails both because of the uncertainty of several individual links and because of the number of speculative links that must hold for the chain to connect the challenged acts to the asserted particularized injury," the Court found plaintiffs did not have standing  Id. at 670.

Here, by contrast, the only causal link involved is that between the Coast Guard's TSSs and marine vessel travel routing choices, and, as plaintiffs have demonstrated, the evidence before the Court demonstrates that vessels, in fact, use the Coast Guard's TSSs.  See supra at 28-30.

engage in international negotiations, such as proposals to the IMO to regulate international shipping interests") with 33 U.S.C. § 1223(c)(1) ("the Secretary shall designate necessary fairways and *traffic separation scheme*s")(emphasis added).  In short, since the PWSA directs the *Coast Guard* to establish TSSs in United States coastal waters, and plaintiffs are challenging the Coast Guard's failure to comply with Section 7 in carrying out *that* statutory duty, there is certainly no "political question" barrier to plaintiffs' claim.

Indeed, on this issue this case is controlled by Japan Whaling, where the Supreme Court considered, and rejected, a similar "political question" argument.  478 U.S. 221.  That case concerned the Secretary of Commerce's refusal to certify that Japan's whale harvesting was "diminish[ing] the effectiveness" of an international whale convention.  Although, unlike here, a ruling from the Court in fact *would* have implicated foreign affairs, the Court rejected the political question argument because, as in this case, plaintiffs were simply asking the Court to rule on the Secretary's compliance with *domestic* law.  As the Court explained, "it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts," and, thus, because the case "presents a purely legal question of statutory interpretation," id. at 230, judicial review was appropriate.  Id. ("[U]nder the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones").

Similarly, contrary to defendants' characterization, this case also presents a straightforward question of interpreting a federal agency's compliance with *domestic* law – i.e., the ESA and the PWSA – to determine whether the Coast Guard must comply with ESA Section 7 in connection with the establishing TSSs.  As noted, the PWSA, certainly contains judicially

manageable standards by which to evaluate the Coast Guard's responsibility and authority to establish, and amend, TSSs in conformance with the ESA. Indeed, the PWSA not only entrusts the Coast Guard with establishing these routing schemes, it sets forth specific factors the agency must consider in doing so. 33 U.S.C. § 1224.[27]

Moreover, the myriad of judicial decisions from all levels of the federal courts ruling on claims that federal agencies are out of compliance with Section 7(a)(2) of the ESA attests to the judicial reviewability of plaintiffs' claim vis-a-vis the ESA. Indeed, in the seminal case of TVA v. Hill, the Supreme Court made absolutely clear not only that a claim for a violation of ESA Section 7(a)(2) is judicially reviewable, but that agencies must take necessary actions to insure they do not jeopardize species, "whatever the cost." 437 U.S. 153, 180 (1978).

Accordingly, there is also no basis for defendants' argument that the Court should decline to rule on political question grounds. See also, e.g., Red Lake Band of Chippewa Indians v. Swimmer, 740 F. Supp. 9, 15 (D.D.C. 1990) (rejecting political question defense where case presented question of statutory interpretation); Offshore Fishing Ass'n v. Daley, 995 F. Supp. 1411, 1426-27 (M.D. Fla. 1998) (same); Bancoult v. McNamara, 445 F.3d 427, 432-33 (D.C. Cir. 2006) ("unless one of" the factors counseling toward withholding review on political question grounds "is inextricable from the case at bar," a court "*may not dismiss* the claims as

---

[27] This difference in the statutory scheme also distinguishes this case from Chicago & Southern Air Lines Inc. v. Waterman Steamship Corp., 333 U.S. 103 (1948), cited by defendants, Def. Br. at 34, for, in that case, the statute at issue expressly provided for "Presidential approval" of the agency decision at issue, and thus the Court declined review because of the international implications inherent in the President's decision-making. 333 U.S. at 111-113.

nonjusticiable under the political question doctrine") (emphasis added), quoting <u>Baker v. Carr</u>,

