Plaintiffs' Exhibit 34
Defenders of Wildlife v. Gutierrez
No. 05-2191 (PLF) (D.D.C.)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Defenders of Wildlife, et al.          )
                                       )    No. 05-2191 (PLF)
          v.                           )
                                       )
Carlos Gutierrez, et al.               )

## DECLARATION OF REGINA ASMUTIS-SILVIA PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56(F)

I, Regina Asmutis-Silvia, declare as follows:

1.     I submitted an earlier declaration in support of plaintiffs' motion for summary judgment and I submit this declaration in support of plaintiffs' opposition to defendants' motion for summary judgment, and in further support of plaintiffs' motion for summary judgment. This declaration also explains the discovery to which plaintiffs should be entitled before the Court can consider ruling for defendants based on facts asserted in defendants' motion.

2.     On July 24, 2006 a juvenile female right whale was found dead in the Bay of Fundy approximately eleven miles off of Campobello Island, Canada. The whale, which was estimated to be approximately a year old, was killed as the result of a ship strike. The whale was towed to Campobello, near the Maine border, where a necropsy revealed a series of 13 propeller cuts, each approximately one meter long, on the right side of the animal. The loss of this whale marks another tragic step in the decline of the species, which is being exacerbated by what are preventable ships strikes. Notably, in 2003, Canada reconfigured an existing Traffic Separation Scheme ("TSS") within the Bay of Fundy, although significantly northeast from where this whale was found, specifically to

reduce the risk of ship strikes for right whales.  Since that time no whales have been struck in that area.

3. There is substantial evidence that right whales regularly use waters in and near routing measures designated by the Coast Guard, such as the TSSs established in right whale habitat.  Generally, right whales use areas along the east coast at different times of the year; there are major aggregations in the Northeast and Southeast in the summer and winter respectively, and a significant portion of the population migrates annually between these areas.  The majority of whale sightings occur with thirty-five nautical miles of shore.  Thus, the large majority of right whales are using the precise areas where the Coast Guard has designated routing measures.

4. NMFS has regularly documented the presence of right whales in and near established traffic separation schemes.  See, e.g., Sighting Notices (http://whale.wheelock.edu/whalenet-stuff/reportsRW_NE ( last visited on August 4, 2006).  Moreover, NMFS, through the establishment of Dynamic Area Management measures, pursuant to regulations implementing the Atlantic Large Whale Take Reduction Plan, has repeatedly demonstrated that right whale congregate, and remain resident in and near, established TSSs.  See, e.g., 70 Fed. Reg. 20484 (establishing a DAM in the waters near the Boston TSS).

5. Moreover, historically, ship strike incidents have occurred in, or in close proximity to, designated routing measures.  Twelve of the thirty-nine known right whale death documented between 1970-1999 occurred, on average, within twelve miles of a designated routing measures.  Knowlton, A.R. and S.D. Kraus. Mortality and serious injury of northern right whales in the western North Atlantic Ocean, Table 1

(2001)(Plaintiffs' Exhibit 31).  Of the remaining twenty-seven deaths, the cause was unknown for eleven individuals; three of these whales were found with nine miles of a shipping lane, and another four were found between nine and twenty-six miles from a lane.  Id.  This trend has continued in the recent ship strike incidents, as several of the right whales killed over the past two years were discovered near designated shipping lanes.  For example, two whales were found dead in the waters between the New York TSS and the Boston TSS in late 2004 and early 2005.  Another documented mortality, which is suspected to be the result of a ship strike, was found beached no more than 50 miles from the Boston TSS.

6.      The impacts from the designation of a routing measure in a particular area are not limited to the potential increase in risk of ship strike.  Indeed, when designating the species' critical habitat, NMFS noted that "right whales are no longer observed in certain areas where they once were found" and attributed this absence, in part, to "[i]ncreased human activities, habitat degradation, insufficient quantities of prey . . .."  59 Fed. Reg. 28793, 28796 (Designated Critical Habitat; Northern Right Whale) (June 3, 1994)(Plaintiffs' Exhibit 8).  Thus, when outlining the activities that may affect the right whale's critical habitat, NMFS specifically included: mortalities due to ship strikes; habitat degradation as result of pollution, noting that pollution may have "direct toxic effects on the whale" and "may also affect phytoplankton and zooplankton populations in a way that decreases the density and abundance of specific zooplankton patches on which northern right whales feed";  "[t]urbulence associated with vessel traffic" which can "break[] up the dense surface zooplankton patches" in feeding areas; and possible harassment from vessels repeatedly coming too close to whales.  See id. at 28796-97.

