Plaintiffs' Exhibit 40
Defenders of Wildlife v. Gutierrez
No. 05-2191 (PLF) (D.D.C.)



FILED          ENTERED
LODGED          RECEIVED

JUL 2 - 2002

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                          DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WASHINGTON TOXICS COALITION, et al., | |
| Plaintiffs, | |
| v. | CASE NO. C01-132C |
| | ORDER |
| ENVIRONMENTAL PROTECTION AGENCY, and CHRISTINE TODD WHITMAN, ADMINISTRATOR, | |
| Defendants, | |
| AMERICAN CROP PROTECTION ASSOCIATION, et al., | |
| Intervenor-Defendants. | |

This matter comes before the Court on plaintiffs' motion for summary judgment (Dkt. No. 14) and defendants' motion to dismiss or for summary judgment (Dkt. No. 58). The Court has considered the papers submitted by all parties and determined that oral argument is not necessary. For the following reasons, plaintiffs' motion for summary judgment is hereby GRANTED in part and DENIED in part, and defendants' motion to dismiss or for summary judgment is hereby GRANTED in part and DENIED in part.

ORDER – 1



I. BACKGROUND AND LEGAL FRAMEWORK

When Congress enacted the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544 (2002), it sought to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). Congress declared that such species, including species of fish, are of "esthetic, ecological, educational, historical, recreational, and scientific value" to this nation. 16 U.S.C. § 1531(a)(3).

To promote the recovery of species threatened with and in danger of extinction, Congress mandated: "Federal agencies shall, in consultation with and with the assistance of the Secretary,[1] utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species." 16 U.S.C. § 1536(a)(1) ("section 7(a)(1)"). Congress also instructed that:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . . . In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

16 U.S.C. § 1536(a)(2) ("section 7(a)(2)"). Federal regulations and case law further elucidate these consultation requirements. See 50 C.F.R. §§ 402.02, .12 – .14 (2002); Pac. Rivers Council v. Thomas, 30 F.3d 1050, 1054 n.8 (9th Cir. 1994).

The ESA citizen-suit provision allows individuals to protect their and the nation's interests in threatened and endangered species. It provides, "[A]ny person may commence a civil suit on his own behalf - (A) to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter or

---

[1] Here, "Secretary" means the Secretary of Commerce because the Department of Commerce, through the National Marine Fisheries Service ("NMFS"), is responsible for protecting threatened and endangered anadromous fish, including salmon and steelhead. See 16 U.S.C. § 1532(15).

ORDER – 2

1  regulation issued under authority thereof . . . ." 16 U.S.C. § 1540(g)(1).  Here, plaintiffs assert an

2  interest in threatened and endangered salmon and steelhead (collectively, "salmonids").  These

3  salmonids are native to the Pacific Northwest, including California, Idaho, Oregon, and Washington.

4  The National Marine Fisheries Service ("NMFS") first protected a salmonid under the ESA in 1989.[2]

5  Since then, NMFS has listed pursuant to the ESA approximately twenty-five additional salmonids as

6  threatened or endangered throughout the Pacific Northwest.[3]

7         Plaintiffs claims stem from the administration of the Federal Insecticide, Fungicide, and

8  Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136 – 136y (2002), by defendants Environmental Protection

9  Agency and its Administrator, Christine Todd Whitman (collectively, "EPA").  FIFRA

10  comprehensively governs pesticide[4] registration[5] and use in the United States.  No person in any state

11  may distribute or sell any pesticide not registered[6] or exempted pursuant to FIFRA.  7 U.S.C. § 136a(a).

12  Likewise, it is unlawful for any person "to use any registered pesticide in a manner inconsistent with its

13  labeling."  7 U.S.C. § 136j(a)(2)(G).  EPA classifies pesticides as general or restricted use, depending on

14  risks to human health and the environment.  7 U.S.C. § 136a(d)(1)(C)(2).  EPA must classify a pesticide

---

16     [2] The U.S. Fish and Wildlife Service ("FWS") and NMFS share responsibility for administering
the ESA.  50 C.F.R. § 402.01(b) (2002).

18     [3] NMFS identifies threatened and endangered salmonids by evolutionary significant units
("ESUs").  The concept of ESUs is not relevant to the issues presently before the Court.

19     [4] Pesticides include "any substance or mixture of substances intended for preventing, destroying,
20  repelling, or mitigating any pest . . . [or] for use as a plant regulator, defoliant, or desiccant . . . [or] any
nitrogen stabilizer."  7 U.S.C. § 136(u).

21     [5] EPA shall register a pesticide if, when considered with appropriate restrictions, "(A) its
22  composition is such as to warrant the proposed claims for it; (B) its labeling and other material required
to be submitted comply with the requirements of this subchapter; (C) it will perform its intended
23  function without unreasonable adverse effects on the environment; and (D) when used in accordance
with widespread and commonly recognized practice it will not generally cause unreasonable adverse
24  effects on the environment."  7 U.S.C. § 136a(c)(5).

25     [6] A registered pesticide contains one or more active ingredients.  See 7 U.S.C. § 136(a) (defining
active ingredient); 7 U.S.C. §§ 136a(c)(1)(F)(i), 136a-1(g)(2)(A).
26  ORDER – 3

1   as restricted use when necessary to prevent unreasonable adverse effects to the environment.  7 U.S.C. §

2   136a(d)(1)(C)(ii).  EPA retains significant discretionary authority over registered pesticides.  See, e.g., 7

3   U.S.C. § 136d.

4          Plaintiffs assert two types of claims in this action.  First, plaintiffs allege that EPA has failed to

5   consult with NMFS regarding the effects of EPA's pesticide-registrations on threatened and endangered

6   salmonids and their habitat, in violation of 16 U.S.C. § 1536(a)(2).  Second, plaintiffs allege that EPA

7   has failed to use its authority and programs, in consultation with NMFS, to promote the conservation of

8   threatened and endangered salmonids, in violation of 16 U.S.C. § 1536(a)(1).  Plaintiffs move for

9   summary judgment on all claims.  EPA moves to dismiss or for summary judgment on all claims.

