UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DEFENDERS OF WILDLIFE *et al.*, | ) | |
| | ) | Case No. 1:05CV02191 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CARLOS GUTIERREZ *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR
CROSS-MOTION FOR SUMMARY JUDGMENT**

The parties agree that the North Atlantic right whale ("right whale") is critically endangered, and one of the factors hindering its recovery is death or injury to individual right whales resulting from ship strikes. While the government can understand the Plaintiffs' desire to pursue all options it believes necessary to aid this species, Plaintiffs' lawsuit simply seeks relief on both an inappropriate schedule, seeking emergency implementation of speed restrictions currently being vetted through the rulemaking process of the Administrative Procedure Act ("APA"), and from an inappropriate agency, by bringing an Endangered Species Act ("ESA") claim against the Coast Guard for several traffic separation schemes ("TSSs") established by the International Maritime Organization ("IMO"), a specialized agency of the United Nations and the only body recognized to develop and establish such internationally-recognized measures.

In our opening brief, we demonstrated that the National Marine Fisheries' Service's ("NMFS") petition denial was reasonable. Furthermore, we demonstrated that the agency's ongoing permanent rulemaking process seeks to implement the same measures requested in Plaintiffs' petition, which raises prudential mootness concerns. In response, Plaintiffs devote much discussion

1

to arguing that the petition denial was unreasonable because there is a need for the speed restrictions. As demonstrated below, it is well-established that a bare need for the regulation is insufficient to invoke the waiver of the rulemaking proceedings required by the APA, which would have been necessary to grant Plaintiffs' request for emergency implementation of the speed restrictions. Since NMFS found that Plaintiffs' petition presented no new information that justified contravening these requirements, the petition finding is reasonable and should be upheld by the Court.

As for Plaintiffs' claim against the Coast Guard, we demonstrated that this Court could only find a procedural violation of ESA Section 7 if there is an agency action authorized, funded, or carried out by the Coast Guard that may affect the right whale. 16 U.S.C. § 1536(a)(2). We demonstrated that all TSSs challenged by Plaintiffs were established by the IMO, through the process thoroughly described in our opening brief. In return, Plaintiffs advance an alternative interpretation of how a domestic TSS could, or should, be established under the Ports and Waterways Safety Act ("PWSA"). Their entire responsive brief hinges on their theory of how the PWSA should be applied, and it is their answer to the jurisdictional issues raised by Defendants, as well. As demonstrated below, this Court has to evaluate the merits of Plaintiffs' "failure to consult" claim on the TSSs actually challenged in the complaint, and the administrative record supporting those TSSs. The challenged TSSs were established by IMO following the United States' practice of submitting proposals to the IMO for international acceptance and establishment, which is reasonable and practical, as the majority of vessels calling at U.S. ports are foreign vessels. Plaintiffs simply cannot demonstrate that there is a Coast Guard action here that "may affect" the right whale, or even causes their alleged injuries, and therefore their 'failure to consult' claim must also fail.

## I.    SUMMARY JUDGMENT MUST BE GRANTED IN FAVOR OF NMFS.

As NMFS has proposed permanent rulemaking covering all the measures requested in Plaintiffs' petition[1], the question for this Court when evaluating the reasonableness of NMFS' petition denial is not whether there is a need for the measures at issue. Rather, the inquiry is whether NMFS was reasonable in choosing to implement speed restrictions through the APA rulemaking procedures, 5 U.S.C. § 553, or whether NMFS should have acted immediately to implement the same measures through an "emergency" rule. While, at most, entitled to a remand of the petition finding, Plaintiffs ultimately desire for the substance of the speed restriction proposed rule to be imposed immediately. However, simply because Plaintiffs believe that the regulatory process prescribed by Congress takes too long does not make NMFS' decision to complete notice and comment rulemaking, instead of issuing an emergency rule, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

One general argument upon which Plaintiffs repeatedly rely is that NMFS' denial of the petition for emergency rulemaking is contrary to the "source of [the agency's] delegated power," referring both to the ESA and the Marine Mammal Protection Act ("MMPA"). Pls.' Resp. at 7-8, citing American Horse Protection Ass'n v. Lyng, 812 F.2d 1 (D.C. Cir. 1987). However, Lyng does not support Plaintiffs' argument. In Lyng, the plaintiffs requested revision of a regulation enacted under a statute designed to eliminate the practice of "soring" show-horses. The regulation expressly prohibited some, but not all, devices used in this practice and the agency had issued administrative decisions interpreting the regulation as permitting the practice with devices not listed in the

---

[1] Indeed, the proposed rule is stricter than Plaintiffs' request, proposing a speed restriction of 10 knots instead of Plaintiffs' proposed restriction of 12 knots. 71 Fed.Reg. 36,299, 36,304-05 (June 26, 2006).

regulation.  Because the statute clearly intended for the practice to be banned, and the agency's interpretation permitted it to go forward under some circumstances, the D.C. Circuit made the extraordinary finding that the Secretary "has been blind to the nature of his mandate from Congress."  Id. at 7; see also Shays v. Fed'l Election Comm'n 424 F. Supp.2d 100, 114 (D.D.C. 2006) (distinguishing Lyng because agency's discretion circumscribed by clear mandate to address and implement discreet policies).  The specific mandate in Lyng is easily distinguishable from the sources of delegated power to which Plaintiffs refer, which are the ESA's and MMPA's general statutory mandates to protect and recover endangered species and marine mammals.

