# Exhibit D

INTERNATIONAL MARITIME ORGANIZATION





**IMO**

| | |
|---|---|
| SUB-COMMITTEE ON SAFETY OF | NAV 52/WP.6 |
| NAVIGATION | 20 July 2006 |
| 52nd session | Original: ENGLISH |
| Agenda item 18 | |

## DRAFT REPORT TO THE MARITIME SAFETY COMMITTEE

## 1    GENERAL

1.1    The Sub-Committee on Safety of Navigation held its fifty-second session from 17 to 21 July 2006 at the Headquarters of the Organization, under the chairmanship of Mr. K. Polderman (The Netherlands).  The Vice Chairman, Mr. J.M. Sollosi (United States), was also present.

1.2    The session was attended by representatives of the following countries:

[ALGERIA
ANGOLA
ANTIGUA AND BARBUDA
ARGENTINA
AUSTRALIA
BAHAMAS
BANGLADESH
BELGIUM
BRAZIL
CANADA
CHILE
CHINA
CROATIA
CUBA
CYPRUS
DEMOCRATIC PEOPLE'S
   REPUBLIC OF KOREA
DEMOCRATIC REPUBLIC
   OF THE CONGO
DENMARK
ECUADOR
EGYPT
ESTONIA
FINLAND
FRANCE
GERMANY
GREECE

HONDURAS
ICELAND
INDONESIA
IRAN (ISLAMIC REPUBLIC OF)
IRAQ
IRELAND
ITALY
JAPAN
KENYA
LATVIA
LIBERIA
LITHUANIA
MALAYSIA
MALTA
MARSHALL ISLANDS
MEXICO
MOROCCO
NETHERLANDS
NEW ZEALAND
NIGERIA
NORWAY
PANAMA
PAPUA NEW GUINEA
PERU
PHILIPPINES
POLAND
PORTUGAL

For reasons of economy, this document is printed in a limited number.  Delegates are kindly asked to bring their copies to meetings and not to request additional copies.

| | |
|---|---|
| REPUBLIC OF KOREA | TUNISIA |
| ROMANIA | TURKEY |
| RUSSIAN FEDERATION | TUVALU |
| SAUDI ARABIA | UKRAINE |
| SINGAPORE | UNITED KINGDOM |
| SOUTH AFRICA | UNITED STATES |
| SPAIN | URUGUAY |
| SWEDEN | VENEZUELA |
| THAILAND | |

and of the following Associate Member of IMO:

HONG KONG, CHINA

1.3     The following IMO Non-Member also attended the session:

COOK ISLANDS

1.4     The following intergovernmental and non-governmental organizations were also represented:

INTERNATIONAL HYDROGRAPHIC ORGANIZATION (IHO)
LEAGUE OF ARAB STATES
EUROPEAN COMMISSION (EC)
INTERNATIONAL FEDERATION OF SHIPMASTERS' ASSOCIATION (IFSMA)
INTERNATIONAL MOBILE SATELLITE ORGANIZATION (IMSO)
INTERNATIONAL CHAMBER OF SHIPPING (ICS)
INTERNATIONAL ORGANIZATION FOR STANDARDIZATION (ISO)
INTERNATIONAL ELECTROTECHNICAL COMMISSION (IEC)
INTERNATIONAL UNION OF MARINE INSURANCE (IUMI)
INTERNATIONAL CONFEDERATION OF FREE TRADE UNIONS (ICFTU)
INTERNATIONAL ASSOCIATION OF MARINE AIDS TO NAVIGATION AND
     LIGHTHOUSE AUTHORITIES (IALA)
INTERNATIONAL RADIO-MARITIME COMMITTEE (CIRM)
BIMCO
INTERNATIONAL ASSOCIATION OF CLASSIFICATION SOCIETIES (IACS)
OIL COMPANIES INTERNATIONAL MARINE FORUM (OCIMF)
INTERNATIONAL MARITIME PILOTS ASSOCIATION (IMPA)
INTERNATIONAL ASSOCIATION OF INSTITUTES OF NAVIGATION (IAIN)
INTERNATIONAL ASSOCIATION OF INDEPENDENT TANKER OWNERS
     (INTERTANKO)
INTERNATIONAL ASSOCIATION OF DRY CARGO SHIPOWNERS
     (INTERCARGO)
INTERNATIONAL SAILING FEDERATION (ISAF)
WORLD NUCLEAR TRANSPORT INSTITUTE (WNTI)
INTERNATIONAL LIFEBOAT FEDERATION (ILF)
WORLD WIDE FUND FOR NATURE (WWF)
INTERNATIONAL HARBOUR MASTERS' ASSOCIATION (IHMA)]

1.5     In welcoming the participants, the Secretary-General referred to the previous week's terrorist attacks in Mumbai, with heavy loss of life, which had demonstrated, yet again, how vulnerable the transport system was.  In Mumbai, as previously in Tokyo, Moscow, Madrid and London, the perpetrators of these evil acts had chosen the railway system to strike; in New York and Washington their preferred weapon of destruction had been the airplane.  The fact that shipping had, fortuitously so far, escaped their attention should not lead to any comforting feeling of relaxation and should allow no space for any complacency.  If there was a lesson that could be learned from the recent attacks, it was that it was necessary to continue relentlessly raising the industry's defences to the extent that terrorists might be dissuaded from launching an attack on ships and port facilities and, in the unfortunate event that such an act had been committed, that the industry was in a strong position to mitigate its impact on human life, property and the environment.  The world community depended too much on shipping for the Organization not to do all that was humanly possible to ensure its uninterrupted flow.  In the meantime, he asked the Indian delegation to convey the entire membership's, the Secretariat's and his own deep sympathy and condolences to the families, friends and colleagues of the innocent victims of the Mumbai tragedy.

He drew the delegates attention to the theme for this year's World Maritime Day, which was "Technical Co-operation: IMO's response to the 2005 World Summit", with special emphasis on the maritime needs of Africa.  The theme was chosen to give the Organization the opportunity to contribute, from its perspective, to the fulfilment of the Millennium Development Goals, adopted by the 2000 Millennium Summit and re-affirmed by last year's World Summit, as the world community's response to identified new needs and challenges presented, first and foremost, by the fact that hundreds of millions of people were left defenceless against hunger, disease and environmental degradation, even though the means to protect them against these were available. Maritime activity had a key role to play in meeting these goals, for shipping moved the world's burgeoning trade, while international commerce promoted production, job creation and greater socio-economic prosperity.  And the combination of all these had undoubtedly the potential to lift people from hunger and poverty and also eradicate life-threatening diseases.

Turning to the Sub-Committee's work at the current session, the Secretary-General referred to the fascinating voyage it was embarking on by taking the concept of e-navigation forward and he recalled his opening remarks regarding the development of a strategic vision for e-navigation to integrate existing and new navigational tools, in particular electronic tools, in an all-embracing

system at the last May's eighty-first session of the Maritime Safety Committee. As the basic technologies for such an innovative step were already available, the challenge lay in ensuring the availability of all the other components of the system, including electronic navigational charts, and in using them effectively in order to simplify, to the benefit of the mariner, the display of the real-time environment in which his or her ship navigated.

He further alluded to his keynote address to the 16th IALA/AISM Conference, held in Shanghai last May, when he had reiterated that the strategic vision required would ensure that the new generation of navigational tools, available now and anticipated in the near future, could be drawn together in a holistic and systematic manner to secure a greater level of safety and accident prevention and, at the same time, to deliver substantial operating efficiencies with consequent commercial benefits. However, the design of the system should be such as not to reduce the navigator solely to the role of monitoring its function but also to enable him or her to obtain optimum navigational support and information to facilitate and ensure appropriate and timely navigational and anti-collision decision-making, in line with good seamanship. It was also very likely that, as the overall strategy for e-navigation became clearer, there would be implications for the international regulatory framework. At that stage, and as usual, IMO, in co-operation with all relevant entities, would have to act diligently and prudently to ensure that no aspect of the innovative concept that e-navigation presented was left unattended. One such aspect would be to engage, at an early stage, the developing countries so that the whole system might benefit from their capabilities and potential, thus narrowing the gap between them and the developed world and contributing to the elimination of the digital divide or the elimination of what branded, at last month's TCC meeting, as "maritime poverty", which seemed to exist nowadays.

Referring to the various items of operational significance on the Sub-Committee's agenda for the current session, he highlighted the numerous proposals on ships' routeing, ship reporting and other measures aimed at enhancing the safety of navigation in areas of identified navigational hazards and environmentally sensitive sea areas including the use of the XML format for ship reporting systems.

He reminded the Sub-Committee that the importance of the role of the human element in the safety of navigation could never be over emphasized. The significance of the man/machine interface in safe operations was widely recognized including ergonomic issues with respect to shipboard operations and he was confident that the Sub-Committee would be able to make significant progress in its quest for sound INS and IBS performance standards. Still on the issue

of performance standards, he observed that progress on ECDIS performance standards and related issues would also assist in the development of the concept of e-navigation as a whole. With respect to navigational aids and related issues, the finalization of performance standards for shipborne Galileo receiver equipment would allow the industry to produce the relevant equipment in time for the introduction of the system so that when the Galileo system became operational, it would form part of the World-wide Radionavigation System.

The Secretary-General then invited the Sub-Committee's attention to a few issues of a rather general nature. Firstly, referring to security in ports and on ships, he advised that in these turbulent times, there was no place for complacency about security at the Headquarters and no compromise should be allowed on this vital issue. He, therefore, appealed to everyone to promptly abide by the security rules in place.

Secondly, with reference to the implementation of the Voluntary IMO Member State Audit Scheme (resolution A.974(24)), he stated that he would appreciate receiving favourable responses from Members offering themselves for audit, nominating auditors to enable him to select audit teams to conduct the audit and nominating qualified auditors to participate in the planned regional training courses. He had pledged his personal commitment to the Scheme and would appreciate the support of, and co-operation in, the wide and effective implementation of the Scheme.

Thirdly, on the issue of the planned refurbishment of the Headquarters Building which would be closed for approximately 12 months between the summers of 2006 and 2007, the Secretary-General informed that the Secretariat would move temporarily to offices in London provided by the Host Government, and expressed hope that Members would be prepared to face, with resolute spirit and good humour, any discomfort and disruption from normal operations.

1.6      The Chairman thanked the Secretary-General for his words of encouragement and stated that the Secretary-General's advice and requests would be given every consideration in the Sub-Committee's deliberations.

**Adoption of the agenda**

1.7      The Sub-Committee adopted the agenda, as approved by MSC 81 (NAV 52/2/2, annex 2).

## 2    DECISIONS OF OTHER IMO BODIES

2.1    The Sub-Committee noted, in general, decisions and comments (NAV 52/2, NAV 52/2/1, NAV 52/2/2 and NAV 52/2/3) pertaining to its work made by A 24, DE 49, COMSAR 10, MEPC 54, MSC 81 and FSI 14 and considered them under the appropriate agenda items.

2.2    The Chairman informed the Sub-Committee that MSC 81 had considered the report of the fifty-first session of the Sub-Committee and taken action of relevance to the Sub-Committee regarding ships' routeing and reporting systems namely it:

> .1    approved MSC.1/Circ.1060/Add.1 on Amendment to the Guidance note on the preparation of proposals on ships' routeing systems and ship reporting systems for submission to the Sub-Committee on Safety of Navigation (MSC/Circ.1060);

> .2    reminded Governments of the requirement to provide "information on the adequacy of the state of hydrographic surveys and nautical charts in the area of a proposed routeing system", as set out in MSC/Circ.1060;

> .3    advised the Sub-Committee that it might seek, where necessary, guidance from IHO regarding hydrographic surveying and nautical charting in areas of proposed routeing systems; and

> .4    noted that IHO would comment on proposed routeing systems where it considered this to be appropriate.

## 3    ROUTEING OF SHIPS, SHIP REPORTING AND RELATED MATTERS

**General**

3.1    The Chairman recalled that during NAV 51 (NAV 51/19, paragraph 3.4), in summing up the extensive discussion on the quality of ships' routeing proposals, he had stressed the need to use a procedure similar to the one being presently used by the Committee for the assessment of proposals for new work programme items to pre-assess such proposals. He had further recommended that for future sessions of the Sub-Committee, therefore a preliminary assessment of these proposals would be made by him in consultation with the Secretariat and the Chairman of the Ships' Routeing Working Group, following the general criteria in MSC/Circ.1060 but not addressing the technical aspects of the proposal.  The results of the assessment would then be

made available to the Sub-Committee by means of a Working Paper.  The Sub-Committee had supported this proposed course of action.


3.2     The Chairman informed the Sub-Committee that accordingly, he had in co-operation with the Secretariat prepared document NAV 52/WP.1, outlining a preliminary assessment of the ships' routeing and ship reporting proposals.  The Sub-Committee considered document NAV 52/WP.1 and noted that, in general, the proposals were in conformity with the criteria outlined in MSC/Circ.1060.


**New Traffic Separation Schemes (TSSs)**

**New Traffic Separation Scheme – mandatory ships' routeing system in international waters, off the coast of northern Norway from Vardø to Røst**

3.3     At the request of the Government of Norway (NAV 52/3/6 and Corr.1 (English only)), the Sub-Committee discussed briefly a proposal for the establishment of a mandatory ships' routeing system in international waters, off the coast of northern Norway, from Vardø to Røst which would establish a safe route for sea transport, and in particular for the transport of oil from the increased petroleum activity in the Barents Region, thereby reducing the environmental risk related to ship movements in the area, especially with regard to tanker traffic.


3.4     The Sub-Committee also noted the additional information provided by WWF (NAV 52/INF.9) about the nature resources and environmental values in the area of Vardø – Røst in the Barents Sea including its support for routeing ship traffic far away from the coast to reduce environmental risks in this vulnerable area.


3.5     The delegation of the Russian Federation informed the Sub-Committee that Norway had been in touch with Russia in the early stages of its development of the ships' routeing proposal.  The Russian Federation fully shared the concerns of Norway and supported their proposal.  However, the Russian Federation was of the opinion that the growth of traffic flow in the region had been over estimated (for the year 2015, Norway had estimated a growth in traffic of 150 million tonnes whilst according to the Russian Federation it should be 50 million tonnes); there was no special regime under the COLREGs for a mandatory routeing system; as there are no restricted waters in the region the width of the traffic lanes of the proposed traffic separation scheme should be extended to 3 miles and accordingly the distance off from the shore of the proposed routeing system should be minimized taking into account navigational and

hydrometeorological conditions of the region.  The Russian Federation also stated that the Traffic Separation Scheme should apply to ships carrying hazardous cargo only.

