CG Suppl. AR Doc. 4

25 Septe... 1969
Original: ENGLISH

SUB-COMMITTEE ON SAFETY OF
NAVIGATION – 8th session

## REPORT OF THE SUB-COMMITTEE ON SAFETY OF
## NAVIGATION ON THE WORK OF ITS EIGHTH SESSION

1.    The Sub-Committee held its eighth session at the
Headquarters of the Organization from 15-19 September 1969;
Captain F. Bohnke (Federal Republic of Germany) was re-
elected as Chairman and Captain W.S.G. Morrison (Canada) was
elected as Vice-Chairman.  The Agenda as adopted and a list
of documents issued in connexion with the session are attached
hereto as Annexes XII and XIII.

2.    The session was attended by representatives from
Argentina, Belgium, Canada, Denmark, the Federal Republic of
Germany, Finland, France, Greece, Iceland, Indonesia, Japan,
Liberia, Netherlands, Norway, Spain, the USSR, the United States
and the United Kingdom.

3.    The International Labour Organisation and the Inter-
governmental Oceanographic Commission (UNESCO) were represented
at the meeting.  The following Organizations were represented
by Observers:

       International Association of Lighthouse Authorities
       International Chamber of Shipping
       International Confederation of Free Trade Unions
       International Radio Maritime Committee
       International Shipping Federation
       International Association of Ports and Harbors
       International Hydrographic Bureau.

- 2 -

MSV VIII/8

4.   The Sub-Committee examined the items on the agenda and its
conclusions and findings are recorded in the following pages.

I.   REVISION OF THE INTERNATIONAL REGULATIONS
FOR PREVENTING COLLISIONS AT SEA;
UNIFICATION OF LOCAL SPECIAL RULES

5.   The Sub-Committee continued its work on the revision of
the Rules and had information about the considerable amount of
research work which had been initiated by Members at national
level and by the ICS.  In developing its study the Sub-Committee
considered a number of questions according to plans made at the
previous session.  It formulated tentative views which will have
to be reconsidered.  These views appear at Annex I.

6.   It was agreed that Members should submit analysed results
of the questionnaires and conclusions of the discussions at
national level as soon as these are available, for immediate
circulation by the Secretariat;  a comprehensive paper combining
all the contributions will be prepared to facilitate the
discussion at the next session when, as agreed, the Sub-Committee
will consider the fundamental issues regarding the steering and
sailing rules, and possibly the preliminary part.

7.   The subject of "unification of local rules" had been
previously included by the Committee on the Sub-Committee's
work programme;  the signals for dredgers were part of this
subject.  It was agreed that these signals had to be considered
in the context of the revision of the Rules;  proposals
submitted by Members will be considered in due course.

8.   The Sub-Committee, taking into account the time-table for
collating the results of the questionnaires and the circulation
of the analyses, agreed that the appropriate time for its next
session would be from 13-17 April;  it requested that necessary
provision be made in the programme of meetings.

- 3 -

NAV VIII/3

## II.  MATTERS RELATED TO ROUTEING
### AND TRAFFIC SEPARATION

(a)  Amendments to Regulations 7 and 8, Chapter V of the International Convention for the Safety of Life at Sea, 1960

9.  The Sub-Committee considered, in accordance with the instructions given to it by the Committee (MSC XVIII/24, paragraph 12), the subject of amending Regulation 8, Chapter V, of the Convention, with the aim of bringing it into conformity with the doctrine now being developed by IMCO on routeing and traffic separation.  It agreed on a new draft Regulation 8 which appears at Annex II and submits it to the Committee for its consideration.  The Sub-Committee finally concluded that there was no need to amend Regulation 7 of Chapter V.  It also agreed that a warning be included in the publication on routeing with regard to avoiding the Grand Banks of Newfoundland, and prepared appropriate text (see Annex III).

(b)  Checking of the co-ordinates of the scheme in the approaches to Rostock

10.  Following the request of the Sub-Committee at its seventh session, the Government of the USSR checked the co-ordinates of the scheme in the approaches to Rostock.  The Sub-Committee agreed with the suggested changes for inclusion in the draft Publication on routeing as necessary (See Annex IV).

(c)  Traffic Separation Scheme in the Approaches to Chesapeake Bay

11.  The Sub-Committee gave consideration to the proposal by the Government of the United States of America to establish a scheme in the above-mentioned area.  The general outline of the scheme was agreed, but certain modifications were suggested, which in the opinion of the Sub-Committee would improve the scheme.  The description of the scheme, as modified, is given in Annex V.

- 4 -

V VIII/8

12. The delegation of the United States agreed to bring the aforementioned modifications to the attention of the appropriate national authorities; the Secretary-General would then be informed by the Government of the United States of its comments on the proposed modifications and the scheme together with such comments would be submitted to the Maritime Safety Committee for consideration and eventual inclusion in IMCO publication on routeing.

(d) Crossing traffic at Sandettie area

13. The Sub-Committee gave consideration to the general traffic pattern in the area in question and came to the conclusion that it is working satisfactorily and no radical changes are required at this time. It felt, however, that some improvements could be effected by establishing a traffic separation system for crossing ships in the Sandettie-Fairy Bank-West Hinder area. A particular routeing system worked out by the Sub-Committee appears in Annex VI and is illustrated in the chartlet attached to Annex VII.

14. To support the proposed system, it is recommended that light buoys be established in the following positions:

    (i)  $51^{\circ}$ 20'.0 N        $2^{\circ}$ 25'.2 E

   (ii)  $51^{\circ}$ 21'.5 N        $2^{\circ}$ 18'.1 E

 (iii)  $51^{\circ}$ 20'.9 N        $2^{\circ}$ 8'.3 E      (with racon, to mark the centre of a traffic separation zone)

Fairy Bank buoy West in position $51^{\circ}$ 23'.7 N $2^{\circ}$ 14'.0 E recently removed, should be re-placed.

- 5 -

NAV VIII/8

15.  As a part of the recommended measures, it was found desirable to amend the boundary of the inshore traffic zone of the Dover Strait on the Continental side; from position 50° 53'.6 N 1° 31'.0 E the boundary passes through position 51° 06'.4 N 1° 49'.0 E to position 51° 20'.0 N 2° 25'.2 E.

(e)  Establishment of new scheme West of North Hinder

16.  As a further improvement a new traffic separation scheme west of North Hinder was recommended, as described in Annex VII and illustrated in the attached chartlet.  It is also recommended that a new light buoy with racon be established in position: Lat. 51° 47'.0 N 2° 33'.0 E to facilitate navigation in the area.

