CG Suppl. AR Doc. 14

INTER-GOVERNMENTAL MARITIME
CONSULTATIVE ORGANIZATION

SUB-COMMITTEE ON SAFETY OF
NAVIGATION - 19th session
14-18 February 1977



NAV XIX/3
1 March 1977
Original: ENGLISH

IMCO

REPORT TO THE MARITIME SAFETY COMMITTEE

I. GENERAL

1.   The Sub-Committee held its nineteenth session from 14-18 February 1977 at the Headquarters of the Organization under the Chairmanship of Captain E.J. Salvesen (Norway). Captain B. Masson (Federal Republic of Germany) was unanimously elected Vice-Chairman.

2.   The session was attended by representatives from the following countries:

| | |
|---|---|
| ARGENTINA | JAPAN |
| AUSTRALIA | LIBERIA |
| BELGIUM | NETHERLANDS |
| CANADA | NORWAY |
| CHILE | POLAND |
| CHINA | SINGAPORE |
| DENMARK | SPAIN |
| FINLAND | SWEDEN |
| FRANCE | USSR |
| GERMAN DEMOCRATIC REPUBLIC | UNITED KINGDOM |
| GERMANY, FEDERAL REPUBLIC OF | UNITED STATES |
| GREECE | YUGOSLAVIA |
| ITALY | |

3.   The following inter-governmental and non-governmental organizations were also represented:

   INTERNATIONAL HYDROGRAPHIC ORGANIZATION (IHO)
   INTERNATIONAL CHAMBER OF SHIPPING (ICS)
   INTERNATIONAL ASSOCIATION OF LIGHTHOUSE AUTHORITIES (IALA)
   INTERNATIONAL RADIO-MARITIME COMMITTEE (CIRM)
   INTERNATIONAL ASSOCIATION OF PORTS AND HARBORS (IAPH)
   OIL COMPANIES INTERNATIONAL MARINE FORUM (OCIMF)
   INTERNATIONAL MARITIME PILOTS' ASSOCIATION (IMPA)
   INTERNATIONAL ASSOCIATION OF INSTITUTES OF NAVIGATION (IAIN)
   OIL INDUSTRY INTERNATIONAL EXPLORATION AND PRODUCTION FORUM (E & P FORUM)

4.   The Agenda of this session, including documents considered under each item, is given at Annex I.

NAV XIX/8                                  - 2 -

## II. MATTERS RELATED TO ROUTEING OF SHIPS

5. The Sub-Committee took note of the two draft Resolutions approved by the Committee (MSC XXXV/21, Annexes XIV and XV) on the Adoption of Traffic Separation Schemes for the Purposes of the International Regulations for Preventing Collisions at Sea, 1972 and the Adoption and Amendment of Routeing Systems other than Traffic Separation Schemes.

6. With respect to the latter (MSC XXXV/21, Annex XV), the Sub-Committee noted a typographic error and recommended that the following amendment be made "authorizes the Maritime Safety Committee to adopt for implementation and subject to confirmation by the Assembly, any new routeing systems other than traffic separation schemes or amend such systems as necessary and to advise all concerned accordingly".

(a) *Proposed new and amended schemes*

7. The Sub-Committee had before it a substantial number of new and amended schemes. Details of those schemes which are recommended for approval by the Committee, are given at Annex II. The Sub-Committee's comments and views on the proposals are recorded in the following paragraphs.

8. The Sub-Committee examined and recommended for approval the following routeing systems:

   (a) Amendment to the traffic separation scheme *off Falsterborev*.
       This amendment is already in force.

   (b) New traffic separation schemes:

      (i)   *In the Approaches to Antofagasta*.
      (ii)  *In the Approaches to Valparaiso*.
      (iii) *In the Approaches to Quintero Bay*.
      (iv)  *In the Approaches to Conception Bay*.
      (v)   *In the Approaches to San Vicente Bay*.

      The Government of Chile will provide information on the date of implementation of those schemes. However, the date will not be before their adoption by the Assembly.

   (c) Amendments to traffic separation schemes:

      (i) *In the Approaches to Portland, Maine*. Effective date for implementation 1 January 1978.

  (ii) *In the Approaches to Chesapeake Bay*. Effective date for implementation 1 January 1978.

  (iii) *Off New York*. To be implemented on a voluntary basis from 1 July 1977 and be effective from the date of adoption by the Organization.

