UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
DEFENDERS OF WILDLIFE, *et al.*,    )
                                    )
            Plaintiffs,             )
                                    )
        v.                          )   Civil Action No. 05-2191 (PLF)
                                    )
CARLOS GUTIERREZ,                   )
Secretary of the Department of Commerce, )
*et al.*,                           )
                                    )
            Defendants.             )
_____ )

OPINION

This matter is before the Court on cross motions for summary judgment.[1]  The Court heard oral argument on these motions on March 16, 2007.  On March 30, 2007, the Court entered an Order and Judgment granting defendants' motion for summary judgment and denying plaintiffs' motion for summary judgment.  This Opinion explains the reasoning underlying that Order.

---

[1] The papers submitted to the Court include: Plaintiff's Motion for Summary Judgment ("Pls' Mot.") and Memorandum in Support of Plaintiffs' Motion for Summary Judgment ("Pls' Mem."); Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment ("Defs' Mem."); Plaintiffs' Opposition to Defendants' Motion for Summary Judgment and Reply in Support of Motion for Summary Judgment ("Pls' Opp."); and Defendants' Reply in Support of their Cross-Motion for Summary Judgment ("Defs' Reply"). Plaintiffs' motion included a Statement of Material Facts as to Which There is No Genuine Dispute ("Pls' SMF").  Defendants' cross motion included a Statement of Material Facts as to Which There is No Genuine Dispute ("Defs' SMF").  Each side responded to the other's Statement of Material Facts.  In response to a request from the Court during oral argument, the defendants submitted a Supplemental Statement of Material Facts ("Defs' Supp. SMF"), and the plaintiffs filed a Notice Regarding Coast Guard Traffic Separation Schemes ("Pls' Notice").

Plaintiffs Defenders of Wildlife, the Humane Society of the United States, the Ocean Conservancy, and Regina Asmutis-Silva brought this action against defendants Carlos Gutierrez, the Secretary of the Department of Commerce; William T. Hogarth, the Assistant Administrator for Fisheries; Michael Chertoff, the Secretary of the Department of Homeland Security; and Thomas H. Collins, the Commandant of the United States Coast Guard, seeking to protect the endangered North Atlantic right whale ("right whale") (*Eubalaena glacialis*). Plaintiffs bring suit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*; the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*; the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1361 *et seq.*; and the Ports and Waterways Safety Act ("PWSA"), 33 U.S.C. § 1221.

Plaintiffs assert two claims in their amended complaint, seeking declaratory and injunctive relief. First, plaintiffs seek judicial review of the denial of their rulemaking petition by the National Oceanic and Atmospheric Administration ("NOAA"). Plaintiffs submitted a formal rulemaking petition under the ESA and the MMPA to the National Marine Fisheries Service ("NMFS") (within NOAA) in May 2005, seeking emergency regulations to reduce the risk of ships striking the North Atlantic right whale. Second, plaintiffs contend that the Coast Guard, a division of the Department of Homeland Security, is violating the ESA and the APA by failing to consult with NMFS "regarding activities undertaken and authorized by the Coast Guard which may affect North Atlantic right whales or modify [their] critical habitat," by "failing to use its authorities to protect and recover" the right whale, and by requiring commercial vessels to travel within traffic separation schemes ("TSS") inhabited by North Atlantic right whales. Amended Complaint ("Am. Compl.") ¶¶ 79-81.

I.  BACKGROUND

"The right whale is the most endangered of all large whale species.  A baleen whale, it has a thick body and a huge head that accounts for about one-third of its length.  Adults range between 45 and 55 feet in length and weigh up to 70 tons.  It has distinctive callosities on the head.  Right whales were once abundant throughout the Pacific and Atlantic.  Prized for their oil and easy to catch, commercial whaling during the nineteenth century decimated the species.  By 1935, they were so near extinction that the League of Nations convinced the whaling nations to stop hunting them[.]"  Center for Biological Diversity v. Evans, 2005 WL 1514102, at *1 (N.D.Cal. June 14, 2005) (discussing the North Pacific right whale).

