UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| _____ | ) | |
| Defenders of Wildlife, <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | No.  05-2191 (PLF) |
| | ) | |
| v. | ) | |
| | ) | |
| Carlos Gutierrez, <u>et al.</u>, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## PLAINTIFFS' NOTICE OF FILING OF MEMORANDUM
## IN SUPPORT OF MOTION FOR RECONSIDERATION

Pursuant to the Court' Minute Order of March 30, 2007, which granted plaintiffs' motion

for an extension of time until April 26, 2007 to file a memorandum in support of their motion for

reconsideration of the Court's March 30, 2007 Order and April 5, 2007 Opinion, attached hereto

is plaintiffs' supporting memorandum.

Respectfully submitted,


Of Counsel:
                                                                      _____/s/_____

Michael P. Senatore (D.C. Bar No. 453116)          Howard M. Crystal (D.C. Bar No. 446189)
Andrew Hawley (Cal. Bar No. 229274)                 Eric R. Glitzenstein (D.C. Bar No. 358287)
Defenders of Wildlife                                         Meyer Glitzenstein & Crystal
1130 Seventeenth Street, N.W.                            1601 Connecticut Ave., N.W., Suite 700
Washington, D.C.  20036                                    Washington, D.C.  20009
                                                                       (202) 588-5206

April 26, 2007                                                 Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

)
Defenders of Wildlife, et al.,                )
                                              )
            Plaintiffs,                       )       No.  05-2191 (PLF)
                                              )
            v.                                )
                                              )
Carlos Gutierrez, et al.,                     )
                                              )
            Defendants.                       )
_____)

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR
RECONSIDERATION OF THE COURT'S
<u>MARCH 30, 2007 ORDER AND APRIL 5, 2007 OPINION</u>**

<u>Introduction</u>

Plaintiffs respectfully request that the Court reconsider its ruling for defendants on Claim

Two of Plaintiffs' Amended Complaint.  <u>See</u> Amended Complaint ("Am. Cmplt."), ¶ 79.  In that

claim, plaintiffs allege that the United States Coast Guard ("Coast Guard") is violating Section

7(a)(2) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a)(2), by failing to "consult

with NOAA Fisheries regarding activities undertaken and authorized by the Coast Guard which

may affect North Atlantic right whales or modify critical habitat . . . ."  Am. Cmplt., ¶ 79.

Plaintiffs respectfully submit that the Court made a significant legal error in rejecting this

claim.  In particular, the Court proceeded on the assumption that, in order to prevail, plaintiffs

must identify a "final agency action" by the Coast Guard, as required for claims brought under the

Administrative Procedure Act ("APA"), 5 U.S.C. § 704.  Thus, the Court ruled for the Coast

Guard on the grounds that, in the Court's view, plaintiffs had failed to identify any "final agency

actions that are reviewable under the APA."  Apr. 5, 2007 Opinion ("Op.") at 18; <u>see also</u> <u>id.</u> at

17, n.8 ("[T]he Court concludes that plaintiffs have failed to allege any final agency actions of the Coast Guard that the Court may review under the APA . . ..").

However, as plaintiffs explain below, the APA's "final agency action" requirement has no application to this Claim, which plaintiffs are pursuing under Section 1540(g)(1)(A) of the ESA. 16 U.S.C. § 1540(g)(1)(A). That citizen suit provision permits "any person" to pursue a claim against "any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." Id.; see Bennett v. Spear, 520 U.S. 154, 173 (1997) (explaining that Section 1540(g)(1)(A) "is a means by which private parties may enforce the substantive provisions of the ESA against regulated parties – both private entities and Government agencies").

In this case, plaintiffs claim that the Coast Guard is violating ESA Section 7(a)(2), which mandates that "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary, insure that *any action authorized, funded, or carried out* by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize" species or adversely modify critical habitat. 16 U.S.C. § 1536(a)(2) (emphasis added). Therefore, to present this claim against the Coast Guard the plaintiffs merely have to identify any "action" that has been authorized, funded, or carried out by the agency, NRDC v. Houston, 146 F.3d 1118, 1125 (9th Cir. 1998), not a "final agency action" as required by the APA. See, e.g., Washington Toxics Coalition v. EPA, 413 F.3d , 1024, 1034 (9th Cir. 2005), cert. denied 126 S. Ct. 1024 (2006)

("Because [ESA Section 1540(g)(1)(A)] independently authorizes a private right of action,

[Section 704 of] of the APA does not govern the plaintiffs' [ESA Section 7(a)(2)] claims").[1]

Applying this more liberal standard in light of the purposes of the ESA, the Record before

the Court demonstrates that the Coast Guard's involvement in the establishment and

implementation of Traffic Separation Schemes ("TSSs") triggers obligations under Section

7(a)(2). However, at bare minimum, the Court cannot resolve this claim *in favor of the Coast*

*Guard* based on the present, patently deficient Administrative Record. See, e.g., Walter O.

Boswell Mem. Hosp. v. Heckler, 749 F. 2d 788, 792 (D.C. Cir. 1984); see also Plaintiffs' Rule

56(f) Declaration (Pl. Ex. 34). Indeed, in resolving this claim for the Coast Guard, Op. at 18, the

Court did not address the Administrative Record concerns plaintiffs had raised in briefing, see

Plaintiffs' Summary Judgment Reply at 19-20, or the similar concerns the Court itself raised

during oral argument. See Transcript of Mar. 16, 2007 hearing ("Tr.") (Attached) at 71-72.

Moreover, although plaintiffs requested an opportunity to address the Coast Guard's

"Supplemental Administrative Record" submitted after oral argument, see Plaintiffs' Notice of

Filing ("Pl. Not. Filing"), at 1, n. 1 (Mar. 23, 2007) (seeking an opportunity to respond to any

new materials filed by the Coast Guard), the Court resolved the claim in the Coast Guard's favor

before plaintiffs had an opportunity to explain why the "Supplemental Record" – which is limited

to records from the International Maritime Organization ("IMO") (not a party in this case), rather

---

[1]    As plaintiffs will further explain below, the D.C. Circuit's ruling in National Assn
of Homebuilders v. Norton, 415 F.3d 8, 13 (D.C. Cir. 2005), which was not cited by the
defendants, but which the Court relied upon in its ruling, Op. at 8-9, does not hold otherwise,
because that case concerned a claim under a provision of the ESA *that expressly incorporates
APA requirements*, 16 U.S.C. § 1533(b)(4). See infra at 12-13.

than the Coast Guard – actually highlights the need for a *complete* Administrative Record before the Court can consider the Coast Guard's request for summary judgment in its favor.

