Defenders of Wildlife v. Gutierrez, No. 05-2191
Plaintiffs' Motion for Reconsideration


ATTACHMENT

```
1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF COLUMBIA

3   DEFENDERS OF WILDLIFE, ET AL      CIVIL ACTION NO. 05-2191

4                                     WASHINGTON, DC

5   VERSUS                           FRIDAY, MARCH 16, 2007

6   CARLOS GUTIERREZ, SECRETARY OF
    DEPARTMENT OF COMMERCE, ET AL     10:00 a.m.

7                            MOTIONS

8            BEFORE THE HONORABLE PAUL L. FRIEDMAN

9            UNITED STATES DISTRICT COURT JUDGE

10  A P P E A R A N C E S:

11  FOR THE PLAINTIFF,               MR. HOWARD CRYSTAL, ESQ.
    DEFENDERS OF WILDLIFE, ET AL     MEYER GLITZENSTEIN &CRYSTAL
12                                   1601 Connecticut Ave.NW#700
                                     Washington, DC  20009
13                                   (202)588-5206

14  FOR THE DEFENDANT,               MS. BRIDGET K.MCNEIL, ESQ.
    CARLOS GUTIERREZ,SECRETARY OF    U.S.DEPARTMENT OF JUSTICE
15  COMMERCE,ET AL                   1961 Stout Street
                                     8th Floor,Room 620
16                                   Denver, CO  80294
                                     (303)844-1484
17
                                     ANDREW J.  TURNER, ESQ.
18                                   U.S. COAST GUARD
                                     2100 2nd Street, S.W.
19                                   Washington, DC  20593-0001
                                     (202)372-3786
20  REPORTED BY:                     WENDY C. RICARD, CCR, RPR
                                     OFFICIAL COURT REPORTER
21                                   333 Constitution Street
                                     Room 6816
22                                   Washington, DC 20001
                                     (202) 354-3111
23
    Proceedings recorded by mechanical stenography.

24  Transcript produced by computer-aided transcription.

25
```

```
 1                      P-R-O-C-E-E-D-I-N-G-S

 2              THE COURT: Good morning everybody.  You left your

 3     partner in crime at home?

 4              MR. CRYSTAL:  Yes, Your Honor.

 5              THE COURT:  We're here basically on cross-motions

 6     for summary judgment.  The plaintiffs filed a motion for

 7     summary judgment.  The defendants filed a cross-motion reply

 8     and opposition.  There's also a motion to supplement the

 9     administrative record.  I don't think y'all need to spend a

10     whole lot of time on that.  If there is some particular matter

11     that you're relying on that's going to be resolved in that

12     motion, you might want to flag that for me.

13              I've read the briefs.  I've read a fair number of

14     the cases you cited,  the administrative record, and I may

15     have some questions about some things in the administrative

16     record.  Do you have a proposed order in which you want to

17     argue and do you have an estimate of how much time you need?

18     Who is going to go first?

19              MR. CRYSTAL:  We haven't discussed that -- I propose

20     that we argue first -- movants, Your Honor, and if that's okay

21     with Ms.  McNeil?

22              MS. MCNEIL:  That's fine.

23              MR. CRYSTAL:  And I think -- I was going to suggest

24     30 minutes.

25              THE COURT: All right.  That seems about right.  I'm
```

1    not -- I don't know how Chief Justice Roberts does it. You

2    know, Chief Justice Renquist used to cut you off in mid-

3    sentence, and I'm not that way.

4            MR. CRYSTAL:  We appreciate that, Your Honor. Your

5    Honor, this case concerns the incredible threat that ship

6    strikes pose to the continued existence of the North Atlantic

7    Right Whale. These large and slow moving whales migrate up and

8    down the east coast where they congregate near and migrate

9    through numerous shipping lanes in and out of busy United

10   States ports.  The National Marine Fishery Services or NMFS

11   has said that the species status is so precarious with only

12   approximately 300 right whales remaining, that the death of

13   even one whale a year could preclude the recovery of the

14   species.  And yet since the plaintiffs filed this lawsuit, six

15   additional right whales have been struck by ships, and, in

16   fact, there were some news accounts just the other day of yet

17   another right whale being seen with large propeller wounds on

18   it.  So this is an ongoing crisis. There are two federal

19   agencies, NMFS and the U.S. Coast Guard, have the authority

20   and the responsibility --

21           THE COURT: For the court reporter -- NMFS?

22           MR. CRYSTAL:  NMFS.  Yes, I'm sorry.  The National

23   Marine Fishery Service.

24           THE COURT:  NMFS.

25           MR.  CRYSTAL:  NMFS.  I apologize for the acronym.

1          THE COURT:    And the Coast Guard?

2          MR. CRYSTAL:    And the Coast Guard. Those two federal

3     agencies have the principal authority and responsibility to

4     protect right whales from ship strikes, and plaintiffs' claims

5     in this case concern the failure of each of those agencies to

6     fulfill their mandates in that regard.

7          What I'd like to do this morning is first discuss

8     plaintiffs' claims against NMFS, the National Marine Fishery

9     Service, and then turn to plaintiffs' claims against the Coast

10    Guard.

11         Your Honor, in 2001, NMFS commissioned a report

12    concerning the best way to address this problem of ship

13    strikes, and the report, which is Exhibit 6 in the plaintiffs'

14    exhibits submitted with our summary judgment brief, concluded

15    that one of the principal measures that would protect right

16    whales would be speed limits in areas of high right whale

17    concentrations. If vessels are traveling at slower speeds,

18    there is more opportunity for right whales to get out of the

19    way and more opportunity for ships to get out of the way, and

20    it also reduces the chances of a right whale getting sort of

21    sucked into a ship given the way that wave patterns work, and

22    this is all described in that Exhibit 6.

23         Now, three years later in 2004, NMFS issued an

24    advance notice of proposed rule-making concerning vessel speed

25    limits in these areas of high right whale concentrations.

5

```
 1    There are seasonal limits.   So the speed limits take place

 2    during certain times of year when right whales are expected to

 3    be in certain areas given their migration patterns from off

 4    the coast of Florida and Georgia, north to off the coast of

 5    New England and Canadian waters. They proposed -- they put out

 6    this advanced notice of proposed rule-making, but it didn't

 7    move forward and right whales continued to be struck.

 8              Over the following several years, numerous groups,

 9    including the presidentially-appointed Marine Mammal

10    Commission -- that's our Exhibit 16, numerous professional

11    scientists, that's our Exhibit 10 -- advocated to NMFS that it

12    needed to impose emergency measures that would be in place

13    until the agency could finally promulgate permanent

14    regulations imposing these speed limits. Nothing happened.

15              Finally, in May of 2005, the plaintiffs in this case

16    submitted a formal rule-making petition under the APA asking

17    the agency to impose emergency speed limits until such time as

18    the agency could promulgate final regulations. Now, as Your

19    Honor knows from reading the briefs, since we started briefing

20    this case, the agency has actually issued proposed regulations

21    regarding these speed limits; and in fact, the defendants have

22    asked Your Honor not to rule on our claim concerning emergency

23    measures on that basis.  In light of the fact that proposed

24    regulations are out --

25              THE COURT: Well, what they have asked is to conclude
```

```
1   that -- to decline to act on your emergency petition or to
2   deny your emergency petition. It was not an arbitrary and
3   capricious decision because they had a rational basis for
4   doing so, and because -- maybe this wasn't their original
5   argument, but now it is, they are moving forward on the final
6   rule and it doesn't make sense to divert their resources and
7   spend their time and effort on emergency rule. And, you know,
8   on its face that doesn't sound like an unreasonable argument,
9   so long as at some point the final rule is going to issue; and
10  it is not in your client's interest or in the public interest,
11  I would say, to wait ad infinitum for something.
12          MR. CRYSTAL:  I think that's exactly right, Your
13  Honor. If I could take the second part of that first which
14  regards their suggestion that because they are moving forward,
15  regardless of the merits of our claim, that the Court should
16  either stay its hand or deny the petition on that basis. I
17  just want to make sure the Court understands that the
18  plaintiffs are not interested in sort of a hyper-technical
19  resolution of their petition.  What they are interested in are
20  regulations that will protect right whales, and if in fact it
21  were the case that the agency will complete the rule-making
22  that's currently underway, that's indicated to Your Honor in
23  the filing that it expects may be completed as early as June,
24  if it will finish that process, then we don't need a
25  resolution of our request for emergency regulations because
```

```
1    the protections will be in place during the next calving
2    season which starts in November.
3              Now, it will come as no surprise to the defendants,
4    Your Honor, that the plaintiffs will be willing to resolve
5    this claim with a binding commitment that these permanent
6    regulations will be initialized, but, barring that, the
7    question for the Court, I think as Your Honor properly framed
8    it, is what do we do this outstanding request for emergency
9    regulations in the absence of a binding commitment to finish
10   the permanent regulation process by November.  And with regard
11   to that, Your Honor, again I'd like to talk in a minute about
12   the merits of our petition, but I think the question for the
13   Court is, even if the Court agreed with us, as a question of
14   relief, what does the Court do now?
15             And again, I just want to make sure the Court
16   understands that we have a very practical approach to this.  We
17   don't want our petition remanded, assuming the Court agreed
18   with us on the merits, and, therefore, have the agencies'
19   attention diverted, which is the concern they have raised,
20   from finishing the permanent regulatory process.  And,
21   therefore, we would suggest, given now that it is March of
22   2007, and this is -- I'm sort of updating you because our
23   briefs were filed in an earlier time period -- we would
24   suggest with regard to relief, and then I'll turn to the
25   merits is that the Court craft an order that requires the
```

1    agency to issue a new and, we believe, reasoned decision on a

2    rule-making petition by August 1st.  But that, if by that

3    date, the agency completes its permanent regulatory process,

4    providing protections starting in November, that it would be

5    relieved of that obligation.  So, again, Your Honor, what

6    we're suggesting, if the Court were to rule in our favor with

7    regard to the request for emergency regulations, the agency

8    still would have no obligation to consider whether emergency

9    regulations are necessary if, by August 1st which is already

10   several months after the date they have suggested to the

11   Court, they're going to finish this process. They can actually

12   put permanent regulations in effect.

13          Now, turning to the merits of the plaintiffs'

14   request for emergency regulations.  The agency in denying the

15   rule-making petition, and this is our Exhibit 5 on Page three

16   of the NMFS administrative record, this is the entirety of

17   what they said, and I'm quoting: "Promulgating a separate 12

18   knot speed limit at this time would curtail full public

19   notice, comment, and environmental analysis, duplicate agency

20   resources for more comprehensive strategy, as well as risk

21   delaying implementation of the draft strategy." And our

22   contention, Your Honor, is that, under the APA and under the

23   case law, principally the Ling case which we cite in our

24   briefs, that explanation does not satisfy the APA requirements

25   of a reasoned decision on a request for rule-making in light

1    of the agencies' overarching mandate under both the Endangered

2    Species Act and the Marine Mammal Protection Act to protect

3    right whales, and I would like to take each of their principal

4    rationales in turn, briefly.

5             First, they said that it would curtail public notice

6    and comment, and they raised a concern about that. Well, Your

7    Honor may have noticed that the agency doesn't actually really

8    defend their decision on that basis in the briefs, and that

9    may be because, in the administrative records, and I refer

10   Your Honor to Page 154 of the NMFS administrative record, this

11   is an e-mail from the agency discussing how they were going to

12   handle the petition, and one of the agency officials said, and

13   I quote: "Seeking comments would be quote 'a bit disingenuous.

14   We have received comments on the ship strike strategy and have

15   held many public meetings. We don't need more comments.'"

