# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued May 13, 2008        Decided July 18, 2008

No. 07-5278

DEFENDERS OF WILDLIFE, ET AL.,
APPELLANTS

v.

CARLOS GUTIERREZ, SECRETARY, DEPARTMENT OF
COMMERCE, ET AL.,
APPELLEES

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED   JUL 1 8 2008

CLERK

———

Appeal from the United States District Court
for the District of Columbia
(No. 05cv02191)

———

*Howard M. Crystal* argued the cause for appellants. With
him on the brief was *Eric R. Glitzenstein.*

*Sambhav N. Sankar*, Attorney, U.S. Department of Justice,
argued the cause for appellees. With him on the brief was
*Andrew C. Mergen*, Attorney.

Before: SENTELLE, *Chief Judge*, HENDERSON and
RANDOLPH, *Circuit Judges.*

Opinion for the Court filed by *Chief Judge* SENTELLE.

2

SENTELLE, *Chief Judge*:  This case concerns the North Atlantic right whale (*Eubalaena glacialis*) ("right whale") and the role of National Marine Fisheries Service ("NMFS") and the Coast Guard in the federal government's efforts to protect the species from extinction.  Appellants, composed of several environmental groups and one whale researcher, challenged NMFS's denial of a petition for emergency rulemaking and the Coast Guard's failure to consider the impact of some of its actions on the right whale.  The district court granted summary judgment to the agencies.  We affirm the district court's grant of summary judgment to the agencies on the challenge to the petition denial but reverse its summary judgment order relating to the Coast Guard's actions.  We remand to the district court for further proceedings.

## I. Background

Right whales are mostly black in color, generally grow up to 45–55 feet in length, and can weigh up to 70 tons.  Proposed Endangered Status for North Atlantic Right Whales, 71 Fed. Reg. 77,704, 77,705 (Dec. 27, 2006) ("Proposed Endangered Status").  Right whales are so named because, historically, they were considered the "right" (correct) whale to hunt due to their close proximity to coastlines, their relatively slow speed, the prized oils they contain, and the large volume of blubber that gives them a tendency to float when dead.  U.S. Army Research Office, Endangered Species Act Biological Assessment for the U.S. Atlantic Coast, at 3-2 (Aug. 1, 1995) ("Biological Assessment").  By the early twentieth century, the right whale population was so depleted that both the League of Nations (in 1935) and the International Whaling Commission (in 1949) banned all whaling of them.  NMFS, Final Environmental Impact Statement for Amending the Atlantic Large Whale Take Reduction Plan: Broad-Based Gear Modifications, Vol. I, at 9-6 & n.2 (Aug. 2007), *available at* NOAA Fisheries Service: 2007

3

Final ALWTRP Modifications, http://www.nero.noaa.gov/nero/
hotnews/whalesfr (follow "9.0 Cumulative Effects Analysis"
hyperlink) (last visited June 30, 2008).

Relatively recent population estimates show around 300
remaining right whales. Proposed Endangered Status, 71 Fed.
Reg. at 77,705. The population does not reproduce rapidly;
females are not mature reproductively until they reach the age
of eight and even then reproduce at a rate of one calf every four
years. Biological Assessment, at 3-6 to 3-7. Recent estimates
show a mortality rate of at least four percent per year, which,
combined with the low birth rate and already low population
levels, "mak[e] it one of the most critically endangered large
whale species in the world." Proposed Rule To Implement
Speed Restrictions To Reduce the Threat of Ship Collisions with
North Atlantic Right Whales, 71 Fed. Reg. 36,299, 36,300 (June
26, 2006) ("Proposed Rule"). Right whales were first listed as
"endangered" under the Endangered Species Conservation Act
of 1969, Pub. L. No. 91-135, 83 Stat. 275, the precursor to the
Endangered Species Act of 1973 ("ESA"), 16 U.S.C. § 1531 *et
seq.*, which is the Act under which they are now listed. *See* 50
C.F.R. § 17.11 (listing the North Atlantic right whale as
endangered under the ESA); *see also* 35 Fed. Reg. 8491, 8495
(June 2, 1970) (listing the right whale as endangered pursuant to
the Endangered Species Conservation Act). Right whales are
also listed as "depleted" under the Marine Mammal Protection
Act of 1972 ("MMPA"), 16 U.S.C. § 1361 *et seq. See* 38 Fed.
Reg. 20,564, 20,570 (Aug. 1, 1973) (listing the right whale as
"depleted").

Right whales are migratory mammals. They generally
spend spring, summer, and fall in New England waters near
Massachusetts, Rhode Island, and Maine, but some whales have
been spotted as far north as Greenland. Proposed Endangered
Status, 71 Fed. Reg. at 77,705. Their only known wintering

4

location is along the southeastern U.S. coastline near Georgia and Florida, which is where some females go to calve. *Id.* National Marine Fisheries Service designated these areas—the Great South Channel east of Cape Cod, Cape Cod and Massachusetts Bays, and the southeastern United States off the coasts of southern Georgia and northern Florida—as right whale "critical habitat." 50 C.F.R. § 226.203 (listing right whale critical habitat); *see* 16 U.S.C. § 1533(a)(3)(A) (giving the Secretary of Commerce authority to designate critical habitat); *id.* § 1532(5)(A) (defining "critical habitat").