369 U.S. 186, 217 (1962) (setting standards for application of this doctrine).[28]

### 3. Defendants' Statute of Limitations Argument Also Has No Merit.

Pointing to several TSSs established long ago, defendants assert that the Court cannot

consider whether the Coast Guard has any Section 7(a)(2) obligations with regard to those

particular TSSs due to statute of limitations constraints.  Def. Br. at 34-35.  As a threshold

matter, the Coast Guard concedes that this argument is inapplicable to the TSSs in Chesapeake

Bay, North Carolina (Cape Fear/Beaufort), Delaware Bay, and Boston.  Def. Br. at 36.  The

Chesapeake Bay TSS was established in 2004.  33 C.F.R. §§ 167.200 - 167.203; CG AR 2162

(announcing 2004 changes to the TSS).  The North Carolina TSS became effective in 2005.  CG

AR 2559.  The Delaware Bay TSS was established in 2000.  33 C.F.R. §§ 167.172-174; CG AR

1807 (Final Rule).  And the Coast Guard has just made its decision regarding the Boston TSS.

<u>See</u> CG AR 1085.[29]

---

[28]     Moreover, since this suit does not seek to force the Coast Guard to establish, or modify, any particular TSS, any "political question" argument would be premature in any event.

[29]     As plaintiffs have explained, some of the Coast Guard's TSSs are codified in the Code of Federal Regulations (33 C.F.R. Part 167) (codifying Delaware Bay, Chesapeake Bay, and New York TSS), while others are not.  Although defendants do not appear to have included in the AR all of the relevant records regarding the non-codified TSSs, such records are not necessary since there is no dispute that these TSSs all exist, Defendants' Answer, ¶ 63 (admitting the existence of these TSSs).  <u>See, e.g.</u>, <u>Solon v. Gary Comm. School Corp.</u>, 180 F.3d 844, 858 (7th Cir. 1999) (admission in an answer is a "judicial admission which remove[s] th[e] point from the realm of contested issues"); <u>see also</u> 2d Asmutis-Silvie Decl., ¶¶ 8-10 (discussing discovery plaintiffs are entitled to before the Court could conclude that these TSSs do not exist).

In addition, although defendants do not specifically mention the March 10, 2000 Delaware TSS (CG AR 1807), their claim that, if statute of limitations principles apply, plaintiffs would be limited to actions "taken only within six years of the March 20, 2006 date of service of the amended complaint," Def. Br. at 34 – which would put the Delaware TSS outside the

41

However, contrary to defendants' argument, the statute of limitations also does not implicate whether the Coast Guard must comply with Section 7(a)(2) in connection with TSSs first established many years ago.  Def. Br. at 34-35.  To the contrary, as plaintiffs have explained, because the purpose of Section 7 is to insure that agency actions – whenever taken – are not likely to jeopardize species, courts have held that agencies have a *continuing obligation* to modify their actions to avoid this result.  See, e.g., PRC, 30 F.3d at 1053; Turtle Island Restoration Network v. NMFS, 340 F.3d 969, 977 (9th Cir. 2003).

To be sure, as plaintiffs have also explained, some courts looking at this issue have focused on whether the agency *retains the discretion* to modify their actions to protect the species, explaining that so long as that discretion exists, consultation is required regardless of when the original decision was made.  See, e.g., Washington Toxics Coalition, 413 F.3d 1024 (requiring consultation over effects of pesticides); see also supra at 25-27 (discussing additional cases); accord Western Watersheds, 2006 WL 2042825.  Similarly, here, since the Coast Guard admittedly retains ample discretion to modify its TSSs to protect right whales (as it is doing in New England), it must insure that these TSSs comply with Section 7 regardless of when they were first established.  See 33 U.S.C. § 1223(c)(5)(C) (Coast Guard "may . . .adjust the locations

---

limitations period – is erroneous.  It is well established that the applicable date for statute of limitations purposes is the date a complaint is filed, not the date of service.  See Ragan v. Merchants Transfer & Warehouse Co., 337 U.S. 530, 533 (1949).  Thus, here, where the Amended Complaint was accepted for filing on February 8, 2006, there is simply no statute of limitations argument applicable to the Delaware TSS.

or limits of designated fairways or traffic separation schemes"); id. § 1224(a) (TSSs should "take into account" both "protection of the marine environment" and other "environmental factors").