3

7.      The effects of vessel interactions and close approaches to right whales could have consequences that may be jeopardizing the continued existence and impeding the recovery of the population.  Indeed, the available evidence suggests that anthropogenic disturbances, such as vessel activity, cause short term behavioral changes in large whales.  Specifically, vessel activity may displace cow/calf pairs, cause whales to dive to avoid impacts or other perceived threats, the cessation of feeding activity, or result in a whale temporarily leaving an area or rerouting its migration.  The intensity of these impacts can be expected correlate with the number of ships in a particular area and thus are potentially greatest near established ship routing measures.

8.      I have reviewed the factual allegations contained in the federal defendants' Memorandum in Support of Motion for Summary Judgment ("Def. Mem.").  In this Memorandum, defendants assert a number of facts, with no support, that plaintiffs will not be able to adequately respond to until they have had an opportunity to engage in discovery.  For example, plaintiffs will need discovery to respond to the following:

    a.      "The actual establishment of [Traffic Separation Schemes ("TSS")] is an action taken by the IMO."  Def. Mem. at 9

    b.      "[I]t is the IMO which decides whether to adopt and implement a TSS, based on the recommendation of NAV, which is in turn based upon a proposal from the government of the United States, not the Coast Guard."  Id. at 30.

    c.      In this case "there is no domestic statute for this Court to interpret which constrains or directs how or when the President and his subordinates engage in international negotiations, such as proposals to the IMO to regulate international shipping interests."  Id. at 33.

    d.      "The action that Plaintiffs challenge is the establishment of a TSS, which is an action of the IMO, not the United States or any of its agencies, including the Coast Guard."  Id. at 36.

      e.      "Establishment of a TSS is the action of the IMO, a specialized international body implementing the international treaty regulating commercial shipping and navigation." Id. at 36-37.

      f.      "[T]he only activity of the Coast Guard as an agency leading up to the IMO adoption of and implementation of a TSS is the PARS of the applicable port and shipping traffic." Id. at 38.

      g.      There is no "evidence in the administrative records that the action of establishing a TSS 'may affect' right whales, thereby triggering a consultation requirement." Id. at 39.

      h.      "[H]ow a particular vessel operates at a given moment is up to the vessel operator [and] establishment of a TSS is not the cause of any interaction between ships and right whales." Id. at 39.

      i.      "[T]here is no evidence in the record that a TSS makes ship strikes either more or less likely" and "TSS do not cause adverse effects to right whales." Id. at 40-41.

9.      Although the Court does not need to rely on these assertions in order to grant plaintiffs' motion for summary judgment, before considering whether to grant defendants' motion for summary judgment based on these factual assertions, plaintiffs are entitled to utilize document production requests, interrogatories, and perhaps several depositions to discover, among other things:

      a.      The basis for the Coast Guard's assertion that the existing TSSs in United States coastal waters have not been established by the Coast Guard pursuant to the Ports and Waterways Safety Act, 33 U.S.C. § 1221, et seq.

      b.      The authority for the Coast Guard's purported delegation of its statutory obligations under the PWSA to an international body, the International Maritime Organization ("IMO").

      c.      The relationship between the establishment of a TSS under the PWSA, and the international recognition of a TSS by the IMO.

      d.      The basis for the Coast Guard's decision to move the Boston TSS in order to reduce the risks of ship strikes of right whales.

5

      e.      The degree to which large, high speed vessels comply with the TSSs located in right whale habitat, including federally designated right whale critical habitat.

10.      Absent this discovery, plaintiffs are unable to provide this Court with all the relevant facts necessary to demonstrate that defendants are not entitled to summary judgment on plaintiffs' Claim against the Coast Guard.

11.      Plaintiffs' Exhibits 6, 9, 10, 11, 14, 16, 25, 30, 31, 32, 33, 36, 37, and 41 are true and correct copies of scientific studies and other documents I have reviewed concerning North Atlantic right whales, and/or the impact of ships strikes on these and other whale species.

12.      Plaintiffs' Exhibits 8, 12, 13, 26, 27, 28, 35 and 38 are true and correct copies of Notices from the Federal Register.

13.      Plaintiffs' Exhibit 7 and 29 are a true and correct copy of documents that defendants previously made available to plaintiffs in connection with this case, but failed to include in the Administrative Records here.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

DATED this 4th day of August, 2006

                                                                            */s/ Regina A. Asmutis-Silvia*

                                                                            Regina Asmutis-Silvia