10  II. PLAINTIFFS' CLAIMS UNDER 16 U.S.C. § 1536(a)(2)

11         Both plaintiffs and EPA move for summary judgment with respect to plaintiffs' section 7(a)(2)

12  claims.  Summary judgment is appropriate if the pleadings, affidavits, depositions, and admissions on

13  file demonstrate there is no genuine issue of material fact and the moving party is entitled to judgment as

14  a matter of law.  Fed. R. Civ. P. 56(c) (2002).  If a defendant who moves to dismiss for failure to state a

15  claim upon which relief can be granted presents matters outside the pleadings, the Court shall treat the

16  motion as one for summary judgment.  Fed. R. Civ. P. 12(b) (2002).  In determining whether a genuine

17  issue of material fact exists, the court must view all evidence in the light most favorable to the

18  nonmoving party and draw all reasonable inferences in that party's favor.  Anderson v. Liberty Lobby,

19  Inc., 477 U.S. 242, 248-50 (1986).

20  A.  The Nature and Justiciability of Plaintiffs' Section 7(a)(2) Claims

21  1.  Plaintiffs' Claim Arise Under the ESA Citizen-Suit Provision

22         As a preliminary matter, EPA and intervenor-defendants ("CropLife") contend that plaintiffs'

23  claims do not arise under the ESA's citizen-suit provision.  The statute provides, "[A]ny person may

24  commence a civil suit on his own behalf – (A) to enjoin any person, including the United States and any

25  other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of

26  ORDER – 4

1  this chapter or regulation issued under authority thereof . . . ."  16 U.S.C. § 1540(g)(1)(A).  Instead, they

2  argue that the Administrative Procedures Act ("APA") or FIFRA governs plaintiffs' claims.

3       The APA provides judicial review only with respect to "final agency action[s] for which there is

4  no other adequate remedy in a court."  5 U.S.C. § 704; Bennett v. Spear, 520 U.S. 154, 161-62 (1997).[7]

5  Thus, the APA only governs a plaintiff's claims when the underlying substantive statute does not

6  independently authorize a private right-of-action.  Defenders of Wildlife v. Adm'r, Envtl. Prot. Agency,

7  882 F.2d 1294, 1301-02 (8th Cir. 1989).  Here, plaintiffs employ the ESA citizen-suit provision to assert

8  section 7(a)(1) and 7(a)(2) claims.  Therefore, the APA, including its peculiar doctrines, does not govern

9  plaintiffs' claims.[8]

10      Next, CropLife contends that plaintiffs' claims constitute an impermissible challenge to valid

11  FIFRA-governed pesticide registrations.  However, plaintiffs do not challenge any pesticide

12  registrations.  Rather, plaintiffs challenge EPA's alleged failure to consult with NMFS regarding the

13  effects of such registrations on threatened and endangered salmonids.  When Congress vests an agency

14  with responsibility for administering a statute, such as EPA's administration of FIFRA, the ESA

15  nevertheless applies to agency actions taken pursuant to that statute.  See, e.g., Thomas v. Peterson, 753

16  F.2d 754 (9th Cir. 1985); Defenders of Wildlife, 882 F.2d 1294.  Thus, FIFRA and its procedures do not

17  govern plaintiffs' claims.

18      CropLife also argues that Bennett v. Spear, 520 U.S. 154 (1997), bars plaintiffs' section 7(a)(2)

19  claims.  There, the U.S. Bureau of Reclamation commenced formal consultation with respect to an

20  endangered species monitored by the U.S. Fish and Wildlife Service ("FWS").  520 U.S. at 158-59.[9]

21

22       [7] CropLife suggests that the APA trumps the ESA.  This proposition merits no response.

23       [8] For example, in the context of section 7(a)(2) and ongoing agency actions, CropLife's demand
    for an administrative "agency record" is misplaced.

24

25       [9] Relevant statutes, regulations, and case law make clear that NMFS and FWS are the sole
    agencies charged with administering the ESA.  EPA, like other federal agencies, must comply with, but
    not administer, the ESA.  In Bennett, the Supreme Court explicitly stated that private parties may use the
26  ORDER - 5

1   The consultation resulted in a biological opinion regulating the Bureau's operation of a large-scale

2   irrigation project. Id. Plaintiffs sued FWS, objecting to the resultant reduction in available irrigation

3   water. Id. at 160. The Supreme Court held that plaintiffs could not employ the citizen-suit provision to

4   challenge FWS's administration of the ESA. Id. at 173-74; see also Southwest Ctr. for Biological

5   Diversity v. U.S. Bureau of Reclamation, 143 F.3d 515, 522 (9th Cir. 1998) (plaintiffs may not use

6   provision to challenge FWS biological opinion, decision to adopt incidental take statement, or

7   reasonable and prudent alternatives; plaintiffs must sue under APA).[10] Here, plaintiffs assert no claims

8   against NMFS, the agency charged with monitoring threatened and endangered salmonids. Accordingly,

9   Bennett does not preclude plaintiffs' claims against EPA. Sierra Club v. Glickman, 156 F.3d 606, 616-

10  17 (5th Cir. 1998) (Bennett does not bar citizen-suit charging Department of Agriculture with section 7

11  violations). In sum, the ESA citizen-suit provision is the proper avenue for plaintiffs' section 7(a)(1)

12  and 7(a)(2) claims.

13  2. Plaintiffs' Sixty-Day Notice Letter Satisfies All Jurisdictional Prerequisites

14          This Court has subject matter jurisdiction only with respect to claims properly identified in

15  plaintiffs' sixty-day notice letter. See 16 U.S.C. § 1540(g)(2)(A)(i); Southwest Ctr., 143 F.3d at 520-22

16  (letter must sufficiently inform defendant of alleged violation so defendant has opportunity to abate).