The Lyng case actually supports NMFS' defense, as the D.C. Circuit specifically held that a reviewing court applies the highest level of deference to review of an agency's decision not to institute rulemaking proceedings.  Id. at 4-5 (such a refusal is to be overturned "only in the rarest and most compelling of circumstances" which involve "plain errors of law, suggesting that the agency has been blind to the source of its delegated power.")(citing WWHT, Inc. v. FCC, 656 F.2d 807, 818 (D.C. Cir. 1981) and State Farm Mutual Automobile Insurance Co., v. Dep't of Transportation, 680 F.2d 206, 221 (D.C. Cir. 1982).  The issue here is even more narrow: NMFS has not refused to initiate rulemaking, but simply declined to do so on an emergency basis, because it had begun the full notice and comment rulemaking process.  Accordingly, applying the highest level of deference, this Court should uphold NMFS' denial of the emergency rulemaking petition.

## A.    Plaintiffs Failed to Present Information Justifying Elimination of the Required APA Rulemaking Procedures.

As explained in our opening brief, one of NMFS' rationales for denying the petition is that the Plaintiffs presented no new information that would warrant emergency rulemaking instead of full notice and comment rulemaking.  Def. Mem. at 22-23.  In response, Plaintiffs argue that the

relevant question is not whether the information is *new*, but whether it demonstrates the need for regulations sought in the petition. Pls.' Resp. at 10. This position is incorrect. Because NMFS had already recognized the threat to the species and was working on proposed regulations, now published, the inquiry is exactly whether Plaintiffs presented new information that the species was experiencing a sudden threat or crisis not previously considered. NMFS determined that Plaintiffs' petition simply presented the factual background of which NMFS was already aware.

Nevertheless, Plaintiffs argue that NMFS' petition denial is arbitrary because NMFS has recognized the risks to right whales and the "efficacy of speed restrictions to ameliorate those risks." Pls' Resp. at 15. However, simply because NMFS has recognized a problem and proposed corrective measures does not mean there is an emergency situation justifying contravention of the normal rulemaking process required by the APA. Under those requirements, an agency may issue regulations without notice and comment[2] *only* when it finds, for good cause, that "notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). It is well-established that this waiver of the required procedures is to be narrowly construed and "reluctantly countenanced." Tennessee Gas Pipeline Co. v. FERC, 969 F.2d 1141, 1144 (D.C. Cir. 1992) (quoting New Jersey v. EPA, 626 F.2d 1038, 1045 (D.C. Cir.1980)). Indeed, the D.C. Circuit has cautioned administrative agencies that "emergency" situations are "indeed rare" and that courts will closely examine "proffered rationales justifying the elimination of public procedures" Am. Fed'n of Gov't Employees, AFL-CIO v. Block, 655 F.2d 1153, 1158 n. 6 (D.C. Cir. 1981). This is directly contrary to the impression that Plaintiffs provide, which is that an agency

---

[2] Neither the term "emergency rule" nor the concept of "emergency" rulemaking is found in the statute. 5 U.S.C. § 553.

must issue an emergency rule whenever a petitioner can demonstrate a need for the rule.

Nor does the endangered status of the right whale, on its own, justify issuing emergency regulations. Even when a species is being added to the endangered or threatened lists, and before it has the benefit of any federal ESA protection, Congress directed that the full APA rulemaking procedures apply[3]. 16 U.S.C. § 1533(b)(4) (APA rulemaking procedures apply "to any regulation promulgated to carry out the purposes of this chapter."). If the precarious status of the species alone were enough to justify emergency regulation, no ESA regulation would ever go through the APA rulemaking procedures. However, most species are listed, and protective regulations are issued, through the normal APA rulemaking process, despite agency recognition that they are "endangered" or "threatened." See e.g. "Right whale avoidance measures," 50 C.F.R. §224.103(2) [Proposed rule - 61 Fed.Reg. 41,116 (August 7, 1996); Final rule - 62 Fed.Reg.6,729 (Feb. 13, 1997)]. This is in line with the D.C. Circuit's finding that "good cause to suspend notice and comment must be supported by more than the bare need to have regulations." Nat'l Ass'n of Farmworkers Organizations v. Marshall, 628 F.2d 604, 621 (D.C. Cir. 1980). Congress clearly intended regulations concerning endangered species to be promulgated with full public involvement, recognizing that public notice and comment are important in order to: "(1) ensure that agency regulations are tested via exposure to diverse public comment, (2) ensure fairness to affected parties, and (3) give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." Am. Coke and Coal

---

[3] Congress did provide discretion for the Secretary to "emergency list" a species only in an "emergency posing a significant risk to the well-being of any species." 16 U.S.C. § 1533(b)(7). While such a regulation can take effect immediately upon publication in the Federal Register, it is only effective for 240 days, unless the applicable rulemaking procedures can be complied with during that period. Id. However, this provision is not implicated by Plaintiffs' APA petition.

Chemicals Inst. v. EPA, 452 F.3d 930, 938 (D.C. Cir. 2006)(quoting Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin., 407 F.3d 1250, 1259 (D.C. CIR.2005)).

Finally, NMFS could not have justified emergency implementation of speed restrictions simply because it would be an interim rule until the promulgation of final regulations. Tennessee Gas, 969 F.2d at 1145. The D.C. Circuit has explained that "[w]ere the opposite true, agencies could issue interim rules of limited effect for any plausible reason, irrespective of the degree of urgency. Should this be allowed, the good cause exception would soon swallow the notice and comment rule." Id. This is exactly what Plaintiffs seek to have NMFS do - contravene the rulemaking process and impose speed restrictions on an "emergency" basis, despite NMFS' finding that there is no new information justifying the waiver of full notice and comment rulemaking. NMFS' denial of this request is reasonable, rationale, and should be upheld by this Court, pursuant to the highest level of deference. Lyng, 812 F.2d at 5.