**New Traffic Separation Schemes – Modification and extension of the existing SUNK Precautionary Area**

3.6     At the request of the Government of the United Kingdom (NAV 52/3/9 and Corr.1 (English only)), the Sub-Committee discussed briefly a proposal for a comprehensive new routeing scheme for the northern approaches to the Thames Estuary consisting of a modification and extension of the existing SUNK Precautionary Area, which had not been adopted by IMO; it was originally established in 1998 as a national scheme within the United Kingdom territorial waters.

**New Traffic Separation Scheme – "Off Neist Point" in the Minches**

3.7     At the request of the Government of the United Kingdom (NAV 52/3/14), the Sub-Committee discussed briefly a proposal for a new traffic separation scheme "Off Niest Point" consisting of one north and one south bound routes with a separation zone.

**Amendments to existing Traffic Separation Schemes (TSSs)**

**Amendments to the existing Traffic Separation Scheme "In the Strait of Gibraltar"**

3.8     At the request of the Governments of Spain and Morocco (NAV 52/3/2), the Sub-Committee discussed briefly a proposal to amend the existing routeing system in the "In the Strait of Gibraltar" by the establishment of two precautionary areas, one adjoining the eastern end of the traffic separation scheme for the Strait of Gibraltar and the other off the Moroccan port of Tangiers-Med, together with the recommended directions for ships entering or leaving that port, and an amendment to the existing southern inshore traffic zone involving the creation of two new southern inshore traffic zones.

3.9     The delegation of the Republic of Korea sought clarification whether the existing mandatory ship reporting system "In the Strait of Gibraltar" would also be amended.  The delegation of Spain stated that only the existing traffic separation scheme "In the Strait of Gibraltar" would be amended and that there was no need to amend the existing mandatory ship reporting system "In the Strait of Gibraltar".

**Amendments to the existing Traffic Separation Scheme "In the approach to Boston, Massachusetts"**

3.10    At the request of the Government of the United States (NAV 52/3/3), the Sub-Committee discussed briefly a proposal to amend the existing traffic separation scheme (TSS) "In the approach to Boston, Massachusetts" that should result in a significant reduction in the likelihood of ship strike deaths and serious injuries to Right and other whales, while maintaining and improving maritime safety.

**Amendments to the existing Traffic Separation Schemes "In the Adriatic Sea"**

3.11    At the request of the Governments of Croatia and Italy (NAV 52/3/7), the Sub-Committee discussed briefly a proposal to amend the existing traffic separation schemes (TSS) "In the Adriatic Sea" intended to enhance maritime safety, safety of navigation and protection of the environment.

**Amendments to Existing Traffic Separation Schemes "Off Cani Island" and "Off Cape Bon", off the coast of Tunisia**

3.12    At the request of the Government of Tunisia (NAV 52/3/10), the Sub-Committee discussed briefly a proposal to amend the existing traffic separation schemes (TSSs) "Off Cani Island" and "Off Cape Bon", off the coast of Tunisia.

**Amendments to the existing Traffic Separation Scheme "Off Botney Ground"**

3.13    At the request of the Governments of the United Kingdom and the Netherlands (NAV 52/3/15), the Sub-Committee discussed briefly a proposal to amend the existing traffic separation scheme (TSS) "Off Botney Ground".

**Routeing measures other than Traffic Separation Schemes (TSSs)**

**Establishment of an Area to be Avoided/Mandatory No Anchoring Area in the approaches to the Gulf of Venice**

3.14    At the request of the Government of Italy (NAV 52/3/8), the Sub-Committee discussed briefly a proposal for the establishment of an Area to be Avoided/Mandatory No Anchoring Area in the approaches to the Gulf of Venice.

**Establishment of a Precautionary Area off the west coast of the North Island of New Zealand**

3.15    At the request of the Government of New Zealand (NAV 52/3/11), the Sub-Committee discussed briefly a proposal for establishing a new Precautionary Area off the west coast of the North Island of New Zealand aimed at minimizing the risk of collision in an area of dense traffic.

**Amendments to the existing Deep-Water route west of the Hebrides**

3.16    At the request of the Government of the United Kingdom (NAV 52/3/12), the Sub-Committee discussed briefly a proposal for amending the existing Deep-Water route west of the Hebrides, as a measure to increase the protection of the marine environment in the area.

**Amendments to the existing Recommended Tracks in the Minches**

3.17    At the request of the Government of the United Kingdom (NAV 52/3/14), the Sub-Committee discussed briefly a proposal for upgrading the existing Recommended Tracks in the Minches to Recommended Routes.

**Amendments to the Recommendations on navigation around the United Kingdom coast**

3.18    At the request of the Government of the United Kingdom (NAV 52/3/14), the Sub-Committee discussed briefly a proposal for amendments to the Recommendations on navigation around the United Kingdom coast (Resolution A.768(18), annex) adopted on 4 November 1993) relating to the existing voluntary reporting system in the Minches applicable to all ships.

**Abolition of the Area to Be Avoided around the EC 2 Lighted Buoy**

3.19    At the request of the Government of the United Kingdom (NAV 52/3/16), the Sub-Committee discussed briefly a proposal for the abolition of the Area to be Avoided around the EC 2 Lighted Buoy, due to the intended discontinuance of the EC 2 Lighted Buoy.

3.20    The Sub-Committee noted that this amendment would also entail a consequential amendment to the Recommended directions of traffic flow in the English Channel (Resolution A.475 (XII), annex 1, section 3 adopted on 19 November 1981).

**Mandatory ship reporting systems**

**New mandatory ship reporting system for the Galapagos Particularly Sensitive Sea Area (PSSA)**

3.21    At the request of the Government of Ecuador (NAV 52/3, NAV 52/3/1 and Corr.1), the Sub-Committee discussed briefly a proposal for establishing a new mandatory ship reporting system for the Galapagos Particularly Sensitive Sea Area" (GALREP), for ships entering and leaving the PSSA, which would enable the Maritime Rescue Sub-Centre located in the Galapagos to obtain accurate information on these ships and give the alert promptly to ensure an immediate response, if necessary.

3.22    The Sub-Committee noted the submission by Ecuador (NAV 52/3) notifying the implementation of two mandatory traffic separation schemes for ships entering ports in the Galapagos archipelago.  Recognizing the benefits to be obtained by the adoption of ships' routeing measures by the Organization, such as the marking of such measures on international charts and the inclusion in the Ships' Routeing Guide, the Sub-Committee encouraged Ecuador to submit a proposal for the adoption of traffic separation schemes by IMO.

**Amendments to the existing mandatory ship reporting system "In the Great Belt Traffic Area"**

3.23    At the request of the Government of Denmark (NAV 52/3/4), the Sub-Committee discussed briefly a proposal outlining an expansion of the existing mandatory ship reporting system "In the Great Belt Traffic Area" and the implementation of a structured Navigational Assistance Service in this area.

**Amendments to the existing mandatory ship reporting system "In the Gulf of Finland"**

3.24    At the request of the Governments of Estonia, Finland and the Russian Federation (NAV 52/3/5), the Sub-Committee discussed briefly a proposal outlining amendments to the existing mandatory ship reporting system "In the Gulf of Finland".

**XML format for ship reporting systems**

3.25    The Sub-Committee noted that COMSAR 10 (COMSAR 10/16, paragraphs 7.7 to 7.9) had agreed, in principle, that an XML format similar to that proposed by Japan in document COMSAR 10/7 should be standardized for the data exchange of ship reporting systems recognized by the Organization.  It was noted that XML format standards for maritime services

NAV 52/WP.6                                  - 12 -

were being developed within other fora, notably through projects supported by the European Union, although these standards did not necessarily include ship reporting systems. Therefore, COMSAR 10 deemed that it was necessary to obtain further information and views from the European Union and maritime agencies on document COMSAR 10/7 and the use of the XML format for consideration at its next session, with a view towards developing an MSC resolution regarding this standard.

3.26    The Sub-Committee also noted that COMSAR 10 had further agreed that the NAV Sub-Committee should also be asked to provide relevant comments and advice on the issue.

3.27    The observer of the European Commission informed the Sub-Committee that European legislation required masters, owners, agents and operators to report to mandatory ship reporting systems, as well as other systems set up by the Member States. The way to report varied from voice on VHF to sophisticated IT systems. The information would primarily be used for different national vessel information and management systems. In the relevant European Directive 2002/59, European Union Member States are requested to participate in an European exchange of maritime information through a system called SafeSeaNet. The central server of SafeSeaNet receives notifications that a national system has information about a particular vessel and if other Member States request that information, SafeSeaNet would retrieve the information and send it to the requesting Member State. All exchange of information between the EU Member States systems and SafeSeaNet was done through messages in XML standard. At present, the messages covered almost all ships' arrival and departure notifications, ships position reporting through AIS, as well as reporting of dangerous or polluting cargo, SITREP and POLREP. In the near future, standard XML messages might also be available for waste information and ships position reporting through LRIT and ISPS arrival notification. This available extensive XML-based infrastructure for exchange of information onshore in the EU would be greatly enhanced with widely used standard messages using XML. It would also contribute to the possibility for direct exchange of information between the European SafeSeaNet system and similar systems in other countries outside the European Union. Therefore, the European Commission supported the development of such standard XML-based messages.

**Other Matters**

**Amendment to the Aids to Navigation in the Dover Strait Traffic Separation Scheme**

3.28    The Sub-Committee noted the information provided by the United Kingdom (NAV 52/INF.7) on the intended discontinuance of the South Goodwin Light vessel and the consequential upgrading of the S W Goodwin Lighted Buoy.

**Planned new routeing measures in the southern part of the Baltic Sea**

3.29    The Sub-Committee noted with interest the information provided by Poland (NAV 52/INF.5) providing information on planned new routeing measures in the southern part of the Baltic Sea, which are intended to be submitted to the Sub-Committee in 2007 as a joint proposal.

3.30    The delegations of Denmark and Sweden expressed concern that the proposal for routeing measures in the southern part of the Baltic Sea would increase the number of ships that cross the traffic flow in the Bornholmsgat, thus increasing the risk of collisions beyond an acceptable level in a region with a number of particularly vulnerable environmental areas.

3.31    The Sub-Committee requested Poland to consult with Denmark and Sweden during the formulation of planned new routeing measures in the southern part of the Baltic Sea for submission to NAV 53.

**Review of adopted mandatory ship reporting systems**

3.32    The Chairman recalled that resolution MSC.43(64) – Guidelines and criteria for ship reporting systems, as amended by resolutions MSC.111(73) and MSC.189(79) relates to ship reporting systems.  In addition, SOLAS regulation V/11.11 states that the Organization shall ensure that adopted ship reporting systems are reviewed under the guidelines and criteria developed by the Organization.  Lastly, section 4.4 of resolution MSC.43(64), as amended  states that the Organization should provide a forum for the review and re-evaluation of systems, as necessary, taking into account the pertinent comments, reports, and observations of the systems.

3.33    The Sub-Committee was of the opinion that Member Governments responsible for overseeing the operation of IMO adopted ship reporting systems should, at suitable intervals, undertake a review and re-evaluation of systems based on the operational experience gained.

**Terms of Reference for the Ships' Routeing Working Group**

3.34    After a preliminary discussion, as reported in paragraphs 3.1 to 3.33 above, the Sub-Committee re-established the Ships' Routeing Working Group and instructed it, taking into account any decisions of, and comments and proposals made in Plenary as well as relevant decisions of other IMO bodies (item 2):

.1    consider all documents submitted under item 3 regarding routeing of ships and related matters and prepare routeing and reporting measures, as appropriate and recommendations for consideration and approval by Plenary;

.2    consider the request of COMSAR 10 (COMSAR 10/16, paragraphs 7.7 to 7.9) to provide relevant comments and advice regarding the use of XML format to be standardized for data exchange of ship reporting systems and advise the Sub-Committee accordingly;

.3    consider document MSC 81/23/12 and prepare draft revised text of the proposed amendments to Annex IV of the Convention on the International Regulations for Preventing Collisions at Sea, 1972, as amended;

.4    take into account the role of the human element guidance as updated at MSC 75 (MSC 75/24, paragraph 15.7) including the Human Element Analysing Process (HEAP) given in MSC/Circ.878/MEPC/Circ.346 in all aspects of the items considered; and

.5    submit a report to Plenary on Thursday, 20 July 2006 for consideration at Plenary.

**Report of the Ships' Routeing Working Group**

[3.35    Having received and considered the Working Group's report (NAV 52/WP.5), the Sub-Committee approved it in general and, in particular (with reference to paragraphs 3.1 to 9.6) took action as summarized hereunder.

**New Traffic Separation Schemes(TSSs)**

**New Traffic Separation Schemes and recommended routes off the coast of Norway from Vardø to Røst**

3.36    The Sub-Committee noted that the working group had agreed in general to a routeing system off the coast of northern Norway between Vardø to Røst to improve the safety of navigation and the protection of the marine environment. However, the majority of the working group could not agree to one mandatory traffic separation scheme of 560 nautical miles between Vardø and Røst and the delegation of Norway was invited to amend their proposal.

3.37    The Sub-Committee further noted that the delegation of Norway had agreed to revise their proposal. The revised proposal consists of eight new traffic separation schemes and seven recommended routes connecting them, off the coast of northern Norway, from Vardø to Røst. The proposed new traffic separation schemes and recommended routes would establish a safe route for sea transport, and in particular for the transport of oil from the increased petroleum activity in the Barents Region, thereby reducing the environmental risk related to ship movements in the area, especially with regard to tanker traffic. The new traffic separation schemes and recommended routes were not likely to cause a disproportionate burden to the shipping industry.

3.38    The Sub-Committee approved the proposed new traffic separation schemes and recommended routes off the coast of Norway from Vardø to Røst with some corrections to the description, as set out in annex (…), which the Committee is invited to adopt.

**New Traffic Separation Schemes in the SUNK area and associated routeing measures in the Northern approaches to the Thames Estuary**

3.39    The Sub-Committee approved the proposed new traffic separation schemes "In the SUNK area and associated routeing measures to the Northern approaches to the Thames Estuary with some corrections to the description, as set out in annex (…), which the Committee is invited to adopt.

**New Traffic Separation Scheme – "Off Neist Point" in the Minches**

3.40    The Sub-Committee approved the proposed new traffic separation scheme "Off Neist Point" in the Minches with some corrections to the description, as set out in annex (…), which the Committee is invited to adopt.

**Amendments to existing Traffic Separation Schemes (TSSs)**

**Amendments to the existing Traffic Separation Scheme "In the Strait of Gibraltar"**

3.41     The Sub-Committee approved the proposed amendments to the existing traffic separation scheme "In the Strait of Gibraltar" with some corrections to the description, as set out in annex (…), which the Committee is invited to adopt.

**Amendments to the existing Traffic Separation Scheme "In the approach to Boston, Massachusetts"**

3.42     The Sub-Committee approved the proposed amended traffic separation scheme "In the approach to Boston, Massachusetts" with some corrections to the description, as set out in annex (…), which the Committee is invited to adopt.