17.  The traffic separation schemes referred to in paragraphs 13-16 should not be brought into operation until buoys recommended for supporting the schemes have been established.

(f)  Navigation of deep draught ships through the
Dover Strait

18.  The Sub-Committee felt that such a problem does exist. It was felt highly desirable to recommend the removal of wrecks and the undertaking of necessary clearance of the sea bottom between Sandettie N.E. buoy and Fairy Bank buoys.

19.  The Sub-Committee also gave consideration to the possible eventual routeing of deep-draught vessels west of the Sandettie Bank.  Such measures would require the removal of certain wrecks in that area and the provision of additional aids to navigation.

20.  The Sub-Committee recommends that consideration be given to the problem, which may be discussed at the next session of the Sub-Committee, due account being taken of studies regarding sand waves and negative storm surges.

- 6 -

VIII/8

(g)  Traffic Separation schemes in the approaches
to Hong Kong

21.  At the request of the Government of Hong Kong, consideration
was given to traffic separation schemes in approaches to Hong Kong.
The Sub-Committee had before it traffic separation schemes already
in force in that area.

22.  The Sub-Committee, taking into account the IMCO practice of
delineating traffic separation schemes in similar circumstances,
suggested alternative schemes, described in Annex VIII, which
in its opinion constitute an improvement.

23.  The Sub-Committee recommended that the Secretary-General
be requested to consult as necessary as to the acceptability of
these proposals.  The description of the scheme together with
comments, if any, should be submitted in due course to the
Maritime Safety Committee for approval and eventual inclusion
in the publication.

(h)  Traffic Separation Schemes Off the Coast of Tunisia

24.  The Sub-Committee gave consideration to the proposal
submitted to the Organization by the Government of Tunisia.

25.  In the course of its considerations, the Sub-Committee
came to the following conclusions:

(i)  the schemes off Zembra Island and off Cape Bon should
be combined;

(ii)  the directions of traffic in the scheme north of
Cani Isles should be slightly rearranged to coincide
with the actual pattern of traffic in the area;

(iii)  the establishment of a traffic separation scheme off
La Galite Island, in the unanimous opinion of the
Sub-Committee, was not considered justified at this
time, as better navigation aids exist to the South
and many eastbound ships take advantage of the coastal
current to the south of the Island.

- 7 -

NAV VIII/8

26.  As a result of its deliberations the Sub-Committee recommended the establishment of traffic separation schemes, descriptions of which are given in Annexes IX and X, following consultations with the Government concerned.

27.  The Sub-Committee felt it necessary to draw attention to the existence of a bank positioned approximately at $37^\circ$ 30' N., $10^\circ$ 27' E.  It was of the opinion that the Secretary-General should be requested to bring this fact to the attention of the International Hydrographic Bureau for action as necessary, and in particular the possibility of tinting the area of the bank on charts in view of its proximity to the traffic using the newly established traffic separation schemes off the Tunisian coast.

  (i)  Traffic Separation Scheme in the
       Malacca and Singapore Straits

28.  The Sub-Committee had before it proposals submitted by the Government of the USA and by the International Chamber of Shipping.  The Sub-Committee noted that since it last examined this problem some hydrographic surveys had been carried out and further surveys are planned to be undertaken jointly by the Governments of Indonesia, Malaysia, Japan and Singapore, as well as by the Government of the United Kingdom.  The Sub-Committee recognized the importance of detailed surveys, which should, in its view, be the prerequisite to the establishment of a definitive scheme in this area.  Under this circumstance, the Sub-Committee agreed that it was not advisable to formulate at this session an interim scheme to be recommended to the Committee.

- 8 -

V VIII/S

19.  An attempt was, however, made to produce a preliminary delineation of the scheme based on the information available at present.  The description of the tentative scheme will be transmitted as soon as possible to the countries undertaking the surveys in the area for their information.

20.  There was a strong opinion, however, that the scheme could not be brought into operation until outstanding surveys were completed and the necessary aids to navigation were established.  It deferred, therefore, any decision on this point until the results were available.  The Sub-Committee reaffirmed the view reached at its fourth session that there was an urgent need for the introduction of a scheme in this area.

## (j)  Date of implementation

21.  In the interest of allowing sufficient time for the proper promulgation of any new measure on routeing recommended by the Committee, the Sub-Committee agreed to suggest that a date of implementation should be decided by the Committee, which would no doubt be aware of the wishes of any Administration in this respect.  It is not the intention of the Sub-Committee to set aside what is said in the publication on routeing on the adoption of routeing schemes by individual Administrations.

## III.  ITEMS FOR FURTHER STUDY BY THE JOINT IMCO/ILO COMMITTEE ON TRAINING:  FORMULATION OF PRELIMINARY IMCO VIEWS

22.  The Sub-Committee gave consideration to the items referred to it by the Maritime Safety Committee at its nineteenth session, relating to the training of deck officers.

The curricula and syllabuses considered suitable under the different subjects are contained in Annex XI.  In these curricula and syllabuses an attempt has been made to adhere as closely as possible to the lay-out in the corresponding parts of the "Document for Guidance - 1968".

- 9 -

NAV VIII/2

34. The Sub-Committee wishes to make the general statement that no drill mentioned in the syllabuses shall be regarded as having been properly conducted unless it has encompassed subsequent analysis and discussion.

35. Attention is drawn to the "Merchant Ship Manual on Search and Rescue" (MERSAR) which has been compiled by IMCO and is pending approval. It would seem to be desirable to include knowledge of this manual in the curricula for the training of deck officers, and the Committee is therefore invited to consider recommending this to the Joint Committee.

36. The requirements of the International Convention for the Prevention of Pollution of the Sea by Oil, 1954, as amended in 1962, and shipboard practices in compliance therewith, were considered as being desirable for inclusion in the curricula for the training of ships' officers. (Resolution 11 of the International Conference on Prevention of Pollution of the Sea by Oil, 1962). It was not felt that this subject could be appropriately included under any of the general subject titles, but the Sub-Committee nonetheless felt compelled to bring the importance of the matter of pollution, not only by oil but also by other hazardous or noxious cargoes, to the attention of the Committee as a subject it may wish to recommend for submission to the Joint Committee for further discussion.