 (d) New traffic separation scheme *in the approaches to Prince William Sound*. This scheme will be implemented on a voluntary basis from 1 July 1977 and be effective from the date of adoption by the Organization.

 (e) New traffic separation scheme *in the southern approaches to the Kertch Strait*. This scheme is already in force.

 (f) Amendment to the traffic separation scheme *Off Ushant*. This scheme will be effective from 1 October 1978.

 (g) *New Deep Water Route leading to the Port of Antifer*.

9. **Amendment to the traffic separation scheme in the approaches to Narragansett Bay, Rhode Island and Buzzards Bay, Massachusetts**

At the request of the delegation of the United States consideration of this scheme was deferred to enable reappraisal at national level.

10. **New traffic separation schemes in the approaches to the Ports of Odessa and Ilichevsk**

At the request of the delegation of the USSR consideration of this scheme was deferred to enable reappraisal at national level.

11. **Amended traffic separation scheme off Casquets**

At the request of the littoral States concerned the proposal in respect of this scheme was withdrawn. It was agreed that the amended scheme "off Casquets", approved by the Committee at its thirty-fourth session (MSC XXXIV/18, paragraph 47) should also be withdrawn pending re-consideration of the scheme, the details of which will be submitted to the Sub-Committee's twentieth session.

12. **Separation scheme off Ras al Hadd**

 (a) The delegate of the Federal Republic of Germany informed the Sub-Committee that German shipmasters had suggested that it would be in the interest of safety to separate traffic off Ras al Hadd in the Arabian Sea. The Sub-Committee considered that there might

NAV XIX/8                              - 4 -

        well be a requirement for separation of traffic both off Ras al Hadd and off Ras al Kuh in the Gulf of Oman, noting that all traffic to and from the Strait of Hormuz passes the latter headland.

  (b)  The Sub-Committee noted that there are no navigational aids at Ras al Hadd, but considered that ships could determine their position in a scheme with sufficient accuracy by radar bearings and ranges of the headland, which constitutes a good and readily identifiable radar target.

  (c)  The ICS offered to enquire from its members whether schemes off these two points would be desirable in the interest of navigational safety, and to make an initial approach to the two littoral States concerned.

(b) **Routeing principles**

13. The Sub-Committee had before it the Report of an Intersessional Working Group on Routeing Principles which met at The Hague at the kind invitation of the delegation of the Netherlands from 6-10 September 1976. The Group reviewed the general provisions of ships' routeing contained in Annex I to Resolution A.284(VIII).

14. Based on that Report, the Sub-Committee prepared a draft Recommendation on General Provisions of Ships' Routeing, which is attached at Annex III, for the approval of the Committee. The draft Recommendation is intended to replace Annex I of Resolution A.284(VIII). A summary of the Sub-Committee's comments is recorded in the following paragraphs.

15. The Sub-Committee has included in Annex III certain matters on routeing principles which previously existed in Resolution A.340(IX).

16. It was pointed out that nautical charts depicting traffic separation schemes do not indicate whether the area between the landward boundary of a scheme and the adjacent coast has been designated as an inshore traffic zone. In order to prevent possible confusion governments and IHO were requested to include such indication or a relevant note in the charts concerned.

17. IHO was also invited to ask its Members to approve the inclusion of arrowheads in symbols for recommended tracks and deep water routes when based on a system of fixed marks. The Committee is recommended to invite the Assembly to approve such symbols subject to subsequent

- 5 -  NAV XIX/8

18. With respect to temporary adjustments to traffic separation schemes resulting from the positioning of oil exploration rigs, the representative of IHO informed the Sub-Committee that such adjustments would not be printed on nautical charts and would therefore have to be promulgated by means of Notices to Mariners and NAVAREA warnings.

19. The Sub-Committee recalled that at the previous session (NAV XVIII/11, paragraph 23) it concluded that a ship using a traffic lane may transfer from one side to the other, provided that this is carried out at as small an angle to the general direction of traffic flow as practicable.

20. The Belgian delegation informed the Sub-Committee that accordingly the French Administration has issued a Notice to Mariners advising fishing vessels crossing the Dover Strait traffic separation scheme on voyages between fishing grounds and French Channel ports, that the angle of deviation from the general direction of traffic flow has to be limited to not more than $15^\circ$. The Belgian delegation expressed the opinion that this arrangement was not in compliance with the 1972 Collision Regulations.

21. The Sub-Committee, however, re-affirmed its previous conclusion that this is within the ordinary practice of prudent seamanship and in accordance with the provisions of Rule 10(b), (c) and (e) of the 1972 Collision Regulations.