There is no dispute between the parties with respect to the current status of the North Atlantic right whale – it is in peril.  See Defs' Mem. at 12; Pls' Mem. at 1.  The North Atlantic right whale has been listed as an endangered species since 1970 – longer than the ESA itself has been in effect.  See 50 C.F.R. 17.11; see also Am. Compl. ¶ 41.  As NMFS has recognized, each death of a North Atlantic right whale affects the long term prospects of the entire species.[2]

---

[2]     According to the Advanced Notice of Proposed Rulemaking:

> NMFS has been working with state and other Federal agencies, concerned citizens and citizen groups, environmental organizations, and the shipping industry to address the ongoing threat of ship strikes to North Atlantic right whales as part of its responsibilities related to right whale recovery.  The North Atlantic right whale was severely depleted by commercial whaling and, despite protection from commercial harvest, has not recovered.  The current population is believed to number about 300 animals and is considered one of the most critically endangered large whales in the world.  Recent modeling exercises suggest that if

There also is no dispute that "right whale recovery efforts continue to be adversely affected by ship collisions." Defs' Mem. at 14; <u>see</u> also Pls' Mem. at 1. As the defendants explain:

> Right whales are migratory animals and seasonal movements are observed between the spring and summer feeding grounds off the coast of Massachusetts and the winter calving grounds off the coasts of Georgia and Florida. In 1994, NMFS designated critical habitat for the right whale in the Great South Channel, Cape Cod Bay, and in the coastal waters off Georgia and Florida. Right whale critical habitat and distribution tend to coincide with several major shipping corridors on the eastern U.S. and southeastern Canadian coasts. Accordingly, *mortality due to entanglements in fishing gear and collisions with ships are the two most significant human-caused threats to right whales* of the modern era.

Defs' Mem. at 13 (emphasis added) (citations omitted). NMFS has issued a recovery plan for the right whale. It has been updated numerous times, most recently in 2005. <u>See</u> 70 Fed. Reg. 32,293 (June 2, 2005) (stating that it is the "final revision"). Several aspects of the recovery plan have been implemented. <u>See</u> Defs' Mem. at 13-14. NMFS worked with the Coast Guard to

---

> current trends continue, the population could go extinct in less than 200 years (Caswell et. al., 1999). *These models indicate that the loss of even a single individual may contribute to the extinction of the species; likewise, according to the models, preventing the mortality of one adult female a year alters the projected outcome.* Mortality due to entanglements in fishing gear and collisions with ships are the two significant human-caused threats to right whales (Knowlton and Kraus, 2001; Jensen and Silber, 2003). Collisions with ships account for more confirmed right whale mortalities than any other human-related activity. Ship strikes are responsible for over 50 percent of known human-related right whale mortalities and are believed to be one of the principal causes for the lack of recovery in this population.

Advance Notice of Proposed Rulemaking ("ANPR"), 69 Fed. Reg. 30,857 (June 1, 2004) (emphasis added).

formulate a draft strategy to reduce ship strikes to the extent practicable while minimizing the adverse impact on ship operations, detailed in an Advance Notice of Proposed Rulemaking.  See 69 Fed. Reg. 30,857 (June 1, 2004).[3]  NMFS requested, and received, public comment on the ANPR, and has held a number of public hearings.  See Defs' Mem. at 15.  NMFS also issued a Notice of Intent to Prepare an Environmental Impact Statement Pursuant to the National Environmental Policy Act ("NEPA").  See 70 Fed. Reg. 36121 (June 22, 2005), NMFS AR 12 at BN 152.[4]

Section 2.1 of the draft Environmental Assessment of the North Atlantic right whale ship strike reduction strategy recognizes that the failure to take regulatory operational measures thereunder would "not fulfill [NMFS's] mandate to protect the endangered North Atlantic right whale" under the ESA and the MMPA.  NMFS AR 11 at BN 54; see also NMFS AR 11 at BN 134 (stating that failure to take the proposed action under the ship strike reduction strategy would lead to non-compliance with the MMPA and the ESA).