Indeed, because the relevant legal inquiry here is whether the Coast Guard "authorized, funded, or carried out" an action as defined by ESA Section 7(a)(2), 16 U.S.C. § 1536(a)(2), and not whether there is "final agency action" under the APA, 5 U.S.C. § 704, it is critical that the Court resolve this issue based on the "full administrative record," <u>Citizens to Preserve Overton Park v. Volpe</u>, 401 U.S. 402, 420 (1971), so that the Court can assess whether, as a matter of fact, the Coast Guard plays a sufficient role in the process to trigger Section 7(a)(2) obligations – especially in light of the very broad definition of "agency action" in the ESA's implementing regulations. <u>See</u> 50 C.F.R. § 402.02 (defining "agency action" under Section 7 to include "*all activities or programs of any kind* authorized, funded, or carried out*, in whole or in part, by Federal agencies,* in the United States or upon the high seas . . . .")(emphasis added). In other words, because, even under *defendants'* legal theory – in which the Coast Guard may act under some "foreign affairs authority," Tr. at 67, rather than under the express provisions of the Ports and Waterways Safety Act ("PWSA"), 33 U.S.C. § 1221, <u>et</u> <u>seq.</u> – the question remains whether the Coast Guard's involvement constitutes an "activit[y]" that has at least "*in part*" been "authorized, funded, or carried out" by the Coast Guard. 50 C.F.R. § 402.02 (emphasis added). To answer *that* question, the Court must review, and plaintiffs are entitled to obtain, all documents bearing on the *Coast Guard's* involvement in the process, and not simply the actions taken by the IMO.[2]

---

[2]    Plaintiffs continue to maintain that the plain terms of the PWSA should govern here, and that defendants cannot sidestep that statutory framework by referring to some generic

(continued...)

4

Accordingly, by this motion plaintiffs respectfully request that the Court grant reconsideration by reinstating plaintiffs' Section 7(a)(2) claim against the Coast Guard. At that point, the Court should either grant summary judgment for plaintiffs, or, at minimum, order the agency to produce the *complete* Administrative Record related to this claim. If the Court chooses the latter course, plaintiffs would request that, after the Record is completed, the Court permit the parties to file brief supplemental memoranda solely addressing whether, based on the *complete* Administrative Record, the Coast Guard's activities related to the TSSs at issue constitute "actions" sufficient to trigger Section 7(a)(2) duties.

## Background

Plaintiffs' claim against the Coast Guard concerns that agency's role in the establishment and implementation of TSSs in the habitat of the critically-imperiled North Atlantic right whale. Am. Cmplt., ¶ 79. Plaintiffs assert that because these TSSs – which cause marine vessels to travel in areas frequented by right whales, thereby increasing the risks of ship strikes – "may affect" right whales, 50 C.F.R. § 402.14(a), the Coast Guard must undertake consultation with the National Marine Fisheries Service ("NMFS") under Section 7 of the ESA, in order to (a) insure that its activities are "not likely to jeopardize" the right whale or adversely modify the species federally-

---

[2](...continued)
"foreign affairs authority." Tr. at 67. Plaintiffs recognize, however, that the Court has rejected this argument. Thus, plaintiffs are focusing on the further factual analysis that is necessitated by *defendants'* legal paradigm here, whereby the Coast Guard's authority to make final designations concerning TSSs under the PWSA is not at issue.

5

designated critical habitat,  16 U.S.C. § 1536(a)(2), and, (b) even if jeopardy is not likely, to receive "reasonable and prudent measures" that will minimize those impacts.  Id. § 1536(b)(4)(ii).[3]

Although seven specific TSSs in right whale habitat are at issue here, the Coast Guard did not produce the complete Administrative Record related to the agency's development and implementation of each of these TSSs.  To the contrary, as to three of the TSSs – Boston (CG AR Vol. II); Casco Bay, Maine (Vol. III-A); and Buzzards Bay, Rhode Island (Vol. III-B) – the agency simply produced records concerning its participation in considering and developing *modifications* to the existing TSSs.   For one other TSS - New York (Vol. III-C) – the only records the Coast Guard produced were the Federal Register notices proposing, and finalizing, the publication of the TSS in the Code of Federal Regulations ("CFR").

The agency provided some more documentation for the three other TSSs at issue.  For Delaware Bay (Vol. IV), the Coast Guard included documents related to its most recent Port Access Routing Study ("PARS"), and its codification of a new TSS in the CFR, but the AR included *no* documentation concerning any *proposal* to the IMO, or the agency's implementation of the TSS once it was finalized.  For Chesapeake Bay (Vol. V), the agency included the request to the IMO that the TSS be modified (CG AR 2134), but no records concerning the Coast Guard's implementation of the TSS.  Finally, for Cape Fear (Vol. VI), the agency not only

---

[3]      Plaintiffs also sought summary judgment on a claim against NMFS's denial of a Rulemaking Petition, but do not seek reconsideration of the Court's adverse ruling on that claim, in light of defendants' representation that the permanent rule is presently pending at the Office of Management and Budget and will be issued shortly.  See Tr. at 37.  Certainly, if the rule is not finalized shortly, plaintiffs may be forced to seek further administrative and/or legal relief, particularly in light of the ongoing death of right whales.  See "Right Whale Found Dead In N.C. Waters; Necropsy Being Performed," Associated Press, Apr. 2, 2007 (available at http://www.wcnc.com/sharedcontent/APStories/stories/D8O8N8TO0.html)(last visited Apr. 25, 2007).

included the proposal to the IMO (CG AR 2518), but also some information about the Coast

Guard's *implementation* of the new TSS, including its "Local Notice to Mariners" notifying ships

of the existence of the TSS,  CG AR 2557; 2559 (The new TSS "was announced though the

Local Notice to Mariners . . .").[4]

The parties subsequently briefed cross-motions for summary judgment.  In their opening

brief, plaintiffs argued that the Coast Guard's role in establishing TSSs plainly constitute "agency

action" under ESA Section 7(a)(2), given that the term "has been defined broadly," Houston, 146

F.3d at 1125.  Plaintiffs' Sum. Jud. Mem. at 35; see also Pl. Sum. Jud. Reply ("Pl. Reply") at 26.