16            Your Honor, again, to just put this petition in its'

17   regulatory context, there was an advanced notice for proposed

18   rule-making in 2004. Numerous interested parties, including

19   the  shipping industry, submitted comments on that advanced

20   notice;  so the agency already knew what the various parties

21   thought about the need and the urgency of emergency

22   regulations. So again, their argument that emergency

23   regulations wasn't necessary or weren't appropriate because it

24   would curtail public notice, fails for that reason.

25            In addition, as Your Honor knows, agencies can, and

1  often do, impose emergency regulations bypassing notice and

2  comment when it deems it necessary, and we've provided an

3  example for Your Honor, our Exhibit 27, where NMFS did just

4  that, finding, Your Honor, agencies, including NMFS, and this

5  is our Exhibit 28, often put request for emergency regulations

6  out for notice and comment. That is, publish a Federal

7  Register notice saying we have received your request for

8  emergency regulations; what does the public think about

9  whether they are necessary or appropriate? So the agency,

10  having done none of those things, and having just again

11  summarily rejected the petition, in our view, their rationale

12  regarding public comment just doesn't withstand scrutiny.

13          Now, the principal rationale that Your Honor alluded

14  to earlier that the agency provided was that focusing on

15  emergency regulations would divert agency resources from the

16  permanent regulatory process.  The problem with that

17  rationale, Your Honor, is that the administrative record

18  contains absolutely no analysis as to the trade off the agency

19  was making between waiting until permanent regulations could

20  be finalized versus the benefits of emergency regulations,

21  and, in that regard, the key point that the agency overlooks

22  is that if emergency regulations were imposed, right whales

23  would be protected from ship strikes until the permanent

24  regulations could be finalized.  So it's not clear why there

25  would be any concern if in fact imposing emergency regulations

1    would delay the final regulatory process, because speed limits

2    would be in place in the meantime, but, even more importantly,

3    Your Honor, again, the agency did not evaluate whether, for

4    example, by rejecting the request for emergency regulations

5    and waiting until permanent regulations could be imposed,

6    right whale ship strikes would continue to such an extent that

7    it might in fact preclude recovery of the species.  As I

8    mentioned, the agency itself has said that the species status

9    is so precarious that one death a year could preclude

10   recovery, and we've had six ship strikes in the past year.

11   And the agency had already calculated that there are an

12   average several ship strikes a year that result in mortality.

13         So we believe that if the agency had conducted the

14   required analysis, which it didn't do, about the trade off

15   that would occur in forgoing emergency regulations, it may

16   well have, and we think it inexorably would have, concluded

17   that emergency regulations are necessary. But at bottom in

18   terms of our claim, which again is APA claim concerning the

19   denial of the request, the only burden the plaintiffs have,

20   I'm not suggesting it's a low burden but just to make clear

21   how far it goes, is that the agency did not make a reasoned

22   decision; and what -- our argument is that these two

23   rationales are not a reasoned basis for the agency to have

24   denied the petition.

25         And therefore, Your Honor, again, just to conclude

1   where I began on this claim, our request is that, barring a

2   court ordered stipulation which the plaintiffs are still very

3   interested in, that would insure that permanent regulations

4   are in place before this upcoming calving season, the November

5   time frame, and we would suggest that those regulations get

6   finalized soon, barring that, we're asking for the Court to

7   remand the request for emergency regulations, to order the

8   agency to make a reasoned decision about the need for

9   emergency regulations, but to essentially provide an escape

10  clause that would say that if the agency imposes these

11  permanent regulations by August 1st, that it would be relieved

12  of the obligation to resolve the emergency rule-making

13  petition.

14          THE COURT: Well, let me -- doesn't your argument

15  lead to the conclusion that if I were to remand it, I would be

16  remanding it not for -- not with a direction to issue

17  emergency regulations, but with a direction to either issue

18  emergency regulations or to give a more reasoned explanation

19  as to why emergency regulations have not and will not be

20  issued?

21          MR. CRYSTAL:  Yes, Your Honor. As Your Honor knows,

22  with regard to the various burdens that a plaintiff would have

23  to meet, the standard for the first relief, Your Honor,

24  framed, which of course we'd love to see, which is an order

25  that they impose emergency regulations, is a very,very

1  difficult one; and, we haven't suggested to the Court that

2  this is a case where the Court would order the agency to

3  impose emergency regulations, although, again, we think that

4  would be entirely appropriate, but that's not the way we

5  presented the claim to the Court.  In part, now, of course,

6  because what we really want to see is these permanent

7  regulations get finalized. So as Your Honor suggested, what

8  we're requesting is that either the agency provide a reasoned

9  explanation regarding the rule-making petition -- and, again,

10  I think it's important for Your Honor to sort of look at it in

11  terms of the prism of what the agency will be considering.

12  Bless you, Your Honor.

13        If the agency were, in August 1st, faced with the

14  prospect that permanent regulations are not going to be in

15  place by the upcoming calving season, then it's our view that

16  the agency at that point would have to conclude that emergency

17  regulations need to be imposed. Now, the agency will make a

18  new decision.  It's possible, of course, that we could reach

19  August 1st and the ink could just not yet be dry on the

20  permanent regulations.  They could deny it on the grounds that

21  we've already sent it to the Federal Register, and it'll be

22  out in another few days. Even under that scenario, Your Honor,

23  I don't think it's safe to say there'll be no problem here.

24        What the plaintiffs want is something very

25  practical. They want to make sure that, after these many years

1    of delay, that right whales are finally provided this critical

2    protection of these vessel speed limits, be it by permanent

3    regulations or by emergency regulations, if in fact it turns

4    out that there's going to be yet another delay.  In that

5    regard, I think it's important for the Court to understand how

6    many delays there have been in this process since it's moved

7    forward.

8            THE COURT: I don't -- don't use up too much of your

9    time, because I think we really need to get to the Coast

10   Guard.

11           MR. CRYSTAL:  That's fine. If Your Honor has no

12   further questions on that claim, let me turn to the Coast

13   Guard which, I agree, is somewhat more complicated issues in

14   that claim.

15           MR. CRYSTAL: Your Honor, the Plaintiffs' claim

16   against the Coast Guard is that that agency is violating

17   section 7 (a) 2 of the Endangered Species Act, which requires,

18   and I quote, "That each agency shall ensure that any action

19   authorized, funded, or carried out by such agency is not

20   likely to jeopardize the continued existence of any endangered

21   species or result in the destruction or adverse modification

22   of critical habitat."

23           Your Honor, there's no dispute between the parties

24   that, to date, the United States Coast Guard has never engaged

25   in section seven consultation regarding the traffic separation

1    schemes that exist up and down the east coast, that right

2    whales travel through and congregate near, and that pose an

3    important threat to the species.  Now, the purpose of the

4    consultation process, as I think, as Your Honor is aware, is

5    to make sure that an agency does not act blind to the

6    consequences endangered species, and consults with the expert

7    agency, which here happens to be NMFS again, with regard to

8    the impacts of its actions, to make sure at the end of the day

9    that its  activities are not jeopardizing the species, but

10   also to evaluate those impacts and see if there's appropriate

11   mitigation that can take place to help lessen the severity of

12   those impacts.

13          The Coast Guard has presented four defenses to their

14   -- to our argument that consultation is required, and I am

15   going to take them in turn. First, they argue that they don't

16   have to consult because they don't actually set traffic

17   separation schemes; they are established by an international

18   body, the IMO, or International Maritime Organization. Second,

19   they argue, even if they have the authority, excuse me, even

20   if they set the lanes, they lack the authority under the

21   statute, the Ports and Waterway Safety Act, to take endangered

22   species into account. Third, they argue, even if we have the

23   authority, traffic separation schemes don't affect right

24   whales; and finally, they have an argument regarding the

25   statute of limitations, and whether the plaintiffs can bring

 1   their claims regarding each of the traffic separation schemes.

 2           What I would like to explain is that each of these

 3   arguments is both contrary to the cases, the statutes, and, in

 4   fact, the administrative record before the Court.

 5           Turning first to the question of who sets traffic

 6   separation schemes. Your Honor, the Court needs to start with

 7   the statute; the statute here is the Ports and Waterway Safety

 8   Act, which says, and I quote: "The secretary here, the Coast

 9   Guard, shall designate necessary fairways and traffic

10   separation schemes".

11           The Court:  I think even your brief acknowledges

12   that that's not the exclusive -- that's not the exclusive way

13   in which TSS's can be set; that some -- that there is -- you

14   would argue, they might disagree, but you would argue that

15   under that statute there is the authority, and that sometimes,

16   that's the way it is done. But that other times, it is done by

17   an international organization, the IMO. As I understood the

18   argument that you were making, there are two parts to it: one

19   is that the statute authorize it, and this is the way the

20   statute works; and -- to which they respond in part that --

21   they may disagree with you, but they go on to say, but even if

22   that's true, it's hypothetical, because in this case none of

23   the TSS's at issue in this case were promulgated and acted --

24   designated, whatever the right verb is, in that fashion. Each

25   and every one of them was done by the IMO, not by the Coast

1    Guard or any other United States agency.

2        And so one of the questions I think we really need

3    to get to here is not what this statute says is possible, and

4    may happen, and could happen, but whether or not the specific

5    claims and specific TSS's you're concerned about, were

6    actually promulgated in the way that you said the statute

7    contemplates, or in fact, whether they were all contemplated

8    elsewhere. Because if they were all contemplated by the IMO,

9    then we don't have, the argument goes, we don't have a major

10   federal action or an agency action, whatever the phrase is,

11   and that's the end of the case, either because you don't have

12   standing or because there's no agency action, and that's my

13   paraphrase of what I think one of their arguments is.

14        MR. CRYSTAL:  I understand, Your Honor. I think that

15   is their argument. I think there are several problems with

16   their argument, Your Honor.  Again, if the Court were to just

17   look, for starters, at the several traffic separation schemes

18   which are actually codified in the Code of Federal

19   Regulations, we have the Chesapeake Bay, the Delaware Bay, the

20   New York -- this is 33 CFR, Part 167. We have a situation

21   where an agency has an organic statute giving it the authority

22   to impose these traffic separation schemes has put out

23   proposed and  final regulations in the Federal Register,

24   codified in the CFR, setting traffic separation schemes and

25   then argues to a court that, that may all be very well and

1     good; we acknowledge there's authority; we acknowledge actions

2     were taken that would be arguably consistent with that

3     authority, but we didn't actually make that decision, Your

4     Honor. That was made by an international body.  Well, imagine,

5     Your Honor, if an agency were to argue to a court that the

6     reason they made a certain regulatory decision was because

7     they received a phone call from the White House that said, we

8     want this regulation in place.

9            THE COURT: Gee, it sounds like something I have been

10     reading in the newspaper.

11            MR. CRYSTAL:  Well, Your Honor, the point is, and in

12     fact Your Honor may recall, there was a time in the Bush One

13     administration where the White House got very involved --

14     there was a competitiveness counsel set up -- got very

15     involved in the regulatory process. A number of those agency

16     decisions were challenged and the agencies never even tried to

17     defend their agency decisions on the grounds that, we were

18     just carrying out someone else's bidding.