Some of the areas labeled by NMFS as "critical habitat" for right whales are dense with shipping traffic. *See* Right Whale Ship Strike Reduction Strategy Notice of Intent To Prepare an Environmental Impact Statement and Conduct Public Scoping, 70 Fed. Reg. 36,121, 36,121 (June 22, 2005) ("Notice of Intent") ("Right whales are located in, or adjacent to, several major shipping corridors on the eastern U.S. and southeastern Canadian coasts."); Proposed Rule, 71 Fed. Reg. at 36,306 (describing shipping traffic in the bays and channels near Boston, Massachusetts). Ship strikes are "the greatest source of known deaths" of right whales. Proposed Rule, 71 Fed. Reg. at 36,300. They "are responsible for over 50 percent of known human-related right whale mortalities and are considered one of the principal causes for the lack of recovery in [the right whale population]." Notice of Intent, 70 Fed. Reg. at 36,121.

There are two primary agencies whose actions appellants challenge in this case. The first agency is National Marine Fisheries Service, which is an arm of the National Oceanic and Atmospheric Administration, which, in turn, falls within the Commerce Department. NMFS is one of the agencies to which the Endangered Species Act and Marine Mammal Protection Act delegate enforcement. *See* 16 U.S.C. § 1533(a)(1) and *id.* § 1532(15) (delegating to the Secretary of Commerce, of which

5

NMFS is part, the duty to identify endangered species); *id.*
§ 1362(12)(A)(i), (B) (delegating to the Secretary of Commerce,
and the National Oceanic and Atmospheric Administration
within that agency, authority over the Marine Mammal
Protection Act with respect to whales). The second agency is
the United States Coast Guard, a part of the Department of
Homeland Security. The Coast Guard is the main agency
responsible for effectuating the Ports and Waterways Safety Act
of 1972 ("PWSA"), 33 U.S.C. § 1221 *et seq.*, under which it has
the duty to designate vessel routing measures "to provide safe
access routes for the movement of vessel traffic" coming in and
out of ports, *id.* § 1223(c)(1).

On June 1, 2004, NMFS issued an Advance Notice of
Proposed Rulemaking requesting comments on proposed
regulations that aim to reduce the likelihood of right whale ship
strike mortalities. Advance Notice of Proposed Rulemaking
(ANPR) for Right Whale Ship Strike Reduction, 69 Fed. Reg.
30,857 (June 1, 2004) ("ANPR"). The agency noted that despite
its efforts to notify mariners of right whale sightings and ship
strikes, impose mandatory ship reporting systems, collaborate
with the Coast Guard, and take other measures, "right whales
continue to be killed as a result of collisions with vessels." *Id.*
at 30,858. Because of these failings, the agency recognized
"that this complex problem requires additional, more pro-active
measures to reduce or eliminate the threat of ship strikes to right
whales." *Id.* Without additional measures, the agency noted
that "[r]ecent modeling exercises suggest that if current trends
continue, the population could go extinct in less than 200 years"
and that "the loss of even a single individual may contribute to
the extinction of the species . . . ." *Id.* It further noted that
"according to the models, preventing the mortality of one adult
female a year alters the projected outcome." *Id.* The agency
proposed, *inter alia*, to impose speed limits on vessels 65 feet
and longer traveling in areas when right whales are present in

6

significant numbers, and invited comments on its proposal. *Id.* at 30,858, 30,861.

On May 19, 2005, Defenders of Wildlife, The Humane Society of the United States, Ocean Conservancy, and others submitted a petition for emergency rulemaking to NMFS pursuant to 5 U.S.C. § 553(e). Petition for Initiation of Emergency Rulemaking To Prevent the Extinction of the North Atlantic Right Whale to the Secretary of Commerce, the Administrator of the National Oceanic and Atmospheric Administration, and the Assistant Administrator for Fisheries at NMFS (May 19, 2005) ("Emergency Rulemaking Petition"); *see* 5 U.S.C. § 553(e) (requiring agencies to "give an interested person the right to petition for the issuance, amendment, or repeal of a rule"). The petition, among other things, requested "emergency regulations [that] require all ships entering and leaving all major East Coast ports to travel at speeds of 12 knots or less within 25 nautical miles of port entrances during expected right whale high use periods." Emergency Rulemaking Petition, at 3–4. Just over six months after the petitioners requested an emergency rule, NMFS published its denial. Petition To Initiate Emergency Rulemaking To Prevent the Extinction of the North Atlantic Right Whale; Final Determination, 70 Fed. Reg. 56,884 (Sept. 29, 2005) ("Denial of Emergency Rulemaking Petition").

At the same time the petitioners were pursuing an emergency rulemaking petition with NMFS, Defenders of Wildlife, The Humane Society of the United States, Ocean Conservancy, and Regina Asmutis-Silvia (together, "appellants") were challenging the Coast Guard about a series of purported omissions regarding its duties under the Endangered Species Act. On November 3, 2005, appellants sent a 60-day notice letter to the Coast Guard pursuant to the citizen-suit provision in the ESA, 16 U.S.C. § 1540(g), notifying the

agency that it was violating ESA section 7(a)(2), 16 U.S.C.
§ 1536(a)(2), by failing to consult with NMFS about the impact
its regulation of commercial shipping has on right whales, "and
therefore failing to insure that this vessel traffic is not likely to
jeopardize the continued existence of the species" and its
habitat. Am. Compl. ¶¶ 71, 72. The letter also maintained that
the Coast Guard was violating its ESA section 7(a)(1), 16 U.S.C.
§ 1536(a)(1), obligation "to carry out programs for the
conservation of the right whale." Am. Compl. ¶ 73. Appellants
noted that the Coast Guard has authority to control vessel
movement pursuant to 33 U.S.C. § 1223 and to take into account
"environmental factors" while doing so, id. § 1224(a)(6). They
requested that the Coast Guard use this authority to protect the
right whale. Am. Compl. ¶ 73. They also argued that the
agency was violating ESA section 9, 16 U.S.C. § 1538, by
establishing and maintaining vessel shipping lanes in areas
inhabited by right whales, effectuating the "take" of the marine
mammals. Am. Compl. ¶ 74. The record contains no response
to the notice letter. See id. at ¶ 75.