In short, then, because the Coast Guard's TSSs have an *ongoing effect* on right whales, which continue to trigger the consultation obligations of ESA Section 7(a)(2), and the Coast Guard has ample authority to modify its TSSs to protect right whales, plaintiffs may present their Section 7(a)(2) claim as to all of these TSSs, regardless of when they were first put into place. See also Houston, 146 F.3d at 1130 (agency's ongoing, discretionary decision to provide water is an agency action triggering the duty to reinitiate consultation); cf. Amtrak v. Morgan, 536 U.S. 101, 122 (2002) (statute of limitations does not apply to unlawful employment practices that continue into the limitations period).[30]

Nonetheless, in light of the fact that this argument does not *apply* to certain TSSs, plaintiffs respectfully suggest that the Court need not even consider this arguments at this time. Instead, the Court should simply decide the basic question of whether the Coast Guard, in fact, has a duty to comply with Section 7(a)(2) of the ESA by insuring, in consultation with NMFS, that its TSSs do not jeopardize right whales or adversely modify their critical habitat. Plaintiffs assume that if this legal issue is resolved in plaintiffs' favor, the Coast Guard will be willing to take the steps necessary to come into compliance with the ESA – which might involve the agency undertaking a global consultation on *all* of its TSSs in right whale habitat, or, alternatively, might

---

[30]    Thus, plaintiffs' Claim also covers the existing TSSs in New York, 33 C.F.R. §§ 167.150-167.155 (CG AR 1276); Casco Bay (Maine) (CG AR 1120) and Buzzards Bay (CG AR 1218).

take the form of a separate consultation as to each TSS at an appropriate juncture.  Accordingly,
should the Court rule for plaintiffs on that overarching issue, the parties could be directed to meet
and confer to determine whether they can resolve the application, and timing, of that ruling as to
specific TSSs without further Court involvement.

Other courts have taken a similar approach.  See  Center for Biological Diversity v.
Leavitt, 2005 WL 2277030 (N.D. Cal. Sept. 19, 2005) (directing parties to meet and confer on
scope and timing of required consultation on impacts of pesticides on listed species).  And if,
after taking these steps, the parties are unable to resolve the matter among themselves, they could
then provide further briefing to the Court as to each specific TSS.[31]

---

[31]    In such a meet and confer process the parties could also consider the timing for any
appropriate consultation concerning the Coast Guard's new routing measures in the Southeast
United States (Jacksonville, Florida, Fernandina Beach, Florida, and Brunswick, Georgia), 71
Fed. Reg. 29,876 (May 24, 2006) (Pl. Ex. 35), and other measures still under development.  See,
e.g., 68 Fed. Reg. 74,199 (2003)(PARS in Buzzards Bay).

44

## <u>CONCLUSION</u>

For the foregoing reasons, plaintiffs respectfully request that the Court grant their motion

for summary judgment, and deny defendants' motion for summary judgment.[32]

Respectfully submitted,

_____/s/_____

Of Counsel:

Michael P. Senatore (D.C. Bar No. 453116)          Howard M. Crystal (D.C. Bar No. 446189)
Andrew Hawley (Cal. Bar No. 229274)                Eric R. Glitzenstein (D.C. Bar. No. 358287)
Defenders of Wildlife                              Meyer Glitzenstein & Crystal
1130 Seventeenth Street, N.W.                      1601 Connecticut Ave., N.W., Suite 700
Washington, D.C.  20036                            Washington, D.C.  20009
                                                   (202) 588-5206

August 4, 2006                                     Attorneys for Plaintiffs

---

[32]    As for plaintiffs' Section 7(a)(1) claims, as plaintiffs have explained, <u>see</u> Pl. Br. at 44-45, in the event the Court directs the Coast Guard to consult under Section 7(a)(2), the agencies can consider Section 7(a)(1) duties in that process.  However, defendants' suggestion that they have *no* Section 7(a)(1) obligations here, Def. Br. at 26-28, 41-44, is off the mark, in light of the affirmative obligations imposed by the Section 7(a)(1) "conservation" mandate.  <u>See</u> <u>Gifford Pinchot</u>, 378 F.3d at 1070.