17  Plaintiffs' eight-page July 25, 2000 letter, which appropriately predates their complaint, reads, in part:

18          Specifically, EPA has failed to consult with . . . [NMFS] as required [by § 7(a)(1) and (2) of
        the ESA] . . . to ensure that registered pesticides will not jeopardize the survival and
19          recovery of threatened and endangered salmon and steelhead and to utilize EPA pesticide
        programs to conserve listed salmonids. . . . Despite the passage of nine years since the first
20          salmonid listing, EPA has not initiated consultation with NMFS under either Section 7(a)(1)
        or 7(a)(2). . . . EPA has, therefore, violated its ESA obligations. . . . EPA has a duty to
21          consult under Section 7(a)(2) on new registrations, reregistration determinations, and other

22  _____

23  citizen-suit provision to ensure that such agencies comply with the ESA. 520 U.S. at 173-74.

24          [10] As a practical matter, the ESA provides no standard to review the ESA-related administrative
    decisions of NMFS and FWS. See Southwest Ctr., 143 F.3d at 523 (FWS not required to explain choice
25  or to choose alternative that would most effectively protect species). In contrast, whether an agency has
    violated mandatory consultation requirements is a straightforward inquiry.

26  ORDER – 6

authorizations of pesticide use, as well as on its existing registrations given that it retains discretion and duties with respect to pesticide registrations. . . . The law requires consultations on all EPA authorizations – existing registrations, reregistrations, new registrations, emergency exemptions, and the like – that may affect listed salmonids and their habitat. Without such consultations, EPA cannot discharge its obligation to ensure that pesticide use in accordance with EPA registrations will not jeopardize salmonid survival or adversely modify critical habitat.

Plaintiffs' letter unequivocally asserts that plaintiffs believe EPA is in violation of sections 7(a)(1) and 7(a)(2) with respect to all ongoing pesticide registrations. Plaintiffs' failure to identify by name specific pesticides, or pesticide active ingredients, does not render the notice insufficient. The instant lawsuit conforms with plaintiffs' notice letter. Thus, this Court has subject matter jurisdiction over plaintiffs' claims.[11]

3. The Agency Action Requirement

EPA and CropLife argue that plaintiffs fail to identify specific agency actions subject to section 7(a)(2)'s mandatory consultation requirement. Plaintiffs argue that each pesticide registration constitutes an ongoing agency action requiring consultation. Section 7(a)(2) applies to "any action authorized, funded, or carried out by" EPA. 16 U.S.C. § 1536(a)(2). It applies to all actions in which there remains discretionary federal involvement or control. 50 C.F.R. § 402.03. Further, the term "action" means "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," including, but not limited to "the granting of licenses, contracts, leases, easements, rights-of-way, permits, or . . . actions directly or indirectly causing modifications of the land, water, or air." 50 C.F.R. § 402.02.

The Ninth Circuit broadly construes the agency action requirement. Pac. Rivers Council, 30 F.3d at 1055. In Pac. Rivers Council, the court addressed whether U.S. Forest Service "land resource

---

[11] It appears that EPA raised this jurisdictional defense in response to plaintiffs' initial request for formal consultation with respect to particular pesticides. See 50 C.F.R. §§ 402.02, .14. Plaintiffs' notice letter made no such request. However, plaintiffs' reply brief makes clear that they do not seek such relief. Whether formal or informal consultation is necessary for particular pesticides is "a side issue that need not be addressed in this case." EPA's arguments regarding the ripeness of a request for formal consultation are also moot.

ORDER – 7

1  management plans," adopted prior to the listing of the Snake River chinook, thereafter required section

2  7(a)(2) consultation. Id. at 1051-52. The Forest Service argued that consultation was only necessary

3  when the plans were adopted, revised, or amended. Id. at 1053. The court unequivocally rejected this

4  argument[12] and held that the plans, having "ongoing and long-lasting effect[s]," were ongoing agency

5  actions requiring consultation. Id. The Ninth Circuit noted that the ESA may require the alteration of

6  ongoing agency activities. Id. at 1055 (citing TVA v. Hill, 437 U.S. 153, 173 (1978)).

7         All parties agree that EPA retains significant ongoing discretionary authority with respect to all

8  pesticide registrations.[13] For example, EPA may change the use classification of any pesticide when

9  necessary to prevent unreasonable adverse effects on the environment. 7 U.S.C. § 136a(d)(2). Also,

10  EPA may determine that additional data is required to maintain an existing pesticide registration. 7

11  U.S.C. § 136a(c)(2)(B)(i).[14] Moreover, FIFRA grants EPA authority to change, cancel, restrict, or

12  immediately suspend registered pesticides, pesticide labeling, or particular uses. 7 U.S.C. § 136d.[15]

13         The Court agrees with EPA that EPA's entire universe of pesticide registrations is not a single

14  agency action. Both EPA and plaintiffs suggest that each pesticide registration constitutes a distinct

15  agency action. EPA describes a registration as "a license which establishes the terms and conditions

16

17         [12] CropLife makes the identical argument here. It proffers no persuasive support for its position
that an agency must *actually invoke* its discretionary authority before consultation is required.

18

19         [13] In fact, EPA previously invoked this authority to protect a listed species from pesticide use.
See 60 Fed. Reg. 11,090 (March 1, 1995) (EPA restricts carbofuran use to protect bald eagles).

20         [14] FIFRA further mandates that all pesticide registrants submit to EPA any "additional factual
information regarding unreasonable adverse effects on the environment . . . ." 7 U.S.C. § 136d(a)(2).