**B.    Prudential Mootness Concerns Do Apply Because the Regulatory Process is Proceeding in a Timely Manner.**

In the opening memorandum, NMFS argued that this Court should apply the doctrine of prudential mootness, based on "considerations of prudence and comity for coordinate branches of government," Chamber of Commerce v. U.S. Dep't of Energy, 627 F.2d 289, 291 (D.C. Cir. 1980), because NMFS is actively engaged in finalizing the June 2006 proposed rule to implement the requested speed restrictions. Defs.' Mem. at 24-25. Plaintiffs oppose this argument, based largely on speculation on future delay of "years" and additional possible right whale deaths, before the rulemaking process is complete. Pls.' Resp. at 12-14. Contrary to Plaintiffs' hypothesis that the process will "drag on," the rulemaking process has been proceeding apace. Since our opening brief, NMFS has held three well-attended public meetings in Jacksonville, Florida on August 5, 2006, in

Baltimore, Maryland on August 10, 2006, and in Boston, Massachusetts on August 14, 2006. Declaration of Stewart Harris, ¶ 4.  To date, NMFS has received over 8,000 public comments,[4] which the agency will need to review and analyze before issuing a final rule.  Id., ¶ 6.  While NMFS has recently extended the comment period to October 13, 2006, see 71 Fed.Reg. 46,440 (August 14, 2006), this was at the specific request of the public.  Id., ¶ 4.  This high public interest and involvement in the rulemaking supports NMFS' determination that any speed restrictions must be established through the full APA rulemaking process.  If the Court were to reach Plaintiffs' claim, and find in favor of Plaintiffs, to remand Plaintiffs' petition for additional explanation will simply detract agency resources from moving forward with the rulemaking process on the permanent speed restrictions, which is the end result desired by Plaintiffs.  This is just such a situation that can be avoided by applying the doctrine of prudential mootness in this case.

### C.    Should the Court Remand The Petition Finding, It Should Consider a Reasonable Schedule for a Revised Petition Finding.

If successful on their APA claim against NMFS, Plaintiffs request this Court to remand the petition finding to the agency, with instructions to issue a new petition finding before November,

---

[4] Plaintiffs attempt to refute a statement in our opening brief that the proposed speed restrictions are novel and unprecedented.  Pls.' Resp. at 11, n.8.  Over 8,000 comments received thus far, in addition to a request to extend the comment period, certainly demonstrate the controversial nature of these proposed speed restrictions.  The "identical regulations" cited by plaintiff do not contradict this statement.  The speed restrictions applicable to protect the West Indian manatee apply only in designated manatee protection areas.  See 50 C.F.R. §§ 17.100-108.  Likewise, the 20 knot speed restriction in Glacier Bay National Park is only applicable in an area not even utilized by the commercial shipping industry.  These discrete examples do not even come close to affecting the commercial shipping industry and East Coast ports in the way that the proposed speed restrictions are expected to impact these interests.  Perhaps Defendants should have been clearer in stating that a broad application of speed restrictions to the entire East Coast commercial shipping fleet, the majority of which are foreign flag vessels, is novel and unprecedented.

2006. While NMFS agrees that remand is the only available remedy for an arbitrary and capricious denial of a petition for rulemaking, <u>Geller v. FCC</u>, 610 F.2d 973, 980 (D.C.Cir.1979), it requests the Court to carefully consider whether it should impose any schedule at all for the remand, let alone Plaintiffs' requested schedule. As this Court has postponed oral argument, it is unclear when the Court might ultimately rule on the cross-motions for summary judgment. NMFS may not be able to complete a new petition finding before November 2006. Should this Court remand NMFS' petition denial, Defendants ask that the Court consider a reasonable timeframe, in order to permit NMFS to make a new finding that comports with the requirements of the APA. <u>See</u> <u>Sierra Club v. Johnson</u>, –F. Supp.2d –, 2006 WL 2148566 (D.D.C. Aug. 2, 2006) (rejecting plaintiffs' proposed schedule as too compressed to afford reasonable compliance).

## II.    SUMMARY JUDGEMENT MUST BE GRANTED IN FAVOR OF THE COAST GUARD.

Before turning to the specifics of Plaintiffs' claim against the Coast Guard, it is necessary to address Plaintiffs' hyperbolic assertion that the Coast Guard takes "herculean efforts to avoid its basic responsibilities under Section 7 of the Endangered Species Act." Pls.' Resp. at 4. Perhaps as a strategy to cast the Coast Guard in a negative light, Plaintiffs take great pains to ignore the Coast Guard's myriad efforts over the past ten years to protect the right whale and other marine species and ensure compliance with both ESA Section 7(a)(1) and 7(a)(2). <u>See</u> Defs.' Mem. at 13-17. A cursory review of the administrative record demonstrates that Plaintiffs' allegation is a clear mischaracterization of the Coast Guard's efforts to conserve and protect the right whale, and comply with the ESA. Plaintiffs' assertions are a poor attempt to distract the Court from the legal issues at hand.