**Amendments to the existing Traffic Separation Schemes "In the Adriatic Sea"**

3.43     The Sub-Committee approved the proposed amendments to the existing traffic separation schemes "In the Adriatic Sea" with some corrections to the description, as set out in annex (…), which the Committee is invited to adopt.

**Amendments to Existing Traffic Separation Schemes "Off Cani Island" and "Off Cape Bon", off the coast of Tunisia**

3.44     The Sub-Committee noted that the amended existing traffic separation schemes (TSSs) "Off Cani Island" and "Off Cape Bon", off the coast of Tunisia are based on ED50 Datum. Consequently, the delegation of Tunisia informed the Sub-Committee that the Tunisian Hydrographic Office will publish an *ad hoc* nautical chart based on WGS 84 in September 2006.

3.45     The Sub-Committee approved the proposed amendments to the existing traffic separation schemes (TSSs) "Off Cani Island" and "Off Cape Bon", off the coast of Tunisia with some corrections to the description, as set out in annex (…), which the Committee is invited to adopt.

**Amendments to the existing Traffic Separation Scheme "Off Botney Ground"**

3.46    The Sub-Committee approved the proposed amendments to the existing traffic separation scheme (TSS) "Off Botney Ground" as set out in annex (…), which the Committee is invited to adopt.

**Routeing measures other than Traffic Separation Schemes (TSSs)**

**Establishment of an Area to be Avoided/Mandatory No Anchoring Area in the approaches to the Gulf of Venice**

3.47    The Sub-Committee approved the proposed Area to be Avoided/Mandatory No Anchoring Area in the approaches to the Gulf of Venice with some corrections to the description, as set out in annex (…), which the Committee is invited to adopt.

**Establishment of a Precautionary Area off the west coast of the North Island of New Zealand**

3.48    The Sub-Committee approved the proposed new Precautionary Area off the west coast of the North Island of New Zealand with some corrections to the description, as set out in annex (…), which the Committee is invited to adopt.

**Amendments to the existing Deep-Water route west of the Hebrides**

3.49    The Sub-Committee approved the proposed amended Deep-Water route west of the Hebrides with some corrections to the description, as set out in annex (…), which the Committee is invited to adopt.

**Amendments to the existing Recommended Tracks in the Minches**

3.50    The Sub-Committee approved the proposed upgrading of the existing Recommended Tracks in the Minches to Recommended Routes, as set out in annex (…), which the Committee is invited to adopt.

**Amendments to the Recommendations on navigation around the United Kingdom coast**

3.51    The Sub-Committee approved the proposed amendments to the Recommendations on navigation around the United Kingdom coast with some corrections to the description, as set out in annex (…), which the Committee is invited to adopt.

**Abolition of the Area to Be Avoided around the EC 2 Lighted Buoy**

3.52    The Sub-Committee approved the proposed abolition of the Area to be Avoided around the EC 2 Lighted Buoy including the consequential amendment relating to the cancellation of the Recommendation on directions of traffic flow in the English Channel as set out in annex (…), which the Committee is invited to adopt.

**Implementation of new and amended traffic separation schemes and other routeing measures**

3.53    The new TSSs and amendments to the existing TSSs and other routeing measures mentioned in the above paragraphs 3.36 to 3.52 will be implemented at 0000 hours UTC 6 months after adoption by the Committee.

**Mandatory ship reporting systems**

**New mandatory ship reporting system for the Galapagos Area**

3.54    The Sub-Committee approved the proposed new mandatory ship reporting system for the Galapagos area with some corrections, as set out in annex (…), which the Committee is invited to adopt.

**Amendments to the existing mandatory ship reporting system "In the Great Belt Traffic Area"**

3.55    The Sub-Committee approved the proposed amendments to the existing mandatory ship reporting system "In the Great Belt Traffic Area" with some corrections, as set out in annex (…), which the Committee is invited to adopt.

**Amendments to the existing mandatory ship reporting system "In the Gulf of Finland"**

3.56    The Sub-Committee approved the proposed amendments to the existing mandatory ship reporting system "In the Gulf of Finland" with some corrections as set out in annex (…), which the Committee is invited to adopt.

**Implementation of Mandatory Ship Reporting Systems**

3.57     The new and amended mandatory ship reporting systems mentioned in the above paragraphs 3.54 to 3.56 will be implemented at 0000 hours UTC 6 months after adoption by the Committee.

**XML format for ship reporting systems**

3.58     The Sub-Committee noted that taking into consideration the recent changes in the technology in communications; it would be appropriate to standardize the format for ship reporting systems and agreed in principal with the proposed XML format standards for maritime services.  XML format will contribute to reduce the heavy workload for masters and navigational officer during the navigational watch. Bearing in mind the reasons mentioned, the group felt that it would be appropriate to implement the standardized XML format in as little time as possible. Direct data exchange between ship to shore, but also between VTS and others (authorities, shipowners and shipping agencies) by XML format, would contribute to improved safety and security.  The Secretariat was instructed to forward this information to COMSAR 11.]

**4        REVIEW OF PERFORMANCE STANDARDS FOR INS AND IBS**

4.1     The Sub-Committee noted that MSC 78 (MSC 78/26, paragraph 18.12.5) had agreed that there was no need to develop a new instrument to demonstrate compliance with SOLAS regulation V/15 and instructed NAV 50 to take this into account when considering documents MSC 78/11/3 (IACS) and MSC 78/11/4 (Republic of Korea).

4.2     The Sub-Committee recalled that the IACS observer had informed NAV 50 that the IACS Unified Interpretation (UI) 181, submitted as document MSC 78/11/3, was amended in co-operation with the delegation of the Republic of Korea to ensure that their concerns relating to MSC/Circ.982 expressed in their paper MSC 78/11/4, and the additional comments made during the plenary discussion, were fully covered.  The UI was further reviewed in co-operation with the delegation of Germany to ensure that it covered all the applicable parts of MSC/Circ.982.  This revised UI would be submitted to MSC 79 and NAV 51.

4.3     The Sub-Committee also recalled that, NAV 50, with a view to progressing the matter further intersessionally, had established a correspondence group under the co-ordination of

Germany to give preliminary consideration to the revision of the performance standards for INS and IBS and advise the Sub-Committee.

4.4      The Sub-Committee further recalled that NAV 51 had agreed with the conclusions of the correspondence group that work should begin with a revision of INS performance standards and with a revision of the IBS performance standards following and in addition, that performance standards for a bridge alarm management system were also required but was of the opinion that they could form a part of INS performance standards.  NAV 51, therefore, agreed to the revised draft structure of performance standards for INS together with terms of reference for the correspondence group to prepare the work under the leadership of Germany for consideration at NAV 52.

4.5      The Sub-Committee also noted that DE 49 had considered document DE 49/13 (Germany), advising on the progress made by the correspondence group on the revision of Integrated Navigation System (INS) and Integrated Bridge System (IBS) performance standards, and the development of performance standards for bridge alarm management system, established by NAV 51, which had also been instructed to liaise with the DE Sub-Committee to ensure consistent treatment of alarm management when reviewing the Code on Alarms and Indicators; and document DE 49/13/1 (United Kingdom), supporting the proposals in document DE 49/13 to classify alarms on the basis of the urgency of the required response and suggesting common definitions between the INS activity and the revision of the Code and the inclusion of some aspects of alarms that are outside the scope of performance standards which are under development by the NAV Sub-Committee.  Following a brief discussion, DE 49 had invited Member Governments and international organizations to submit to DE 50 (5-9 March 2007), proposals for amendments to the Code on Alarms and Indicators, taking into account the outcome of NAV 52's consideration.

4.6      The Sub-Committee briefly discussed the report by Germany as co-ordinator of the Correspondence Group for INS and IBS (NAV 52/4).

4.7      The Observer from IACS informed the Sub-Committee that IACS Unified Interpretation (UI)181 was proving very difficult to come to an agreement and therefore IACS was unable to submit anything to NAV 52.  It was expected that the agreement would be reached in two weeks time and then IACS would be in a position to provide this information to the Correspondence Group and NAV 53.

4.8    The Sub-Committee agreed to refer document NAV 52/4 to the Technical Working Group to be established under agenda items 4, 5, 9, 10, 11 and 12.

**Establishing the Technical Working Group**

4.9    Having also considered agenda items 5, 9, 10, 11 and 12, which were deemed to be within the remit of the Technical Working Group, the Sub-Committee re-established the Technical Working Group and instructed it, taking into account any decisions of, and comments and proposals made in Plenary, undertake the following tasks:

.1    consider NAV 52/4 and provide any comments and guidance on:

.1    the draft INS performance standards including the alert management module with a concept and structure, which could be extended to all alerts on the bridge (agenda item 4);

.2    the recommendation for the development of a bridge resource management standard or guidelines in the framework of the revision of the IBS performance standard to allow for a comprehensive application of the SOLAS regulation V/15 on board (agenda item 4); and

.3    the modular concept of INS and future revised individual equipment performance standards (agenda item 4).

.2    prepare revised terms of reference for the Correspondence Group on INS and IBS issues to progress work on this issue for finalization at NAV 53 (agenda item 4);

.3    consider NAV 52/5, NAV 52/5/1, NAV 52/5/2 and NAV 51/6/2 and prepare a complete revised draft performance standards for ECDIS (agenda item 5);

.4    prepare, as appropriate, recommendations, opinions and liaison statements to appropriate ITU bodies in relation to NAV 52/9, NAV 52/9/1 and NAV 52/INF.2 (agenda item 9);

.5     consider NAV 51/19 (annex 14), the relevant part of NAV 52/10 and NAV 52/10/1 and finalize the draft performance standards for shipborne Galileo receiver equipment (agenda item 10);

.6     consider the relevant part of NAV 52/10 and NAV 52/INF.8 and provide any comments and guidance on the World-Wide Radionavigation Systems (WWRNs) issues, namely:

.1     review and amendment of IMO policy for GNSS (resolution A.915(22)) (agenda item 12);

.2     recognition of radionavigation systems as components of the WWRNS (resolution A.953(23)) (agenda item 12); and

.3     finalization of a draft liaison statement to IEC Technical Committee 80, Working Group 4A on shipboard GNSS receiver equipment (agenda item 12).

.7     if time permits, consider NAV 52/11, NAV 52/11/1 and NAV 52/INF.3 and start work on the development of the draft performance standards for navigation lights, navigation light controllers and associated equipment; otherwise submit the outcome of its consideration to NAV 53 (agenda item 11);

.8     take into account the role of the human element guidance as updated at MSC 75 (MSC 75/24, paragraph 15.7) including the Human Element Analysing Process (HEAP) given in MSC/Circ.878/MEPC/Circ.346 in all aspects of the items considered; and

.9     submit a report to Plenary on Thursday, 20 July 2006 for consideration at Plenary.

**Report of the Technical Working Group**

4.10    Having received and considered the Technical Working Group's report (NAV 52/WP.4), the Sub-Committee (with reference to paragraphs 3.1 to 3.4), took action as summarized hereunder.

4.11    The Sub-Committee agreed with the conclusions of the Group that more work was required in section 3 (Application), in section 15 (Provision of on-board familiarization material) where guidance and requirements should be clearly differentiated and in Appendix 1 (Definitions) where a definition for Human Machine Interface should be added.    The Sub-Committee further noted that the correspondence group had indicated the need for more work in several areas.

4.12    The Sub-Committee agreed with the conclusion of the correspondence group's opinion that a revision of the performance standards for IBS should include the development of bridge resource management guidelines and be conducted in the framework of SOLAS regulation V/15 and that Appendix 3 of NAV 52/4 was a suitable base text.

4.13    Further, the Sub-Committee agree with the Group that a proposal for a modular concept of INS and future revised individual performance standards should be developed further.

4.14    In conclusion, the Sub-Committee agreed with the opinion of the group that one more session was needed to complete the work.  The Sub-Committee also approved revised terms of reference for the correspondence group and invited the Committee to extend the target completion date to 2007.

4.15    Accordingly, the Sub-Committee agreed to re-establish an intersessional Correspondence Group under the leadership of Germany[*] with the following terms of reference:

    .1    develop draft revised performance standards for INS including an alert management module based on document NAV 52/4 and the outcome of the discussion in the Technical Working group (NAV 52/WP.4);

---

[*]    **Co-ordinator:**

Dipl.-Ing. Florian Motz
Department
Ergonomics and Information Systems
Research Institute for Communication,
    Information Processing and Ergonomics
Neuenahrer Straße 20
53343 Wachtberg-Werthhoven
Germany
Telephone:        + 49 - (0)228 / 9435 - 271
Telefax:          + 49 - (0)228 / 9435 - 508
E-mail address:    motz@fgan.de

.2      develop revised IBS performance standards together with Bridge Resource Management (BRM) guidelines to allow for a comprehensive application of SOLAS regulation V/15;

.3      develop a proposal for an SN/Circ. for the application of the modular concept for future performance standards;

.4      continue liaison with the Sub-Committee on Ship Design on Equipment (DE) to ensure consistent treatment of alerts; and

.5      submit its report to NAV 53 for consideration.

## 5    AMENDMENTS TO THE ECDIS PERFORMANCE STANDARDS

5.1     The Sub-Committee recalled that, NAV 51 had noted that Greece and IHO had submitted a proposal to MSC 80 (MSC 80/21/2), outlining some amendments/improvements to the ECDIS performance standards (resolution A.817(19), as amended)) and that MSC 80 (MSC 80/24, paragraph 21.22) had added a new high priority item on its work programme with a target completion date of 2007.

5.2     The Sub-Committee also recalled that, NAV 51 had agreed that it would be more appropriate to consider the amendments to the ECDIS performance standards (NAV 51/6, paragraph 21.4), proposed by the Correspondence Group in conjunction with all other amendments, as proposed in document MSC 80/21/2, at NAV 52 and that NAV 51 should only concentrate on the other remaining issues outlined in document NAV 51/6, paragraph 21. Consideration of the document by the Russian Federation (NAV 51/6/2), referring mainly to the performance standards was, therefore, deferred to NAV 52, with some relevant parts being referred to the Working Group on ECDIS for consideration.  NAV 51 also agreed that, to progress the work for NAV 52, an intersessional Correspondence Group should be established under the leadership of Norway.

5.3     The Sub-Committee briefly considered documents by Norway (NAV 52/5 and NAV 52/5/1), the co-ordinator of the Correspondence Group on ECDIS and by CIRM (NAV 52/5/2). The delegation of Norway, invited the Sub-Committee to consider proposed amendments to the ECDIS performance standards (resolution A.817(19), as amended)) (NAV 52/5, annex 1) and the future restructuring of the ECDIS Performance Standards

(NAV 52/5, annex 2), as suggested by Germany, whilst CIRM recommended changes to the draft revised performance standards for ECDIS as prepared by the Correspondence Group.