37. Statements made during the discussion of this agenda item by the representatives of the International Confederation of Free Trade Unions and the International Shipping Federation are appended to Annex XI.

9/25/69

– 10 –

VIII/8

IV.  USE OF A QUICK FLASHING WHITE LIGHT (AND CORRESPONDING
SOUND SIGNAL) FOR DRILLING AND PRODUCTION PLATFORMS

38.  The Sub-Committee considered previously the use of a quick
flashing white light and sound signal (sound 2 seconds, silence
18 seconds) repeated every 20 seconds. and recommended that
Administrations may use it as an alternative.  Realizing however
that two systems of marking were thus being introduced and
considering it preferable that there should be uniformity to the
maximum possible extent in these matters, the Sub-Committee
recommended that Administrations establishing new platforms
should give careful consideration to the existing practice in
the area in order to avoid any increase in the number of signals
which the mariner may encounter.

39.  The delegation of the USSR expressed its strong belief
that the use of signal "U" is inappropriate and dangerous because
of its possible confusion with some aids to navigation, and also
with signals given in the context of the International Code of
Signals with a meaning "You are running into danger".  The
majority of the North European countries, however favoured the
retention of signal "U".

V.  MATTERS RELATED TO THE OPERATION AND USE
OF OCEANOGRAPHIC STATIONS (ODAS)

40.  The Sub-Committee had before it explanatory information
concerning the operation and use of Ocean Data Acquisition
Systems (ODAS) in so far as they effect the safety of navigation
and the safety of stations themselves, and examined tentative
suggestions about the marking of such stations.  The discussions
were not conclusive in view of the forthcoming consideration
of the subject by the Group of Experts of the IOC in which IMCO
is expected to participate.  Various points were clarified and
the Sub-Committee expressed opinions intended to assist the

- 11 -

NAV VIII/8

Secretariat in the further consideration of the problem with the
IOC.  The Sub-Committee agreed to return to the subject at its
next session and formulate concrete proposals.  In view of the
relation of this subject to the Regulations for Preventing
Collisions at Sea, it was felt that the Sub-Committee's work on
the revision of the Regulations may have a bearing on the final
requirements.

41.   The Sub-Committee considered it essential that every effort
should be made to unify the signals shown by drilling platforms,
ocean data acquisition systems and any other similar structures
or systems which may be encountered by the mariner.

MSV VIII/2

ANNEX I

REVISION OF THE REGULATIONS FOR PREVENTING
COLLISIONS AT SEA

A preliminary consideration of the subject resulted in
the following tentative views, which will have to be developed
further:

## I.   ORGANIZATION OF THE RULES

A.   Preliminary Part

This Part would contain:

1.   Application of the Rules and exemptions thereof.

2.   Definitions (they would cover new terms, novel types
of craft, etc.)

3.   Rules of a general type, such as the existing Rules 13,
28(d), 29 and 30.

4.   Basic principle(s) governing the use of traffic
separation measures in the context of the Rules.

B.   Lights and shapes

In principle this part would contain all the lights and
shapes exhibited for identification purposes.  Only the main
operational characteristics will be retained in the Rules;
constructional details and specifications such as those concerning
dimensions, sizes, intensities, colours, positioning and the like
will appear in an Annex.

C.   Steering and Sailing Rules

1.   Manoeuvring Rules in unrestricted visibility and
associated signals, including signals for vessels
in sight of one another.

2.   Conduct in restricted visibility and associated signals.

3.   Warning signals, such as those in existing Rules 28(b)
and 25(b).

The grouping of the steering and sailing Rules into one or
more parts will be considered later.

PCO 1057/3
of
2

D.   Annexes

One or more Annexes may be used to deal with:

1.   Specifications for lights and shapes as indicated in B.

2.   Specifications and requirements for sound signals and related equipment.

3.   Basic principles for the use of, or navigation in, routeing schemes.

4.   Lights and shapes used by fishing vessels when operating as a fleet or in close proximity, in so far as such lights are not of direct interest to other ships.

E.   General remarks

1.   Rule 31 - Distress signals; these signals are not intended for collision avoidance.  It is however recognized that their inclusion in the Rules is an effective method of ensuring that they are made known to the mariner.  Alternatives under consideration are:

     (a)  inclusion in Chapter V of the Safety Convention

     (b)  inclusion in the Code of Signals

     (c)  inclusion in an Annex to the Rules

or a combination of the above.

2.   Lights for seaplanes: it should be further considered whether they should be included

     (a)  as at present, among similar rules for lights (under B).

     (b)  in a Part of their own (or in an Annex).

3.   It is thought that there may be merit in some illustration to illustrate certain provisions of the Rules.

NOTE:   The order in which the above items are listed and their numbering are intended for reference purposes only.

MSC VIII/?
ANNEX I
Page 3

## II.   COLOURS TO BE USED FOR THE LIGHTS

The basic colours should be white, red and green.  Blue and yellow are available for secondary purposes and preferably as flashing lights.

## III.   FUNDAMENTAL ISSUES

These are:

(a)  action in clear weather and action in reduced visibility

(b)  if, and in what circumstances, action would be required by both vessels – provisions of existing Rule 21

(c)  the concept of the "hampered" vessels.

These are considered key questions and they will have to be decided on the evidence produced by the answers to the questionnaires sent out by the International Chamber of Shipping and Member Governments.  With regard to item (b), thought was given to:

(a)  explicitly providing for a "never to port" manoeuvre

(b)  exploring the question of maintaining course AND speed.

NAV VIII/8

## ANNEX II

### NEW DRAFT REGULATION 8, CHAPTER V OF THE
### INTERNATIONAL CONVENTION FOR THE SAFETY OF LIFE AT SEA, 1960
### ROUTEING

(a)  The practice  of following recommended routes, particularly in converging areas, for the purpose of separation of traffic including avoidance of passage through areas designated as areas to be avoided by ships or certain classes of ships, or for the purpose of avoiding unsafe conditions, has contributed to the safety of navigation and is recommended for use by all ships concerned.

(b)  The Organization is recognized as the only international body for establishing and recommending measures on an international level concerning routeing and areas to be avoided by ships or certain classes of ships.  It will collate and disseminate to Contracting Governments all relevant information.

(c)  The selection of the routes and the initiation of action with regard to them, and the delineation of what constitutes converging areas, will be primarily the responsibility of the Governments concerned.  In the development of routeing schemes which impinge upon international waters, or such other schemes they may wish recommended by the Organization, they will give due consideration to relevant information published by the Organization.