22. Denmark and Sweden proposed that the 1972 Collision Regulations could be interpreted in such a way that pleasure craft and other small vessels of less than 20 m in length will be allowed to pass a traffic separation area through the inshore traffic zones even if the "voyage" starts and terminates outside the terminations of the traffic separation scheme. The Sub-Committee concurred with this interpretation.

23. A proposal by the Yugoslavian delegation to replace the term "deep water route" by "deep draught route" was not supported.

(c) <u>Safety Zones and Fairways or Routeing Systems in Off-Shore Exploration Areas</u>

24. The United Kingdom informed the Sub-Committee of the large number of infringements by ships of safety zones around off-shore installations which have been established in accordance with Article 5 of the 1958 Convention on the Continental Shelf.

25. Recognizing that ships colliding with off-shore structures could cause serious loss of life and pollution of the marine environment, the Sub-Committee prepared a draft Assembly Resolution urging Governments to take all necessary steps to ensure that ships under their flags, unless specifically authorized, should not enter or pass through duly designated safety zones.

26. The draft Resolution has also included those parts of Resolution A.340(IX) which deal with the establishment of fairways or routeing systems through off-shore exploration areas. In consequence, and taking into account the contents of paragraph 15 of this Report, it is recommended that Resolution A.340(IX) be revoked.

27. The text of the draft Resolution, appearing at Annex IV, is submitted to the Committee for approval.

III. NAVIGATIONAL AIDS AND EQUIPMENT

(a) <u>Recommendation on performance standards for radar reflectors (Resolution A.277(VIII))</u>

28. The Sub-Committee was informed by the observer of CIRM that paragraph 5(b) of the Annex to Resolution A.277(VIII) could result in the reflector being installed in a wrong position.

29. The Sub-Committee concurred with this view and agreed that the paragraph should be modified as follows:

> "5(b) If there is a preferred orientation of mounting this should be clearly marked on the reflector. In the case of an octahedral reflector, the correct method of mounting is one corner cavity at the top and one at the bottom. Any other method might reduce its performance below that in 3(c)".

30. It is recommended that if the Assembly adopts this amendment Resolution A.277(VIII) should be revoked and issued in its new form.

(b) <u>Review of international requirements and recommendations</u>

31. Further consideration was given to to the Organization's future policy in relation to the carriage of navigational aids and related equipment.

32. A summary of preliminary decisions on individual items was prepared, the text of which is given at NAV XIX/WP.11.

33. With respect to the proposed requirements which are intended to be incorporated in Chapter V of the 1974 Safety Convention, the following opinions were expressed:

  (i) the "seaworthiness clause" (Chapter V, Regulation 12(e)) should upon investigation also apply to the equipment requirements;

  (ii) a Regulation on exemptions concerning the carriage of navigational aids should be included in Chapter V based on Regulation 5 of Chapter IV;

  (iii) the requirements should be based on IMCO agreed performance standards for the purpose of reducing divergent national specifications. In this connexion, the observer of ICS requested that Administrations be invited to adopt these standards and not to impose additional requirements on shipping. At the request of the Sub-Committee, ICS will prepare a document on this subject for consideration at the next session;

  (iv) the application of the requirements and recommendations necessitating structural alterations should not apply in the first instance to existing ships. If application is later extended to existing ships, a reasonable period of grace should be allowed to enable them to fit the necessary equipment.

34. Members were urgently requested to submit their comments and proposals on these matters with a view to preparing detailed draft requirements and recommendations at its twentieth session.

(c) <u>Radar beacons and transponders</u>

35. Further consideration was given to the operational requirements for fixed frequency radar beacons, swept frequency radar beacons and transponders.

36. On the basis of the possible uses and applications for each type of equipment outlined at previous sessions, the Sub-Committee prepared a comprehensive preliminary report (NAV XIX/WP.7 and NAV XIX/WP.7/Add.1, as amended) containing the following subjects:

  - Table based on replies to a Questionnaire

  - Operational uses and advantages of radar beacons and transponders

  - Draft Recommendation on swept frequency radar beacons

NAV XIX/8 - 8 -

- Draft Recommendation on fixed frequency radar beacons
- Draft Recommendation on transponders.