To accomplish the Congressional directive in the Coast Guard and Maritime Transportation Act of 2004, the Coast Guard utilized its Port Access Route Study ("PARS") process.  See Defs' Mem. at 16; see also 71 Fed. Reg. 29,876.  The Coast Guard announced its

---

[3]   As defendants explain, the "draft Strategy . . . consists of five elements: (1) establishment of new operational measures for the shipping industry, including consideration of routing and speed restrictions, applicable to vessels 65 feet or greater; (2) negotiation of a right whale conservation agreement with Canada; (3) development and implementation of education and outreach programs; (4) review of the need for ESA Section 7 consultation with all Federal agencies who operate or authorize the use of vessels in waters inhabited by right whales, or whose actions directly or indirectly affect vessel traffic; and (5) continuation of ongoing research, conservation, and education/outreach activities."  Defs' Mem. at 14.

[4]   The Court follows the same style for citations to the administrative record used by the parties in their briefs.

completion of a PARS and requested comments on May 24, 2006.  See 71 Fed. Reg. 29,876.

The PARS recommendations include the following:

> 1. Establish precautionary areas at the entrance to the ports of Jacksonville and Fernandina Beach, FL, and Brunswick, GA.
>
> 2. Establish six, two-way routes for the ports of Jacksonville and Fernandina Beach, FL, and Brunswick, GA.
>
> 3. Establish precautionary areas at the entrance to Cape Cod Canal and in the vicinity of New Inlet, MA.
>
> 4. Establish three, two-way routes in Cape Cod Bay to the ports of Boston and Provincetown, MA, and the entrance to Cape Cod Canal.
>
> 5. Establish a two-way recommended track from the Cape Cod Canal entrance to Provincetown, MA.
>
> 6. Realign and modify the location and size of the western portion of the TSS "In the Approach to Boston, Massachusetts."

Id.  The Coast Guard also stated that the changes to the TSSs recommended in this PARS would "proceed towards implementation . . . through submission of a proposal by the United States to the International Maritime Organization (IMO).  Upon IMO approval, adoption, and implementation, NOAA charts will be revised to reflect changes to the TSS and the Coast Guard will revise the list of TSSs at 33 CFR part 167."  Id.

On May 19, 2005, plaintiffs filed a petition for rulemaking under the APA requesting NMFS to promulgate emergency regulations within 60 days to slow and/or re-route vessels within right whale critical habitat to protect the endangered species from the dangers posed by ship collisions until a permanent rulemaking is complete.  See NMFS AR 16; see also Defs' Mem. at 17; Am. Compl. ¶¶ 53-54.  On September 14, 2005, NMFS sent a letter to

plaintiffs which stated its intention to deny their petition for emergency rulemaking. See NMFS AR 5. NMFS formally denied the rulemaking petition on September 29, 2005. See 70 Fed. Reg. 56884 (Sept. 29, 2005), NMFS AR 2 at BN 4. Plaintiffs allege that this denial was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the Administrative Procedure Act. See Am. Compl. ¶ 3.

Plaintiffs also allege that the Coast Guard is violating Sections 7(a)(1) and 7(a)(2) of the ESA, and acting in a manner which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the Administrative Procedure Act. See Am. Compl. ¶¶ 4, 20. The Coast Guard is alleged to be violating the ESA and the APA by failing to consult with NMFS "regarding activities undertaken and authorized by the Coast Guard which may affect North Atlantic right whales or modify [their] critical habitat," by "failing to use its authorities to protect and recover" the right whale, and by requiring commercial vessels to travel within traffic separation schemes inhabited by North Atlantic right whales, causing a prohibited "taking" of the whales. Am. Compl. ¶¶ 79-81.

Plaintiffs filed this action on November 9, 2005, and filed an amended complaint on February 7, 2006. Defendants filed an answer to the amended complaint on February 16, 2006. Defendants filed administrative records on behalf of the National Marine Fisheries Service and the Coast Guard on March 31, 2006. Defendant NMFS filed an amended administrative record on May 2, 2006. The Coast Guard supplemented its administrative record on May 19, 2006 and again on March 23, 2007. The NMFS supplemented its administrative record on May 26, 2006.

NMFS published a proposed rule to implement speed restrictions to reduce the threat of ship strikes to right whales on June 26, 2006 – after plaintiffs' motion for summary judgment in this case had been filed but before NMFS filed its own. These proposed speed restrictions are said to be even more stringent than the ones requested by the plaintiffs. See Defs' Mem. at 24.