In response, the Coast Guard argued that plaintiffs' claim must fail because these TSSs were

established by the IMO, not the Coast Guard.  Def. Summary Judgment Mem. at 36-39.

In their Reply brief, plaintiffs argued that because the Ports and Waterways Safety Act

("PWSA"), 33 U.S.C. § 1221, et seq., directs the *Coast Guard* to establish and modify TSSs, the

agency is responsible for the TSSs at issue as a matter of law. Pl. Reply at 16-18.  Plaintiffs also

explained that, because their claim arises directly under the ESA, and not the APA, "there is no

final agency action requirement here," id. at 24, n.17, and cited Metcalf v. Daley, 214 F.3d 1135

(9th Cir. 2000), for the proposition that an agency may have obligations under federal law in

connection with actions it takes pursuant to an international process, even if there is also

involvement by an international body that is not subject to domestic law.  Pl. Reply at 23-24.

---

[4]     It bears emphasizing that in the Federal Register notices proposing, and then
finalizing, the Delaware, Chesapeake Bay, and New York TSSs, the Coast Guard explicitly
acknowledged the requirement to comply with *other* federal laws – such as, *inter alia*, the
National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq. and the Regulatory
Flexibility Act, 5 U.S.C. § 601, et seq. – but *ignored* whether it had any obligations under the
ESA.  CG AR 1809-10 (Delaware Rulemaking); CG AR 1832 (Chesapeake Bay); CG AR 1287
(New York).

At the oral argument, the Court's principal concern was that, regardless of the requirements of the PWSA, the agency had represented that the TSSs at issue in this case had *in fact* been designated solely by the IMO.  Tr. at 16-17 ("Each and every one of them was done by the IMO, not by the Coast Guard. . . ."); id. at 18 ("what they're saying is there are two possible tracks you can go down here").  Plaintiffs responded to this concern by explaining that (a) even if the Coast Guard had delegated some decision-making authority to the IMO, as to three TSSs (Delaware Bay, Chesapeake Bay and New York), the ultimate decision, as reflected in the CFR, was made by the Coast Guard, id. at 17, and (b) as to *all* of the TSSs, the Coast Guard's role in proposing and "carry[ing] out" the TSSs, 16 U.S.C. § 1536(a)(2), is sufficient to trigger Section 7 obligations.  Id. at 26-28.

The Court also raised a concern about whether there were factual disputes that might preclude summary judgment, particularly with regard to the division of authority between the IMO and the Coast Guard.  Tr. at 19, 21, 71.  Accordingly, the Court invited the parties to provide additional citations to the Administrative Record to address the Court's concerns.  Id. at 70 (requesting a "list of every citation that's relevant to each of these" TSSs).  Plaintiffs responded to this inquiry by providing the Court with citations to the AR.  See Pl. Not. Filing.

The Coast Guard, by contrast, responded to this request by filing a self-styled "Supplemental Administrative Record."  See Defendants' Administrative Record (Supplemental) (Mar. 26, 2006).  However, rather than provide further documentation concerning the *Coast Guard's* role regarding these TSSs, the agency produced documents *from the IMO* concerning *that* international body's adoption of the TSSs at issue.  Id.

In its April 4, 2007 ruling, the Court concluded that, to prevail on this claim, plaintiffs must identify a "final agency action" of the Coast Guard.  Op. at 8-9.  Based on the Record and Supplemental Record the Court concluded that the "final agency action" at issue here is the establishment of TSSs, and that they are established by the IMO, rather than the Coast Guard.  Id. at 16-18 ("it is clear from the record before the Court that . . . the Coast Guard did not in fact designate any of the TSSs [Traffic Separation Schemes] at issue in this case," and "this was made even more clear by the defendants Supplemental Statement of Material Facts").  Finding no "final agency action" by the Coast Guard, the Court entered summary judgment for defendants.  Id. at 18 ("The court agrees with the defendants that the plaintiffs have not shown that the Coast Guard has engaged in any final agency actions that are reviewable under the APA").[5]

## Argument

The Court may grant a request for reconsideration based on "'the need to correct a clear error or prevent manifest injustice.'"  Fox v. American Airlines, Inc., 389 F.3d 1291, 1296 (D.C. Cir. 2004), quoting Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996).  Applying this test, courts grant reconsideration of their rulings when they are based upon the wrong legal standard, and the application of the correct standard may affect the outcome, or may require further factual or legal development.  See, e.g., Klayman v. Judicial Watch, No. 06-670 (CKK), 2007 WL 1034936 (D.D.C. Apr. 3, 2007) (granting reconsideration based on error of law); Danziger v. Ford Motor Co., 402 F. Supp. 2d 236 (D.D.C. 2005) (same).

---

[5]    Pursuant to Fed. R. Civ. P. 59(e), plaintiffs filed a motion for reconsideration on April 10, 2007.  See Pl. Mot. for Reconsid. (Apr. 10, 2007).  However, the Court granted plaintiffs' motion for an extension of time to file a supporting memorandum.  Minute Order of Apr. 11, 2007.

In this case, plaintiffs respectfully submit that the Court applied the wrong legal test to determine whether the Coast Guard must comply with Section 7(a)(2) of the ESA. 16 U.S.C. § 1536(a)(2). Moreover, applying the correct legal standard leads to one of two possible outcomes. First, based on the existing Record, the Court could grant summary judgment to *plaintiffs* on this claim. Alternatively, if the Court is not convinced that plaintiffs are entitled to summary judgment, the Court should order the Coast Guard at least to produce the *complete* Administrative Record related to the Coast Guard's involvement in the TSSs at issue before the Court resolves plaintiffs' claim.