19            THE COURT: That is not what the defendants are

20     arguing in this case.  I mean, I think what they are saying is

21     -- putting the best light from your perspective on it, I think

22     what they're saying is there are two possible tracks you can

23     go down here. They may not concede this, but for the sake of

24     argument, the Coast Guard can issue, under this statute,

25     TSS's, but, in practice and it's not recent, for years,

1    decades, all or most of this has been done by the IMO or its

2    predecessor organization, whether it's international waters,

3    or waters that only touch us domestically, and that's the way

4    it has been done.  And the Coast Guard has a role to play, but

5    their role is to do a study, which they do, they pass it on.

6    The State Department negotiates, and the United States

7    government negotiates, and, ultimately, the IMO makes the

8    decision, and then the Coast Guard or somebody -- I guess it's

9    the Coast Guard -- puts a notice in the Federal Register

10   saying this is the decision that the IMO has made.

11        Now, unless you're going to argue that the

12   ministerial act of publishing a notice is an agency action

13   that has an effect, it strikes me as, you know -- you don't

14   have to consult before you publish a notice. I know you're

15   saying that the Coast Guard actually promulgated these things,

16   but there --  maybe there's an issue of fact about whether

17   that's true or not, but do you have argument that their

18   scenario is actually the way it occurred in each and every one

19   of these cases about which you complain, that you still have a

20   lawsuit?

21        MR. CRYSTAL:  Absolutely, Your Honor. Another

22   analogy that is I think is absolutely the same scenario here,

23   imagine if the Coast Guard -- because -- I have to back up for

24   just a second so Your Honor understands, and I think Your

25   Honor has sort of acknowledged this, there is nothing in the

1    Ports and Waterway Safety Act, the underlying statute, that

2    provides for this alternative scenario.  It talks about going

3    to an international body after you've made your decision. We

4    understand that apparently the agency has decided, and we're

5    not complaining about this, that they go to the IMO before

6    they actually finalize the decision; but, the question before

7    the Court is when the traffic separation scheme is established

8    in the Code of Federal Regulations, is that an agency decision

9    or pursuant to their defense? Are they carrying out a

10   ministerial decision made by someone else?

11        THE COURT: Well, you used the word established. They

12   would say we're notifying people that somebody else has

13   established.

14        MR. CRYSTAL:  Your Honor, if I could give you one

15   other analogy.  Imagine if the Coast Guard sent a map to a

16   fifth grade classroom, and said, draw on it where you think

17   the traffic separation schemes could be, and we will then put

18   that in the Federal Register and make it the traffic

19   separation schemes. And then again, they argue to a court that

20   we were just carrying out the ministerial act of someone else;

21   someone else told us to do it. Your Honor, what a court would

22   do, and if you look at the cases that the defendants cite, the

23   Franklin case, the Dalton case, the Jensen case, what a court

24   does in resolving a question like this is, it looks at the

25   statute that the agency is acting under, to see who actually

```
1    has the authority to act. The courts do not engage in sort of
2    a free floating inquiry as to what the agency may say it was
3    acting pursuant to. It has the statutory authority.
4           Now, if we were in a situation where, as a component
5    of the statute, it said alternatively the Coast Guard may
6    allow the international maritime organization to establish
7    traffic separation schemes, we may have a different scenario,
8    and, in fact, we site this on note 13 of our reply brief. The
9    international treaty that gives rise to the IMO, and I quote:
10   "The functions of the IMO shall be consultative and advisory."
11          The entire process, the international process, is
12   set up to allow domestic authorities to go to this
13   international body to seek international approval, to ensure
14   that these lanes exist on international maps. Again, the
15   plaintiffs aren't complaining about any of that; all they are
16   saying is that, at the end of the day, when the traffic
17   separation schemes, these -- the ones I'm focusing on, the
18   ones in the Code of Federal Regulations appear, that is an
19   agency action that gives rise to obligations under section
20   seven of the Endangered Species Act. In fact, the definition
21   of an agency action includes the promulgation of regulations.
22          So, Your Honor -- certainly if Your Honor is
23   sufficiently troubled by this issue, we would suggest that at
24   a bare minimum there is an issue of fact, because the
25   assertions that the agency makes in their briefs about this
```

1    issue being one that's decided by the IMO, I think Your Honor

2    will see are not supported by any citation to anything in the

3    administrative record. They give you examples of IMO traffic

4    separation schemes, but the question of whether or not the

5    agency under the Ports and Waterway Safety Act has the

6    authority and does in fact sort of delegate their statutory

7    authority and therefore is carrying out a ministerial act, I

8    don't think is supported by anything that the agency has

9    pointed the Court to.

10            THE COURT: Let's be clear on what you're saying.

11    What's not supported? The legal argument that the statute says

12    "X", or the factual question of whether the IMO did it, or the

13    Coast Guard did it, in each of the cases that you cite in your

14    complaint?

15            MR. CRYSTAL:  Well, both -- I mean, with regard to

16    -- the legal question, of course, I think is answered by the

17    statute, not the administrative record. But the factual

18    question --

19            THE COURT: You have an argument that the statute

20    says shall and, therefore, it must be the Coast Guard, and

21    they've  got to tell me why shall doesn't mean shall, and that

22    they can either delegate to, refer it to, or through treaty or

23    agreement, have agreed that it will be done by an

24    international organization. When we get beyond that very

25    simple question of statutory instruction treaties,

1    international law, foreign relations, we get to the facts.

2    And the facts are, you have --  you have listed in your

3    complaint six TSS's.   They have listed -- they have dealt

4    with of them in footnote 11 of their reply brief, and maybe

5    they've dealt with others of them elsewhere.  But each of you

6    cite parts of the administrative record, CFR, Federal

7    Register, as to what happened, what really happened.

8    Now, you just made a statement that there's nothing in the

9    administrative record that supports their position, and the

10   question is whether you're talking about those six or however

11   number of TSS's are involved in this case as a matter of fact.

12   Is that what we're talking about 'cause, if so, we ought to

13   talk about it?

14         MR. CRYSTAL:  Yes, well, the point I'm making with

15   regard to the administrative record is there are assertions in

16   the record, with regard to this particular issue. So maybe it

17   is really more of a legal matter than a factual matter. That

18   traffic separation schemes are not established by the Coast

19   Guard, they are established by the IMO.

20         THE COURT: Right.

21         MR. CRYSTAL:  That argument, which I think again is

22   really more of a legal argument or maybe a defense to our

23   request that the Court actually look at the statute here, is

24   not supported by, in our view, the administrative record

25   because the administrative record does not contain, for

24

1     example, some international agreement concerning  the

2     establishment of traffic separation schemes. In fact, as I

3     pointed out, the international treaty concerning the IMO

4     specifically says that the IMO's role is consultative and

5     advisory. It doesn't say that the IMO has the authority under

6     international law to make decisions about traffic separation

7     schemes. So that's what I am trying to suggest is not

8     supported by the administrative record. But, Your Honor, our

9     sort of threshold argument, just so -- I don't want to divert

10    the Court too much on that point -- is that in resolving this

11    inquiry, when the Court looks at the cases that defendants

12    cite, the Court will see that what the sort of traditional

13    tools that a court uses to resolve this inquiry is to look at

14    the statute under which the agency is acting.

15         Now, just one other point I want to make, which is

16    that there's sort of a question lurking in here about when the

17    agency goes to the IMO and when consultation might be

18    necessary. As Your Honor knows, the agency doesn't dispute

19    that it undertakes a process called port access routing

20    studies, or PARS. Those are, again, a creature of the statute

21    and are the precedents, or precursor, excuse me, to actually

22    making decisions about traffic separation schemes. So the

23    agency isn't suggesting to the Court that they are engaged in

24    a completely separate process outside of the Ports and

25    Waterways Safety Act. Conveniently, what they are arguing is,

1    we follow the statute up until the time we make the decision

2    that the plaintiffs may be able to sue us over, and at that

3    juncture, we delegate it to something else. And that's what

4    I'm suggesting, Your Honor, isn't supported by the statute or

5    the administrative record.

6           THE COURT: Those are two separate questions.  You

7    say it is not supported by the statute because the statute

8    says "shall".

9           MR. CRYSTAL:  Uh-huh.

10          THE COURT: They say that there are two different

11   ways that they could do this: one is under that statute where

12   the Coast Guard does it; the other is to do all the

13   preliminary work and then pursuant to international agreement,

14   to let the IMO make the decision. That's the legal question;

15   is there authority to do that, outside the statute or within

16   the statute, or separate and apart from the statute, because

17   we have the right to enter into treaties, if it was a treaty,

18   or I can't remember if it's a treaty or an international

19   agreement, or a memorandum of understanding.

20          MR. CRYSTAL:  It's a convention, Your Honor.

21          THE COURT: Convention. Then we have the factual

22   question, if they can do it.  Are you saying that I should sit

23   here and say, that convention is illegal, unconstitutional,

24   and inconsistent with the statute, and therefore under the

25   administrative procedure act, I can do or say something?

1          MR. CRYSTAL:  No, Your Honor, we're not saying that.

2     What we're saying is that whatever step in the process the

3     agency decides to consult with the IMO, just like pursuant to

4     the statute, it's required to consult with other interested

5     parties. At the end of the day when a decision is made to

6     impose a traffic separation scheme, that is the decision of

7     the Coast Guard.  Again, they haven't pointed to any point of

8     international law or domestic statute that says the agency

9     wouldn't have the authority to disagree with the IMO, and to

10    impose a different traffic separation scheme.

11          So, their voluntary decision to, again, sort of

12    delegate their authority to this international body, our

13    position is that that can't excuse their obligation under

14    Section 7(a)2 of the ESA to make sure that the ultimate

15    decision that they are making is consistent with the

16    obligation to avoid jeopardizing species. Again, under the

17    Coast Guard's contention, traffic separation schemes can be

18    established, however it is they are established, and they

19    might jeopardize the right whale, but the Coast Guard would

20    have no obligations. And there's one case I want to point Your

21    Honor to, that we didn't really focus on for this proposition

22    in our briefs but I think it's helpful in this regard, this is

23    Metcalf vs. Daily, which is at 214 F third 1135. It involved

24    an Indian tribe engaged in whaling off the coast of -- in

25    Puget Sound, off the coast of Washington; and the issue in

1  that case was whether or not it was NMFS, the same agency, had

2  an obligation to engage in NEPA review in relation to its

3  proposal to an international body, they were with the

4  International Whaling Commission, to get approval to allow

5  this domestic whaling to occur. In that case, the government

6  didn't even argue that because we're letting an international

7  body decide, actually pursuant to an international agreement,

8  whether whaling could occur domestically. We weren't taking an

9  action.

10          So, one possibility here, we haven't really

11  presented the case this way, but I think it's perfectly

12  consistent with our argument is that when the agency pursuant

13  to the statute goes to the IMO with their proposal, if that is

14  what the Court decided, sort of the end of the process for the

15  agency, then under Metcalf v Daily, that's the agency action

16  that would require consultation. What we --

17          THE COURT: What's the agency action that would

18  require consultation?