On November 9, 2005, appellants filed this action against
Secretary of Commerce Carlos Gutierrez, then-Assistant
Administrator for NMFS William T. Hogarth, Secretary of
Homeland Security Michael Chertoff, and then-Commandant of
the U.S. Coast Guard Admiral Thomas H. Collins (together,
"appellees").

Appellants' first claim was directed against NMFS,
contending that its denial of the emergency rulemaking petition
was "arbitrary, capricious, an abuse of discretion, or otherwise
not in accordance with law." 5 U.S.C. § 706(2)(A). Appellants
contend that the agency violated ESA section 7(a)(1), 16 U.S.C.
§ 1536(a)(1), which requires the agency to utilize its authority
to further the purposes of the ESA by carrying out programs to
conserve the right whale, and section 1382(a) of the Marine

8

Mammal Protection Act, 16 U.S.C. § 1382. Am. Compl. ¶ 77. They asked the court to declare that NMFS violated the ESA and the Administrative Procedure Act, to vacate and remand the denial of their Emergency Rulemaking Petition, and, if the agency should grant the emergency petition on remand, to enjoin the agency to issue emergency regulations within 60 days. *Id.* at ¶ 82(1)–(3).

Appellants' second claim was primarily directed against the Coast Guard, contending that it had violated and was continuing to violate ESA sections 7(a)(1), 7(a)(2), and 9, 16 U.S.C. §§ 1536(a)(1), (2), 1538, with respect to right whales, and requesting that the court direct compliance with those provisions. Am. Compl. ¶¶ 79–81, 82(4)–(7). Specifically, they asked the district court to enjoin the Coast Guard to consult with NMFS within 90 days about the impact of commercial shipping on right whales and to direct that NMFS issue a biological opinion within 45 days of the consultation. *Id.* at ¶ 82(5).

On June 2, 2006, appellants moved for summary judgment, and on June 25, 2006, NMFS published its highly anticipated proposed ship strike rule. Proposed Rule, 71 Fed. Reg. 36,299. Approximately three weeks later, appellees filed a cross motion for summary judgment. On October 25, 2006, noting that NMFS had published its proposed ship strike rule, the district court ordered counsel for NMFS to "inform the Court within 10 days of the date of this Order when the final rule will issue." *Defenders of Wildlife*, No. 05-2191 (D.D.C. Oct. 25, 2006) (order). On November 13, 2006, appellees responded, explaining that NMFS must

respond to over 10,000 public comments received on its proposed rule, consult with other Federal agencies affected by this rule, consult with itself for purposes of Section 7 of the ESA, finish a final environmental

impact statement and record of decision, and wait 30 days prior to implementation of the proposed ship strike measures . . . .

Defendants' Response to the Court's October 25, 2006 Order at 1–2, *Defenders of Wildlife*, No. 05-2191 (D.D.C. Nov. 9, 2006). The agency estimated that it would "tak[e] final action on the proposed rule in June 2007." *Id.* at 2. In a hearing held on March 16, 2007, counsel stated to the district court that "the draft final rule has cleared the Department of Commerce and is currently with the Office of Management and Budget for review . . . ." Transcript of Hearing at 37, *Defenders of Wildlife*, No. 05-2191 (D.D.C. Mar. 16, 2007). Counsel also stated that the Office of Management and Budget received the draft final rule on February 20, 2007, and that pursuant to Exec. Order No. 12866, 58 Fed. Reg. 51,735 (Oct. 4, 1993), that office has 90 days to review the rule and return it to NMFS. Transcript of Hearing at 37.

On April 5, 2007, the district court granted appellees' cross motion for summary judgment and denied that of appellants. *Defenders of Wildlife v. Gutierrez*, 484 F. Supp. 2d 44 (D.D.C. 2007). The district court rejected appellants' challenge to the agency's denial of the rulemaking petition, explaining that

> [w]hile NMFS' explanation may have been lacking in detail, and may not represent the policy choices that the plaintiffs might make, the Court cannot conclude that NMFS "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency or [was] so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

10

*Id.* at 54 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The district court also held that appellants failed to identify any "final agency action[] of the Coast Guard reviewable by the Court." *Id.* at 55. Because judicial review requires agency action, the district court granted appellees' motion for summary judgment on this issue as well. *Id.* at 56.

On April 10, 2007, appellants filed a motion for reconsideration in the district court, arguing primarily that the district court did not have a complete administrative record on which to base its decision. Plaintiffs' Motion for Reconsideration of the Court's March 30, 2007 Order and April 5, 2007 Opinion, No. 05-2191 (Apr. 10, 2007). The district court denied their motion on June 29, 2007. Order, No. 05-2191 (June 29, 2007). On August 16, 2007, appellants filed a notice of appeal from both the summary judgment order and the denial of their motion for reconsideration. Notice of Appeal, No. 05-2191 (Aug. 16, 2007).

## II. Analysis

As with all summary judgment dispositions, we review the district court's denial of appellants' motion for summary judgment and grant of appellees' cross motion for the same *de novo. See Flynn v. Dick Corp.*, 481 F.3d 824, 828 (D.C. Cir. 2007). We also apply the same standard of review applicable to the underlying claims in the district court. *Id.* at 828–29.

We review National Marine Fisheries Service's denial of the emergency rulemaking petition under the standards set forth in the Administrative Procedure Act; therefore, we must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C.