45

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                              )
Defenders of Wildlife, et al.,                )
                                              )
          Plaintiffs,                         )          No.  05-2191 (PLF)
                                              )
          v.                                  )
                                              )
Carlos Gutierrez, et al.,                     )
                                              )
          Defendants.                         )
_____)

**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF MATERIALS FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

        Pursuant to Local Rule 7(h), plaintiffs hereby respond to defendants' statement of

material facts as follows:

        1.      Admitted.

        2.      Plaintiffs' deny that the species is recovering.  In fact, the species is in decline,

and ship strikes are one of the leading causes of that decline.  NMFS AR 20, at BN 468; Pl. Ex. 6

at 7; CG AR 684;  Defendants' Answer ("Answer") (Feb. 16, 2006); Recovery Plan at IG-1 (Pl.

Ex. 9) ("The greatest known current cause of right whale mortality in the western North Atlantic

is collision with ships").

        3.      Admitted.

        4.      Admitted.

        5.-11.  None of these paragraphs set forth any facts material to a resolution of Plaintiffs'

claims, which concern the denial of a Petition seeking vessel speed restrictions in right whale

habitat, and the nature of the Coast Guard's responsibilities in connection with its Traffic

Separation Schemes ("TSSs") to insure that the TSS are not likely to jeopardize the right whale or adversely modify right whale critical habitat.

12.     Denied that the National Marine Fisheries Service ("NMFS") ever issued a "Strategy" to reduce ship strikes.  Instead, in its Advance Notice of Proposed Rulemaking ("ANPR") NMFS listed steps it claimed to be working on, and referred to these steps constituting a proposed Strategy.  69 Fed. Reg. 30,857.  The AR contains no such Strategy.

13.     Admitted that defendants recognize the importance of "designated routes to reduce the risk of collisions" between right whales and ships, and that the measures outlined were described in the ANPR.

14-17.  Admitted.

18.     This paragraph states a conclusion of law as to which no response is required.  In any event, it is denied that any adjustments to TSSs must be made by the IMO.  While IMO adoption may be necessary for the international recognition of TSSs, the Coast Guard has the authority to establish TSSs under the Ports and Waterways Safety Act ("PWSA"). 33 U.S.C. § 1221, et seq.

19.     Admitted.

20.     Admitted that NMFS considered several responses, and that this was the response provided, but denied that this response justifies denying the Petition.

21.     Admitted that this is the text of the Federal Register notice cited, but the Proposed Regulations are not a fact material to a resolution of plaintiffs' Claim seeking emergency regulations pending completion of the Rulemaking.

22.    Admitted, but these are also not facts material to a resolution of plaintiffs' Claim seeking emergency regulations pending completion of the Rulemaking.

23.    This paragraph states a conclusion of law as to which no response is required.  In any event, it is denied that the establishment of TSSs is an action taken by the IMO.  CG AR 894, 896, 973, and 1829 (59 Fed. Reg. at 21935) ("The Ports and Waterways Safety Act (PWSA), 33 U.S.C. 1223 authorizes the Secretary of the Department in which the Coast Guard is operating to establish TSSs and shipping safety fairways, where necessary, to provide safe access routes for vessels proceeding to or from United States ports").  Whether acceptance by the IMO is necessary to gain international recognition of a TSS is not a material fact here, and is not required to designate a TSS under the PWSA.

24-26.  None of these paragraphs identify facts material to a resolution of plaintiffs' Claim that the Coast Guard must insure that its TSSs are not likely to jeopardize the continued existence of the right whale or adversely modify right whale critical habitat.

Respectfully submitted,

Of Counsel:

Michael P. Senatore (D.C. Bar No. 453116)
Andrew Hawley (Cal. Bar No. 229274)
Defenders of Wildlife
1130 Seventeenth Street, N.W.
Washington, D.C.  20036

_____/s/_____

Howard M. Crystal
(D.C. Bar No. 446189)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C.  20009
(202) 588-5206

August 4, 2006

Attorneys for Plaintiffs

3