21

22         [15] The fact that FIFRA outlines distinct procedures for the cancellation, suspension, or
amendment of pesticide registrations is not relevant to whether pesticide registrations constitute ongoing
23  agency actions for purposes of section 7(a)(2). The issues before the Court do not require, as CropLife
suggests, a determination that either FIFRA or the ESA trumps the other. See Am. Forest & Paper
24  Ass'n v. Envtl. Prot. Agency, 137 F.3d 291, 298-99 (5th Cir. 1998) (section 7 merely requires EPA to
consult with FWS or NMFS before undertaking agency action). In fact, FIFRA explicitly grants EPA
25  authority to consult with other federal agencies regarding the registration of any pesticide. 7 U.S.C. §
136a(f)(3).

26  ORDER – 8

under which the pesticide product may be lawfully sold, distributed, or used." Because EPA retains

ongoing discretionary authority to modify the terms and conditions of these "licenses", the Court

concludes that each pesticide registration constitutes an ongoing agency action for purposes of section

7(a)(2). See Envtl. Prot. Info. Ctr. v. Simpson Timber Co., 255 F.3d 1073, 1080-82 (9th Cir. 2001)

(agency with discretionary authority to amend or cancel permit subject to ongoing agency action

requirements).[16]

4. The Programmatic Challenge Bar Does Not Preclude Plaintiffs' Claims

EPA and CropLife also argue that plaintiffs' section 7(a)(2) claims constitute an impermissible

programmatic challenge to EPA's administration of FIFRA in the context of the ESA. The Supreme

Court articulated the programmatic challenge bar in Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871 (1990),

to preclude plaintiffs from challenging broad agency policies and programs. There, plaintiffs alleged

that the Bureau of Land Management ("BLM") violated several federal laws and regulations via the

administration of its "land withdrawal review program." Lujan, 497 U.S. at 875, 877-79 (Court

---

[16] There appear to be approximately 953 pesticide active ingredients, contained in approximately 19,000 registered pesticides. The papers submitted by the parties reveal that, for purposes of gauging environmental harm, EPA studies pesticide active ingredients, not simply pesticides. See 7 U.S.C. § 136a-1(g)(2)(A) (reregistration eligibility decision premised on analysis of pesticide active ingredients); Decl. Arthur Jean B. Williams. For example, plaintiffs submit EPA's interim reregistration eligibility decision for the pesticide active ingredient bensulide. Decl. Aimee Code, Ex. 8. This decision demonstrates how EPA requires the submission of active-ingredient specific data to support the reregistration of pesticides containing bensulide. Similarly, in proposing its own section 7(a)(2) consultation schedule, EPA contemplates consultation occurring on a per pesticide active ingredient basis, rather than on a per pesticide basis. In fact, EPA reports that it has already made "no-effects" determinations with respect to 292 pesticide active ingredients.

Thus, while the Court identifies pesticide registrations as the relevant agency actions, the parties implicitly construe EPA's approval of 953 pesticide active ingredients as ongoing agency actions. The distinction here is inapposite. For purposes of this litigation, the relevant agency actions may be alternatively construed as EPA's registration of all pesticides including particular pesticide active ingredients. As discussed in detail below, plaintiffs have standing to challenge EPA's failure to comply with section 7(a)(2) with respect to all pesticides containing 55 identified pesticide active ingredients.

ORDER – 9

1    consumes three pages simply listing laws invoked by plaintiffs).[17]  The alleged violations included

2    "failure to revise land use plans in proper fashion, failure to submit certain recommendations to

3    Congress, failure to consider multiple use, inordinate focus upon mineral exploitation, failure to provide

4    required public notice, [and] failure to provide adequate environmental impact statements." Id. at 891

5    (citations omitted).  In Lujan, plaintiffs' claims arose "not pursuant to specific authorization in the

6    substantive statute, but only under the general review provisions of the APA." Id. at 882 (citing 5

7    U.S.C. § 704).  Noting that APA review is available only with respect to final agency actions, the Court

8    held that plaintiffs could not challenge BLM's land withdrawal review program – essentially the

9    agency's "day-to-day operations" – because the program was "not an identifiable action or event." Id. at

10    894-99; see also Indep. Petroleum Ass'n of Am. v. Babbitt, 235 F.3d 588, 594 (D.C. Cir. 2001).[18]

11        Here, the programmatic challenge bar does not preclude plaintiffs' section 7(a)(2) claims. First,

12    as discussed above, plaintiffs' claims arise pursuant to "specific authorization in the substantive statute:"

13    the ESA citizen-suit provision. Lujan, 497 U.S. at 882.  In contrast, Lujan and its progeny are premised

14    on judicial review arising under the APA and its final agency action requirement.[19]  Second, plaintiffs'

15

_____

16      [17] The Court noted that the term "land withdrawal review program" does not "refer to a single

17    BLM order or regulation, or even to a completed universe of particular BLM orders and regulations.  It
is simply the name by which petitioners have occasionally referred to the continuing (and thus

18    constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the
classifications of public lands and developing land use plans as required by the FLPMA." Lujan, 497

19    U.S. at 890.

20      [18] Sitting en banc, the Fifth Circuit further elucidated the programmatic challenge bar in Sierra
Club v. Peterson, 228 F.3d 559 (5th Cir. 2000).  Pursuant to the APA, plaintiffs had challenged three

21    decades of Forest Service timber-management practices in the State of Texas: particularly clearcutting,
seed-tree cutting, and shelterwood cutting. Id. at 562-64.  The challenge encompassed over a half-dozen

22    statutes and over one dozen regulations. Id. at 564-65 n.8.  The Fifth Circuit concluded that the APA
and Lujan barred plaintiffs' claims because plaintiffs had not "actually challenged a specific final agency

23    action." Id. at 561, 565-66.