Since 1995, the Coast Guard has engaged in ESA Section 7(a)(2) consultation on its own

vessel operations.  CG AR - 308.  The Coast Guard requested reinitiation of formal consultation in

1996, CG AR 310-343, and in 1998, CG AR 344-416, and has remained in compliance with this

Biological Opinion since its issuance.  In its 1998 Biological Opinion, NMFS concluded that the

Coast Guard's vessel and aircraft operations are not likely to jeopardize the continued existence of

several listed species, including the right whale.  CG AR 378.  In addition, and as described at length

in Defendants' opening memorandum, the Coast Guard has numerous programs to benefit marine

mammals, and the right whale in particular.  Defs.' Mem. at 41-44.  Contrary to Plaintiffs'

distortion,  the record is clear that, when triggered by an appropriate action, the Coast Guard

responsibly executes its consultation duties under Section 7(a)(2), and that it is actively engaged in

additional efforts directly benefitting the right whale.

### A.    This Court Should Resolve the Jurisdictional Issues in Favor of the Coast Guard.

#### 1.    Plaintiffs Fail to Demonstrate that Specific Coast Guard Acts Cause Their Alleged Injury.

Because Plaintiffs completely misunderstand the function of a TSS, they thereby

misunderstand the causation of their alleged injuries.  See Pls.' Resp. at 37 (arguing that plaintiffs

not required to prove that vessel would not be using areas if no TSS, but that vessels travel in TSS

"as intended by the Coast Guard").  A TSS does not concentrate vessel traffic in areas used by right

whales, as Plaintiffs seem to believe, nor does a TSS direct vessel traffic to an area not previously

utilized.[5]    Rather, a TSS provides mariners who choose to use them a degree of navigational

_____

[5] In fact, this is what Plaintiffs seemingly desire as an end result to their litigation - they must
believe that if the Coast Guard has to consult on the establishment of TSSs, and if a proposed
TSS is found to adversely affect right whales, then perhaps it would be recommended that the
TSS be modified to completely route vessels around right whale critical habitat and use areas.
However, the IMO's Ship's Routeing Guide instructs that the extent of a traffic separation

certitude by establishing lines of separation between inbound and outbound vessel traffic. The practical effect of a TSS is to reduce the risk of vessel collisions and groundings, along with the significant risk of harm to the environment resulting from a spill caused by a vessel collision or grounding. TSSs are generally voluntary, not mandatory, and follow *preexisting* vessel traffic patterns. TSSs do not affect the many ships transiting the Atlantic seaboard in innocent passage, or exercising their freedom of navigation rights. Thus, the establishment of a TSS - which is for the purpose of separating existing traffic into separate lanes - does not inherently concentrate or redirect vessel traffic, as Plaintiffs contend in support of their arguments on standing and the merits. Plaintiffs fail to show that establishment of a TSS has actually caused any of their alleged injuries.

Likewise, while the Plaintiffs devote much discussion to demonstrating that TSSs "may affect" right whales, and therefore allegedly require Section 7 consultation, Pls' Resp. at 29-34, Plaintiffs miss the point that causation must be linked to acts of the defendant agency before the Court. While Plaintiffs attempt to address this problem by advancing their own interpretation of the PWSA, and theory of how the TSSs at issue should have been established, the administrative record demonstrates that all of the TSSs at issue were established by the IMO, and not the Coast Guard. See Defs.' Mem. at 36, n. 11. Plaintiffs fail to demonstrate the factual connections between causation of their injury and an action authorized, funded, or carried out by the Coast Guard, which is one of the three necessary prongs of standing.

--------

scheme should be limited to what is essential in the interests of safe navigation. See Ships Routeing § 6.9, submitted as Defendants' Exhibit A. Even if the Coast Guard chose to establish only domestic TSSs under the PWSA, without regard to IMO requirements, that statute does not provide authority for the Coast Guard to so drastically alter vessel traffic for considerations other than safety of navigation. See 33 U.S.C. § 1223(c)(1) (routing measures "shall recognize . . . the paramount right of navigation over all other uses."); see also *infra* p. 20-22.

2.     **The Six-Year Statute of Limitations is Applicable to "Every Civil Suit Commenced Against the United States," Including Plaintiffs' ESA "Failure to Consult" Claims.**

Plaintiffs apparently now seek to challenge all TSSs potentially affecting right whales, yet only challenged six specific TSSs in their Amended Complaint.  To achieve this, Plaintiffs argue that the statute of limitations does not apply to their "failure to consult" claim.  Pls.' Resp. at 41-44.  Even if the Court were to permit such a programmatic attack and find that establishment of a TSS is a Coast Guard "agency action" within the meaning of ESA Section 7(a)(2), the Plaintiffs can only challenge those TSSs established or modified within six years of their complaint.  This is contrary to the widespread relief that they seem to seek.  See Pls' Resp. at 43 (suggesting that if the Court finds a violation, the Coast Guard might have a duty to consult on all TSSs in right whale habitat).  In an effort to expand their reach, Plaintiffs improperly apply a series of Ninth Circuit cases which have analyzed whether, for the purpose of determining the merits of an ESA Section 7(a)(2) "failure to consult" claim, there is an ongoing agency action.  These cases make absolutely no attempt to even analyze, let alone override, the six-year statute of limitations and cannot support the weight of Plaintiffs' argument[9].