5.4    The Sub-Committee noted with appreciation the comprehensive report prepared by the Correspondence Group (NAV 52/5) co-ordinated by Norway and was of the opinion that the draft performance standards would form a good basis for revising the performance standards for ECDIS.  Some delegations suggested that the Sub-Committee might wish to consider preparation of revised performance standards for ECDIS based on the modular concept.

5.5    The Sub-Committee, recognizing the need to make progress on the issue, instructed the Technical Working Group to consider documents NAV 52/5, NAV 52/5/1, NAV 52/5/2 and NAV 51/6/2 and prepare complete revised draft performance standards for ECDIS.

**Report of the Technical Working Group**

5.6    Having received and considered the Technical Working Group's report (NAV 52/WP.4/Add.1), the Sub-Committee (with reference to paragraphs 9.1 to 9.4 and annex) took action as summarized hereunder.

5.7    The Sub-Committee agreed with the view of the Group that the draft Performance Standards were mature enough to be forwarded to the Committee for adoption, bearing in mind that there were only editorial amendments and cross references had to be completed before submission to the Committee.    Accordingly, the Sub-Committee approved the draft MSC resolution on Adoption of the revised ECDIS performance standards, set out in annex ... and forwarded them  to the Committee with a view to adoption.

[5.8    The Sub-Committee also agreed with the Group that there may be positional inconsistencies in some charts, and that a circular needed to be developed giving methods of detection of these inconsistencies using radar overlay in advanced models of ECDIS.]

[5.9    Accordingly, the Sub-Committee prepared and approved SN/Circ.... on additional guidance on chart datums and the accuracy of positions on charts including appropriate setting of ECDIS parameters, given at annex ....  This guidance is in addition to the guidance contained in SN/Circ.213 issued on 31 May 2000.  The Committee was invited to endorse this action.]

5.10    The Committee was invited to delete this agenda item from the Sub-Committee's Work Programme as action on the issue had been completed.

## 6    EVALUATION OF THE USE OF ECDIS AND ENC DEVELOPMENT

6.1    The Sub-Committee noted that MSC 78 had referred documents by Australia (MSC 78/24/3), Norway (MSC 78/24/17) and France (MSC 78/24/18) to it and decided to include, in its work programme and the provisional agenda for NAV 51, a high priority item on "Evaluation of the use of ECDIS and ENC development", with two sessions needed to complete the item; and also instructed NAV 50 to give a preliminary consideration to the matter.

6.2    The Sub-Committee recalled that NAV 50 had recognized that a number of issues needed to be considered and discussed before any decision on a revision of the performance standards of ECDIS including the carriage and back-up requirements could be taken and established a correspondence group (co-ordinated by Norway) to give consideration to documents MSC 78/24/3, MSC 78/24/17 and MSC 78/24/18 and exchange preliminary views.  In addition, NAV 50 welcomed the offer from the observer of IHO to evaluate together with its members if, and to what extent, coastal waters were adequately covered by RNC in relation to safety of navigation and also decided to request IHO to evaluate the extent of world-wide ENC coverage and present the outcome of the evaluation to NAV 51.

6.3    The Sub-Committee also recalled that NAV 51 had expressed support for the IHO initiative to establish a comprehensive online catalogue of available official charts, which would facilitate the determination of "appropriate folio of up-to-date paper charts".  It further endorsed the view of the Working Group that Member States should be invited to consider which paper charts would meet the "appropriate folio of up-to-date paper charts" in territorial seas and where ENCs did not exist, and communicate this information to the IHO for inclusion in its online chart catalogue.  In considering what waters the coastal State should cover when advising an appropriate folio of up-to-date paper charts, it was of the view that this was only relevant in territorial seas not covered by ENCs and transiting ships should seek the advice of the coastal State.

6.4    The Sub-Committee further recalled that, NAV 51 had considered the need to review SN/Circ.207 to ensure consistency with the proposed clarifications for "an appropriate folio of up-to-date paper charts" and was of the view that while a review of the circular was necessary to

update it in the light of experience, it would be premature to revise it at present in view of the revision of the Performance Standards of ECDIS as from NAV 52.

6.5    The Sub-Committee considered document NAV 52/6 by Australia giving details of a navigation simulation exercise, a key outcome of which supported the fact that there was a need to revise and re-issue SN/Circ.207 relating to differences between RCDS and ECDIS.

6.6    The Sub-Committee had an extensive discussion with respect to the document by Australia (NAV 52/6) suggesting the revision of SN/Circ. 207.  Some delegations were of the opinion that the findings were based on a very limited simulation exercise and there was no convincing argument to amend SN/Circ.207.  Some delegations also pointed out the decision of NAV 51 not to amend SN/Circ.207 until the time the performance standards for ECDIS had been finalized.

6.7    The delegation of Norway supported by others expressed the opinion that ECDIS in RCDS mode had the same limitation as paper charts and SN/Circ.207 only highlighted the differences between the two modes of operations. Furthermore, the circular should not be revised based on the evaluation carried out by a single Member and it would be better to wait until the revised performance standards were finalized.

6.8    The observer from Cook Islands supported by other delegations expressed the opinion that Australia had provided useful information, which provided practical guidance to the mariner.

6.9    The delegation of the Russian Federation informed the Sub-Committee that they had carried out a similar exercise and had reported the findings to the previous sessions of the Sub-Committee. Furthermore, presently 20% of the world's paper as well as raster charts did not have any chart datum parameters. Therefore it was necessary for shipping companies to develop appropriate procedures so that seafarers were constantly on the alert and did not become over reliant on technology.

6.10    The Sub-Committee agreed that there was a need for revising/refining SN/Circ.207 and there was some support for finalizing the performance standards for ECDIS at this session. Accordingly, the Sub-Committee instructed the Working Group to prepare a draft revised SN/Circ.207 and also decided to request an extension of this agenda item to 2007 so that the revision of the performance standards and SN/Circ.207 could come together at NAV 53.

6.11    The Sub-Committee also considered briefly document NAV 52/6/1 by IHO regarding the development of the online catalogue of ENC, RNC and paper charts used as backup and noted that the IHO was currently working on the technical requirements for the catalogue and would provide a further report to NAV 53.

6.12    With reference to document NAV 52/6/2 by Japan providing the results of an FSA study relating to the evaluation of cost-effectiveness of ECDIS on routes of cargo ships taking into account ENC coverage, the Chairman was of the opinion that it was more relevant during the consideration of agenda item 17 under the sub-item on Development of carriage requirements for ECDIS.  The delegation of Japan and the Sub-Committee concurred with the observation of the Chairman and considered that document under agenda item 17 – Any other business.

**Establishing a Working Group on ECDIS**

6.13    The Sub-Committee further agreed to establish a Working Group on ECDIS and to refer documents NAV 52/6 and NAV 52/6/1 for its consideration.  The ECDIS Working Group was instructed to:

.1    consider documents NAV 52/6 (Australia) and NAV 52/6/1 (IHO) including comments and decisions made in Plenary to:

.1    prepare draft revised SN/Circ.207 with a view to finalization after the completion of the revised performance standards for ECDIS, and provide relevant comments and guidance, as appropriate, on the following:

.1    the proposed structure of the IHO online catalogue including the IHO initiative to establish a comprehensive online catalogue of available official charts, which will facilitate the determination of "appropriate portfolio of up-to-date paper charts"; and

.2    the invitation to coastal States to consider which paper charts would meet the requirements of an "appropriate portfolio of paper charts" in waters under their jurisdiction in consultation with the relevant hydrographic authorities and where ENCs do not exist to

communicate this to IHO for inclusion in the online chart catalogue including information on "derived charts";

.2    take into account the role of the human element guidance as updated at MSC 75 (MSC 75/24, paragraph 15.7) including the Human Element Analysing Process (HEAP) given in MSC/Circ.878/MEPC/Circ.346 in all aspects of the items considered; and

.3    submit a report to Plenary by Thursday, 20 July 2006 for consideration at Plenary.

**Report of the Working Group on ECDIS**

6.14    Having received and considered the report of the Working Group on ECDIS (NAV 52/WP.3), the Sub-Committee (with reference to paragraphs 3.1 to 4.6) took action as summarized hereunder.

**Revision of SN/Circ. 207**

6.15    The Sub-Committee, using the information provided in document NAV 52/6 (Australia), prepared a draft revised SN/Circ.207 on the difference between RCDS and ECDIS with a view to approval after the finalization of the revised performance standards for ECDIS at NAV 53.

6.16    The Sub-Committee agreed that in order to approve this circular after the finalization of the revised performance standards for ECDIS at NAV 53, it was necessary to extend the target completion date for this item. Accordingly, the Committee is invited to extend the target completion date to 2007.

**Development of a comprehensive online catalogue of available official charts**

6.17    The Sub-Committee considered the information in document NAV 52/6/1 (IHO) and a presentation by IHO on the development of a comprehensive online catalogue of available official charts. The presentation demonstrated a possible prototype of the catalogue which would provide information as to the availability of chart coverage in as clear and simple manner as possible. The catalogue was primarily aimed at ENCs and RNCs would be shown where ENCs were not available. This information would be provided as a graphic display showing chart and data limits.

6.18    The Sub-Committee was informed by IHO that there had been an increase in the production of ENCs worldwide. The Sub-Committee concurred with the view expressed by IHO and was of the opinion that with the possibility of mandatory carriage requirements for ECDIS, the production would increase further. The Sub-Committee requested IHO to provide more detailed information to NAV 53.

6.19    The Sub-Committee appreciated the efforts made by IHO relating to the development of an online catalogue of official charts. In discussing the paper charts to be included in the catalogue, the Sub-Committee agreed that a global index of paper charts should be included in the proposed online catalogue.

6.20    Recalling the discussions at NAV 51 (see paragraph 6.23 below), the delegation of the Netherlands supported by others, in referring to the appropriate folio of up-to-date paper charts, informed the Sub-Committee that under UNCLOS, the coastal States (of departure and destination) only had a right to specify carriage of charts under the port entry provisions and, that the flag State was responsible in other areas, including for transiting ships for which they may seek the advice of the coastal State. Hence the online catalogue should only provide recommendations of the coastal States.

6.21    While supporting the Netherlands, the delegation of the Bahamas supported by others expressed the opinion that coastal States should provide differentiated recommendations which could be used by flag States to specify carriage requirements for ships flying their flag depending on the type and size of ships in transit.

6.22    After in depth discussion, the Sub-Committee agreed that the proposed structure of the online catalogue should include the following:

    .1      ENCs;
    .2      RNC where ENCs are not available;
    .3      coastal States' recommendation on appropriate folio of up-to-date paper charts for areas where ECDIS is operated on RCDS mode; and
    .4      index of all globally available paper charts.

6.23    In considering the requirements of "appropriate folio of up-to-date paper charts", the Sub-Committee recalled the discussions at NAV 51 (NAV 51/19 paragraphs 6.30 to 6.33) and

agreed that coastal States should consider which paper charts would meet the requirements of an "appropriate portfolio of paper charts" in waters under their jurisdiction in consultation with the relevant hydrographic authorities and where ENCs do not exist and to communicate this to IHO for inclusion in the online chart catalogue including information on "derived charts". Accordingly, the Sub-Committee invited coastal States to provide their recommendations to IHO at an early date.

6.24    The Sub-Committee, during its deliberation, also recognized that there was a need to provide guidance to coastal States to assist them in identifying the paper charts that would be required to meet the "appropriate folio of up-to-date paper charts" in waters under their jurisdiction.

# 7    DEVELOPMENT OF GUIDELINES FOR THE INSTALLATION OF SHIPBORNE RADAR EQUIPMENT

7.1    The Sub-Committee noted that MSC 80 (MSC 80/24, paragraph 21.23) had considered document MSC 80/21/4 (Norway), proposing to develop guidelines on installation of shipborne radar equipment with the aim of ensuring the proper installation and setting-up of such equipment, which would contribute to ensuring that the performance of future radar installations on board ships will realize the maximum performance potential offered by the performance standards.    Subsequently, MSC 80 had decided to include, in the Sub-Committee's work programme, a high priority item on "Development of guidelines for the installation of shipborne radar equipment", with three sessions needed to complete the item and instructed the Sub-Committee to include the item in the provisional agenda for NAV 52.

7.2    The Sub-Committee considered document NAV 52/7 (Norway) providing a basic framework for developing draft Guidelines for the installation of shipborne radar equipment.

7.3    The delegation of Norway requested Members to provide suitable comments and guidance including suggestions on the draft guidelines for the installation of shipborne radar equipment detailed in document NAV 52/7.

7.4    A number of delegations spoke on the issue.    Some were of the view that special consideration should be given to on-site installation practices with respect to shipyards.    Others were of the opinion that new radar installations on existing ships should be according to the

proposed Guidelines, as far as practicable and from the operational aspect, the radar antenna should preferably be sited on the centre-line of the ship.

7.5    The Sub-Committee invited Members to submit comments and suitable proposals for consideration at NAV 53.

## 8    AMENDMENTS TO COLREGs ANNEX I RELATED TO COLOUR SPECIFICATION OF LIGHTS

8.1    The Sub-Committee recalled that MSC 80 (MSC 80/24, paragraph 21.24.1) based on a proposal by Norway (MSC 80/21/8), had agreed to add a high priority work item on "Revision of Annex I of the Convention on the International Regulations for Preventing Collisions at Sea, 1972, (COLREG) to the work programme of the Sub-Committee, with two sessions needed to complete the work.  According to Norway, the colour specification of lights given in Annex I of COLREG  had been revised by the International Commission on Illumination; the reference in the Annex I of COLREG was therefore no longer valid, and should therefore be updated in accordance with the newest revised standard.

8.2    The Sub-Committee briefly considered the Norwegian proposal.

8.3    The delegation of the Netherlands stated that the use of established industrial standards wherever possible, specifically those emanating from international standardization bodies, should be pursued by the Organization and its Members.  Norway had proposed the revision of the standards as revised by the International Commission on Illumination, however, the reasons behind the revision had not been elaborated on and neither had Norway clarified the consequences of the proposed changes to section 7 (Colour specification of lights) of Annex I of the COLREGs.  The change in the colour temperature range of lights had been initiated by the wish to make use of LED systems in navigation lights.  This had led to a shift in the chromaticity of white light towards the blue.  This might not seem very problematic; however, it presented a severe problem for the present range of navigation lights in use, in storage and in production.  It was not only the shift of the white light to the blue that was creating the problem but the elimination of part of the colour temperature range of the white light as it was specifically this part of the range that was covered by present white navigation lights.  Research by a leading navigation light manufacturer in the Netherlands, carried out in co-operation with the German Bundesamt für Seeschiffahrt und Hydrografie, had shown that approximately 90% of all white navigation lights either in use or produced did not meet the new colour temperature standard.