(d)  Contracting Governments will use their influence to secure the maximum appropriate use of recommended routes and will do everything in their power to ensure adherence to the measures recommended by the Organization in connexion with routeing of ships.

SM/VIII/8
Annex II
Page 2

(e)  Contracting Governments will also induce all ships proceeding on voyages in the vicinity of The Grand Banks of Newfoundland to avoid, as far as practicable, the fishing banks of Newfoundland north of latitude 43°N and to pass outside regions known or believed to be endangered by ice.

NAV VIII/8

## ANNEX III

### NAVIGATION IN THE VICINITY OF THE GRAND BANKS.
### OF NEWFOUNDLAND

Attention is drawn to Regulation 8, of Chapter V of the Convention for the Safety of Life at Sea, 1960. It directs that all ships proceeding on voyages in the vicinity of the Grand Banks of Newfoundland avoid as far as practicable the fishing banks of Newfoundland north of latitude 43° N. The reasons for avoiding the area are:

(a)  high concentration of fishing vessels;

(b)  prevailing adverse weather conditions;

(c)  seasonal existence of icebergs.

NAV VIII/2

ANNEX IV

CORRECTIONS IN THE CO-ORDINATES OF THE
TRAFFIC SEPARATION SCHEME IN THE APPROACHES TO ROSTOCK
(AS DESCRIBED ON PAGES 2-4, ANNEX I, NAV VII/10)

1.  3(a)(i)   —  $54°22'.0$ N. instead of $54°21'.9$ N.

2.  3(c)      —  $150°.5 - 330°.5$ instead of $150°.5-33°.5$

3.  3(d)(i)   —  $54°23'.4$ N., $12°06.5$ E instead of
                 $54°23'.0$ N., $12°07'.4$ E.

4.  3(d)(ii)  —  $54°20'.5$ N., $12°03'.2$ E instead of
                 $54°20'.4$ N., $12°03'.7$ E

5.  4(a)(i)   —  $54°22'.0$ N., instead of $54°21'.9$ N.

6.  4(b)(i)   —  $54°17'.0$ N., $12°00'.8$ E instead of
                 $54°16'.9$ N., $12°00.0$ E.

7.  4(c)(i)   —  $12°00'.9$ E instead of $12°01'.0$ E.

8.  4(c)(ii)  —  $54°23'.4$ N., $12°06'.5$ E instead of
                 $54°23'.0$ N., $12°07'.4$ E.

9.  6(a)*     —  $54°22'.0$ N., instead of $54°21'.9$ N.

10. 6(c)*     —  $54°23'.4$ N., $12°06'.5$ E instead of
                 $54°23'.0$ N., $12°07'.4$ E.

11. 6(d)*     —  $54°20'.5$ N., $12°03'.2$ E. instead of
                 $54°20'.4$ N., $12°03'.7$ E.

Admiralty Chart 2365 was used as the reference chart.

---

*  In a corrected version of the description of the Rostock
   Scheme, these paragraphs are renumbered 5(a), 5(c), and 5(d).

ANNEX N

TRAFFIC SEPARATION SCHEME IN THE APPROACHES
TO CHESAPEAKE BAY

(Reference chart 2843 and also United States' C & G.S. 1222)

This scheme consists of the following three parts:

Part I

The dividing line is a line passing through the following geographical positions:

(i)   $36°58'.7$ N.,   $75°43'.7$ W
(ii)  $36°56'.5$ N.,   $75°56'.3$ W

Part II

The dividing line is a line passing through the following geographical positions:

(iii) $36°51'.3$ N.,   $75°50'.9$ W
(iv)  $36°55'.5$ N.,   $75°56'.6$ W

Part III

A circular traffic separation zone of half a mile in diameter centred on a buoy was established in the following position:

(v)   $36°56'.1$ N.,   $75°57'.5$ W

The following buoys equipped with radar reflectors, lights and sound signals were established to facilitate navigation in the scheme:

(a)   in the centre of the circular traffic separation zone (position (v) above);

SERIAL/6
TAB V
Page 2

    (b)   In Part I:

$$36^{\circ}58'.7 \text{ N., } 75^{\circ}48'.7 \text{ W}$$

$$36^{\circ}58'.0 \text{ N., } 75^{\circ}50'.8 \text{ W}$$

$$36^{\circ}57'.4 \text{ N., } 75^{\circ}53'.0 \text{ W}$$

$$36^{\circ}56'.8 \text{ N., } 75^{\circ}55'.2 \text{ W}$$

    (c)   In Part II:

$$36^{\circ}51'.3 \text{ N., } 75^{\circ}50'.9 \text{ W}$$

$$36^{\circ}52'.6 \text{ N., } 75^{\circ}52'.6 \text{ W}$$

$$36^{\circ}53'.7 \text{ N., } 75^{\circ}54'.2 \text{ W}$$

$$36^{\circ}55'.0 \text{ N., } 75^{\circ}55'.8 \text{ W}$$

GENERAL

    Inbound and outbound traffic should leave all buoys of the scheme on the port side.

L.V VIII.

## ANNEX VI

SANDETTIE TRAFFIC SEPARATION SYSTEM (Reference Chart: 1406)

The system consists of two Parts:

### PART I

A circular traffic separation zone, one mile in diameter, is centred at $51^\circ 20'.9$ N., $2^\circ 08'.3$ E

The main directions of crossing traffic are:

$$281^\circ - 101^\circ$$

### PART II

A traffic separation line passes through the following geographical positions:

(i)    $51^\circ 21'.2$ N.,   $2^\circ 26'.5$ E
(ii)   $51^\circ 19'.8$ N.,   $2^\circ 21'.5$ E
(iii)  $51^\circ 20'.5$ N.,   $2^\circ 14'.5$ E

The main directions of crossing traffic are:

$$281^\circ - 101^\circ \text{ and}$$
$$244^\circ - 064^\circ.$$

### PRECAUTION

Northeast bound ships should be aware of the possibility of encountering westbound ferries using the westbound route in the general area between Bergues Whistle Buoy and Sandettie Light Vessel.

### Aids to Navigation

Light buoys should be established in the following geographical positions:

(i)    $51^\circ 20'.0$ N.,   $2^\circ 25'.2$ E
(ii)   $51^\circ 21'.5$ N.,   $2^\circ 18'.1$ E
(iii)  $51^\circ 20'.9$ N.,   $2^\circ 08'.3$ E (with RACON; to mark the centre of the traffic separation zone).