37. The Sub-Committee further considered the implementation of radar beacons and agreed that:

(a) swept frequency radar beacons should be used to identify temporary navigational hazards and, after a fixed frequency radar beacon system is internationally agreed and introduced, could continue to be provided for the identification of selected navigational marks;

(b) fixed frequency radar beacons should be used to identify selected navigational marks and off-shore structures;

(c) if studies justify the use of fixed frequency radar beacons for the identification of navigational marks, they should be introduced in the following stages:

   (i) preparation of international standards;
   (ii) preparation of technical specifications;
   (iii) inclusion in the IMCO performance standards for navigational radar equipment of details of a beacon facility;
   (iv) inclusion of a beacon facility in national radar specifications;
   (v) amendments to the 1974 Safety Convention to provide that all new radars installed on board ships be equipped with a beacon facility;
   (vi) introduction of fixed frequency radar beacons to identify navigational marks in addition to swept frequency devices.

38. The observer of CIRM urged Administrations to ensure that the embodiment of a requirement for a beacon facility in national specifications for navigational radar shall take place simultaneously in all specifications.

39. As requested by CCIR Study Group 8, the Secretariat was requested to convey the preliminary report to the Director of CCIR to assist the Study Group in its technical studies.

40. The Sub-Committee expressed its appreciation to the Japanese delegation for showing a film about the use and application of swept frequency radar

(d) <u>Omega differential correction system</u>

41. The Sub-Committee gave consideration to the preparation of provisional draft operational requirements for Omega differential correction systems and prepared a list of parameters, given in NAV XIX/WP.10, for which operational standards should be developed, based on test results.

42. It was noted that differential Omega techniques offer a potential capability to enhance the accuracy of the Omega system. However, it was considered that as the Omega system had not yet been fully introduced and the world-wide monitoring system was only in the early stages of development, Omega was not sufficiently stabilized to provide conditions for conclusive tests to determine feasibility of a differential sub-system.

43. It was agreed that the work on the preparation of preliminary operational requirements for Omega differential correction systems should take place at an inter-sessional meeting.

44. The Sub-Committee agreed that terms of reference for the Group should be as follows:

   (a) to ascertain the present state of the Omega system and its associated monitoring system;

   (b) to consider the probable system accuracy likely to be realized when the monitoring system is fully introduced;

   (c) to consider the results of studies and tests which have been carried out on differential Omega;

   (d) to prepare draft operational standards for Omega differential correction systems, as far as this is practicable, taking account of information currently available;

   (e) to outline possible work programmes aimed at providing relevant information, where necessary.

45. The Sub-Committee thanked the French delegation for the kind offer to host the meeting of the Group on 20-24 June 1977 in Paris at a still to be determined address.

46. The following countries and organizations expressed the wish to participate at the meeting, subject to confirmation:

   FRANCE
   GERMANY, FEDERAL REPUBLIC OF
   NETHERLANDS

NAV XIX/8                                  - 10 -

        SWEDEN
        USSR
        UNITED KINGDOM
        UNITED STATES

        ICS
        IALA
        CIRM

47.  All correspondence relating to the meeting should be sent to:

    M. le Directeur,
    du Service de Phares et Balises,
    43 Avenue du Président Wilson,
    75775 Paris Cedex 16,
    France.

    Telephone (1) 553. 8304.

(e)  Technical specifications for gyro compasses

48.  The Sub-Committee had before it a proposal by the Netherlands to amend the Recommendation on Performance Standards for Gyro Compasses (Resolution A.280(VIII)).  The proposal, based on a study by the Federal Republic of Germany and the Netherlands, showed that a number of specifications were impracticable.

49.  The Sub-Committee agreed to consider this matter at the next session.

IV.  MATTERS RELATED TO THE 1972 COLLISION REGULATIONS

(a)  Proposed amendments to the Regulations

50.  The Sub-Committee had before it a considerable number of proposed amendments to the 1972 Collision Regulations submitted by the Netherlands, Norway and the USSR (NAV XIX/5) concerning possible errors, inaccuracies and inconsistencies in the texts of certain Rules.

51.  The majority was of the opinion that it would be premature and imprudent to amend the Rules at this stage.  They felt that changes would only be justified in cases of serious errors and ambiguities and that this should be assessed in the light of information from users concerning the application of the new Collision Regulations.

52.  Some delegations expressed the view that the proposed changes are not of a substantive nature, but that some errors may cause a wrong application of the Rules concerned and that therefore amendments should be made as soon as possible in order to remove any ambiguities.

53. Recognizing that formal amendments to the 1972 Collision Regulations cannot be submitted at this stage, the Sub-Committee did not consider this matter any further.