On October 25, 2006, the Court issued an Order directing NMFS to inform the Court when it expected the final rule implementing the speed restrictions to issue. NMFS responded on November 9, 2006, that "NMFS anticipates taking final action on the proposed rule in June 2007." Defendants' Response to the Court's October 25, 2006 Order. Plaintiffs responded to the defendants' filing on November 15, 2006. The Court heard oral argument on the cross motions for summary judgment on March 16, 2007.

## II.  DISCUSSION

### A.  Legal Framework

#### 1. Administrative Procedure Act

Under the Administrative Procedure Act, the Court only has jurisdiction to review final agency actions. As the D.C. Circuit has succinctly explained:

> The APA authorizes judicial review of "[a]gency action made reviewable by statute and *final agency action* for which there is no other adequate remedy in a court." 5 U.S.C. § 704 (emphasis added). There exists no statutory review provision in the ESA that authorizes judicial review of agency action beyond that provided for in the APA. *See Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson,* 685 F.2d 678, 685 (D.C. Cir. 1982). Thus, an agency action must be final in order to be judicially reviewable. *See, e.g., Ctr. for Law and Educ. v. Dep't of Educ.,* 396 F.3d 1152, 1165 (D.C. Cir. 2005) ("APA . . . bars

> review prior to final agency action."); *Indep. Petroleum Ass'n of Am. v. Babbitt,* 235 F.3d 588, 594 (D.C. Cir. 2001) ("'[T]he requirement of a final agency action has been considered jurisdictional. If the agency action is not final, the court . . . cannot reach the merits of the dispute.'" (*quoting DRG Funding Corp. v. Sec'y of Housing & Urban Dev.,* 76 F.3d 1212 (D.C. Cir. 1996))).

National Ass'n of Home Builders v. Norton, 415 F.3d 8, 13 (D.C. Cir. 2005) (emphasis in original) (footnotes omitted).

Judicial review of final agency actions under the ESA is governed by Section 706 of the APA. See 5 U.S.C. § 706; see also City of Las Vegas v. Lujan, 891 F.2d 927, 932 (D.C. Cir. 1989). The reviewing court may set aside agency actions, findings, or conclusions when they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. See 5 U.S.C. § 706(2)(A); Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 375 (1989). "Review under the 'arbitrary and capricious' tag line, however, encompasses a range of levels of deference to the agency, and . . . an agency's refusal to institute rulemaking proceedings is at the high end of the range." Am. Horse Prot. Ass'n v. Lyng, 812 F.2d 1, 4-5 (D.C. Cir. 1987) (citing, *inter alia*, Heckler v. Chaney, 470 U.S. 821 (1985)) (other internal citations omitted); see also Massachusetts v. Environmental Prot. Agency, – S.Ct. –, 2007 WL 957332, * 17 (U.S. April 2, 2007) (A denial of a rulemaking petition is susceptible to judicial review, but such review is "extremely limited" and "highly deferential.") (citing Am. Horse Prot. Ass'n v. Lyng, 812 F.2d at 3-4). "Such a refusal is to be overturned only in the rarest and most compelling of circumstances, which have primarily involved plain errors of law, suggesting that the agency has been blind to the source of its delegated power." Am. Horse Prot. Ass'n v. Lyng, 812 F.2d at 5 (internal quotations and citations omitted).

To survive review under the "arbitrary and capricious" standard, an agency must "examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." PPL Wallingford Energy LLC v. Federal Energy Regulatory Comm'n, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (citing Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)) (internal citations and quotations omitted). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43. The reviewing court should not attempt itself to make up for such deficiencies: the Court "may not supply a reasoned basis for the agency's action that the agency itself has not given." Id. (citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)). The party challenging an agency's action as arbitrary and capricious bears the burden of proof. See City of Olmsted Falls v. F.A.A., 292 F.3d 261, 271 (D.C. Cir. 2002) (citations and quotations omitted).