**A.      Based On The Existing Administrative Record, Plaintiffs Are Entitled To Summary Judgment On Their Claim That The Coast Guard Is "Authoriz[ing], Fund[ing], or Carry[ing] Out" Actions Within The Meaning of ESA Section 7(a)(2).**

**1.      The Court Committed A Clear Error of Law By Resolving Plaintiffs' Claim Based On Whether The Coast Guard Has Taken "Final Agency Action" Within The Meaning of the APA.**

As noted, section 1540(g)(1)(A) of the ESA authorizes "any person" to file suit against "the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)(A). In Bennett v. Spear, the Supreme Court explained that "§ 1540(g)(1)(A) is a means by which private parties may enforce the substantive provisions of the ESA against regulated parties – both private entities *and Government agencies* . . . ." 520 U.S. 154, 173 (1997) (emphasis added).

Unlike the claim in this case, Bennett involved whether this citizen suit provision applies where a plaintiff brings a claim against the Fish and Wildlife Service ("FWS") (or NMFS) for its alleged "maladministration" of the ESA. Id. Because *another* subsection of the ESA citizen suit

10

provision (Section 1540(g)(1)(C)) specifically authorizes such maladministration suits only for alleged violations of nondiscretionary duties under ESA Section 1533 (which principally concerns listing species), the Court concluded that any claims against the FWS or NMFS concerning *their* implementation of *other* ESA requirements – such as the obligation under ESA Section 7 to prepare Biological Opinions based on the "best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), may only be brought under the APA. <u>Bennett</u>, 520 U.S. at 174; <u>see also</u> <u>Building Ind. Assn of Superior Cal. v. Babbitt</u>, 979 F. Supp. 893, 900 (D.D.C. 1997) (explaining this distinction), <u>appeal dismissed</u> 161 F.3d 740 (D.C. Cir. 1998); <u>accord</u> <u>Sierra Club v. Glickman</u>, 156 F.3d 606, 616-17 (5th Cir. 1998).[6]

Rather than challenging NMFS or FWS's maladministration of the ESA, however, in this case plaintiffs have invoked this citizen suit provision to present a claim against *the Coast Guard*, alleging that the agency is violating ESA Section 7(a)(2) by not undertaking the consultation process to insure that the agency's participation in TSSs does not jeopardize the right whale or destroy the species' critical habitat. Am. Cmplt, ¶ 79. Thus, as provided by <u>Bennett</u>, plaintiffs are presenting a claim *directly under the ESA citizen suit provision, and not under the APA*.

Accordingly, for plaintiffs to prevail on this claim they do not need to identify "final agency actions" that are reviewable under the APA. Op. at 18. Rather, all that is required is for plaintiffs to identify any action "authorized, funded, or carried out" by the Coast Guard within the

---

[6]    This explains, for example, why earlier in this case plaintiffs explained that their claim against NMFS for its alleged maladministration of Section 7(a)(1) of the ESA is an APA claim, not an ESA claim. <u>See</u> Plaintiffs' Reply in Support of Motion to File Amended Complaint at 11 (Feb. 2, 2006).

meaning of the ESA and that statute's implementing regulations, 16 U.S.C. § 1536(a)(2); 50

C.F.R. § 402.02.  See, e.g., Washington Toxics Council, 413 F.3d at 1034.

 Indeed, the Court in Bennett made this very distinction, explaining that for claims under

Section 1540(g)(1)(A), "[a]ny procedural default, *even one that ha[s] not yet resulted in a final*

*disposition of the matter at issue*, would form the basis for a lawsuit."  520 U.S. at 174 (emphasis

added).  In short, "final agency action is not required to invoke jurisdiction under the ESA citizen

suit provision."  Center for Biological Diversity v. U.S. Dep't of Housing and Urban Dev't, No.

05-261, _ F.R.D. _, 2006 WL 3234591, * 7 (D. Ariz. May 12, 2006); Center for Food Safety v.

Johanns, 451 F. Supp. 2d 1165, 1190 (D. Haw. 2006) ("the Plaintiffs' ESA claim is not limited by

the 'final agency action' restriction applicable to the NEPA claim"); Washington Toxics Coal. v.

EPA, No. C01-132C, 2002 U.S. Dist. LEXIS 27654, *17 (W.D. Wash. July 2, 2002) at 10 (Pl.

Ex. 40).

 The D.C. Circuit's ruling in National Assn of Homebuilders v. Norton ("NAHB"), 415

F.3d 8, 13 (D.C. Cir. 2005), is not to the contrary.  In that case, plaintiffs claimed that the FWS

had violated the APA's notice and comment requirements by issuing a species survey protocol

without advance notice and public comment.  Id. at 9.  In light of the nature of plaintiffs' claim,

the Court analyzed whether the "agency action" plaintiffs were challenging constituted the APA-

required "final agency action" before inquiring into whether notice and comment was required.

Id. at 13-16.  Concluding that the survey protocol failed the second part of the "final agency

action" test – which requires that the action impose "rights or obligations," or has "legal

consequences," id. at 14, quoting Bennett, 520 U.S. at 178 – the Court found for the agency.

Plaintiffs' claim in that case did arise under ESA Section 1540(g)(1)(C), which, as noted, see supra at 10-11, permits citizen suits for alleged failures of the FWS (or NMFS) to perform a non-discretionary duty under Section 4 of the ESA.  415 F.3d at 12.  Crucially, however, plaintiffs' specific claim was that the FWS was violating ESA Section 4(b)(4), which simply incorporates the APA's notice and comment requirements into the ESA.  16 U.S.C. § 1533(b)(4) ("Except as provided in paragraphs (5) and (6) of this subsection, *the provisions of Section 553 of Title 5 (relating to rulemaking procedures)*, shall apply to any regulation promulgated to carry out the purposes of this chapter") (emphasis added).  Thus, the Court was applying an ESA provision that *expressly* adopted APA requirements.  The Court certainly did not suggest that a "final agency action" limitation should be read into every ESA claim based on every provision of the Act, including those provisions that do not cross-reference APA standards, and expressly impose obligations on a far broader range of agency activities than "final agency action."