19          MR. CRYSTAL:  The proposal to -- if they are saying,

20  we're done with this issue when we make a proposal to the

21  international body, which is exactly what Metcalf v Daily

22  concerned,  and the Court in that case said, under those

23  circumstances you have obligations, they are under NEPA, which

24  I think as Your Honor knows is a slightly more involved

25  trigger than under the ESA, which very broadly defines agency

1    action -- you have an obligation to look at environmental

2    concerns. So, again,  one possibility here if the Court has

3    sort of a concern about this final decision even though we

4    think it's absolutely clear, it's a decision of the Coast

5    Guard, is to just say, at some point in this process, you

6    start with a statute. We're all in agreement that the agency

7    does port access routing studies, that it is intricately

8    involved in the establishment of traffic separation schemes.

9    The plaintiffs' concern is not so much -- again, it is a

10   practical one. It's not so much at what point in the process

11   does consultation occur; they want to make sure that when the

12   schemes are put in place, the schemes that the Coast Guard is

13   intricately involved in, and we believe are their ultimate

14   decision, that they make sure that those schemes are not

15   jeopardizing the right whale. And we don't think that they can

16   rely on these, sort of, finer points of international law to

17   escape those responsibilities because that's what we think

18   they are doing. Because, again, they are suggesting that --

19   whatever -- they're saying, Your Honor, please ignore that

20   statute over there. Please ignore the CFR. What we actually

21   do, as a matter of fact, is we let an international body make

22   these decisions and therefore the plaintiffs have no place

23   suggesting that we play a role that would give rise to these

24   duties.

25              THE COURT: But if -- you know, we can go round and

1    round in this. But if they have authority pursuant to an

2    international convention to -- if the United States has

3    entered into an international convention so that an

4    international body is making these decision, and if that's an

5    appropriate alternative to the statute, then if the PWSA?

6          MR. CRYSTAL:  Yep.

7          THE COURT: -- doesn't come in, doesn't come into

8    play at all, or only the first part of it, we're going to do a

9    PARS but we're going to then go pursuant, I thought your whole

10   argument was that 7 (a) consultation kicks in only because of

11   the PWSA requiring to do certain things. If they are doing

12   certain things under the PWSA, then they have an obligation to

13   consult under the Endangered Species Act, Section 7 (a), but

14   if they are not acting under the PWSA, if the Coast Guard is

15   not acting at all, then they don't have obligation to consult

16   with other agencies. If there is no agency action other than

17   to do a study, and give that study to an international body,

18   then where is the obligation to consult? About which? About

19   what, is there an obligation to consult?

20         MR. CRYSTAL:  Two responses, Your Honor. Again, if I

21   could go back to one of my analogies. If an agency were -- if

22   it were true as a matter of fact that an agency,

23   extra-statutorily, had --

24         THE COURT: But -- and I don't mean to interrupt you

25   -- but if the United States has a treaty, then it's not

 1    extra-statutorily.

 2          MR. CRYSTAL:  If the United States has a treaty

 3    which says that this international body has the authority,

 4    right, and that the United States will accede to the authority

 5    of that international body in setting traffic schemes. I agree

 6    with you, we'd have a very different case here, if there were

 7    a parallel route, maybe extra-statutory, maybe it's pursuant

 8    to international agreement by which these schemes are

 9    established, but, Your Honor, the international agreement

10    doesn't say that. The international agreement says that the

11    IMO should be consultative and advisory. It doesn't say, the

12    agency has not pointed Your Honor to the actual alternative

13    scheme that Your Honor is premising the question on, that

14    provides to the agency that's both appropriate, and it has the

15    authority to set traffic separation schemes pursuant to an

16    international agreement.

17          And the other response I'd like to make to Your

18    Honor, because I know we keep saying that their argument of

19    the statue is irrelevant, but I think it's critical here that

20    Section 1230 of the statute is called "international

21    agreement."  It's not like the statute is all about domestic

22    law and there is some completely separate scheme for

23    international law, and Section 1230 (a), this is 33 USC

24    Section 1230, says the Secretary shall transmit, via the

25    Secretary of State, to appropriate international bodies or

```
1    forums, any regulation issued under this chapter for
2    consideration as international standards. Now, again, as we
3    understand the actual process, and we're not concerned about
4    this, but it appears that what the Coast Guard does is before
5    it actually makes its decision it goes to the IMO to make sure
6    that the  international body agrees, rather than waiting to
7    make its decision and then going to the international body,
8    which is how the statute is written; but, the only burdens the
9    plaintiffs have here, which I think is amply satisfied, is
10   that, however they get there, when the traffic separation
11   schemes are finally put in the federal code of regulations,
12   they are an agency action giving rise to obligations under
13   Section 7 (a) 2. That's all we're trying to suggest, Your
14   Honor. And that the agency can't, by sort of changing the
15   route by which it gets there --
16              THE COURT: All right.  I am being repetitive and
17   you're being repetitive, but if the agency action is putting
18   it in the Federal Register, or in the CFR, that's what you
19   just said, that's the agency action, then you said, and the
20   only difference is the route by they get there, that's a huge
21   difference, because if the route by which they get there is
22   that an international body makes the decision, and then they
23   just put it in Federal Register, that's very different from if
24   the Coast Guard makes the decision and then puts in the
25   Federal Register. So, it can't be putting in the Federal
```

1   Register; you don't really mean that.

2           MR. CRYSTAL:  No, I don't really mean that. I mean

3   that putting it in the Federal Register is the codification of

4   the decision.

5           THE COURT: It is the codification of the decision,

6   but we still get back to whose decision --

7           MR. CRYSTAL: -- whose decision is it --

8           THE COURT: -- and whether there is authority for the

9   -- is it the international -- is it the IMO's decision as

10  opposed to the Coast Guard, and does the IMO pursuant to

11  convention, have the authority to do it, despite what the

12  statute says; those are the questions.

13          MR. CRYSTAL:  Those are the questions, and I think

14  Your Honor will find that when it looks at the arguments the

15  Coast Guard has made, the administrative record, and the law,

16  that there is not an alternative route that the Coast Guard

17  could be taking, and that when, and this is what I meant to

18  say, Your Honor, when the traffic separation scheme finally

19  ends up in the Code of Federal Regulations, that decision is

20  made by the Coast Guard. The Coast Guard may decide to follow

21  what the IMO tells them just like they may decide to follow

22  what a group of fifth graders, or the White House orders them

23  to do. But, the question for the Court is whether or not that

24  decision is a decision made by the Coast Guard, because there

25  is nothing that requires, and that they've suggested, that

```
 1    would require that they follow what those other, any of those
 2    other delegated authorities, tell them to do. They decide to
 3    follow it, and therefore our argument is that gives rise to
 4    those duties. I think if Your Honor doesn't have anymore
 5    questions about that point, I was going to move on to -- there
 6    are several other issues.
 7              THE COURT: Well, you've been up for 45 minutes.
 8              MR. CRYSTAL: Oh, really, Your Honor.
 9              THE COURT: What are the other issues?
10              MR. CRYSTAL: Well, to be very brief, Your Honor, the
11    Coast Guard argues that, and maybe I'll just answer these all
12    with the administrative record, Your Honor, rather than to
13    talk about the legal arguments. The Coast Guard argues that
14    even if they have authority, even if they make these
15    decisions, the Ports and Waterway Safety Act doesn't give them
16    the authority to actually make these decisions; that is, to
17    take right whales impact into account in setting these traffic
18    separation schemes.  And I point Your Honor to Page 146 of the
19    Coast Guard's record, which is a biological assessment from
20    the Coast Guard, which says, quote: "Traffic separation
21    schemes may also be used to prevent or reduce the risk of
22    pollution or harm to endangered species." So, we think the
23    record and the statutes, especially Section 1224 (a), disposes
24    of the discretion argument.
25              Finally, the agency argues that, even if it has the
```

1   discretion to take them into account, these traffic separation

2   schemes don't impact right whales; and, again, if I could just

3   highlight --

4           THE COURT: 1224 (a )almost says that in verbatim.

5           MR. CRYSTAL:  Excuse me?

6           THE COURT: 1224 (a) almost says verbatim that the

7   secretary shall take into account all the relevant factors,

8   including protection of the marine environment.

9           MR. CRYSTAL:  That's certainly our contention, Your

10  Honor.

11          THE COURT:  Anyway --

12          MR. CRYSTAL:  So, their third sort of fallback

13  argument is even if they have the authority, these traffic

14  separation schemes don't impact right whales. And Your Honor,

15  again, if I could just highlight the administrative record,

16  this is Page 1086, where in a document of the Coast Guard's

17  record, they say, quote: "Extensive research on marine mammals

18  has been conducted that demonstrates and supports the need for

19  amending the TSS traffic separation scheme, and here it's the

20  Boston scheme, to help protect right whales --

21          THE COURT: Go back again. You're quoting from what?

22          MR. CRYSTAL:  I'm quoting from, actually, one of the

23  documents that the Coast Guard submitted to the IMO concerning

24  the changing of the Boston traffic separation scheme --

25          THE COURT: Yeah.

1          MR. CRYSTAL: -- to protect right whales, and in

2   submitting the information to the IMO, the Coast Guard

3   explains that research has demonstrated the need to move this

4   traffic separation scheme to protect right whales from

5   collisions with ships. So this is with reference to their

6   argument that traffic separation schemes don't impact right

7   whales.

8          THE COURT: Okay. Well, that may well support your

9   argument that it is a legitimate consideration and so forth,

10  but it also supports their argument that they're not making

11  the decision; the IMO is making that decision because that

12  part of the administrative record actually is -- actually,

13  when you look at it closely, indicates that the Coast Guard is

14  suggesting to the IMO that certain changes should be made.

15  And the IMO will decide whether or not to make the changes

16  that the Coast Guard is suggesting.

17         MR. CRYSTAL:  Your Honor, I agree that the

18  administrative -- we're not suggesting to Your Honor that the

19  IMO doesn't play a role in this process. The question is the

20  legal significance of that role. So with regard to Boston, if

21  the IMO ultimately approves the change, and therefore

22  domestically the maps are changed, the buoys are moved, all of

23  which happens under domestic law and domestic authorities, and

24  domestic ships take those actions; is that a decision of the

25  Coast Guard or is that a decision of the IMO?

1          Our contention is that, under the statute, based on

2    the administrative records, I wouldn't belabor that point. And

3    the final point, Your Honor, and I'll sit down, the Coast

4    Guard argues that we can only seek relief, assuming we get to

5    this point, as to certain of the traffic separation schemes,

6    and are suggesting in that regard, which we suggested in our

7    reply brief, is that if the Court resolves these threshold

8    legal questions in our favor, that rather than the Court go

9    scheme by scheme, that at that juncture we just have an

10   opportunity to meet and confer about the Coast Guard's

11   consulting on these schemes. Some of them have been created

12   within the past six years, therefore there's no statute of

13   limitations issue. Some of them are up for review right now.

14   So we think that, again, if the Court resolves these issues in

15   our favor, that we could work something out with the Coast

16   Guard that would set a timetable for the consultation.  We

17   think the appropriate thing would be a global consultation on

18   the entire East Coast, and what the impact of that --

19          THE COURT: I thought when you meant global, we'd get

20   all the people from the IMO here.

21          MR. CRYSTAL:  No, no, no. Just the Coast Guard, Your

22   Honor, just the Coast Guard. Your Honor, thank you.

23          THE COURT: Thank you, Mr.  Crystal.

24          THE COURT: Ms. McNeil.

25          MS. MCNEIL:  Good morning.  I have a few

1    introductory statements about updating the Court on

2    implementation of the comprehensive ship strike strategy

3    before I jump into the merits; but, first of all, we'd like to

4    make the point that NMFS and the Coast Guard certainly don't

5    dispute that ship strikes are a critical factor. Plaintiffs'

6    claims are that these two agencies are failing to fulfill

7    certain statutory duties, ignores the broader context of the

8    myriad efforts taken by both agencies over the past ten years,

9    and also the specific context and limitations of the statutes

10   and authority of issue, which certainly we were getting into

11   before.