11

§ 706(2)(A); *see Am. Horse Prot. Ass'n v. Lyng*, 812 F.2d 1, 4 (D.C. Cir. 1987) (holding that the appropriate standard to apply to a challenge to an agency decision on a rulemaking petition is "arbitrary and capricious" review). The district court's determination that it lacked jurisdiction to hear the challenges against the Coast Guard is a question of law, which we review *de novo*. *See Munsell v. Dep't of Agric.*, 509 F.3d 572, 578 (D.C. Cir. 2007). Finally, we review the district court's denial of appellants' motion for reconsideration for abuse of discretion. *Flynn*, 481 F.3d at 829.

## A. Emergency Rulemaking Petition

Defenders of Wildlife, The Humane Society of the United States, Ocean Conservancy, and Regina Asmutis-Silvia now appeal the district court's denial of their challenge to NMFS's denial of the petition for emergency rulemaking on the ship strike issue. Appellants claim that the district court failed to recognize that NMFS's September 2005 denial of the emergency petition was arbitrary and capricious in light of the admitted need for ship speed regulations and the agency's ESA section 7(a)(1) duty to protect right whales through its programming. We affirm the district court's grant of summary judgment on the challenge to the agency's denial of the petition.

We begin by noting that "an agency's refusal to institute rulemaking proceedings is at the high end of the range" of levels of deference we give to agency action under our "arbitrary and capricious" review. *Am. Horse Prot. Ass'n*, 812 F.2d at 4–5. Where, as here, "the proposed rule pertains to a matter of policy within the agency's expertise and discretion, the scope of review should 'perforce be a narrow one, limited to ensuring that the Commission has adequately explained the facts and policy concerns it relied on and to satisfy ourselves that those facts have some basis in the record.'" *WWHT, Inc. v. FCC*, 656 F.2d

12

807, 817 (D.C. Cir. 1981) (quoting *Natural Res. Def. Council, Inc. v. SEC*, 606 F.2d 1031, 1053 (D.C. Cir. 1979)). In other words, we look to see whether the agency employed reasoned decisionmaking in rejecting the petition. *See Am. Horse Prot. Ass'n*, 812 F.2d at 5 (quoting *Prof'l Drivers Council v. Bureau of Motor Carrier Safety*, 706 F.2d 1216, 1220 (D.C. Cir. 1983)).

In analyzing appellants' arguments, we would like to clarify the record on review. We recognize that certain events occurred after the agency's September 2005 denial of the emergency rulemaking petition that may cast doubt on the reasoning put forward in that denial. Most significant among these subsequent events (or omissions) is that—despite the issuance of a proposed ship strike rule in June 2006 (after appellants moved for summary judgment in this case), and the agency's assurance to the district court that it expected to issue a final rule in June 2007—in June 2008, no final rule has been issued. Nonetheless, we cannot take judicial notice of three years of events concerning the right whale ship strike rule about which no one, most crucially not the agency, had knowledge at the time it denied the emergency rulemaking petition in September 2005. We are bound on review to the record that was before the agency at the time it made its decision. "[W]here the agency decides not to proceed with rulemaking, the 'record' for purposes of review need only include the petition for rulemaking, comments pro and con where deemed appropriate, and the agency's explanation of its decision to reject the petition." *WWHT*, 656 F.2d at 817–18.

We are aware that we once considered testimony made before a congressional committee that was not available to the agency at the time of the action under review. *See Amoco Oil Co. v. EPA*, 501 F.2d 722 (D.C. Cir. 1974). However, this exception was made with the understanding that "[a] reviewing court must tread cautiously in considering events occurring

13

subsequent to promulgation of a rule." *Id.* at 729 n.10. We acknowledged in *Amoco Oil* that events occurring after an agency action do "not inform the agency decision-making which is the subject of review." *Id.* This reasoning remains true today. The exception made in *Amoco Oil* was quite narrow, applying to testimony by discrete individuals during a narrow window of time, and we decline to extend it to the three years of events that occurred after the agency's decision in this case.

Thus, in considering the agency's denial of the rulemaking petition, we "must examine 'the petition for rulemaking, comments pro and con . . . and the agency's explanation of its decision to reject the petition." *Am. Horse Prot. Ass'n.*, 812 F.2d at 5 (quoting *WWHT*, 656 F.2d at 817–18). The petition under review noted that since the start of 2004, the year in which NMFS published its ANPR on right whale ship strikes, eight right whales had died, four from ship strikes, and that five of those killed were adult females—"at least three of which were pregnant at the time they were killed." Emergency Rulemaking Petition, at 2. Quoting NMFS's statement that "'the loss of even one northern right whale . . . may reduce appreciably the likelihood of both survival and recovery of this species . . . [,]'" the petitioners requested "emergency regulations [that] require all ships entering and leaving all major East Coast ports to travel at speeds of 12 knots or less within 25 nautical miles of port entrances during expected right whale high use periods." *Id.* at 2–4. The petition also requested that NMFS "institute dynamic management areas to protect whales outside of the times and areas" specified by the petitioners. *Id.* at 4.

The agency denied the petition. Denial of Emergency Rulemaking Petition, 70 Fed. Reg. 56,884. The published denial noted that it was continuing its current efforts to reduce ship strikes on right whales, had held a series of public meetings on the advance notice for its proposed rule to impose vessel speed

14

restrictions in right whale-inhabited waters, and was undergoing a draft environmental impact statement on that rule. *Id.* at 56,885; *see* Notice of Intent, 70 Fed. Reg. at 36,121 (stating intent to prepare environmental impact statement). The agency's denial stated that

> [p]romulgating a separate 12-knot speed limit, at this time, would curtail full public notice, comment and environmental analysis, duplicate agency efforts and reduce agency resources for a more comprehensive strategy, as well as risk delaying implementation of the draft Strategy. Instead of imposing measures in piecemeal fashion, NMFS continues to believe that putting a comprehensive Strategy in place is the best course of long-term action.