24

25      [19] Here, EPA's longstanding failure to commence section 7(a)(2) consultation with respect to
threatened and endangered salmonids satisfies any possible finality requirement. See Sierra Club v.
Glickman, 156 F.3d 606, 618 n.7 (5th Cir. 1998).

26    ORDER – 10

claims bear no similarity to the broad challenges presented in the Lujan cases. Plaintiffs concisely allege that EPA is in violation of section 7(a)(2), a singular statutory provision, with respect to the effects of all registered pesticides on threatened and endangered salmonids. In the Lujan cases, plaintiffs' complaints were saturated with alleged statutory and regulatory violations. Here, plaintiffs neither challenge broad agency policies, discretionary decisions, EPA's administration of FIFRA, nor the validity of EPA pesticide registrations. EPA and CropLife fail to identify any legitimate EPA "program" challenged by plaintiffs.[20] Although plaintiffs challenge approximately 953 ongoing agency actions, numerosity alone does not constitute a programmatic challenge. The Court's recognition of EPA's programmatic-challenge argument would effectively exempt EPA from section 7(a)(2)'s mandatory consultation requirement where Congress provided no such exemption.

5. Plaintiffs Have Standing to Challenge EPA's Actions with Respect to 55 Pesticide Active Ingredients

EPA argues that "plaintiffs have standing only to challenge the [ongoing] registration decisions for the pesticides for which they have provided some evidence of potential harm to the species of their interest, salmon." Plaintiffs assert that the scientific evidence submitted is "illustrative" of the impacts of pesticides on threatened and endangered salmonids. EPA concedes that plaintiffs have standing to assert section 7(a)(2) claims with respect to pesticides, or pesticide active ingredients, for which plaintiffs proffer evidence demonstrating some reasonable connection between pesticide use and salmonid recovery.

Plaintiffs must satisfy both statutory and constitutional standing requirements. It is undisputed that plaintiffs satisfy all statutory standing requirements. The phrase "any person" in the ESA citizen-suit provision reflects everyone's interest in the environment and an expanded notion of standing. Bennett, 520 U.S. at 164-66 (reasoning that Congress intended "to permit enforcement by everyman").

---

[20] Of course, a "program" of wholesale non-compliance with section 7(a)(2) is patently unlawful. Similarly, the Court would not immunize from challenge an agency "program" entailing the rampant disregard of the ESA's "no-take" provision with respect to numerous endangered species.

ORDER – 11

1   Here, plaintiffs are interested in the preservation of threatened and endangered salmonids.

2        Yet, recent Supreme Court precedent dictates a more searching inquiry with respect to

3   constitutional standing.  To satisfy constitutional standing requirements, plaintiffs must show: (1) they

4   have suffered some concrete and particularized actual or threatened injury, (2) that injury is fairly

5   traceable to the challenged agency action, and (3) that injury is likely redressable by a favorable decision

6   of the court.  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81

7   (2000).  All parties agree that plaintiffs demonstrate a concrete and particularized interest in any injury

8   to threatened and endangered salmonids or their habitat caused by EPA-registered pesticides.  Moreover,

9   this injury is likely redressable by a favorable decision of this Court.  See Alaska Ctr. for the Env't v.

10  Browner, 20 F.3d 981, 984-85 (9th Cir. 1994) (defendants' argument with respect to redressability

11  untenable because Congress determined that relief plaintiff seeks is appropriate means to protect

12  plaintiff's interest).  However, with respect to approximately 900 pesticide active ingredients, EPA

13  argues that plaintiffs fail to demonstrate that the actual or threatened injury to their interest in salmonids

14  is fairly traceable to, or caused by, EPA's failure to consult with NMFS, pursuant to section 7(a)(2),

15  regarding the effects of pesticide-registrations on threatened and endangered salmonids.

16       The D.C. Circuit addressed in detail this second constitutional standing requirement in Fla.

17  Audubon Soc'y v. Bentsen, 94 F.3d 658 (D.C. Cir. 1996).  It held:

18         To demonstrate standing . . . a procedural-rights plaintiff must show not only that the
    defendant's acts omitted some procedural requirement, but also that it is substantially
19         probable that the procedural breach will cause the essential injury to the plaintiff's own
    interest. . . . [A plaintiff must establish] that the omission of [a] procedure may cause a
20         government actor to overlook a demonstrably increased risk of injury to a personal and
    particularized environmental interest of the plaintiff, and that there is a substantial
21         probability that the government act allegedly implicating the [omitted procedure] will cause
    that demonstrably increased risk of injury.
22
23  94 F.3d at 664-65, 672.  Although EPA does not contend that plaintiffs' allegations are based on a

24  "protracted chain of causation" or a "lengthy chain of conjecture", EPA nevertheless argues that

25  plaintiffs do not have standing to assert section 7(a)(2) claims with respect to pesticides for which they

    submit no evidence of causation.  Id. at 666, 670.
26  ORDER – 12

Plaintiffs argue that their burden with respect to causation is minimal. They contend that the scientific evidence they proffer with respect to particular pesticide active ingredients is illustrative of effects of all pesticides on salmonids and satisfies the "fairly traceable" standing requirement. Plaintiffs rely on Alaska Ctr. for the Env't, 20 F.3d 981. There, plaintiffs sued EPA, pursuant to the Clean Water Act, for failing to perform a mandatory "act or duty": to establish "its own list of water quality limited segments and TMDLs within 30 days." 20 F.3d at 983-85 (citing 33 U.S.C. §§ 1313(d)(2), 1365(a)). Defendants argued that plaintiffs only had standing with respect to particular bodies of water in Alaska. Id. at 985. The Ninth Circuit disagreed, reasoning that EPA's statutory duty – to establish TMDLs for the State of Alaska – was a singular "precise duty" and that all state water bodies were interrelated for standing purposes. Id. at 985-86.