---

[9] See Turtle Island Restoration Network v. NMFS, 340 F.3d 969 (9th Cir. 2003)( no analysis of statute of limitations, because the May 2001 challenge to permits which were issued under law passed in November 1995, was brought within the six-year time period); Pacific Rivers Council v. Thomas, 30 F.3d 1050 (9th Cir. 1994) (no analysis of statute of limitations, because 1992 failure to consult claim brought against land management plans issued in 1990); Washington Toxics Coalition v. EPA, 413 F.3d 1024 (9th Cir. 2005) cert. denied CropLife America v. Washington Toxics Coalition, 126 S.Ct. 1024 (2006) (no analysis of statute of limitations); Western Watersheds Project v. Matejko, –F.3d–, 2006 WL 2042825 (9th Cir. 2006) (same); NRDC v. Houston 146 F.3d 1118 (9th Cir. 1998) (no analysis of statute of limitations because challenge to BLM's affirmative act of providing water in the absence of a contractual requirement to do so, ultimately found to be "agency action" for ESA Section 7, was brought within six years of the action).

Indeed, the courts that have expressly considered the issue have barred "failure to consult" challenges to agency actions taken more than six years before a plaintiff's complaint. See Sierra Club v. EPA, 162 F. Supp.2d 406, 422 n. 26 (D.Md. 2001) (six year statute of limitations barred claim that EPA failed to engage in ESA Section 7 consultation when approving state's water quality revisions under the Clean Water Act); Broadened Horizons Riverkeepers v. U.S. Army Corps of Engineers, 8 F. Supp.2d 730, 736 n.9 (E.D. Tenn. 1998)(statute of limitations barred "failure to consult" claims against Corps of Engineers and TVA issuance of river dock permits allowing transport of logged timber); Kentucky Heartwood v. Worthington, 20 F. SUPP.2d 1076, 1093 (E.D.Ky. 1998) (28 U.S.C. § 2401(a) barred challenge that Forest Service failed to consult under the ESA when adopting Forest Plan).

These courts have done so with good reason, for despite Plaintiffs' argument that the six-year statue of limitations does not apply to this category of claim, Section 2401(a) specifies in no uncertain terms that the provision applies to "*every* civil action commenced against the United States." 28 U.S.C. § 2401(a) (emphasis added). By its plain language, this provision applies to the Plaintiffs' ESA citizen-suit claim.[7] To the extent Plaintiffs argue that ESA Section 7 "failure to consult" claims are exempt from the six-year statute of limitations, this argument must be rejected. Nothing in the language, history or structure of the ESA indicates that Congress had this intent. It is well-established that statutes of limitation are to be strictly observed and exceptions are not to be

---

[7] Notably, Congress amended Section 2401 in 1978 to create an exception for claims brought under the Contract Disputes Act of 1978. *See* Pub. L. No. 95-563 § 14(b), 92 Stat. 2383 (1978). If Congress had intended to create an exception for a class of ESA claims, it can be expected that Congress would have amended Section 2401 or, alternatively, prescribed a specific statute of limitations period in the ESA. Congress has done neither. This Court should not, therefore, read an exception into Section 2401(a) for a class of ESA citizen-suit claims.

implied. <u>Soriano v. United States</u>, 352 U.S. 270, 273 (1957). "[Courts] will not, as a general rule, read into statutes of limitation an exception which has not been embodied therein, however reasonable such exception may seem, even though the exception would be an equitable one." <u>Simon v. United States</u>, 244 F.2d 703, 705 (5th Cir. 1957).

The flip side of Plaintiffs' statute of limitations argument is that it would impermissibly permit them to broaden their claim into a programmatic attack. Plaintiffs' responsive brief demonstrates this: Plaintiffs do not rely on the administrative record to establish a violation of ESA Section 7 for any specific TSS; they request the Court to make a blanket ruling that all TSSs require ESA consultation, irrespective of the facts pertaining to each action; and suggest that the Coast Guard may undertake a "global" consultation on all of its TSSs in right whale habitat. However, this violates the bar on "programmatic" challenges, enunciated by the Supreme Court in <u>Lujan v. National Wildlife Fed'n</u>, 497 U.S. 871 (1990). While the reasoning of <u>Lujan</u> rested on the APA requirement of "final agency action," it has also been applied to "failure to consult" claims brought pursuant to the ESA citizen-suit provision. <u>See</u> <u>National Wildlife Fed'n v. Caldera</u>, Civ. A. 00-1031(JR), 2002 WL 628649 (D.D.C. March 26, 2002) (applying <u>Lujan</u> and <u>Sierra Club v. Peterson</u>, 228 F.3d 559, 562 (5th Cir. 2000)(en banc), to dismiss ESA 'failure to consult' claims that sought to address "rampant unlawfulness" in agency's permit program[9]); <u>National Wildlife Fed'n v. Brownlee</u>, 402 F. SUPP.2d 1, 6 (D.D.C. 2005) (affirming <u>Caldera</u> holding that broad programmatic relief is improper under the ESA, but permitting "narrowly tailored" challenge to the issuance of

---

[9] The <u>Caldera</u> court dismissed the complaint without prejudice to a future "as applied" challenge to four of the challenged permits. Those plaintiffs later brought a challenge to four of those permits, pursuant to the ESA and other authorities, as set forth in <u>National Wildlife Fed'n v. Brownlee</u>,402 F. Supp.2d 1 (D.D.C. 2005).

four permits); <u>Defenders of Wildlife v. Flowers</u>, No. CIV02 195 TUC CKJ, 2003 WL 22143270 at

*2 (D.Ariz. Aug. 18, 2003), *aff'd* 414 F.3d 1066 (9th Cir. 2005) (dismissing ESA 'failure to consult'

because was an improper programmatic challenge, despite specific actions challenged as examples).

The statute of limitations equally applies to ESA "failure to consult" claims. Moreover, any

finding to the contrary predicated on a challenge to an ongoing "program" of TSS establishment

rather than a challenge limited to the specific TSSs named in Plaintiffs' amended complaint would

render Plaintiffs' claim nonjusticiable based on the bar against programmatic challenges.