Annex I of the COLREGs was clear in itself: it stated that the colour temperature of navigation lights shall conform to the co-ordinates given.  This would mean that approximately 90% of all white navigation light would have to be replaced at an enormous cost to the industry.  The Netherlands for that reason and without the safety benefits having been demonstrated by way of an FSA study could not accept the Norwegian proposal.

8.4     A number of delegations supported the views expressed by the Netherlands including the need for a FSA study and a Cost Benefit Analysis.  Accordingly, the Sub-Committee requested Norway to re-consider its proposal and submit a revised document to NAV 53.

# 9     ITU MATTERS, INCLUDING RADIOCOMMUNICATIONS ITU-R STUDY GROUP 8 MATTERS

**Maintenance and administration of AIS binary messages**

9.1     The Sub-Committee recalled that the responsibility for the maintenance of AIS binary messages had been transferred from the IALA to IMO.  ITU WP 8B had noted that SN/Circ.236 conflicted with Recommendation ITU-R M.1371-1, which included a set of international application identifier (IAI) definitions.  The most significant conflict was the duplication and renumbering of messages.  This had raised concerns, mainly from equipment manufacturers, who were reported to be confused as to which document to follow (ITU or IMO).  Consequentially, there was a need to modify the existing equipment on board vessels in order to apply SN/Circ.236.

9.2     The Sub-Committee noted that this matter was considered further at the 18th meeting of WP 8B in March 2006 and IMO was informed that ITU-R intended to remove the International Function Messages (IFMs 16, 17, 18, 19 and 40) during the revision of Recommendation ITU-R M.1371-2.  These IFMs were superseded by IMO SN/Circ.236 and would not be part of the next edition of Recommendation ITU-R M.1371.  Two IFMs were no longer available; Ship Waypoint and/or Route Plan Report, former IFM 17 and Advice of Waypoints and/or Route Plan of VTS, former IFM 18.  ITU-R intended to continue to define the system-related messages in the revision to Recommendation ITU-R M.1371-2 and in any subsequent revisions. ITU-R had requested that IMO implements IFMs 0 to 9 by reference to Recommendation ITU-R M.1371 only.  Similarly for IFMs 10 to 63, ITU-R in Recommendation ITU-R M.1371-3, intended to refer to IMO's publicly available reference of operational applications (currently SN/Circ.236).

ITU-R had also requested that IMO maintains this publicly available reference of operational applications.

9.3      The Sub-Committee also noted that in summary, IMO was responsible for IFMs 10 to 63 and ITU-R was responsible for IFMs 0 to 9.  This reflected the division of responsibilities identified in IMO SN/Circ.236.  ITU-R was responsible for the technical characteristics, structure of the binary messages and the system related applications and IMO was responsible for the operational applications.

9.4      The Sub-Committee considered documents NAV 52/9, NAV 52/9/1 and NAV 52/INF.2 (Secretariat) and agreed to refer the documents to the Technical Working Group for consideration and comments, as appropriate.

**Report of the Technical Working Group**

9.5      Having received and considered the Technical Working Group's report (NAV 52/WP.4), the Sub-Committee (with reference to paragraphs 4.1 to 4.3 and annex), took action as summarized hereunder.

9.6      The Sub-Committee approved the daft Liaison Statement to ITU on Maintenance and Administration of AIS binary messages given in annex … and instructed the Secretariat to convey the statement to ITU for consideration by WP 8B in September 2006.   The Sub-Committee invited the Committee to endorse this action.

9.7      The Committee was invited to extend the target completion date of this agenda item to 2009.

## 10      PERFORMANCE STANDARDS FOR SHIPBORNE GALILEO RECEIVER EQUIPMENT

10.1    The Sub-Committee recalled that NAV 51 had considered the report by France (NAV 51/12), as co-ordinator of the Correspondence Group for Galileo, requesting it to review for approval the amended draft standards for Galileo Open and Safety of Life service receivers and also provide its views on the ability to shorten the recognition process for Galileo once the system becomes operational.  The Chairman had explained that, since the work programme item only encompassed three specific sub-items, and performance standards for Galileo receivers were

not explicitly mentioned, the Sub-Committee was not authorized to address the issue as per the Guidelines on the organization and method of work of the Committees and their subsidiary bodies. However to make progress on the issue, the Technical Working Group was instructed to consider document NAV 51/12 and provide the necessary justification for a corresponding new work programme item.

10.2    The Sub-Committee also recalled that NAV 51 had concurred with the Technical Working Group's opinion that both service receivers could be described in single performance standards and agreed that there was an urgent need to complete the performance standards by 2006 in order to give time for industry to produce equipment for the Galileo system becoming operational in 2008. NAV 51 also agreed to the revised performance standards (NAV 51/19, annex 14) together with the justification to include a new agenda item on "Performance standards for shipborne Galileo receiver equipment" in the Sub-Committee's work programme and was of the opinion that the performance standards should be finalized at NAV 52. Therefore, the Committee was invited to include the proposed new agenda item in the Sub-Committee's work programme.

10.3    The Sub-Committee further recalled that NAV 51 had agreed with the Technical Working Group's view that the recognition process could be achieved in a timely manner once the system became operational. Therefore, the Galileo system operators were invited to commence the process as soon as they were able to do so. This was subsequently endorsed by MSC 81 (MSC 81/25, paragraph 10.22).

10.4    The Sub-Committee observed that MSC 81, in considering document MSC 81/23/6 (France, Norway, United Kingdom) proposing to develop performance standards for Galileo satellite navigation system receiver equipment as a future part of the World-Wide Radionavigation System (WWRNS), had noted the proposal by NAV 51, following consideration, to include an appropriate item in its work programme and the provisional agenda for NAV 52. Subsequently, MSC 81 (MSC 81/25, paragraph 23.33) had endorsed the inclusion in the NAV Sub-Committee's work programme and the provisional agenda for NAV 52, a high priority item on "Performance standards for shipborne Galileo receiver equipment", with a target completion date of 2006.

10.5    The Sub-Committee briefly discussed documents NAV 52/10 by the United States concerning GPS damage from high-power shipborne radars and NAV 52/10/1 by the

United Kingdom on proposed amendments to sections 3.9 and 3.20 of the draft performance standards for shipborne Galileo receiver equipment, as developed by NAV 51 (NAV 51/19, annex 14).

10.6    The Sub-Committee also agreed to refer documents NAV 52/10 and NAV 52/10/1 to the Technical Working Group.

**Report of the Technical Working Group**

10.7    Having received and considered the Technical Working Group's report (NAV 52/WP.4), the Sub-Committee (with reference to paragraphs 5.1 to 5.2 and annex 3) took action as summarized hereunder.

10.8    The Sub-Committee approved the draft MSC resolution on Adoption of standards for Galileo receiver equipment, given at annex … for submission to the Committee for adoption.

10.9    The Sub-Committee noted that these performance standards were intended for a stand-alone Galileo receiver and that there may be a future need for performance standards for combined Galileo/GNSS receivers.

10.10   The Committee was invited to delete the sub-item "Performance standards for shipborne Galileo receiver equipment" from the Sub-Committee's work programme, as the work on this item had been completed.

**11    DEVELOPMENT OF PERFORMANCE STANDARDS FOR NAVIGATION LIGHTS, NAVIGATION LIGHT CONTROLLERS AND ASSOCIATED EQUIPMENT**

11.1    The Sub-Committee recalled that MSC 80 (MSC 80/24, paragraph 21.24.2) based on a proposal by Norway (MSC 80/21/8) had agreed to add a high priority work item on "Development of Performance Standards for Navigation Lights, Navigation Light Controllers and associated equipment" to the work programme of the Sub-Committee, with two sessions to complete the work and include it in the provisional agenda for NAV 52.

11.2    The Sub-Committee briefly discussed document NAV 52/11 (Denmark and Norway) providing a basic framework for the development of draft performance standards for Navigation

Lights, Navigation Light Controllers and associated equipment and document NAV 52/11/1 (Republic of Korea) stating that the performance standards for navigation lights should include the standard for light bulbs and providing relevant information on this.

11.3    The Sub-Committee noted with interest the information provided by Japan (NAV 52/INF.3, paragraphs 1 to 6) on the result of a research on LED navigation lights and proposing that the two significant differences between LED navigation lights and ordinary navigation lights using incandescent bulbs should be taken into account during the development of draft performance standards for navigation lights, navigation light controllers and associated equipment.

11.4    The Sub-Committee agreed to refer documents NAV 52/11, NAV 52/11/1 and NAV 52/INF.3 to the Technical Working Group and instructed it, time permitting, to start work on the development of the draft performance standards for navigation lights, navigation light controllers and associated equipment; otherwise to submit the outcome of its consideration to NAV 53.

**Report of the Technical Working Group**

11.5    Having received and considered the Technical Working Group's report (NAV 52/WP.4), the Sub-Committee (with reference to paragraphs 7.1 to 7.4), took action as summarized hereunder.

11.6    In regard to the proposal for performance standards for navigation lights, navigation light controllers and associated equipment, the Sub-Committee noted the views of the Group that the proposed requirement, to connect the information of the navigational lights to the AIS and VDR, should only apply to larger ships which had carriage requirements for this equipment.   In addition, the proposed requirement for an alarm notifying the OOW that the output of LED lamps had reduced below the level required by the COLREGs would involve the development of a suitable measuring sensor otherwise review of the proposed requirement would be necessary.

11.7    The Sub-Committee invited Member Governments to submit comments and suitable proposals for consideration at NAV 53.

## 12    WORLD-WIDE RADIONAVIGATION SYSTEM

12.1    The Sub-Committee recalled that, NAV 48 having reinstated the item on "World-wide radionavigation system" in the Sub-Committee's work programme, MSC 75 instructed the Sub-Committee to indicate specific sub-items within it with appropriate target completion dates. NAV 48 considered the issue and was of the opinion that the following sub-items be inserted under the item on "World-wide radionavigation system" in the Sub-Committee's work programme with a target completion date of 2005:

    .1    new developments in the field of GNSS, especially Galileo;

    .2    review and amendment of IMO policy for GNSS (resolution A.915(22)); and

    .3    recognition of radio navigation systems as components of the WWRNS (resolution A.815(19)).

12.2    The Sub-Committee also recalled that, NAV 51 subsequently, when reviewing its work programme, requested the extension of the target completion dates of all three sub-items to 2008; MSC 81 concurred with that request.

12.3    The Sub-Committee briefly discussed the relevant part of document NAV 52/10 (United States) relating to the approval of a draft liaison statement to IEC Technical Committee 80, Working Group 4A, to take into account the high electromagnetic environment in the development or revision of relevant standards, including IEC Standard 61108 - "Maritime navigation and radiocommunication equipment and standards - Global Navigation Satellite Systems (GNSS)".

12.4    The Sub-Committee noted with interest the information provided by the Republic of Korea (NAV 52/INF.8) concerning communication techniques for high accuracy DGPS in the Republic of Korea.

12.5    The Sub-Committee referred documents NAV 52/10 and NAV 52/INF.8 to the Technical Working Group to provide any comments and guidance on the World-Wide Radionavigation Service (WWRNS) issues including the finalization of a draft liaison statement to IEC Technical Committee 80, Working Group 4A, on the shipboard GNSS receiver equipment.

**Report of the Technical Working Group**

12.6    Having received and considered the Technical Working Group's report (NAV 52/WP.4), the Sub-Committee (with reference to paragraphs 6.1 to 6.3), took action as summarized hereunder.

12.7    The Sub-Committee agreed with the views of the Group in regard to the results of commercial GPS antenna vulnerability tests to high power military radars, and that whilst the results of the tests presented showed some possible problems of damage to GPS antennas, the Sub-Committee was not aware of a widespread problem of this nature with civil use. Accordingly, the Sub-Committee did not consider that it had sufficient evidence of a problem and invited Members to submit more information to the next session.  The Sub-Committee agreed with the Group that a liaison statement to IEC Technical Committee 80 was therefore not necessary at this stage.

12.8    The Sub-Committee noted that, with respect to resolution A.915(22) concerning the IMO policy for GNSS and resolution A.953(23) concerning recognition of radionavigation systems as components of the WWRNS, no action needed to be taken at this session.

## 13    CASUALTY ANALYSIS

13.1    The Sub-Committee recalled that MSC 78 (MSC 78/26, paragraph 24.8) had decided that the item on "Casualty analysis" should remain on the work programme of the sub-committees.

13.2    The Sub-Committee observed that at this session no documents had been submitted for consideration or referred to by either the FSI Sub-Committee or any other technical body of the Organization for action and agreed to defer further consideration of the item to NAV 53.

## 14    CONSIDERATION OF IACS UNIFIED INTERPRETATIONS

14.1    The Sub-Committee recalled that in order to expedite the consideration of IACS unified interpretations being submitted to the Committee on a continuous basis, MSC 78 had decided that IACS should submit them directly, as appropriate, to the sub-committees concerned.  To this effect, MSC 78 agreed to retain, on a continuous basis, the item on "Consideration of IACS unified interpretations" in the work programmes of the BLG, DE, FP, FSI, NAV and SLF Sub-Committees and to include it in the agenda for their next respective sessions.

14.2    The Sub-Committee also recalled that, as instructed by MSC 78 (MSC 78/26, paragraph 22.10), NAV 50 had considered, on a preliminary basis, the proposal by IACS (MSC 78/22/1, annex 7) regarding the IACS unified interpretation SC139 relating to Navigation bridge visibility.  The observer from IACS informed the Sub-Committee that some other IACS Unified Interpretations might also be submitted to NAV 51.

14.3    The Sub-Committee further recalled that, since no document had been submitted to NAV 51, the IACS observer had informed NAV 51 that IACS would submit relevant IACS Unified Interpretation proposals for its review to NAV 52.

**Clarification for the application of Rules 23(a), 27(b) including sections 3(b) and 9(b) of Annex I to the 1972 COLREGs, as amended**

14.4    The Sub-Committee considered document NAV 52/14 (IACS) clarifying the application of Rules 23(a), 27(b) of the COLREGs 1972, as amended including sections 3(b) and 9(b) of Annex I to the 1972 COLREGs, as amended.

14.5    The Sub-Committee concurred with the view of IACS and, having considered document NAV 52/WP.2, annex 1, agreed to the draft MSC circular on unified interpretations of Rules 23(a), 27(b) and sections 3(b) and 9(b) of Annex I of the 1972 COLREGs, as amended, and set out in annex …, for submission to MSC 82 for approval.

**Clarification for applying SOLAS regulation V/19.2.2.1**

14.6    The Sub-Committee considered document NAV 52/14/1 (IACS) clarifying the application of regulation V/19.2.2.1 of SOLAS chapter V.