ANNEX VII

NORTH HINDER TRAFFIC SEPARATION SCHEME (Reference Chart: 1406)

A traffic separation zone, one mile wide, is centred upon the following geographical positions:

    (i)  $51^{\circ}47'.0$ N.,  $2^{\circ}33'.0$ E
    (ii)  $51^{\circ}42'.5$ N.,  $2^{\circ}26'.5$ E

A traffic separation line is established between the following geographical psotions:

    (ii)  $51^{\circ}42'.5$ N.,  $2^{\circ}26'.5$ E
    (iii)  $51^{\circ}28'.0$ N.,  $2^{\circ}07'.1$ E

Aids to Navigation

A light buoy with RECON should be established in position $51^{\circ}47'.0$ N.,  $2^{\circ}33'.0$ E.

MAV VIII/1

ANNEX VIII

TRAFFIC SEPARATION SCHEMES IN APPROACHES
TO HONG KONG (REFERENCE CHARTS: 938 AND 1917)

The eastern entrance scheme

(a) Division of traffic in this scheme is achieved by the
introduction of a traffic separation line passing through the
following geographical positions:

| | | |
|---|---|---|
| (i) | $22^{\circ}$ 16'24" N., | $114^{\circ}$ 15'16" E |
| (ii) | $22^{\circ}$ 16'11" N., | $114^{\circ}$ 15'53" E |
| (iii) | $22^{\circ}$ 14'24" N., | $114^{\circ}$ 16'18" E |
| (iv) | $22^{\circ}$ 12'18" N., | $114^{\circ}$ 19'08" E |

(b) The north-eastern limit of the scheme is a line passing
through the following geographical positions:

| | | |
|---|---|---|
| (v) | $22^{\circ}$ 16'53" N., | $114^{\circ}$ 15'19" E |
| (vi) | $22^{\circ}$ 16'21" N., | $114^{\circ}$ 15'42" E |
| (vii) | $22^{\circ}$ 14'30" N., | $114^{\circ}$ 16'56" E |
| (viii) | $22^{\circ}$ 12'53" N., | $114^{\circ}$ 19'38" E |

(c) The south-western limit of the scheme is a line passing
through the following geographical positions:

| | | |
|---|---|---|
| (ix) | $22^{\circ}$ 16'15" N., | $114^{\circ}$ 15'09" E |
| (x) | $22^{\circ}$ 16'05" N., | $114^{\circ}$ 15'23" E |
| (xi) | $22^{\circ}$ 14'18" N., | $114^{\circ}$ 16'00" E |
| (xii) | $22^{\circ}$ 11'44" N., | $114^{\circ}$ 18'39" E |

ANNEX VIII
page 2

The western entrance scheme

(a) Division of the traffic is achieved by the introduction
of a traffic separation line passing through the following
geographical positions:

    (i) 22° 16'50" N.,      114° 06'06" E

    (ii) 22° 14'58" N.,      114° 07'13" E

    (iii) 22° 12'54" N.,     114° 10'00" E

    (iv) 22° 08' 0" N.,     114° 13'00" E

(b) The north-eastern limit of the scheme is a line passing
through the following geographical positions:

    (v) 22° 16'54" N.,     114° 06'13" E

    (vi) 22° 15'00" N.,     114° 07'40" E

    (vii) 22° 15'00" N.,     114° 10'12" E

    (viii) 22° 08'30" N.,     114° 13'54" E

(c) The south-western limit of the scheme is a line passing
through the following geographical positions:

    (ix) 22° 16'48" N.,     114° 05'50" E

    (x) 22° 14'51" N.,     114° 06'51" E

    (xi) 22° 12'42" N.,     114° 09'48" E

    (xii) 22° 07'30" N.,     114° 12'00" E

ANNEX IX

THE TRAFFIC SEPARATION SCHEME OFF CANI ISLAND (coast of Tunisia)

(Reference chart 2122)

A two-mile wide separation zone is centred upon the following geographical positions:

(i) 37°31'.8 N.,     10°02'.0 E

(ii) 37°31'.8 N.,     10°02'.8 E

A traffic lane three miles wide is established on each side of the separation zone.

The main traffic directions are:

90° - 270°.

NAV VII/1/3

## ANNEX X

THE TRAFFIC SEPARATION SCHEME OFF CAPE BON (coast of Tunisia)
(Reference chart 2122)

A two-mile wide separation zone is centred upon the following geographical positions:

(i) 37°13'.2 N.,     11° 1'.3 E

(ii) 37°10'.2 N.,    11°11'.5 E

A traffic lane three miles wide is established on each side of the separation zone.

The main traffic directions are:

290° – 110°.

NAV VIII/3

ANNEX XI

CURRICULA AND SYLLABUSES
FOR THE TRAINING OF DECK OFFICERS

1.  FIRE-FIGHTING APPLIANCES AND TECHNIQUES (PREVENTION,
    DETECTION AND EXTINCTION)

It was considered that this item has already been dealt with in the "Document for Guidance - 1968". (See JCT I/1, Annex I, VI, and Appendices H and I). In the light of this no further consideration was given to the subject.

2.  INTERNATIONAL REGULATIONS FOR PREVENTING COLLISIONS AT SEA

This item does not readily lend itself to the formulation of detailed guidance of the kind which the Joint Committee could usefully supply. It also brings in the operational use of radar to which detailed reference was made in the Joint Committee's report of its first session and in the "Document for Guidance - 1968".

However, deck officers should be given thorough knowledge of the Collision Regulations and their practical application to enable them to be in charge of a bridge watch.

3.  NAVIGATION AIDS, e.g. buoys, light vessels

The standard of knowledge required of a deck officer should be such that he is able to ascertain, on sighting a navigation mark, what action, if any, needs to be taken.

In providing instruction reference should be made to:

(a) recognition and meaning of characteristics, e.g. shape, colour, positioning etc. of buoys;

(b) where further information can be obtained, e.g. charts, light lists, sailing directions; and

(c) the danger of placing implicit reliance upon floating navigation aids.

4.  KNOWLEDGE AND USE OF THE INTERNATIONAL CODE OF SIGNALS

This item does not lend itself readily to the formulation
of detailed guidance, and the heading would to a large extent
seem to be self-explanatory.