(b) <u>Questionnaire on the use of manoeuvring lights</u>

54. The Sub-Committee was informed that the Netherlands Administration in conformity with Resolution A.282(VIII), had requested masters of ships under its flag to report on their experience with manoeuvring lights. Ships transmitting such light signals and ships observing these signals were requested to report.

55. In considering the Questionnaire used by the Netherlands for this purpose, it was agreed to recommend that this Questionnaire be brought to the attention of Member Governments with an invitation to circulate it, as appropriate. Member Governments were requested to collate the completed Questionnaires and transmit the result to the Netherlands Administration for evaluation and analysis.

56. The Netherlands Administration intends to submit the result of this analysis to the Organization for further study and consideration in compliance with Resolution A.282(VIII).

57. The proposed Questionnaire is given at Annex V for approval by the Committee.

(c) <u>Signals and lights at oil recovery</u>

58. The Sub-Committee considered a proposal by Sweden to make provisions for special signals and lights to be carried on sweeps and ships when used for combating oil spills at sea.

59. Taking into account that such operations will only be carried out under exceptional circumstances, the Sub-Committee agreed that no special provisions should be made in the 1972 Collision Regulations for this purpose. It was felt that the marking of such ships and operations could be based on Rules 27 and 36 of those Regulations.

V.   STANDARD MARINE NAVIGATIONAL VOCABULARY

(a) <u>Amendment procedure</u>

60. As instructed by the Committee, the Sub-Committee prepared a draft Resolution on an amendment procedure for the Standard Marine Navigational Vocabulary based on the procedure adopted for the International Code of

NAV XIX/8                              - 12 -

Signals. The draft Resolution, appearing at Annex VI, is submitted to the Committee for approval.

61. The Sub-Committee noted with appreciation that the United Kingdom Administration is preparing a revised tape recording of the approved version of the Vocabulary, a copy of which will be made available to each IMCO Member State.

(b) <u>VHF procedures</u>

62. The Sub-Committee gave consideration to proposals made at the eighteenth session to prepare a draft Recommendation containing guidance on VHF procedures.

63. In examining this matter, the Sub-Committee prepared a text on the use of VHF at sea containing sections on VHF communication techniques, procedure and examples of standard messages.

64. It was agreed that this document (NAV XIX/WP.13) could be included in the Standard Marine Navigational Vocabulary at an appropriate time. The view was also expressed that it might be incorporated in the International Code of Signals.

65. The Sub-Committee requested the Sub-Committee on Radiocommunications to consider the text at its next session, bearing in mind its intended use as a practical guideline.

66. It was recommended that the text, when approved by the Committee, be submitted to the Sub-Committee on Standards of Training and Watchkeeping for information.

VI. OTHER MATTERS

(a) <u>Units of measurement</u>

67. As instructed by the Committee, the Sub-Committee examined Chapter V of the 1974 Safety Convention with a view to replacing the present units by metric values in the SI system in round figures.

68. Taking into account the lists prepared by the Sub-Committee on Ship Design and Equipment, the Sub-Committee concluded that no adjustments will be necessary with the exception of deleting the values of the Imperial system given in parenthesis.

69. The Secretariat was requested to convey the Sub-Committee's views to

- 13 -                    NAV XIX/8

(b) <u>Amendments to the International Code of Signals</u>

70. The Sub-Committee gave preliminary consideration to:

- a document prepared by the Secretariat containing suggested amendments to the International Code of Signals consequential upon the forthcoming entry into force of the 1972 Collision Regulations (NAV XIX/7/2), and

- a document submitted by the United Kingdom proposing new signals for ships operating in the vicinity of safety zones around off-shore installations and equipment, for the suspension of traffic separation schemes and for small vessels operating inside and outside congested harbours (NAV XIX/7/2/Add.1).

71. It was decided to defer final examination on this matter until the next session.

72. Members were requested to submit comments on the proposed amendments in time for consideration at the Sub-Committee's twentieth session.

(c) <u>Visual signalling for identification of medical transport</u>

73. The Sub-Committee had before it the text of a draft Resolution concerning visual signalling for the identification of medical transport, prepared by Committee II of the Diplomatic Conference on the Reaffirmation and Development of International Humanitarian Law applicable in Armed Conflicts.

74. The Sub-Committee gave preliminary consideration to the draft Resolution, taking into account that the text will be submitted to the final session of the Conference (17 March to 10 June 1977) for adoption.