### 2. Endangered Species Act

The Endangered Species Act is the "'most comprehensive legislation for the preservation of endangered species ever enacted by any nation.'" Babbitt v. Sweet Home Chapter of Cmty. for a Great Oregon, 515 U.S. 687, 698 (1995) (quoting Tennessee Valley Auth. v. Hill, 437 U.S. 153, 180 (1978)). The Act "provide[s] a means whereby the ecosystems upon which

endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). The ESA requires all federal agencies to "seek to conserve endangered species and threatened species and [to] utilize their authorities in furtherance of the purposes of this chapter." 16 U.S.C. § 1531(c). The Supreme Court has explained that "[l]est there be any ambiguity as to the meaning of this statutory directive, the Act specifically defined 'conserve' as meaning 'to use and the use of *all methods and procedures which are necessary* to bring *any endangered species or threatened species* to the point at which the measures provided pursuant to this chapter are no longer necessary.'" Tennessee Valley Auth. v. Hill, 437 U.S. at 180 (emphasis in original). "The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend towards species extinction, whatever the cost." Id. at 184. As Judge Huvelle has noted:

> The [Supreme] Court has also recognized the enactment of the ESA constituted "an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species . . . and reveals a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." All persons, including federal agencies, are specifically instructed not to 'take' endangered species, . . . and federal agencies in particular are directed by . . . the Act to 'use . . . all methods and procedures which are necessary' to preserve endangered species."

Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121, 124-25 (D.D.C. 2001) (quoting Tennessee Valley Auth. v. Hill, 437 U.S. at 184-85) (internal punctuation and citations omitted).

To achieve its objectives, the ESA directs the Secretary of the Interior and the Secretary of Commerce to determine which species of plants and animals are "threatened" or "endangered." 16 U.S.C. § 1533(a)(1).[5] An "endangered species" is "any species which is in

---

[5] NMFS, which is within NOAA, which itself is within the Department of Commerce, is responsible for administering the ESA for marine species. See 50 C.F.R. 222.101(a); see also 50

11

danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A "threatened species" is "any species that is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). The ESA authorizes NMFS and the Coast Guard "to promulgate such regulations as may be appropriate to enforce this chapter . . ." 16 U.S.C. § 1540(f). The ESA provides for lawsuits brought by citizens, and the jurisdiction of United States District Courts to hear them. See 16 U.S.C. § 1540(g).

The ESA also requires that the Secretary of the Interior or the Secretary of Commerce, as appropriate, "by regulation promulgated in accordance with subsection (b) of this section and to the maximum extent prudent and determinable . . . shall, concurrently with making a determination under paragraph (1) that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat; and . . . may, from time-to-time thereafter as appropriate, revise such designation." 16 U.S.C. § 1533(a)(3)(A). The decision to designate such critical habitat must be made "on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2).

Section 7 of the ESA "places two responsibilities on federal agencies." Strahan v. Linnon, 187 F.3d 623, at *2 (1st Cir. 1998) (unpublished opinion). First, section 7(a)(1) of the ESA requires that "[a]ll other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying

---

CFR § 402.01(b).

out programs for the conservation of endangered species and threatened species . . ." 16 U.S.C. § 1536(a)(1).[6] The conservation requirement under Section 7(a)(1) is often, but not always, met in conjunction with a federal agency's formal consultation obligations under Section 7(a)(2) – the second Section 7 responsibility – to ensure that its actions are not likely to jeopardize the continued existence of threatened or endangered species. That section of the ESA provides:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical . . . In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

16 U.S.C. § 1536(a)(2).

A formal consultation is required whenever activities "may affect" a listed species, unless the agency and NMFS conclude that the activities are "not likely to adversely affect" such species. See 50 C.F.R. § 402.14(b). Title 50 of the Code of Federal Regulations provides that Section 7 applies to "all actions in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03. "The purpose of Section 7(a)(2)'s consultation requirement is to insure that an agency's activities do not jeopardize endangered species[.]" Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d at 126. As the D.C. Circuit has noted, the ESA "directs agencies to 'utilize their authorities' to carry out the ESA's objectives; it does not expand the powers

---

[6] According to Judge Huvelle, "'the case law is well settled that federal agencies are accorded discretion in determining how to fulfill their § 1536(a)(1) obligations." Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d at 135 (quoting and citing Coalition for Sustainable Res. v. U.S. Forest Serv., 48 F. Supp. 2d 1303, 1315-16 (D.Wyo. 1999) (and cases cited therein)).

conferred on an agency by its enabling act." Platte River Whooping Crane Critical Habitat Maint. Trust v. Federal Energy Regulatory Comm'n, 962 F.2d 27, 34 (D.C. Cir. 1992).