Thus, it is critical that in this case, in contrast to NAHB, Section 7(a)(2) of the ESA does not refer to the APA.  16 U.S.C. § 1536(a)(2).  Therefore, because plaintiffs are presenting a claim under the ESA citizen suit provision, 16 U.S.C. § 1540 (g)(1)(A), concerning a violation of the ESA that makes no mention of the APA, "*the APA does not govern" plaintiffs' claim*. Washington Toxics Coalition, 413 F.3d at 1034 (emphasis added); see also National Wildlife Fed. v. FEMA, 345 F. Supp. 2d 1151, 1160 (W.D. Wash. 2004) (the final agency action "requirement[ ] do[es] not apply to suits brought under the ESA's broad citizen suit provision"); see also id. at 1166 ("relief is available under the ESA's citizen suit provision, regardless of whether such relief is available when a claim is brought solely under the APA"); Forest Service Empl. for Env. Ethics v. U.S. Forest Serv., 397 F. Supp. 2d 1241, 1255-56 (D. Mont. 2005) ("There is no requirement

13

for "final agency action" with regard to the ESA claim because Plaintiff has brought suit under 16 U.S.C. § 1540(g), the 'citizen suit' provision of the ESA").

This conclusion is bolstered by two additional points.  First, the Court in <u>NAHB</u> cited <u>Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson</u>, 685 F.2d 678, 685-86 (D.C. Cir. 1982), <u>see</u> 415 F.3d at 13, which simply stands for the proposition that, in a claim against an agency for a decision made pursuant to an ESA obligation, the appropriate *standard of review* is the same "arbitrary and capricious" standard that would apply to an APA claim under 5 U.S.C. § 706.  685 F.2d at 685.  However, the appropriate standard of review is plainly a distinct question from which agency activities are even subject to Section 7(a)(2), which says nothing about "final agency action," and, on its face, applies to a broader range of agency conduct.[7]

Second, once again, any argument that Section 1540(g)(1)(A) claims are subject to the APA's "final agency action" requirement is impossible to reconcile with <u>Bennett</u>.  520 U.S. at 173-74.  As noted, one of the specific reasons the Court in that case concluded that claims against *the FWS and NMFS* could not proceed under this ESA provision was that such an approach would "effect a wholesale abrogation of the APA's 'final agency action requirement."  <u>Id.</u>  Of course, if the "final agency action" requirement in fact *existed* for claims under Section 1540(g)(1)(A), there would be no such "abrogation."  Accordingly, <u>Bennett</u> dictates that, to pursue their Section 7(a)(2) claim against the Coast Guard, plaintiffs need not demonstrate any

---

[7]        In this regard, it also bears noting that APA Section 706 authorizes courts to review "agency action," 5 U.S.C. § 706(2), and makes no reference to "final agency action." Instead, the "final agency action" requirement comes from a different APA provision, 5 U.S.C. § 704, which is the provision authorizing judicial review under the APA – and which is inapplicable where judicial review is authorized by the ESA itself.  <u>Bowen v. Massachusetts</u>, 487 U.S. 879, 903 (1988) (explaining that there is no judicial review under the APA where review is expressly permitted by another statute).

"final agency action" here, and that <u>NAHB</u> cannot and should not be construed as reading into a claim alleging that an agency is violating Section 7(a)(2) a limitation that the provision simply does not contain.

**2. The Existing Record Indicates That The Coast Guard Has "Authorized, Funded, or Carried Out" Actions Within The Meaning of ESA Section 7(a)(2) In Connection With The TSSs in Right Whale Habitat.**

Once again, the ESA's implementing regulations broadly define "agency action" as "all activities or programs of any kind authorized, funded, or carried out, *in whole or in part*, by Federal agencies in the United States or upon the high seas." 50 C.F.R. § 402.02 (emphasis added). In light of the breadth of this definition, reviewing courts have "construed 'agency action' broadly" for purposes of determining which actions are covered by Section 7(a)(2). <u>Pacific Rivers Council v. Thomas</u>, 30 F.3d 1050, 1055 (9th Cir. 1994); <u>see also</u> <u>NRDC v. Houston</u>, 146 F.3d 1118, 1125 (9th Cir. 1998) ("The term 'agency action' has been defined broadly"); <u>Turtle Island Restoration Network v. NMFS</u>, 340 F.3d 969, 974 (9th Cir. 2003) (same); <u>Forest Service</u>, 397 F. Supp. 2d at 1256; <u>National Wildlife Fed. v. Brownlee</u>, 402 F. Supp. 2d 1, 10 (D.D.C. 2005) ("'action' in this case is broadly defined"); <u>Rio Grande Silvery Minnow v. Keys, III</u>, 469 F. Supp. 2d 973, 990 (D.N.M. 2002).

Although, as plaintiffs will explain, <u>see</u> <u>infra</u> at Part B, the Coast Guard has not yet filed the complete Administrative Record concerning the agency's TSS-related "agency actions" here, for most of these TSSs even the *existing* Record is sufficient to demonstrate that the regulatory definition has been satisfied, even under defendants' theory that it has left the ultimate TSS decisions up to the IMO.