12          But updating the Court and the parties on

13   implementation of the comprehensive ship strike strategy, as

14   you are aware, the proposed regulation was issued last summer,

15   along with the draft environmental impact statement under

16   NEPA, economic analysis, a public comment period which were

17   extended, numerous public meetings, and then in this past

18   fall, we advised the Court that NMFS anticipated possibly

19   taking action in June 2007. To update you, the draft final

20   rule has cleared the Department of Commerce and is currently

21   with the Office of Management and Budget for review; it was

22   received in that office February 20th, 2007, pursuant to

23   executive order 12(a)66, OMB has ninety days to review that

24   rule, after which it returns the rule to NMFS to address any

25   concerns or points made by OMB.

1          Also, in November of 2006, NOAH introduced new,

2    recommended routes, for vessels entering four ports: two in

3    Florida, one in Georgia, one in Cape Cod Bay. NOAH expects

4    that the voluntary adherence of mariners to these routes could

5    reduce the chance of ship strikes, especially in the sensitive

6    calving areas in the southeast.

7          THE COURT: Which areas? I'm sorry.

8          MS. MCNEIL:  I'm sorry. In the areas where the

9    mothers and calves are, in the southeast, off of Florida and

10   Georgia.  And then finally, in early December of 2006, the IMO

11   adopted the United States proposal to amend the TSS off of

12   Boston.  This will become effective on July 1st, 2007, and not

13   to necessarily delve too much into the merits, but I would

14   highlight that this doesn't require any additional action by

15   the United States to become effective. It's -- the IMO sets

16   the  July 1st, 2007 date; the charts are updated, and it goes

17   into effect whether it's published in the CFR or not by that

18   time. And turning to the merits, I had planned to address the

19   NMFS issue first, but I can address the Coast Guard issue, if

20   that is more recently -- NMFS first?

21          THE COURT: Either one. Your choice.

22          MS. MCNEIL:  Well, as plaintiffs have pointed out,

23   the Coast Guard issue certainly does take more time so maybe

24   I'll address the NMFS issue first and then we can turn to the

25   Coast Guard issue. The reasonableness of the petition denial,

1    we think, is supported, we certainly discussed two of the

2    rationales plaintiffs pointed out. They did leave out a third

3    rationale which was set forth in the letter sent to plaintiffs

4    before publication of the petition denial in the Federal

5    Register; it was also that NMFS found that plaintiffs had

6    presented no new information warranting implementation of

7    emergency speed restrictions versus implementation of the

8    comprehensive ship strike strategy. And now, plaintiffs argue

9    that the current state of the species means that anything less

10   than emergency regulations is unreasonable; that delay of a

11   comprehensive strategy is acceptable if interim regulations

12   are in place; and that public comment for emergency

13   regulations is unnecessary or irrelevant because of the prior

14   public involvement with the advanced notice of proposed rule

15   making.

16        Two points I'd like to make on that.  Bare minimum need

17   for regulations certainly does not mean that there's a

18   situation justifying departure from the normal APA rulemaking

19   process. The D.C. Circuit is quite clear on that; that

20   emergency situations they have stated are indeed rare and the

21   courts will certainly look very closely at the agencies

22   indication of good cause waiver of notice and comment under

23   the APA.  So that there must be more than a bare need for the

24   regulations, and in our papers we gave the example of even the

25   situation under the Endangered Species Act about where a

1    species is conferred the first basic initial protections of

2    the statute to be listed. Congress directed that even before

3    they get those basic protections, that the listing go through

4    the full sweep of rulemaking procedures directed under the

5    Administrative Procedure Act.

6         Also, the argument that any emergency speed

7    restrictions would be interim, that this justifies waiver of

8    notice and comment, has certainly also been addressed by the

9    D.C. Circuit. They found that, if this were the case, every

10   agency could simply issue interim regulations thereby the good

11   cause exception starting to swallow the entire rulemaking

12   procedure.

13        The second point on the prior public comment and

14   involvement in the advance notice of proposed regulations:

15   this does not certainly negate the APA requirement for

16   permanent speed restrictions to go through the entire

17   rulemaking process themselves.  Plaintiffs' position really

18   only works if the Court, and they believe that notice and

19   comment are irrelevant. To put in emergency speed restrictions

20   that are novel, complicated for enforcement reasons, and also

21   be taking notice and comment from the regulated industry

22   certainly almost makes notice and comment an empty act. Here

23   we have a situation where the APA rulemaking procedures are of

24   the highest importance.

25        It's a complex rule that cuts across the

1    responsibilities of several different federal agencies who

2    have to coordinate. It affects a huge geographic area, from

3    Florida to Massachusetts, not just the East Coast, but 30

4    nautical miles out into the open ocean. It affects every major

5    shipping point - port, sorry -- on the East Coast, and those

6    associated economies. It also impacts recreational industries

7    such as whale watching vessels, recreational fishermen, sail

8    boats and, as is relevant also with the Coast Guard, raises

9    international issues because the majority of vessels calling

10   at our ports are foreign flagged vessels. We have submitted

11   statistics in our reply brief, that I think it was 2005, 85

12   percent of the vessels calling at our ports are foreign

13   flagged.

14          So the novel proposal of speed limits and enforcing

15   these speed limits on the open ocean certainly is complex, and

16   NMFS believes is appropriately vetted through the full notice

17   and comment rule-making procedures.

18          So we believe that the petition denial is certainly

19   reasonable for those reasons. The Prudential Mutinous argument

20   that we made touched upon with plaintiffs, we haven't heard

21   their newest proposal about the August 1st deadline.

22          THE COURT: What in the normal course, if you know,

23   when OMB is finished with its review, assuming that they don't

24   come up with any significant problems, maybe that's too big an

25   assumption to make, how long does something like this finally

1    take?

2          MS. MCNEIL:  I'm not personally familiar with that.

3    I think that it  -- this is what is termed as significant

4    rule-making under the Executive Order 12(b)66.  So it's

5    certainly of more interest, the comments that NMFS has

6    received during the public comment period, certainly

7    demonstrate that it's controversial. How much longer it takes

8    NMFS to implement a final rule after receiving it from OMB is

9    really very fact specific on --

10          THE COURT: But, I mean, the comments have already

11   been evaluated and all that's happened before it went to OMB;

12   is that correct?

13          MS. MCNEIL: That's correct. The draft final rule

14   that went to OMB had cleared Department of Commerce. How much

15   input OMB wants to have on what the final rule looks like, is

16   very fact specific.

17          THE COURT: Okay.

18          MS. MCNEIL:  So, we do think this is certainly a

19   situation that, whenever they do get the rule back from OMB,

20   NMFS wants to devote all available resources to addressing any

21   concerns raised and getting these final regulations on the

22   ground, to have to take time to address plaintiffs' petition

23   denial which seeks the exact same measures which would hold

24   them up from implementing the permanent measures, we think is

25   certainly a situation where the doctrine of Prudential

1    Mutinous counsels the Court to certainly stay its hand. We

2    realize that it rare, and it is not about the technicalities,

3    whether there is case of controversy remaining; it's about

4    coordinating branches of the government and here, really,

5    what's best for the species is permanent regulations, to have

6    those go into effect as soon as possible.

7              Do you have any more questions about the NMFS issue?

8              THE COURT: No.

9              MS. MCNEIL:  All right. The Coast Guard issue, I'd

10   like to first focus exactly what we're talking about.

11             Plaintiffs' complaint challenges the six specific

12   TSS's; of those, four were established or amended within the

13   past six years.  Chesapeake Bay, Cape Fear, Delaware Bay, and

14   the new Boston TSS, which the IMO just approved the amendment.

15   These are the actions at issue. This is not altered by the

16   plaintiffs' ongoing discretion argument, as we addressed in

17   our reply brief; the line of Ninth Circuit cases that

18   plaintiff cited certainly don't conflict with the statute of

19   limitations, do not analyze the statute of limitations, and

20   certainly the Ninth Circuit has never come out and said that

21   this ongoing discretion line of reasoning trumps the statute

22   of limitations. The plain language is clear that every civil

23   action against the United States -- I mean, the six year

24   statute of limitations applies. The plaintiffs' request for

25   global consultation is certainly, I think, over reaching

1    because the Court is addressing these four issues; if, for

2    some reason, rules against the Coast Guard, this is the scope

3    of the remedy. I think if you were to order a global

4    consultation the parties might not agree, would certainly be,

5    possibly, right back here. You can head that off, I mean,

6    jurisdictionally these are the four actions that we are

7    talking about.

8              THE COURT: I thought they were six listed in their

9    complaint.

10             MS. MCNEIL:  They are six listed in the complaint;

11   two of those have not had any amendment in the past six years,

12   or were established more than six years ago. And also,

13   plaintiffs had mentioned that there are several under revision

14   which is not entirely accurate. There have been several PARS

15   studies; however, none of those, I think it's Casco Bay,

16   Buzzards Bay, and one other that were mentioned in our brief

17   -- the name eludes me.  There's been no proposal, there's been

18   no further action after those PARS; so a speculation that

19   there's going to be a new TSS or a revision to TSS, that's

20   just not a ripe action for this court. The PARS itself,

21   plaintiffs don't seriously question NMFS conclusion that the

22   PARS itself is not an agency action within Section 7. So I

23   think those -- you have both the statute of limitations

24   problem on one end, and a ripeness issue on the other, which

25   narrows us down to the four.

1    Turning to the IMO issue, whose action is it?  First

2    of all, I would like to address the statements the plaintiffs

3    made. I mean I think it is quite clear from the record that

4    the IMO is the one that has either amended or established the

5    four in question. We cited in our initial brief, Page 36 ,

6    footnote, two places in the record of IMO either adopting the

7    proposal or the amendment of the Chesapeake, the Boston, and

8    Cape Fear. I  did not address Delaware Bay because plaintiff

9    did correct me on my statute of limitations argument there, so

10   I do concede that Delaware Bay was within the six year statute

11   of limitations, but the record support for IMO adoption of

12   that can be found at Coast Guard AR 1808.

13          THE COURT: That's the Delaware?

14          MS. MCNEIL: Delaware. What is also interesting to

15   note about that is that this is a 2000 -- the record cite is

16   actually 2 CFR which gets us kind of into the whole

17   ministerial issue, but the CFR notice actually says that the

18   IMO adopted the first TSS in Delaware Bay in 1969; amended it

19   in 1976; and then later on that page, I mean, clearly if you

20   have codification in 2000, the TSS have been in existence,

21   people have been using it for years. The ministerial

22   codification --

23          THE COURT: What happened with respect to Delaware

24   Bay within the last six years?

25          MS. MCNEIL:  There was --

1          THE COURT: -- an adjustment?

2          MS. MCNEIL:  I think so.

3          THE COURT: And which CFR are you looking at?

4          MS. MCNEIL:  I'm sorry, this is the Federal Register

5    note as updating the CFR in 65 Federal Register, 12944.  I was

6    just trying to illustrate the point that, you know, even the

7    CFR recognizes that it is the IMO action that establishes the

8    TSS and adopts any amendments. Turning to -- so I think we've

9    answered the factual question of who actually has taken action

10   with respect to these. The more pressing question, I think is

11   the legal issue of, plaintiffs say that it's not possible for

12   the IMO action, that, really, they have to be established

13   through the Ports and Waterways safety Act or not at all. I

14   would note that when Congress amended the Ports and Waterways

15   Safety Act in 1978, it was the same year that they ratified

16   the convention on the safety of life at sea, which is the

17   convention under which IMO operates. It's commonly referred to

18   as SOLAS, S-O-L-A-S.