Denial of Emergency Rulemaking Petition, 70 Fed. Reg. at 56,885. NMFS further stated that it would "implement specific regulatory measures of the comprehensive ship strike reduction strategy in the coming months." *Id.*

A separate letter to petitioners dated September 14, 2005, stated an additional reason for the agency's denial: petitioners did "not present any new information about right whales that warrants promulgating a rule on an emergency basis rather than completing the ongoing rulemaking." Letter from William T. Hogarth, Assistant Administrator, NMFS, to Jonathan R. Lovvorn, Vice President, The Humane Society of the United States, at 2 (Sept. 14, 2005). NMFS also stated that it expected to issue a draft environmental impact statement and proposed regulations "by the end of the year or early in 2006" and would "continue . . . to proceed as quickly as possible with analysis and rulemaking to implement the comprehensive ship strike strategy." *Id.* at 1, 2.

15

Although "[i]t is only in the rarest and most compelling of circumstances that this court has acted to overturn an agency judgment not to institute rulemaking," *WWHT*, 656 F.2d at 818, such circumstances do arise. In *Geller v. FCC*, 610 F.2d 973 (D.C. Cir. 1979), we reversed an agency's refusal to initiate rulemaking proceedings because an "agency cannot sidestep a reexamination of particular regulations when abnormal circumstances make that choice imperative." *Id.* at 979. We did so again in *American Horse Protection Association*, when the agency did not "present[] a reasonable explanation of [its] failure to grant the rulemaking petition," particularly in light of new evidence, and the agency's denial "strongly suggest[ed] that [it] ha[d] been blind to the nature of [its] mandate from Congress." 812 F.2d at 7.

However, this case presents no "abnormal circumstances" like those found in *Geller* when a newly enacted law removed the sole basis for the regulations at issue, but the agency refused to either terminate the regulations or show that they continued to have a basis in law. *See* 610 F.2d at 979–80. And unlike *American Horse Protection Association*, petitioners failed to present new evidence "strongly" suggesting that the agency was unaware of its congressional mandate to protect the right whales. *See* 812 F.2d at 7. To the contrary, NMFS was well aware of its mandate to protect right whales and was pursuing it by initiating a full notice-and-comment rulemaking on speed restrictions that would potentially be even lower than the ones proposed by petitioners. ANPR, 69 Fed. Reg. at 30,859 (predicting that proposed speed restrictions would "be in the range of 10–14 knots").

The explanations presented in the agency's denial represented reasoned decisionmaking. The agency's prediction that an emergency rule would detract agency resources from the promulgation of a final, comprehensive rule is based on facts

16

found in the record. At the time of the denial of the petition for emergency rulemaking, NMFS was holding public meetings on the ANPR and preparing a draft environmental impact statement on proposed vessel speed restriction measures. Letter from William T. Hogarth, Assistant Administrator, NMFS, to Jonathan R. Lovvorn, Vice President, The Humane Society of the United States, at 1 (Sept. 14, 2005). Petitioners presented no evidence to rebut the agency's prediction that an emergency rule would curtail the public's notice-and-comment period and analysis of the rule's environmental impact. The agency made a policy decision to focus its resources on a comprehensive strategy, which in light of the information before the agency at the time, was reasoned and adequately supported by the record. We will not disturb it on appeal.

### B.  Coast Guard Action

Appellants' second claim is directed against the Coast Guard and its purported omissions while engaged in the process by which it promulgates, enforces, and alters vessel routing measures that coincide with right whale habitat. Appellees first contend that appellants lack standing to raise this argument, and second, that the Coast Guard has no more than a ministerial role in the vessel routing process, giving rise to no duties regarding right whales. We will address the standing argument first, but we begin by providing a brief overview of the relevant statutory provisions.

The Ports and Waterways Safety Act requires the Coast Guard to "designate necessary fairways and traffic separation schemes" to provide safe routes for boats traveling in and out of U.S. ports and other places subject to U.S. jurisdiction. 33 U.S.C. § 1223(c)(1). Traffic separation schemes ("TSSs") are similar to the markings on paved roads—they are "aimed at the separation of opposing streams of traffic . . . by the

17

establishment of traffic lanes." 33 C.F.R. § 167.5(b). The Coast Guard's construction of "measures for controlling or supervising vessel traffic" is "[s]ubject to the requirements of section 1224," 33 U.S.C. § 1223(a)(1); *see also id.* § 1223(c)(3), which, *inter alia,* requires the Coast Guard to "take into account all relevant factors concerning . . . protection of the marine environment, . . . including but not limited to . . . environmental factors," *id.* § 1224(a)(6). Prior to designating a traffic separation scheme, the Coast Guard must, *inter alia,* (1) undertake a study, which the Coast Guard calls a port access route study ("PARS"), and publish notice of it in the Federal Register, *id.* § 1223(c)(3)(A); (2) "take into account all other uses of the area under consideration," in consultation with the Secretary of Commerce and others, *id.* § 1223(c)(3)(B); and (3) "to the extent practicable, reconcile the need for safe access routes with the needs of all other reasonable uses of the area involved," *id.* § 1223(c)(3)(C). After completing the above tasks, the Coast Guard must issue a notice of proposed rulemaking of the contemplated route, or lack thereof, in the Federal Register, and state its reasons for the decision. *Id.* § 1223(4). The Coast Guard may later adjust the location or limits of these vessel shipping routes, *id.* § 1223(5)(C), and may also make them mandatory, *id.* § 1223(5)(B).