Plaintiffs' reliance on Alaska Ctr. is misplaced. Here, plaintiffs' claims arise under section 7(a)(2), which includes an agency action requirement. The Court has defined the relevant agency actions as EPA's pesticide registrations or, in the alternative, its approval of 953 pesticide active ingredients. Thus, the actions that plaintiffs challenge are not singular, as in Alaska Ctr., but myriad. Although the duty to consult is identical with respect to all registered pesticides, it is distinct with respect to each pesticide. Accordingly, plaintiffs must demonstrate standing separately for each section 7(a)(2) claim. See Friends of the Earth, 528 U.S. at 185. The "interrelated" and "precise duty" concepts embraced in Alaska Ctr. simply do not comport to the facts and law relevant to the instant lawsuit.[21]

The Court identifies 55 pesticide active ingredients for which plaintiffs submit scientific or competent declaratory evidence demonstrating a causal link between EPA's ongoing registration actions

---

[21] Plaintiffs also rely on Thomas v. Peterson, 753 F.2d 754 (9th Cir. 1985). There, the court commented, "A plaintiff's burden in establishing a procedural violation [under the ESA] is to show that the circumstances triggering the procedural requirement exist, and that the required procedures have not been followed. . . . It is not the responsibility of the plaintiffs to prove, nor the function of the courts to judge, the effects of a proposed action on an endangered species when proper procedures have not been followed." 753 F.2d at 765. EPA correctly notes that Thomas is not a standing case. Thomas also predates the Supreme Court's recent focus on constitutional standing requirements.

ORDER – 13

1   and direct or indirect adverse effects on salmonid populations.[22] However, with respect to the 898 other

2   pesticide active ingredients, plaintiffs submit absolutely no evidence in any form showing that EPA's

3   respective actions are fairly traceable to an actual or threatened injury to threatened and endangered

4   salmonids. In fact, plaintiffs fail to even provide the Court with the names of these pesticide active

5   ingredients. Thus, plaintiffs give the Court no basis to conclude that 898 unidentified pesticides have

6   any adverse effect on salmonids.[23] Supreme Court precedent demands more. Although the Court agrees

7   that plaintiffs' burden is relatively minimal, plaintiffs' evidentiary burden exists with respect to each

8   agency action challenged. Accordingly, the Court GRANTS in part EPA's motion to dismiss or for

9   summary judgment and DISMISSES without prejudice plaintiffs' section 7(a)(2) claims with respect to

10   the 898 pesticide active ingredients for which plaintiffs fail to submit any evidence of causation.

11   Plaintiffs have standing with respect to the 55 pesticide active ingredients identified above.

12   B. The Merits of Plaintiffs' Section 7(a)(2) Claims

13   1. The EPA Is in Violation of ESA Section 7(a)(2)

14       Plaintiffs request a Court declaration that EPA has violated section 7(a)(2). That section

15   mandates:

16       Each Federal agency shall, in consultation with and with the assistance of the Secretary,
       insure that any action authorized, funded, or carried out by such agency . . . is not likely to

17

18   _____

        [22] The 55 identified pesticide active ingredients are:
19   •   Alachlor, bensulide, bentazon, bromoxynil, captan, chlorothalonil, dichlobenil, 1,3-
        dichloropropene, fenbutatin-oxide, iprodione, methomyl, metolachlor, norflurazon, oryzalin,
20       paraquat dichloride, pebulate, pendimenthalin, prometryn, tebuthiuron, terbacil, thiobencarb,
        thiodicarb, triclopyr, acephate, dimethoate, disulfoton, ethoprop, fenamiphos, metamidophos,
21       methidathion, methyl parathion, naled, phorate, phosmet, propargite. Decl. Aimee Code.
     •   Azinphos-methyl, carbaryl, carbofuran, chlorpyrifos, diazinon, malathion, trifluralin, atrazine,
22       simazine, "2, 4-D", diuron, dicamba, metribuzin, lindane (gamma-BHC & HCH). Decl. Richard
        D. Ewing, PhD.
23   •   Lindane, oxyfluorfen, molinate, diflubenzuron, coumaphos, linuron. Second Decl. Aimee Code.

24       [23] As EPA notes, each pesticide is unique in chemical composition, hazardousness, and
25   application. Some scientific or competent declaratory evidence addressing these properties, such as
     pertinent similarities between pesticides, is necessary to satisfy constitutional standing requirements.
26   ORDER – 14

jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . . . In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

16 U.S.C. § 1536(a)(2). A federal regulation interpreting this provision dictates, "Each agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). Neither EPA nor CropLife asserts that EPA has complied with section 7(a)(2) with respect to its pesticide-registrations and determined the effects of those ongoing agency actions on threatened and endangered salmonids.[24]

NMFS listed the Sacramento winter run chinook in 1989. During the 1990s, NMFS listed as threatened or endangered approximately 25 additional salmonids. Despite competent scientific evidence[25] addressing the effects of pesticides on salmonids and their habitat, EPA has failed to initiate section 7(a)(2) consultation with respect to its pesticide registrations. Specifically, EPA proffers no evidence that it has consulted, either formally or informally, with NMFS regarding the 55 pesticide active ingredients for which plaintiffs have standing. Such consultation is mandatory and not subject to unbridled agency discretion. The Court declares, as a matter of law, that EPA has violated section 7(a)(2) of the ESA with respect to its ongoing approval of 55 pesticide active ingredients and registration of pesticides containing those active ingredients.

2. Plaintiffs' Section 7(a)(2) Claims Are Not Moot

EPA argues that, even if it has violated section 7(a)(2) with respect to its pesticide registrations, plaintiffs' claims are now moot because it has proposed a reasonable schedule for the completion of effects-determinations and consultation. EPA asserts that it is "already in the process of undertaking the procedural relief that the plaintiffs seek" and that "there is a reasonable expectation" that EPA will meet

---

[24] It does appear that EPA has made "no-effects" determinations for approximately 292 pesticide active ingredients.