Accordingly, this Court must reject Plaintiffs' statute of limitations argument[9].

**B.      Plaintiffs Fail to Show a Violation of the ESA by a Federal Agency with Respect
         to the Specific TSSs Challenged in Their Amended Complaint**.

Plaintiffs' responsive brief rests on their interpretation of how the Coast Guard can, and

should, establish a TSS under the PWSA. Under their theory, Plaintiffs argue that a TSS established

in such a manner should be subject to ESA Section 7 consultation because it would be an "agency

action" of the Coast Guard that may affect right whales. In our opening brief, Defendants

painstakingly described the process through which each of the TSSs challenged by Plaintiffs was

created. <u>See</u> Defs.' Mem. at 8-12. Defendants demonstrated that the establishment of each

_____

[9] Plaintiffs suggest that the Court sidestep this jurisdictional issue and simply order the parties to
"meet and confer to determine whether they can resolve the application, and timing, of [the
Court's] ruling as to specific TSSs without further Court involvement." Pls.' Resp. at 44; <u>id.</u> at
fn 31. The Court need not do so, because the statute of limitations clearly applies and the Court
only has jurisdiction over Plaintiffs' challenge to TSSs named in their amended complaint that
were established or modified in the past six years, i.e., in the approaches off Delaware Bay and
Chesapeake Bay. Defendants further believe that it is premature for the Court to even reach the
issue of remedy at this stage because there is a serious dispute of application of the law to the
facts. If the Court does find for Plaintiffs on their claim against the Coast Guard, Defendants
request the opportunity to provide additional briefing on the specifics of any remedy, after
receiving the Court's opinion on the merits of Plaintiffs' claim.

challenged TSS, by the IMO, is not a federal "agency action" within the meaning of ESA Section 7(a)(2). Id. at 35-41. While all of the challenged TSSs were proposed by the United States, it is the IMO which is the competent body to *establish* internationally-recognized TSSs. See Regulation V/10(2) of the International Convention for Safety of Life at Sea, Defendants' Exhibit A. Regardless of how Plaintiffs believe the PWSA should be applied, their claim must be reviewed on the basis of the actual establishment of the challenged TSSs.[10]

Plaintiffs fail to discuss why the TSSs challenged in the complaint, and supported by the administrative record before the Court, are subject to ESA Section 7 consultation. In fact, the administrative record demonstrates that the TSSs challenged by Plaintiffs were established by the IMO. See Defs.' Mem. at 36, n.11. The administrative record also contains absolutely no evidence that any federal agency, or member of the public, ever raised a concern about right whales or suggested a need for ESA Section 7 consultation on any of the TSSs challenged by Plaintiffs, despite the Coast Guard's request for public comment in the Federal Register notices announcing the Port Access Route Study ("PARS"), and coordination with NOAA and other federal agencies, pursuant to the PWSA. 33 U.S.C. § 1223(c)(3)(B). To the contrary, the United States Fish and Wildlife Service stated that the potential routes under consideration for Delaware Bay would be "beneficial to living resources by reducing the likelihood of collisions and the accompanying oil spills." CG AR 1727. Furthermore, as Plaintiffs have recognized, NMFS specifically informed the Coast Guard that a PARS is not an "agency action" for the purpose of triggering ESA Section 7 consultation. CG

---

[10] Any collateral attack Plaintiffs may want to bring against the method by which TSSs are established is a challenge for another day. Likewise, this Court need not indulge Plaintiffs' requests for discovery on these matters because the claim before this Court is whether the TSSs at issue are subject to ESA consultation.

AR 992. In that same communication, NMFS further stated that if any agency proposes to authorize, fund, or carry out any of the recommendations from the PARS study, that action may trigger the requirements of Section 7. Id. Notably, though intricately involved in the interagency process of crafting and submitting a United States government proposal to the IMO to amend the Boston TSS, which was one of the PARS recommendations, NMFS never suggested that this proposal triggers ESA Section 7. Accordingly, Plaintiffs fail to demonstrate that the evidence before this Court demonstrates a need for ESA consultation on the TSSs at issue, and the administrative record supports the Coast Guard's position that ESA consultation was not required for these TSSs.

## C. The Process by Which the TSSs at Issue Were Established is Reasonable and Not in Contravention of the PWSA.

Defendants maintain that this Court must review the merits of Plaintiffs' claims based on the TSSs at issue, established by the IMO, and not Plaintiffs' competing statutory interpretation of how the PWSA should be applied. Even if Plaintiffs' interpretation of how the PWSA should be applied were relevant, the United States' practice of submitting proposals to the IMO for establishment or amendment of TSSs is reasonable and not in contravention of the PWSA.

The PWSA directs the Secretary to "designate necessary fairways and traffic separation schemes for vessels operating in the territorial sea of the United States and in high seas approaches, outside the territorial sea, to such ports or places." 33 U.S.C. § 1223(c)(1). But, not surprisingly, the PWSA does not preclude establishment of TSSs through recognized international processes by the IMO. To the contrary, this practice comports with the process set forth in the International Convention for the Safety of Life at Sea ("SOLAS"), ratification of which was advised by the Senate in 1978, in the same year that Congress amended the PWSA with the Port and Tanker Safety Act of 1978, Pub. L. No. 95-474, 92 Stat. 1471 (1978). Contracting governments to SOLAS, including

17

the United States, recognize the IMO as "the only international body for developing guidelines, criteria and regulations on an international level for ships routeing systems." Contracting governments to SOLAS also agree that "Ships' routeing systems should be submitted to the Organization for adoption." SOLAS Ch. V, Regs. 10.2 and 10.4, Nov. 1, 1974, 32 U.S.T. 47, T.I.A.S. No. 9700. In addition to the process set forth in the PWSA, Congress recognized and validated the international process through which the challenged TSSs were established.