14.7    The Sub-Committee concurred with the view of IACS and, having considered document NAV 52/WP.2, annex 2, agreed to the draft MSC circular on unified interpretations to SOLAS chapter V, set out in annex …, for submission to MSC 82 for approval.

14.8    The Sub-Committee invited IACS to submit any further relevant IACS Unified Interpretation proposals to NAV 53 for its review.

## 15    WORK PROGRAMME AND AGENDA FOR NAV 53

15.1    The Sub-Committee recalled that, at MSC 78, the Chairman, in addressing the Committee's method of work relating to the consideration of proposals for new work programme items, clarified that the objective of the Committee when discussing these proposals was to decide, based upon justification provided by Member Governments in accordance with the Guidelines on the organization and method of work, whether the new item should or should not be included in the sub-committee's work programme.   A decision to include a new item in a sub-committee's work programme did not mean that the Committee agreed with the technical aspects of the proposal.   If it was decided to include the item in a sub-committee's work programme, detailed consideration of the technical aspects of the proposal and the development of appropriate requirements and recommendations should be left to the sub-committee concerned.

15.2    The Sub-Committee noted that MSC 81 had agreed to include, in the NAV Sub Committee's work programme, high priority items on:

.1    "Performance standards for shipborne Galileo receiver equipment", in the Sub-Committee's work programme and the provisional agenda for NAV 52;

.2    "Carriage requirements for a bridge navigational watch alarm system", with two sessions needed to complete the item and instructed the Sub-Committee to include the item in the provisional agenda for NAV 53;

.3    "Guidelines for the control of ships in an emergency", with one session needed to complete the item and instructed the Sub-Committee to include the item in the provisional agenda for NAV 53;

.4    "Development of an e-navigation strategy", with two sessions needed to complete the item and instructed the Sub-Committee to consider including the item in the provisional agenda for NAV 53.

.5    "Amendments to COLREGs Annex IV relating to distress signals", with one session needed to complete the item and instructed the Sub-Committee to include the item in the provisional agenda for NAV 53;

.6     "Development of carriage requirements for ECDIS", with two sessions needed to complete the item and instructed the Sub-Committee to include the item in the provisional agenda for NAV 53;

.7     "Guidelines for uniform operating limitations of high-speed craft", with three sessions needed to complete the item and instructed the Sub-Committee to include the item in the provisional agenda for NAV 53; and

.8     "Guidelines on the lay-out and ergonomic design of safety centres on passenger ships", with three sessions needed to complete the item and instructed the Sub-Committee to include the item in the provisional agenda for NAV 53.

15.3    Taking into account the progress made at the current session, the decisions of MSC 81 and the provisions of the agenda management procedure, the Sub-Committee prepared a proposed revised work programme and a provisional agenda for NAV 53 (NAV 52/WP…), as amended based on those approved by MSC 81 (NAV 52/2/2, annexes 1 and 2), and set out in annexes … and … respectively, for consideration and approval by the Committee.  While reviewing the work programme, the Sub-Committee agreed to invite the Committee to:

.1     delete the following work programme sub-items/items, as work on them has been completed:

| | | | |
|---|---|---|---|
| .1.1 | sub-item H.1.2 | performance standards for shipborne Galileo receiver equipment | 2006 |
| .1.2 | item H.5 | Amendments to the ECDIS performance standards | 2006 |
| [.1.3 | item H.12 | Amendments to COLREGs Annex IV relating to distress signals | 2007] |

.2     extend the target completion date of the following work programme items:

| | | | |
|---|---|---|---|
| .1.1 | item H.2 | ITU matters, including Radiocommunications ITU-R Study Group 8 matters | 2009 |
| .1.2 | item H.3 | Revision of the performance standards for INS and IBS | 2007 |

| .1.3 | item H.4 | Evaluation of the use of ECDIS and ENC development | 2007 |

15.4    The Sub-Committee anticipated that Working Groups on the following subjects might be established at NAV 53:

> .1    Ships' Routeing;
>
> .2    Technical matters; and
>
> .3    [E-Navigation].

15.5    The Sub-Committee noted that the fifty-third session of the Sub-Committee had been tentatively scheduled to be held from [23 to 27 July 2007] at the Royal Horticultural Halls and Conference Centre, in London.

# 16    ELECTION OF CHAIRMAN AND VICE-CHAIRMAN FOR 2007

16.1    In accordance with rule 16 of the Rules of Procedure of the Maritime Safety Committee, the Sub-Committee unanimously re-elected Mr. K. Polderman (the Netherlands) as Chairman and Mr. J.M. Sollosi (United States) as Vice-Chairman for 2007.

# 17    ANY OTHER BUSINESS

**Progress on standards published by the IEC**

17.1    The Sub-Committee recalled that, NAV 51 had agreed with its Technical Working Group's opinion that low-cost AIS devices, affordable for non-SOLAS vessels and pleasure craft, involving both SOTDMA and CSTDMA technology, and harmoniously operating with Class A devices, with a view to improve safety of navigation in general and safety of life at sea, in particular, should be developed as a matter of urgency.  Therefore, Member Governments were invited to actively participate in the work of IALA, ITU, IEC and other organizations dealing with the issue.

17.2    The Sub-Committee noted with interest the information provided by IEC (NAV 52/17) on the progress made in developing/revising standards for voyage data recorder and AIS by IEC TC80.

17.3    The delegation of Norway requested the observer from IEC to provide the Sub-Committee with an update of the situation on the difficulties being experienced by IEC WG1

in meeting the requirement for a benchmark test specified in IEC 62388 – Radar Test Standard (replacing 60872 and 60136 series of test standards) with respect to the revised IMO performance standards for radar equipment (resolution MSC.192(79) adopted on 6 December 2004), which would apply to radar equipment installed on or after 1 July 2008.

17.4    The observer from IEC informed the Sub-Committee that the IEC Marine Radar Working Group had made good progress in developing the radar equipment standard based on resolution MSC. 192(79).    However, one issue that had not been resolved to the complete satisfaction of the Working Group concerned was the measurement of performance of a radar in the presence of sea and rain clutter (section 5.3.1.3.4 of resolution MSC 192(79)).  These specific conditions were difficult to obtain in a live situation and the Working Group had been investigating whether radars could be more readily and consistently tested by injecting simulated signals into the radar receiver system.    The national administrations of Norway, the United Kingdom and Germany had agreed to fund research work to produce such a simulator. The United Kingdom undertook an initial project which produced a prototype device, identifying a number of issues that needed to be resolved before an acceptable test device could be produced. The difficulties were magnified because of the need for such a simulator to work with coherent radars, sometimes known as New Technology radars, which require state-of-the-art simulation facilities to faithfully reproduce their complex signals reflected from targets and clutter. Although the design of an effective simulator was difficult, it was generally considered by the Working Group to be achievable in about three years with available technology. However, the envisaged cost of producing a simulator design was beyond the funding available to the Administrations currently contributing to this activity.    Bearing in mind both the funding difficulties and the timescales associated with developing a simulator, an interim version of the standard was being prepared that was detailing over-the-sea tests from which an overall assessment of the radar performance in varying conditions of clutter could be made.  It was anticipated that this draft standard would be completed in October 2006 and would then be circulated for international voting by IEC members.  The interim IEC standard would then be revised when suitable simulators became available.

17.5    The Sub-Committee noted with appreciation the efforts by IEC in developing an interim standard for new radar testing.

17.6    The delegation of Norway informed the Sub-Committee that it would be submitting a document to MSC 82 on the issue explaining the funding situation.

17.7    The Sub-Committee considered document NAV 52/17/1 (Germany) informing it that Germany had recently discovered that shipyards and owners had tried to increase the container carrying capacity of vessels by permanently stowing on deck additional containers beyond the line of visibility.    According to Germany's understanding of SOLAS chapter V, container stowage positions above the visibility line should only be temporarily used in some rare cases for single overheight containers or flats with non-standardized overheight cargo.    However, the regular and permanent use of all these stowage positions would dramatically reduce the horizontal field of vision from the other bridge workstations.    Even if approved in accordance with the letter of regulation V/22, there were reasons to believe that the vessel concerned might be claimed "not seaworthy" by law and would not be able to document conformance with regulation V/15 and be detained by port State control.

17.8    A number of delegations spoke on the issue and there was general support for the German proposal.    All were of the opinion that visibility of the sea surface from the bridge was of paramount importance.    There were suggestions that the development of Guidelines for shore-side stowage planners including Port State Control officers was necessary.

17.9    The delegations of Denmark, the Netherlands and the observer from BIMCO were of the opinion that container ships loaded properly could comply with the requirements of regulation V/22 on navigation bridge visibility and there was no need for any amendments.

17.10    The Chairman informed the Sub-Committee that paragraph 3.8 of the Guidelines on the organization and method of work of the Committees and their subsidiary bodies, as amended (MSC/Circ.1099 and MEPC/Circ.405), stated clearly that subsidiary bodies should not develop amendments to, or interpretations of, any relevant IMO instrument without authorization from the Committee(s) and on this basis Germany might wish to submit an appropriate proposal to MSC 82 for the inclusion of a relevant new item on the Sub-Committee's work programme.

17.11    The Sub-Committee noted that the deadline for submitting proposals for new work programme items to MSC 82 was 29 August 2006 due to a decision by MSC 81 that the deadline for submission of documents containing proposals for new work items should be reduced to 13 weeks.

NAV 52/WP.6                          - 46 -

**IALA Risk Management Tool for ports and restricted waterways**

17.12   The Sub-Committee considered document NAV 52/17/2 (IALA) providing information that, following a successful validation process at a workshop held in Copenhagen from 2 to 5 May 2006 using The Sound as the restricted waterway, the Council of IALA had adopted a Recommendation on the IALA Risk Management Tool for Ports and Restricted Waterways, 2006.

17.13   The Sub-Committee noted that the IALA Risk Management Tool was capable of:

   .1    assessing the risk in ports or restricted waterways, compared with the risk level considered by Authorities and stakeholders to be acceptable; the elements that can be taken into consideration include those relating to vessel conditions, traffic conditions, navigational conditions, waterway conditions, immediate consequences and subsequent consequences;

   .2    identifying appropriate risk control options to decrease the risk to the level considered to be acceptable, which include improved co-ordination and planning; training; rules and procedures including enforcement; navigational, meteorological and hydrographical information; radio communications; active traffic management and waterway changes; and

   .3    identifying the effect on the risk level of an existing port or waterway that may result from a change or reduction of any of the risk control options in use including assistance in assessing the risk level of proposed new ports and waterways.

17.14   The Sub-Committee concurred with the view of IALA that the tool was a useful and convenient aid in assessing the risk in ports or restricted waterways.

17.15   The Sub-Committee invited Member Governments to use the tool for analysis and risk level management within waterways and port areas as recommended by IALA.

**Emergency wreck marking buoy**

17.16   The Sub-Committee considered document NAV 52/17/3 (IALA) giving details of  the IALA Guideline No.1046 - Response Plan for the Marking of New Wrecks (June 2005) which provided guidance to Authorities for an immediate, effective and well co-ordinated response to marking of new dangers and prevent collisions.   However, in preparing the Guideline, the limitations of the present IALA Maritime Buoyage System, when providing initial marking of new dangers, were noted.  At present, new dangers were generally marked by cardinal or lateral buoys, although it was recognised that a number of Authorities also deploy isolated danger marks.  Recent groundings and collisions had indicated a need for a revision of how new dangers were to be marked, especially in an emergency.  As a possible means of ensuring the clear and unambiguous marking of dangerous new wrecks, IALA had recently adopted Recommendation O-133, which introduced, on a trial basis, a new emergency wreck marking buoy.  Results from the trials would be assessed in the 2006-2010 IALA work programme before being included into the overall IALA Buoyage system.

17.17   The Sub-Committee having considered document NAV 52/WP.8, annex agreed the draft SN/Circ….. on Emergency wreck marking buoy, set out in annex …, for submission to MSC 82 for approval.

**Development of an E-Navigation strategy**

17.18   The Sub-Committee recalled that MSC 81 had considered document MSC 81/23/10 (Japan, Marshall Islands, Netherlands, Norway, Singapore, United Kingdom and the United States) proposing to develop a broad strategic vision for incorporating the use of new technologies in a structured way and ensuring that their use was compliant with the various navigational communication technologies and services that were already available, with the aim of developing an overarching accurate, secure and cost-effective system with the potential to provide global coverage for ships of all sizes.

17.19   The Sub-Committee also recalled that the observer from IFSMA, in supporting the above proposal, drew the Committee's attention to MSC/Circ.1091 on Issues to be considered when introducing new technology on board ship, addressing matters of standardization, training needs and the human element, and stressed the need for these recommendations to be taken into account in all stages of the development of e-navigation.

17.20   The Sub-Committee further recalled that following discussion, MSC 81 had decided to include, in the work programmes of the NAV and COMSAR Sub-Committees and the provisional agendas for NAV 53 and COMSAR 11, a high priority item on "Development of an e-navigation strategy", with a target completion date of 2008, and assigned the NAV Sub-Committee as co-ordinator, instructing NAV 52 to give preliminary consideration to the matter.  MSC 81 also agreed that the two Sub-Committees should consider the issues with the aim of developing a strategic vision within their associated work programmes for taking this issue forward and to report to MSC 85, for it to develop the necessary policy direction for further progress of this important work.

17.21   The Sub-Committee recalled also the Secretary-General's opening remarks underlining the need to make progress on the development of an e-navigation strategy.

17.22   The Sub-Committee considered document MSC 81/23/10 (Japan, Marshall Islands, Netherlands, Norway, Singapore, United Kingdom and the United States) on the development of an e-navigation strategy.

17.23   The Sub-Committee also considered document (NAV 52/17/4 (Japan) outlining Japan's approach to E-Navigation which covered three issues, namely:

> .1      development of measures to prevent small vessels from accidents (e.g. utilization of Class-B AIS);

> .2      further development of information systems on the bridge, particularly in view of human element, to improve functions on recognition and judgment; and

> .3      reinforcement of shore-based navigational support by introducing broadband data communications at sea (e.g. up-to-date documents required on board including latest information on route).

17.24   There was an extensive debate on the issue.  The Sub-Committee fully supported the concept of e-navigation and were of the opinion that the Sub-Committee should work expeditiously towards developing a strategic vision/concept relating to e-navigation in a well defined and structured manner.

17.25  The Sub-Committee was also of the opinion that IMO should take the lead in the development of the strategy for e-navigation, but it would also be important to invite other organizations, in particular, IALA and IHO, to participate in its work and provide relevant input.

17.26  The Sub-Committee further recognized that it would be essential, as a first step, to develop a clear definition and objectives for the concept of e-navigation.  It was also of the opinion that a very careful and strict management of such a large project would be a critical factor for its success.