However, deck officers should be given sufficient knowledge
of the morse-code to enable them to receive and transmit simple
messages.  They should know the flags and pendants of the
international code and the significance of the more important
single-letter signals.  They should have knowledge of the
signalling procedures set out in the International Code of
Signals and how to make use of that publication.

5.  USE, CARE AND MAINTENANCE OF LIFE-SAVING APPLIANCES

(a) The IMCO/ILO Document for Guidance indicated (Appendix F,
    page 27, of JCT I/1, Annex I) the broad minimum
    requirements necessary for a rating who may in an emergency
    and in the absence of an officer be required to launch and
    take charge of a boat.  This information does not cover
    all the elements desirable for an officer who may be in
    overall control of a number of boats or rafts. The training
    arrangements should have regard to events and conditions
    prior to abandonment when communications with the Master
    or Officer in charge might be difficult and launching
    conditions complicated by list or excessive trim.

(b) Deck officers should be trained to have regard to the
    following points:

    General

    (i)  the difference between the emergency signal and the
         abandon ship signal;

(ii) within the limits dictated by the urgency of the situation, the extent to which the standard equipment could and should be supplemented, e.g. by placing on board the lifeboat/life-raft additional items such as blankets, etc.;

(iii) the need to have placed on board the lifeboat/life-raft portable radio equipment;

(iv) knowledge of bowsing and tricing equipment for retaining the lifeboat/life-raft at the embarkation position;

(v) knowledge of the means of restraining and controlling the lifeboat/life-raft during the lowering procedure;

(vi) means to adopt when almost waterborne to safeguard against premature unhooking in a seaway;

(vii) how to clear the ship's side using oars or power;

(viii) how and under what conditions to lay off to a sea anchor or drogue;

(ix) methods of recovering persons from the sea;

(x) modern search and rescue philosophy e.g. the advisability of remaining in casualty area;

(xi) correct usage of signalling equipment and distress signals including life saving signals and signals from search and rescue aircraft;

(xii) handling of craft in bad weather; including use of oil to subdue waves;

(xiii) protection of crew and passengers, including dangers of exposure to wind or sun and of sacrificing protection for apparent progress

and use of protective covers and other measures
for their care and comfort;

(xiv) advice and control applicable to

(a) issue of water and food;

(b) treatment of sickness, injuries and ailments;

(c) use of morphia and energy producing tablets; and

(d) avoidance of drinking sea water.

(xv) maintenance of control and discipline;

(xvi) regulations **governing life-saving appliances, musters
and drills;**

Life-rafts

(xvii) the basic construction and stowage of life-rafts, the
equipment to be carried and its correct usage;

(xviii) methods of launching and boarding rafts;

(xix) the influence on comfort of closing the entrance
to the life-rafts and, on inflatable life-rafts, of
inflating the floors,

(xx) the precautions necessary to prevent piercing
damage to the inflatable life-raft and ways to
repair;

(xxi) righting an inflatable life-raft;

Other life-saving appliances

(xxii) use of line throwing apparatus;

(xxiii) use and proper stowage of buoyant apparatus, life
buoys and life jackets.

(c) It is realised that training in the use of items (v) (vi), (ix) and (xii) cannot be achieved realistically because it is impracticable and unreasonable to place trainees at risk in unsuitable weather conditions. Nevertheless it is possible to demonstrate at lectures and in practice sessions methods which have been found effective.

(d) In addition to deck officers, <u>all officers and seamen</u> should receive instructions in launching, inflating and boarding an equipped life-raft and the correct method of righting an inflatable life-raft. The Committee is accordingly invited to put forward to the Joint Committee the items (b) (xvii), (xviii), (xix), (xx) and (xxi) as a syllabus for additional training of seamen in accordance with the intentions expressed in Annex I, Part V, paragraph three of document JCT I/1.

6.    <u>FAMILIARIZATION WITH, AND ABILITY TO IMPLEMENT PROCEDURE FOR THE SAFETY OF SHIPS, CREW AND PASSENGERS</u>

(a) It is not possible to give an exhaustive list of measures which should be taken in an emergency. Proficiency in this subject can properly only be obtained on board ship as it is finally dependent on the individual ship and organisation on board.

(b) Basic training should be designed to enable the officer to identify the factors which should affect his decisions, including the planning of emergency procedures.

(c) The curriculum should include the following subjects:

(i) the syllabus of fire-fighting (prevention, detection and extinction);

II/8
XI

(ii) the syllabus on life-saving appliances;

(iii) precautions when beaching a vessel;

(iv) action to be taken prior to, and after, grounding;

(v) floating a grounded vessel, with and without
assistance;

(vi) action to be taken following a collision;

(vii) temporary plugging of leakages;

(viii) precautions for the protection and safety of passengers
in emergency situations;

(ix) limiting damage and salving the ship following a fire
or explosion;

(x) abandoning ship;

(xi) emergency steering, rigging and operation of jury
rudder;

(xii) arrangements for towing and being taken in tow, in
an emergency;

(xiii) saving of persons from a vessel in distress or from
a wreck;

(xiv) assisting a vessel in distress;

(xv) man overboard procedures;

(xvi) a knowledge of action to be taken when emergencies
arise in port.

## THE PRACTICE OF NAVIGATION AT SEA

To provide the theoretical basis for carrying out duties
of a navigating officer on watch as far as it concerns which
position and the ability of the vessel to proceed from point
to point in safety and obtaining of position fixes by astronomical

all terrestrial observations and electronic aid to navigation. The syllabus should include, but not be limited to, the following main subjects:

(a) navigation terms and definitions

(b) principles of navigation

(c) nautical charts

(d) terrestrial navigation

(e) time

(f) astronomical navigation

(g) tides and currents

(h) compass error

(i) navigation tables and publications

(j) navigation instruments

(k) electronic navigation (covered by the "Document for Guidance - 1968" (JCT I/1, ANNEX I, Appendices A,B,C and D).

8.  ADEQUATE KNOWLEDGE OF METEOROLOGY AND THE ABILITY TO APPLY THE METEOROLOGICAL INFORMATION AT HIS DISPOSAL

In order to provide the officer with a knowledge of meteorology necessary for the efficient and safe operation of the ship the syllabus should include, but not necessarily be limited to, the following main subjects:

(a) meteorological terms and definitions;

(b) meteorological instruments;

(c) theory and practice of general circulation of the atmosphere;

(d) winds, cyclones, anti-cyclones, storms, fog, frosts, tropical storms, etc.

(e) interpreting weather charts

(f) practical use of weather information.