75. In the absence of any substantive comments, the Sub-Committee agreed to defer further action pending the adoption of the Resolution by the Conference and instructions by the Committee.

(d) <u>Matters related to the 1969 Tonnage Measurement Convention</u>

76. The Sub-Committee was informed of the actions taken by the Committee with respect to the application of tonnage parameters in the Safety Convention connected with the possible entry into force of the 1969 Tonnage Measurement Convention in the near future.

NAV XIX/8 — 14 —

77. Taking into account that the tonnage parameters in Chapter V of the Safety Convention are used in connexion with the carriage of navigational equipment, the Sub-Committee agreed to consider this question when its review of the international requirements and recommendations on navigational aids and equipment has been more advanced and the Committee has provided more detailed instructions.

(e) Signs and symbols for emergency and operational purposes on board ships

78. At the request of the Committee (MSC XXXV/21, paragraphs 103 and 104) the Sub-Committee considered the above matter and concluded that there was no immediate need for signs and symbols to be used for emergency and operational purposes aboard ships.

79. The Secretariat was requested to inform the Facilitation Committee accordingly.

(f) Single-handed voyages

80. The Sub-Committee considered a document submitted by the Government of Belgium in which concern was expressed at the increasing number of single-handed races and individual voyages by small vessels over long distances. The inability of such vessels to maintain a proper look-out at all times constituted a violation of the Collision Regulations, resulting in an ever-present risk of collision.

81. The observer of IAIN informed the Sub-Committee that the International Yacht Racing Union has already requested its members to give careful consideration to the organization of races which are in conflict with the 1972 Collision Regulations.

82. It was decided to defer consideration on this matter until the next session when the views of the International Yacht Racing Union will be brought to the attention of the Sub-Committee through IAIN.

(g) Marine casualty reports

83. The Sub-Committee was informed of the findings of the United States Coast Guard Marine Board of Investigation on the collision between the SS SEA WITCH and SS ESSO BRUSSELS in New York Harbour in June 1973 in so far as they relate to safety of navigation. It was noted that this collision was primarily caused by:

    (i) loss of steering control;

- 15 -                         NAV XIX/8

    (iii)  failure to put the engines astern when required;

    (iv)  inability to drop the port anchor.

84. A proposal to study a general speed control of ships underway in harbours, channels and fairways was not supported, taking into account that such provisions are governed by local or national regulations.

(h) <u>Date of the next session</u>

85. The Sub-Committee was informed that its twentieth session had been tentatively scheduled from 5 to 9 September 1977.

(i) <u>Items for consideration at the next session</u>

86. It was agreed that the following items should be included in the Agenda of the twentieth session:

    (i)  Matters related to routeing of ships.

    (ii)  Navigational aids and equipment:

        (1)  review of international requirements and recommendations;

        (2)  radar beacons and transponders;

        (3)  Omega differential correction systems;

        (4)  specifications for gyro compasses.

  (iii)  Matters related to the 1972 Collision Regulations.

   (iv)  Amendments to the International Code of Signals.

    (v)  Single-handed voyages.

   (vi)  Harmonization of Buoyage Systems.

87. Members were requested to include appropriate experts in their delegations at the next session to deal with the above subjects.

(j) <u>Actions to be taken by the Maritime Safety Committee</u>

88. The Committee is requested to consider and approve the Report in general and in particular:

    (a)  to take note of an editorial amendment to the draft Resolution on the adoption and amendment of routeing systems other than traffic separation schemes - MSC XXXV/21, Annex XV (paragraph 6);

    (b)  to approve the proposed new and amended routeing systems (paragraphs 7 and 8 and Annex II);

V XIX/6                  - 16 -

  (c) to revoke the Committee's approval of the amendment to the traffic separation scheme "Off Casquets" (paragraph 11);

  (d) to approve the draft Recommendations on Routeing Principles (paragraphs 14 and 17 and Annex III);

  (e) to approve the draft Resolution on the establishment of safety zones and fairways or routeing systems in off-shore exploration areas (paragraph 27 and Annex IV);

  (f) to approve a modified paragraph 5(b) of the Recommendation on performance standards for radar reflectors (paragraphs 29 and 30);

  (g) to approve and circulate the draft Questionnaire on manoeuvring lights (paragraph 57 and Annex V);

  (h) to approve the draft Resolution on the Standard Marine Navigational Vocabulary (paragraph 60 and Annex VI).

                         \*\*\*