*B. The National Marine Fisheries Service*

Plaintiffs challenge NMFS' denial of their rulemaking petition for emergency regulations. NMFS set forth the reasons for its denial as follows:

> Promulgating a separate 12-knot speed limit, at this time, would curtail full public notice, comment and environmental analysis, duplicate agency efforts and reduce agency resources for a more comprehensive strategy, as well as risk delaying implementation of the draft Strategy. Instead of imposing measures in piecemeal fashion, NMFS continues to believe that putting a comprehensive strategy in place is the best course of long-term action. NMFS is enhancing its non-regulatory measures to reduce ship strikes and will proceed with analysis and rulemaking to implement specific regulatory measures of the comprehensive ship strike reduction strategy in the coming months.

70 Fed. Reg. 56885 (Sept. 29, 2005); NMFS AR 2 at BN 5. NMFS also set forth its reasoning in a letter to the Marine Mammal Commission on July 1, 2005. See NMFS AR 10 at BN 33. In the letter, NMFS explained that it had considered emergency regulations, but had determined that such regulations would "still require that an environmental analysis be conducted, including economic effects, on affected parties and the environment." Id. Such requirements would be time-consuming, "comparable to the normal rulemaking process." Id. NMFS therefore declined to issue the emergency regulations "so that we may direct our full energies to proceed as quickly as possible with analysis and rulemaking to implement the comprehensive ship strike strategy." Id.[7]

---

[7]     On October 25, 2006, the Court issued an Order directing NMFS to inform the Court when it expected the final rule implementing the speed restrictions to issue. NMFS responded on

The only question before the Court with respect to NMFS is whether or not NMFS' denial of plaintiffs' rulemaking petition for emergency regulations was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the Administrative Procedure Act. See 5 U.S.C. § 706(2)(A); see also Fox Television Stations, Inc. v. Fed. Communications Comm'n, 280 F.3d 1027, 1037 (D.C. Cir. 2002); Am. Horse Prot. Ass'n v. Lyng, 812 F.2d at 4. As noted above, NMFS explained that it did not want to "duplicate agency efforts and reduce agency resources for a more comprehensive strategy, as well as risk delaying implementation of the draft Strategy. Instead of imposing measures in piecemeal fashion, NMFS continues to believe that putting a comprehensive strategy in place is the best course of long-term action." 70 Fed. Reg. 56885 (Sept. 29, 2005); NMFS AR 2 at BN 5.

While NMFS' explanation may have been lacking in detail, and may not represent the policy choices that the plaintiffs might make, the Court cannot conclude that NMFS "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [was] so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43. Nor does it appear to the Court that NMFS committed a "plain error[] of law, suggesting that the agency has been blind to the source of its delegated power." Am. Horse Prot. Ass'n v. Lyng, 812 F.2d at 5. NMFS' explanation for its denial of the petition was rather bare, but it "articulated a satisfactory explanation for its action,

---

November 9, 2006, that "NMFS anticipates taking final action on the proposed rule in June 2007." Defendants' Response to the Court's October 25, 2006 Order.

including a rational connection between the facts found and the choice made." PPL Wallingford Energy LLC v. Federal Energy Regulatory Comm'n, 419 F.3d at 1198. Accordingly, with respect to NMFS' denial of plaintiffs' rulemaking petition for emergency regulations, the Court granted defendants' motion for summary judgment and denied plaintiffs' motion for summary judgment.

*C.  The Coast Guard*

As noted above, plaintiffs allege that the Coast Guard is violating the ESA and the APA by failing to consult with NMFS "regarding activities undertaken and authorized by the Coast Guard which may affect North Atlantic right whales or modify [their] critical habitat," by "failing to use its authorities to protect and recover" the right whale, and by requiring commercial vessels to travel within traffic separation schemes inhabited by North Atlantic right whales, causing a prohibited "taking" of the whales. Am. Compl. ¶¶ 79-81. Specifically, plaintiffs allege that the Coast Guard "established numerous TSS in right whale habitat" and designated shipping lanes without consulting with NOAA under Section 7 of the ESA. Id. ¶¶ 63, 64, 66.