15

In particular, for all but two of the TSSs at issue, the Coast Guard does not dispute that each of them came into existence, at least "in part," 50 C.F.R. § 402.02, as the result of actions *of the Coast Guard*. Thus, in Cape Fear, Chesapeake Bay, Delaware Bay, Boston, and Buzzards Bay, the Coast Guard (acting under the PWSA, 33 U.S.C. § 1223(c)), prepared PARS, and then concededly *proposed specific routing measures* that were considered by the IMO. See Supplemental Statement of Material Facts ("Supp. Stmt. Mat. Facts") (acknowledging these proposals, though not providing documentation). Because this involvement in adoption of these TSSs alone is sufficient to trigger section 7 obligations – insofar as it constitutes an "activit[y] that is "carried out . . . in part" by the Coast Guard, 50 C.F.R. § 402.02 – and, indeed, these TSSs would not exist but for the Coast Guard's discretionary decision to develop them, plaintiffs urge the Court to grant reconsideration on this basis. See Coleman-Adebayo v. Leavitt, 400 F. Supp. 2d 257, 261 (D.D.C. 2005) (granting reconsideration based on corrected understanding of factual predicate for plaintiffs' claim).[8]

For several reasons, the fact that, on occasion, the IMO has modified these proposals does not change this outcome. First, the potential for IMO modification does not change the fact that the Coast Guard's own role in the process is sufficient to trigger Section 7(a)(2) responsibilities under the plain terms of that Section and the broad definition of "agency action." 50 C.F.R. § 402.02. Second, as the Coast Guard has acknowledged (again, without providing the complete documentation in the Record), for most of the TSSs at issue – Delaware, Boston, Buzzards Bay,

---

[8]    For New York, where the original TSS predated the PWSA, the relevant consideration is the Coast Guard's *adoption* of the TSS in the CFR. See infra at 17-18. As for the final TSS, in Casco Bay, since that TSS was also created prior to the PWSA, and was never codified by the Coast Guard, only its implementation could trigger Section 7(a)(2). See infra at 21-22.

Casco Bay, and Cape Fear – the IMO adopted the proposal in toto.  See Suppl. Stmt. Mat. Facts at 3 and 5-8.[9]

Moreover, for three of the TSSs, there is an independent basis for finding "agency action" giving rise to Section 7(a)(2) obligations – the final TSS was promulgated in the CFR after a notice and comment rulemaking process.  With regard to these TSSs – for New York, Delaware, and Chesapeake Bay – the Court rejected plaintiffs' argument on the ground that codifying the TSSs in the CFR is a "purely ministerial task . . .."  Op. at 18.  However, particularly given that there is no "final agency action" requirement here, and that Section 7(a)(2) applies to "any action" that is "carried out by" the Coast Guard, 16 U.S.C. § 1536(a)(2), that conclusion cannot be reconciled with either the existing Record, or the applicable legal standard.  See 50 C.F.R. § 402.02 (expressly defining "agency action" to include "the promulgation of regulations").

As for the Administrative Record, it is critical that, rather than simply issuing Final Regulations, in each instance the Coast Guard issued *proposed rules for notice and comment* .  See 51 Fed. Reg. 44,072 (New York); 62 Fed. Reg. 25,576 (Delaware); 55 Fed. Reg. 36,666 (Chesapeake Bay).  Moreover, rather than announcing that it was *obligated* to codify the IMO-sanctioned TSS, the Coast Guard acknowledged that it may decide to make "changes resulting

_____

[9]     Even where the IMO has modified the Coast Guard's original proposals, that raises the distinct issue as to whether the IMO-adopted changes constitute "effects of the action" that must be considered in the Section 7 consultation.  See 50 C.F.R. § 402.02 (defining "effects of the action"); see also Pl. Reply at 32-34.  That term, in turn, is defined to include "[i]ndirect effects," which are "those that are caused by the proposed action and are later in time, but still *are reasonable certain to occur*."  Id. (emphasis added).  Here, as the Court has recognized, the *only* issue is whether the Coast Guard has a threshold duty to consult.  Tr. at 53.  Until and unless the agency does so, it is premature to consider the extent or nature of the effects that the consultation must cover.  NWF v. FEMA, 345 F. Supp. 2d 1151, 1175 (W.D. Wash. 2004) (explaining agency's threshold duty to *consider* whether its actions may affect species).

from this rulemaking."  62 Fed. Reg. at 25,577 (CG AR 1802 (first full sentence)).  Indeed, as

noted, in each instance the Coast Guard studiously made note of its compliance with *other* federal

statutes – such as NEPA – which it also would have had no need to comply with were it carrying

out a purely "ministerial" action.  <u>See</u> CG AR 1831-32 (Chesapeake Bay); CG AR 1802-03

(Delaware); CG AR 1287 (New York); <u>see also</u> <u>Department of Transp. v. Public Citizen</u>, 541

U.S. 752, 770 (2004) (no NEPA analysis required where agency has no decision-making

authority).[10]

In addition, while the Court may have assumed that, in promulgating these regulations, the

Coast Guard *disavowed that it was acting under the PWSA* and hence had no statutory basis for

deviating from the IMO determination, Tr. at 61 (The New York TSS "doesn't say we're doing

this pursuant to the PWSA"), in fact that is not the case.  To the contrary, in codifying the New

York TSS the Coast Guard expressly explained that the "New York TSS is incorporated into 33

CFR Part 167 by this rulemaking *under the authority of the PWSA*."  CG AR 1287 (first

paragraph); <u>see also</u> Pl. Not. Filing, at 2.[11]  These statements not only undermine the Coast

Guard's contention that the codification of these TSSs is a purely ministerial act over which the

---

[10]    The Coast Guard's suggestion that *it* does not make proposals to the IMO – they are made by the U.S. Government – is also contradicted by the Record.  <u>See</u> CG AR 1808 (Coast Guard Federal Register Notice stating, "[t]herefore, *we* proposed to IMO that the Eastern Approach TSS be adjusted" and "IMO adopted and implemented *our* recommendation")(4th full paragraph)(emphasis added).

[11]    <u>See also</u> CG AR 1832 (Chesapeake Bay rulemaking, explaining that its action in codifying the TSS "is committed to the Coast Guard by Federal Statute")(second paragraph under "Federalism")(59 Fed. Reg. 21,935, 21,937); CG AR 1810 (Delaware Bay Rulemaking, stating that the "authority" for the TSS establishment is "33 U.S.C. 1223," the PWSA, *not* international law)(65 Fed. Reg. 12,944, 12,945).

18

agency has no control, but they suggest that the Coast Guard *was* acting under the PWSA, which, the agency concedes, authorizes it to take environmental impacts into consideration. Tr. at 33-34.