19          SOLAS member governments, including the United

20   States, do recognize IMO as the only competent body to

21   establish international routing measures, and agree to submit

22   routing measures to the IMO for adoption.  This is the

23   language of the convention.  I think Your Honor was correct in

24   saying that our position is that there are two alternative

25   avenues;  just because the Executive Branch has chosen to go

1    through the IMO process for many reasons, which I'd like to
2    touch on briefly, does not negate the PWSA. The PWSA doesn't
3    preclude establishment of TSS's through this international
4    procedure and certainly in light of the fact that the majority
5    of the vessels calling here are foreign flagged vessels, it's
6    entirely reasonable for the Executive Branch to seek routing
7    measures that are acceptable to the international community,
8    let alone to be a good faith member government of SOLAS. I
9    mean, SOLAS commits that we will submit routing measures to
10   IMO for adoption.
11            This is the Executive Branch's prerogative, to
12   decide that this is a better scheme instead of unilaterally
13   establishing domestic TSS's, and then asking IMO for their
14   rubber stamp afterwards. I'd like to also point out that
15   plaintiffs proposal that -- the United States proposal to the
16   IMO be termed the agency action on which there is
17   consultation; "a", it has problems, and we've got this
18   hypothetical, floating, what is the agency action at issue
19   here, but also the specific example of Norway that we brought
20   up in our reply brief shows that this really isn't necessarily
21   even feasible. In that situation, Norway proposed a mandatory
22   TSS to IMO of over five hundred miles off of their coast line,
23   and in the subcommittee for navigation meeting, there was
24   almost near unanimous opposition. Norway had to go back,
25   really significantly revise the proposal into seven or eight,

```
1    kind of voluntary, recommended routes, I believe, or TSS's,
2    I'm not sure which one. I can get it for you in the briefing;
3    but the point was, you know, it's not necessarily that even
4    the proposal to IMO is going to be the action that's adopted.
5    IT really is IMO involvement and action, and to require ESA
6    consultation, even on the United States government proposal
7    which raises a whole lot of foreign affairs issues, it is not
8    even necessarily still a proposal that may or may not be
9    enacted. It's the IMO's final decision on what is accessible
10   to all member governments.
11          So this, I think this Norway example illustrates
12   certainly there are complex and time sensitive aspects  of
13   international agreements, which certainly committed to the
14   firm discretion of the President under his foreign affairs
15   authority. Stepping back from that, even if the Court
16   construed that the United States proposal of the action,
17   that's action of the President, the Ground Zero case that we
18   briefed, the Ninth Circuit case, I think, is right on point.
19          THE COURT: The government actually relied on the
20   Ninth Circuit?
21          MS. MCNEIL:  Don't hold me to that, Your Honor, but
22   here that case is applicable. The Ninth Circuit found that the
23   Navy was not required to engage in ESA consultation on the
24   effects of a decision made by the President. The Navy did not
25   have to necessarily consider those effects because the Court
```

```
1   found that in the President's role there as Commander in

2   Chief, it was his decision to cite the nuclear missiles at the

3   specific location, that the Navy did not have to then engage

4   on analysis under the ESA.

5           Finally, even if the Court wants to go one step

6   further back to find some Coast Guard action, that would only

7   be the PARS. I don't think it's again questioned that NMFS has

8   concluded that the PARS is not an action under Section 7; it

9   is merely a study proposing recommendations for future

10  actions.  Also, notably during the public comment period for

11  all these PARS that the Coast Guard does, nobody has ever

12  mentioned that PARS or routing measures may impact right

13  whales. Nobody has suggested that they need to go through

14  Section 7 consultation --

15          THE COURT: -- PARS themselves.

16          MS. MCNEIL: Or the routing measures -- none of these

17  issues have ever been raised in public comment on the PARS.

18  Along the same lines, there's also nothing in the record from

19  NMFS, the expert agency, ever suggesting that even the most

20  recent amendment to the TSS in Boston should go through

21  Section 7 consultation, and they were fairly involved in

22  developing that process.  And it need not, just like other

23  TSS's here, because it is not agency action authorized,

24  funded, carried out, within the meaning of Section 7, it

25  doesn't fit within the purposes of the statute.  Brief -- do
```

1    you have a question?

2            THE COURT: Not on that.

3            MS. MCNEIL:  Okay.  Turning to the causation issue.

4            THE COURT: Which issue?

5            MS. MCNEIL:  The causation issue. We certainly have

6    raised concerns.  TSS's and other routing measures do not make

7    ship strikes anymore likely, they're not the legal cause of

8    ship strikes, nor are ship strikes an indirect effect of

9    routing measures.  Just because the cause of ship strikes,

10   which is interaction between the right whales and the ships

11   exist independently of whether there are routing measures or

12   not.  TSS's don't direct vessel traffic where there was none

13   before. They don't cause increased vessel traffic.  They're

14   supposed to be established as closely as possible to

15   preexisting vessel traffic patterns, so that the traffic is

16   there.  Plaintiffs have not pointed to anything which

17   demonstrates that TSS's increase the chance of ship strikes.

18   The studies that they cite for their effects argument are

19   general discussions of shipping lanes, shipping corridors,

20   which can, and most often do, preexist any TSS or routing

21   measure.

22            I think on the legal -- on the causation issue, the

23   Public Citizen Supreme Court case is certainly relevant. There

24   the Supreme Court held that it was inappropriate to consider

25   an agencies act the cause of an environmental effect when it

had no authority to prevent the effect.  Here, even if the Coast Guard did, for the sake of argument, establish that TSS as an issue, they would not have any authority to decrease or eliminate the amount of vessel traffic present around any port.  In fact, this case is even removed from Public Citizen because routing measures are not even a "but for" causation of ship strikes that the plaintiffs were arguing in Public Citizen.  If anything, the effect of the TSS's themselves, absent just the presence of ships in and around the ports, is mildly beneficial. They separate existing traffic into lanes thereby reducing the possibility of collisions which could leak oil or other hazardous substances into right whale habitat and waters. And in fact we do have records where the Fish and Wildlife Service commented on proposed routes in the Delaware Bay positively, and said that they thought this would be a benefit to the marine environment, the reduced risk of collision and possible resulting spills. That's Coast Guard administrative record 1727.

And finally, in the same kind of continuum of causation, TSS's are entirely voluntary in nature. The vessel master has the discretion to follow them based on a variety of factors that he has to assess everyday and the safe conduct of his vessel. The  plaintiffs have made a lot of the facts that vessels typically do comply with TSS's; this may be true and it still doesn't change the facts that IMO or the Coast Guard

1   has no control over whether vessels use the TSS.  And I'd also
2   like to --
3             THE COURT: But, where does that get you exactly? If
4   the Coast Guard, as opposed to the IMO, promulgated a TSS, it
5   would still be an agency action; and we would be here.  We
6   wouldn't be arguing no jurisdiction or -- .
7             MS. MCNEIL:  Well, the cause of ship strike is
8   vessel masters themselves.
9             THE COURT: Okay.  The causation redress-ability kind
10  of question that you're talking about?
11            MS. MCNEIL:  Right. I'd like to dispel the
12  implication, maybe, that vessels somehow -- once they're in
13  the TSS, if they encounter a right whale, they're going to
14  collide with it. I mean, they can exit the TSS, it is
15  completely voluntary, they don't have to stay --
16            THE COURT:  I'm just trying to figure out where that
17  fits into the overall argument because, if the TSS were issued
18  by the Coast Guard under the PWSA --
19            MS. MCNEIL:  Uh-huh.
20            THE COURT:  -- there would be an obligation to
21  consult under Section 7(a) of the ESA before the Coast Guard
22  issued the TSS.  Am I right so far?
23            MS. MCNEIL:  For the sake of argument --
24            THE COURT: Yeah.
25            MS. MCNEIL:  -- if we're going down that road, in

53

1    this case, this voluntary control argument, I believe, might

2    fit in on whether the TSS may affect, or what type of impact

3    it might have because there's a third party intervening actor

4    here: the vessel masters.

5         THE COURT: It would be agency action, and there

6    would be obligation to consult, whether it was an agency

7    action that affected something is the question. I mean, I'm

8    just trying to figure out analytically where we are. If you're

9    right on the IMO's and/or the statute or limitations, this is

10   all sort of irrelevant. But I'm just trying to figure out

11   which part of your argument -- where this gets me and where it

12   fits, and I guess I just am not quite following you.

13        MS. MCNEIL: Okay. This issue was raised in this --

14   you know, we think it's completely hypothetical because we're

15   not there. They are IMO actions, but, if you were to find that

16   the TSS's were a Coast Guard action, we're not necessarily

17   conceding that they would have to consult. You know, that's a

18   hypothetical that we are not going into because they are

19   clearly IMO actions, but, third party vessel masters certainly

20   cuts off, or puts a huge road block to causation or any link

21   between the Coast Guard, the potential, hypothetical Coast

22   Guard TSS and an effect to a right whale.

23        Plaintiffs have cited that several cases where

24   federal agencies have been held accountable for third party

25   actions and have been required to consult; those cases the

1    government all had some type of control, the activity

2    potentially harming the species -- wasn't going to go forward

3    in the absence of the agency action, whether it was the

4    federal highway project or whether it was a permit issuance.

5    Here, the activity harming the species, presence of vessels,

6    occurs whether there are routing measures or not. The Coast

7    Guard don't authorize shipping.

8            That line of cases also goes back to looking at

9    whether, you know, a ship strike would hypothetically be an

10   indirect effect of the TSS. We have the view of the indirect

11   effects analysis, again, in the light of the Supreme Court

12   Public Citizen legal causation, teaching the indirect effects

13   are not limitless; so, where this fits in -- I guess we're not

14   necessarily conceding even if it were an agency action, there

15   would be a duty to consult because we think there is third

16   party issue.  So unless you have any questions, I think we've

17   hit --

18           THE COURT: Let me ask you this. Let's get back to

19   the specific TSS's for a minute. You said that once you get --

20   work your way through the statue of limitations question, we

21   basically have four at issue: Boston, Chesapeake Bay, Delaware

22   Bay and Cape Fear.

23           MS. MCNEIL:  Cape Fear.

24           THE COURT: Cape Fear. First, on Delaware Bay, you

25   mentioned 65 Federal Register 12944.

1           MS. MCNEIL:  Uh-huh.

2           THE COURT: In -- that quote seems to, quote,

3    "codify" an existing TSS, if I am reading that correctly.

4           MS. MCNEIL:  Uh-huh.

5           THE COURT: And is -- is that -- does that get to my

6    -- but then you cited back to 65 and 76, things that happened

7    in 65 and 76, and I don't know if you gave me a citation to it

8    or whether it is in your brief, but what you said, I believe,

9    is that in 65, and then amended or modified or updated in 76,

10   it was the IMO that actually took the action, not the Coast

11   Guard.

12          MS. MCNEIL: uh-huh.

13          THE COURT: Is that right?

14          MS. MCNEIL:  That's correct, and those dates were on

15   the next page, 1808.