Since the enactment of the Ports and Waterways Safety Act, the Coast Guard has established numerous traffic separation schemes, some of which coincide with right whale habitat. In recent years, the Coast Guard has undertaken several port access route studies and modified traffic separation schemes in right whale-inhabited areas. *See, e.g.,* Port Access Routes: Approaches to Portland, ME and Casco Bay, 70 Fed. Reg. 7067 (Feb. 10, 2005) (notice of PARS); Port Access Routes Study: In the Approaches to Chesapeake Bay, VA, 69 Fed. Reg. 3869 (Jan. 27, 2004) (notice of PARS results); Port Access Routes Study: In the Approaches to Narragansett Bay and Buzzards

18

Bay, Cleveland Ledge to the Race, Narragansett Bay East Passage, and the Areas Offshore of Connecticut, Rhode Island, and Massachusetts, 68 Fed. Reg. 74,199 (Dec. 23, 2003) (notice of PARS); TSS in the Approaches to Delaware Bay, 65 Fed. Reg. 12,944 (Mar. 10, 2000). There are at least six traffic separation schemes at issue in this case—namely, (1) In the Approaches to the Chesapeake Bay, (2) Off Delaware Bay, (3) Off New York, (4) In the Approaches to Narragansett Bay, R.I. and Buzzards Bay, Mass., (5) In the Approach to Boston, Mass., and (6) In the Approaches to Portland, Maine. *See Defenders of Wildlife v. Gutierrez*, 484 F. Supp. 2d 44, 55 n.9 (D.D.C. 2007) (listing the TSSs mentioned in the amended complaint).

The Endangered Species Act and the Marine Mammal Protection Act give the Coast Guard duties regarding the right whale. ESA section 7(a)(1) requires all federal agencies, "in consultation with and with the assistance of the Secretary, [to] utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species . . . ." 16 U.S.C. § 1536(a)(1). And ESA section 9 prohibits any federal agency from "tak[ing]," *id.* § 1538(a)(1)(B), meaning, *inter alia*, harassing, harming, wounding, or killing, *id.* § 1532(19), "any endangered species of fish or wildlife" "within the United States or [its] territorial sea . . . [,]" *id.* § 1538(a)(1)(B); *see id.* § 1332(13) (including federal departments, instrumentalities, and agents in its definition of "person" for ESA purposes). The Marine Mammal Protection Act also prohibits the unauthorized "take" of all marine mammals, *id.* § 1372(a), and requires the Secretary of Commerce to "prescribe such regulations as are necessary and appropriate to carry out the purposes of this subchapter," *id.* § 1382(a).

19

The statutory provision most relevant to this dispute is ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2). This provision requires "[e]ach Federal agency . . . in consultation with and with the assistance of the Secretary, [to] insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species" or its habitat, unless the agency is granted an exemption. *Id.* No party disputes that the Coast Guard did not consult with NMFS about the potential effect of any of the above-listed traffic separation schemes on the right whale. They do argue, however, about the applicability of the ESA to the Coast Guard's role in the traffic separation scheme process. First, however, we address standing. *See Allen v. Wright*, 468 U.S. 737, 756 (1984) (noting that "[c]onstitutional limits on the role of the federal courts preclude" us from judging the merits of a case in which plaintiffs fail to show standing).

## 1. Standing

Appellees argue that appellants fail to meet two of the three elements required to establish "the irreducible constitutional minimum of standing": causation and redressability. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Appellees do not contest the first element of our standing inquiry, injury-in-fact, nor, in light of precedential authority, do we question appellants' showing of this element. *See* Declarations of Regina Asmutis-Silvia, Sharon Young, Linda Bremer, and John Phillips (declaring that these individuals engage in whale watching and the studying of whales, activities that ship strike mortalities threaten); *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 n.4 (1986) (holding that plaintiffs "undoubtedly have alleged a sufficient 'injury in fact' in that the whale watching and studying of their members will be adversely affected by continued whale harvesting").

20

The second element of our standing analysis requires "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant . . . ." *Lujan*, 504 U.S. at 560 (internal quotation marks and alterations omitted). Appellees essentially argue that the chain of causation between the Coast Guard's actions and collisions between right whales and vessels is too speculative to provide standing. Appellees contend that this case is controlled by *Florida Audubon Society v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996) (*en banc*), in which we found that plaintiffs "premise[d] their claims of particularized injury and causation on a lengthy chain of conjecture." *Id.* at 666. There, plaintiffs claimed that the challenged tax credit would cause an increase in the production of a fuel additive derived from ethanol, which is made from either corn or sugar—items that would also be grown in greater quantities. *Id.* Plaintiffs claimed that an increase in production of corn and sugar would cause more agricultural pollution, which would likely increase pollution in wildlife areas bordering farms. *Id.* Plaintiffs regularly visited the wildlife areas in question and claimed they would be harmed by that pollution. *Id.* This particular chain of causation failed to meet the second element of the standing inquiry "both because of the uncertainty of several individual links and because of the number of speculative links that must hold for the chain to connect the challenged acts to the asserted particularized injury." *Id.* at 670.

Appellees argue that appellants' theory of causation depends upon this type of attenuated chain. They claim that the Coast Guard's only arguably discretionary role in promulgating the traffic separation schemes at issue was to conduct port access route studies on them, studies they argue do not alone constitute "final agency action." They contend the Coast Guard then performed purely ministerial acts, first by forwarding those studies to the Shipping Coordinating Committee in the State

21

Department, and finally after many intermediary actions—(1) review by the Shipping Coordinating Committee in the State Department, (2) development of those proposals by that committee into traffic separation scheme proposals for the Secretary of State, (3) review of the proposals by the Secretary, (4) forwarding of the proposals by the Secretary to the International Maritime Organization, and (5) adoption of the traffic separation schemes by the International Maritime Organization—the Coast Guard simply ensured that the vessel routing measures were codified in the Code of Federal Regulations. And even after adoption by the International Maritime Organization, appellees argue, no direct link exists between traffic separation schemes and right whale ship strikes because those schemes are voluntary. Appellees assert, in short, this sequence of events is too attenuated to fulfill the causation element of standing.