[25] EPA's own reports document the potentially-significant risks posed by registered pesticides to threatened and endangered salmonids and their habitat.

ORDER – 15

1  its schedule. With respect to its proposed schedule, EPA must satisfy a "formidable" burden to

2  demonstrate mootness. Friends of the Earth, 528 U.S. at 190. EPA must make it "absolutely clear that

3  the allegedly wrongful behavior could not reasonably be expected to recur." Id. at 189-90.

4      Plaintiffs and EPA dispute which body of case law is relevant to EPA's mootness argument.

5  Plaintiffs cite several cases where plaintiffs' asserted, as here, section 7 claims pursuant to the ESA. In

6  contrast, EPA suggests that the applicable mootness doctrine is governed by a six-factor test adopted by

7  the Ninth Circuit in Independence Mining Co. v. Babbitt, 105 F.3d 502 (9th Cir. 1997). However, that

8  case addressed whether relief was appropriate pursuant to the APA for agency action withheld or

9  unreasonably delayed. 105 F.3d at 507 (citing 5 U.S.C. § 706(1); Telecommunications Research &

10  Action v. F.C.C., 750 F.2d 70, 79-80 (D.C. Cir. 1984)). As discussed above, this lawsuit does not arise

11  under the APA; EPA cites no case in which a court applied this six-factor test to section 7 claims. Thus,

12  this body of case law is neither binding nor persuasive.

13      Mootness turns on whether circumstances have changed since the outset of the litigation so as to

14  preclude any occasion for meaningful relief. Am. Rivers v. NMFS, 126 F.3d 1118, 1123 (9th Cir. 1997)

15  (citations omitted); S. Utah Wilderness Alliance v. Smith, 110 F.3d 724, 727 (10th Cir. 1997)

16  (quotations and citations omitted). In S. Utah Wilderness Alliance, plaintiffs' section 7(a)(2) claim

17  became moot because the defendant agency completed informal consultation and received concurrence

18  from the agency monitoring the endangered species at issue. 110 F.3d at 728. That is, the defendant

19  fully satisfied section 7(a)(2). The Ninth Circuit employed the same reasoning in Lane County Audubon

20  Soc'y v. Jamison, 958 F.2d 290 (9th Cir. 1993). There, addressing the BLM's failure to conduct section

21  7(a)(2) consultations, the court held that injunctive relief is appropriate and warranted until "consultation

22  is satisfactorily completed." Id. at 293.

23      Here, it is undisputed that EPA has not initiated, let alone completed, consultation with respect to

24  the relevant 55 pesticide active ingredients. Yet, EPA suggests that its mere pledge to comply with its

25  proposed schedule moots plaintiffs' section 7(a)(2) claims with respect to these pesticides. Section

26  ORDER – 16

7(a)(2)'s consultation procedures are mandatory; the Court has already concluded that EPA has violated this provision. Relevant case law dictates that this Court remains capable of granting meaningful relief; plaintiffs' section 7(a)(2) claims are not moot until EPA satisfactorily completes consultation. EPA's pledge to complete consultation per a reasonable schedule does not moot plaintiffs' claims.[26] Therefore, the Court GRANTS plaintiffs' motion for summary judgment with respect to plaintiffs' section 7(a)(2) claims and DENIES EPA's motion to dismiss or for summary judgment on these claims.

C. Appropriate Relief

EPA proposes a schedule for consultation with respect to 48 pesticide active ingredients initially identified by plaintiffs. Plaintiffs endorse the proposed schedule. Accordingly, the Court ORDERS EPA to initiate and complete section 7(a)(2) consultation with NMFS regarding the effects of pesticide-registrations on threatened and endangered salmonids as follows:[27]

- EPA shall make effects determinations and consult, as appropriate, for 3 pesticides by July 15, 2002.
- EPA shall make effects determinations and consult, as appropriate, for 3 additional pesticides by August 1, 2002.
- EPA shall make effects determinations and consult, as appropriate, for 7 additional pesticides by December 1, 2002.
- EPA shall make effects determinations and consult, as appropriate, for 7 additional pesticides by April 1, 2003.
- EPA shall make effects determinations and consult, as appropriate, for 7 additional pesticides by August 1, 2003.

---

[26] Throughout its briefing EPA repeatedly asserts its discretion with respect to section 7(a)(2) consultation. It asks the Court not to substitute its judgment for that of EPA. EPA asks the wrong question. The question is whether EPA may substitute its judgment for that of Congress. The ESA answers that question. Although the Court appreciates the finite resources EPA possesses to fulfill its legal obligations, it cannot disregard Congressional mandates. EPA also suggests that by granting relief this Court is "dictating that EPA adjust its schedule to favor salmonids." The ESA makes the preservation of *all* threatened and endangered species the highest priority. EPA further opines, "Should the Court elect to act in this matter, it could, therefore, be reordering EPA's priorities and schedule for a species that may not in the future even warrant the protections of the ESA [because the species was de-listed]." The Court neither comprehends the relevance of unrelated legal or agency proceedings nor is aware of any authority suspending the ESA's unequivocal mandates for such speculative contingencies.

[27] The Court has modified the proposed schedule to include all 55 pesticide active ingredients for which plaintiffs' satisfy constitutional standing requirements.

ORDER – 17

1 • EPA shall make effects determinations and consult, as appropriate, for 7 additional pesticides by December 1, 2003.

2 • EPA shall make effects determinations and consult, as appropriate, for 7 additional pesticides by April 1, 2004.

3 • EPA shall make effects determinations and consult, as appropriate, for 7 additional pesticides by August 1, 2004.

4 • EPA shall make effects determinations and consult, as appropriate, for 7 additional pesticides by December 1, 2004.

5

6 EPA also represents that it can complete section 7(a)(2) consultation with respect to all pesticide active

7 ingredients by 2007. Although the Court lacks jurisdiction at this time to compel any such schedule, the

8 schedule appears reasonable.