Furthermore, the current practice is reasonable in light of the practical realities raised by modern commercial shipping. Plaintiffs argue that the United States, or the Coast Guard, could unilaterally establish TSSs based upon the statutory language cited above, and then expect to receive automatic IMO approval after-the-fact. However, this assertion is at odds with reality, irrelevant to analysis of whether the challenged TSSs were established in violation of the ESA, and would have this Court render an advisory opinion. The IMO Sub-Committee on Navigation ("NAV") met most recently in late July, where the United States' proposal to amend the TSS off Boston was approved by NAV and forwarded on to the IMO Maritime Safety Committee ("MSC") for adoption. See "Report of the Fifty-Second Session of the Subcommittee, Safety of Navigation," attached as Exhibit B to the Second Declaration of Bridget Kennedy McNeil. While the United States' proposal was accepted without modification, a TSS proposed by Norway was not. See NAV's "Report of the Working Group" at 3.1-3.7, attached as Exhibit C to McNeil Declaration. The original Norwegian proposal was for a mandatory TSS some 30 miles from the Norwegian coastline and extending continuously through the Norwegian EEZ for some 560 miles. Id. This original proposal was modified by Norway to overcome near-unanimous opposition from other member governments during the deliberations of the Working Group, and ultimately consisted of a series of eight smaller

18

voluntary TSSs at "way points" along the route that the previous proposed 560-mile long TSS would have covered, joined by a recommended route.[11]  Id.

The Norway example directly contradicts Plaintiffs' suggestion that the United States should unilaterally establish TSSs without submitting them to IMO for international approval and recognition, or the implication that the IMO would simply "rubber-stamp" any TSS that the United States attempted to establish unilaterally.  The practice of submitting proposed TSSs to IMO for international establishment has several rationales: without such review, a proposal may not comport with the requirements of the IMO's Ships' Routeing Guide; without such review, other countries may object to the proposal, such as the recent proposal by Norway; a TSS without IMO-approval would not appear on international charts; and Rule 10 of the International Regulations for Preventing Collisions at Sea ("COLREGS") applies *only* to IMO-approved TSSs[12].  Convention on the International Regulations for Preventing Collisions at Sea, Rule 10, Oct. 20, 1972, 28 U.S.T. 3459, 1050 U.N.T.S. 16.  Following from this, the regulations implementing Congress' adoption of the

_____

[11] This not only illustrates the need for international review and approval of a proposed TSS, but that the final TSS – including the TSSs named in Plaintiffs' amendment complaint – is an action of the IMO, not the proposing government.  Because member government's proposal - such as a proposal by the United States - can be rejected or modified, meaning that the final TSS may vary greatly from the initial proposal, there is no action to which ESA Section 7(a)(2) applies because there is a lack of decisionmaking authority over the action of the type challenged, much less an "agency action" by the Coast Guard.  See Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of the Navy, 383 F.3d 1082, 1092 (9th Cir. 2004) (holding that the action at issue fell outside the agency's authority because the risk of harm to listed species arose from the President's decision regarding the Navy's nuclear submarine force, not the Navy's obedience to that order); see also Marbled Murrelet v. Babbitt, 83 F.3d 1068, 1074 (9th Cir.1996) (holding section 7(a)(2) inapplicable where a different agency made the ultimate decisions, while the respondent agency "merely provided advice," without authorizing, funding or carrying out anything).

[12] Plaintiffs' statement that COLREG 10 "applies to all Coast Guard TSSs" is correct, but only because all existing TSS were approved and established by IMO.  As set forth above, the COLREGS, including COLREG 10, apply only to IMO-approved TSSs.

COLREGS, 33 U.S.C. §§ 1601 *et seq.*, anticipate that all TSSs will be approved and established by IMO, as they provide that "The operator of a vessel in a TSS shall comply with Rule 10 of the International Regulations for Preventing Collisions at Sea, 1972, as amended." 33 C.F.R. § 167.10.

Furthermore, IMO establishment and approval ensures maritime safety for all vessels calling at U.S. ports, approximately 85% of which are foreign flag vessels. In 2005, of the 61,047 oceangoing vessels of 10,000 deadweight tons ("DWT") or greater calling at United States ports, 53,302 were foreign flag vessels and a mere 7,745 were United States flag vessels. <u>See</u> "Vessel Calls at U.S. and World Ports 2005," United States Department of Transportation, Maritime Administration, available at <u>http://www.marad.dot.gov/MARAD_statistics/index.html</u>. Moreover, that same data shows that the percentage of foreign flag vessels is increasing over time, while the percentage of U.S. vessels is decreasing, making the cooperation and approval of the international shipping community even more imperative.

### D. Finally, Plaintiffs' Interpretation of the Authority Conferred by the PWSA is Incorrect.

Assuming *arguendo* that the Court finds it appropriate to consider whether a TSS established only under the PWSA would be subject to consultation, Defendants address Plaintiffs' contentions concerning that statute, but reiterate that, in doing so, the analysis strays into abstract grounds as none of the TSSs challenged were established through such a process. Defendants previously explained the relevant sections of that statute in our opening brief. Defs.' Mem. at 6-8. In their restatement of that statute, Plaintiffs assert that the PWSA gives the Coast Guard authority to establish and amend TSSs in order to protect right whales. To the extent that Plaintiffs interpret the PWSA to authorize the Coast Guard to establish and amend TSSs for reasons other than safety of navigation, Plaintiffs are incorrect. <u>See</u> 33 U.S.C. § 1223(c)(1) ("In order to provide safe access

routes . . ." routing measures "shall recognize . . . the paramount right of navigation over all other uses.").