17.27  There was general support that the issue of the human element, in general, and training and education requirements, in particular, would form a key issue in the development of an e-navigation strategy.

17.28  The Sub-Committee agreed that, to progress the work for NAV 53, an intersessional Correspondence Group should be established under the co-ordination of the United Kingdom[*] and approved the draft terms of reference of the proposed Correspondence Group, given below.

17.29  The Sub-Committee instructed the Secretariat to inform COMSAR 11 of the outcome of this debate.

17.30  Taking into account document MSC 81/23/10 (Japan, Marshall Islands, Netherlands, Norway, Singapore, United Kingdom and the United States) and the relevant decisions of MSC 81 (MSC 81/25, paragraphs 23.34 to 23.37), document NAV 52/17/4 (Japan) and the comments and general views expressed and decisions taken by NAV 52 including the guidance in MSC/Circ.1091 on Issues to be considered when introducing new technology on board ship and  MSC/Circ.878/MEPC/Circ.346 on Human Element Analysing Process (HEAP); the Correspondence Group on e-navigation should consider, provide comments and make recommendations on the following:

.1    the definition and scope of the concept of e-navigation in terms of its purpose, components and limitations to produce a system architecture;

---

[*]  **Co-ordinator:**

.2    the identification of the key issues and priorities that will have to be addressed in a strategic vision and a policy framework on e-navigation;

.3    the identification of both benefits of and obstacles that may arise in the further development of such a strategic vision and policy framework;

.4    the identification of the roles of the Organization, its Member States, other bodies and industry in the further development of such a strategic vision and policy framework;

.5    the formulation of a work programme for the further development of such a strategic vision and policy framework, including an outline migration plan and recommendations on the roles of the NAV and COMSAR Sub-Committees and the input of other parties concerned; and

to submit a document to COMSAR 11 raising specific questions that should be addressed by COMSAR and prepare a comprehensive report for submission to NAV 53.

**Guidelines on the control of ships in an emergency**

17.31    The Sub-Committee noted that, MSC 81 had considered document MSC 81/23/4 (Bahamas) proposing to develop guidelines covering the responsibilities of all parties in a maritime emergency, which would not create a chain of command but, if implemented by Member States as part of their emergency action plans, would clarify what the chain should be.  In the opinion of the Bahamas, the guidelines would not change the responsibilities of the master, but they might avoid misunderstandings as to what a master's role should be when coastal State laws would be enforced and what their effect would be on the master and others involved in an emergency.  MSC 81 noted that, in commenting on the above proposal, IFSMA (MSC 81/23/22) invited the Committee, when considering the proposal, to develop clear and distinct guidelines in order to avoid misunderstanding as to where the responsibility lay in cases where the master was being ordered to take action against his own decision.

17.32    The Sub-Committee also noted that, in the context of the above proposal, the delegation of the United Kingdom, referring to the Sea Empress incident, had informed MSC 81 of the SOSREP system which was developed to establish the command, control and communication procedures that were needed during maritime emergencies in the United Kingdom.  The delegation also advised that, since the establishment of the SOSREP system, six years ago, it had been put into action on more

than 600 occasions of which about 30 were considered as very significant and, therefore, the delegation was of the opinion that the development of appropriate guidelines would not be a single incident issue.  In the course of the ensuing debate, a number of delegations, having referred to the information provided by the delegation of the United Kingdom, advised the Committee of similar national systems and supported the idea that appropriate measures should be taken to regulate internationally the issue of co-operation among parties involved in maritime emergencies.

17.33   The Sub-Committee further noted that, in view of this debate, MSC 81, having recognized the importance of the issue and that this matter should be addressed in a generic manner and not as a single incident issue, decided to include, in the work programmes of the NAV and COMSAR Sub-Committees and the provisional agendas for NAV 53 and COMSAR 11, a high priority item on "Guidelines for the control of ships in an emergency", with a target completion date of 2007, and assigned the NAV Sub-Committee as a co-ordinator, instructing NAV 52 to give a preliminary consideration to the matter.

17.34   The Sub-Committee considered document NAV 52/17/5 (Bahamas) suggesting the development of and providing the framework for proposed generic guidelines on the control of ships in an emergency.

17.35   There was considerable support for the Bahamas proposal to develop such guidelines. The Sub-Committee was also of the opinion that the International Salvage union should be involved, since the proposed guidelines would include a section on Guidelines for salvors.

17.36   The Sub-Committee, keeping in mind the close proximity of COMSAR 11 (February 2007) and the target completion date of 2007, agreed to instruct the Secretariat to forward document NAV 52/17/5 to COMSAR 11 together with the Sub-Committee's comments thereon for its review and comments.

17.37   Member Governments were invited to submit suitable proposals and comments for consideration at NAV 53.

**Automatic Identification Systems: Accuracy of transmissions**

17.38   The Sub-Committee noted with interest the information provided by the United Kingdom (NAV 52/INF.4) on the active surveillance of Automatic Identification Systems (AIS) with the

aim of identifying and informing ship operators of erroneous vessel data being transmitted whilst in United Kingdom waters.

**Integrated navigational information system on seascape image**

17.39  The Sub-Committee noted with interest the information provided by Japan (NAV 52/INF.6) on a new integrated navigational information display developed in Japan i.e. (INT-NAV) and the results of the simulator study on the effectiveness of the collision avoidance supporting function of the INT-NAV.

**Mandatory emergency towing systems in ships other than tankers of not less than 20,000 DWT**

17.40  The Sub-Committee noted that DE 49 had considered the issue of Mandatory Towing Systems in Ships other than tankers of not less than 20,000 DWT and agreed, in principle, to the draft amendments to SOLAS regulation II-1/3-4, for further consideration at DE 50, noting that the amendments should take into account comments made in plenary to focus on functional requirements for procedures rather than requiring additional equipment.  In the context of the possible application of the proposed draft SOLAS amendments and in view of the decision made earlier to apply the proposed amendments to cargo ships above  500 gross  tonnage  and  all passenger ships, DE 49 noted possible difficulties regarding the application to existing ships, in particular that for existing ships certain information may not always be available, e.g. capacity of bollards.  However, DE 49 agreed that the proposed draft SOLAS amendments should apply to existing ships and the above-mentioned difficulties should be taken into account when developing the guidelines for procedures.  Bearing in mind that one date of coming into force for all ships, both new and existing, could lead to a bottleneck in developing the required procedures, DE 49 agreed to split the date of entry into force into two phases: one date for new ships, existing cargo ships of not less than 20,000 DWT, and existing passenger ships; and another date for existing cargo ships of less than 20,000 DWT two years later.  Noting that SOLAS regulation II-1/3-4 required emergency towing arrangements on tankers of not less than 20,000 DWT, DE 49 discussed the application of emergency towing procedures also to such tankers.  Noting further that the existing SOLAS requirements as well as the Guidelines on emergency towing  arrangements for tankers, adopted by resolution  MSC.35(63),  did  not explicitly contain requirements for procedures, but on the other hand most of those ships were provided with respective procedures anyway, DE 49 agreed to apply the new procedures also to tankers of not less than 20,000 DWT.

17.41  The Sub-Committee also noted that, furthermore, DE 49 noted possible implications on navigational issues and instructed the Secretariat to inform the NAV Sub-Committee about the ongoing work on emergency towing procedures in the Sub-Committee.

17.42  The Sub-Committee further noted that MSC 81 had noted the outcome on the development of provisions for mandatory emergency towing systems in ships other than tankers of not less than 20,000 DWT, as reflected in paragraphs 7.3 to 7.18 of document DE 49/20, in particular that DE 49 had established a correspondence group to progress the work intersessionally, and that the matter would be further considered at DE 50 on the basis of the report of the group.

17.43    The Sub-Committee considered the annex to document DE 49/WP.5 and concurred with the draft SOLAS amendment on emergency towing procedures.  The Sub-Committee deemed it appropriate to inform the DE Sub-Committee that existing shipboard equipment might limit the emergency towing capabilities in severe weather conditions.

**Carriage requirements for a bridge navigational watch alarm system**

17.44  The Sub-Committee noted that MSC 81 had considered document MSC 81/23/2 (Bahamas and Denmark) proposing to amend the 1974 SOLAS Convention to require that all ships of 150 gross tonnage and upwards and passenger ships irrespective of size be fitted with a BNWAS, to be in operation when the ship is at sea, with a view to enhancing the safety of navigation, taking into account the human element.  Whilst the Performance standards for a bridge navigational watch alarm system had been adopted by resolution MSC.128(75), no carriage requirements or guidelines for the use of such systems had been adopted yet.  Following consideration, MSC 81 decided to include, in the Sub-Committee's work programme and the provisional agenda for NAV 53, a high priority item on "Carriage requirements for a bridge navigational watch alarm system", with a target completion date of 2008, and instructed NAV 52 to give a preliminary consideration to the matter.

17.45  The Sub-Committee considered on a preliminary basis document MSC 81/23/2 (Bahamas and Denmark) containing the proposed draft amendment to SOLAS regulation V/19.2.2 (MSC 81/23/2, annex) and was of the opinion that further consideration was necessary.

NAV 52/WP.6                          - 54 -

Member Governments were invited to submit suitable proposals and comments for consideration at NAV 53.

**Revision of Annex IV to the 1972 COLREGs**

17.46  The Sub-Committee recalled that following consideration of a proposal by Norway (MSC 81/23/12) to amend the list of distress signals in Annex IV to the COLREGs to include GMDSS distress signals, as required in SOLAS chapter IV, and also to amend Annex IV by deleting distress signals which have been made redundant by the introduction of the GMDSS distress signals, MSC 81 had decided to include, in the work programmes of the NAV and COMSAR Sub-Committees and the provisional agendas for NAV 53 and COMSAR 11, a high priority item on "Amendments to COLREGs Annex IV relating to distress signals", with a target completion date of 2007, and assigned the NAV Sub-Committee as a co-ordinator, instructing NAV 52 to give a preliminary consideration to the matter.

17.47  The Sub-Committee preliminary discussed the proposed amendments to ANNEX IV of the COLREGs based on the Norwegian proposal (MSC 81/23/12) and, in order to make progress on the issue, instructed its Ships' Routeing Working group (agenda item 3) to consider the matter and report to Plenary.

**Report of the Ships' Routeing Working Group**

[17.48 Having received and considered the Ships' Routeing Working Group report (NAV 52/WP.5), the Sub-Committee (with reference to paragraphs: 10.1 to 10.2 and annex 18) took action as summarized hereunder.]

17.49  The Sub-Committee endorsed the views of the working group that mobile satellite providers for Global Maritime Distress and Safety System (GMDSS) other than Inmarsat should be recognized by COLREG and forwarded the draft revised text of the proposed amendments to Annex IV of the Convention on the International Regulations for Preventing Collisions at Sea, 1972, as amended to the Committee for adoption and communication to all Contracting Parties and Members of the Organization at least six months prior to its consideration by the twenty-fifth session of the Assembly and instructed the Secretariat to forward them to COMSAR 11 for review and comments to MSC 83 (paragraph 10.2 and annex 18).]

**Development of carriage requirements for ECDIS**

17.50   The Sub-Committee recalled that, at NAV 51 the delegation of Norway, as co-ordinator of the Correspondence Group (NAV 51/6), emphasized in particular the opinion of the Group that there was a sound basis to implement a phased carriage requirement for ECDIS for certain types of ships.  A phase-in programme for the carriage of ECDIS would provide certainty and clear direction to mariners, data distributors, equipment manufacturers and Hydrographic Offices.  These measures would also accelerate the use and support of ECDIS which would benefit mariners and at the same time contribute to increasing the rates of ENC production.  In considering the report of the Correspondence Group, some delegations supported the phased-in approach for a carriage requirement for ECDIS for certain types of ships, with priority being given to High-Speed Craft.  In opposing a possible carriage requirement, some delegations noted the present shortfall in the coverage of ENCs world-wide and stated that a full FSA on the use of ECDIS should be carried out before the consideration of any carriage requirement for ECDIS, which was premature to consider at this stage.  Some delegations also noted that there were limitations to the use of ECDIS as well as training and qualification implications.  There were also questions as to some flag and coastal States' interpretation and coastal State jurisdiction with regard to what constituted an "appropriate folio of up-to-date paper charts", when ECDIS was operated in the RCDS mode in areas where ENCs were not available.

17.51   The Sub-Committee also recalled that, NAV 51 it was of the view that there should be an FSA on the use of ECDIS on ships other than High-Speed Craft and Passenger Ships prior to any discussion on possible carriage requirement and that the outcome of this FSA would be taken into account when developing any proposals for a carriage requirement.  With respect to the feasibility of an appropriate FSA on the safety benefits of the carriage of ECDIS, NAV 51 was of the view that such an analysis was feasible and desirable.

17.52  The Sub-Committee noted that MSC 81 had considered document MSC 81/23/13 (Denmark and Norway) proposing to develop carriage requirements for ECDIS equipment, for subsequent inclusion in SOLAS chapter V, where the lower size limit of ships and other ship parameters should be recommended by the Sub-Committee based on the results of the FSA study, as well as other relevant factors identified at NAV 51, while the factor of ECDIS training and familiarization should be dealt with by the STW Sub-Committee.  Having noted, in the context of the above proposal, the outcome of the FSA study on ECDIS/ENCs provided by Denmark and Norway (MSC 81/24/5 and MSC 81/INF.9), MSC 81 had decided to include in the

NAV Sub-Committee's work programme and the provisional agenda for NAV 53, a high priority item on "Development of carriage requirements for ECDIS", with a target completion date of 2008, instructing NAV 52 to give a preliminary consideration to the matter.

17.53   The Sub-Committee considered document MSC 81/23/13 (Denmark and Norway) on the development of carriage requirements for ECDIS equipment in SOLAS chapter V.

17.54   The Sub-Committee also considered document NAV 52/6/2 (Japan) providing the results of a study, which indicated that the mandatory installation of ECDIS to cargo ships was justified as being cost-effective if the ships sailed in routes or sea areas where suitable scaled ENCs are available.   Hence, when considering a mandatory carriage requirement for ECDIS, the implementation date should be harmonized with the date when ENCs become available on the intended route.

17.55   The Sub-Committee discussed the issue in depth.   In summing up the debate the Chairman concluded that there had been considerable support for the results of the FSA study conducted by Japan including its recommendations.   A majority of the delegations had been of the view that ENC coverage was a necessary prerequisite for the introduction of a mandatory carriage requirement of ECDIS.   Some delegations had been of the view that this did not mean a 100% ENC coverage would be necessary or achievable.   The Sub-Committee concurred with the Chairman's summary.

17.56   The Sub-Committee reiterated its invitation to the IHO and Members of the Sub-Committee to continue progress towards ENC development.