## SAFE AND EFFICIENT WORKING PRACTICES ON BOARD SHIP

The whole question of accident prevention/safe working practices is being considered in September 1969, at the International Preparatory Technical Maritime Conference convened by the ILO at Genoa.  In view of this the item was not given consideration.

## KNOWLEDGE OF SAFE HANDLING AND STOWAGE OF CARGOES

Minimum standards of knowledge and training of deck officers should comprise:

(a) Stowage

    (i) knowledge of international regulations and recommendations pertaining to stowage of cargo; e.g. Chapter VI - Carriage of Grain - of the International Convention for the Safety of Life at Sea, 1960, (new grain regulations are pending approval by the sixth regular Assembly of IMCO for being recommended to governments as equivalents to the regulations of the present Chapter VI), the International Convention of Load Lines, 1966, the IMCO Code of Safe Practice for Bulk Cargoes (other than grain); the International Maritime Dangerous Goods Code;

    (ii) general precautions with and methods of stowage and securing of cargoes;

Page 9

(iii) bulk cargoes such as coal, grain, ores, chemical and petroleum products. Their stowage factors proneness to shift. The influence of stowage on stability. Moisture content maxima and minima for safe carriage. Pulsing effects with ore concentrates;

(iv) carriage of dangerous goods and hazardous cargoes;

(v) carriage of deck cargoes;

(vi) liquid cargoes in bulk – precautions against fire and explosions;

(vii) damage by cargo to the ship;

(viii) preparation of cargo compartments, bilges, strums etc. before receiving cargo, including cleaning of tanks. Drainage of holds and tanks;

(ix) methods and safeguards in fumigating holds;

(x) practical knowledge of the calculation and maintenance of stability during loading and discharging operations and while making a sea passage, effect of free surfaces and icing on stability;

(xi) Load-line marks and their general and seasonal use;

(xii) precautions before entering closed or contaminated spaces;

(b) Handling.

It was felt that the "safe handling" of cargoes might well be dealt with under a separate heading under which subjects like the following could be included:

(i) methods of cargo handling using ship's gear;

(ii) handling and stowage of heavy weights;

(iii) separation and marking of cargo;

(iv) receiving cargo, tallying and supervision of condition;

(v) mate's receipts, cargo book, hatch lists and loading

(vi) rigging, loading or discharging gear (various types used);

(vii) damage made by cargo to other cargo.

10. A BASIC KNOWLEDGE OF THE CONSTRUCTION OF SHIPS AND THE ABILITY TO USE THE STABILITY DATA SUPPLIED

(a) The training of deck officers should be designed to acquaint them with:

(i) the terms and definitions used in ship construction;

(ii) typical methods of ship construction including some knowledge of specialized carriers;

(iii) the piping systems a deck officer will generally have to deal with.

(b) Officers serving on specialized types of ships, e.g. solvents-carriers, L.P.G.-carriers etc., should be given appropriate and relevant knowledge in this respect.

11. USE OF MEDICAL GUIDES AND OTHER ITEMS ON BOARD SHIP FOR GIVING QUICK AID TO INJURED PERSONS

As pointed out in paragraph 2(c) of the Joint Committee's report (JCT I/1) of December, 1964, there is a Sub/Committee established with the approval of governments. This Committee was specifically set up to deal with questions on the medical care of seafarers and is that time produced the model International Ships' Medical Guide. There is also a medical section in the International Code of Signals.

In view of the foregoing this item has not been given consideration.

15. **KNOWLEDGE OF THE MANOEUVRING OF SHIPS IN PORT AND AT SEA AND THE SAFE CONDUCT OF SHIPS IN BAD WEATHER**

The training and theoretical knowledge required of deck officers should include the subject matters:

(a) manoeuvres on approaching pilot vessels with due regard to weather and tide;

(b) handling a vessel in rivers, estuaries, etc., having regard to the effects of current, wind and restricted water on the response to helm;

(c) the effect of squat;

(d) interaction between passing vessels and between own vessel and nearby banks;  e.g. "canal effect";

(e) berthing and unberthing under all conditions of wind and tide, with and without tugs;

(f) choice of anchorage.  Operation of anchoring using one and two anchors, in unrestricted and in limited anchorages;

(g) dragging, clearing foul anchors;

(h) dry-docking both intact and with damage;

(i) management and handling of ships in heavy weather, means of keeping a disabled or unmanageable vessel out of the trough and lessening drift, use of oil;

(j) precautions in manoeuvring for launching boats or life-rafts in bad weather;

(k) methods of taking on board survivors from life-boats or life-rafts;

STW/3
XI
12

(l) familiarization with manoeuvring characteristics of own ship, e.g. stopping distance and turning circle;

(m) the importance of navigating with prudence with regard to damage caused by own ship's waves;

(n) management and handling of ships when navigating in ice or conditions of ice accretion.

## APPENDIX TO ANNEX XI

The representative of the ICFTU requested the following statement to be included in the report:

The ICFTU representative

<u>Recognizing</u>   that IMCO has a responsibility to ensure that adequate training in Safety of Life at Sea is given to ships' personnel

<u>Recognizing</u>   that ILO is deeply concerned with vocational training including all facets of maritime training

<u>Recognizing</u>   that an agreement exists between ILO and IMCO for the establishment of a Joint Committee on Training to co-operate on items of mutual interest

<u>Believed</u> that training in the subjects of:

1. handling of cargo including cleaning of oil tanks

2. the practice of navigation

3. meteorology

should be considered as purely vocational training lying outside the scope of the agreement on co-operation of the two Organizations

<u>He did therefore not take part</u> in the discussion of the subjects mentioned above.

In this connexion it was pointed out by the IOF representative that no objection would be raised to the inclusion in the report of the subjects in question, always provided that discussions covered the basis as laid down in the "Document for Guidance - 1950".

It was recognized, insofar as the ISF was concerned,
that within their respective spheres of activity, IGO and
IIO would co-operate in dealing with these subjects.

NAV VIII/8

ANNEX XII

AGENDA FOR THE EIGHTH SESSION

Election of Chairman and Vice-Chairman

1.   Adoption of agenda (NAV VIII/1/Rev.1;  NAV VIII/1/1).

2.   Revision of the International Regulations for Preventing
     Collisions at Sea;  unification of local special rules
     (NAV VIII/2;  NAV VIII/2/1;  NAV VIII/2/2;  NAV VIII/2/3;
     NAV VIII/2/3/Add.1;  NAV VIII/2/4;  NAV VIII/2/5;
     NAV VIII/2/6).