Defendants respond that plaintiffs have mischaracterized the process by which a traffic separation scheme is established, and that the Coast Guard takes no actions which trigger the requirements of ESA Section 7. Essentially, defendants argue that there has been no Coast Guard "agency action" within the meaning of Section 7. See Defs' Mem. at 2. More specifically, defendants argue that it is the International Maritime Organization ("IMO") within the United Nations ("UN") that establishes the TSSs at issue, under international law – at the recommendation of the United States, but not as the result of any "action" by a United States

federal agency within the meaning of the APA. See Defs' Mem. at 29.[8]

> Plaintiffs respond that:
>
> despite defendants' assertion that "it is the IMO which decides whether to adopt and implement a TSS," Def. Br. at 30, in fact the [Ports and Waterways Safety Act] specifically directs that *the Coast Guard* must develop and adopt these schemes. . . . Thus, regardless of whether the Coast Guard, for whatever reason, chooses to seek the IMO's input before making its final TSS decisions, in light of the statutory scheme, the final decision on setting TSSs, by Congressional mandate, rests with the Coast Guard, and, consequently, the impacts of TSSs on right whale [*sic*] are legally *caused* by the Coast Guard.

Pls' Opp. at 36 (emphasis in original). Essentially, plaintiffs argue that while the Coast Guard might leave the designation of TSSs to the IMO in practice, the Coast Guard is authorized by domestic statute to designate the TSSs directly, and it therefore must engage in a Section 7(a)(2) consultation.

This argument misses one key point – it is clear from the record before the Court that, regardless of what authority the Coast Guard might have to create TSSs under the PWSA (a matter disputed by the defendants), the Coast Guard did not in fact designate any of the TSSs at issue in this case.[9] Rather, it appears that in each instance the United States made

---

[8]  Defendants also argue that plaintiffs' claims against the Coast Guard fail for lack of standing, involve nonjusticiable political questions, are not ripe, and are barred by the statute of limitations. Because the Court concludes that plaintiffs have failed to allege any final agency actions of the Coast Guard that the Court may review under the APA, it need not address these other arguments, or issues relating to the Coast Guard's authority to create TSSs under the PWSA.

[9]  There are six TSSs referenced in the Amended Complaint: (1) In the Approach to Boston; (2) In the Approaches to the Chesapeake Bay; (3) Off Delaware Bay; (4) Off New York; (5) In the Approaches to Narragansett Bay, R.I. and Buzzards Bay, Mass.; and (6) In the Approaches to Portland, Maine. See Am. Compl. ¶ 63. The TSS off Cape Fear is also discussed by the parties, although it is not in the complaint. See Pls' Mem. at 15, 34; Defs' Mem. at 36.

recommendations to the IMO, which the IMO adopted, sometimes after alteration or amendment. While the Court's own review of the administrative record and the Federal Register prior to the oral argument preliminarily led it to this conclusion, this was made even more clear by the defendants' Supplemental Statement of Material Facts, and the chart submitted therewith, filed on March 23, 2007 in response to the Court's request at oral argument. It is apparent that at most, the Coast Guard engages in the purely ministerial task of codifying some (but not all) of the IMO-designated TSSs for publication in the Code of Federal Regulations, after their adoption by the IMO.

While plaintiffs allege that the "Coast Guard has established numerous TSS in right whale habitat" and that the "Coast Guard's designation of shipping lanes concentrates vessels in areas used by right whales," Am. Compl. ¶¶ 63-64, these allegations are at odds with the evidence in the Administrative Record that shows quite clearly that in fact the TSSs at issue were created by an international organization, not by the Coast Guard. Plaintiffs allege that the creation of TSSs are final agency actions of the Coast Guard reviewable by the Court, but this assertion simply is not borne out by the record in this case. The Court agrees with the defendants that the plaintiffs have not shown that the Coast Guard engaged in any final agency actions that are reviewable under the APA. The Court therefore lacks jurisdiction to consider plaintiffs' claims against the Coast Guard.

Accordingly, by Order and Judgment of March 30, 2007, the Court granted defendants' motion for summary judgment and denied plaintiffs' motion for summary judgment.

```
                              _____/s/_____
                              PAUL L. FRIEDMAN
                              United States District Judge
```

DATE: April 5, 2007