In other words, with regard to these TSSs, through the notice and comment rulemaking the Coast Guard made a discretionary decision to "carry out" the TSS, and hence must comply with Section 7(a)(2), 16 U.S.C. § 1536(a)(2). See 50 C.F.R. § 402.03 ("Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control"); id at § 402.02 (defining "agency action" to include "the promulgation of regulations"). Moreover, although not a prerequisite to judicial review here, by putting these TSSs out for public comment in the Federal Register, and then issuing a final rule, the Coast Guard also took "final agency action" within the meaning of the APA. See, e.g., Edison Elec. Institute v. U.S. E.P.A., 996 F.2d 326, 332 (D.C. Cir. 1993). Thus, it is well-recognized that where an agency *itself* makes a decision, if it reopens the matter for public comment and suggests that it may change the decision, its subsequent ratification of its *prior* decision is judicially reviewable final agency action. Id.; see also Public Citizen v. NRC, 901 F.2d 147, 151 (D.C Cir. 1990). Certainly, therefore, the Coast Guard's voluntary decision to codify another entity's decision – here, that of the IMO – would be reviewable under Section 704 of the APA – a *narrower* standard than that which triggers Section 7(a)(2) obligations.[12]

Finally, the Coast Guard's activities *vis-a-vis* these TSSs not only fall squarely within the terms of Section 7(a)(2) and the implementing regulations, but consultation would also be

---

[12]    Two of these three TSSs – Chesapeake Bay and Delaware Bay – were promulgated recently enough that the Coast Guard's statute of limitations argument does not apply. See Tr. at 43 (defendants' agreement on this score). As for New York, plaintiffs respectfully refer the Court to its briefing as to why the statute of limitations should not bar relief. See Pl. Reply Br. at 41-43.

19

consistent with Section 7(a)(2)'s core purpose of requiring that federal agencies adopt a policy of "institutionalized caution" when taking *any* action that may adversely affect species. TVA v. Hill, 437 U.S. 153, 194 (1978). In other words, when the Coast Guard decides to submit a TSS proposal and/or codify and implement the final TSS – including in a notice and comment rulemaking proceeding – it is engaging in the very kind of agency activities that *should* be informed by potential impacts on endangered species, especially a species as critically imperiled as the right whale. See, e.g. Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 690 (1995) (emphasizing that the "plain intent" of Congress in passing the ESA "was to halt and reverse the trend toward extinction, whatever the cost"). To take but one example, if consultation with NMFS resulted in a proposal that would reduce adverse impacts to right whales, that is *precisely* the kind of result Section 7(a)(2) was designed to produce. Because it is also fully consistent with the language of the statute and implementing regulations, plaintiffs urge the Court to reconsider its ruling that the Congressionally-mandated "institutionalized caution," Hill, 437 U.S. at 194, has no role to play in the TSS activities undertaken by the Coast Guard.

**B.    At Minimum, The Court Should Order The Coast Guard To Produce The Complete Administrative Record Before Concluding That The Agency's Role In Setting TSSs Is Insufficient To Trigger Section 7(a)(2) Duties.**

Finally, although plaintiffs maintain that the existing Record is sufficient to demonstrate that the Coast Guard has engaged in activities triggering Section 7(a)(2) duties here, at minimum plaintiffs are entitled to the *complete* Administrative Record that may bear on that question. As noted, although plaintiffs raised this issue in their briefing (Pl. Reply at 19-20), and the Court

recognized the concern during the oral argument (Tr. at 19, 71), the Court did not address this issue in its ruling.

Since there is no "final agency action" requirement here, the complete Record may be critical to evaluating whether the Coast Guard's role falls within the statutory and regulatory definition of "agency action." First, as noted, irrespective of the IMO TSSs – which is *all* the Coast Guard provided the Court in its "Supplemental Administrative Record" – the Coast Guard's discretionary actions *preceding the IMO* actions clearly implicate Section 7(a)(2) duties. See supra at 16-17. However, the Coast Guard has yet to produce the complete Record related to these proposals.

Thus, while the agency has now included some of the final IMO proposals, they have not all been provided. Moreover, to the extent the agency is arguing that these proposals are made by the United States, not the Coast Guard, see Coast Guard Sum. Jud. Memo. at 27 (claiming the proposal "is an action of the United States government, not a particular federal agency"), then the Coast Guard Record must include the final determinations made *by the Coast Guard*.

Second, the Coast Guard has included almost *no* records concerning its *implementation* of the TSSs once they are established. The IMO does not notify mariners of TSSs, nor does it place aids to navigation in waterways. These are steps taken by the Coast Guard, and constitute "actions" that are both "funded" and "carried out" by that agency. 16 U.S.C. § 1536(a)(2).

For example, the Record reflects that after the Coast Guard finalized the new Cape Fear TSS, it issued a "Local Notice to Mariners" ("LNM") notifying ships about the new TSS. CG AR 2557; see also CG AR 2529 (Federal Register notice announcing that, for the Cape Fear TSS, "[c]hanges to aids to navigation [ ]will be accomplished through . . . changes in the Local Notice

21

to Mariners with an opportunity for comment and notification of the final changes in the Local

Notice to Mariners").  As provided in the CFR, these Coast Guard actions "report[ ] changes to [

] aids to navigation that are established or maintained and operated by or under the authority of

the Coast Guard, and any other information pertaining to the waterways within each Coast Guard

district that is of interest to the mariner."  33 C.F.R. § 72.01-5(a).[13]   Indeed, LNMs are just one

component of the Coast Guard's overall "aids to navigation system," which is designed to inform

mariners of marine channels such as TSSs, and which include not only these notices, but also

navigational buoys, beacons, and other systems.  See generally 33 C.F.R. Part 62; id. at § 62.1(c)

("The Coast Guard maintains systems of marine aids to navigation consisting of visual, audible,

and electronic signals which are designed to assist the prudent mariner in the process of

navigation");  id. § 62.31 (explaining that certain aids *may be used "for example, to mark

[ ]traffic separation schemes*")(emphasis added).

Thus, even apart from the actions leading up to the establishment of these TSSs, there is a

separate question as to whether these implementing actions by the agency require Section 7(a)(2)

compliance.  However, with the exception of the Cape Fear TSS, the Coast Guard failed to

include any of this documentation in the Record.  See, e.g., Kent County, Del. Levy Court v.