16          THE COURT: So, those are discussed in that part of

17   the Federal Register.

18          MS. MCNEIL: In the Federal Register notice.

19          THE COURT: So, essentially by codifying it or

20   publishing it, you are essentially telling me, to use the term

21   I used and as Mr.  Crystal said, it's sort of a ministerial

22   act. It's just the U.S. government publishing, the Department

23   of Transportation and Coast Guard publishing, something that

24   is to show what the IMO had done and historically how it

25   evolved; is that the way to look at that particular thing?

1          MS. MCNEIL:  That's exactly correct. For example,

2      some TSS's, it takes several years to put them into the CFR,

3      some of them I don't know that they even have a CFR

4      codification; but they certainly exist. They're on the

5      international charts. All it takes is the IMO adoption to make

6      them effective.

7          THE COURT:  There is -- there are two more I want to

8      ask you about that were not among the four that you focused

9      on, because they're in his complaint.

10         MS. MCNEIL:  Uh-huh.

11         THE COURT: And maybe you didn't focus on them

12     because of the statute of limitations argument. One is, the

13     one off of New York, and there is a Federal Register or a --

14     there is a final rule from 1987, which is at Coast Guard

15     administrative record 1284 through 1297, and maybe -- it's

16     hard for me to sort through it and you may not be able to give

17     me the answer right this minute, at your fingertips, but

18     reading it, it is not clear whether or not there's a

19     suggestion or a statement there that the Coast Guard actually

20     promulgated the New York TSS, or whether it went through the

21     IMO process. And it may be buried in there somewhere, just as

22     you've just told me that the other one, on the second or third

23     page of the administrative record cite, gives me the history

24     of it. So I raise that; maybe you or your colleagues can

25     either give me an answer before we adjourn today or not. And

1    then the last one, and this really is a question that, if I am

2    reading it right, sort of undercuts any reliance that Mr.

3    Crystal has on it, but it's also one that's in his complaint,

4    and that's the Narragansett and Buzzards Bay one, which in his

5    complaint at 63; but, if you look at the administrative

6    record, what I found, one of which you brought to my

7    attention, is Coast Guard ministerial record 1218, is a notice

8    of a PARS, and not a TSS.  But, if you look also at pages 1142

9    and 1270 of that record, it looked to me like there is no TSS

10   at all. The only thing that ever happened there was a PARS.

11   I'm not sure I'm right about that, but it is in Paragraph 63

12   of his complaint, and you didn't mention it this morning. It

13   could be in the brief somewhere, but, again, if I'm reading it

14   right, then he gets nowhere with that one.  The only thing

15   that's involved is a PARS, and so I am asking both you and Mr.

16   Crystal if I'm reading that one right.

17         I think the other ones, I'm pretty clear on, both

18   from looking at the administrative record and looking and

19   hearing what you said this morning and looking at the various

20   places on both parties' briefs and the footnotes and so forth,

21   but those two I was a little confused about.

22         MS. MCNEIL: Right.

23         THE COURT:  IS there another one?  There may be a

24   another one.  Oh, and the other one that neither side has

25   talked about here today is Portland, Maine which is in the

```
 1   complaint, and I'm not sure whether you discussed that in your
 2   brief, the plaintiff certainly did, the plaintiff certainly
 3   did, and that's another one where I'm not clear whether
 4   there's a TSS at all.  And the parts of the administrative
 5   record we looked at were 1120 and pages near there, and 1134
 6   and pages near there. So, again, I'm not asking everybody to
 7   go sorting through the administrative record in the next five
 8   minutes unless there's a quick answer to these three that I've
 9   raised.
10           MS. MCNEIL:  Well, at least on the Buzzards Bay, I
11   believe we did address that in our opening brief, and I think
12   it was in the paragraph where we were talking about ripeness,
13   that there were a few cases where there were only PARS done
14   and no additional proposals for routing measures had come out
15   of those PARS, and so we certainly raised the concern that
16   even if mentioned in plaintiffs' complaint, they certainly
17   weren't ripe for review.
18           I definitely know the Buzzards Bay one was in the
19   initial brief, and I can get you the answers on the other two.
20           THE COURT: Either this morning or later?
21           MS. MCNEIL: I will try to do it this morning,
22   definitely.
23           THE COURT: Why don't we do this? By taking a five
24   minute break, I'm not encouraging Mr.  Crystal to be
25   long-winded.
```

1          MR. CRYSTAL: No, Your Honor.

2          THE COURT: But I'll give him a brief rebuttal, and

3    then since these are cross-motions, if you have anything else

4    you want to say briefly, then you can, too.  So let's take a

5    real brief break, and I'll hear from each of you briefly.

6          **(Whereupon, there was a brief recess at this time.)**

7          THE COURT: Mr.  Crystal?

8          MR. CRYSTAL:  Thank you, Your Honor. I do promise to

9    be brief.  Your Honor, first, I'd like to address the

10   defendant's contention that the National Marine Fishery

11   Service has never suggested that consultation would be

12   necessary.  If the Court looks at Coast Guard administrative

13   record 8992 -- excuse me, that's 992.  There is a letter from

14   NMFS concerning their most recent port access routing study

15   where NMFS says, and I quote: "If and when the U.S.  Coast

16   Guard or another agency proposes to authorize, find, or carry

17   out, the PARS study recommendations, that proposal may

18   constitute an action for the purpose of Section 7(a) of the

19   ESA and may require formal or informal consultation with our

20   agency."

21          So I don't think that there's anything in the record

22   that suggests, as I think counsel was suggesting, that NMFS's

23   position here is that consultation isn't necessary.  What is

24   clear is that the Coast Guard's position is that consultation

25   isn't necessary.

1          Now, counsel also referred Your Honor to the Ground
2     Zero case, and I had mentioned some of the other cases that
3     are relevant to this point about authority, and I think Your
4     Honor will see when you look at Ground Zero and when you look
5     at Jensen and when you look at the Public Citizen case -- as I
6     mentioned earlier, all of those cases decided whose decision
7     it was based on the underlying statutes, and, Your Honor, I
8     think that there is no case that presents these kinds of facts
9     where an agency comes to a court and says that we acknowledge
10    that there are regulations in the Code of Federal Regulations,
11    but we delegated that authority or it happened some other way,
12    that we got to that result.  And, in addition, I still have
13    heard nothing from the defendants -- and there's nothing in
14    their briefs -- that shows a parallel avenue by which the
15    Coast Guard may allow an international body to make these
16    decisions.

17          So I think this Court would be the first one to be
18    deciding that an agency could go that route, and, not
19    surprisingly, we find that troubling.  Now, Your Honor, the
20    last thing I want to say on this point is that, again, we're
21    all acknowledged that at least some of these traffic
22    separation schemes are in the Code of Federal Regulations.
23    They're not in the Code of Federal Regulations pursuant to
24    international law.  Agencies put things in regulations
25    pursuant to a statute.  So, again, the agency has to be

1  suggesting that, at some point, acting under the statute they

2  go extra-statutory, and they don't interact with an

3  international body, and, then afterwards, they come back to

4  their statutory authority and publish something in the Federal

5  Code of Regulations.  And, again, we don't see anything either

6  in the record or in international or domestic law that would

7  support that route of getting to a traffic separation scheme.

8  THE COURT: You say that and maybe you can, at some

9  point, show me that, but, you know, here's one, for example,

10  167.150, off New York traffic separation schemes.  It says the

11  specific areas in the New York traffic separation scheme and

12  precautionaries are described in, and then they cite to some

13  other provisions of the CFR. It doesn't say we're doing this

14  pursuant to the PWSA.  It doesn't say we're doing this

15  pursuant to the Endangered Species Act.  It doesn't say we're

16  doing it -- it also doesn't say we're doing it pursuant to the

17  convention or the IMO, but you make this statement but why

18  isn't it possible to put something in the Code of Federal

19  Regulations, which is simply the provision of a notice of the

20  decision that's been made by an international body pursuant to

21  a convention to which we're a party.  You know, you'd have a

22  much stronger argument if she's saying the IMO did this and

23  this CFR said this is being promulgated pursuant to 33 USC or

24  section such-and-such, rather than to a convention, but it

25  doesn't say anything about -- at least the ones I found.

1           MR. CRYSTAL:  I understand, Your Honor. I guess the

2    question is sort of in the absence of that what conclusions

3    the Court reaches regarding what authority it is acting under.

4    The Coast Guard hasn't pointed to you any point of

5    international law or domestic law that provides that the Coast

6    Guard acting pursuant to international agreements can publish

7    something in the Code of Federal Regulations, whereas, we have

8    pointed you to elements of domestic law that provide for the

9    Coast Guard to publish regulations establishing traffic

10   separation schemes.

11          So, I understand Your Honor's concerns. I guess all

12   I'm trying to suggest, Your Honor, is that there is no case

13   that stands for the proposition that an agency can publish

14   regulations, but, yet avoid any responsibilities. Of course,

15   this would cover notice and comment claims over traffic

16   separation schemes; this would cover claims by the shipping

17   industry. Let's say the shipping industry didn't like a

18   traffic separation scheme.  They claimed it was arbitrary and

19   capricious because it required them to go a thousand miles out

20   of their way, and they came and sued in Federal District Court

21   after it appeared in Code of Federal Regulations. The Coast

22   Guard's defense would be, Your Honor, that's not our action;

23   they can take that up with international bodies.  We don't

24   think there's any case out there that supports that

25   proposition. So, that's our concern.

1      THE COURT: They would say the same thing to them

2   that they're saying to you.

3      MR. CRYSTAL:  Exactly, exactly. Although, I think

4   that helps crystalize the concern here, and the reason why, I

5   think, Your Honor, should be hesitant to find, especially

6   based on this administrative record, that the agency is acting

7   pursuant to some as yet unidentified international authority

8   that says that when the IMO sets lanes, we, as a ministerial

9   act, domestically implement them. But I think, Your Honor, I

10  probably have said enough on that point. I just want to make a

11  couple of other brief points responsive to defendants'

12  arguments.

13      Defendants argued that, even if the Court agreed

14  with us that they set these schemes, the traffic separation

15  schemes don't impact right whales. And, I think, earlier I

16  read Your Honor, from one of the Coast Guard's documents, and

17  this is certainly clear throughout the record, the Coast Guard

18  is moving the Boston traffic separation scheme to protect

19  right whales, so the notion that traffic separation schemes

20  have no impact on right whales is completely belied by the

21  administrative record; and, Your Honor, with regard to the

22  cases on that, there are two cases in particular: the Florida

23  Key Dear case and the National Wildlife Federation case, both

24  of which we discussed in our reply brief, which involves flood

25  insurance by the Federal Emergency Management Agency. In both

1    of those cases, the courts made clear applying --

2             THE COURT: Well, relying on FEMA is almost like

3    relying on Ninth Circuit.

4             MR. CRYSTAL: Exactly. I'm relying on FEMA; they're

5    relying on Ninth Circuit. Well, those cases both relied on the

6    Supreme Court's due power case, which I think plaintiffs rely

7    on often, stands for the proposition that where agency action

8    has important incentives to third party behavior, then courts

9    will find the agencies responsible for reasonably foreseeable

10   consequences. Here, there is no dispute that ships generally

11   travel in the traffic separation schemes established by the

12   Coast Guard, and therefore we think there can be question that

13   the establishment of those scheme is an action that may affect

14   right whales.