Appellees' argument assumes that its view on the merits of the case will prevail. But "in reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) (citing *Warth v. Seldin*, 422 U.S. 490, 502 (1975)). In *Southern California Edison Co. v. FERC*, 502 F.3d 176 (D.C. Cir. 2007), we noted that it was "sharply contested whether [the petitioner] in fact forfeited its right to recover the costs [of a construction project] if it did not provide an invoice within the twelve-month period." *Id.* at 180. FERC's contention that the petitioner forfeited its rights by not providing an invoice during the twelve-month period in question was the exact reason it contended the petitioner lacked standing. *Id.* at 179. Just as in *Southern California Edison Co.*, appellees' argument here "'is nothing more than an effort to bootstrap standing analysis to issues that are controverted on the merits.'" *Id.* at 180 (quoting

22

*Public Citizen v. FTC*, 869 F.2d 1541, 1549 (D.C. Cir. 1989)). Here, the Coast Guard's actual role in the traffic separation scheme process is "sharply contested." Appellants argue that the Coast Guard plays a much more pronounced and discretionary role in the promulgation of traffic separation schemes than appellees suggest. We assume for the purposes of standing that appellants view on the merits will prevail. *See id.* Therefore, we reject this standing argument by appellees.

Appellees also contest redressability. The redressability element of standing requires that it be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal quotation marks omitted). Appellees base their argument solely upon the premise that the Coast Guard does not have authority to recommend changes to traffic separation schemes to protect endangered and threatened species, such as the right whale, from ship strikes. Again, appellants disagree with this premise, and as a disputed proposition, we assume for the purposes of standing that appellants' view will prevail.

Appellants stress that the Coast Guard's duty under 33 U.S.C. § 1223(c)(1) to designate traffic separation schemes is subject to its duties under *id.* § 1224(a) to "take into account all relevant factors concerning . . . protection of the marine environment, . . . including but not limited to . . . environmental factors." *See id.* § 1223(a)(1) (applying the requirements of 33 U.S.C. § 1224 to the "construct[ion], maintain[ance], improve[ment], or expan[sion of] vessel traffic services," which includes "routing systems[] and fairways"); *id.* § 1223(c)(3) (specifically applying 33 U.S.C. § 1224 to the designation of traffic separation schemes). They also note that Congress reinforced the agency's authority to take into account the effects of vessel routing measures on right whales in the Coast Guard and Maritime Transportation Act of 2004, Pub. L. No. 108-293,

23

118 Stat. 1028, when it directed the agency to "cooperate with the Administrator of the National Oceanic and Atmospheric Administration in analyzing potential vessel routing measures for reducing strikes of North Atlantic Right Whales . . . ." 118 Stat. 1065–66. Assuming appellants' view on the merits will prevail, the Coast Guard has authority to take into account right whales when promulgating traffic separation schemes; thus, an order from the district court could redress appellants' injury, at least in part. *See Meese v. Keene*, 481 U.S. 465, 476 (1987) (requiring only partial redressability). Therefore, we may proceed to the merits of appellants' claim.

## 2. Merits

Appellants challenge the Coast Guard's actions regarding the traffic separation scheme process as violations of ESA sections 7(a)(1), 7(a)(2), and 9. 16 U.S.C. §§ 1536(a)(1), (a)(2), 1538. The district court dismissed this challenge, concluding that the International Maritime Organization, a multinational body, adopted the traffic separation schemes at issue, not the Coast Guard. *Defenders of Wildlife*, 484 F. Supp. 2d at 55. Because the district court held that there was no final agency action, the court concluded that it lacked jurisdiction to consider appellants' claims against the Coast Guard. *Id.* at 55–56.

The parties dispute whether "agency action" or "*final* agency action" is required in order to bring suit under the citizen-suit provision of the ESA, 16 U.S.C. § 1540(g), based on a violation of ESA section 7(a)(2)'s consultation requirement. Appellants extract a simple "agency action" requirement from the text of ESA section 7(a)(2), which speaks only to "agency action." 16 U.S.C. § 1536(a)(2) ("Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is

24

not likely to jeopardize the continued existence" of endangered species or their habitats.). Appellees argue that the "final agency action" requirement in the second clause of the Administrative Procedure Act should be read into ESA section 7(a)(2). *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."). We find it unnecessary to resolve this issue because we hold that appellants are challenging final agency action by the Coast Guard.

As they did in their standing arguments, appellees characterize the traffic separation scheme process as one controlled by an international organization with the State Department acting as an intermediary between the international body and the Coast Guard, leaving the Coast Guard with a minor and purely ministerial role. However, the record shows quite a different role for the Coast Guard in this process. Most significantly, the Coast Guard is the sole body charged with the duty of promulgating traffic separation schemes. 33 U.S.C. § 1223(c)(1); *see* 33 C.F.R. § 1.05-1. Appellees point to no congressional authorization permitting the State Department to promulgate traffic separation schemes. Nor can they point to any provision that gives the International Maritime Organization, which was created as a "consultative and advisory" body, Convention on the Intergovernmental Maritime Consultative Organization, art. 2, Mar. 6, 1948, 9 U.S.T. 621, T.I.A.S. 4004, authority to promulgate regulations in U.S. waters. Treaties "are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be self-executing and is ratified on these terms." *Medellin v. Texas*, 128 S. Ct. 1346, 1356 (2008) (internal quotation marks omitted). Appellees do not contend that Congress has enacted implementing statutes for the treaty at issue, International Convention for the Safety of Life at Sea

25

("SOLAS"), Nov. 1, 1974, 32 U.S.T. 47, T.I.A.S. 9700, or that the treaty is self-executing. In fact, the treaty relies on member nations to enforce its routing measures: "Contracting Governments will use their influence to secure the appropriate use of adopted routes and will do everything in their power to ensure adherence to the measures adopted by the Organization in conne[ct]ion with rout[]ing of ships." SOLAS, ch. 5, reg. 8(d).