III. PLAINTIFFS' CLAIM UNDER 16 U.S.C. § 1536(a)(1)

9

10 Both plaintiffs and EPA move for summary judgment with respect to plaintiffs' section 7(a)(1)

11 claim. Section 7(a)(1) provides: "All other federal agencies shall, in consultation with and with the

12 assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by

carrying out programs for the conservation of endangered species and threatened species . . . ." 16

13 U.S.C. § 1536(a)(1). Here, the question is whether EPA, in consultation with NMFS, is using its

14 authorities to carry out programs for the conservation of threatened and endangered salmonids. EPA

15 argues that is has developed such conservation programs. Plaintiffs disagree.

16 The plain language of section 7(a)(1) requires that an agency carry out its conservation programs

17 "in consultation with and with the assistance of" the agency monitoring the relevant species. See Sierra

18 Club, 156 F.3d at 618. In dicta, the Ninth Circuit has noted that agencies have "some discretion" in

19 fulfilling their section 7(a)(1) duties. Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy, 898

20 F.2d 1410, 1418 (9th Cir. 1990) (noting that agency had begun consultation with NMFS and had altered

21 programs to conserve species via agreement with plaintiffs). Similarly, the Fifth Circuit has found that

22 agencies have decision-making discretion in the context of section 7(a)(1). Sierra Club, 156 F.3d at 617;

23 see also 50 C.F.R. § 402.14(j) (Secretary's conservation recommendations in biological opinion are

24 discretionary; agency not legally bound to follow recommendations). Given this discretion, one court

25 has held it is improper to declare an agency in violation of section 7(a)(1) when the agency has taken

26 ORDER    18

some steps to develop conservation programs. Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121, 135 (D.D.C. 2001) (plaintiffs argued that defendants had wholly failed to comply with section 7(a)(1) mandate).

EPA argues that it has met all legal obligations imposed by section 7(a)(1). Citing a letter from FWS, plaintiffs assert that EPA has simply paid lip-service to those obligations. EPA correctly notes that section 7(a)(1) does not require any particular conservation program with respect to any particular species and does not apply to each specific agency action. It appears EPA has expressed an intent to administer an "endangered species program". Plaintiffs suggest that any such "program" has remained dormant for over ten years. There also appears to be some interagency dialogue with respect to pesticide labeling and county-based use restrictions. In addition, EPA avers that it is currently using its authority to carry out several salmonid conservation programs. Such programs include working in conjunction with NMFS and the States of California and Washington to review pesticide use, practices, and effects on salmonids; creating a "public outreach and education program" with NMFS;[28] and developing "enhanced interagency coordination under the Clean Water Act and ESA." EPA also cites a February 2001 correspondence with NMFS regarding the development of conservation programs in conjunction with that agency.

In Defenders of Wildlife, the court reasoned, "The record does not support a finding that defendants have failed entirely to carry out programs for the conservation of the pronghorn. Plaintiffs clearly dispute that defendants are doing enough, and believe that the additional measures they advocate should be implicated." 130 F. Supp. 2d at 135. The same is true here. Plaintiffs concede that EPA has initiated proactive consultation with NMFS regarding conservation programs and has developed some programs promoting salmonid recovery. Yet, plaintiffs argue that EPA should be using its pesticide-registration and FIFRA-administration programs to conserve threatened and endangered salmonids in

---

[28] This program apparently includes a website identifying the geographic distribution of listed species and corresponding fact sheets.

ORDER – 19

1  particular ways. Although such programs[29] would undoubtedly benefit salmonid recovery, section

2  7(a)(1)'s mandate is not so stringent.

3     It is not the province of this Court to judge the substance of EPA's conservation programs or to

4  determine the best way for EPA to promote the conservation of threatened and endangered salmonids.

5  Neither the text of section 7(a)(1) nor relevant case law provide any appropriate authority or standard for

6  doing so. The record reflects that EPA has used its authority to develop some conservation programs in

7  conjunction with NMFS. Agency discretion governs the nature of these programs. As a matter of law,

8  EPA has not violated section 7(a)(1) with respect to threatened and endangered salmonids. Therefore,

9  the Court DENIES plaintiffs' motion for summary judgment with respect to plaintiffs' section 7(a)(1)

10  claim and GRANTS EPA's motion to dismiss or for summary judgment on that claim.

11  IV. CONCLUSION

12     In sum, the Court GRANTS in part and DENIES in part plaintiffs' motion for summary

13  judgment, and the Court GRANTS in part and DENIES in part defendants' motion to dismiss or for

14  summary judgment. As a matter of law, defendants have not violated section 7(a)(1). As a matter of

15  law, defendants have violated section 7(a)(2) with respect to the 55 pesticide active ingredients identified

16  above. However, the Court dismisses plaintiffs' section 7(a)(2) claims with respect to 898 unidentified

17  pesticide active ingredients for lack of standing. The Court orders defendants to initiate and complete

18  section 7(a)(2) consultation in accordance with the schedule detailed above, which defendants propose

19  as reasonable. Defendants estimate they will complete section 7(a)(2) consultation with respect to all

20  pesticide active ingredients by 2007. Thus, EPA will have had eighteen years since the first salmonid-

21  species listing in 1989 to fulfill the mandates of the ESA.

22

23

_____

24     [29] For example, plaintiffs submit that EPA could require pesticide registrants to submit additional
   data pursuant to FIFRA regarding pesticide impacts on salmonids. Plaintiffs also submit that EPA could
25  establish aquatic life criteria pursuant to the Clear Water Act to address the impact of pollutants on
   salmonids and their habitat.
26  ORDER – 20

SO ORDERED this 2nd day of July, 2002.

_____
CHIEF UNITED STATES DISTRICT JUDGE

ORDER – 21