Plaintiffs first base their argument upon statutory language concerning "environmental factors." Pls.' Resp. at 20-21. It is clear from the legislative history of the PWSA that the primary concern is safety of navigation in order to prevent collisions between, and groundings of, oil tankers. See S.Rep. 92-724, *2767 (March 28, 1972). The Senate report indicates that the legislation was deemed necessary "to cope with the increasing safety hazards of maritime transportation and with pollution resulting from operation and casualties of vessels carrying oil or other hazardous substances in bulk." Id. at *2768. While the statute includes "the environment," the legislative history demonstrates that this concern was for the well-being of the overall marine environment, and the legislation was aimed to prevent spills of oil or other hazardous substances. Id. at *2769.

This is the concern that underscores the statutory language concerning the consideration of "environmental factors" when evaluating routing schemes in and around American ports. However, as explained in our opening brief, the PWSA does not provide discretion or authority to establish or modify vessel routing unrelated to preventing collisions between, and groundings of, vessels. Plaintiffs urge this Court to interpret the PWSA in the opposite manner, based solely on "broad, sweeping language" and a Ninth Circuit case[13] holding that ESA Section 7(a)(2) provides additional authority to modify the action to protect endangered species, even where the statute at issue does not. Pls' Resp. at 20-21. Surprisingly, Defendants fail to discuss the binding law in this Circuit directly contrary to this argument. In Platte River Whooping Crane Critical Habitat Maintenance

---

[13] Defenders of Wildlife v. EPA, 420 F. 3d 946, 970 (9th Cir. 2005). After denying the petition for rehearing en banc, 450 F.3d 394 (9th Cir. 2006), the Ninth Circuit has yet to issue the mandate. In any event, this case is inapposite and not binding on this Court.

Trust v. FERC, 962 F.2d 27, 33-34 (D.C. Cir. 1992), the D.C. Circuit rejected a plaintiffs' argument

that ESA 7(a)(2) provided additional authority for an agency to do "whatever it takes" to protect

listed species, holding that "the statute directs agencies to 'utilize their authorities' to carry out the

ESA's objectives; it does not *expand* the powers conferred on an agency by its enabling act." Id.;

Am. Forest and Paper Ass'n v. EPA 137 F.3d 291, 299 (5th Cir. 1998) (agency cannot use ESA to

create requirements not authorized by the Clean Water Act).  Because the ESA does not provide any

additional authority or discretion to establish or modify TSSs solely for the benefit of endangered

species, the only authority to do so would have to reside in the PWSA, which it does not.

    The Court must also reject Plaintiffs' second argument that the Coast Guard and Maritime

Transportation Act of 2004 Pub. L. 108-293, 118 Stat. 1028, § 626 (Aug. 9, 2004), somehow

amended the PWSA to confer additional authority to establish shipping measures solely for the

benefit of right whales.  This act is a merely a directive to the Coast Guard to cooperate with NOAA

in analyzing potential vessel routing measures for reducing vessel strikes of right whales, as outlined

in NOAA's Advance Notice of Proposed Rulemaking ("ANPR"), and to report back to Congress

by January 2006.  It is a stand-alone act, and does not, by its own terms, amend the PWSA.  It does

not confer any additional authority upon the Coast Guard, but simply directs them to cooperate with

NMFS on the specific proposals outlined in the ANPR.  In fact, all it really does is direct the Coast

Guard to analyze the measures outlined by NMFS.  However, Plaintiffs clearly cannot challenge the

recommendations resulting from the PARS, or lack thereof, under Section 7(a)(2), as a PARS is not

an action triggering ESA Section 7(a)(2).  See CG AR 992.

    In conclusion, it remains true that the challenged TSSs either established or modified within

the six years prior to Plaintiffs' complaint were all done so through the IMO process.  There is no

action authorized, funded, or carried out by the Coast Guard that may affect the right whale.  This

Court must grant summary judgment on Plaintiffs' claim in favor of the Coast Guard.

**<u>CONCLUSION</u>**

For the reasons discussed above, and set forth in Defendants' opening memorandum, this

Court should deny Plaintiffs' motion for summary judgment and dismiss all claims with prejudice.


Respectfully submitted this 25th day of August, 2006.

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division
JEAN E. WILLIAMS, Chief

    /s/ *Bridget Kennedy McNeil*
BRIDGET KENNEDY McNEIL, Trial Attorney
Wildlife and Marine Resources Section
Ben Franklin Station, P.O. Box 7369
Washington, D.C. 20044-7369
Tel: (202) 305-0388/ Fax: (202)305-0275
bridget.mcneil@usdoj.gov

Attorneys for Federal Defendants

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 25th day of August, 2006, I electronically filed the

Defendants' Reply In Support of Their Cross-Motion for Summary Judgment with the Clerk of

Court using the ECF/CM system, which will generate an electronic Notice of Filing on:

**Howard M. Crystal**          howardcrystal@meyerglitz.com

**Eric Robert Glitzenstein**          eric@meyerglitz.com

Pursuant to the Court's mailing information for this case, listed on the ECF system, no

parties require manual noticing.


_Bridget Kennedy McNeil_____

24