17.57   Member Governments were invited to submit suitable proposals and comments for consideration at NAV 53.

**Voluntary IMO Member State audit scheme**

17.58   The Sub-Committee recalled that MSC 81, having recognized that the issues raised in the two submissions (MSC 81/24/1 and MSC 81/24/4) relating to SOLAS chapter V were not currently developed enough by the Audit Standard, agreed, in principle, that further work should be carried out on the basis of the proposals made by IHO and IALA.   In this context, and while acknowledging that the areas covered by the aforementioned proposals were not currently

auditable, MSC 81 instructed FSI 14 to consider these proposals in the context of a potential review of annex 3 to the Code for the Implementation of Mandatory IMO Instruments (annex to resolution A.973(24)), seeking any necessary complementary input from NAV 52, if deemed appropriate, for reporting to MSC 82.

17.59   The Sub-Committee noted that, FSI 14 had considered the two proposals, which were introduced together with the advice, received from the submitting parties, that the two questionnaires could not be combined into one, since they might refer to two different types of administrative structures, as was reported to be the case in most countries.  Having noted the positive comments made by those Member States which presented their own experience of the use of the two questionnaires under consideration in their preparation for the audit, FSI 14 agreed, for the purpose of assisting those Member States, volunteering for the audit, and auditors, in their preparatory work and in need of additional guidance, to recommend that interested parties could be made aware of the existence of this material, until such time when, on the basis of experience gained, a relevant proposal for amendments to the procedures for the voluntary IMO Member State audit could be prepared for consideration by the Council.  The Secretariat was instructed to bring this outcome to the attention of NAV 52.

17.60   The Sub-Committee concurred with the decisions of FSI 14.

**Inspection of VDRs under the HSSC**

17.61   The Sub-Committee recalled that MSC 81 noted that the FSI Correspondence Group on Revised Survey Guidelines under the HSSC (resolution A.948(23)), reporting to FSI 14, had identified the need, based on the requirements contained in SOLAS regulation V/18(8), for an annual performance test for the voyage data recorder (VDR) system and for better guidance as to what needs to be done during the annual performance test, including the adoption of a standard format for the required certificate of compliance.  Having also noted the FSI Correspondence Group's opinion that the aforementioned matter was beyond the remit of the group, MSC 81 had considered the proposal contained in document MSC 81/8/2 (United Kingdom) on the inspection of VDRs under the HSSC and referred it to FSI 14 and NAV 52 for review and recommendation under their agenda items on "Review of the Survey Guidelines under the HSSC (resolution A.948(23))" and "Any other business", respectively, and reporting to MSC 82.

17.62   The Sub-Committee noted that FSI 14 had considered document MSC 81/8/2 (United Kingdom) and agreed to the draft Guidelines on annual testing of Voyage Data Recorders (VDR) and simplified Voyage Data Recorders (S-VDR) incorporating the Form for the Voyage Data Recorder Performance Test Certificate (FSI 14/19, annex 8), for review by NAV 52, subject to MSC 82's concurrence.

17.63   The Sub-Committee considered the relevant part of document NAV 52/2/3 (Secretariat), with respect to the draft MSC circular and the Form for the Voyage Data Recorder Performance Test Certificate (FSI 14/19, annex 8) and agreed to the draft Guidelines on annual testing of Voyage Data Recorders (VDR) and simplified Voyage Data Recorders (S-VDR).

17.64   The observer from CIRM informed the Sub-Committee that it would be submitting a document to MSC 82 proposing minor editorial amendments to draft Guidelines on annual testing of voyage data recorders (VDR) and simplified voyage data recorders (S-VDR).

17.65   The delegation of Greece was of the opinion that the checklist for the voyage data recorder performance test certificate was incomplete and further work was necessary to develop a more comprehensive format.

**AIS inspection and test report**

17.66   The Sub-Committee noted that FSI 14 had considered document FSI 14/11/2 (Norway) regarding technical survey of AIS installations and developed an adequate text for inclusion in the draft Survey Guidelines under the HSSC of inspection procedures of Automatic Identification Systems (AIS) equipment by radio inspectors.  In addition, FSI 14 had also agreed to the draft Form for the AIS Test Report as developed by the Working Group (FSI 14/19, annex 6), for further review by NAV 52, subject to MSC 82's concurrence.

17.67   The Sub-Committee considered the relevant part of document NAV 52/2/3 (Secretariat), with respect to the Form for the AIS Test Report (FSI 14/19, annex 6) and agreed to the draft form.

**Regional Marine Electronic Highway in the East Asian Seas**

17.68   The Sub-Committee recalled that at previous sessions, the Secretariat had updated the Sub-Committee on the key elements and expected outputs of the demonstraion project for the

Development of a Regional Marine Electronic Highway (MEH) in the East Asian Seas including the progress made.

17.69  The Sub-Committee noted that the signing of a US$6.86 million grant agreement on 19 June 2006 between the Global Environment Facility (GEF)/World Bank and the International Maritime Organization (IMO) heralded the start of the four-year Marine Electronic Highway (MEH) Demonstration Project in the Straits of Malacca and Singapore.  The demonstration project aims to integrate shore-based marine information and communication infrastructure with the corresponding navigational and communication facilities aboard transiting ships, while being also capable of incorporating marine environmental management systems. The overall objectives are to enhance maritime services, improve navigational safety and security and promote marine environment protection and the sustainable development and use of the coastal and marine resources of the Straits' littoral States, Indonesia, Malaysia and Singapore.  In addition to the US$6.86 million assigned to IMO for the regional MEH demonstration project, the GEF/World Bank has also agreed to grant US$1.44 million to Indonesia for the procurement of equipment for a Differential Global Positioning System (DGPS) station and Automatic Identification System (AIS) stations, as well as tidal instruments and an ocean  data buoy**.** The MEH would be built upon a network of electronic navigational charts using Electronic Chart Display and Information Systems (ECDIS) and environmental management tools in an integrated platform covering the region that allows the maximum of information to be made available both to ships and shipmasters as well as to shore-based users, such as vessel traffic services.  Work on the project is underway but actual start up activities such as the establishment of the Batam Project Management Office;  holding of the 1st Project Steering Committee Meeting and recruitment of the Project Manager, among others, until commence when the Project Launching Consultant will be hired (possibly nearing September 2006).  A procurement consultant will be hired also to prepare the bidding document for a hydrographic survey, scheduled to take place in 2007, of the Traffic Separation Scheme of the Malacca Strait Routeing System from One Fathom Bank to Pulau Iyu Kecil, using multi-beam technology, with the aim of producing electronic navigational charts of the Straits.

**Navigational warnings**

17.70  The delegation of Japan, referring to the multiple launches of missiles conducted by the Democratic People's Republic of Korea on 5 July 2006 without issuing navigational warnings, stated that these acts constitute a serious threat to the maritime safety and urged all IMO Member States  to  reaffirm  compliance  with  Assembly  resolution  A.706(17).    The

delegation of Japan considered the issue should be considered in a serious way from the viewpoint of navigational safety at the next meeting of the Maritime Safety Committee and stated that it intends to submit a proposal on this issue to MSC 82.  A complete text of the statement is given at annex.

17.71   The serious concern on such activities without prior navigational warning and the appeal for strict compliance to Assembly resolution A.706(17) on the World-Wide Navigational Services raised by the delegation of Japan were supported by the United States, Russian Federation, the United Kingdom, France, Italy, the Republic of Korea and Finland.

17.72   The delegation of the Democratic People's Republic of Korea, with regard to the statement by the Japanese delegation on missile launches and relevant comments made by other delegates, stated that the latest successful missile launches were part of the routine military exercises staged by the Korean People's Army to increase the nation's military capacity for self-defence and that their military exercise for missile launches pertaining to its sovereign right to self-defence was not an issue to be discussed in the international forums including IMO meetings.   The delegation of the Democratic People's Republic of Korea further stated its Government's position regarding the relevant UN Security Council resolution which was referred to in the comment made by the United States.  A complete text of the statement by the delegation of the Democratic People's Republic of Korea is given at annex …

17.73   The Sub-Committee noted the statements made by the various countries and, upon the proposal by the United Kingdom, agreed to express its support for, and the continued validity of resolution A.706(17) on World-Wide Navigational Warning service and MSC/Circ.893 on Navigational warnings concerning operations endangering the safety of navigation and urged Members to act accordingly to ensure the safety of navigation.

**Compulsory Pilotage in the Torres Strait**

17.74   The delegation of Singapore stated that as the NAV Sub-Committee was the IMO forum for safety of navigation and ships' routeing measures, the delegation would like to register its concerns and restate its position at the current session regarding Australia's and Papua New Guinea's introduction of compulsory pilotage in the Torres Strait, a strait used for international navigation, with effect from 6 October 2006. The Australian Maritime Safety Authority (Marine Notice 8/2006) relating to this new requirement, referred to IMO

resolution MEPC.133(53) as the basis for introducing a compulsory pilotage system in the Torres Strait. The Marine Notice also stated that under the new "laws and regulations" enacted by Australia to give effect to compulsory pilotage in the Torres Strait, the refusal to take a pilot on board would result in an "offence" being committed and "significant penalties" applied. The delegation of Singapore pointed out that this was not in line with the outcome and understanding reached at MEPC 53. The outcome and understanding at MEPC 53, as recorded in MEPC 53/24, paragraphs 8.5 to 8.6 was that resolution MEPC.133(53) was recommendatory and provided no international basis for mandatory pilotage for ships in transit in the Torres Strait or any other strait used for international navigation. This understanding had been supported by several delegations at MEPC 53, including Singapore. Singapore had also previously stated and would like to restate its position that the imposition of compulsory pilotage for ships transiting a strait used for international navigation would have the "practical effect of denying, hampering or impairing the right of transit passage" and thus be in contravention of Article 42(2) of UNCLOS. Singapore could not accept the application of a compulsory pilotage system in the Torres Strait, a strait used for international navigation. Singapore would however like to assure member States, in particular Australia and Papua New Guinea, that it recognised and fully appreciated the environmental concerns relating to the Torres Strait and would continue to encourage ships flying the Singapore flag to engage pilots when transiting the Torres Strait, in line with the recommendatory nature of the measure.

17.75  The concerns raised by Singapore regarding Australia's and Papua New Guinea's introduction of compulsory pilotage in the Torres Strait and the view that resolution MEPC.133(53) was recommendatory and provided no international basis for mandatory pilotage for ships merely transiting an international strait were generally supported by the Russian Federation, Japan, the United States, Panama, China, Norway, Greece, Liberia, Brazil, United Kingdom, Cyprus, Bahamas and South Africa including observers from ICS and BIMCO. Several delegations, nevertheless, stated that they are recommending or requiring the pilotage for ships under their flags for the passage of the strait in question, in view of the importance attached to the strait.

17.76  The delegation of Australia stated that navigation safety matters related to extending the Great Barrier Reef pilotage arrangements to the Torres Strait had been considered by this Sub-Committee in the context of a submission to designate the Torres Strait as a Particularly Sensitive Sea Area. NAV 50 agreed "That the proposed compulsory pilotage in the Torres Strait was operationally feasible and largely proportionate to provide protection to the marine

environment" (NAV 50/19, paragraph 3.29.14).  Australia was confident that it was acting in accordance with international law and within resolution MEPC.133(53) with the steps it was taking.  Paragraph 8.3 of resolution A.982(24) designated MEPC as the IMO body with primary responsibility for Particularly Sensitive Sea Area applications.  Australia considered that this matter was settled at previous meetings of MSC and MEPC and, as such, it did not think it was appropriate to discuss this matter further in this Sub-Committee.

EXPRESSIONS OF APPRECIATION

17.77    The Sub-Committee further expressed appreciation to the following delegates who had recently relinquished their duties, retired or were transferred to other duties or were about to, for their invaluable contribution to its work and wished them a long and happy retirement or, as the case might be, every success in their new duties:

-    Mr. Trygve Scheel (Norway) (on retirement);
-    Mr. Yun Min Jong (Republic of Korea) (on transfer);
-    Mr. Fikret Hakgüden (Turkey) (on transfer);
-    Captain Carlos Ormaechea (Uruguay) (on transfer); and
-    Captain Norman Cockroft (IAIN) (on retirement).

EXPRESSIONS OF CONDOLENCES

17.78    The Sub-Committee, having been informed of the passing of Captain Hans Jürgen Roos (Germany), former long standing Chairman of the SPI Working Group, and his major contribution to the work of IMO and the promotion of maritime safety, in general, and in particular, both as an earlier delegate and member of the Secretariat, requested the delegation of Germany to convey the Sub-Committee's and the Secretariat's condolences and sympathy to the family, friends and colleagues of Capt. Roos who would be sadly missed.

## 18    ACTION REQUESTED OF THE COMMITTEE

**[to be prepared by the Secretariat]**

\* \* \*

## PROVISIONAL LIST OF ANNEXES
(To be completed)

[ANNEX 1       NEW AND AMENDED TRAFFIC SEPARATION SCHEMES

ANNEX ..      ROUTEING MEASURES OTHER THAN TRAFFIC SEPARATION SCHEMES

ANNEX ..      DRAFT RESOLUTION MSC.[…](81) MANDATORY SHIP REPORTING SYSTEM FOR THE GALAPAGOS ARCHIPELAGO

ANNEX ..      DRAFT RESOLUTION MSC.[…..]82 - ADOPTION OF AMENDMENTS TO THE EXISTING MANDATORY SHIP REPORTING SYSTEM "IN THE GREAT BELT TRAFFIC AREA"

ANNEX ..      DRAFT RESOLUTION MSC.[…..]82 - ADOPTION OF AMENDMENTS TO THE EXISTING MANDATORY SHIP REPORTING SYSTEM "IN THE GULF OF FINLAND"

ANNEX ..      DRAFT ASSEMBLY RESOLUTION A….(25) ON AMENDMENTS TO THE INTERNATIONAL REGULATIONS FOR PREVENTING COLLISIONS AT SEA, 1972

ANNEX ..      REVISED TERMS OF THE CORRESPONDENCE GROUP ON INS AND IBS

ANNEX ..      DRAFT LIAISON STATEMENT TO ITU WORKING PARTY 8B

ANNEX ..      DRAFT RESOLUTION MSC.[…..](82) - ADOPTION OF THE PERFORMANCE STANDARDS FOR SHIPBORNE GALILEO RECEIVER EQUIPMENT

ANNEX ..      DRAFT RESOLUTION MSC.[….](82) - ADOPTION OF AMENDMENTS TO THE PERFORMANCE STANDARDS FOR ECDIS

ANNEX ..      REVISED WORK PROGRAMME OF THE SUB-COMMITTEE

ANNEX ..      PROVISIONAL AGENDA FOR THE FIFTY-THIRD SESSION]

_____