3.   Matters related to routeing and traffic separation
     (NAV VIII/3)

     (a)   new schemes (NAV VIII/3(a);  NAV VIII/3(a)/1;
           NAV VIII/3(a)/2;  NAV VIII/3(a)/2/Add.1;
           NAV VIII/3(a)/3;  NAV VIII/3(a)/4;  NAV VIII/3(a)/5;
           NAV VIII/3(a)/6)

     (b)   crossing traffic in the Dover Strait and adjacent
           waters

     (c)   amendments to Regulations 7 and 8, Chapter V of the
           International Convention for the Safety of Life at
           Sea, 1960 (NAV VIII/3(c);  NAV VIII/3(c)/1;
           NAV VIII/3(c)/2).

4.   Items for further study by the Joint IMCO/ILO Committee
     on Training;  formulation of preliminary IMCO views
     (NAV VIII/4;  NAV VIII/4/1;  NAV VIII/4/2;  NAV VIII/4/3).

5.   Use of a quick flashing white light (and corresponding
     sound signal) for drilling and production platforms
     (NAV VIII/5;  NAV VIII/5/1).

6.   Matters related to the operation and use of oceanographic
     stations (ODAS) (NAV VIII/6;  NAV VIII/6/1;  NAV VIII/6/1/Add.1).

7.   Any other business (NAV VIII/7;  NAV VIII/7/1;  NAV VIII/7/2).

NAV VIII/7

ANNEX XVII

LIST OF DOCUMENTS ISSUED IN CONNEXION WITH
THE EIGHTH SESSION OF THE SUB-COMMITTEE
ON SAFETY OF NAVIGATION

| Document symbol | Title |
|---|---|
| NAV VIII/1/Rev.1 | Agenda for the eighth session. |
| NAV VIII/1/1 | Adoption of the Agenda.   Note by the Secretariat. |
| NAV VIII/2 | Revision of the International Regulations for Preventing Collisions at Sea: Unification of Local Special Rules.   Note by the Secretariat. |
| NAV VIII/2/1 | Idem.   Note by the Government of Belgium. |
| NAV VIII/2/2 | Idem.   Note by the Secretariat. |
| NAV VIII/2/3 | Idem.   Note by the Government of Finland. |
| NAV VIII/2/3/Add.1 | Idem. |
| NAV VIII/2/4 | Idem.   Note by the Government of the Federal Republic of Germany. |
| NAV VIII/2/5 | Idem.   Note by the Secretariat. |
| NAV VIII/2/6 | Idem.   Note by the Government of the USSR. |
| NAV VIII/3 | Matters related to Routeing and Traffic Separation.   Note by the Secretariat. |
| NAV VIII/3(a) | Idem.   New Schemes.   Note by the Secretariat. |
| NAV VIII/3(a)/1 | Idem.   Note by the Secretariat. |
| NAV VIII/3(a)/2 | Idem.   Note by the Government of Japan. |
| NAV VIII/3(a)/2/Add.1 | Idem. |

| Document Symbol | Title |
|---|---|
| MSC VIII/3(a)/3 | Matters related to Routeing and Traffic Separation.   Note by the Secretariat. Note by the Secretariat. |
| MSC VIII/3(a)/4 | Idem. |
| MSC VIII/3(a)/5 | Idem.   Note by the Government of the United States of America. |
| MSC VIII/3(a)/6 | Idem.   Note by the Government of Japan. |
| MSC VIII/3(c) | Amendments to Regulations 7 and 8, Chapter V of the International Convention for the Safety of Life at Sea, 1960. Note by the Secretariat. |
| MSC VIII/3(c)/1 | Idem.   Note by the Secretariat. |
| MSC VIII/3(c)/2 | Idem.   Note by the Government of the United States of America. |
| MSC VIII/4 | Items for further study by the Joint IMCO/ ILO Committee on Training;   formulation of Preliminary IMCO views.   Note by the Secretariat. |
| MSC VIII/4/1 | Idem.   Note by the Government of the United Kingdom. |
| MSC VIII/4/2 | Idem.   Note by the Government of Norway. |
| MSC VIII/4/3 | Idem.   Note by the Secretariat. |
| MSC VIII/5 | Use of a quick flashing white light (and corresponding sound signals) on drilling and production platform... Note by the Secretariat. |
| MSC VIII/5/1 | Idem.   Note by the Government of ... |

CONFIDENTIAL

Page 5

| Document Symbol | Title |
|---|---|
| NAV VIII/6 | Matters related to the operation and use of oceanographic stations (ODAS). Note by the Secretariats of IMCO and IOC. |
| NAV VIII/6/1 | Idem. Note by the Secretariat. |
| NAV VIII/6/1/Add.1 | Idem. Note by the Secretariat. |
| NAV VIII/7 | Performance Specifications and type-testing procedures for shipborne navigational equipment. Note by the Secretariat. |
| NAV VIII/7/1 | Idem. Note by the Secretariat. |
| NAV VIII/7/2 | Idem. Marine Radar Performance Specifications. Note by the Government of the United States of America. |
| NAV VIII/8 | Report of the Sub-Committee on Safety of Navigation on the work of its eighth session. |
| NAV VIII/WP.1 | Revision of the International Regulations for Preventing Collisions at Sea; unification of local special rules. Statistics of Collisions at Sea. |
| NAV VIII/WP.2 | Use of a quick flashing white light (and corresponding sound signal) for drilling and production platforms. |
| NAV VIII/WP.3 | Matters related to Routeing and Traffic Separation. New Schemes. Report by the Group of Experts on crossing traffic at Sandettie area. |
| NAV VIII/WP.4 | Proposed Amendments to Regulation 8, Chapter V of the International Convention for the Safety of Life at Sea, 1960. |
| NAV VIII/WP.5 | Report by the Working Group on Traffic Separation. |

| Document No. | Title |
|---|---|
| VIII/WP.6 | Report of the Ad Hoc Working Group on Training. |
| VIII/WP.7 | Report by the Working Group on Traffic Separation (continued). |
| VIII/WP.8 | Terms of Reference of the Working Group on traffic separation regarding routeing measures in the Dover Strait. |
| VIII/WP.9 | Draft report of the Sub-Committee Safety of Navigation on the work of its eighth session. |
| VIII/INF.1 | List of participants. |