EPA, 963 F.2d 391, 395-96 (D.C. Cir. 1992)(providing for record supplementation with relevant

materials).

_____

[13]     See also 33 C.F.R. § 72.01-1 ("The Coast Guard issues information concerning the
establishment of aids to maritime navigation . . . maintained and operated by or under the
authority of the Coast Guard in documents and marine broadcasts having the general title of
"Notice to Mariners"); accord http://www. navcen.uscg.gov/lnm/default.htm (Coast Guard Local
Notice to Mariners website).

The Coast Guard's "Supplemental Administrative Record" reinforces this concern. Once again, at oral argument the Court noted that there may be unresolved factual issues, and requested that the parties provide additional citations concerning the TSSs at issue. Tr. at 71-72. Plaintiffs complied with that request by pointing the Court to relevant Record cites, and noting where the record was barren. See Pl. Not. Filing.

However, while defendants provided a few citations to the existing Record, the Coast Guard primarily responded by providing an entirely *new* Administrative Record "Supplement" consisting of documents *of the IMO, not the Coast Guard*. Thus, rather than providing a more complete Administrative Record concerning the Coast Guard's involvement in the TSSs at issue – which is what plaintiffs are challenging here – the agency provided records that are entirely irrelevant to the matter at hand.

Accordingly, before the Court can resolve this claim in the Coast Guard's favor, and conclude that none of the agency's actual activities in connection with the creation and implementation of TSSs in right whale habitat constitute "agency action" within the meaning of ESA Section 7, 16 U.S.C. § 1536(a)(2), at bare minimum plaintiffs are entitled to the *complete* Administrative Record concerning this claim. Only then will plaintiffs – and the Court – be in a position to evaluate the extent, and legal significance, of the Coast Guard's actions here. See Burlington Ins. Co. v. Okie Dokie, Inc., 439 F. Supp. 2d 124, 128-29 (D.D.C. 2006) (granting reconsideration based on new evidence).

An order compelling the agency to produce the *complete* Record would also be consistent with a long line of cases making it clear that, in resolving claims against agencies, the reviewing

23

Court should have the "full administrative record," Volpe, 401 U.S. at 420, and not simply the records the agency has selected. Boswell, 749 F.2d at 792; Envtl Def. Fund v. Blum, 458 F. Supp. 650, 661 (D.D.C. 1978) (agency may not "skew the 'record' for review in its favor by excluding from that 'record' information in its own files which has great pertinence to the proceeding in question"); Kent County, 963 F.2d at 395-96.

Indeed, one of the specific circumstances where the D.C. Circuit has recognized that it is appropriate to require a more complete Record is where an agency has "deliberately or negligently excluded documents that may have been adverse to its decision." James Madison Ltd. by Hecht v. Ludwig, 82 F.3d 1085, 1095 (D.C. Cir. 1996); see also Amfac Resorts LLC v. Dep't of Interior, 143 F. Supp. 2d 7, 11 (D.D.C. 2001); National Wildlife Fed. v. U.S. Army Corps. of Engs., No. 01-273 (TFH), 2005 WL 691775, *10 (Mar. 23, 2005). Here, in light of the foregoing, and the Coast Guard's decision to limit its Supplemental Record to *records of the IMO*, rather than records regarding the Coast Guard's participation in the TSS process, plaintiffs submit that a more complete record is appropriate. Boswell, 749 F.2d at 792-93 (remanding "to the District Court so that it may obtain the full administrative record," where it appeared "the plaintiffs were unaware of a number of items" that should have been in the Record and the "asymmetry in information [would] undermine[] the reliability of a court's review").

Thus, in order to shore up their theory that plaintiffs are seeking to challenge actions of the IMO, rather than the Coast Guard, defendants simply produced records of that international body, which is not a party to the case. See Supplemental Admin. Record. However, because, in fact, plaintiffs are challenging the Coast Guard's failure to comply with Section 7(a)(2) in connection with *that agency's* TSS-related activities, the complete Administrative Record –

24

particularly in view of the Court's determination to apply a *de facto* test in lieu of simply looking

to the plain terms of the PWSA – must consist of, *inter alia*, all of the records related to the

*Coast Guard's* development, and implementation, of TSSs in right whale habitat.  Accordingly, at

minimum, the Court should order the Coast Guard to file the *complete* Record concerning

*its* involvement in these TSSs before resolving whether the agency's role is sufficient to trigger

the endangered species safeguards of Section 7(a)(2).[14]

     If the Court goes that route, plaintiffs would respectfully request that, once the complete

Record is produced, the parties be afforded an opportunity to file brief supplemental memoranda

further explaining whether, in light of that Record, the Coast Guard's actual activities require

Section 7 consultation.

## Conclusion

     For the foregoing reasons, plaintiffs respectfully request that the Court grant their motion

for reconsideration.

                                              Respectfully submitted,

Of Counsel:                                   _____/s/_____

Michael P. Senatore (D.C. Bar No. 453116)     Howard M. Crystal (D.C. Bar No. 446189)
Andrew Hawley (Cal. Bar No. 229274)           Eric R. Glitzenstein (D.C. Bar. No. 358287)
Defenders of Wildlife                         Meyer Glitzenstein & Crystal
1130 Seventeenth Street, N.W.                 1601 Connecticut Ave., N.W., Suite 700
Washington, D.C.  20036                       Washington, D.C.  20009
                                              (202) 588-5206

April 26, 2007                                Attorneys for Plaintiffs

---

     [14]     Alternatively, as the Court suggested, Tr. at 71, and as proposed in plaintiffs' Rule
56(f) declaration, the Court could authorize a brief period of discovery for plaintiffs to obtain
these materials.  See Amfac Resorts, 143 F. Supp. 2d at 12 (outlining grounds for discovery); see
also Bar MK Ranches v. Yuetter, 994 F.2d 735, 739 (10th Cir.1993) (permitting discovery when
a party has made a "showing that the record may not be complete"); Natural Resources Defense
Council v. Train, 519 F.2d 287, 292 (D.C. Cir. 1975) (permitting "limited discovery" to ensure
that "documents which are properly part of the administrative record have [not] been withheld").