15            And finally, Your Honor, with regard to this

16   question about statute of limitations, Your Honor asked a

17   bunch of questions about the particular lanes.  We cited in --

18   we put in one of our exhibits, this is not in the

19   administrative record, this is our Exhibit 13, a very old

20   Federal Register notice from 1982, where the Coast Guard

21   discusses the schemes that Your Honor was asking about. So our

22   understanding is that those traffic separation schemes exist

23   and that's where, sort of, our evidence is as to their

24   existence. We agree that the administrative record doesn't

25   really have the underlying documentation regarding those, but

1    I think you'll probably hear more from the government about

2    that, one way or the other.

3        But, again, just to be clear on terms of what we

4    think should happen, we don't think the Court has to get to

5    those questions because we think that if the Court were to

6    agree with us, that consultation is necessary for traffic

7    separation schemes, we weren't asking the Court to order a

8    global consultation, just to be clear. We were suggesting that

9    the Court could remand the issue to the agency and then let

10   the parties discuss the matter; and I point Your Honor to a

11   particular case which we cite on Page 44 of our reply brief,

12   Center for Biological Diversity vs. Levitt, and that's exactly

13   what the Court did there, concerning consultation over various

14   pesticide regulations by EPA.  The Court found that there was

15   obligation to consult, and then remanded and ordered the party

16   to actually discuss how and on what timetable that

17   consultation would take place. So I think that provides a

18   roadmap to Your Honor.

19       But the last thing I'd like to say, with regard to

20   this question about traffic separation schemes that have been

21   in place for long time, is that the relevant question for

22   Section 7 of the ESA is whether the agency action may be

23   jeopardizing species. And our contention is that, as an

24   ongoing matter, these schemes -- again, the Boston one,

25   they're moving to protect right whales -- these schemes are

1    having impacts on right whales and may, in fact, be

2    jeopardizing the right whales continued existence. So, we

3    don't believe under the ESA that the agency can avoid those

4    responsibilities, continuing ongoing questions of jeopardy, by

5    invoking the statute of limitations, as long as, and this is

6    undisputable here, the agency has the authority under the

7    Ports and Waterway Safety Act, to modify those schemes in

8    order to protect right whales.

9              Thank you, Your Honor.

10             THE COURT: Thank you.

11             MS. MCNEIL:  And I, too, will be brief. To answer

12   the Court's question about the Buzzards Bay, I believe it is

13   just a PARS that is the only activity that has happened within

14   the past six years, only a PARS, no other proposals. New York,

15   there is a TSS; it is old.  That's in the record at 1284, and

16   then on Page 4 of that, it interestingly says that the

17   original New York TSS was established in 1967, was approved by

18   the IMO prior to the promulgation of the PWSA.  And then, just

19   says for consistency, they're incorporating it into the Code

20   of Federal Regulations; it says in the next paragraph, "This

21   action is administrative in nature,"; which, administrative

22   not necessarily meaning agency action, but more the meaning of

23   ministerial, as we were discussing before.

24             The question about Portland, Maine, Casco Bay is the

25   nominal reference that's just off of Portland; and that again

1    is -- a PARS is the only action that has been taken within the

2    past six years.

3            And then, just to clarify a few points Mr.  Crystal

4    touched on, to clarify, my position was that there's nothing

5    in the record that suggests that NMFS thinks that their

6    consultation was required on the Boston TSS;  not that there

7    was a specific document in the record stating that. The

8    document that the plaintiff cited, you know, is almost

9    verbatim, Section 7(a) 2, specifically stating that when any

10   agency takes an action, you know, then it would be required to

11   consult. It certainly doesn't make the jump from Coast Guard

12   action, when, in fact, the Boston TSS amendment was an IMO

13   action that was just approved in December.

14           Also, it's not necessary to demonstrate that there's

15   an approved, parallel, international process.  It's the

16   President's decision under his foreign affairs authority to

17   either go the IMO route, or the Coast Guard can go under the

18   PWSA route.  And, again, plaintiffs are mixing apples and

19   oranges.  It's not the Coast Guard going some

20   extra-territorial route.  It's the United States government,

21   as a whole, acting under the executive branch, acting under

22   the President's foreign affairs authority. There is an

23   applicable convention, and I don't think that the United

24   States government is required to prove that convention

25   specifically supercedes the PWSA by name.

```
1              Also, on the may effect point that Mr.  Crystal
2    raised about the IMO amending the Boston TSS at the proposal
3    of the United States government, again, it is not the Coast
4    Guard moving it, it's the IMO; and, the fact that the United
5    States government has taken a beneficial, affirmative action
6    to aid right whales does not necessarily equate to the
7    argument that TSS's, let alone these other three that are at
8    issue, necessarily effects right whales, or the legal cause.
9    Again, that's key point that we have to come back to, with the
10   teaching of the Supreme Court in the Public Citizen case. The
11   Key Dear and the National Wildlife Federation case is cited by
12   plaintiffs, look at this indirect effects analysis, but the
13   Supreme Court clearly says that indirect effects analysis is
14   bounded by a legal causation analysis, and it won't
15   necessarily hammer home the point that we don't think there is
16   legal cause here.
17              And, finally, on the remedy, I don't think you need
18   to get to a situation plaintiffs mentioned in the Levitt case
19   because, again, here we're only talking about four TSS's that
20   have had any amendment or establishment within the six year
21   statute of limitations. I think that's all I have, unless you
22   have any further questions?
23              MS. MCNEIL:  Thank you.
24              THE COURT: I have a request for each of you, though,
25   but it flows from your last point. You say only four TSS's
```

1    because of the statute of limitations, assuming I agree with

2    you on the statute of limitations, but even if I don't agree

3    with you, I think we're only talking about a total of eight

4    TSS's.  There are six listed in Paragraph 63 of the complaint.

5    Then, there are two additional ones that we've talked about:

6    one is in Cape Fear, which you mentioned, and then there's

7    also -- although this may be related to one that is mentioned

8    in the amended complaint, this may also be a separate one --

9    the southern approach to the Chesapeake Bay, and it may be

10   part of what's in the amended complaint, or it may be an

11   additional one, I'm not clear.

12        So, just so I'm clear what I'm saying, we have six

13   mentioned in the amended complaint; we've got the Cape Fear

14   one, which you both agree is worth talking about; and then I

15   have identified the southern approach to Chesapeake Bay, which

16   may or may not be separate from the one that's in the amended

17   complaint. In trying to analyze these, the primary place I

18   have looked to see where in the administrative record to look,

19   which is generally either Federal Register sites or Federal

20   Register excerpts or -- I've relied on footnote 11 of the

21   defendants' brief, and Pages 15 and 16 of the plaintiffs, and

22   I, therefore, may have missed something that you think is

23   relevant. I mean what I am trying to do is to get myself -- I

24   know Mr. Crystal doesn't want me to go down this road because

25   he thinks there are a lot of other arguments that mean I that

1    shouldn't even get here.  But I'm still trying to focus, at

2    least for one aspect of this, as to whether it's the IMO or

3    whether it's the Coast Guard in the history of these seven or

4    eight TSS's.

5            So I would appreciate it if you all could give me

6    either a chart or a supplement to your statement of material

7    facts or something which leads me to -- and if you need to

8    append them -- if I can find them easily, you don't need to

9    append them or if they're already in the administrative

10   record, you don't need to append.  If both sides would give

11   me, either jointly or separately, a list of every citation

12   that's relevant to each of these eight things for me to see

13   what's there.  Is it the Coast Guard or is it the IMO?

14           Now, it still doesn't get me -- it doesn't resolve

15   the legal question, but if I am -- if I agree with the

16   defendants' legal analysis, they still may win on some and

17   lose on some, if some of them were actually promulgated, or

18   amended, or modified, by the Coast Guard, rather than the IMO.

19   And there may be other ways to analyze it that you win some

20   and lose some.  I'm not sure.  But for me at least -- and

21   maybe I'm going down the wrong road here -- for me at least,

22   it was helpful, although, it came late in the day, to focus on

23   exactly what's at issue in this case, and there are, according

24   to the defendant, four TSS's; according to the plaintiff,

25   somewhere between six and eight.

1           And I don't want to be -- if I do get to the point
2   of focusing on them, I don't want to be unfair to either side
3   by missing relevant parts of the CFR, the Federal Regulation,
4   or whatever else answers the factual question. I mean,
5   frankly, one of the things that crossed my mind as I was
6   reading all this stuff, even though this is an administrative
7   agency case, it is also a summary judgment case, and while one
8   doesn't normally do this on administrative agency cases -- you
9   always do it in summary judgment cases -- you ask yourself the
10  question, are there genuine issues and material fact? And, if
11  I really get to the fact piece of it, does it go back for -- I
12  hate to use this word in administrative agency cases in the
13  presence of government lawyers -- does it go back for
14  discovery or some other way to resolve genuine issues of
15  material fact, or, at the end of the day, are there really no
16  genuine issues of material fact. Or let me put it another
17  way. You may think, you may think, there are genuine issues
18  of material fact, but if I sit down and read all the CFR or
19  Federal Register citations that each side gives me, can I by
20  doing that determine if there are genuine issues of material
21  issue fact or whether it's really answered by reading this
22  stuff?
23          So is that clear, what I'm trying to say? So do you
24  think you all -- I don't think this is big project because
25  most or all of it is probably buried in your -- I hope you

1    don't mind I use the word "buried" -- in your briefs or

2    someplace in all this stuff that you have given me.

3                MS. MCNEIL: I think so. When would you like that?

4                THE COURT: Can you do it in a week?

5                MR. CRYSTAL:  Absolutely, Your Honor. Yes, I think

6    we can definitely do that.

7                MS.MCNEIL: Sure.

8                MR. CRYSTAL: I think that would be helpful to the

9    court.

10               THE COURT: It might be helpful depending upon where

11   I go with the rest of the analysis.

12               MR. CRYSTAL:  I just wanted to mention, Your Honor,

13   with regards to the last point you made, we also have -- we

14   did submit a Rule 56(f) declaration exactly along the lines of

15   what Your Honor is suggesting, if once Your Honor looked at

16   all this and still had some questions pointing to the things

17   that we'd be entitled to submit for further information about

18   it.

19               THE COURT: I remember that as well; and, as I say,

20   everything I want, or almost everything may be in these

21   volumes someplace, but it may not be.  So I think that may be

22   helpful. Anything else?  Okay.  Thank you.  It has been

23   interesting, both the preparation for the argument and the

24   argument have been interesting.  I know I've got some law

25   students here who came to watch this argument, and give me

1    five minutes and I'll come back and we'll talk, if you've got

2    time. We'll talk about this argument. We'll talk about other

3    things I do.  So I'll come back in about five minutes.  I

4    won't tell them how I'm going to decide the case.

5                      [END OF PROCEEDINGS]

6

7                   C E R T I F I C A T E

8

9         I, Wendy C. Ricard, Official United States Court

10    Reporter in and for the District of Columbia, do hereby

11    certify that the foregoing proceedings were taken down by

12    me in shorthand at the time and place aforesaid,

13    transcribed under my personal direction and supervision,

14    and that the preceding pages  represent a true and correct

15    transcription, to the best of my ability and

16    understanding.

17

18

19

20    _Wendy C. Ricard_

21    Wendy C. Ricard, CCR, RPR

22    Official U.S. Court Reporter

23

24

25