By giving the Coast Guard authority to promulgate traffic separation schemes, Congress intended to make the Coast Guard accountable for them. *See* 33 U.S.C. § 1223(c)(1). Were we to hold that the Coast Guard had delegated its duties under the Ports and Waterways Safety Act to the International Maritime Organization, and that this delegation relieved the Coast Guard of any responsibility for the final action, we would countermine this intent. Such an outcome would also undermine several other statutes that Congress enacted to give parties the ability to challenge unlawful agency action. A party harmed by the Coast Guard's failure to take into account "the safety and security of United States ports and waterways," 33 U.S.C. § 1224(a), or the "economic impact and effects," *id.* § 1224(a)(7), of traffic separation schemes would normally have recourse under the citizen-suit provision of the Endangered Species Act, 16 U.S.C. § 1540(g), or the Administrative Procedure Act. But if the Coast Guard delegates its responsibility for traffic separation schemes to the International Maritime Organization, and if we accept this delegation as relieving the Coast Guard of any responsibility for them, no such recourse is available. The International Maritime Organization is not subject to the Administrative Procedure Act or the ESA. As we noted in *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004), "when an agency delegates power to outside parties, lines of accountability may blur, undermining an important democratic check on government decision-making." *Id.* at 565. Appellees

26

point to no evidence showing that Congress intended to undermine the ability of injured parties to challenge unlawful agency action in the promulgation of traffic separation schemes. Just as the President cannot "unilaterally convert[] a non-self-executing treaty into a self-executing one," *Medellin*, 128 S. Ct. at 1368, the Coast Guard cannot convert the SOLAS treaty into domestic law by simply delegating its congressionally given authority under the Ports and Waterways Safety Act to the International Maritime Organization.

Even if the Coast Guard had delegated some or all of its decisionmaking authority under the Ports and Waterways Safety Act to an outside body not subordinate to it, such as the International Maritime Organization, the delegation would be unlawful absent affirmative evidence that Congress intended the delegation. "[W]hile federal agency officials may subdelegate their decision-making authority to subordinates absent evidence of contrary congressional intent, they may not subdelegate to outside entities—private or sovereign—absent affirmative evidence of authority to do so." *U.S. Telecom*, 359 F.3d at 566. Appellees do not argue that affirmative evidence of congressional intent to subdelegate the Coast Guard's decisionmaking authority to an outside party exists.

The simple fact that an agency possesses statutory authority is not a basis for finding final agency action if no evidence exists that the agency used it. However, appellants have presented evidence of final agency action in this case. The Coast Guard has conducted port access route studies, *see, e.g.*, Port Access Routes: Approaches to Portland, ME and Casco Bay, 70 Fed. Reg. 7067 (Feb. 10, 2005), published notice of port access route study results, *see* Port Access Routes: Approaches to Delaware Bay, 60 Fed. Reg. 49,237 (Sept. 22, 1995), accepted comments on a proposed route, *see* TSS in the Approaches to Delaware Bay, 65 Fed. Reg. 12,944 (Mar. 10, 2000), and ensured that

Case 1:05-cv-02191-PLF    Document 60-2    Filed 09/12/2008    Page 27 of 28

traffic separation schemes appear in the Code of Federal Regulations, *see, e.g.*, 33 C.F.R. § 167.170 (traffic separation scheme for the approach to the waters off Delaware Bay). These tasks are not merely ministerial; they require a significant amount of discretion.   In promulgating traffic separation schemes, the Coast Guard must

> (a) take into account all relevant factors concerning navigation and vessel safety, protection of the marine environment, and the safety and security of United States ports and waterways, including but not limited to—(1) the scope and degree of the risk or hazard involved; (2) vessel traffic characteristics and trends . . . ; (3) port and waterway configurations and variations in local conditions of geography, climate, and other similar factors; (4) the need for granting exemptions for the installation and use of equipment or devices for use with vessel traffic services for certain classes of small vessels . . . ; (5) the proximity of fishing grounds, oil and gas drilling and production operations, or any other potential or actual conflicting activity; (6) environmental factors; (7) economic impact and effects; (8) existing vessel traffic services; and (9) local practices and customs, including voluntary arrangements and agreements within the maritime community; and (b) at the earliest possible time, consult with and receive and consider the views of representatives of the maritime community, ports and harbor authorities or associations, environmental groups, and other parties who may be affected by the proposed actions.

33 U.S.C. § 1224.  The Coast Guard accepts and responds to public comment on all the above issues prior to codifying a traffic separation scheme in the Code of Federal Regulations. *See, e.g.*, Traffic Separation Scheme in the Approaches to

28

Delaware Bay, 62 Fed. Reg. 25,576, 25,577 (May 9, 1997) (stating, in the notice of proposed rulemaking, that changes may result from the notice-and-comment period). Accordingly, appellants have demonstrated final agency action, and the district court erred in granting summary judgment to appellees based on its conclusion that it lacked subject matter jurisdiction.

Because we reverse the district court's holding on the "agency action" issue and remand the case to that court to reconsider the cross motions for summary judgment in light of our holding, it is unnecessary to decide whether the district court abused its discretion in denying appellants' motion to reconsider its judgment on that issue.

### III. Conclusion

We affirm the district court's denial of appellants' challenge to NMFS's denial of the emergency rulemaking petition and reverse the district court's grant of summary judgment to appellees on the Coast Guard issue. We remand this case to the district court.



NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT
SEP 1 2 2008
RECEIVED